**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**ALBANY DIVISION**

| | |
|---|---|
| **STATE OF WEST VIRGINIA, STATE OF ALABAMA, STATE OF ARKANSAS, STATE OF GEORGIA, STATE OF IDAHO, STATE OF IOWA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF NORTH DAKOTA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF UTAH, STATE OF WYOMING, WEST VIRGINIA COAL ASSOCIATION, GAS AND OIL ASSOCIATION OF WEST VIRGINIA, INC., AMERICA'S COAL ASSOCIATIONS,** and **ALPHA METALLURGICAL RESOURCES, INC.,** | Civil Action No. 1:25-cv-168 (BKS/DJS) _____ |
| *Plaintiffs,* | |
| v. | |
| **LETITIA JAMES**, in her official capacity as the Attorney General of New York, **SEAN MAHAR**, in his official capacity as Interim Commissioner of the New York State Department of Environmental Conservation, and **AMANDA HILLER**, in her official capacity as the Acting Tax Commissioner of the New York State Department of Taxation and Finance, | |
| *Defendants.* | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs State of West Virginia, State of Alabama, State of Arkansas, State of Georgia, State of Idaho, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, State of Wyoming, West Virginia Coal Association, Gas and Oil Association of West Virginia, Inc., America's Coal Associations, and Alpha Metallurgical Resources, Inc. bring this civil action against Defendants for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1.     The State of New York believes it can seize control over the makeup of America's energy industry.  In an unprecedented effort, New York has set out to impose tens of billions of dollars of liability on traditional energy producers disfavored by certain New York politicians.  These energy producers needn't operate in New York before becoming a target.  And New York consumers won't bear the brunt of these crushing new costs once they're imposed.  Rather, New York intends to wring funds from producers and consumers in *other* States to subsidize certain New-York-based "infrastructure" projects, such as a new sewer system in New York City.

2.     The Climate Change Superfund Act is an ugly example of the chaos that can result when States overreach.  It imposes retroactive fines on traditional energy producers for their purported *past* contributions to greenhouse gas emissions (a term new York applies to certain substances, N.Y. ENV'T CONSERV. LAW § 75-0101(7)), which were lawful

2

operations endorsed by both federal and state regulators. And rather than focusing on greenhouse-gas emissions released in New York, the Act punishes a small group of energy producers for global greenhouse gases emitted from *all* sources into the atmosphere from 2000 to 2018. Yet coal, oil, and natural gas were helping New York during that time. They helped keep the lights on in Albany, manufacture the steel that supported New York City's iconic skyscrapers, and fuel the industry that keeps New York ports humming.

3.    This liability could be devastating to traditional energy producers. Indeed, the ruinous liability that the Act promises—especially when paired with similar efforts that might arise in other States—could force coal, oil, and natural gas producers to shutter altogether.

4.    Unfortunately for New York, the U.S. Constitution has something to say about the State's retroactive and extraterritorial shakedown. Among other things, the Constitution gives Congress the power "[t]o regulate commerce ... among the several states." U.S. CONST. art. I, § 8, cl. 3. In creating that grant, the Founders recognized that certain categories of conduct are best regulated through nationwide rules. And the Commerce Clause implies the converse as well: a patchwork of state-by-state regulations on some subjects subverts the States' common interest and must be prohibited.

5.    Congress exercised its Commerce Clause power in this context by enacting the Clean Air Act. The Act regulates certain sources' emission of pollutants into the air in a variety of ways. For instance, the Clean Air Act empowers the Environmental Protection Agency to address greenhouse emissions from fossil-fuel-fired energy facilities through New Source Performance Standards. And EPA imposes procedures for new or

3

substantially modified facilities to use the best available control technology for greenhouse gas emissions. So while States have "the primary responsibility" to prevent and control "air pollution … *at its source*," 42 U.S.C. § 7401(a)(3) (emphasis added), the Clean Air Act gives the federal government the chief role in determining interstate emissions standards.

6.     And that choice makes sense. Emissions standards that vary from one State to another would divide the States and counter the goal of promoting interstate trade that helped unite the States under one constitution. So for that reason, decisions about "[t]he basic and consequential tradeoffs involved" in deciding how much fossil-fuel generation there should be in the "coming decades" rest with Congress (and, subject to an appropriate delegation, federal executive agencies). *West Virginia v. EPA*, 597 U.S. 697, 729-30 (2022). Even so, New York has purported to take that task on for itself through the levies in the Act.

7.     The Commerce Clause not only vests Congress with the power to regulate interstate trade, but it also "contain[s] a further, negative command" that effectively forbids the enforcement of "certain state [economic regulations] even when Congress has failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). New York cannot ignore the Commerce Clause and impose rules that fall within the Clause's negative implications. And for that matter, New York cannot "legislate for, or impose its own policy upon[,] the other" States. *Kansas v. Colorado*, 206 U.S. 46, 95 (1907). Yet the Climate Change Superfund Act looks exactly like the "state tariffs" that constituted "one of the chief evils that led to the adoption of the Constitution" and the Commerce Clause. *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015).

8.    The Commerce Clause is hardly the only problem with the Climate Change Superfund Act.  Quite the opposite: the Act violates the U.S. Constitution, the New York Constitution, and federal law for several reasons.

9.    *First*, the inherent structure of the U.S. Constitution precludes the Act.  The Supreme Court has already recognized that States must tread carefully when regulating interstate emissions at all, at least outside the context of a cooperative federalism scheme imposed by Congress.  Interstate disputes over air and water resources "demand[]" federal resolution. *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 & n.6 (1972) ("*Milwaukee I*").  If States were instead free to exercise "independent and plenary regulatory authority" over the same emissions—as New York purports to do here—the result would be "chao[s]," including "confrontation between sovereign states," "impossible to predict [] standard[s]," and a wholly "irrational system of regulation." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496 (1987).  Such dangerous outcomes are just over the horizon if the Climate Change Superfund Act is allowed to stand.

10.    The Constitution also recognizes the "equal sovereignty" afforded to all States. *Shelby County v. Holder*, 570 U.S. 529, 544 (2013).  "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996).  And "[o]ur system of government … imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Zschernig v. Miller*, 389 U.S. 429, 442-43 (1968).  Yet the Act imposes significant penalties on energy producers for harms

5

allegedly caused by greenhouse gas emissions beyond New York—including emissions from abroad. It shows no regard for equal sovereignty and no awareness of the complications that could arise from direct state involvement in this international problem. The Constitution forbids that extraterritorial effort.

11.     *Second*, the Clean Air Act preempts the Climate Change Superfund Act. State laws preempted by a federal statute may not be enforced under the Supremacy Clause. And the Second Circuit has found that the Clean Air Act leaves only a "slim reservoir" of state authority to regulate greenhouse gas emissions outside of the Clean Air Act's regulatory scheme: The Clean Air Act "permit[s] only state lawsuits brought under the law of the pollution's source state." *City of New York v. Chevron Corp.*, 993 F.3d 81, 100 (2d Cir. 2021) (cleaned up). New York's Act authorizes the State to levy billions of dollars in fines for greenhouse gas emissions from sources *beyond* New York's borders. That's outside the "slim reservoir" the Clean Air Act left to the States.

12.     *Third*, the Act violates the domestic and foreign Commerce Clauses. By targeting and discriminating against large energy companies located outside of New York, the Act imposes significant barriers to interstate and international trade. Billions of dollars in fines will negatively impact energy production and drive-up energy costs in other States, especially those States that rely heavily on the fossil-fuel-related energy sector, such as West Virginia. And here again, the Act harms the United States' foreign policy by creating contradictory domestic regulatory stances on greenhouse gas emissions.

13.     *Fourth*, the Act violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article One, Section 6 of the New York

Constitution. The Due Process Clause protects citizens from "arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). In serving this principle, the Due Process Clause demands that state law shall not be "unreasonable" or "arbitrary" and it must serve a "real and substantial relation to the object sought to be attained." *Nebbia v. New York*, 291 U.S. 502, 525 (1934). Here, the Act violates these protections because it imposes a harsh, retroactive penalty against a select few energy producers who lawfully extracted and refined fossil fuels. And it imposes this fine in an unfair and flawed with insufficient procedural safeguards.

14. *Fifth*, the Act violates the Equal Protection Clause of the Fourteenth Amendment. In operation and effect, the Climate Change Superfund Act aims to protect New York energy producers while harming out-of-state ones. According to the U.S. Energy Information Administration, "New York is consistently among the nation's top producers of hydroelectricity." *New York: State Profile and Energy Estimates*, U.S. ENERGY INFO. ADMIN. (Jan. 16, 2025), http://bit.ly/4jMdht2. It also pursues nuclear, solar, and wind energy production. In contrast, producers targeted by the Climate Change Superfund Act—oil, natural gas, and coal—are almost non-existent in New York. The State has no significant proved petroleum reserves, has few natural gas reserves, and has no coal mines or economically viable coal reserves. Thus, the Climate Change Superfund Act "aim[s] to promote domestic industry" in a "purely and completely discriminatory" way, which "constitutes the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 878 (1985); *see*, *e.g.*, N.Y. Assemb. A03351-B. Reg. Sess. Transcript (June 7, 2024) (statement of Jeffrey

7

Dinowitz, Assemblyman), https://tinyurl.com/2mk5pbtx (bill sponsor expressing hope that the bill would force producers to "put the money where it should go," that is, into solar technologies).

15.  *Sixth*, the Act imposes an excessive fine in violation of the Eighth Amendment to the U.S. Constitution.  The Constitution prohibits the government from imposing excessive fines as a form of punishment.  *See, e.g.*, *Austin v. United States*, 509 U.S. 602, 609-10 (1993).  But the Act does that by punishing covered energy producers for their purported role in greenhouse gas emissions and their impacts on climate change in New York.  And the amount of the penalty is unconstitutionally excessive—subjecting energy producers to hundreds of millions or even billions of dollars in penalties for greenhouse gas emitted over 18 years.

16.  *Seventh*, the Act is an unconstitutional taking in violation of the Fifth Amendment to the U.S. Constitution and Article I, Section 7 of the New York Constitution. A regulatory taking occurs when the government goes "too far" in restricting a landowner's ability to use his own property.  *74 Pinehurst LLC v. New York*, 59 F.4th 557, 564 (2d Cir. 2023).  The Act's retroactive penalties impose substantial economic impact on covered energy producers and significantly interfere with those producers' investment-backed expectations.

17.  Plaintiffs thus file this action to vindicate the interests of States, consumers, producers, and employers who will be directly harmed if the Climate Change Superfund Act is allowed to stand.  The Court should enjoin Defendants from enforcing the Act and declare it unlawful.

## PARTIES

### Plaintiffs

18.    Plaintiff State of West Virginia is a sovereign State of the United States of America.  West Virginia is one of America's leading energy-producing States, ranking fifth among all States in total energy production based on the most recent data.  Among other things, the State is the second largest coal producer, fifth largest natural gas producer, and fourteenth largest crude oil producer.  West Virginia seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.  John B. McCuskey is the Attorney General of West Virginia.  He is authorized to bring legal actions on behalf of the State of West Virginia and its citizens.

19.    Plaintiff State of Alabama is a sovereign State of the United States of America. Alabama is an energy-rich State with deposits of coal, crude oil, and natural gas. Mining and extraction are major economic drivers.  Alabama is also a heavy consumer of traditional energy because some of its major industries, such as the automotive manufacturing and forestry product sectors, are particularly energy intensive.  The State generates revenue from the production and use of traditional fuels, such as gasoline. Alabama seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.  Steve Marshall is the Attorney General of Alabama and is authorized to conduct litigation on behalf of the State and its citizens.

20.    Plaintiff State of Arkansas is a sovereign State of the United States of America.  Arkansas brings this suit through its attorney general, Tim Griffin.  General

Griffin is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts."  Ark. Code § 25-16-703.

21.    Plaintiff State of Georgia is a sovereign State of the United States of America. Christopher M. Carr is the Attorney General of Georgia.  He is authorized to bring legal actions on behalf of the State of Georgia and its citizens.

22.    Plaintiff State of Idaho is a sovereign State of the United States of America. Raúl R. Labrador is the Attorney General of Idaho.  He is authorized to bring legal actions on behalf of the State of Idaho and its citizens.

23.    Plaintiff Iowa is a sovereign State of the United States of America.  Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.  Iowa brings this suit through its attorney general, Brenna Bird.  She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.

24.    Plaintiff State of Kansas is a sovereign State of the United States of America. Kris W. Kobach is the Attorney General of Kansas.  He is authorized to bring legal actions on behalf of the State of Kansas and its citizens.  *See* Kan. Stat. Ann. Sec. 75-702.

25.    Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky is one of America's leading energy-producing States, ranked number five in coal production with some 5% of the nation's output according to the most recent data.  Among all sources Kentucky produced 2390.8 trillion BTUs of energy in 2022. Kentucky seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Russell M. Coleman is the duly elected Attorney General of Kentucky.  He has constitutional, statutory, and common-law authority to bring suit on behalf of the

10

Commonwealth and its citizens.  *See* Ky. Rev. Stat. § 15.020; *see also Commonwealth ex rel. Beshear v. Commonwealth ex rel. Bevin*, 498 S.W.3d 355, 362–65 (Ky. 2016).

26.    Plaintiff State of Louisiana is a sovereign State of the United States of America.  Elizabeth B. Murrill is the Attorney General of the State of Louisiana.  She is authorized by Louisiana law to sue on the State's behalf.  *See* La. Const. art. IV, § 8.  Her offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

27.    Plaintiff State of Mississippi is a sovereign State of the United States of America. Lynn Fitch is the Attorney General of Mississippi. She is authorized to bring legal actions on behalf of the State of Mississippi and its citizens.

28.    Plaintiff State of Missouri is a sovereign State of the United States of America.  Andrew Bailey is the Attorney General of Missouri.  He is authorized to bring legal actions on behalf of the State of Missouri and its citizens.  Plaintiff Missouri, its political subdivisions, and its citizens are harmed by Defendants' actions.  Coal provides two-thirds of Missouri's electricity output, the fourth highest of any State.  Missouri is also a net energy consumer and is greatly harmed by increases in energy prices.

29.    Plaintiff State of Montana is a sovereign State of the United States of America.  Montana is an energy-producing state, rich in fossil fuels.  Montana ranks 12th in oil production and 20th in natural gas production nationally.  Montana is the sixth-largest coal producing state.  Montana seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.  Austin Knudsen is the Attorney General of Montana.  He is authorized to bring legal actions on behalf of the State of Montana and its citizens.

30.    Plaintiff State of Nebraska is a sovereign State of the United States of America.  Michael T. Hilgers is the Attorney General of Nebraska.  He is authorized to bring legal actions on behalf of the State of Nebraska and its citizens.

31.    Plaintiff State of North Dakota is a sovereign State of the United States of America.  North Dakota is an energy-producing powerhouse and obtains a large share of its tax revenue directly and indirectly from the development of natural resources.  Among other sources of energy production, North Dakota is ranked third among the States in crude oil production, seventh among the States in coal production (first in lignite coal production), and ninth among the States in natural gas production.  Drew Wrigley is the Attorney General of North Dakota and is authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state."  N.D.C.C. § 54-12-01(2).

32.    Plaintiff State of Ohio is a sovereign State of the United States of America. Ohio is one of America's leading energy-producing States, ranking eighth among all States in total electricity production as of 2023. Among other things, Ohio also had the fourth-largest electricity sales in the nation, and was the largest oil producing-state east of the Mississippi River.  Ohio seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.  Dave Yost is the Attorney General of Ohio.  He is authorized to bring legal actions on behalf of the State of Ohio and its citizens.

33.    Plaintiff State of Oklahoma is a sovereign State of the United States of America.  Oklahoma sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.  Oklahoma brings this suit by and through its Attorney General, Gentner Drummond, who is authorized by Oklahoma law to sue on Oklahoma's behalf.  *See*

Okla. Stat. tit. 74, § 18b(A)(2)-(3).  His offices are located at 313 Northeast 21st Street, Oklahoma City, Oklahoma, 73105.

34.    Plaintiff State of South Carolina is a sovereign State of the United States of America.  Alan Wilson is the Attorney General of South Carolina.  He is authorized to bring legal actions on behalf of the State of South Carolina and its citizens.

35.    Plaintiff State of South Dakota is a sovereign State of the United States of America.  Marty Jackley is the Attorney General of South Dakota.  He is authorized to bring legal actions on behalf of the State of South Dakota and its citizens.

36.    Plaintiff the State of Tennessee is a sovereign State of the United States of America.  Tennessee is home to a leading coal-production company, among other members of the energy protection industry, and sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.   Jonathan Skrmetti, the Attorney General and Reporter of Tennessee, is authorized by statute to try and direct "all civil litigated matters … in which the state … may be interested."  Tenn. Code Ann. § 8-6-109(b)(1).

37.    Plaintiff State of Texas is a sovereign State of the United States of America.  Texas brings this suit through its attorney general Ken Paxton.  He is the chief legal officer of the State of Texas and has the authority to represent Texas in civil litigation.  *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2011).

38.    Plaintiff State of Utah is a sovereign State of the United States of America and a significant contributor to energy production.  According to recent data, Utah is the fourteenth largest coal producer, thirteenth largest natural gas producer, and ninth largest crude oil producer.  Similar to West Virginia, Utah seeks to vindicate its sovereign, quasi-

sovereign, financial, and proprietary interests. Derek E. Brown is the Attorney General of
Utah. He is authorized to bring legal actions on behalf of the State of Utah and its citizens.

39.     Plaintiff State of Wyoming is a sovereign State of the United States of
America. Wyoming is one of America's leading energy-producing States, ranking fourth in
total energy production based on the most recent data. Wyoming is the largest coal
producing state in the United States and holds about one-third of U.S. recoverable coal
reserves at producing mines. Wyoming is also the seventh-largest crude oil producer and
ranks among the top ten states in both natural gas reserves and marketed natural gas
production. Wyoming seeks to vindicate its sovereign, quasi-sovereign, financial, and
proprietary interests, including its interest in protecting its citizens. Bridget Hill is the
Attorney General of Wyoming. She is authorized to bring legal actions on behalf of the
State of Wyoming and its citizens.

40.     Plaintiffs West Virginia Coal Association ("WVCA") is a non-profit trade
association representing the interests of companies engaged in the mining of coal within
the State of West Virginia. WVCA's producing membership accounts for most of West
Virginia's underground and surface coal production of both thermal and metallurgical coal.
WVCA also represents hundreds of associate members that supply an array of services to
the mining industry, including permitting, environmental, and engineering consulting
firms; mining equipment manufacturers; coal transportation companies; coal consumers
and land and mineral holding companies. WVCA's primary goal is to enhance the viability
of West Virginia coal as a source of domestic fuel by facilitating environmentally responsible

coal mining through reasonable, equitable, and achievable state and federal policy and regulation.

41.    Plaintiff Gas and Oil Association of West Virginia, Inc. is a non-profit corporation working to promote and protect all aspects of the oil and natural gas industry in West Virginia. GO-WV supports and advocates for its 500 member companies and their thousands of employees, as they contribute to the growth and prosperity of West Virginia by safely providing reliable clean energy to meet the needs of our state and our nation.

42.    Plaintiff America's Coal Associations ("ACA") is an organization comprised state coal industry trade associations and coal advocacy groups working together to inform and educate Americans about the coal industry and its vital role in the country's energy and economic security. ACA also advocates for coal and coal-fired electric utilities across the country. ACA develops strategies on national coal policies and regulations impacting the coal industry and voices its position to Congress and other political leaders.

43.    The ACA's member-associations[1] represent entities that produce coal in the States responsible for the vast majority of U.S. coal production. Thus, the entities represented by ACA's members will be adversely impacted by the Climate Change Superfund Act's unlawful attempt to levy billions of dollars in fines against all fossil fuel

---

[1] ACA's members include the following non-profit associations: the Rocky Mountain Mining Institute ("RMMI"); the Kentucky Coal Association ("KCA"); the Illinois Coal Association ("ICA"); Indiana-based Reliable Energy, Inc. ("REI"); the Montana Coal Council ("MCC"); the Ohio Coal Association ("OCA"); the Pennsylvania Coal Alliance ("PCA"); the Texas Mining and Reclamation Association ("TMRA"); the Utah Mining Association ("UMA"); the West Virginia Coal Association ("WVCA"); American Coal Council; Energy Policy Network; Tennessee Mining Association; Women's Mining Coalition; and Wyoming Mining Association ("WMA").

producers who satisfy the act's arbitrary jurisdictional nexus. Together, the members of ACA represent most of the nation's production of thermal and metallurgical coal from both underground and surface mines. The coal producing states represented by the ACA account for 136,000 jobs, $10.6 billion in wages and $2.3 billion in state and local tax revenues and total national economic impact of roughly $43.5 billion. Thermal coal-fired electric generating power plants that located in these states and across the country provide an additional $261 billion in economic activity and 381,000 jobs. The American iron and steel industry, which depends on metallurgical coal produced in these States, accounts for another 547,000 jobs and $186 billion in economic activity.

44.    Plaintiff Alpha Metallurgical Resources, Inc. ("Alpha Metallurgical Resources" or "Alpha") is a Tennessee-based mining company. By and through its subsidiaries (collectively with Alpha Metallurgical Resources, "Alpha"), Alpha operates coal mines in both West Virginia, where it operates four surface and twelve underground mines, and Virginia, where it operates two surface and three underground mines. Alpha's mission is to create long-term value for its stakeholders by mining metallurgical coal with a primary focus on safety, environmental stewardship, and efficiency. Alpha, which produced over 16 million short tons of coal in 2023, is one of the largest coal producers in the United States, but it maintains no operations in the State of New York.

## Defendants

45.    Defendant Letitia James is the Attorney General of New York. Defendant James is responsible for administering and enforcing New York's Climate Change

16

Superfund Act as well as issuing implementing regulations.  Defendant James is sued in her official capacity.

46.    Defendant Sean Mahar is the Interim Commissioner of the New York State Department of Environmental Conservation.    Defendant Mahar is responsible for administering the Climate Change Superfund Act, including issuing cost recovery demands under the Act to covered energy producers.  Defendant Mahar is sued in his official capacity.

47.    Defendant Amanda Hiller is the Acting Tax Commissioner of the New York State Department of Taxation and Finance.    Defendant Hiller is responsible for administering the "climate change adaption fund," which includes collecting and depositing funds received pursuant to the Act.  Defendant Hiller is also responsible for issuing funds for qualifying expenditures under the "climate change adaption cost recovery program." Defendant Hiller is sued in her official capacity.

## JURISDICTION AND VENUE

48.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this case presents federal questions under the Constitution and laws of the United States.

49.    The Court has authority to award relief against Defendants under 42 U.S.C. § 1983.  *See Am. Auto. Mfrs. Ass'n v. Cahill*, 53 F. Supp. 2d 174, 185 (N.D.N.Y. 1999).  The Court also has equity jurisdiction under *Ex Parte Young*, 209 U.S. 123 (1908), may award injunctive relief under 28 U.S.C. § 1651, and can award declaratory relief under 28 U.S.C. § 2201(a).

50.    Venue in this Court is proper under 28 U.S.C. § 1391(b) because Defendants maintain offices and conduct their business in the Northern District of New York.  *See Smolen v. Brauer*, 177 F. Supp. 3d 797, 801 (W.D.N.Y. 2016) ("For the purposes of venue, state officers 'reside' in the district where they perform their official duties.").

51.    This Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2022, and its inherent equitable powers.

## STANDING

52.    Plaintiff States have standing to sue in their sovereign and quasi-sovereign capacities.

53.    Plaintiff States are injured by Defendants' attempts to use their law to impose billions of dollars in fines on traditional energy companies for actions conducted by Plaintiff States and their residents within Plaintiff States' borders.  Doing so interferes "with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989).

54.    The Act is a form of regulation.  "State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute." *BMW*, 517 U.S. at 572 n.17.  The "obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)).  By applying their law extraterritorially, Defendants have offended equal sovereignty.

55. Each Plaintiff State likewise has an "interest in not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607 (1982). A State is denied that equal right when another State tries to exercise jurisdiction over it, its interests, and its citizens in violation of federal law. As further explained below, the Climate Change Superfund Act does exactly that here.

56. Plaintiff States also have standing as sovereigns based on their impending loss of tax revenue if the sale of certain energy products in their States is diminished. *Wyoming v. Oklahoma,* 502 U.S. 437, 447 (1992); *see also Dep't of Com. v. New* York, 588 U.S. 752, 767 (2019) (indirect loss of funding suffices for standing). Many Plaintiff States, including West Virginia, derive substantial revenue from severance taxes and other special taxes derived from the energy production that the New York law targets.

57. "Jurisdiction is also supported by the States' interest as *parens patriae.*" *Maryland v. Louisiana,* 451 U.S. 725, 737 (1981). A State may act as the "representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way." *Id.*

58. Here, Plaintiff States have an "interest in protecting [their] citizens from substantial economic injury presented by" the Act's attempt to regulate nationwide energy policy. *Id.* at 739. In addition, considering coal, oil, and natural gas's central roles in producing key industrial products (including petrochemicals and steel), the Act threatens to upend vast swathes of Plaintiff States' economies even beyond the energy sector. Even when "no question of boundary is involved, nor of direct property rights belonging to the complainant state[s], … it must surely be conceded that if the health and comfort of the

19

inhabitants of a state are threatened"—and here, as well, their constitutional rights—"the state is the proper party to represent and defend them." *Kansas,* 185 U.S. at 141-42; *see also Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 338 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (finding *parens patriae* standing where State's "quasi-sovereign interests involve[ed] … concern for the health and well-being—both physical and economic—of [their] residents in general" (cleaned up)); *Georgia v. Pa. R. Co.*, 324 U.S. 439, 447 (1945) ("The rights which Georgia asserts, parens patriae, are those arising from an … scheme, it is said, has injured the economy of Georgia.").

59.    Plaintiff States also have standing as purchasers of energy. States purchase massive quantities of energy in performing their sovereign duties. The Act will make energy less affordable and less available, *see City of New York*, 993 F.3d at 93, harming Plaintiff States' ability to exercise their sovereign functions. *See Maryland*, 451 U.S. at 737 ("It is clear that the plaintiff States, as major purchasers of natural gas whose cost has increased as a direct result of Louisiana's imposition of the First-Use Tax, are directly affected in a 'substantial and real' way so as to justify their exercise of this Court's original jurisdiction."); *Orangeburg v. FERC,* 862 F.3d 1071, 1074 (D.C. Cir. 2017) ("[T]he city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power).").

60.    Plaintiff States' standing is confirmed by *Pennsylvania v. West Virginia*, in which the Supreme Court exercised original jurisdiction to stop constraints imposed by West Virginia on the commercial flow of natural gas to neighboring states. 262 U.S. 553 (1923). The Court recognized Pennsylvania's standing both "as the proprietor of various

public institutions and schools" that use gas for fuel and "as the representative of the consuming public whose supply will be similarly affected." *Id.* at 591.

61.    Likewise, in *Maryland v. Louisiana,* the Supreme Court held that Maryland and other States had standing to sue Louisiana over its tax on pipeline companies, as the plaintiff States asserted "substantial and serious injury to their proprietary interests as consumers of natural gas as a direct result of the allegedly unconstitutional actions of Louisiana." 451 U.S. at 739. The plaintiff States there also had an "interest in protecting [their] citizens from substantial economic injury presented by imposition of the [tax]." *Id.*

62.    As in each of these prior cases, Plaintiff West Virginia, its political subdivisions, and its citizens are harmed by the Act and Defendants' actions. The country runs on West Virginia energy. In 2021, for instance, West Virginia was the 5th highest producer of total energy in the United States. *State Profile and Energy Estimates: West Virginia*, U.S. ENERGY INFO. ADMIN., https://tinyurl.com/2yubrfet (last updated Jan. 18, 2024). Coal and natural gas make up the bulk of that production. *Id.* In other words, West Virginia is both a substantial producer and consumer of the energy sources that the Act means to target.

63.    The Bureau of Economic Analysis reports that in 2023, employees in West Virginia working in oil and gas extraction received over $271 million in compensation, and employees in pipeline transportation received over $170 million. *SAGDP4N Compensation of Employees*, U.S. BUREAU OF ECON. ANALYSIS, https://tinyurl.com/ddsp67h. These revenue streams would be threatened by the ruinous liability of the Act; substantial economic injury is imminent.

64.    In Fiscal Year 2022, West Virginia received close to $700 million in tax revenue from the State severance tax on coal and natural gas.  *Severance Taxes*, W.V. TAX DIV. at 3, https://tinyurl.com/zvamv8cj (last visited Jan. 14, 2025).  Here again, this important source will be diminished by lowered production resulting from the levies in the Climate Change Superfund Act.

65.    West Virginia is but one of many States that the Climate Change Superfund Act injures.

66.    For instance, Plaintiff State of Montana, its political subdivisions, and its citizens are similarly harmed by the Act and Defendants' actions.  Montana provides invaluable energy production for the United States.  Montana ranks 12th in oil production and 20th in natural gas production nationally.  As of 2022, Montana had 45,000 plus total oil wells and 5,000 plus active wells.  Montana has the nation's largest recoverable coal reserves, about 30 percent of the US total reserves, accounting for about 5 percent of US coal production.  In 2023, Montana mined approximately 28 million tons of coal. The Act improperly targets the State of Montana, both as a producer and consumer of energy.

67.    According to a study by the American Petroleum Institute, the oil and gas industry supported nearly 57,000 jobs, 8 percent of the state's total employment, and contributed over $7 billion toward the state's economy in 2021.

68.    In 2024, $77,151,000 in severance taxes was paid by Montana Coal Producers.  The coal severance tax funds a variety of programs across the state, including education.  In 2023, coal mines also paid approximately $5,105,485 in property taxes to the counties where the mines are located.

69.     Similarly, Plaintiff State of North Dakota, its political subdivisions, and its citizens are harmed by the Act and Defendants' actions.  North Dakota is ranked third among the States in crude oil production, seventh among the States in coal production (first in lignite coal production), and ninth among the States in natural gas production. *See* U.S. Energy Info. Admin., *North Dakota State Profile*, https://www.eia.gov/state/?sid=ND (last accessed Feb. 3, 2025).  Those industries employ thousands of people in communities large and small across the State, and North Dakota obtains a large share of its State revenues— billions of dollars annually—directly and indirectly from the development of those natural resources.  Those, jobs, communities, and State revenues will all be severely impacted by the ruinous liability that the Act threatens to impose.

70.     Likewise, Plaintiff State of Oklahoma, its political subdivisions, and its citizens are harmed by the Act and Defendants' actions.  Oklahoma is a leader in the nation's production of energy.  For example, in 2022, Oklahoma was the 7th highest producer of total energy in the United States. *State Profile and Energy Estimates: Oklahoma*, U.S. ENERGY INFO. ADMIN., https://www.eia.gov/state/?sid=OK.  Much of the energy production in Oklahoma is in the form of natural gas and crude oil production.  In 2023, Oklahoma was the nation's 6th largest producer of marketed natural gas and producer of crude oil. *Id.*  That same year, Oklahoma's 5 crude oil refineries had a combined processing capacity of about 547,000 barrels per calendar day, which is about 3% of the U.S. total refining capacity. *Id.*

71.     The Act will cause significant harm to Oklahoma, including creating risks to Oklahoma's economy.  In 2024, Oklahoma's oil and natural gas production contributed over

$60 billion annually in total economic impact in Oklahoma. *2024 Economic Impact in Oklahoma*, OKLAHOMA ENERGY RESOURCES BOARD, https://oerb.com/wp-content/uploads/2025/01/Economic-Impact_Full-Report.pdf. Oklahoma's oil and natural gas industry impacts twenty-three percent of total statewide economic activity and supports over 255,000 jobs. *Id.*

72.     Further, the Act will deprive the State of Oklahoma of millions of dollars in revenue to support schools, roads, bridges, and other public priorities. The oil and natural gas industry recently contributed $3.2 billion in total taxes, including $132 million to the revenue stabilization fund in Oklahoma in 2024. *Id.* The Act would threaten this significant source of tax revenue for the State of Oklahoma.

73.     Similarly, Plaintiff State of Utah, its political subdivisions, and its citizens are harmed by the Act and Defendants' actions. Utah provides invaluable energy production for the United States. For example, in 2023, Utah was the ninth largest producer of crude oil in the country. U.S. Crude Oil Production by State, 1995-2023, https://tinyurl.com/ye25sve3 (last visited on February 5, 2025). In addition, Utah ranks as a significant producer of natural gas and coal. The Act improperly targets the State of Utah, both as a producer and consumer of energy.

74.     The Utah Division of Oil, Gas and Mining estimates that, for Fiscal Year 2021, Utah received over $260 million in tax revenue and royalty/lease payments related to natural gas, crude oil, coal, and other minerals. Utah's revenues will be diminished based on New York's Climate Change Superfund Act.

75.     In short, these and other States will be substantially harmed in a variety of ways by the Act.

76.     In addition, Plaintiff West Virginia Coal Association and Plaintiff Gas and Oil Association of West Virginia each have associational standing to bring this challenge because: (1) at least one of each of their members has individual standing to sue in its own right; (2) challenging the Act is germane to Plaintiffs' respective purposes; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 112 (2d Cir. 2024).  An order enjoining Defendants from enforcing the Act against Plaintiffs' covered members would redress the harm to those members of being forced to pay cost-recovery demands under the Act.

77.     At least one member from both West Virginia Coal Association and Gas and Oil Association of West Virginia has individual standing to sue.  *See Do No Harm*, 96 F.4th at 112-13 (elements of individual standing).  The Act is expected to lead to cost recovery demands to at least some of Plaintiffs' members.  New York has made clear that it will issue targeted companies cost recovery demands for hundreds of millions or billions of dollars. Targeted companies will then be forced to expend time and resources to argue that they do not owe any money to New York under the unlawful Act in defending against a cost-recovery demand.  So each company has standing in its own right.

78.     Challenging the Act is germane to the purposes of both the West Virginia Coal Association and the Gas and Oil Association of West Virginia.  Both represent their members in advocating against and challenging laws that negatively impact their members'

businesses, including laws that impose unreasonable and unlawful financial and regulatory burdens on the private sector.

79.    For much the same reason, Plaintiff Alpha Metallurgical Resources, Inc. has standing.  Alpha was a coal producer in years covered by the Climate Change Superfund Act and remains a leading domestic producer of coal today.  A memorandum issued by the bill's sponsors identified Alpha—using the name under which it operated until 2021, Contura Energy—among the "covered companies" under the Act.  Alpha thus faces a credible threat of enforcement.[2]  Even if the Act is never enforced against Alpha, the burden it imposes on the interstate commerce in coal will place Alpha and the other members of the industry at a competitive disadvantage to producers of alternative sources of energy. Finally, the discriminatory effects of the law will disproportionately harm Alpha and other energy producers doing business in West Virginia and other coal producing States in the Central Appalachian region.  These injuries will be remedied by the relief from the Climate Change Superfund Act sought in this Action.

## FACTUAL ALLEGATIONS

### Operation and Regulation of Traditional Energy Production

80.    Traditional energy—that is coal, oil, and natural gas—is essential to American prosperity.  Today, fossil fuels account for more than 83% of American energy production.  *See Monthly Energy Review*, U.S. ENERGY INFO. ADMIN. (Jan. 2025),

---

[2] Alpha reserves any and all arguments that the Act could not lawfully be enforced against it, including any argument that it does not have a "sufficient connection with [New York] to satisfy the nexus requirements of the United States Constitution."  N.Y. ENV'T CONSERV. LAW § 76-0103.

https://tinyurl.com/52puxu2w.    Fossil fuel production employs millions of Americans, contributes billions to the economy each year, and provides the energy reliability and security that's necessary to keep the American economic engine running.    Altogether, "energy from generally plentiful and affordable supplies of fossil fuels … has been considered one of the important enablers of domestic economic growth."  Victor K. Der, *Carbon Capture and Storage: An Option for Helping to Meet Growing Global Energy Demand While Countering Climate Change*, 44 U. RICH. L. REV. 937, 938 (2010).  And that's especially true in energy-centric locales like West Virginia.

81.    Coal, one of the oldest and most abundant fossil fuels, has played a central role in industrialization and energy production since the Industrial Revolution.  *See Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 866 (1999).  Its use drives advancements in manufacturing, transportation, and electricity generation.    Though coal's exceptional importance in generating steam for electricity generation is perhaps the use that first comes to mind, America is quite literally built on coal.  Metallurgical coal is the "raw material for coke, a key ingredient in steel manufacturing," and "[t]here is no present substitute for metallurgical coal."  Michael R. Drysale, *Farewell to Coal?*, 65 RMMLF-INST 17-1, 17-3 (2016).

82.    Even as the sector has evolved in recent years, exports continue to "project[] that coal will remain the nation's largest energy source for, at least, several decades."  Sam Kalen, *Coal's Plateau and Energy Horizon?*, 34 PUB. LAND & RESOURCES L. REV. 145, 147 (2013).  For good reason: coal (along with natural gas) is essential to maintaining reliability, especially when weather conditions don't allow renewables to generate electricity.  *See*

27

MISO, *Miso's Response to the Reliability Imperative* at 1 (Feb. 2024), https://ti-nyurl.com/ya7tz7y9 (noting the need for "new dispatchable generation"—that is, generation "that can be turned on and off and adjusted as needed"). Because "coal mining operations presently contribute significantly to the Nation's energy requirements," Congress has found that it is "essential to the national interest to insure the existence of an expanding and eco-nomically healthy underground coal mining industry." 30 U.S.C. § 1201(b); *see also id.* § 1201(j) ("[S]urface and underground coal mining operations affect interstate commerce, contribute to the economic well-being, security, and general welfare of the Nation"). And coal production continues to grow internationally, as countries like China, India, and Indo-nesia have seen production increase significantly. *See* INT'L ENERGY AGENCY, *Coal Mid-Year Update* (July 2024), https://tinyurl.com/mvkpfnzw.

83. Natural gas is critical to America's story, too, even as it has come on the scene more recently. Now, it is widely used for electricity generation, home heating, and industrial applications. *See* Josh Lute, *LNG Terminals: Future or Folly?*, 43 WILLAMETTE L. REV. 621, 627 (2007). It is also a key component in the production of chemicals. The development of liquefied natural gas technology has expanded its accessibility, making it a flexible and globally traded energy resource. In short, "[n]atural gas is one of the most important energy resources in the world today." Lincoln L. Davies & Victoria Luman, *The Role of Natural Gas in the Clean Power Plan*, 49 J. MARSHALL L. REV. 325, 327 (2015). And "[t]he United States Department of Energy predicts that domestic consumption of natural gas will grow steadily and significantly over the next twenty years as the demand for energy in the United States expands." James B. Lebeck, *Liquefied Natural Gas*

*Terminals, Community Decisionmaking, and the 2005 Energy Policy Act*, 85 TEX. L. REV. 243, 246 (2006).

84.     No one doubts oil's importance, either.  Along with gas, it is one "of our most important natural resources."  *Burford v. Sun Oil Co.*, 319 U.S. 315, 320 (1943).  Most obviously, oil drives the U.S. transportation sector, which in turn facilitates most all the nation's economy.  *Use of Energy Explained: Energy Use for Transportation*, U.S. ENERGY INFO. ADMIN., https://tinyurl.com/43byhxkw (updated Aug. 16, 2023).  It's also a key raw material in petrochemical industries.  It is thus "essential to modern society."  Keith B. Hall, *Hydraulic Fracturing and the Baseline Testing of Groundwater*, 48 U. RICH. L. REV. 857, 858 (2014).  And along with natural gas, oil is expected to supply about 60% of the country—and the world's—energy supply in the years to come.  *Id.; see also* Mot. for Leave to File Bill of Compl. 7-13, *Alabama v. California*, 2024 WL 4426505 (May 22, 2024) (No. 22O158).

85.     Perhaps recognizing benefits like these, "fossil fuels remain the federal government's favorite energy source," Molly Elkins, *Winds of Change: Using the Tax Regime to Facilitate the Renewable Energy Transition*, 22 HOUS. BUS. & TAX L. J. 77, 85 (2021), despite vocal opposition from some quarters (and despite sometimes-unlawful attacks on the industry during the last administration).  In fact, coal, oil, and natural gas have been regulated *and encouraged* by the United States government for years, including during the years the New York Climate Change Superfund Act now proposes to levy upon. "The government affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and

29

overseas projects, and leases for fuel extraction on federal land." *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020).  Quite simply, America relies on traditional energy.

86.    New York has long relied on traditional energy, too.  Although New York law requires the State to obtain 70% of its electricity from renewable resources by 2030, its current production of nuclear power and hydropower are insufficient to meet its energy needs.  NYSERDA, DRAFT CLEAN ENERGY STANDARD BIENNIAL REVIEW 53 (July 1, 2024), https://tinyurl.com/mryc4x3d.  So it relies on traditional energy—primarily natural gas—to meet its demands.  For example, in 2023, natural gas-fired power plants accounted for almost three-fifths of New York's generating capacity and provided 46% of the State's electricity net generation.  *New York State Profile and Energy Estimates*, U.S. ENERGY INFO. ADMIN. (Jan. 16, 2024), https://tinyurl.com/mvypfrsk.  New York also imports substantial amounts of coal for domestic use, much of it from Pennsylvania.

87.    But even though New York remains an aggressive *consumer* of fossil fuels, it produces next to none of them.  New York has few natural gas reserves, so most of its natural gas comes from out of state, including from Plaintiff States.  *Id.*  New York also gets its fuel ethanol from out of state.  New York's only fuel ethanol production plant has a capacity of about 62 million gallons per year, and the State consumes about 534 million gallons of fuel ethanol annually.  *Id.*  In sum, the State depends on energy supplies from elsewhere—usually traditional energy—to meet nearly 85% of its energy needs.  *Id.*  This structure incentivizes New York to impose aggressive regulation on fossil-fuel producers in other States to "gain an economic comparative advantage" relative to the producing States.  Jason Scott Johnston, *Climate Change Confusion and the Supreme Court: The*

*Misguided Regulation of Greenhouse Gas Emissions Under the Clean Air Act*, 84 NOTRE DAME L. REV. 1, 50 (2008).

88.    These energy choices—and the benefits that come with them—entail necessary tradeoffs.  All energy use, including energy deriving from "renewable" sources, creates some pollution.  Traditional energy is no different.  So while encouraging fossil fuel use in New York and the other 49 States, Congress has also acted to regulate those industries to address consequences like pollution and climate change.

89.    Concerned that these pollutants harmed the environment, Congress used its power under our Constitution to regulate the emission of pollutants in the Clean Air Act in 1970.  The Act employs a "cooperative federalis[t]" approach, which places "primary responsibility for enforcement on state and local governments."  *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319-20 (2d Cir. 2003).  But each State only gets to determine "how best to achieve EPA emissions standards *within its domain*."  *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011) (emphasis added).  Nothing in the Clean Air Act empowered States to regulate interstate gas emissions emanating from outside their borders.  Instead, the Clean Air Act reserves for EPA the role as "primary regulator of [domestic] greenhouse gas emissions."  *Id.*

90.    In other words, the Clean Air Act leaves only a "slim reservoir" of state authority to regulate greenhouse gas emissions *outside* of the Act's regulatory scheme.  *City of New York*, 993 F.3d at 100.  That means the Clean Air Act "permit[s] only state lawsuits brought under the law of the pollution's *source* state."  *Id.* (cleaned up).  And Congress's laws concerning interstate emissions trump inconsistent state laws.

### New York's Attempt to Unilaterally Target
### Select Traditional Energy Producers With Punitive Measures

91.    New York, however, was not satisfied with the Clean Air Act's provisions limiting greenhouse gas emissions.  U.S. courts have not held coal, oil, and natural gas companies liable for the effects of climate change.  *See Big Oil in Court – The latest trends in climate litigation against fossil fuel companies*, ZERO CARBON ANALYTICS (Sept. 11, 2024), https://tinyurl.com/59acz4zr.  Even so, New York legislators decided that traditional energy producers were, in fact, akin to "tobacco companies" who "lied about" the consequences of their products and were later forced to settle for "zillions of dollars."  N.Y. Assemb. A03351-B. Transcript (statement of Jeffrey Dinowitz, Assemblyman), https://tinyurl.com/2mk5pbtx; *see also id.* (bill sponsor insisting that targeted companies were "committing egregious harm to the environment and I think they knew it, they knew it from day one.  They covered it up, they lied about it[,] and people are suffering as a result of it").

92.    New York thus passed the "climate change superfund act," which authorizes the State to levy billions of dollars in fines on fossil fuel companies over the next two decades for their alleged contribution to greenhouse gas emissions.  N.Y. ENV'T CONSERV. LAW § 76-0103.  Those payments are then paid into a fund to support projects to address the alleged effects of climate change.  *Id.*

93.    The Act targets the largest energy producers that satisfy a jurisdictional "nexus" with New York.  The Act applies to "[r]esponsible part[ies]"—"any entity (or a successor in interest to such entity described herein), which, during any part of the covered

period, was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the department to be responsible for more than one billion tons of covered greenhouse gas emissions." N.Y. ENV'T CONSERV. LAW § 76-0101(20). Ordinary end users—that is, those not engaged in the business of extraction—are not included as responsible parties.

94.    The Act's coverage definition excludes "any person who lacks sufficient connection with the state to satisfy the nexus requirements of the United States Constitution." *Id.* The Act does not provide any explanation for what "nexus" might be sufficient.

95.    The Act's "[c]overed period" runs from January 1, 2000 through December 31, 2018. N.Y. ENV'T CONSERV. LAW § 76-0101(7).

96.    "Covered greenhouse gas emissions" means "the total quantity of greenhouse gases released into the atmosphere during the covered period, expressed in metric tons of carbon dioxide equivalent." N.Y. ENV'T CONSERV. LAW § 76-0101(6). The Act targets producers based on greenhouse gas emissions that are released not only during each producer's extraction and refinement of fossil fuels but also for those greenhouse gas emissions that are generated by the end users of those fuels—users over whom that producer exercised no control. *Id.*

97.    The Act does not list specific covered energy producers, but it does call out the largest domestic oil, gas, and coal producers as "bear[ing] a much higher share of responsibility for climate damage to New Yort State than is represented by" the Act's fines.

33

N.Y. S. 2129 §2(6)(c). So the Act makes clear that it targets, among other entities, energy producers like ExxonMobil Corporation and Shell USA, Inc.

98.     The Act imposes a penalty on out-of-state energy producers. The Act imposes severe, retroactive, and arbitrary penalties on out-of-state energy producers through a "cost recovery demand." N.Y. ENV'T CONSERV. LAW § 76-0103(3)(b). Only producers to whom New York attributes more than "one billion metric tons" of carbon dioxide are subject to a demand under the Act. *Id.* § 76-0103(c). On information and belief, no entity in the State of New York would qualify as a liable "responsible party" under that definition. A list of anticipated "covered companies" under the Act in a memorandum issued by the bill's sponsors did not include any producer with operations in New York. And a bill sponsor declared on the Act's passage that it was intended only to make "Big Oil" pay. *See* Liz Krueger, *Governor Signs Climate Change Superfund Act*, OFF. OF N.Y. STATE SENATOR LIZ KRUEGER (Dec. 26, 2024), https://tinyurl.com/47brs745.

99.     Under the Act, the New York Department of Environmental Conservation is to issue "notices of cost recovery demands" to "responsible part[ies]." N.Y. ENV'T CONSERV. LAW § 76-0103(4)(a)(iii). Those parties will be held "strictly liable" for their purported share of greenhouse gas emissions; the notices will demand payment to the State as punishment for that purported liability. *Id.*, § 76-0103(3)(a).

100.     The Act provides a method to calculate each responsible party's cost recovery demand.

101.     First, the Act sets the total assessment rate at $3 billion per year, with a goal of raising $75 billion over 25 years. S. 2129 §2(6)(c). It is not clear where the Assembly

derived this figure; the bill sponsor suggested he simply "didn't want it to be too little, [and] … didn't want it to be too much."  N.Y. Assemb. A03351-B. Transcript (statement of Jeffrey Dinowitz, Assemblyman), https://tinyurl.com/2mk5pbtx.  Similarly, the legislative findings only obliquely say that the total assessment "represents a small percentage of the extraordinary cost to New York State for preparing from and preparing for climate-driven extreme events over the next 25 years."  N.Y. S. 2129 § 2(6)(c).

102.    Second, each responsible party's "cost recovery demand" equals the responsible party's alleged proportionate share of covered greenhouse gas emissions (again, as defined by the statute to span a period from 2000 to 2018, N.Y. ENV'T CONSERV. LAW § 76-0101) applied to an aggregate payment $75 billion, N.Y. ENV'T CONSERV. LAW § 76-0103(2)(b).  Although labelled a "responsible party," the targeted producer is "strictly liable, without regard to fault."  *Id.* § 76-0103(3).  Thus, the Act codifies a form of market-share liability.  "Market-share liability has been one of the most controversial doctrines in tort law, with a strong plurality of courts rejecting the doctrine on the ground that it radically departs from the fundamental tort principle of causation."  Mark A. Geistfeld, *The Doctrinal Unity of Alternative Liability and Market-Share Liability*, 155 U. PA. L. REV. 447 (2006).

103.    Third, in determining the amount of greenhouse gas emissions attributable to a given responsible party, the Act includes specific metrics for coal, crude, and fuel gases.  *Id.* § 76-0103(3)(e).  Every million pounds of coal represents 942.5 metric tons of carbon dioxide; every million barrels of crude oil represents 432,180 metric tons of carbon dioxide;

and every million cubic feet of fuel gas represents 53,440 metric tons of carbon dioxide. *Id.* It is not clear how these purported equivalencies were determined.

104.    The Act's calculation of responsible parties' cost recovery demands is not limited to greenhouse gas emissions in New York. Rather, the penalties are calculated based on global emissions. *See* N.Y. ENV'T CONSERV. LAW § 76-0101(6) (defining covered emissions to include "the total quantity of greenhouse gases released into the atmosphere"). Specifics are left largely to the implementing agency. N.Y. ENV'T CONSERV. LAW § 76-0103(4). For instance, it is not clear if costs will be reapportioned if New York is unable to collect against a foreign-controlled entity (like Saudi Aramco) because of sovereign immunity.

105.    Responsible parties must either pay the cost recovery demand in full by the applicable payment date, which the Act provides is September 30, 2026, *see* N.Y. ENV'T CONSERV. LAW § 76-0101(1), or in 24 annual installments with 8% of the total due in the first installment, and 4% due in each of the following 23 installments, *id.* § 76-0103(3)(h).

106.    The Act uses penalties paid by out-of-state energy producers to subsidize a "climate change adaptation fund." N.Y. ENV'T CONSERV. LAW § 76-0103(8). These funds will be used for various "climate change adaptation infrastructure projects," including restoring coastal wetlands, upgrading stormwater drainage systems, preparing for hurricanes and other extreme weather events, and "undertaking preventive health care programs and providing medical care to treat illness or injury caused by the effects of climate change supporting." *Id.* § 76-0101(2).

36

107.    The Act also requires at least 35% of program benefits to go to projects that directly benefit disadvantaged communities.  N.Y. S. 2129 § 2(6)(d).  These "disadvantaged communities" include "members of groups that have historically experienced discrimination on the basis of race or ethnicity."  N.Y. ENV'T CONSERV. LAW § 75-0111(1)(c)(ii).

108.    The Act's supporters anticipate that this law is only the beginning.  On passage, Assemblyman Jeffrey Dinowitz proclaimed that New York had "set[] a precedent for the nation to follow."  *Governor Hochul Signs Landmark Legislation Creating New Climate Superfund*, GOVERNOR KATHY HOCHUL (Dec. 26, 2024), https://tinyurl.com/4j7xnrc2.  And supporters hoped these "punitive measures" would spur other, similar actions in New York in 2025, too.  *Id.* (quoting Sierra Club Atlantic Chapter Conservation Director Roger Downs).

## CLAIMS FOR RELIEF

## COUNT I

### Federal Preemption Under the U.S. Constitution

109.    All allegations above are incorporated by reference.

110.    The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land."  U.S. CONST. art. VI.  In ratifying the Supremacy Clause, the States "surrendered to congress, and its appointed Court, the right and power of settling their mutual controversies."  *Rhode Island v. Massachusetts*, 37 U.S. 657, 737 (1838).

111.     Alongside granting States the right to self-govern, the Constitution also ensures that States co-exist with "equal sovereignty." *Shelby County*, 570 U.S. at 544.  The Constitution requires comity—the respect each State must give to each other State's right to self-govern.  *See Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 245 (2019) (observing that the Constitution incorporates some forms of comity between the states).  To preserve this balance, each State may legislate only within its own jurisdiction.  *See Bonaparte*, 104 U.S. at 594 ("No State can legislate except with reference to its own jurisdiction.").  The result is that "the statutes of Missouri" cannot be the governing authority in "the State of New York."  *See N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).

112.     One way a State violates "equal sovereignty" is by "impos[ing] economic penalties" intended to change out-of-state conduct that is lawful where it occurred.  *See Gore*, 517 U.S. at 572.  A State is entitled to regulate only "persons and property within the limits of its own territory."  *Hoyt v. Sprague*, 103 U.S. 613, 630 (1880); *see also Bonaparte v. Appeal Tax Ct. of Baltimore*, 104 U.S. 592, 594 (1881) ("No State can legislate except with reference to its own jurisdiction.").

113.     The Act invades the equal sovereignty of other States by unconstitutionally imposing liability and penalties on energy companies outside of New York for greenhouse gas emissions produced by lawful activities outside of New York's borders.  Other than acknowledging that a responsible party must "satisfy the nexus requirements of the United States Constitution," N.Y. ENV'T CONSERV. LAW § 76-0101(20), the Act applies to "the *total* quantity of greenhouse gases released into the atmosphere" over an 18-year period.  *Id.* § 76-0101(6) (emphasis added).  The emissions are not said to originate from New York.

The decisions that led to those emissions are not said to have occurred in New York. The effects of those emissions are not said to have unique effects on the State of New York. So the greenhouse gas emissions New York seeks to penalize have no direct connection to the State. New York is thus attempting to "directly regulate[] transactions which take place … wholly outside the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982) (plurality op.).

114.     On top of that, Plaintiff States and their citizens are directly affected by New York's Act. Massive fines will inevitably lead to increased energy costs and decreased energy production. The Act does not identify any in-state, out-of-state laws, or federal laws violated during the covered period. Instead, it imposes fines for greenhouse gas naturally released during any "extraction, storage, production, refinement, transport, manufacture, distribution, sale, and use of fossil fuels or petroleum products." N.Y. ENV'T CONSERV. LAW § 76-0101(6). All these are allegedly lawful activities by the covered energy producers. But the only conceivable way for these producers to avoid facing similar levies seriatim for other periods will be for them to change their behavior in Plaintiff States and elsewhere. This approach effectively regulates *intrastate* energy production elsewhere, even though regulation of intrastate energy matters is a core state function. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983).

115.     Because the Act regulates out-of-state energy producers that operate lawfully within their respective states, the Act violates the principles of comity and equal sovereignty the Constitution protects.

116.    What's more, in crafting the Constitution, the "Framers split the Atom of sovereignty" between federal and state governments. *U.S. Term Limits Inc., v. Thornton*, 514 U.S. 779, 838 (1995) (Kenndy J., concurring).

117.    The Act directly undermines principles of federalism by inserting state law into an area where there is a strong "need for a uniform rule of decision," *Milwaukee I*, 406 U.S. at 105 n.6.  Federal law must "remain[] unimpaired for dealing … with essentially federal matters," *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 307 (1947), that is, those matters implicating "uniquely federal interests … committed by the Constitution and laws of the United States to federal control." *Boyle v. United States*, 487 U.S. 500, 504 (1998) (cleaned up).  Uniquely federal interests exist where the application of state law "would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states." *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 367 (1943).

118.    The U.S. Supreme Court has already recognized that laws and litigation purporting to address climate issues do in fact implicate a "special federal interest," *Am. Elec. Power Co.*, 564 U.S. at 424, such that applying "the law of a particular State would be inappropriate," *id. at 422.*  Federal law addresses subjects "where the basic scheme of the Constitution so demands," including "air and water in their ambient or interstate aspects." *Id.* at 422 (quoting *Illinois*, 406 U.S. at 103); *accord City of New York*, 993 F.3d at 91.  And federal authorities maintain exclusive control over the interstate energy markets, another subject necessarily implicated here. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).  Were States entitled to go their own way on such subjects, energy companies

would face tremendous "vagueness" and "uncertainty," and States would risk "chaotic confrontation" with each other. *Ouellette*, 479 U.S. at 496.

119. Despite this need for federal control and national uniformity, the Climate Change Superfund Act purports to assume control over these issues. It imposes a unique and atypical means of regulating interstate air and the production of interstate energy. It decides that greenhouse gas emissions must be punished and assigns liability for them based on a *global* perspective. "A state may mandate that products for sale in the state meet certain specifications; it may not, however, as a condition of doing business in the state, require that the manufacturer meet those specifications everywhere." Tyler L. Shearer, *Locating Extraterritoriality: Association for Accessible Medicines and the Reach of State Power*, 100 B.U. L. REV. 1501, 1543 (2020).

120. As Judge Henry Friendly observed, "'[e]nvironmental protection is undoubtedly an area 'within national legislative power,'" *Am. Elec. Power*, 564 U.S. at 421 (quoting Henry Friendly, *In Praise of Erie—And of the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 421-22 (1964)). In other words, "[t]he[] sovereign prerogatives" that New York purports to exercise in the Act "are now lodged in the Federal Government." *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).

121. In short, New York's "attempt to set national energy policy through its own … laws would effectively overrule the policy choices made by the federal government and other [S]tates." *Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 719 (8th Cir. 2023) (cleaned up) (Stras, J., concurring). If allowed to stand, the Act would "scuttle the nation's carefully created system for accommodating the need for energy production and

the need for clean air.  The result would be a balkanization of clean air regulations and a confused patchwork of standards, to the detriment of industry and the environment alike." *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 296 (4th Cir. 2010).

122.    The Constitution also prohibits and preempts state actions interfering with foreign federal relations.  *Zschernig*, 389 U.S. at 442-43.  "Our system of government … imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Id.*  This "field of foreign affairs" is entrusted to "the President and the Congress." *Id.* at 432.  So while States may interact with other nations, they cannot do so in a way "where there is evidence of clear conflict [with] the policies" adopted by the federal government.  *See Am. Ins. Ass'n v. Garamendi*, 539, U.S. 396, 421 (2003).  Likewise, "when a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power, the Supremacy Clause prevents the state statute from taking effect." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc).

123.    But the Act launches such an intrusion by expanding its reach internationally. Though the Act has an ill-defined "nexus" requirement, it expressly contemplates demanding money from "foreign nation[s]."  N.Y. ENV'T CONSERV. LAW § 76-0101(9).  And because New York is a populous state with huge energy needs, the Act will likely cover foreign energy producers.  Indeed, most of New York's oil comes from Canada.  *New York State Profile and Energy Estimates*, *supra*.  Early lists of potential targets included companies in the United Kingdom, France, Brazil, Australia, Russia, Switzerland, Norway, Spain, South Africa, Colombia, and Italy—including some sovereign-controlled producers.

124.     Allowing a single State like New York to enact a law that interferes with the federal government's response to a global policy challenge like greenhouse gas emissions "sow[s] confusion and needlessly complicate[s] the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *City of New York*, 993 F.3d at 103. Here, the Act imposes $75 billion in after-the-fact sanctions on energy companies for the very conduct, based on the same theory of harm, that is the focus of national diplomatic efforts.

125.     This effort intrudes upon the federal government's foreign affairs power by "bypass[ing] the various diplomatic channels that the United States uses to address this issue, such as the U.N. Framework and the Paris Agreement." *Id.*  That's especially the case where "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level." *Id.* at 103 n.11.

126.     Because the Act violates Constitutional law protecting equal sovereignty and the United States foreign policy, it is preempted under the Supremacy Clause.

127.     Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

**COUNT II**

**Preemption Under the Clean Air Act**

128.     All allegations above are incorporated by reference.

129.     State laws that are expressly preempted by a federal statute may not be enforced under the Supremacy Clause.  U.S. CONST. art. VI, cl. 2.

130.    When a state attempts to insert itself in a regulatory field expressly reserved for the federal government, those state laws are preempted.  Indeed, "[i]t is a familiar and well-established principle that the Supremacy Clause … invalidates state laws that 'interfere with, or are contrary to,' federal law."  *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712-13 (1985).  Because federal law does not necessarily need to explicitly preempt state laws, *see Ouellette*, 479 U.S. at 491, unconstitutional interference arises when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hillsborough County*, 471 U.S. at 713 (cleaned up).

131.    Congress enacted the Clean Air Act to address a national concern over air pollution.  *See* 42 U.S.C. § 7401(b)(1) (describing how the purpose of the Clean Air Act was to "protect and enhance the quality of the Nation's air resources").  While States have "the primary responsibility" to prevent and control "air pollution … *at its source*" under the Clean Air Act, 42 U.S.C. §7401(a)(3) (emphasis added), the Act deems EPA to be "the best suited [entity] to serve as primary regulator of greenhouse gas emissions."  *Am. Elec. Power Co.*, 564 U.S. 410, 427 (2011).  And because greenhouse gases present a "national question," any regulatory decisions must be informed by "our Nation's energy needs and the possibility of economic disruption must weigh in the balance."  *Id*. at 427.

132.    In implementing the Clean Air Act, EPA must engage in a "complex balancing" act that considers "the appropriate amount of regulation in any particular greenhouse gas-producing sector," along with "our Nation's energy needs and the possibility of economic disruption."  *Am. Elec. Power Co.*, 564 U.S. at 427.  To achieve this

balance, the Act grants EPA the ability to categorize which entities fall under the Act's regulatory scheme. *See* 42 U.S.C. § 7411(b), (d). Under this authority, EPA has placed coal, oil, and natural gas producers under Clean Air Act jurisdiction. *See Clean Air Act Standards and Guidelines for the Oil and Natural Gas Industry*, EPA, https://bit.ly/3WhsGrc (last visited Jan. 14, 2025). Indeed, although the lawfulness of particular measures is still a matter of some dispute, the past administration purported to aggressively employ its Clean Air Act powers to regulate greenhouse gas emissions and fossil-fuel-related activities. *See Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil Fuel-Fired Power Plants*, EPA (Apr. 25, 2024), https://tinyurl.com/muyf3f6s.

133.    Here, the Clean Air Act does not authorize New York's Act. The Second Circuit has already interpreted the Clean Air Act to "permit only state lawsuits brought under the law of the pollution's source state." *City of New York*, 993 F.3d at 100. By extension, an attempt by a State to regulate out-of-state pollutants is thus prohibited, whether through direct attempts like an "imposition of pollution standards" or indirect like imposing an "obligation to pay" or an "award of damages." *Id.* at 92. In other words, the Clean Air Act reflects the national, federal-level solution to the problem of interstate pollution. There is "no room for a parallel track." *Am. Elec. Power*, 564 U.S. at 425; *see also Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) (collecting authorities establishing that claims based on the "law of a non-source state" are preempted by the Clean Air Act).

45

134.    The Clean Air Act preempts New York's Act because it imposes liability on energy producers for greenhouse gas emissions emitted outside of New York.  The Act demands "recovery" from "responsible parties"—i.e., any business involved in "extracting fossil fuel or refining crude oil"—for their "strict liability" role in global warming.  *See* N.Y. Env't Conserv. Law §§ 76-0101, 76-0103(3)(c).  The statute will affect any "responsible party" provided they have a "sufficient connection to New York under the "constitution's nexus requirements."  *Id.* § 76-0101.  It does not limit itself to the production or emission of greenhouse gases within the State of New York.  It imposes the law of a non-source State across the board.

135.    Allowing New York to penalize energy producers for out-of-state emissions would "undermine [the] regulatory structure" provided by the Clean Air Act and would "lead to chaotic confrontation between sovereign states."  *Ouellette*, 479 U.S. at 496-97 (cleaned up).  The Second Circuit has at least once before struck down a New York law as preempted under the Clear Air Act, where the law did "not set requirements for air pollution control or abatement within New York, but, rather, attempt[ed] to control emissions in another state."  *Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 89 (2d Cir. 2003) (cleaned up).  So too here.

136.    Because the Clean Air Act preempts New York's Act, the Climate Change Superfund Act may not be enforced against Plaintiffs and Plaintiffs' citizens.

137.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT III

### Violation of the Commerce Clause

138.    All allegations above are incorporated by reference.

139.    The Commerce Clause of the United States Constitution gives Congress the power "[t]o regulate Commerce … among the several States."  U.S. CONST. art. I, § 8, cl. 3. This affirmative grant of power also supplies a "dormant" limitation on States' ability to affect interstate commerce.  *Healy*, 491 U.S. at 326 n.1.  Under the dormant Commerce Clause doctrine, a State may not regulate in a way designed to "benefit in-state economic interests by burdening out-of-state competitors."  *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (1994).  "[T]he Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State."  *Healy*, 491 U.S. at 336 (cleaned up).  Indeed, a "long line of cases" confirm that "the Court will not hesitate to strike down a state law shown to have extraterritorial scope and an adverse impact on commerce occurring wholly outside the enacting state."  *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 659 (7th Cir. 1995).

140.    So a State violates the dormant Commerce Clause when it "discriminat[es] against interstate commerce."  *Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 373 n. 18 (1994).  Such discrimination "invite[s] a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause."  *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 356 (1951).

47

141.    The Climate Change Act violates the dormant Commerce Clause because it discriminates against the important economic interests of other States by specifically targeting energy producers headquartered in other States with clearly excessive penalties. *See Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 364 (2023).  The Act discriminates against the economic interests of every other State by raising the costs of energy production by imposing massive fines on energy producers.  While New York produces a small amount of natural gas, "[m]ost of the natural gas consumed … is produced in other states." *New York State Profile and Energy Estimates*, *supra*.  The same is true for New York's oil consumption. *Id.*  And New York has no coal producers.  New York companies will not be targeted, only out-of-state ones.  Indeed, the bill sponsor, in speaking in support of the bill, proudly and repeatedly touted how funds resulting from the Act would not be drawn from New York taxpayers.  N.Y. Assemb. A03351-B. Transcript (statement of Jeffrey Dinowitz, Assemblyman), https://tinyurl.com/2mk5pbtx.

142.    The Act also harms other States that depend largely on traditional energy production, like West Virginia, by penalizing them.  New York leaves off the table its own preferred sources, like wind, solar, or other renewable energy sources.  New York's clean energy sector makes up about a third of its energy market, *see* Thomas P. DiNapoli, Renewable Electricity in New York State 1 (Aug. 2023), but it needs to increase production if it is going to meet the statutorily required 70 percent of electricity coming from renewable energy sources by 2030.  N.Y. Pub. Serv. Law § 66-p (Consol. 2023).  The Act appears to be an avenue to paying for that shift.

143.    And indeed, the Act takes money from out-of-state energy producers and makes that money available to in-state clean energy producers.  The Act earmarks the money for use in "Climate change adaptive infrastructure projects," *see* N.Y. ENV'T CONSERV. LAW § 76-0101(2), which can be made available to "private individuals." *Id.* § 76-0103(4)(a)(v).  Those infrastructure projects could mean anything New York considers "designed to avoid, moderate, repair, or adapt to negative impacts caused by climate change." *Id.* § 76-0101(2).  So if a private nuclear plant decided it wanted to improve infrastructure that makes it more efficient and competitive than out-of-state covered energy producers, it could receive those funds.  It only would need to show that its improvements would mitigate climate damage simply—an easily satisfied standard for a clean-energy producer—as nearly any upgrade could be framed as addressing climate change.

144.    What's more, the Act's imposition of retroactive strict liability means no out-of-state energy producer deemed responsible can escape payment.  So by the Act's plain terms, the Act causes substantial harm to interstate commerce. *Cf. Pork Prods.*, 598 U.S. at 386-87 (noting that out-of-state pork producers' choice to be subject to California's law disfavors a finding of substantial harm to interstate commerce).

145.    Overall, the Act's burdens on interstate commerce—upending the national energy markets, engendering hostility among the States, and raising costs to out-of-state persons—are "clearly excessive in relation to the putative local benefits," which consist only of a sum of money. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  That

disproportionality reveals New York's true purpose of attacking disfavored industries elsewhere.

146.     The foreign Commerce Clause also restricts states from enacting laws that burden or discriminate against foreign commerce.  U.S. CONST. art. I, § 8, cl. 3.  This doctrine safeguards the federal government's exclusive authority to regulate international trade and ensures that the United States speaks with one voice to foreign countries.  *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979).  A unified approach is essential to maintain diplomatic consistency and avoid fragmented or conflicting state-level policies that could undermine national interests.  *See id.*  So the federal government's "scope of the foreign commerce power" is "greater" than the state's commerce power.  *Id.* at 448. In application, this doctrine does not allow state laws to "excessive[ly] interfere" with foreign affairs.  *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66 (1st. Cir. 1999), *aff'd sub nom.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).  This includes prohibiting state laws that "impos[e] a different, state system of economic pressure" against a foreign entity than what the federal government would impose.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000).

147.     The Act violates the foreign Commerce Clause.  The United States deals with 86 different countries to import close to 9 million petroleum barrels daily.  *How much petroleum does the United States import and export?*, U.S. ENERGY INFO. ADMIN., https://bit.ly/40nFH53 (last visited Jan. 8, 2025).  The United States also works cooperatively with foreign governments to "coordinate a global response to climate change and greenhouse gas emissions."  *City of New York*, 993 F.3d at 88.  But because the Act

50

covers any producer with "sufficient connection" to the state, it could easily cover foreign oil and gas producers.  N.Y. ENV'T CONSERV. LAW § 76-0101(20).  Indeed, the Act expressly lists foreign entities as a potential "responsible party."  *See id.* 76-0101(9).  A foreign entity then would face payment demands to the tune of billions, thus impacting their local costs, and bringing harm to their countries.  This antagonism, in turn, will substantially affect the United States' foreign policy on coordinating efforts to combat greenhouse emissions.

148.    The Act violates the dormant Commerce Clause and foreign Commerce Clause.

149.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

**COUNT IV**

**Violation of the Due Process Clause of the
Fourteenth Amendment to the U.S. Constitution**

150.    All allegations above are incorporated by reference.

151.    The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

152.    The Due Process Clause's "touchstone" principle is protecting individuals against "arbitrary action of government."  *Wolff*, 418 U.S. at 558.  In serving this principle, the Due Process Clause demands that state law shall not be "unreasonable" nor "arbitrary" and serve a "real and substantial relation to the object sought to be attained."  *Nebbia*, 291

51

U.S. at 525. In other words, "a legitimate legislative purpose furthered by rational means" must exist. *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992).

153.     With "fundamental fairness" as its polestar, *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 24 (1981), the Clause is particularly concerned with retroactive laws because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). And the principle that legislation usually applies only prospectively … protects vital due process interests, ensuring that individuals … have an opportunity to know what the law is before they act, and may rest assured after they act that their lawful conduct cannot be second-guessed later." *Opati v. Republic of Sudan*, 590 U.S. 418, 425 (2020). That's especially important for "unpopular groups or individuals" who may be targeted by retroactive laws. *See Landgraf*, 511 U.S. at 266.

154.     The New York Act violates the Due Process Clause because its retroactive application is fundamentally unfair. It does this in two ways.

155.     *First*, the Act imposes a harsh retroactive penalty on energy producers for greenhouse gas emissions emitted as long as 25 years ago and sweeps in over 18 years of conduct. So rather than confining the penalties to a "short and limited" period, *E. Enters. v. Apfel*, 524 U.S. 498, 526 (1998), the Act punishes energy companies for lawful actions taken long ago with no opportunity to know what the law was before they acted. *See id.* at 549-50 (Kennedy, J., concurring in the judgment and dissenting in part) (concluding that a law that "create[ed] liability for events which occurred 35 years ago" violated due process).

Especially considering how climate science has evolved over time, and activities during the relevant period were actually *encouraged* by relevant governmental authorities (New York included), it is not the case that the targeted companies "could have reasonably expected to be liable for a share of the remediation costs" over the course of this period. *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1330 (Fed. Cir. 2001).

156.    *Second*, the Act imposes an arbitrary and irrational punishment on energy producers that indicates the Act is ultimately "a means of retribution." *See Landgraf*, 511 U.S. at 270.  Start with the Act's coverage period from January 1, 2000 to December 31, 2018.  New York has no sound basis for choosing this 18-year period.  Yes, the bill says that by 2000 "the science of climate change was well established and no reasonable corporate actor could have failed to anticipate regulatory action to address its impacts," N.Y. S. 2129 § 2(7), but that clashes against congressional legislation like the Clean Air Act and the Comprehensive Environmental Response, Compensation, and Liability Act, which were passed decades before 2000 to address environmental concerns.  Nor does it explain why 2018 is the end of the coverage date when greenhouse gas emissions continue to go in the atmosphere.

157.    Not only does the Act lack a sound basis for choosing this eighteen-year period, it does not (and cannot) fairly attribute specific impacts in New York from specific greenhouse gas emissions.  "Greenhouse gases, once emitted, become well mixed in the atmosphere, meaning U.S. emissions can affect not only the U.S. population and environment, but other regions of the world as well."  Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74

53

Fed. Reg. 66496, 66514 (Dec. 15, 2009). The converse is true, too: emissions from other regions of the world can affect New York. So the Act's attempt to blame specific energy producers for the purported impacts to New York from climate change caused by greenhouse gas emissions can't be done in a scientific way. It is even more arbitrary and unreasonable to assume that specific emissions from specific places caused specific weather events that then gave rise to a need for remediation.

158.     New York tries to avoid this problem by including a method to determine the amount of greenhouse gas emissions attributable to any entity, N.Y. ENV'T CONSERV. LAW § 76-0103(3)(d), but the Act does not explain how it has arrived at its numbers. And as the Act acknowledges, it targets only a small number of large traditional-energy producers— it ignores greenhouse gas emissions from agriculture, farm animals, transportation, and more. End users are entirely excluded from the calculus unless those end users also happen to be producers. So ultimately, the energy producers are the sacrificial lamb for *all* greenhouse gas emissions—whether they caused them or not. The Act unfairly targets a small, disfavored group of energy producers for lawful actions taken over twenty years ago while ignoring the emissions produced from other sources.

159.     *Third*, the Act imposes significant liability in an "imprecise manner" with none of the "protections" that are ordinarily afforded before punitive measures like these are imposed. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). The Act tasks the New York Department of Conservation with determining whether a party is somehow "responsible for more than one billion tons of covered greenhouse gas emissions." The Act does not explain when a party becomes "responsible" for emissions, how such

emissions are to be measured, what sources will be used to determine responsibility, and how proportions will then be assigned. Instead, the Act promises only that the Department will adopt "methodologies using the best available science." N.Y. ENV'T CONSERV. LAW § 76-0103(4)(a)(i). Yet the law does not even provide clear pathways for targeted companies to challenge any of these determinations after the fact.

160.    *Fourth*, even aside from the length of the covered period and the problems with attributing climate harms to certain emissions, the Act's retroactive application standing alone violates the Due Process Clause. The Clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application." *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016). Generally, due process "does not permit the retroactive application of a statute if it has especially harsh and oppressive consequences." *Greenberg v. Comptroller of the Currency*, 938 F.2d 8, 11 (2d Cir. 1991). "The determination of whether a statute is impermissibly retroactive looks to whether application of the statutory provision attaches a new disability, in respect to transactions or considerations already past and should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Peralta-Taveras v. Att'y Gen.*, 488 F.3d 580, 584 n.2 (2d Cir. 2007).

161.    All the relevant factors here show that the Act's retroactivity offends the U.S. Constitution. Producers had no warning that they would be held monetarily responsible for any perceived effects from the lawful emissions of greenhouse gases, particularly in a State with which they might have no connection whatsoever. The federal government, for

instance, did not even state a concern with greenhouse gas emissions under the Clean Air Act until 2009. Nothing suggests that even New York environmental regulators raised objections to the intrastate emission of greenhouse gases in New York. Instead, producers operated under the assumption that they were providing a useful product that produced substantial value for consumers, including government end-users. By conforming with the Clean Air Act and other environmental regulations, the producers had a reasonable expectation that they would not face additional liability. But now, they face ruinous costs, especially if other States accept New York's invitation to follow its "precedent" and impose additional retroactive sanctions based on the same emissions that New York purports to levy upon. None of this is lawful. *See Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 462 (D.C. Cir. 2017) (Kavanaugh, J.) ("[E]ven if EPA has statutory authority to retroactively disapprove the replacement of an ozone-depleting substance with [hydroflurocarbons], EPA plainly may not impose civil or criminal penalties on a manufacturer based on the manufacturer's past use of HFCs at the time when EPA said it was lawful to use HFCs.").

162.    Because the Act violates the Constitution's due process protections, it cannot be enforced against Plaintiffs.

163.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## CLAIM V

### Violation of the Due Process Clause of
### Article One § 6 of the New York Constitution

164.    All allegations above are incorporated by reference.

165.    The Due Process Clause of the New York State Constitution provides that no "person shall be deprived of life, liberty or property without due process of law." N.Y. CONST. art. I, § 6. "[T]he New York State Constitution's guarantees of equal protection and due process are virtually coextensive with those of the U.S. Constitution." *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1261 (2d Cir. 2000).

166.    Like the federal constitution, the New York Constitution protects against certain retroactive applications of state law. "In order to comport with due process, there must be a persuasive reason for the potentially harsh impacts of retroactivity." *U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr. v. Miele*, 197 N.Y.S.3d 656, 670 (N.Y. Sup. Ct. 2023).

167.    First, as noted, the covered energy producers lacked any warning of a change in legislation, and it was entirely reasonable for them to rely on existing law covering their emissions during the covered period. They had no suggestion that they would be on the hook for billions of dollars to upgrade New York's infrastructure. What's more, during that period, "attribution science" (science connecting extreme weather events to climate change) was in its infancy, and still is subject to uncertainty. *See* JONATHAN D. HASKETT, CONG. RSHC. SERV., R47583, IS THAT CLIMATE CHANGE? THE SCIENCE OF EXTREME EVENT ATTRIBUTION 1-10 (2023). Hinging liability for vast infrastructure projects on unsettled science does not serve "a compelling public interest." *Vill. of Hempstead v. SRA Realty Corp.*, 617 N.Y.S.2d 794, 795 (N.Y. App. Div. 1994).

168.    Second, "[c]onsideration of the scope of the legislation is critical to a rational basis analysis," including the "length of the retroactivity period." *U.S. Bank Tr.*, 197

N.Y.S.3d at 670.  The length of the retroactive period is 18 years.  New York courts have struck down retroactive laws covering far shorter periods.  Eighteen years is an excessive amount of time for a law to retroactively apply.

169.    Third, the public purpose of the retroactive application does not justify these extreme measures.  "Retroactive legislation that reaches particularly far into the past and that imposes liability of a high magnitude relative to impacted parties' conduct raises substantial questions of fairness."  *HSBC Bank USA, N.A. v. Besharat*, 195 N.Y.S.3d 380, 391 (N.Y. Sup. Ct. 2023).  And here, the law imposes substantial liability for lawful—even expressly permitted—conduct over a long stretch of time.  *See* All. of Am. Insurers v. Chu, 571 N.E.2d 672, 678 (N.Y. 1991) (explaining that "reliance on pre-existing law" is an appropriate consideration in evaluating a retroactive law).  This punitive measure disrupts the settled expectations of the producers and the States within which they sit—that they could earn an appropriate return on the useful products that they provided.

170.    Applying these factors shows New York's Act violates its Due Process law and causes significant and irreparable harm to Plaintiffs.

171.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## CLAIM VI

### Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution

172.    All allegations above are incorporated by reference.

173.    The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

174.    The Supreme Court "has consistently held that while a State may impose conditions on the entry of foreign corporations to do business in the State, once it has permitted them to enter, 'the adopted corporations are entitled to equal protection with the state's own corporate progeny." *WHYY, Inc. v. Borough of Glassboro*, 393 U.S. 117, 119 (1968). Unjustified differential treatment violates the Equal Protection Clause.

175.    New York has not offered any legitimate purpose for distinguishing between large producers of three specific fuel types (all based outside of New York) and all other greenhouse-gas emitters (many of which are based inside New York).

176.    If the aim of the statute were actually remediation, then legislation would be rationally related to such a purpose if it actually sought remediation from all the relevant emitters. Yet New York obviously did not take such an approach. The only reasonable supposition, then, is that New York defined "responsible" companies in such a way as to avoid placing any burden on any New York taxpayers. "[T]he purpose of [this] legislation … was discrimination itself." *Douglas by Douglas v. Hugh A. Stallings, M.D., Inc.*, 870 F.2d 1242, 1247 (7th Cir. 1989); *see, e.g.*, N.Y. Assemb. A03351-B. Transcript (statement of Jeffrey Dinowitz, Assemblyman), https://tinyurl.com/2mk5pbtx (bill sponsor: "I just think that there are two sides here. Either on the side of our constituents or on the side of the big oil companies. I don't think there's any in between.").

177.    Plaintiffs therefore seek prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT VII

### Violation of the Excessive Fines Clause of the Eighth Amendment to the U.S. Constitution

178.    All allegations above are incorporated by reference.

179.    The Act imposes an excessive fine in violation of the Eighth Amendment of the U.S. Constitution.  U.S. CONST. amend. VIII.

180.    The Eighth Amendment provides in its Excessive Fines Clause that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend. VIII.  It is incorporated against the states under the Fourteenth Amendment's Due Process Clause. *Timbs v. Indiana*, 586 U.S. 146, 150 (2019).

181.    The "Excessive Fines Clause limits the government's power to extract payments … as punishment for some offense." *Austin*, 509 U.S. at 609-10 (cleaned up). Because the "notion of punishment … cuts across the division between" civil and criminal law, the Clauses' protections extend to any statute that "serve[s] in part to punish." *Id.* at 610.  This includes civil sanctions that are not solely remedial but also serve "either retributive or deterrent purposes." *Id.*  In other words, the Clause also "protects against excessive civil fines." *Hudson v. United States*, 522 U.S. 93, 103 (1997).

182.    Courts use a two-step inquiry when determining whether a financial penalty is excessive under the Eighth Amendment. *United States v. Viloski*, 814 F.3d 104, 108 (2d

Cir. 2016). At the first stage, the court determines whether the Excessive Fines Clause applies. *Id.* If it does, then the court looks at whether the fine is unconstitutionally excessive.

183. Here, the Excessive Fines Clause applies to the Act. The key inquiry is whether the fine could be characterized, "at least in part, as punitive." *Viloski*, 814 F.3d at 109 (cleaned up). "[P]urely 'remedial'" fines do not count. *Id.* The Act serves a retributive purpose. It punishes a small group of energy producers for their alleged role in climate change impacts while ignoring other producers, businesses, and consumers. This mismatch between the Act's provisions and its purported goal of mitigating the impacts of climate change shows that the Act's purpose, at least in part, is to punish large energy producers. Likewise, the Act makes no earnest effort to tie the sum of money assigned to these producers to the costs of climate change that the Act is intended to address. And it assigns the liability "without regard to fault," N.Y. ENV'T CONSERV. LAW § 76-0103(3), revealing that the Act is not a true means of allocating responsibility for past harm.

184. The levy is also unconstitutionally excessive. "A [levy] is unconstitutionally excessive if it is grossly disproportional to the gravity of a defendant's offense." *Viloski*, 814 F.3d at 110 (cleaned up). Courts use four factors to test for gross disproportionality: "(1) the essence of the [offense] of the [wrong-doer] and its relation to other [bad acts], (2) whether the [wrong-doer] fits into the class of persons for whom the statute was principally designed, (3) the maximum … fine that could have been imposed, and (4) the nature of the harm caused by the [wrong-doer's] conduct." *Id.* These factors are non-exhaustive. *Id.*

61

185.    The Act's punishment is grossly disproportionate.  The Act punishes a select group of energy producers over their lawful activities.  The penalty is also based on lawful greenhouse gas emissions.  While the Act claims that "the data necessary to attribute proportional responsibility is very robust," N.Y. S. 2129 § 2(7), it is impossible to determine which specific impacts in New York were caused by climate change and impossible to trace those impacts back to specific greenhouse gas emissions from a particular source.  *See City of New York*, 993 F.3d at 92 (noting that the gases causing global warming "cannot be traced to their source").  So the Act imposes penalties that overestimate and arbitrarily attribute greenhouse gas emissions to covered energy producers while ignoring the emissions from other sources or other causes of climate change.

186.    The resulting fine in the billions is grossly disproportionate and violates the Excessive Fines Clause.

187.    Plaintiffs therefore seek prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT VIII

### Violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution

188.    All allegations above are incorporated by reference.

189.    The Act effects a regulatory taking by imposing "cost recovery demands" that require energy producers to hand over funds to New York.  N.Y. S. 2129 § 2(4).  New York then uses those funds for its Climate Change Adaption Cost Recovery Program

without providing just compensation to energy producers.  N.Y. S. 2129 § 2(4).  The Court can prospectively enjoin these types of unlawful takings.

190.    The Takings Clause of the Fifth Amendment states in part that private property may not "be taken for public use, without just compensation."  U.S. Const. amend. V.  This Clause was "made applicable to the States through the Fourteenth Amendment." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005).

191.    While "takings problems are more commonly presented … as a physical invasion by the government," "[e]conomic regulation[s]" can also be considered to "effect a taking." *E. Enters.*, 524 U.S. at 522-23.

192.    "Regulatory takings analysis requires an intensive ad *hoc* inquiry into the circumstances of each particular case." *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006).  Courts consider three factors in determining whether a regulatory taking has occurred: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017).

193.    For the first factor, the economic burden here is significant.  A select group of energy producers are forced to pay billions of dollars to fund climate change adaptation projects.  *See* N.Y. Env't Conserv. Law §§ 76-0103(4)(iii), 76-0103(3)(g).  Those penalties will have a severe economic impact on energy producers, consumers and businesses, and States throughout the country.  So, like *Eastern Enterprises* where the Supreme Court found a "considerable financial burden" where a plaintiff had to make a retroactive payment

of $50 to $100 million, Plaintiffs face a significant economic burden. *E. Enters.*, 524 U.S. at 529.

194.   The Act also "substantially interferes" with Plaintiffs' "reasonable investment-backed expectations." *E. Enters.*, 524 U.S. at 532. The key inquiry is whether the regulated entity had "sufficient notice." *Id.* at 535-36. The Takings Clause "provides a … safeguard against retrospective legislation concerning property rights." *Id.* at 533-34. And in *Eastern Enterprises*, the Supreme Court found this factor met primarily because the statute applied retroactively, "attach[ing] new legal consequences to [an employment relationship] completed before its enactment." *See id.* at 532 (quoting *Landgraf*, 511 U.S. at 270). Here, the Act also applies retroactively—an 18-year period running from 2000 to 2018. N.Y. S. 2129 § 2(7). And like *Eastern Enterprises*, the covered energy producers lacked sufficient notice they would be on the hook for billions to New York. As stressed already, energy producers were already complying with federal law and could not have reasonably expected that they would be punished for their lawful behavior. Further, producers made expensive capital expenditures—opening mines, producing energy, building refineries—with the expectation that these substantial outlays would be recovered *without* a multi-billion-dollar outlay piled on top. So the second factor is met here.

195.   The third factor, the character of the government's action, may be strengthened in favor of the regulated entity when the "nature of the governmental action … is quite unusual." *E. Enters.*, 524 U.S. at 537. And the Act is quite unusual, targeting a small subset of energy producers and holding them strictly liable for damage that every other greenhouse gas producer has a part to play in—including cows. Amy Quinton, *Cows*

*and Climate Change*, UCDAVIS (June 27, 2019), https://bit.ly/3WmbbGm (observing that cows are the number one agricultural source of greenhouse gases). What's more, the Court in *Eastern Enterprises* noted this factor was met when a "solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused" because this "implicates fundamental principles of fairness underlying the Takings Clause." 524 U.S. at 537. Likewise, the Act singles out energy producers to bear a substantial financial burden based on past conduct unrelated to any commitment Plaintiffs made to New York. Only one other State has even attempted such a task, and that State (Vermont) is facing legal challenges of its own.

196.    For these reasons, the Act effects an unconstitutional regulatory taking.

197.    Because the Act violates the Takings Clause, it cannot be enforced against Plaintiffs.

198.    If the Act is not declared invalid and enjoined, its significant penalties will cause irreparable harm to the Plaintiffs.

199.    Plaintiffs therefore seek prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## CLAIM IX

### Violation of the Takings Clause of Article One § 7 of the New York Constitution

200.    All allegations above are incorporated by reference.

201.    Like its federal counterpart, the New York Constitution prohibits the government from taking "[p]rivate property … for public use without just compensation." N.Y. CONST. art. I, § 7.

202.    New York courts, like "[a]ll courts, of course, [are] bound by the United States Supreme Court's interpretations of Federal Statutes and the Federal Constitution." *People v. Kin Kan*, 574 N.E.2d 1042, 1045 (N.Y. 1991).

203.    "The guarantee against Takings provided by the New York Constitution is generally treated as coextensive to that of the U.S. Constitution." *Heidel v. Hochul*, No. 20-CV-10462, 2021 WL 4942823, at *9 (S.D.N.Y. Oct. 21, 2021), *aff'd sub nom.*, *Heidel v. Governor of New York*, No. 21-2860-CV, 2023 WL 1115926 (2d Cir. Jan. 31, 2023).

204.    As outlined in Count VIII, the Act is an unconstitutional taking of the Plaintiff's property in violation of Article One, Section Seven of New York's Constitution.

205.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT X

### Equitable Relief

206.    All allegations above are incorporated by reference.

207.    Federal courts have the power to enjoin state officials' unlawful actions. *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 326 (2015).

208.    To decide if injunctive relief is proper, Plaintiffs must "demonstrate … actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2nd Cir. 2011).  Once that's shown, a court considers four factors to determine whether granting injunctive relief is in

the public interest.  First, the court considers whether the plaintiff has "suffered an irreparable injury." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160 (2d Cir. 2012).  Second, whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Id.*  Third, "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted."  *Id.*  And fourth, "that the public interest would not be disserved by a permanent injunction." *Id.*

209.    As explained above, Plaintiffs will succeed in claims that the Act is barred under the United States Constitution and under federal statutes.

210.    All the factors support injunctive relief, too.

211.    Plaintiffs face an irreparable injury, satisfying the first factor.  Irreparable harm can be shown if a plaintiff "provides evidence of damage that cannot be rectified by financial compensation." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991) (cleaned up).  And the damage alleged must exist "during the interim between the request for an injunction and final disposition of the case on the merits." *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d. Cir. 1995).

212.    Although "[m]onetary loss alone will generally not amount to irreparable harm," a plaintiff can show irreparable harm by "provid[ing] evidence of damage that cannot be rectified by financial compensation." *Borey*, 934 F.2d at 34.  That's true where a plaintiff cannot recover damages due to sovereign immunity. *See United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (affirming irreparable injury exists where Eleventh Amendment barred monetary relief for an unconstitutional state action).

213.    In this case, any monetary relief Plaintiffs seek would be barred by sovereign immunity.  The damage to the States' economies and tax revenues is irreversible.  The payments that private parties must make will later be unrecoverable.  And targeted companies cannot obtain later recovery if their viability is threatened by the Act itself.  So without a preliminary injunction, Plaintiffs will suffer irreparable harm that they could not recover later.

214.    For those same reasons, Plaintiffs satisfy the second factor because monetary damages are inadequate to compensate for the injury.

215.    The final two factors—the balance of hardship and the public interest—support Plaintiffs.  These factors merge when the government is the opposing party because the interests of the State are aligned with those of the public.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  And the "Government does not have an interest in the enforcement of an unconstitutional law."  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (cleaned up).  What's more, if the injunction were not granted, the billions of dollars in fines will be passed on to the public, and energy reliability could well be threatened as targeted companies are forced to make cuts in recognition of these new costs.  An injunction is thus in the public's interest.

216.    For the reasons given, the Court should enjoin Defendant's enforcement of the Act.

## COUNT XI

### Declaratory Relief

217.    All allegations above are incorporated by reference.

218.    For the reasons stated in Counts I through IX, New York's Act is preempted by federal statutes and violates the United States Constitution and New York Constitution.

219.    The unlawful portions of the Act are not severable from any other portion that remains.  Thus, the entire Act should be rightfully declared unenforceable and void.

220.    In any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

221.    This Court should use its equitable power to enter a declaration that the entire Act is unlawful.

## PRAYER FOR RELIEF

An actual controversy exists between the parties that entitles Plaintiffs to declaratory and injunctive relief.  Plaintiffs request that this Court:

A.    Declare the Act preempted by federal statutes, otherwise violative of the United States Constitution, and unenforceable under 28 U.S.C. § 2201;

B.    Enjoin Defendants from taking any action to implement or enforce the Act;

C.    Award Plaintiffs the costs of the action and reasonable attorney's fees; and

D.    Grant the Plaintiffs any other relief as may be necessary and appropriate or as the Court deems just and proper.

Respectfully submitted,

JOHN B. MCCUSKEY
  ATTORNEY GENERAL OF WEST VIRGINIA

*/s/ Michael R. Williams*
Michael R. Williams
  *Solicitor General*
Spencer J. Davenport*
  *Assistant Solicitor General*

Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
spencer.j.davenport@wvago.gov

*Counsel for State of West Virginia*

STEVE MARSHALL
  ATTORNEY GENERAL OF ALABAMA

*/s/ Robert M. Overing*
Robert M. Overing*
  *Deputy Solicitor General*

Office of the Attorney General
of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Robert.Overing@AlabamaAG.gov

*Counsel for State of Alabama*

TIM GRIFFIN
  ATTORNEY GENERAL OF ARKANSAS

*/s/ Dylan L. Jacobs*
Dylan L. Jacobs*
  *Interim Solicitor General*

Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-3661
Dylan.Jacobs@Arkansasag.Gov

*Counsel for the State of Arkansas*

70

CHRISTOPHER M. CARR
  ATTORNEY GENERAL OF GEORGIA

Stephen J. Petrany
  *Solicitor General*

*/s/ Elijah O'Kelley*
Elijah O'Kelley*
  *Assistant Solicitor General*

Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
  ATTORNEY GENERAL OF IDAHO

*/s/ Michael A. Zarian*
Michael A. Zarian #12418ID*
  *Deputy Solicitor General*

Office of the Idaho Attorney General
700 W. Jefferson St., Suite 210,
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

*Counsel for the State of Idaho*

BRENNA BIRD
  ATTORNEY GENERAL OF IOWA

*/s/ Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

KRIS W. KOBACH
  ATTORNEY GENERAL OF KANSAS

*/s/ Anthony J. Powell*
Anthony J. Powell*
  *Solicitor General*

Office of the Kansas Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel.: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

RUSSELL COLEMAN
  ATTORNEY GENERAL OF KENTUCKY

*/s/ Victor B. Maddox*
Victor B. Maddox (KBA No. 43095)*
Jason P. Woodall (KBA No. 95013)*

Kentucky Office of the Attorney General
310 Whittington Parkway, Suite 101
Louisville, KY 40222
(502) 696-5300
Victor.Maddox@ky.gov
Jason.Woodall@ky.gov

*Counsel for Commonwealth of Kentucky*

LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
  *Solicitor General*

Office of the Louisiana Attorney General
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6705
AguinagaB@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
  ATTORNEY GENERAL OF MISSISSIPPI

*/s/ Justin L. Matheny*
Justin L. Matheny*
  *Deputy Solicitor General*

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW BAILEY
  ATTORNEY GENERAL OF MISSOURI

*/s/ Joshua M. Divine*
Joshua M. Divine*
  *Solicitor General*

Missouri Attorney General's Office
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for State of Missouri*

72

AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ *Christian B. Corrigan*
Christian B. Corrigan*
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*

Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for State of Montana*

MICHAEL T. HILGERS
  ATTORNEY GENERAL OF NEBRASKA

/s/ *Zachary A. Viglianco*
Zachary A. Viglianco*
  *Acting Solicitor General*

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
zachary.viglianco@nebraska.gov

*Counsel for State of Nebraska*

DREW H. WRIGLEY
  ATTORNEY GENERAL OF NORTH DAKOTA

/s/ *Philip Axt*
Philip Axt*
  *Solicitor General*

600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

*Counsel for the State of North Dakota*

DAVE YOST
  ATTORNEY GENERAL OF OHIO

/s/ *T. Elliot Gaiser*
T. Elliot Gaiser*
  *Solicitor General*

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*

73

GENTNER DRUMMOND
  ATTORNEY GENERAL OF OKLAHOMA

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
  *Solicitor General*

Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*

MARTY J. JACKLEY
  ATTORNEY GENERAL OF SOUTH DAKOTA

*/s/ Jennifer L. Verleger*
Jennifer L. Verleger*
  *Assistant Attorney General*

South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone: 605-773-3215
E-mail: jennifer.verleger@state.sd.us

*Counsel for State of South Dakota*

ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr.*
  *Solicitor General*

Office of the Attorney General of
South Carolina
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-3680
esmith@scag.gov

*Counsel for State of South Carolina*

JONATHAN SKRMETTI
  ATTORNEY GENERAL AND REPORTER OF
TENNESSEE

*/s/ Whitney D. Hermandorfer*
Whitney D. Hermandorfer*
  *Director of Strategic Litigation*

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Whitney.Hermandorfer@ag.tn.gov

*Counsel for State of Tennessee*

74

KEN PAXTON
  ATTORNEY GENERAL OF TEXAS

Brent Webster
*First Assistant Attorney General*

Ralph Molina
*Deputy First Assistant Attorney General*

Austin Kinghorn
*Deputy Attorney General for Legal Strategy*

*/s/ Ryan G. Kercher*
Ryan G. Kercher*
  *Chief, Special Litigation Division*
Texas Bar No. 24060998

Zachary Berg*
  *Special Counsel*
Tex. State Bar No. 24107706

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Kercher@oag.texas.gov
Zachary.Berg@oag.texas.gov

*Counsel for State of Texas*

DEREK E. BROWN
  ATTORNEY GENERAL OF UTAH

*/s/ Gary T. Wight*
Gary T. Wight (Utah Bar No. 10994)*
  *Assistant Attorney General*

1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah*

BRIDGET HILL
  ATTORNEY GENERAL OF WYOMING

/s/ Ryan Schelhaas
Ryan Schelhaas*
  *Chief Deputy Attorney General*

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

GAS AND OIL ASSOCIATION OF WEST
VIRGINIA, INC.
By Counsel

/s/ Ben Sullivan
Ben Sullivan*

Gas and Oil Association of WV, Inc.
Truist Bank Building, Floor 8
300 Summers Street
Charleston, WV 25301
(303) 344-9867
Cburd@gowv.com

*Counsel for Gas and Oil Association of
West Virginia, Inc.*

*pro hac vice* application forthcoming

Dated: February 6, 2025

WEST VIRGINIA COAL ASSOCIATION AND
AMERICA'S COAL ASSOCIATIONS
By Counsel

/s/ Robert G. McLusky
Robert G. McLusky, WVBN 2489*
Christopher M. Hunter, WVBN 9768*

Jackson Kelly, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
(304) 340-1381
rmclusky@jacksonkelly.com
chunter@jacksonkelly.com

*Counsel for West Virginia Coal
Association and America's Coal
Associations*

ALPHA METALLURGICAL RESOURCES, INC.
By Counsel

/s/ Michael W. Kirk
Michael W. Kirk*
Adam P. Laxalt*
Brian W. Barnes*
Harold S. Reeves*

Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
mkirk@cooperkirk.com
alaxalt@cooperkirk.com
bbarnes@cooperkirk.com
hreeves@cooperkirk.com

*Counsel for Plaintiff
Alpha Metallurgical Resources, Inc.*

76