**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**ALBANY DIVISION**

| | |
|---|---|
| STATE OF WEST VIRGINIA, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> LETITIA JAMES, et al., <br><br> *Defendants*, <br><br> and <br><br> WEST HARLEM ENVIRONMENTAL ACTION, INC., BLACK FARMERS UNITED-NEW YORK STATE, INC., CITIZENS CAMPAIGN FOR THE ENVIRONMENT, and CATSKILL MOUNTAINKEEPER, <br><br> *Proposed Defendant-Intervenors*. | Civil Action No. 1:25-cv-168 (BKS/DJS) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO INTERVENE AND FOR LEAVE TO**
**DEFER FILING A RESPONSIVE PLEADING**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 2

      A.    Climate change harms New York and costs the State money ................................ 2

      B.    The New York State Legislature responded with the Climate
             Change Superfund Act ........................................................................................ 3

      C.    Movants seek to preserve the Climate Change Superfund Act ............................. 5

ARGUMENT ....................................................................................................................... 8

I.    Movants merit permissive intervention ...................................................................... 9

      A.    This timely motion will not cause undue delay or prejudice ................................ 9

      B.    Movants' defense shares common questions of law with the
             main action ........................................................................................................ 9

      C.    Movants have strong interests in preserving the Act ........................................... 10

      D.    Movants will contribute to the just and equitable adjudication
             of the case ......................................................................................................... 14

II.    Movants seek leave to defer filing a responsive pleading ............................................ 17

CONCLUSION .................................................................................................................... 18

i

# TABLE OF AUTHORITIES

## Cases

*335-7 LLC v. City of New York*,
    No. 20-cv-1053 (ER), 2020 WL 3100085 (S.D.N.Y. June 11, 2020) ................................. 10

*Ass'n of Conn. Lobbyists LLC v. Garfield*,
    241 F.R.D. 100 (D. Conn. 2007) ................................................................................... 10, 15

*Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. State of New York*,
    No. 19-cv-11285 (KMK), 2020 WL 5658703 (S.D.N.Y. Sept. 23, 2020) ............... 9, 16, 17

*Blesch v. Holder*, No. 12-cv-1578 (CBA),
    2012 WL 1965401 (E.D.N.Y. May 31, 2012) ..................................................................... 17

*Briscoe v. City of New Haven*,
    No. 3:09-cv-1642 (CSH), 2012 WL 13026762 (D. Conn. Oct. 5, 2012) ............................ 17

*Comcast of Conn. v. Vt. Pub. Util. Comm'n*,
    No. 17-cv-161 (GWC), 2018 WL 11469513 (D. Vt. Feb. 8, 2018) .................................... 16

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*,
    170 F.R.D. 93 (E.D.N.Y. 1996) ................................................................................... 10, 15

*E.E.O.C. v. KarenKim, Inc.*,
    698 F.3d 92 (2d Cir. 2012) ................................................................................................ 16

*Floyd v. City of New York*,
    770 F.3d 1051 (2d Cir. 2014) ............................................................................................ 16

*Friends of the E. Hampton Airport, Inc. v. Fed. Aviation Admin.*,
    No. 15-cv-0441 (JS), 2016 WL 792411 (E.D.N.Y. Feb. 29, 2016) ..................................... 9

*Green Mountain Chrysler Plymouth Dodge Jeep v. Torti*,
    No. 05-cv-302, 2006 WL 8567240 (D. Vt. May 3, 2006) ................................................. 10

*H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*,
    797 F.2d 85 (2d Cir. 1986) ..................................................................................... 8, 10, 15

*Hum. Servs. Council of N.Y. v. City of N.Y.*,
    21-cv-11149 (PGG), 2022 WL 4585815 (S.D.N.Y. Sept. 29, 2022) ......................... 8, 9, 10

*In re Holocaust Victim Assets Litig.*,
    225 F.3d 191 (2d Cir. 2000) ................................................................................................ 8

*Miller v. Silbermann*,
    832 F. Supp. 663 (S.D.N.Y. 1993) ..................................................................................... 15

*N.Y. Pub. Int. Rsch. Grp., Inc. v. Regents of Univ. of State of N.Y.*,
  516 F.2d 350 (2d Cir. 1975) .................................................................. 14

*New York v. U.S. Dep't of Health & Hum. Servs.*,
  No. 19-cv-4676 (PAE), 2019 WL 3531960 (S.D.N.Y. Aug. 2, 2019) ......................... 15, 16

*United States v. Columbia Pictures Indus., Inc.*,
  88 F.R.D. 186 (S.D.N.Y. 1980) .................................................................. 16

*United States v. New York City Hous. Auth.*,
  326 F.R.D. 411 (S.D.N.Y. 2018) ............................................................ 15, 17

*United States v. Pitney Bowes, Inc.*,
  25 F.3d 66 (2d Cir. 1994) ...................................................................... 8

*Va. House of Delegates v. Bethune-Hill*,
  587 U.S. 658 (2019) ............................................................................ 8

*Windsor v. United States*,
  797 F. Supp. 2d 320 (S.D.N.Y. 2011) ......................................................... 17

## Statutes

2024 N.Y. Sess. Laws Ch. 679 (S. 2129-B) (McKinney) ........................................... 3, 4

2025 N.Y. Sess. Laws Ch. 100 (S. 824) (McKinney) ................................................. 3

N.Y. Env't Conserv. Law § 75-0101 ................................................................ 5

N.Y. Env't Conserv. Law § 75-0111 ................................................................ 5

N.Y. Env't Conserv. Law § 76-0101 ............................................................. 4, 14

N.Y. Env't Conserv. Law § 76-0103 ........................................................... 4, 5, 14

## Rules and Regulations

Fed. R. Civ. P. 24(b) ......................................................................... 1, 8, 9

Fed. R. Civ. P. 24(c) ........................................................................... 17

## PRELIMINARY STATEMENT

Movants West Harlem Environmental Action, Inc., Black Farmers United-New York State, Inc., Citizens Campaign for the Environment, and Catskill Mountainkeeper move for permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B) to defend the Climate Change Superfund Act and preserve its benefits for New Yorkers.

The harms from climate change are being felt across New York, from the Great Lakes to the Catskills to New York City and Long Island. The growing frequency and intensity of extreme weather events, such as Hurricane Sandy in 2012, puts livelihoods, properties, communities, and lives at risk. Rising temperatures and heavier rainfall endanger agriculture and ecosystems. Extreme heat, seasonal drought, and wildfires, like those that burned across the State in fall 2024, jeopardize drinking water sources and public health. These harms are not distributed evenly. Communities of color, low-income communities, and other vulnerable groups face greater risks. In response to these threats, New York is taking steps to increase its climate resilience. But these measures are expensive: the cost to the State of climate adaptation through 2050 is expected to reach several hundred billion dollars. To date, the financial burden of climate adaptation has been shouldered primarily by taxpayers.

In December 2024, mindful of the urgency and expense of climate adaptation, the New York State Legislature enacted the Climate Change Superfund Act (the "Act"). The Act requires the largest fossil fuel companies to pay $75 billion over 25 years to fund critical adaptation projects. Each company's share will be proportional to the amount of fossil fuels it extracted or refined over a discrete 25-year period. The Act shifts part of the cost of climate adaptation from ordinary New Yorkers to the companies that profited from—and bear greatest responsibility for—the pollution. At least 35 percent of the funds generated by the Act will go toward projects

1

that benefit disadvantaged communities, in recognition of the disproportionate risks they face from climate change.

Movants are nonprofit organizations devoted to addressing various aspects of the climate crisis, including adaptation and resilience. Movants' members, supporters, and communities include farmers, conservationists, and individuals living in low-income communities and communities of color who face severe risks from climate change. Movants possess concrete experience and hard-won expertise on both the existing harms from climate change and the possibilities of adapting to address future harms. They stand to benefit from implementation of the Act and seek intervention to defend their interests and aid the Court's just and equitable adjudication of Plaintiffs' efforts to strike down this important statute.[1]

## BACKGROUND

### A.    Climate change harms New York and costs the State money

Climate change poses an immediate, grave threat to New York's communities, economy, and natural systems. Average temperatures are rising, and extreme heat events are more frequent. Declaration of Michelle Wu (Wu Decl.) Ex. 1 at 94. High temperatures cause health harms like hyperthermia; these harms disproportionately burden low-income communities and communities of color. Wu Decl. Ex. 3 at 393. Average precipitation has also increased, and extreme weather events are increasingly common. Wu Decl. Ex. 1 at 94. Agriculture is particularly affected by changing precipitation patterns. Too much rain can erode soil, while even short-term droughts can lead to crop losses. Wu Decl. Ex. 2 at 157. Severe storms have become more frequent and intense. Wu Decl. Ex. 1 at 94, 113-14. These storms are extremely damaging, especially due to

---

[1] Defendants consent to the relief requested in this motion. The State Plaintiffs oppose Movants' intervention and take no position on their request to defer filing a responsive pleading. *See infra* Argument II. The remaining Plaintiffs did not provide their position on this motion.

the flooding they cause, as seen in the destruction from storms like Hurricane Sandy. *Id.* at 114. Flooding is exacerbated by sea level rise, which can cause flooding even during everyday high tides (so-called sunny-day flooding). *Id.* at 118-19. Floods carry a host of health hazards, including exposure to contaminated water from outdated sewage systems that, during heavy rains, discharge raw sewage directly into local waterways. Wu Decl. Ex. 3 at 400. Such climate-related harms will only worsen with time.

New York has already incurred massive costs to recover from and adapt to climate change harms. For non-New York City local governments, climate change-related hazards account for about 55 percent of their municipal budgets from 2018 to 2028. 2024 N.Y. Sess. Laws Ch. 679 (S. 2129-B), § 2(6)(b) (McKinney). In New York City, upgrading the sewer system to deal with heavy rain events alone will cost around $100 billion. *Id.* Protecting Long Island from extreme weather is estimated to cost $75 to $100 billion. *Id.* And climate change will continue to cost New York. Through 2050, the cost of climate adaptation is anticipated to climb to several hundred billion dollars. *Id.*

**B.    The New York State Legislature responded with the Climate Change Superfund Act**

In December 2024, recognizing the "immediate, grave threat" posed by climate change, the imperative to adapt to its "irreversible" consequences, and the "huge investments" required to meet that challenge and maintain New York's quality of life into the future, the New York State Legislature enacted the Climate Change Superfund Act. S. 2129-B, § 2(1).[2] The Act's purposes are to "provide a source of revenue for climate change adaptive infrastructure projects within the state" and to identify and fund these projects. *See* N.Y. Env't Conserv. Law § 76-0103(2)(a), (e)-

---

[2] The Act was amended in February 2025, 2025 N.Y. Sess. Laws Ch. 100 (S. 824) (McKinney), and it is now effective as amended.

(f). Such projects may include coastal wetland restorations; storm water drainage system upgrades; defensive upgrades to roads, bridges, subways, and transit systems; extreme weather event preparation and recovery efforts; preventive health care programs; treatment for illness or injury caused by the effects of climate change; wastewater treatment plant relocation, elevation, and retrofits; installations of energy efficient cooling systems and other weatherization and energy efficiency upgrades and retrofits; electrical grid upgrades; green spaces, urban forestry, and other interventions to address heat islands; and responses to harmful algal blooms, loss of agricultural topsoil, and other climate-driven ecosystem threats to forests, farms, fisheries, and food systems. *Id.* § 76-0101(3)(a).

To help fund these projects, the Act directs the Department of Environmental Conservation (the "Department") to collect payments from responsible parties. *Id.* § 76-0103(2)(a). Responsible parties are fossil fuel extractors and refiners with a requisite nexus to the State that the Department determines are responsible for more than one billion tons of greenhouse gas emissions during the covered period between January 1, 2000, and December 31, 2024. *Id.* § 76-0101(9), (21). The payments are capped at $75 billion in the aggregate. *Id.* § 76-0101(6). A responsible party's share of that amount is proportional to the greenhouse gas emissions attributable to the fossil fuels it extracted or refined during the covered period, compared to all responsible parties' aggregate greenhouse gas emissions. *Id.* § 76-0101(7)-(8), 76-0103(3)(b). A responsible party can choose to pay in one lump sum or over 25 annual payments. *Id.* § 76-0103(3)(e)(i). The $75 billion that responsible parties are expected to pay represents a fraction of the several hundred billion dollars in costs that New York will incur through 2050 to adapt to climate change. S. 2129-B, § 2(6)(b)-(c).

The Act provides that at least 35 percent, with a goal of 40 percent or more, of the funds will be allocated to climate change adaptation projects that benefit disadvantaged communities. N.Y. Env't Conserv. Law § 76-0103(2)(g). The Act adopts the 2019 Climate Leadership and Community Protection Act's definition of disadvantaged communities, *see id.* (citing *id.* § 75-0101), defined as those that "bear burdens of negative public health effects, environmental pollution, impacts of climate change, and possess certain socioeconomic criteria, or comprise high-concentrations of low- and moderate- income households," as identified by the Department's climate justice working group, *id.* § 75-0101(5); *see also id.* § 75-0111. The State has already identified communities that meet the criteria for disadvantaged communities. Declaration of Peggy Shepard (Shepard Decl.) ¶ 10.

### C.    Movants seek to preserve the Climate Change Superfund Act

Movants are organizations that strive to reduce the harms their members, supporters, and communities face from climate change, including through climate adaptation initiatives and efforts. They and their members, supporters, and communities stand to benefit from the Act and have strong interests in preserving it.

West Harlem Environmental Action, Inc. ("WE ACT for Environmental Justice") is a nonprofit membership organization with over 45 staff and 1,100 members that fights the impact of climate change on communities of color and low-income communities, with a focus on northern Manhattan. Shepard Decl. ¶ 1-2. Its members are harmed by climate change: extreme heat, particularly for those who do not have or cannot afford to turn on air-conditioning, exacerbates health issues and can be life-threatening. *Id.* ¶¶ 4, 6. Smoke from wildfires, like those last fall, introduces another pollutant to communities that are already overburdened by air pollution. *Id.* ¶ 6. Heavy rain events flood basements, causing boilers and other equipment to fail, and disrupt subway service, preventing members from commuting to and from their jobs. *Id.* ¶ 7.

5

Most of the communities the organization serves in northern Manhattan meet the State's criteria for disadvantaged communities. *See id.* ¶ 10. WE ACT for Environmental Justice has deep expertise advocating to protect members from these harms: it directs the Manhattan Clean Energy Hub, which helps provide low and no-cost renewable energy upgrades to improve air quality and reduce utility costs, *id.* ¶ 3; it runs a leadership training program to prepare members to engage more effectively in advocacy work, *id.*; and in collaboration with community partners, it has developed research-backed plans, including the Northern Manhattan Climate Action Plan, to identify concrete steps to enhance northern Manhattan's climate resilience, *id.* ¶ 9.

Black Farmers United-New York State, Inc. ("BFU") is a member-led nonprofit organization that supports black farmers. Declaration of Joanna Dorsey (Dorsey Decl.) ¶ 1. BFU's members include over 150 farmers, land stewards, and food justice advocates across the State. *Id.* Climate change harms BFU's members through unpredictable weather and excessive rainfall, which can damage crops, shorten growing seasons, cause "root rot" and other crop-damaging ills, and leech away nutrients and minerals from soil. *Id.* ¶¶ 5-6. Extreme weather events like storms can damage farm infrastructure, such as expensive "high tunnels," in-ground greenhouse-like structures that protect crops from extreme heat. *Id.* ¶¶ 4,7. To make matters worse, members' insurance often does not cover climate-related damages. *Id.* ¶ 7. In the most severe instances, climate-related harms have made farming financially inviable, forcing BFU's members to forfeit their land. *Id.* ¶ 8. Members are exploring different strategies and techniques to combat climate change harms, such as heat-resistant crop variations, rainwater collection systems, high tunnels, greenhouses, and agrivoltaics, *id.* ¶ 9, and are invested in sharing their knowledge with each other, *id.* ¶ 10. But some technologies can be prohibitively expensive for

small farmers, and members need training and technical assistance on climate resilient practices to help them survive and thrive in a changing environment. *Id.* ¶¶ 9-10.

Citizens Campaign for the Environment ("CCE") is a nonprofit membership organization that advocates for stronger environmental policy. Declaration of Adrienne Esposito (Esposito Decl.) ¶ 1. CCE has over 100,000 members across New York State and Connecticut, including approximately 40,000 members on Long Island and 20,000 members in central and western New York. *Id.* It has staff in Buffalo, Syracuse, and on Long Island. *Id.* Flooding, which is increasingly common due to climate-related excessive rain and sea level rise, harms CCE's members across New York. *Id.* ¶¶ 3, 8. Heavy rains and floods can damage septic systems, threatening human and environmental health with dangerous bacteria, and lead to sewer overflows and increased runoff, harming water quality and forcing beach closures. *Id.* ¶ 3, 9. Nitrogen pollution degrades wetlands, the traditional bulwark against flooding; flooding can wash nitrogen into the waters, causing a vicious cycle of weakened wetlands leading to worse flooding and vice versa. *Id.* ¶ 4. CCE's members are also harmed by other climate change impacts, including a prolonged tick season, droughts and fires, harmful algal blooms in water bodies, and extreme storms. *Id.* ¶¶ 5, 9, 10. CCE engages in education, research, lobbying, and public outreach to advocate for solutions to these climate-related issues. *See id.* ¶ 2.

Catskill Mountainkeeper is a nonprofit environmental organization with support from more than 700 individuals whose mission is to promote and protect the natural environment and communities within the Catskill region. Declaration of Ramsay Adams (Adams Decl.) ¶¶ 1-2. The Catskills are a popular recreation site and provide 90 percent of drinking water for New York City. *Id.* ¶ 3. Climate change has harmed the region through droughts, wildfires, and floods. *Id.* ¶ 4-7. Last fall, a critical repair to the Delaware Aqueduct, which delivers half of New

7

York City's water supply from the Catskills, was delayed by severe droughts. *Id.* ¶ 4. The outdated infrastructure in the Catskills is not prepared for or built to withstand climate disasters. *Id.* ¶ 8. Catskill Mountainkeeper has fought for a safer, more resilient future by, among other things, pushing for the 2019 Climate Leadership and Community Protection Act, which binds the State to greenhouse gas emission reduction goals. *Id.* ¶ 9. It is also deeply invested in initiatives to provide clean energy alternatives to Catskill residents. *Id.* ¶ 10.

## ARGUMENT

Movants seek permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B). A district court may grant permissive intervention "if the application is timely and if the 'applicant's claim or defense and the main action have a question of law or fact in common.'" *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 202 (2d Cir. 2000) (citing Fed. R. Civ. P. 24(b)(1)). Rule 24(b) is "'to be liberally construed' in favor of intervention." *Hum. Servs. Council of N.Y. v. City of N.Y.*, 21-cv-11149 (PGG), 2022 WL 4585815, at *3 (S.D.N.Y. Sept. 29, 2022) (citation omitted). The court's "principal guide" in exercising its discretion is "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2d Cir. 1994) (quoting Fed. R. Civ. P. 24(b)(3)). The court may also consider the "nature and extent" of proposed intervenors' interests and whether they will "significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.'" *H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986) (citation omitted). These considerations all support permissive intervention here.[3]

---

[3] Movants need not establish Article III standing because, as prospective defendant-intervenors, they do not seek to invoke the Court's jurisdiction. *See Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019).

I.      **Movants merit permissive intervention**

A.      **This timely motion will not cause undue delay or prejudice**

This motion—filed less than a week after Plaintiffs filed their amended complaint, ECF No. 125 (Apr. 7, 2025), and just over seven weeks after Plaintiffs served their initial complaint, ECF Nos. 80-82 (Feb. 19, 2025) (summonses served Feb. 18, 2025)—is timely. The case is still in its early stages: the initial status conference has not yet taken place, no discovery has been taken, no substantive motions have been filed, and no briefing schedule has been set. *See Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. State of New York*, No. 19-cv-11285 (KMK), 2020 WL 5658703, at *7 (S.D.N.Y. Sept. 23, 2020) (intervention motion filed three months after complaint was timely where case was in early stages and no significant substantive motions had been filed); *Hum. Servs. Council of N.Y.*, 2022 WL 4585815, at *3 (intervention motion was timely where it was filed less than two months after complaint). Even when significantly more time has elapsed between the complaint and an intervention motion, courts have deemed intervention timely. *See Bldg. & Realty Inst.*, 2020 WL 5658703, at *7 (collecting cases). As described below, *infra* Argument II, Movants propose to file their responsive pleading within 14 days after Defendants respond to the amended complaint, which will allow them to minimize unnecessary repetition. Movants are also prepared to adhere to any court-ordered briefing schedule and to cooperate with the parties to advance the efficient adjudication of this case. Because "this action is in its infancy," Movants' participation "will not result in delay or prejudice" to any party. *Friends of the E. Hampton Airport, Inc. v. Fed. Aviation Admin.*, No. 15-cv-0441 (JS), 2016 WL 792411, at *9 (E.D.N.Y. Feb. 29, 2016).

B.      **Movants' defense shares common questions of law with the main action**

Movants' defense shares common questions of law with the main action. *See* Fed. R. Civ. P. 24(b)(1)(B). Movants intend to address the fundamental legal questions presented by Plaintiffs

by showing that the Climate Change Superfund Act is constitutional and is not preempted.

Courts in this circuit regularly grant permissive intervention in these circumstances. *See, e.g.*,

*Hum. Servs. Council of N.Y.*, 2022 WL 4585815, at *4 (proposed intervenor "shares the City's

presumed defense–namely, whether Local Law [87] is constitutionally sound and whether it is

preempted by federal labor law" (citation omitted)); *335-7 LLC v. City of New York*, No. 20-cv-

1053 (ER), 2020 WL 3100085, at *3 (S.D.N.Y. June 11, 2020) (proposed intervenors' "defenses

share the same fundamental question of law with the main suit: the constitutionality of the [rent

stabilization law]"); *Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 103 (D. Conn.

2007) (proposed intervenors' defenses "share the same or similar questions of law and fact with

the main action" in case involving "a facial constitutional challenge to a newly-enacted statute");

*Green Mountain Chrysler Plymouth Dodge Jeep v. Torti*, No. 05-cv-302, 2006 WL 8567240, at

*1, 5 (D. Vt. May 3, 2006) (proposed intervenors "share[d] common questions of law and fact"

with the main action in case involving whether state environmental regulations were preempted);

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 106 (E.D.N.Y. 1996) (proposed

intervenors shared "questions of law and fact in common with the parties" in the constitutionality

of New York's kosher laws).

### C.    Movants have strong interests in preserving the Act

The "nature and extent" of Movants' interests in this case weigh in favor of intervention.

*H.L. Hayden*, 797 F.2d at 89. Movants' members have experienced firsthand the harms from

climate change and will continue to face these harms without additional—and costly—adaptation

measures. Through their work and advocacy, Movants know well what types of climate

adaptation solutions would best protect their communities and regions. Movants therefore

possess concrete experience and expertise regarding both the harms that motivated the Act's

passage and the solutions the Act envisions to ameliorate those harms.

Extreme storms and flooding have harmed Movants and their members, supporters, and communities. Hurricane Sandy devastated Long Island in 2012, Esposito Decl. ¶¶ 4, 13, and multiple floods have ravaged the Catskill region in recent years, with one flood destroying Movant Catskill Mountainkeeper's office in 2017, Adams Decl. ¶¶ 6-7. While major storms exact the heaviest toll, heavy rain and flooding have become an ever-present threat. Torrential downpours flood roadways and strand vehicles on Long Island, Esposito Decl. ¶ 3, interrupt subway service in New York City, Shepard Decl. ¶ 7, and increase flooding along the shores of the Great Lakes, Esposito Decl. ¶ 8. And with sea level rise, coastal areas encounter "sunny day flooding" even without storms, caused only by high tides. *Id.* ¶ 3.

Climate change has disrupted members' livelihoods and daily lives in other ways. At Movant BFU's members' farms throughout the State, excessive rain diminishes crop yield and degrades soil, reducing what members can sell at farmers' markets and provide to their community. Dorsey Decl. ¶¶ 5-6. In the worst cases, severe soil degradation has made it impossible for members to grow enough to sustain their livelihoods, forcing them to forfeit their land. *Id.* ¶ 8. In western and central New York, Movant CCE's members often can't visit beaches along Lake Erie, which close due to poor water quality following sewage overflows after heavy rains. Esposito Decl. ¶ 9. Climate change threatens some of the State's pristine and unfiltered drinking water sources, too. Since 2017, harmful algal blooms have increased in Skaneateles Lake, which provides drinking water to Syracuse and surrounding towns in the Finger Lakes region. Esposito Decl. ¶ 10. And in November 2024, a severe drought forced a pause in a critical project to repair the aqueduct that delivers half of New York City's drinking water from the Catskills region. Adams Decl. ¶ 4. That severe drought also contributed to unprecedented

wildfires last fall in the Catskills, *id.* ¶ 5, and in New York City, where smoke exacerbated the air pollution people already breathe, Shepard Decl. ¶ 6.

Climate-related harms will fall disproportionately on communities of color and low-income communities, including those that Movant WE ACT for Environmental Justice serves. Extreme heat is life-threatening in areas like northern Manhattan, where residents—especially those in public housing—have less access to air conditioning. Shepard Decl. ¶ 4. Even if not deadly, rising temperatures harm members by exacerbating health issues like asthma or COPD (Chronic Obstructive Pulmonary Disease). *Id.* ¶ 5. Smoke from wildfires, like those that burned in fall 2024, introduces another pollutant to communities that are already overburdened by air pollution. *Id.* ¶ 6. Smoke also forces members to close their windows to keep smoke out, worsening the heat for those who do not have or cannot afford to turn on air conditioning. *Id.* This is one example of how climate change compounds existing stressors to put vulnerable communities at greater risk.

Significant State, local, and federal funds have been spent on climate adaptation measures to protect New Yorkers, including Movants' members, supporters, and communities, but they are not enough. On Long Island and in western and central New York, ongoing efforts to restore wetlands, improve wastewater infrastructure, and conserve coastal property are strengthening storm resilience. Esposito Decl. ¶ 6, 12. Yet major projects have been pending for years without the resources to implement them at the necessary scale and speed, including a multi-hundred-million-dollar wastewater improvement project and a federal project that identified thousands of structures for potential elevation. *Id.* ¶ 7. New York has a cooling assistance program to subsidize air-conditioning for low-income residents, but funding was insufficient to meet demand for the last three consecutive summers. Shepard Decl. ¶ 4.

In the absence of adequate government support, Movants and their communities have used their own resources to provide disaster relief and adapt to climate change. After Hurricane Sandy, professionals weren't available to clean up thousands of destroyed homes, so volunteers went from home-to-home, ripping sheetrock off walls to prevent mold growth and hauling destroyed belongings to the curb. Esposito Decl. ¶ 14. To help its members confront challenges like climate change, Movant BFU organizes "work days" where volunteers travel to members' farms to provide physical support with labor-intensive projects, such as installing high tunnels at one member's farm to protect her crops from extreme heat. Dorsey Decl. ¶ 4. To accelerate the clean energy transition, Movant Catskill Mountainkeeper has led efforts to ramp up solar deployment and make it easier for Catskill residents to install clean heating and cooling technology, including geothermal and heat-pump water heaters. Adams Decl. ¶ 10. But these efforts are not enough, either. And when climate disaster strikes, private insurance cannot fill the gap: insurers may not cover climate-related disasters, Dorsey Decl. ¶ 7, and are pulling out of certain markets altogether, Esposito Decl. ¶ 13. The consequences of climate change have led to tremendous pain, sorrow, and loss, Esposito Decl. ¶ 14, and the feeling that there is nowhere to turn and no one to turn to, Shepard Decl. ¶ 8.

Movants and their members, supporters, and communities stand to benefit from the Act, which could fund a wide range of adaptation projects to better protect them from future climate harms. Funds could be used to update outdated infrastructure in the Catskills, Adams Decl. ¶ 11, upgrade stormwater and sewage infrastructure on Long Island and in upstate New York, Esposito Decl. ¶¶ 6-7, 12, and improve storm water management in New York City, Shepard Decl. ¶ 9. Funds could be used to restore wetlands and implement other nature-based solutions to protect coastal communities along Long Island and the Great Lakes. Esposito Decl. ¶ 6, 8. Funds could

be used to restore degraded soil on farms throughout the State, *see* Dorsey Decl. ¶ 6, 10; address harmful algal blooms, *see* Esposito Decl. ¶ 10; and defensively upgrade vulnerable roads and transit systems, *see id.* ¶ 3; Shepard Decl. ¶ 7.

Movant WE ACT for Environmental Justice has a particular stake in the Act: most of the communities it serves fall within the State's criteria for disadvantaged communities, and the organization has worked with community partners to develop research-backed plans that identify concrete steps to enhance northern Manhattan's climate resilience. Shepard Decl. ¶¶ 9-10. To help protect residents of northern Manhattan, including those who live in public housing, funds could be used to help install cooling systems and to weatherize and retrofit housing units to increase energy efficiency. *Id.* Funds could also be used to improve stormwater management by increasing permeable surfaces to absorb rainwater, *see id.*, and to provide medical care to treat illnesses exacerbated by extreme heat, *see id.* ¶ 5. The community has the knowledge, solutions, and plans for climate adaptation; what it lacks is the money to implement them. *Id.* ¶ 4.

These projects that would benefit Movants and their members, supporters, and communities are exactly the types of projects the Act contemplates funding. *See supra* pp. 3-4; N.Y. Env't Conserv. Law § 76-0101(2) (describing types of potentially eligible projects under the Act); *see also id.* § 76-0103(6)(e), 76-0103(10)(a)(iii)(3) (referring to "grant programs" for not-for-profit and community organizations for potential funding under the Act). Because "the validity of a [law] from which its members benefit is challenged," Movants have an interest in this case. *N.Y. Pub. Int. Rsch. Grp., Inc. v. Regents of Univ. of State of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975) (per curiam).

### D.    Movants will contribute to the just and equitable adjudication of the case

Given their unique perspectives and deep experience with the issues the Act is designed to address, Movants will "significantly contribute to full development of the underlying factual

issues in the suit and to the just and equitable adjudication of the legal questions presented." *H.L. Hayden*, 797 F.2d at 89.

First, by representing a cross-section of New Yorkers who are harmed by climate change and who stand to benefit from the Act, and as organizations with expertise on the climate adaptation needs of their communities and regions, Movants will bring a "unique, personal and highly relevant factual perspective to the law, its development, and its impact." *Garfield*, 241 F.R.D. at 103; *Commack*, 170 F.R.D. at 106 (granting permissive intervention to rabbis, kosher consumers, and rabbinical and lay organizations that would "bring a different perspective to the case and . . . contribute relevant factual variations that may assist the court in addressing the constitutional issue raised"). While Plaintiffs' constituents and members may be liable under the Act and Defendants are responsible for implementing the Act, Movants are among those "*protected* by the [Act]." *New York v. U.S. Dep't of Health & Hum. Servs.*, No. 19-cv-4676 (PAE), 2019 WL 3531960, at *4 (S.D.N.Y. Aug. 2, 2019). Accordingly, Movants' perspectives will provide the Court with a "fuller picture" of the public interest at stake and "contribute to a just and equitable adjudication" of the case. *United States v. New York City Hous. Auth.*, 326 F.R.D. 411, 419 (S.D.N.Y. 2018); *see also Miller v. Silbermann*, 832 F. Supp. 663, 674 (S.D.N.Y. 1993) (in case challenging rent stabilization law, "considerations of fairness strongly weigh in favor of permissive intervention" by tenants who, "in light of their knowledge and concern, will greatly contribute to the Court's understanding of [the] case").

Second, should the Court need to resolve Plaintiffs' request for injunctive relief, Am. Compl. ¶¶ 222-35, Movants' participation will aid the full development of the facts relevant to that inquiry. *See New York*, 2019 WL 3531960, at *6 (permitting intervention where proposed intervenors could help resolve potential request for preliminary relief). Given the personal

15

experiences of their members, supporters, and communities in dealing with the harms caused by climate change, Movants would be well-positioned to offer "concrete factual submissions," *id.*, to help the Court decide whether the balance of equities and the public interest favor an injunction. *See E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) (per curiam) (balance of equities and public interest are pertinent factors in evaluating request for permanent injunction).

Movants merit intervenor status even though the State will vigorously defend the Act. "[T]o grant permissive intervention, Rule 24(b) does not require a finding that party representation be inadequate." *New York*, 2019 WL 3531960, at *6. Since adequate representation is "clearly a minor factor at most" in the analysis, *United States v. Columbia Pictures Indus., Inc.*, 88 F.R.D. 186, 189 (S.D.N.Y. 1980), courts in this Circuit routinely grant permissive intervention even when the government will adequately defend a law. *See, e.g.*, *New York*, 2019 WL 3531960, at *6 (granting permissive intervention even when "proposed intervenors did not overcome the presumption of [the federal agency's] adequate representation of their interests"); *Bldg. & Realty Inst.*, 2020 WL 5658703, at *12 (granting permissive intervention where proposed intervenors "acknowledged . . . that they do not expressly challenge the adequacy of the State and the City's representation"); *Comcast of Conn. v. Vt. Pub. Util. Comm'n*, No. 17-cv-161 (GWC), 2018 WL 11469513, at *4 (D. Vt. Feb. 8, 2018) (granting permissive intervention even where "the State of Vermont will ably litigate this case," as "the State's representation . . . is not a bar to [proposed intervenor's] intervention").[4] Granting

---

[4] While the Second Circuit has indicated that courts consider the same factors in deciding whether to grant intervention by right or by permission, *see Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (per curiam), district courts have "continued to recognize the . . . flexibility of these factors, especially in the context of permissive intervention," and—as

permissive intervention despite the government's adequate representation is especially appropriate here because Movants will, for the reasons described above, "assist in the just and equitable adjudication" of the case. *New York City Hous. Auth.*, 326 F.R.D. at 418.

## II.    Movants seek leave to defer filing a responsive pleading

Movants respectfully seek leave to defer filing their responsive pleading or motion to dismiss pursuant to Federal Rule of Civil Procedure 24(c) until 14 calendar days after Defendants respond to the amended complaint. This short delay will allow Movants to minimize repetition by ensuring that their response does not unnecessarily duplicate material in Defendants' response. Courts regularly grant such requests where a movant's position is clear from its papers and opposing parties would not be prejudiced. *See, e.g.*, *Briscoe v. City of New Haven*, No. 3:09-cv-1642 (CSH), 2012 WL 13026762, at *6 (D. Conn. Oct. 5, 2012) (granting intervention and directing movants to file a responsive pleading within ten calendar days of defendants' responsive pleading); *Blesch v. Holder*, No. 12-cv-1578 (CBA), 2012 WL 1965401 at *2 (E.D.N.Y. May 31, 2012) (waiving pleading requirement because movant's "position on this litigation is clearly articulated in its motion papers"); *Windsor v. United States*, 797 F. Supp. 2d 320, 326 (S.D.N.Y. 2011) (similar). As described *supra*, Movants intend to argue that the challenged Act is constitutional and is not preempted. In addition, Movants intend to argue that for jurisdictional and/or jurisprudential reasons, this Court can dismiss Plaintiffs' claims at the threshold. *See Blesch*, 2012 WL 1965401, at *2 (proposed intervenors sufficiently articulated their position in motion papers by stating their intent to defend the challenged statute as constitutional under the due process clause). Plaintiffs would not be prejudiced by a deferral,

---

described *supra*—have accordingly granted permissive intervention absent a showing of inadequate representation, *Bldg. & Realty Inst.*, 2020 WL 5658703, at *12 (collecting cases).

which would reduce the burden of duplicative briefing on Plaintiffs and the Court and, at this early stage of the litigation, could be easily accommodated by setting a briefing schedule that allows Plaintiffs additional time and space to respond to Movants. Deferral is appropriate here because Defendants' deadline to respond to the amended complaint is not until April 21. Text Order Updating Answer Date (Apr. 8, 2025). Setting Movants' deadline after this date will avoid premature and potentially duplicative filings, thereby furthering judicial economy.

## CONCLUSION

For the foregoing reasons, Movants urge the Court to grant Movants' motion for permissive intervention and their accompanying request to defer filing a responsive pleading or motion to dismiss until 14 calendar days after Defendants respond to the amended complaint.


Dated: April 11, 2025                                    Respectfully submitted,

/s/ Michelle Wu
Michelle Wu (NDNY Bar No. 706205)
Mitchell S. Bernard (NDNY Bar No. 104409)
Natural Resources Defense Council, Inc.
40 West 20th Street, 11th Floor
New York, NY 10011
(646) 889-1489
michellewu@nrdc.org
mbernard@nrdc.org

/s/ Dror Ladin
Dror Ladin (NDNY Bar No. 705171)
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org

*Counsel for Movants*