# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK
## ALBANY DIVISION

STATE OF WEST VIRGINIA, et al.,

*Plaintiffs*,

v.

LETITIA JAMES, et al.,

*Defendants*.

Civil Action No. 1:25-cv-00168-BKS-DJS

**MEMORANDUM OF PLAINTIFFS CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AMERICAN PETROLEUM INSTITUTE, NATIONAL MINING ASSOCIATION, and THE BUSINESS COUNCIL OF NEW YORK STATE, INC. IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II**

## Table of Contents

Introduction ........................................................................................................... 1

Background ............................................................................................................ 3

    A.  Energy production in the United States is essential to America's national security and economy. ........................................................................................ 3

    B.  Greenhouse gases are emitted from a variety of sources and disperse globally once emitted ...................................................................................................... 5

    C.  New York passed the Act to punish energy producers for global greenhouse gas emissions. ......................................................................................................... 6

Argument ............................................................................................................... 8

  I.  Plaintiffs have associational standing to challenge New York's Act. ................ 8

  II.  The U.S. Constitution precludes New York's Act. ........................................... 9

    A.  New York's Act is unconstitutional because it imposes liability for pollution originating beyond New York's borders and intrudes upon an area governed exclusively by federal law. ....................................................................... 10

    B.  The Constitution's guarantees of equal sovereignty, due process, and federal control of foreign affairs further confirm that New York's Act is unconstitutional. 15

  III.  The Clean Air Act preempts New York's Act. .............................................. 19

    A.  The Clean Air Act comprehensively regulates air pollutants, including greenhouse gases. ........................................................................................................ 19

    B.  Under the Clean Air Act, States may regulate only greenhouse gas emissions that originate within their borders. ..................................................................... 20

    C.  New York's Act is preempted because it imposes liability for emissions originating out of state. ............................................................................... 22

  IV.  Plaintiffs meet all the requirements for a permanent injunction. ..................... 23

Conclusion ......................................................................................................... 25

## Table of Authorities

**Page(s)**

## Cases

*725 Eatery Corp. v. City of New York*,
    408 F. Supp. 3d 424 (S.D.N.Y. 2019)........................................................................25

*Am. Elec. Power Co. v. Connecticut*,
    564 U.S. 410 (2011)..............................................................1, 2, 5, 13, 19, 20

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)........................................................................................17

*In re Assicurazioni Generali, S.P.A.*,
    592 F.3d 113 (2d Cir. 2010)............................................................................17

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964)........................................................................................17

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013)............................................................................22

*Bonaparte v. Tax Court*,
    104 U.S. 592 (1881)....................................................................................2, 16

*Bucks Cnty. v. BP P.L.C.*,
    2025 WL 1484203 (Pa. Com. Pl. May 16, 2025) ...........................................13, 23

*City of Charleston v. Brabham Oil Co.*,
    No. 2020-CP-10-03975 (S.C. Ct. Com. Pl. Aug. 6, 2025) ....................................13

*City of New York v. BP P.L.C.*,
    325 F. Supp. 3d 466 (S.D.N.Y. 2018)..................................................................6

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021)..........................1, 2, 5, 10, 11, 12, 18, 19, 20, 21, 22, 23

*Clean Air Mkts. Grp. v. Pataki*,
    338 F.3d 82 (2d Cir. 2003)..............................................................................19

*N.C. ex rel. Cooper v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010) ...........................................................................22

*Coyle v. Smith*,
    221 U.S. 559 (1911)....................................................................................2, 15

*Dark Storm Indus. LLC v. Cuomo,*
   471 F. Supp. 3d 482 (N.D.N.Y. 2020) .....................................................................3

*Desclafani v. Pave-Mark Corp.,*
   2008 WL 3914881 (S.D.N.Y. Aug. 22, 2008) ..........................................................3

*Franchise Tax Bd. v. Hyatt,*
   587 U.S. 230 (2019) ..........................................................................................11, 15

*Fuld v. Palestine Liberation Org.,*
   606 U.S. 1 (2025) ..............................................................................................15, 16

*Gibbons v. Ogden,*
   22 U.S. 1 (1824) ........................................................................................................9

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.,*
   304 U.S. 92 (1938) ..................................................................................................10

*Hines v. Davidowitz,*
   312 U.S. 52 (1941) ..................................................................................................17

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ..................................................................................................8

*Illinois v. City of Milwaukee,*
   406 U.S. 91 (1972) ..............................................................................................1, 11

*Int'l Paper Co. v. Ouellette,*
   479 U.S. 481 (1987) ..........................................................................1, 2, 21, 22, 23

*State ex rel. Jennings v. BP Am. Inc.,*
   2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) ......................................................23

*Mallory v. Norfolk S. Ry. Co.,*
   600 U.S. 122 (2023) ................................................................................................16

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ........................................................................................2, 6, 19

*Mayor & City Council of Baltimore v. BP P.L.C.,*
   2024 WL 3678699 (Md. Cir. Ct. July 10, 2024) .....................................................13

*McCulloch v. Maryland,*
   17 U.S. 316 (1819) ....................................................................................................9

*Merrick v. Diageo Ams. Supply, Inc.,*
   805 F.3d 685 (6th Cir. 2015) ..................................................................................22

*Movsesian v. Victoria Versicherung AG,*
     670 F.3d 1067 (9th Cir. 2012) ...........................................................................17

*N.Y. Life Ins. Co. v. Head,*
     234 U.S. 149 (1914)...............................................................................15, 16

*N.Y. Progress & Prot. PAC v. Walsh,*
     733 F.3d 483 (2d Cir. 2013).....................................................................25

*N.Y. State Club Ass'n, Inc. v. City of New York,*
     487 U.S. 1 (1988) .......................................................................................9

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n.,*
     No. 25A103 (U.S. Aug. 21, 2025) ...........................................................25

*Nat'l Pork Producers Council v. Ross,*
     598 U.S. 356 (2023)..................................................................................16

*Nken v. Holder,*
     556 U.S. 418 (2009) .................................................................................24

*Platkin v. Exxon Mobil Corp.,*
     2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025) ....................................13

*SEC v. Citigroup Glob. Mkts., Inc.,*
     752 F.3d 285 (2d Cir. 2014).....................................................................24

*Shelby Cnty. v. Holder,*
     570 U.S. 529 (2013)...............................................................................2, 15

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
     451 U.S. 630 (1981)..............................................................................10, 11

*Transp. Workers Union of Am., Loc. 100 v. N.Y. City Transit Auth.,*
     342 F. Supp. 2d 160 (S.D.N.Y. 2004)........................................................9

*Treiber & Straub, Inc. v. UPS, Inc.,*
     474 F.3d 379 (7th Cir. 2007) ...................................................................10

*United States v. Locke,*
     529 U.S. 89 (2000)....................................................................................21

*United States v. New York,*
     708 F.2d 92 (2d Cir. 1983)........................................................................25

*United States v. New York,*
     No. 1:25-cv-03656-PKC (S.D.N.Y.) .....................................................14, 18

*United States v. Rodgers*,
    150 U.S. 249 (1893) ................................................................................ 16

*United States v. Vermont*,
    No. 2:25-cv-00463-MKL (D. Vt.) ........................................................ 14

*Wachovia Bank, N.A. v. Burke*,
    414 F.3d 305 (2d Cir. 2005) ................................................................. 21

*Watson v. Emps. Liab. Assur. Corp.*,
    348 U.S. 66 (1954) ................................................................................ 17

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) .............................................................................. 15

*Zschernig v. Miller*,
    389 U.S. 429 (1968) .................................................................... 2, 10, 17

**Statutes**

26 U.S.C. § 263 ............................................................................................ 3

26 U.S.C. § 613 ............................................................................................ 3

30 U.S.C. § 1201 .......................................................................................... 3

33 U.S.C. § 1370 ........................................................................................ 21

42 U.S.C. §§ 6201-6422 ............................................................................... 3

42 U.S.C. § 7410 ........................................................................................ 20

42 U.S.C. § 7411 ........................................................................................ 20

42 U.S.C. § 7416 ........................................................................................ 21

42 U.S.C. § 7426 ........................................................................................ 20

42 U.S.C. § 7521 ........................................................................................ 20

42 U.S.C. § 7571 ........................................................................................ 20

42 U.S.C. § 7547 ........................................................................................ 20

42 U.S.C. § 7604 ........................................................................................ 21

N.Y. Energy Law § 1-103 .............................................................................. 7

N.Y. Env't Conservation Law § 75-0101 ....................................................... 6

N.Y. Env't Conservation Law § 76-0101 ...............................................................1, 6, 7, 12, 17, 23

N.Y. Env't Conservation Law § 76-0103 .........................................................6, 7, 8, 9, 12, 23, 24

**Other Authorities**

Br. for the United States as Amicus Curiae, *Sunoco LP v. City & Cnty. of Honolulu*, 145 S. Ct. 1111 (Dec. 10, 2025) (No. 23-947), 2024 WL 5095299 ......................14

Br. for United States as Amicus Curiae in Support of Pet. for Reh'g, *City of Oakland v. B.P. p.l.c.*, 969 F.3d 895 (9th Cir. Aug. 3, 2020) (No. 18-16663) ......................14

Br. for the United States as Amicus Curiae Supporting Petitioners, *Suncor Energy v. Cnty. Comm'rs of Boulder Cnty.*, No. 25-170 (Sept. 11, 2025)..............................14

*Declaring a National Energy Emergency*, Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025)......................................................................................18

Oral Arg. Tr. at 31, *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (Jan. 19, 2021)......................................................................................13

*Protecting American Energy from State Overreach*, Exec. Order No. 14,260, 90 Fed. Reg. 15,513 (Apr. 8, 2025) ..............................................................18

*Reinvigorating America's Beautiful Clean Coal Industry*, Exec. Order 14261, 90 Fed. Reg. 15,517 (Apr. 8, 2025) ..............................................................18

U.S. Const. amend. X..............................................................................................15

U.S. Const. amend XIV, § 1......................................................................................16

U.S. Const. art. IV, § 1.............................................................................................15

U.S. Const. art. IV, § 2.............................................................................................15

U.S. Const. art. VI...................................................................................................9

U.S. Mot. Summ. J., *United States v. Vermont*, No. 2:25-cv-00463-mkl (Sept. 15, 2025), Declaration of Deputy Secretary of State Christopher Landau, ECF 50-3................................................................................................................3

## Introduction

This case presents a constitutional challenge to New York's misnamed "Climate Change Superfund Act"; N.Y. Env't Conservation Law §§ 76-0101, *et seq.* ("Act").[1] The Act seeks to hold mostly out of state companies liable for the alleged effects of "*worldwide*" greenhouse gases emitted over the last 25 years. *Id.* § 76-0101(8) (emphasis added). The Act punishes these companies for the lawful extraction and refining of fossil fuels over that 25-year period—activities that have long been central to the development of the American economy and that were not only permitted but actively encouraged by New York and federal policymakers. It compels fossil fuel producers and oil refiners to pay $75 billion into a politically controlled fund for climate-related projects, effectively creating a punitive and arbitrary financial penalty untethered from either causation or culpability.

The Second Circuit has definitively held that "[s]uch a sprawling" theory of liability "is simply beyond the limits of state law." *City of New York v. Chevron Corp.*, 993 F.3d 81, 92 (2d Cir. 2021). That decision controls here. New York cannot "hold [energy] Producers liable, under New York law, for the effects of emissions made around the globe." *Id.*

That is, in part, because it is inherent to the Constitution's structure that certain matters can only be controlled by federal law, not a patchwork of conflicting state rules. *See id.* at 90 (federal law "addresses subjects within national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands" (quoting *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"))). Emissions that cross state or international borders is one such matter. *See, e.g.*, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487-88 (1987); *see also AEP*, 564 U.S. at 421; *Illinois v. City of Milwaukee*, 406 U.S. 91, 103-05 (1972) ("*Milwaukee I*"). This principle

---

[1] Unless otherwise noted, statutory citations are to Article 76 of New York's Environmental Conservation Law.

can be seen, for example, in the Constitution's guarantee of equal sovereignty to each State, and in the limits imposed by due process on each State's authority to intrude on the jurisdiction of other States. *See Coyle v. Smith*, 221 U.S. 559, 580 (1911); *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013); *see also Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881). It also applies where, as here, a State interferes with the federal Government's exclusive authority over foreign policy. *Zschernig v. Miller*, 389 U.S. 429, 432 (1968); *see also City of New York*, 993 F.3d at 100-03. In short, the Constitution bars New York's efforts to reach far beyond its borders to punish global conduct related to out-of-state greenhouse gas emissions.

The Clean Air Act ("CAA") also preempts New York's Act. Although Congress, through the CAA's comprehensive scheme, allows States some authority to address local air emissions, that authority is "narrowly circumscribed" to emissions originating within a State's own borders. *City of New York*, 993 F.3d at 100. For domestic greenhouse gas emissions, Congress supplanted federal common law with a comprehensive regulatory scheme for air pollution. *See Massachusetts v. EPA*, 549 U.S. 497, 528-29 (2007); *AEP*, 564 U.S. at 426. The CAA provides only a narrow role for state regulation of emissions, one limited to in-state emissions. *City of New York*, 993 F.3d at 100 (citing *Ouellette*, 479 U.S. at 497). Because New York's Act, on its face, imposes strict liability based upon greenhouse gas emissions originating outside of New York, the CAA preempts New York's law. Allowing fifty different States to impose fifty different requirements on the same conduct is incompatible with the CAA's comprehensive approach.

Plaintiffs ask that the Court declare New York's Act unlawful and enjoin its enforcement against Plaintiffs' members.

## Background

### A.     Energy production in the United States is essential to America's national security and economy.

Plaintiffs' members produce energy from resources throughout the United States and across the globe. They supply the fossil fuels that power roughly 80% of total U.S. energy needs and create jobs for millions of Americans. *See* Lehotsky Decl. ¶ 3.[2] Indeed, coal alone currently accounts for nearly 17 percent of U.S. electricity generation. *Id.* ¶¶ 4, 6-7. The energy that Plaintiffs' members produce is indispensable to the Nation's economy, including transportation, agriculture, commerce, and security. *See id.* ¶ 5. Energy producers' petroleum refining activities also yield products vital to modern civilization, including medical equipment, fertilizers, plastics, tires, synthetic fibers, coke used in steelmaking, and lubricants. *See id.* ¶¶ 8-10. Similarly, coal is used to produce steel, cement, carbon fibers and foams, medicines, and asphalts. *See id.* ¶¶ 11. This is why the federal Government encourages and incentivizes the critical energy production these companies provide. *See id.* ¶¶ 3, 12; *see also* 26 U.S.C. §§ 263(c), 613 (tax incentives for oil and gas exploration and production); 42 U.S.C. §§ 6201-6422 (creating Strategic Petroleum Reserve and authorizing President to reduce petroleum imports); 30 U.S.C. § 1201(b) (stating that it is "essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry"); U.S. Mot. Summ. J., *United States v. Vermont*, No. 2:25-cv-00463-mkl (Sept. 15, 2025), Declaration of Deputy Secretary of State Christopher Landau ¶ 13, ECF 50-3 ("Landau Decl., *U.S. v. Vermont*"), Lehotsky Decl., Ex. EE.

---

[2] All exhibits referenced in this motion are attached to the same declaration. This declaration includes links to publicly available websites for purposes of background information, and the Court may take judicial notice of the facts contained in those publicly available, government websites. *See, e.g.*, *Dark Storm Indus. LLC v. Cuomo*, 471 F. Supp. 3d 482, 490 n.2 (N.D.N.Y. 2020); *see also Desclafani v. Pave-Mark Corp.*, 2008 WL 3914881, at *5 n.7 (S.D.N.Y. Aug. 22, 2008).

The energy that Plaintiffs' members produce benefits the citizens of the entire nation (as well as nations around the world), including the residents of New York, which is one of the United States' largest consumers of oil and gas. Lehotsky Decl. ¶ 13. The vast majority of New York's total energy consumption comes from oil and gas. *See id.* ¶¶ 13, 15. Indeed, according to New York, "approximately three-quarters of [its] primary energy use comes from fossil fuels, mainly natural gas (39 percent) and petroleum (36 percent)." *Id.* ¶ 15. New York businesses also depend heavily on fossil fuels. For example, Revere Copper is an energy-intensive producer of commodity metal products, which depends on reliable and affordable natural gas and electric power. O'Shaughnessy Decl. ¶¶ 5-6. Further, although coal is not used as an energy source in New York, it is essential to produce steel—a critical material for constructing modern buildings such as the high-rises of New York City's skyline. Lehotsky Decl. ¶ 16.

The New York government has also relied on (and continues to extensively use) fossil fuels. For example, New York's 2025 Draft Energy Plan acknowledges that the State's electricity demand is projected to increase over the next decade. To keep up with that demand, New York will continue to "support the reliable provision of natural gas and petroleum fuels," including "continued investment in the natural gas system" aimed at ensuring "adequate supply." *Id.* ¶ 15. Similarly, the New York Independent System Operator—the entity responsible for planning and administering New York's electrical grids—has recognized that fossil-fired generation will be needed as a "bridge" for reliable electric power while the State pursues decarbonization goals. *Id.* ¶ 14. New York also maintains a strategic reserve fossil fuel plan because the State "relies on the continuous availability and resupply of gasoline and diesel fuel to maintain public safety, commerce, and the well-being and economic vitality of its residents, businesses, and governments." *Id.* ¶ 17. And earlier this year, the New York Department of Environmental Conservation (the "DEC") approved permits to

expand the capacity of the 414-mile Iroquois pipeline to deliver *more* natural gas to New York City. *Id.* ¶ 18.[3]

**B.    Greenhouse gases are emitted from a variety of sources and disperse globally once emitted.**

Greenhouse gases are emitted by billions of natural and human sources. *See id.* ¶ 20. Human sources include fossil fuel combustion (from cars, planes, power plants, etc.), agriculture, forestry, and industrial processes. *See id.* Natural sources include wetlands, oceans, wildfires, and volcanoes. *See id.* ¶¶ 21-22. Although emissions from transportation are estimated to account for 15% of global anthropogenic (*i.e.*, human-caused) greenhouse gas emissions, another 22% come from the cultivation of crops and livestock. *See id.* ¶ 22. With respect to fossil fuel emissions, most greenhouse gases are emitted by *consuming* fossil-fuel products, not by producing them through extraction and refining (the only activities that trigger liability under New York's Act). *See id.* ¶ 23.

Once emitted, greenhouse gases "become well mixed in the atmosphere," dispersing across the globe and crossing state and international boundaries. *AEP*, 564 U.S. at 422 (citation omitted); *City of New York*, 993 F.3d at 92 ("[G]reenhouse gases quickly diffuse and comingle in the atmosphere" (record citation omitted)). This is why "[g]reenhouse gas molecules cannot be traced to their source." *City of New York*, 993 F.3d at 92 (record citation omitted). As the Supreme Court explained, greenhouse gas "emissions in New Jersey may contribute *no more* to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422 (emphasis added). It is instead the *cumulative*

---

[3] In fact, just last month, the New York Public Service Commission approved National Grid's Long-Term Natural Gas Plan, finding that "the additional firm capacity and other aspects of [the Northeast Supply Enhancement Project] would materially improve the reliability and resilience of the Downstate gas system" and that "there is a need for the more reliable source of supply that [the Northeast Supply Enhancement Project] would provide if it receives all required approvals and is constructed." Lehotsky Decl. ¶ 19.

effect of *all* global greenhouse gas emissions—from many different natural and human sources— that creates a "greenhouse" effect, which can warm the earth's atmosphere and impact the climate in various ways. *Massachusetts*, 549 U.S. at 504-05; *see also City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 472 (S.D.N.Y. 2018) (climate-change claims "are ultimately based on the 'transboundary' emission of greenhouse gases").

### C. New York passed the Act to punish energy producers for global greenhouse gas emissions.

The New York Legislature enacted the Act to penalize out-of-state energy companies for the cumulative effect of global greenhouse gas emissions. The Act "established a climate change adaptation cost recovery program" in order "[t]o secure compensatory payments from responsible parties based on a standard of strict liability." § 76-0103(1), (2)(a). The Act directs the DEC to issue "cost recovery demands" to designated "responsible parties," holding them "strictly liable" for their alleged contribution to historical greenhouse gas emissions. § 76-0103(2)(c)-(d), (3)(a). It imposes a total of $75 billion in penalties for greenhouse gases emitted over a 25-year "[c]overed period": January 1, 2000, to December 31, 2024. § 76-0101(6), (9). The "[c]overed greenhouse gas emissions" are "the total quantity of greenhouse gas emissions, expressed in metric tons of carbon dioxide equivalent, as defined in section 75-0101 of this chapter, attributable to the total amount of fossil fuels extracted by that entity during the covered period, as well as the total amount of crude oil refined by that entity during the covered period." § 76-0101(8).[4] The Act does not limit liability to fossil fuel extraction or refining activities *within* New York. It expressly imposes liability for "emissions attributable to all fossil fuel extraction and refining worldwide" and is "not limited to such emissions within the state." *Id.*

---

[4] Section 75-0101 defines "[c]arbon dioxide equivalent" as "the amount of carbon dioxide by mass that would produce the same global warming impact as a given mass of another greenhouse gas over an integrated twenty-year time frame after emission." § 75-0101(2).

The Act applies only to "responsible part[ies]," which it defines as "any entity . . . which, during any part of the covered period, was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by [DEC] to be responsible for more than one billion tons of covered greenhouse gas emissions." § 76-0101(21). However, this definition purports to exclude "any person who lacks sufficient contacts with the state to satisfy the due process clause of the United States Constitution." *Id.*

Because this definition is limited to entities engaged in the "business of extracting fossil fuel or refining crude oil," § 76-0101(21),[5] it applies almost exclusively to companies located outside of New York. New York has little in-state fossil fuel extraction, no coal production, and no crude oil refining in the state. Pls.' Rule 56.1 Statement of Undisputed Material Facts ("SUMF") ¶¶ 33-34. Thus, the Act's aim is *necessarily* extraterritorial. And because New York produces only a small amount of fossil fuels, the Act's threshold of "one billion tons of covered greenhouse gas emissions" can be triggered only by conduct outside of New York. § 76-0101(21). Thus, under the Act's definition of "responsible party," no company could meet the one-billion-ton threshold for the 25-year period based solely on conduct in or emissions from within New York.

The DEC has no discretion over whether to issue payment demands under the Act. § 76-0103(3)(e)(i) (the DEC "*shall* issue notices of cost recovery demand to all responsible parties" (emphasis added)). To determine each responsible party's cost recovery demand, the Act provides that demand "shall be equal to an amount that bears the same ratio to the cost recovery amount" of $75 billion "as the responsible party's applicable share of covered greenhouse gas emissions

---

[5] *See* § 76-0101(12) ("'Fossil fuel' shall have the same definition as in section 1-103 of the energy law"); N.Y. Energy Law § 1-103(7) (defining "fossil fuel" to include "coal, petroleum products and fuel gases"); *see also id.* § 1-103(8) (defining "fuel gases" to include natural gas).

bears to the aggregate applicable shares of covered greenhouse gas emissions of all responsible parties" from around the globe. § 76-0103(3)(b).

The Act funnels these punitive payments into a State fund for its preferred "climate change adaptive infrastructure projects." § 76-0103(1), (2)(d)-(f). These projects could involve, "but [are] not limited to: agriculture, biodiversity, ecosystem services, education, finance, healthcare, manufacturing, housing and land use, retail, tourism (including state and municipal parks), transportation, and municipal and local government." § 76-01013(6)(b).

**Argument**

New York's imposition of strict, retroactive liability for some (but not all) global greenhouse gas emissions is precluded by the U.S. Constitution and preempted by the CAA.[6] The Second Circuit's decision in *City of New York* and decades of Supreme Court precedent confirm that states cannot impose their own liability regimes on out-of-state emissions nor can they interfere with the comprehensive federal framework that Congress established in the CAA.

## I.    Plaintiffs have associational standing to challenge New York's Act.

Plaintiffs have associational standing to bring this challenge because: (1) at least one of Plaintiffs' members has individual standing to sue in its own right; (2) challenging the Act is germane to Plaintiffs' respective purposes; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs are state and national trade associations that are committed to defending the rights of their members and that represent a broad range of businesses, including major energy producers. SUMF ¶¶ 1-2, 6-7, 11-12, 16-17. Moreover, participation of individual members is unnecessary because Plaintiffs challenge the Act on its face and seek only injunctive and

---

[6] As outlined in Counts III through VI of Plaintiffs' Complaint, the Act is constitutionally deficient for myriad other reasons, which Plaintiffs reserve for further proceedings, if necessary.

declaratory relief. *See, e.g.*, *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 10 n.4 (1988) (holding that "facial challenge to the Law does not require the participation of individual members"); *Transp. Workers Union of Am., Loc. 100 v. N.Y. City Transit Auth.*, 342 F. Supp. 2d 160, 169 (S.D.N.Y. 2004) (similar).

New York has made clear that it is targeting Plaintiffs' member companies, among others. *See* SUMF ¶¶ 26-32. For example, the Act's sponsors circulated a memorandum listing seven of Plaintiffs' members as being covered by the Act and estimating those companies' cost recovery demands. SUMF ¶ 26-29; Lehotsky Decl. ¶ 24. Other statements in the legislative history and from the New York Senate reference those same energy producers. SUMF ¶¶ 30-32; Lehotsky Decl. ¶¶ 25-27. And the DEC has no discretion over whether to issue payment demands to responsible parties under the Act. § 76-0103(3)(e)(i).

Finally, an order declaring the Act unlawful and enjoining Defendants from enforcing it against Plaintiffs' members would redress the harms to members of being forced to respond to cost recovery demands under the Act, incurring unrecoverable compliance costs, and suffering reputational damage. *See* Durbin Decl. ¶¶ 18-22; Meyer Decl. ¶¶ 17-19; Sweeney Decl. ¶¶ 14-18; Pokalsky Decl. ¶¶ 15-22; Torrence Decl. ¶¶ 10-22; Swarup Decl. ¶¶ 15-26; Cochrane Decl. ¶¶ 13-21; Martini Decl. ¶¶ 13-21; Jarboe Decl. ¶¶ 14-25; Parrish Decl. ¶¶ 13-23; Slone Decl. ¶¶ 15-22.

## II.    The U.S. Constitution precludes New York's Act.

The U.S. Constitution is "the supreme Law of the Land." U.S. Const. art. VI. State laws are unlawful and unenforceable when they conflict with the Constitution's allocation of authority, whether between the federal government and the States or among the States themselves. *See, e.g.*, *Gibbons v. Ogden*, 22 U.S. 1, 210-11, 240 (1824) ("The nullity of any act[,] . . . inconsistent with the constitution, is produced by the declaration, that the constitution is the supreme law."); *McCulloch v. Maryland*, 17 U.S. 316, 326-27 (1819) ("The constitution . . . declares, that the constitution

itself . . . shall be the supreme law of the land . . . ."). Just as federal laws enacted by Congress preempt contrary state laws under the Supremacy Clause, the Constitution itself precludes state laws that exceed the limits of state power. *See, e.g.*, *Zschernig*, 389 U.S. at 432.

New York's Act is unconstitutional because it seeks to regulate matters that the U.S. Constitution commits exclusively to the federal Government and exceeds the territorial bounds of the State's constitutional authority. Second Circuit precedent confirms that no State can reach beyond its borders to impose liability under its own law for out-of-state and global greenhouse gas emissions. *City of New York*, 993 F.3d at 91-93. Yet that is precisely what the Act does. It targets major energy producers whose extraction and refining activities occur exclusively outside New York—in places like Texas and West Virginia, and in countries across the world—and seeks to hold them strictly liable, *as a matter of New York State law*, for the worldwide climate-related effects of global greenhouse gas emissions. This effort exceeds the Constitution's core structural limits on state authority and violates foundational limits on state power.

> **A.     New York's Act is unconstitutional because it imposes liability for pollution originating beyond New York's borders and intrudes upon an area governed exclusively by federal law.**

By reaching beyond its own borders to impose billions of dollars in liability on almost exclusively out-of-state energy producers for lawful activities outside of New York, the Act trespasses into an area of exclusive federal authority. It is therefore precluded by the U.S. Constitution.

Structural principles embodied in the U.S. Constitution reserve certain areas of law exclusively to the federal government. In these areas of "uniquely federal interests," "our federal system does not permit the controversy to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981) (citation omitted). For example, courts have held that federal law must govern discrete issues like interstate water disputes, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938), and interstate air carrier liability, *Treiber &*

10

*Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 384 (7th Cir. 2007). That is because "the interstate or international nature of the[se] controvers[ies] makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 640-41. In these federal areas, "the Constitution implicitly forbids" States from "apply[ing] their own law," and disputes within these areas must "turn on federal 'rules of law.'" *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 246-47 (2019) (citation omitted).

The Second Circuit has already held that disputes concerning transboundary greenhouse gas emissions are exclusively subject to federal law. *City of New York*, 993 F.3d at 91. *City of New York* explained that "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air . . . pollution." 993 F.3d at 91; *see also Milwaukee I*, 406 U.S. at 103 ("When we deal with air . . . in [its] ambient or interstate aspects," federal law controls). That is because interstate air pollution issues "implicate two federal interests that are incompatible with the application of state law: (i) the 'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *City of New York*, 993 F.3d at 91-92 (alteration in original).

*City of New York* directly controls. There, the Second Circuit rejected New York City's attempt to impose state tort liability on out-of-state energy companies for the alleged effects of global greenhouse gas emissions. *See id.* at 92. The city sought to hold energy companies liable for emissions "made around the globe over the past several hundred years," not just in New York. *Id.* The Second Circuit held that such a sweeping claim "is simply beyond the limits of state law." *Id.* The court explained that the City's suit would have regulated emissions from every State and every foreign country, violating the rights of other States and intruding on the federal government's authority over foreign relations. *Id.* (citing *Tex. Indus.*, 451 U.S. at 641).

The Act is no different. Like the tort law at issue in *City of New York*, the Act imposes penalties for damages purportedly caused by global climate change in New York but bases liability on the cumulative "effects of emissions made around the globe" over nearly 25 years. 993 F.3d at 92. Specifically, the Act (1) bases liability on "covered greenhouse gas emissions," which are defined as "emissions attributable to all fossil fuel extraction and refining *worldwide*," §§ 76-0103(2)(a), 76-0101(8) (emphasis added), (2) assesses each responsible party's share of these worldwide emissions, § 76-0103(3)(b)-(c), and then (3) uses that share to determine New York's recovery from each responsible party, § 76-0103(2). The Act accordingly does *exactly* what the Second Circuit forbade: it imposes penalties "for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet." *City of New York*, 993 F.3d at 92.

It is irrelevant that the Act employs a penalties and liability scheme rather than express emissions controls. *City of New York* held that, even though the City's claims did not "expressly seek[] to impose a standard of care or emission restrictions" on energy producers, "the goal of its lawsuit [was] perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id.* at 93. The Act does the same. It expressly imposes "strict liability" for "worldwide" greenhouse gas emissions. §§ 76-0103(2)(1), 76-0101(8). And like the damages sought in *City of New York*, the Act's substantial financial penalties will influence future business decisions. *See City of New York*, 993 F.3d at 93 ("significant damages award" itself would impact energy producers' behavior). As the Second Circuit explained, "the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Id.* at 92 (cleaned up). Thus, even if the Act only "would regulate cross-border emissions in an indirect and roundabout manner, it would regulate them nonetheless." *Id.* at 93.

*City of New York* is also consistent with the "growing chorus of state and federal courts across the United States" holding that only federal law can govern liability for out-of-state emissions. *City of Charleston v. Brabham Oil Co.*, No. 2020-CP-10-03975, at 2-3 (S.C. Ct. Com. Pl. Aug. 6, 2025) (quoting *Bucks Cnty. v. BP P.L.C.*, 2025 WL 1484203, at *6 (Pa. Com. Pl. May 16, 2025)), Lehotsky Decl., Ex. Z; *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846, at *5 (N.J. Super. Ct. Feb. 5, 2025) ("[O]nly federal law can govern Plaintiffs' interstate and international emissions claims because the basic scheme of the Constitution so demands." (cleaned up)); *Mayor & City Council of Baltimore v. BP P.L.C.*, 2024 WL 3678699, at *6 (Md. Cir. Ct. July 10, 2024) ("[T]he Constitution's federal structure does not allow the application of state law to claims like those presented by Baltimore."). As the *Charleston* court put it, "the U.S. Supreme Court has long made clear [that] the federal Constitution's structure generally precludes and preempts states from using their own laws to resolve disputes involving interstate and international emissions because under 'the basic scheme of the Constitution,' these disputes are not 'matters of substantive law appropriately cognizable by the states.'" *City of Charleston*, No. 2020-CP-10-03975, at 5 (quoting *AEP*, 564 U.S. at 421-22). In each of these cases, a State, county, or municipality pursued a theory of liability under State law that was grounded in the impacts of global, out-of-state greenhouse gas emissions. In each case, the court correctly held that federal law precluded liability under State law.

Likewise, the Second Circuit's controlling decision is supported by the federal government's long-held position that climate-change claims are "inherently federal in nature" and that global greenhouse gas emissions cannot "be subjected to potentially conflicting regulations by every state and city affected by global warming." Oral Arg. Tr. at 31, *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (Jan. 19, 2021), Lehotsky Decl., Ex. AA. Indeed, the United

States during both the Trump and Biden administrations acknowledged that plaintiffs may not hold energy companies liable under state law for alleged injuries from climate change. In 2020, the United States explained that "[a]s a matter of constitutional structure, any claims [asserted in the area [of transboundary emissions] necessarily and inherently arises under federal rather than state law." Br. for United States as Amicus Curiae in Support of Pet. for Reh'g at 9, *City of Oakland v. B.P. p.l.c.*, 969 F.3d 895 (9th Cir. Aug. 3, 2020) (No. 18-16663), Lehotsky Decl., Ex. BB. Similarly, in 2024, the United States recognized that energy producer defendants sued by Honolulu for climate-related claims "may ultimately prevail on their contention that respondents' claims are barred by the Constitution . . . to the extent the claims rely on conduct occurring outside Hawaii." Br. for the United States as Amicus Curiae at 12, *Sunoco LP v. City & Cnty. of Honolulu*, 145 S. Ct. 1111 (Dec. 10, 2025) (No. 23-947), 2024 WL 5095299, Lehotsky Decl., Ex. CC. Even more recently, the United States argued to the U.S. Supreme Court that state-law claims seeking to regulate out-of-state emissions intrude on authority the Constitution assigned exclusively to the federal Government. *See* Br. for the United States as Amicus Curiae Supporting Petitioners at 12-16, *Suncor Energy v. Cnty. Comm'rs of Boulder Cnty.*, No. 25-170 (Sept. 11, 2025), Lehotsky Decl., Ex. DD. And the United States has filed a parallel suit to this one—citing these same principles— that challenges the Act. *See United States v. New York*, No. 1:25-cv-03656-PKC (S.D.N.Y.); *see also United States v. Vermont*, No. 2:25-cv-00463-MKL (D. Vt.) (challenging Vermont's similar law).

In sum, the Act flouts the settled rule that the Constitution reserves to federal law alone the power to address out-of-state greenhouse gas emissions. It is therefore constitutionally precluded.

**B.    The Constitution's guarantees of equal sovereignty, due process, and federal control of foreign affairs further confirm that New York's Act is unconstitutional.**

Specific constraints in the Constitution confirm the settled rule that New York may not impose liability for greenhouse gases emitted across the United States and the world. These constraints include the Constitution's structural provisions establishing a perpetual union of equal, sovereign States; the Fourteenth Amendment's Due Process Clause; and the Constitution's exclusive allocation of foreign affairs authority to the federal Government (and not the States).

The Constitution guarantees that all States are equal and sovereign within their own borders. *See, e.g.*, U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Indeed, numerous provisions of the Constitution rest on the fundamental assumption that state borders limit the territorial scope of state authority. *See, e.g.*, U.S. Const. art. IV, § 1 (Full Faith and Credit Clause); art. IV, § 2 (Privileges and Immunities Clause). This foundational principle reflects the reality that "the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle*, 221 U.S. at 580; *Shelby Cnty.*, 570 U.S. at 544 (same). That "equality" of sovereign powers delimits a State's power to dictate or dominate another's sovereign authority. *See, e.g.*, *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025) (describing the "limits imposed" on States "by their status as coequal sovereigns in a federal system" (citation omitted)); *Hyatt*, 587 U.S. at 246-47.

Equal sovereignty necessarily limits the ability of one State to extend its laws into another's territory. A State cannot exercise authority over conduct that takes place entirely elsewhere "without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority." *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980) ("The sovereignty of each

15

State . . . implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment."); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring) ("We have long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests."). That rule inheres in the federalist structure of the Constitution. *See N.Y. Life Ins. Co.*, 234 U.S. at 161 (the "obviously . . . necessary result of the Constitution" is that a State's sovereignty is limited by the sovereignty of other States). Thus, States may regulate only within the territorial bounds indicated by the "original and historical understandings of the Constitution's structure and the principles of sovereignty and comity it embraces." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 & 377 n.1 (2023).

The Due Process Clause of the Fourteenth Amendment, U.S. Const. amend XIV, § 1, likewise forbids a State from legislating beyond its own jurisdiction unless specifically authorized by Congress. *Fuld*, 606 U.S. at 14; *see also Nat'l Pork Producers*, 598 U.S. at 376; *Mallory*, 600 U.S. at 156 (2023) (Alito, J., concurring) (noting that the Court's Due Process decisions "have continued to recognize that constitutional restrictions on state court jurisdiction . . . reflect 'territorial limitations' on state power" (citation omitted)). In *Fuld*, the Court explained that "due process limitations imposed by the Fourteenth Amendment" are "driven [in relevant part] by" the principle of "protecting interstate federalism" and that as a necessary part of those "principles of interstate federalism embodied in the Constitution[,]" "[s]tate sovereign authority is bounded by the States' respective borders." *Fuld*, 606 U.S. at 13-14 (citation omitted). *Fuld* rests on decades of precedent that explained the due process limits on a state's power to regulate conduct beyond its borders. *See Bonaparte*, 104 U.S. at 594 (state may not legislate "except with reference to its own jurisdiction"); *United States v. Rodgers*, 150 U.S. 249, 282 (1893) (state authority is "coextensive with its

territory"); *Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954) ("[A] State is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activit[i]es wholly beyond its boundaries.").

The Constitution also limits state authority to act on matters of foreign affairs. Foreign policy "must be treated exclusively as an aspect of federal law." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964); *see Zschernig*, 389 U.S. at 442-43 ("Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." (citation omitted)) (Stewart, J., concurring); *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("[T]he supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution."). Where "a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power, the Supremacy Clause prevents the state statute from taking effect." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc); *accord In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 117-18 (2d Cir. 2010) ("[S]tate law 'must give way' to the foreign policy of the United States." (citation omitted)). That is why the Supreme Court has ruled that state laws are constitutionally precluded where "there is evidence of clear conflict between the policies adopted by the [state and federal Government]," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003), or to the extent they have "more than 'some incidental or indirect effect in foreign countries,'" *Zschernig*, 389 U.S. at 434.

New York's Act exceeds these constitutional limitations on state authority. The Act would impose liability based upon emissions associated with fossil fuel extraction and refining that occurred in other States (and around the world) and that bears only an attenuated connection to the harm New York alleges. *See* § 76-0101(8). New York is, for example, targeting oil extracted in

Texas, refined in Louisiana, purchased in Virginia, and used in New Jersey, or coal extracted in West Virginia, purchased in Pennsylvania, and used as fuel in Indiana, based on the idea that using fossil fuels contributes to a global phenomenon—even though neither the fuel nor the use is tied to any activity in New York. By imposing these penalties based on allocated shares of global emissions, New York seeks not only to control lawful activities in other States but also to override the energy policies of sister States and the federal government. *See City of New York*, 993 F.3d at 92 (explaining that a "substantial damages award . . . would effectively regulate" energy producers' "behavior far beyond New York's borders").

Indeed, New York's Act "needlessly complicate[s] the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *Id.* at 103. For example, the Act undermines the federal government's ability to decide whether to join (or to not join or to withdraw from) various international agreements involving greenhouse gas emissions. The Act also directly conflicts with "the United States' longstanding position in international climate-change negotiations . . . to oppose the establishment of liability and compensation schemes at the international level." *Id.* at 103 n.11 (citation omitted); *see* Landau Decl. ¶¶ 15-20, *U.S. v. Vermont* (explaining how Vermont's similar Act conflicts with U.S. foreign policy). And the Act conflicts with the current Administration's national-security priorities and policies. *See, e.g.*, *Declaring a National Energy Emergency*, Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025); *Protecting American Energy from State Overreach*, Exec. Order No. 14,260, 90 Fed. Reg. 15,513 (Apr. 8, 2025); *Reinvigorating America's Beautiful Clean Coal Industry*, Exec. Order 14261, 90 Fed. Reg. 15,517 (Apr. 8, 2025). Indeed, the United States has filed its own suit against New York's Act, asserting that the Act interferes with the federal government's exclusive authority over foreign affairs and undermines its international policies on climate change and energy production. *See United States*

*v. New York*, No. 1:25-cv-03656-PKC (S.D.N.Y.). Because New York's Act "implicates the conflicting rights of states and our relations with foreign nations," the Act "poses the quintessential example of when" federal law "is most needed." *City of New York*, 993 F.3d at 92 (cleaned up).

## III.    The Clean Air Act preempts New York's Act.

"The Supremacy Clause invalidates state laws that interfere with, or are contrary to, federal law," absent explicit congressional authority. *Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 86-87 (2d Cir. 2003) (cleaned up). The CAA establishes a comprehensive scheme for regulating air pollutants—including greenhouse gases—across the United States. Congress defined the states' role under the CAA and "narrowly circumscribed" their authority to regulate the "slim reservoir" of emissions within the State's own borders. *City of New York*, 993 F.3d at 100. Because New York's Act expressly imposes liability for *global* greenhouse gas emissions, the CAA preempts the Act.

### A.    The Clean Air Act comprehensively regulates air pollutants, including greenhouse gases.

Congress created a comprehensive federal scheme to regulate air pollution through the CAA. Greenhouse gases are "pollutants" covered by the CAA and thus subject to regulation by EPA. *Massachusetts*, 549 U.S. at 528-29; *see also id.* at 532 ("[G]reenhouse gases fit well within the [CAA's] capacious definition of 'air pollutant'" under the act-wide definition in Section 302(g)). The CAA "delegate[s]" authority to EPA to "deci[de] whether and how to regulate" greenhouse gas emissions, and "entrusts" to EPA the "complex balancing" of "competing interests" from "environmental benefit[s]" of regulation to "our Nation's energy needs and the possibility of economic disruption." *AEP*, 564 U.S. at 426-27. That delegation includes the authority "to decline to regulate [greenhouse gas] emissions altogether." *Id.* at 426.

For example, EPA has authority to choose national standards for many emissions sources. Title II of the CAA gives EPA authority to determine whether to establish emissions standards for

the transportation sector, including vehicles, aircraft, locomotives, motorcycles, and nonroad engines and equipment. 42 U.S.C. §§ 7521(a)(1)-(2), (a)(3)(E), 7571(a)(2)(A), 7547(a)(1), (5). The CAA also provides EPA with authority to determine whether emissions of a pollutant from "stationary sources," such as power plants, refineries, and oil and gas wells, as well as coal preparation and processing plants, should be regulated and at what levels. *AEP*, 564 U.S. at 426; *see also* 42 U.S.C. § 7411(b)(1)(A)-(B), (d). Even when EPA chooses not to regulate, that is "no less an exercise of the Legislature's 'considered judgment' concerning the regulation of air pollution" than the alternative. *AEP*, 564 U.S. at 426.

Congress included a role for the States under some of these programs. For example, States must develop "state implementation plans" to ensure that stationary sources within their borders comply with EPA standards. *See* 42 U.S.C. § 7410. States also play a role in enforcing those standards. *See, e.g.*, *id.* § 7411(c)(1), (d)(1). Similarly, States are responsible, with EPA oversight, for ensuring sources within their borders do not "contribute significantly" to other States' inability to attain or maintain national standards. *Id.* § 7410(a)(2)(D)(i)(I). If they fail to do so, then the affected state can petition EPA to require further action. *Id.* § 7426. But displeasure with out-of-state pollution may be addressed only through the CAA in cooperation with EPA. "If EPA does not set emissions limits for a particular pollutant or source of pollution, States and private parties may petition [EPA] for a rulemaking on the matter . . . [but there is] no room for a parallel track." *AEP*, 564 U.S. at 425.

**B.     Under the Clean Air Act, States may regulate only greenhouse gas emissions that originate within their borders.**

As explained above, state regulation of greenhouse gas emissions is permissible only as authorized by the CAA's comprehensive scheme. That is because interstate air pollution is governed exclusively by federal law (originally as part of federal common law). *City of New York*, 993

F.3d at 89-95.[7] And "'resort[ing] to state law' on a question" that has historically been governed by federal common law "is permissible only to the extent 'authorize[d]' by federal statute." *Id.* at 99 (citation omitted). Here, under the CAA, the Act's liability scheme would be "permissible only to the extent" it was limited to liability for emissions originating within the State.

That rule flows from the Supreme Court's decision in *International Paper Co. v. Ouellette*, where the Court held that the Clean Water Act "pre-empts [New York] state law to the extent that the state law is applied to an out-of-state point source." 479 U.S. at 500. Plaintiffs in that case were property owners on Vermont's shore of Lake Champlain who brought a nuisance claim against a paper mill on the New York shore of the same lake that discharged pollutants affecting plaintiffs' property. *Id.* at 484. Much like the CAA, the Clean Water Act establishes a "comprehensive" regulatory scheme and charges EPA with primary authority to balance the "costs and benefits" of regulation. *Id.* at 492, 494-95. Both Acts include nearly identical savings clauses that preserve a state's ability to create standards that are at least as "stringent" as EPA's and to enforce requirements respecting the control and abatement of pollution. *Compare* 33 U.S.C. § 1370 *with* 42 U.S.C. §§ 7416, 7604(e). The plaintiffs argued that Vermont's nuisance law fell within the savings clause because it respected the control and abatement of pollution.

Rejecting the application of Vermont nuisance law to sources in New York, the Supreme Court explained that "the only state suits that remain available are those specifically preserved by the [statute]." *Ouellette*, 479 U.S. at 492. "An interpretation of the saving clause that preserved actions brought under an affected [downstream] State's law" would "upset[] the balance of public

---

[7] For the same reason, there is no presumption against preemption in this area. *City of New York*, 993 F.3d at 98; *see Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) ("The presumption against federal preemption disappears, however, in fields of regulation that have been substantially occupied by federal authority for an extended period of time." (citation omitted)); *United States v. Locke*, 529 U.S. 89, 108 (2000) (similar); *see also supra* 10-19.

and private interests so carefully addressed by the Act," and "would be incompatible with the Act's delegation of authority and [] comprehensive regulation of water pollution." *Id.* at 494-95, 500. A State's nuisance laws may reach only emissions that originate within its own borders. *Id.*

Courts, including the Second Circuit, have consistently held that *Ouellette*'s interpretation of the Clean Water Act applies equally to the CAA. *City of New York* held that, "[l]ike the nearly identical savings clauses in the Clean Water Act," the CAA's savings clauses "plainly permit states to create and enforce their own emissions standards applicable to *in-state* polluters." 993 F.3d at 99 (emphasis added). But this "authorization is narrowly circumscribed, and has been interpreted to permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id.* at 100 (quoting *Ouellette*, 479 U.S. at 497).[8]

Therefore, under *Ouellette* and *City of New York*, state laws that seek to impose monetary consequences—whether through common law liability or statutory penalties—on "emissions emanating simultaneously from all 50 states and the nations of the world" do not fit within the "slim reservoir" of state authority under the CAA. *City of New York*, 993 F.3d at 100.

**C.    New York's Act is preempted because it imposes liability for emissions originating out of state.**

Here, the CAA preempts New York's Act because, like the damages suits in *City of New York*, the Act explicitly extends well beyond the "slim reservoir" of state authority to impose liability for emissions released all over the planet. On its face, the Act does not confine itself to emissions from sources located within New York. Its liability scheme and penalties are based

---

[8] *See, e.g.*, *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) ("[C]laims based on the common law of a non-source state . . . are preempted by the [CAA].");
*N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301, 308 (4th Cir. 2010) ("[O]nly *source state* law . . . could impose more stringent emission rates than those required by federal law on plants located in those two jurisdictions." (emphasis added)); *cf. Bell v. Cheswick Generating Station*, 734 F.3d 188, 197 (3d Cir. 2013) (similar).

expressly on global emissions—"those emissions attributable to all fossil fuel extraction and refining worldwide" and "not" just "emissions within the state." § 76-0101(8). Specifically, the Act uses worldwide emissions to identify "[r]esponsible part[ies]," § 76-0101(21), and to determine the "applicable share of covered greenhouse gas emissions . . . attributable to such responsible party," § 76-0103(3)(b), and then, to calculate that responsible party's share of New York's total $75 billion "cost recovery amount," § 76-0103(7). The Act, therefore, by design, imposes billions of dollars in liability on a select group of companies in the fossil-fuel industry for greenhouse gas emissions originating from every State in the union and every country around the world.

As the Second Circuit has held, permitting States to impose this global liability would supplant carefully calibrated federal rules with a patchwork of state-level determinations, which the CAA does not permit. *City of New York*, 993 F.3d at 100; *see Ouellette*, 479 U.S. at 496-97 (permitting States to regulate out-of-state pollution "undermine[s] [the] regulatory structure" provided by the Clean Water Act and "lead[s] to chaotic confrontation between sovereign states"); *see also State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888, at *9 (Del. Super. Ct. Jan. 9, 2024) ("[The] claims . . . seeking damages for injuries resulting from out-of-state or global greenhouse emissions and interstate pollution, are preempted by the CAA."); *Bucks Cnty.*, 2025 WL 1484203, at *7 (similar). Under *Ouellette* and *City of New York*, the CAA preempts New York's Act because the Act imposes New York law on emissions originating outside its borders.

## IV.    Plaintiffs meet all the requirements for a permanent injunction.

Plaintiffs are entitled to an injunction barring enforcement of the Act against their covered members because (1) their members will suffer "an irreparable injury," (2) "remedies available at law . . . are inadequate" due to New York's sovereign immunity from suit, and (3) the "balance of hardships" and the "public interest," which merge where state officials are defendants, support

enjoining New York's unconstitutional law. *SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (citation omitted); *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Absent an injunction, the Act will irreparably harm Plaintiffs' members. The Act is in effect, and Plaintiffs' members are incurring and will continue to incur substantial unrecoverable costs in the coming months if the Act is not enjoined. SUMF ¶¶ 4-5, 9-10, 14-15, 19-20.

For example, before New York issues cost recovery demands, Plaintiffs' members will have to consider whether they must report certain public disclosures to the U.S. Securities and Exchange Commission regarding liability under the Act, requiring time and personnel to complete that process. *See* Torrence Decl. ¶¶ 14-16; Martini Decl. ¶¶ 14-17; Cochrane Decl. ¶ 16; Jarboe Decl. ¶¶ 17-22; Parrish Decl. ¶¶ 17-20. Moreover, members will be forced to spend resources to respond to the DEC's requests for information in the very near future. *See* § 76-0103(3)(d) (giving DEC authority to "require an entity to provide information . . . related to past practices, production, extraction, refining, emissions, or other historical information"); *see* Torrence Decl. ¶ 18; Swarup Decl. ¶¶ 21-22; Martini Decl. ¶ 19; Jarboe Decl. ¶ 16; Parrish Decl. ¶ 17; Slone Decl. ¶ 19. The DEC will likely require this information soon, as it must publish its first annual evaluation of the Act, including "a list of all responsible parties and their respective cost recovery demands," § 76-0103(10)(a)(i), by January 1, 2026, § 76-0103(10)(b). Members will also have to expend resources to analyze and validate the state's complex assessments measuring worldwide extraction volume and emissions calculations and to defend against the Act's payment demands. *See* Torrence Decl. ¶¶ 11-13, 19; Swarup Decl. ¶¶ 17-19, 23; Martini Decl. ¶ 18; Cochrane Decl. ¶¶ 15-16, 19; Jarboe Decl. ¶¶ 14-15, 23; Parrish Decl. ¶¶ 14-17, 21; Slone Decl. ¶¶ 16-17, 20. And in general, the fact that the law is in effect now—with cost recovery demands looming—injures members' reputations among consumers, investors, and other businesses. *See* Torrence Decl. ¶ 20; Martini Decl. ¶ 20;

24

Cochrane Decl. ¶ 20; Jarboe Decl. ¶ 24; Parrish Decl. ¶ 22; Slone Decl. ¶ 21. That damage is already done and will continue until the Act is declared unlawful and enjoined. None of these costs can be recouped, and there is no adequate remedy at law because New York enjoys sovereign immunity from suit. *See, e.g.*, *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n.*, No. 25A103, at 1 (U.S. Aug. 21, 2025).

Finally, the equities favor an injunction. New York "does not have an interest in the enforcement of an unconstitutional law." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019) (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

### Conclusion

The Court should grant Plaintiffs' Motion, declare the Act unlawful, and enjoin Defendants from implementing or enforcing the Act in any way against Plaintiffs' members.

Dated: October 31, 2025

Respectfully submitted,

/s/ Steven P. Lehotsky

Jennifer B. Dickey*
Kevin R. Palmer*
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Plaintiff the Chamber of Commerce of the United States of America*

Steven P. Lehotsky*
Scott A. Keller*
Michael B. Schon*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
    Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: steve@lkcfirm.com
Email: scott@lkcfirm.com
Email: mike@lkcfirm.com

Ryan Meyers**
American Petroleum Institute
200 Massachusetts Avenue, NW,
    Suite 1200
Washington, DC 20001
Telephone: (202) 682-8000

*Counsel for Plaintiff American*

Andrew B. Davis*
LEHOTSKY KELLER COHN LLP
750 Rialto Blvd.
    Suite 1-250
Austin, TX 78735
Telephone: (512) 693-8350
Fax: (512) 727-4755

*Petroleum Institute*

Tawny Bridgeford*
National Mining Association
101 Constitution Avenue, NW
Washington, DC 20001
Telephone: (202) 463-2629

*Counsel for Plaintiff National Mining Association*

Heather Briccetti Mulligan*
The Business Council of New York State, Inc.
111 Washington Avenue, Suite 400
Albany, NY
Telephone: (518) 465-7511

*Counsel for Plaintiff The Business Council of New York State, Inc.*

Email: andrew@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: jared@lkcfirm.com

Meredith R. Pottorff*
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: meredith@lkcfirm.com

Yvonne E. Hennessey
Richard S. Hartunian
Barclay Damon LLP
80 State Street
Albany, NY 12207
Telephone: (518) 429-4293
Email: YHennessey@barclaydamon.com
Email:  RHartunian@barclaydamon.com

*Counsel for Plaintiffs the Chamber of Commerce of the United States of America, American Petroleum Institute, National Mining Association, and The Business Council of New York State, Inc.*

*admitted pro hac vice
**CM/ECF registration pending; notice of appearance forthcoming*

**Certificate of Service**

I, Steven P. Lehotsky, certify that on October 31, 2025, the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky