# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK
## ALBANY DIVISION

|  |  |
|---|---|
| **STATE OF WEST VIRGINIA**, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:25-cv-00168-BKS-DJS |
| **LETITIA JAMES**, in her official capacity as the Attorney General of New York, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

STATEMENT OF MATERIAL FACTS ............................................................. 5

STANDARD OF REVIEW ................................................................................ 9

ARGUMENT ..................................................................................................... 9

    I.    Plaintiffs Have Standing To Sue ............................................................. 10

        A.    The States Are Vindicating Their Proprietary Interests ..................... 11

        B.    The States Can Sue *Parens Patriae* .................................................. 16

        C.    The Private Parties Also Have Standing ............................................. 20

    II.    The Constitution And Federal Common Law Preempt The Act ............ 23

        A.    Federal Common Law Preempts New York's Act ............................... 24

        B.    The Act Is An Unconstitutional Extraterritorial Regulation ............. 31

        C.    The Act Violates the Foreign-Affairs Doctrine ................................. 36

    III.    The Clean Air Act Preempts The Superfund Act ................................. 40

        A.    The Clean Air Act Comprehensively Regulates Interstate Carbon Emissions ............................................................. 41

        B.    New York's Act Impermissibly Imposes Liability Under New York Law for Out-Of-State Greenhouse Gas Emissions ................................................. 44

CONCLUSION ................................................................................................. 50

## INTRODUCTION

New York can't override Congress. And it can't displace the sovereignty of the other forty-nine States. But in passing the Climate Change Superfund Act, that's exactly what New York is trying to do. This State law—expressly targeted at "greenhouse gas emissions"—would supplant the comprehensive scheme of federal regulation that already governs interstate emissions. And it would also invade the States' territory by penalizing conduct that occurs in other States—conduct that those sister States permit and even encourage.

Unfortunately for New York, the United States Constitution forecloses its retroactive and extraterritorial shakedown. States must generally abstain from regulating interstate emissions, at least outside the context of a congressionally crafted cooperative federalism scheme. After all, interstate disputes over air and water resources "demand[]" federal resolution. *Illinois v. City of Milwaukee* (*Milwaukee I*), 406 U.S. 91, 105 & n.6 (1972). If States were instead free to exercise "independent and plenary regulatory authority" over those same emissions—as New York purports to do here—the result would be "chao[s]": "confrontation between sovereign states," "impossible to predict []" standard[s]," and a wholly "irrational system of regulation." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496-97 (1987) (cleaned up). Such dangerous outcomes are just over the horizon if the Climate Change Superfund Act is allowed to stand.

The Constitution also recognizes the "equal sovereignty" afforded to all States. *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013). "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its

laws with the intent of changing the tortfeasors' lawful conduct in other States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996). And "[o]ur system of government … imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Zschernig v. Miller*, 389 U.S. 429, 442-43 (1968) (Stewart, J., concurring) (cleaned up). Yet the Act imposes significant penalties on energy producers for harms allegedly caused by greenhouse gas emissions beyond New York— including emissions from abroad. It shows no regard for equal sovereignty and no awareness of the complications that could arise from direct, piecemeal State involvement in this international problem. It is thus unconstitutional for this separate reason.

None of this should come as news to New York. After all, the Second Circuit has already held that federal common law preempted the City of New York's attempt to sue traditional-fuel producers for contributing to global carbon emissions. *See City of New York v. Chevron Corp.*, 993 F.3d 81, 90-99 (2d Cir. 2021). Repackaging those tort claims into a statutory scheme changes nothing. And by dabbling in *global* emissions regulation, New York's Act violates not only the Constitution's structural limitation on extraterritorial regulations but also its placement of foreign-affairs authority in the federal government. *United States v. Bevans*, 16 U.S. (3 Wheat.) 336, 387 (1818); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375-76 (2023); *United States v. Pink*, 315 U.S. 203, 233 (1942).

Were all that not enough, the Act is preempted by the Clean Air Act, too. The Clean Air Act creates a comprehensive scheme for the regulation of interstate air pollution. And nowhere does it allow States to apply their own laws to out-of-State activities. To be sure, the Clean Air Act leaves the States some room to apply State law in the emissions context—

but only to emissions coming from within their own borders. *City of New York*, 993 F.3d at 99-100. Yet New York is trying to do much more.

Because the Constitution and federal law preempt New York's Act, this Court should grant summary judgment to the Plaintiffs on Counts I and II. No further factual development is needed to see that the Act is unconstitutional and otherwise unlawful. The Court should enjoin enforcement of the law now.

## BACKGROUND

New York's Climate Change Superfund Act authorizes the State to impose $75 billion in "strict liability" on fossil fuel companies for their alleged contributions to greenhouse gas emissions and, by extension, climate change. N.Y. ENV'T CONSERV. LAW §§ 76-0101(6), 76-0103(2)(a). In particular, the law is meant to address "the pollution of the atmosphere by greenhouse gas buildup as a result of burning fossil fuels." N.Y. LEGIS. 679 § 2(2) (2024), 2024 Sess. L. News of N.Y. Ch. 679 (S. 2129-B).

The Act targets large energy producers. It applies to entities that New York labels "[r]esponsible part[ies]": "any entity … engaged in the trade or business of extracting fossil fuel or refining crude oil … responsible for more than one billion tons of covered greenhouse gas emissions" from 2000 to 2024. N.Y. ENV'T CONSERV. LAW § 76-0101(7), (21). Ordinary end users—that is, individuals and entities that burn fuel but are not engaged in the business of extraction or refining—are not included as responsible parties. And "responsible party" is really a misnomer—the targeted producer is "strictly liable, without regard to fault." *Id.* § 76-0103(3)(a). While the Act purports to exclude from "responsible

party" any "person who lacks sufficient contacts with the state," it doesn't explain what "contacts" might be sufficient. *Id.* § 76-0101(21).

The Act's calculation of responsible parties' cost recovery demands is not limited to greenhouse gas emissions in New York. The Act regulates emissions "attributable to all fossil fuel extraction and refining worldwide ... and are not limited to such emissions within the state." *Id.* § 76-0101(8). So the Act imposes liability on out-of-state energy producers and even foreign producers.

The Act contemplates that the State will collect its billions through a "cost recovery demand." *Id.* § 76-0103(3)(b). The New York Department of Environmental Conservation issues "notices of cost recovery demand[s]" to "responsible part[ies]." *Id.* § 76-0103(4)(a)(iv). "Cost recovery demand[s]" are derived from "cost recovery amount[s]," which equal the responsible party's alleged proportionate share of covered greenhouse gas emissions applied to an aggregate payment of $75 billion. *Id.* §§ 76-0101(6), 76-0103(2)(b).

Responsible parties must either pay the cost recovery demand in full by the applicable payment date, December 31, 2028, *see id.* § 76-0101(2), or file a request for reconsideration of its cost recovery demand within sixty days following service of the notice of cost recovery demand, *id.* § 76-0103(4)(a)(v)(1). The Department may decide that "a responsible party may elect to pay an amount no greater than ninety-two percent of the amount of the cost recovery the applicable payment date." *Id.* § 76-0103(3)(e)(i). In other words, the Department has authority to create payment schedules but at least eight percent of the cost recovery demand must be paid by December 31, 2028, and the entire amount must be paid in at least "annual" installments "within twenty-four years of demand after

the applicable payment date." *Id.* Any party that does not "make a payment required" will face an additional penalty of 50% of the unpaid amount plus interest. *Id.* § 76-0103(3)(e)(ii).

## STATEMENT OF MATERIAL FACTS

Traditional energy—that is coal, oil, and natural gas—is essential to American prosperity. Today, fossil fuels account for more than 83% of American energy production. *See Monthly Energy Review*, U.S. ENERGY INFO. ADMIN. (Oct. 2025), https://tinyurl.com/yb4tympa. Fossil fuel production employs millions of Americans, contributes billions to the economy each year, and provides the energy reliability and security that's necessary to keep the American economic engine running.

Some Plaintiff States produce energy. All Plaintiff States consume it. And some States' economies would be devastated by production slowing—or worse, ceasing.

Fossil fuel production is critical to Plaintiff States' economies. For instance, more than 12 percent of West Virginia's workforce is employed in the energy sector. Exhibit 1, Scott Adkins Decl., ¶ 7 (Oct. 1, 2025). More than 150,000 Kentuckians are energy workers. Exhibit 2, Christopher Thacker Decl., ¶ 10 (Oct. 14, 2025). The fossil fuel industry employs 63,000 North Dakotans. Exhibit 3, Nathan Anderson Decl., ¶ 6 (Oct. 3, 2025). Nearly 1 million Texans work in energy production. Exhibit 4, Leslie Savage Decl., ¶ 7 (Oct. 17, 2025). The fossil fuel industry contributed about $18 billion to Utah's economy last year. Exhibit 5, John Rogers Decl., ¶ 8 (Oct. 27, 2025). And a staggering 16.5% of Wyoming's workforce is employed in the energy sector. Exhibit 6, Gagen Decl., ¶ 7 (Oct. 16, 2025).

Energy workers' fossil fuel production creates severance tax revenue for Plaintiff States. West Virginia and Wyoming bring in hundreds of millions of dollars in revenue

annually from fossil fuel severance taxes.  Exhibit 7, Matthew Irby Decl., ¶ 3 (Oct. 6, 2025); Exhibit 8, Matthew Sachse Decl., ¶ 5 (Oct. 14, 2025).  Over the last five years, severance taxes added over $250 million to Arkansas's coffers.  Exhibit 9, Todd Cockrill Decl., ¶¶ 6-7 (Oct. 3, 2025).  North Dakota relies on "taxes related to oil and gas production" for "half of the State's revenue." Ex. 3, ¶ 5.  And while other States aren't as reliant on them, severance taxes still fund parts of their budgets.  *See* Exhibit 10, Christopher Ayotte Decl., ¶ 3 (Oct. 7, 2025) ("Nebraska collected $2,839,986.92 in natural resource severance tax."); Exhibit 11, Paul Woods Decl., ¶ 3 (Oct. 28, 2025) ("Idaho generated nearly $1 million in revenue from severance taxes."); Exhibit 12, Amanda McGraw Decl., ¶ 8 (Oct. 4, 2025) ("Tennessee obtained $466,796.56 in natural gas and crude oil severance taxes."); Ex. 5, ¶ 3 ("Utah generated approximately $76.3 million from state oil and gas severance tax.").  Some States depend on consumption-based taxes on fossil fuels.  *See* Ex. 12, ¶¶ 5-7 (stating that Tennessee received over $1.2 billion in motor fuel tax revenues in the last fiscal year); Ex. 5, ¶ 3 (stating that Utah collected more than $650 million in fuel tax revenues in the last fiscal year).

Plaintiff States are major energy consumers, too.  West Virginia spent nearly $10 million on fuel for its vehicle fleet last year.  Exhibit 13, Kenneth Yoakum Decl., ¶ 2 (Oct. 1, 2025).  And the State spent over $5 million powering thirty-three State-owned buildings. Exhibit 14, Robert Kilpatrick Decl., ¶ 6 (Oct. 2, 2025).  The other Plaintiff States also spend millions of dollars annually to fulfill their sovereign duties.  *See* Exhibit 15, Karen Perry Decl., ¶¶ 5-6 (Oct. 2, 2025) (stating that Arkansas State Police spent over $14 million on diesel and gasoline over the last five years); Exhibit 16, Jazzmin Randall Decl., ¶ 2 (Oct. 1,

2025) (stating that Georgia spent $43 million on fuel, petroleum, and other gas products in 2024); Exhibit 17, Tabetha Mallonee Decl., ¶ 7 (Oct. 6, 2025) (stating that the Kansas Attorney General's Office spent more than $28,000 on gasoline in fiscal year 2025); Exhibit 18, Karl Boston Decl., ¶ 3 (Sept. 26, 2025) (stating that South Carolina Department of Public Safety spent nearly $5 million last year on fuel for vehicles, including those used by law enforcement); Exhibit 19, Nolan Wiggins Decl., ¶ 3 (Sept. 29, 2025) (stating that South Carolina spent $5.6 million on fuel for State vehicles, excluding the vehicles used by the Department of Public Safety); Exhibit 20, Lee Wilkinson Decl., ¶ 2 (Oct. 29, 2025) (stating that Iowa spent more than $8 million on fuel for State transportation in 2024); Exhibit 21, Jason Glass Decl., ¶ 2 (Oct. 6, 2025) (stating that Kentucky Department of Agriculture spent over $400,000 on fuel for transportation needs in 2024); Exhibit 22, Andrew Kuhlmann Decl., ¶ 2 (Oct. 16, 2025) (stating that Wyoming spent $1.4 million on fuel for State transportation needs in 2024).

And the Plaintiff States' residents consume fossil fuel energy. For instance, Idahoans spent more than $7 billion consuming fossil fuels in 2023. Exhibit 23, Brenna Garro Decl., ¶ 4 (Oct. 27, 2025). Utahns spent nearly $12 billion. Ex. 5, ¶ 7.

New York's Act will have adverse effects on energy production, employment, and consumption. Even "[u]nder conservative assumptions," the Act's penalties will "reduce the profitability of investment in fossil energy output by about 18 percent." Exhibit 24, Benjamin Zycher Decl., ¶ 11 (Oct. 30, 2025). And the Act will cause a six-percent "production decline" and a 12-percent price increase. *Id.* Even under the most generous assumptions, the "price increase would be about 6 percent." *Id.* ¶ 12. The price increase

"would be observed quickly," resulting in "substantial" "increases in the cost of fuels consumed" by "West Virginia and a number of other states." *Id.* ¶¶ 14-15. Put simply, "[u]nder any set of plausible assumptions …, states would find themselves spending more for less fossil energy." *Id.* ¶ 55.

In addition to price increases, the Act injures States' pocketbooks another way. "A 6 percent production decline would reduce States' severance tax revenues by 6 percent, assuming the States calculate severance taxes based on production." *Id.* ¶ 44. Several States do just that. *Id.*

The reduced profitability and production decline will affect the private Plaintiffs, too. Indeed, "[b]ecause there cannot persist more than one price for a given good in a given market – in particular for such homogeneous goods as fossil fuels – the price increase would be observed for all producers, both those affected formally by the penalty and those not." *Id.* ¶ 41. So the "decline in profitability" and "reduce[d] capital investment" is market-wide, *id.* ¶¶ 39-41, not limited to so-called "responsible part[ies]." N.Y. ENV'T CONSERV. LAW § 76-0101(21). The Gas and Oil Association of West Virginia, Inc. supports and advocates for over 400 member companies and thousands of employees in the fossil energy market. Exhibit 25, Charlie Burd Decl., ¶¶ 8, 10 (Oct. 30, 2025). And the West Virginia Coal Association has at least two members that "have produced sufficient quantities of coal over the relevant time period" to be a responsible party. Exhibit 26, Jason Bostic Decl., ¶¶ 4-5 (Oct. 31, 2025).

## STANDARD OF REVIEW

A plaintiff is entitled to summary judgment if there is no genuine dispute of material fact, and the plaintiff is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is genuine if a reasonable jury "could return a verdict for the nonmoving party." *Id.* (cleaned up). In considering a motion for summary judgment, the Court can rely on "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## ARGUMENT

The Court should permanently enjoin Defendants from enforcing the Act. Plaintiffs have standing to sue. The States are protecting their proprietary, *parens patriae*, and sovereign interests, which the Act threatens. Likewise, the private parties are reasonably likely to have the Act enforced against them or their members. And the Act is preempted by the Constitution's restraints on States' powers to reach across State and international lines. The Act is also preempted by the Clean Air Act and its comprehensive federal regulatory scheme. Put simply, New York's Act exceeds its own authority and intrudes upon the federal government's (and, by extension, offends the rights of other States).

## I.     Plaintiffs Have Standing To Sue.

Both Plaintiff States and the private parties have standing to challenge the Act.  To establish standing, a plaintiff must demonstrate that: (1) it has "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "the injury was likely caused by the defendant;" and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992)).  Because Plaintiffs bring the same claims, the Court only needs to find that one plaintiff has standing for each form of relief sought.  *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,* 547 U.S. 47, 52 n.2 (2006).

New York appears to question only whether Plaintiffs have suffered an injury in fact.  *See* ECF No. 192 at 5 ("On justiciability, New York contends … West Virginia cannot prove that it has injuries sufficient for standing.").  That limited challenge makes sense because Plaintiffs easily meet the other two elements.  An order declaring New York's Act unlawful and enjoining Defendants from enforcing the law would redress the harm of energy producers being forced to pay billions—payments obviously caused by the Act.  And both Plaintiff States and the private parties can meet the first element by showing they suffered an injury in fact.

A State can typically show an injury in fact in three different ways.  The State can bring "(1) proprietary suits in which the State sues much like a private party … ; (2) sovereignty suits … ; or (3) *parens patriae* suits in which States litigate to protect 'quasi-sovereign' interests."  *Connecticut v. Cahill,* 217 F.3d 93, 97 (2d Cir. 2000) (citations omitted).

The States have an injury in each capacity.  New York's worldwide strict-liability scheme based on the extraction of traditional fuels will raise costs to consumers.  As large consumers of traditional fuels and the electricity they generate, the States will suffer a pecuniary harm in their capacity as proprietors.  Likewise, the citizens of the States purchase energy, and the States can sue in a *parens patriae* capacity to stop the harm New York is inflicting on their citizens.  *Parens patriae* standing likewise lies because New York seeks to deny Plaintiff States their "rightful status within the federal system" by attempting to extend its jurisdiction into the States' territory.  *See Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez,* 458 U.S. 592, 606-08 (1982).  Relatedly, the States have standing because the Act directly infringes their sovereignty by regulating conduct that occurred within their own borders.

## A.     The States Are Vindicating Their Proprietary Interests.

The Act's cost-recovery demands will raise the price of coal, oil, natural gas, and electricity, reducing production and consumption.  And States purchase massive quantities of energy in performing their sovereign duties.  So standing here is as simple as "one plus one."

The Act will make energy more expensive and less available.  Ex. 24, ¶¶ 5-8.  The Second Circuit explained that "basic economics … tell us that the increased cost of … conduct will make that conduct less common."  *NRDC v. NHTSA*, 894 F.3d 95, 105 (2d Cir. 2018) (cleaned up).  The Act does that by imposing billions of dollars in fines on traditional energy companies.  Energy companies will internalize these costs, further disincentivizing producing traditional energy.  *See* ORG. FOR ECON. COOP. & DEV., *The Polluter Pays*

*Principle: Definition Analysis Implementation* 16 (2008) (explaining that the Polluter Pays principle "provide[s] a continuing incentive for improved pollution abatement"). So as supply decreases and traditional energy becomes more expensive to produce, producers will pass along these costs to consumers. *See* Jonathan Klick, *The High Price of 'Costless' Climate Cleanup*, 45 REGULATION 26, 28 (2025) ("[T]he fines will clearly enter into a firm's ongoing marginal costs, leading to increased prices."); *see generally* Jason Scott Johnston, *Fossil Fuel Production Under Liability for Climate Change*, 32 INT'L J. ECON. BUS. 1, 2-3 (2025) (describing how retroactive liability schemes like the New York law will affect "fossil fuel production" by rendering oil and natural gas fields "negative value assets" and changing the timing of drilling); *cf.* Todd Myers, *Major Supporter of Washington's CO2 Tax Admits Gas Prices Will Fall If It is Repealed*, WASH. POL'Y CTR.: BLOG (Oct. 7, 2024), https://tinyurl.com/mr3wb6fs (describing how oil company passed along cost of carbon allowance on wholesale fuel invoices).

And States are major purchasers of energy. West Virginia spends nearly $10 million on fuel for the "State['s] transportation needs" annually. Ex. 13, ¶ 2. Other States spend similar amounts. *See* Ex. 16, ¶ 2 (Georgia spending ~$43 million); Ex. 18, ¶ 3 (South Carolina spending nearly $5 million on gas).

That's sufficient for the States to have standing. In *Maryland v. Louisiana*, a group of States challenged a Louisiana law that imposed a tax on pipeline companies on natural gas that traveled through the State on its way to other States "to reimburse the people of Louisiana" for damage to "waterbottoms barrier islands[] and coastal areas" caused by gas extraction. 451 U.S. 725, 731-32 (1981). Louisiana argued the States lacked standing

"because the Tax is imposed on the pipeline companies," not the States challenging the tax. *Id.* at 736. But the Supreme Court rejected that argument, reasoning that "the plaintiff States, as major purchasers of natural gas whose cost has increased as a direct result of Louisiana's imposition of the First-Use Tax, are directly affected in a 'substantial and real' way so as to justify their exercise of this Court's original jurisdiction." *Id.* at 737. Put another way, the plaintiff States asserted "substantial and serious injury to their proprietary interests as consumers of natural gas as a direct result of the allegedly unconstitutional actions of Louisiana." *Id.* at 739.

Likewise, in *Pennsylvania v. West Virginia*, the Supreme Court exercised original jurisdiction to stop a West Virginia law that sought to control the export of natural gas to neighboring states. 262 U.S. 553 (1923). The Court found a "justiciable controversy" because Pennsylvania "use[d] large amounts of the gas in her several institutions and schools—the greater part in the discharge of duties which are relatively imperative." *Id.* at 591-92. So Pennsylvania had standing "as the proprietor" of those institutions because its interest was "substantial" and "threatened with serious injury." *Id.* at 591. Other cases confirm standing based on the sort of facts here. *See*, *e.g.*, *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2136-37 (2025) (explaining that nonregulated entities can sue over harmful effects of a law); *Orangeburg v. FERC*, 862 F.3d 1071, 1074 (D.C. Cir. 2017) ("[T]he city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power).").

Thus, the States can easily show standing here. Like in *Louisiana*, New York's Act imposes a penalty on producers of traditional energy, which will drive up costs and decrease

13

the availability of energy. Ex. 24, ¶¶ 5-8. Although the States here are not the direct subject of the Act, the costs will be passed on to the States.

The States also have standing based on their impending loss of tax revenue. States have standing when another State's statute causes the "loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (indirect loss of funding suffices for standing). Many Plaintiff States derive substantial revenue from severance taxes and other special taxes derived from the energy production that the Act targets. West Virginia received approximately $500 million in tax revenue from the State severance tax on coal, natural gas, and oil in each of the last two years. Ex. 7, ¶ 3. Texas receives billions of dollars annually from severance taxes, which fund its government and social services. Ex. 4, ¶ 11. Higher costs will reduce consumption and production, leading to a drop in severance taxes.

This Circuit recognized States have standing to challenge far more attenuated harms. In *New York v. United States Department of Homeland Security,* some states challenged a DHS rule that allegedly deterred aliens from seeking public benefits. 969 F.3d 42, 50-58 (2d Cir. 2020). The Second Circuit held that the States could sue because the rule would disincentivize aliens from applying for public benefits, even if they remained eligible under the new DHS rule. *Id.* at 59-60. And because federal aid dollars are tied to the usage of public benefits, a smaller number of aliens using such benefits would "decreas[e] federal transfer payments to the states, reduc[e] Medicaid revenue, increase[e] overall healthcare costs, and caus[e] general economic harm." *Id.* at 59. These indirect but "predictable

14

effect[s]" on State revenue "establish[ed] standing" to challenge the DHS rule.  *Id.* (quoting *Dep't of Com.*, 588 U.S. at 768).

The Act will alter future prices even though the cost-recovery demands are retrospective.  First, traditional fuel producers wouldn't have baked in financial penalties for their *legal* actions sanctioned by EPA, so any penalty will be baked into current and future costs, thus raising prices.  Second, nothing is stopping New York from imposing liability for future emissions.  Indeed, it already expanded the covered period once.  *See* N.Y. Legis. § 76-0101(21).  Producers of traditional fuels are engaging in the same activities in 2025 and will continue to do so.  Given New York has already imposed liability for those activities from 2000 to 2024, producers will include the prospect of cost-recovery demands as a marginal cost of producing coal, oil, or natural gas going forward.  *See* Ex. 24, ¶¶ 33-44 (explaining the Act's adverse effects on fossil-fuel industry capital investment, production, and prices); *see also* Brief for Professor Jason Johnston as Amicus Curiae Supporting Petitioners, *Suncor Energy (U.S.A.) Inc. v. Cnty. Comm'rs of Boulder Cnty.*, (Oct. 9, 2025) (No. 25-170), 2025 WL 2954500, at *7-8  (explaining why "multi-state retroactive fines for fossil fuel production—whether through statute or litigation—will likely have two effects: (1) they will bankrupt many fossil-fuel producers; and (2) they will cause those producers who are still viable to cut back drastically on exploration and drilling").

Finally, the Second Circuit held that States have standing when "predictable" consequences affect third parties' actions—even when those actions are nonetheless "illogical or unnecessary." *New York*, 969 F.3d at 59; *see also Dep't of Com.*, 588 U.S. at 768.  The Act's strict-liability approach makes it "predictable" that traditional fuel

producers would account for cost-recovery demands.  *See* Ex. 24, ¶ 30 (explaining that "perceived likelihood of additional future penalties means that investment in the discovery and production of fossil fuels will be lower"); *see also* Steven Shavell, *Strict Liability versus Negligence*, 9 J. LEGAL STUD. 1, 3 (1980) (explaining how a strict-liability regime will induce producers to change the "product price" to "reflect … losses"); *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 526-27 (5th Cir. 1984) (declining to impose punitive damages because, in part, "[t]he anticipation of multiple litigation for compensation damages serves … as an effective deterrent to future illicit conduct" and explaining that "strict liability provides the impetus for manufacturers to take affirmative steps to ensure the safety of their products").  One predictable effect is a "reduction in investment" causing "prices [to] be higher."  Ex. 24, ¶ 31.  Even if such a response were not wholly rational (which it is), that would be insufficient to defeat standing.

### B.    The States Can Sue *Parens Patriae*.

The States also have standing as *parens patriae*.  A State may act as the "representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way." *Louisiana*, 451 U.S. at 737.  To establish *parens patriae* standing, a State usually "must establish (1) an injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief."  *New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024) (cleaned up).  Plaintiff States meet all three factors.

First, New York's Act will harm virtually every citizen in the Plaintiff States. The Act imposes huge costs on fuel producers, which will then be passed on to consumers. That was enough in *Maryland v. Louisiana*: "[A] great many citizens in each of the plaintiff States are themselves consumers of natural gas and are faced with increased costs." 451 U.S. at 739. If that was enough for natural gas, there's no question that a law imposing huge costs on coal, oil, and natural gas is "sufficiently substantial." *Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th at 280. Plaintiff States' citizens use substantial amounts of traditional fuels to power their lives. For example, Idahoans "spen[d] $5.978 billion to consume 37 million barrels of petroleum, $1.105 billion to consume 151 billion cubic feet of natural gas, and $5 million to consume 49 thousand short tons of coal." Ex. 23, ¶ 4. These costs will go up as the Act imposes huge costs on fuel producers. *See* Ex. 24, ¶ 42 (explaining that the Act "guarantees higher prices for fossil energy").

Second, Plaintiff States have an "interest in protecting [their] citizens from substantial economic injury presented by" the Act's attempt to regulate nationwide energy policy. *Louisiana*, 451 U.S. at 739. It's an understatement to say that traditional energy maintains a significant presence in the Plaintiff States; in fact, traditional energy supports millions of jobs and anchors Plaintiff States' economies. For instance, West Virginians working in oil and gas extraction and pipeline transportation brought in about $442 million in compensation in 2023. Ex. 1, ¶ 8. And "the coal industry in West Virginia is intricately interwoven into the everyday life of the residents," a reality even engrained in West Virginia law. Martin W. Sybblis, *Law, Growth, and the Identity Hurdle: A Theory of Legal Reform*, 95 Tul. L. Rev. 867, 885 (2021); *see also* W. Va. Code § 11-13EE-1 ("encourag[ing]

capital investment in the coal industry in this state and thereby increas[ing] economic development"). Likewise, traditional fuels support nearly one million Texas jobs. Ex. 4, ¶ 7. Many other examples abound. *See, e.g.*, Ex. 2, ¶ 11 (citing SAGDP4 analysis that Kentucky employees received over $1 billion in wages for oil and gas extraction, pipeline transfer, and mining and quarrying in 2023); Ex. 5, ¶ 8 (estimating $17 billion in economic activity from oil and gas supporting over 70,000 Utah jobs in 2024). And when a state targets a particular industry—say, coal, natural gas, or oil—then that targeting can give rise to a *parens patriae* injury.

These "quasi-sovereign" interests support *parens patriae* standing. Again, in *Maryland v. Louisiana*, the Supreme Court found that Maryland had standing to sue Louisiana over its tax on pipeline companies because the plaintiff States had an "interest in protecting [their] citizens from substantial economic injury presented by imposition of the [tax]." 451 U.S. at 739. Same for *Pennsylvania v. West Virginia*, where the Court recognized Pennsylvania's standing "as the representative of the consuming public whose supply [of natural gas] will be similarly affected." 262 U.S. at 591. Finally, the Supreme Court found that Georgia had *parens patriae* standing to sue a group of railroads for price-fixing where "the economy of Georgia and the welfare of her citizens have seriously suffered as the result of [the] alleged conspiracy." *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 447, 450-51 (1945). These harms were "matters of grave public concern in which Georgia ha[d] an interest apart from that of particular individuals who may be affected." *Id.* at 451.

So too here. The Act imposes a quasi-sovereign harm by "limit[ing] the opportunities" of the States' citizens by harming the traditional-fuel industry upon which

the States rely, *Pa. R.R. Co.,* 324 U.S. at 451, while also passing along an "economic injury" to their citizens in the form of higher prices. *Maryland,* 451 U.S. at 739.

Third, and finally, this case is not the kind where "individual consumers" could be "expected to litigate" on their own behalf. *Maryland*, 451 U.S. at 739. Much like in *Maryland v. Louisiana,* the amount that each citizen will pay will be "relatively small," *id.,* disincentivizing individual suits to recoup each citizen's loss. Plaintiff States are in the best position to represent their citizens. Because "the health and comfort of the inhabitants of [the Plaintiff States] are threatened, the [Plaintiff States are] the proper party to represent and defend them." *Kansas v. Colorado*, 185 U.S. 125, 141-42 (1902).

Alternatively, States can establish *parens patriae* standing when they are "discriminatorily denied [their] rightful status within the federal system." *Alfred L. Snapp & Son,* 458 U.S. at 607. States have "an interest in securing observance of the terms under which [they] participate[] in the federal system" and "need not wait for the Federal Government to vindicate the State's interest in the removal of barriers to the participation by its residents in the free flow of interstate commerce." *Id.* at 607-08 (cleaned up).

New York's Act denies Plaintiff States their "rightful status within the federal system." *Alfred L. Snapp & Son,* 458 U.S. at 607. When entering the Union, States gave up their ability to defend their interests through the use of "traditional diplomatic and military tools." *Franchise Tax Bd. of Cal. v. Hyatt,* 587 U.S. 230, 245 (2019). In exchange, the Constitution guaranteed the States equal treatment as sovereigns. *See id.* at 241. When a State attempts to apply its own law beyond its borders and usurp the federal system, it denies its coequal State their "rightful status" in our federal system and repudiates "the

terms under which [States] participate[]" in that system.  *Alfred L. Snapp & Son*, 458 U.S. at 607-08.  The Act does that by punishing lawful conduct that occurred outside of New York—a subject covered exclusively by federal law (or, at most, by the law of the State where the emissions occurred).  Put another way, the Act interferes "with the autonomy of the individual States within their respective spheres."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989).

### C.    The Private Parties Also Have Standing.

Alpha Metallurgical Resources, Inc. has standing to challenge the Act.  Alpha produced large amounts of coal during the years covered by the Climate Change Superfund Act.  Indeed, Alpha was one of the largest coal producers in the country during parts of the covered period, ranking in the top four coal producers and often selling over 100 million tons of coal per year.  *See* Wold Decl., Ex. A, EIA, *Top four U.S. coal companies supplied more than half of U.S. coal production in 2011* (Oct. 2, 2013)(listing Alpha as the fourth-largest producer of coal from 2009 to 2011); Wold Decl., Ex. B, Alpha Nat. Res., Inc., Annual Report (Form 10-K) at 5 (Feb. 29, 2012), (full version available at https://tinyurl.com/yskyyfmw).  And Alpha remains a major domestic coal producer.  Wold Decl. Ex. C, EIA, *Annual Coal Report: Production Table 10* (Oct. 30, 2024) (full version available at https://tinyurl.com/j4trt4zp) (listing Alpha as the tenth largest producer of coal in the United States in 2023).  Because of Alpa's significant mining activities between 2000 and 2024, a public memorandum issued by the Act's sponsors identified it by name as an entity that New York is targeting.  *See* Wold Decl., Ex. D at 2 (claiming that Contura, USA (Alpha's previous corporate name) was responsible for ~3.3 billion tons of carbon-dioxide

emissions and thus liable under the Act for ~$68 million). Likewise, the Carbon Majors database assembled by scientist and activist Richard Heede, who has worked with State legislatures to enact laws like the Act, estimates that Alpha is responsible for ~4.89 billion tons of carbon dioxide over the covered period. *Alpha Metallurgical Resources*, CARBONMAJORS, https://perma.cc/M4PQ-ZCVY (last viewed Oct. 31, 2025). Even if these estimates are mistaken,[1] they certainly suggest that New York will attempt to hold Alpha liable under the Act.

Alpha's mining activities over the past decades thus create a "credible threat" of enforcement. *Giambalvo v. Suffolk Cnty.*, No. 23-208-CV, 2025 WL 2627368, at *13 (2d Cir. Sept. 12, 2025). That is good enough to establish an Article III injury for prospective relief. The Constitution only requires that enforcement be "credible" for a "plaintiff … to challenge the statute." *Antonyuk v. James*, 120 F.4th 941, 1008 (2d Cir. 2024) ("Thus, if a plaintiff's interpretation of a statute is reasonable enough, and under that interpretation, the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute." (cleaned up) (quoting *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022)).

Both West Virginia Coal Association and Gas and Oil Association of West Virginia have associational standing to sue. An associational plaintiff has standing when: (1) its members have individual standing to sue in their own right; (2) challenging the Act is

---

[1] Alpha reserves the right to argue that the Act does not actually apply to its activities or could not be constitutionally applied to its activities in any future enforcement proceeding. Because the standing test only requires a "credible" fear, Alpha need not declare itself liable to challenge the Act. *Antonyuk*, 120 F.4th at 1008.

germane to the association's purposes; and (3) its members' individual participation is unnecessary. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025).

*First*, at least one member from both West Virginia Coal Association and Gas and Oil Association of West Virginia (GO-WV) has individual standing to sue. *See Do No Harm*, 126 F.4th at 118 (elements of individual standing). The Act will lead to cost-recovery demands from at least some of Plaintiffs' members. *See, e.g.*, Ex. 25, ¶¶ 10-11, 14-15 (stating the Act will impose billions of dollars in fines on GO-WV's members, harming the members and GO-WV itself); Ex. 26, ¶ 5 (stating at least two West Virginia Coal Association members have produced sufficient coal to subject them to cost recovery demand). New York has made clear that it intends to target these companies with cost-recovery demands for hundreds of millions or billions of dollars. N.Y. ENV'T CONSERV. LAW § 76-0101(6) (setting cost-recovery amount to seventy-five billion dollars); *see* Johan Sheridan & Jamie DeLine, *Breaking down New York's Climate Change Superfund Law*, ABC NEWS10 (Dec. 30, 2024), https://tinyurl.com/4nuvfnw5 (suggesting "[a]round 35 oil companies … must contribute"). Targeted companies will then be forced to expend time and resources to argue that they do not owe any money to New York under the unlawful Act in defending against a cost-recovery demand. So each company has standing in its own right.

*Second*, challenging the Act is germane to the purposes of both the West Virginia Coal Association and GO-WV. West Virginia Coal Association is a trade association committed to defending the interests of companies engaged in coal mining within the State of West Virginia. *Who We Are*, WV COAL, https://tinyurl.com/ynusybz4 (last visited Oct.

30, 2025). Similarly, GO-WV is a non-profit corporation which advocates for the oil and natural gas industry in West Virginia. Ex. 25, ¶¶ 8, 14-15; *Who We Are*, GAS & OIL ASS'N OF W. VA., https://tinyurl.com/yteex3z3 (last visited Oct. 30, 2025). Thus, both advocate against and challenge laws that negatively impact their members' businesses, including laws that impose unreasonable and unlawful financial and regulatory burdens on the private sector.

*Third*, "individual participation" is not necessary. "Whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Hunt*, 432 U.S. at 343 (cleaned up). Individual participation is "not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996). But participation usually is "required in an action for damages to an association's members." *Id.* Because Plaintiffs seek equitable relief, *see* Compl. ¶¶ 216-227, individual participation is unnecessary.

## II. The Constitution And Federal Common Law Preempt The Act.

Federal law preempts the Act. This Court needs only follow the Second Circuit's roadmap in *City of New York* to reach that conclusion. Federal common law preempts the Act's attempt to regulate interstate air pollution. And the Constitution preempts the Act's attempt to reach across State and international lines. The Act interferes with the other 49 States' sovereignty, and it invades the federal government's foreign affairs power. Any one of these reasons is sufficient to enjoin the Act.

### A.    Federal Common Law Preempts New York's Act.

The Supremacy Clause declares federal law supreme.  So federal common law preempts State law, *City of New York v. Chevron*, 993 F.3d 81, 91 (2d Cir. 2021), if the State law impedes "an identifiable federal policy or interest," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507-08 (1988).  A policy conflict need not be "intractably severe before federal common law may spring into action" and preempt State law.  *City of New York*, 993 F.3d at 90.

Federal common law exists in areas of law where the need for a uniform federal standard is present.  The paradigmatic example of where federal common law must exist is interstate pollution.  *See City of New York*, 993 F.3d at 89; *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981).  In areas where federal common law exists, it applies unless displaced by a *federal* statute.  *City of New York*, 993 F.3d at 95.  But when Congress sees "fit to displace a federal court-made standard with a legislative one," "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard." *Id.* at 98.  In other words, displaced federal common law retains its preemptive effect. *Id.*  Congress may still decide to "grant states the authority to operate in an area of national concern" where federal common law has operated, but doing so "is permissible only to the extent 'authorize[d]' by federal statute."  *Id.* at 99 (quoting *Illinois v. City of Milwaukee*, 731 F.2d 403, 411 (7th Cir. 1984)).

### 1.    In Regulating Interstate Pollution, New York's Act Inappropriately Interferes With Federal Common Law.

Interstate pollution is one of the few remaining pockets of federal common law post-*Erie*.  A largely "unbroken string of cases has applied federal law to disputes involving

interstate air or water pollution." *City of New York*, 993 F.3d at 91 (collecting cases). That makes sense. Interstate pollution is a "uniquely federal interest[]." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (cleaned up). And that "federal interest[] … [is] incompatible" with States' piecemeal, extraterritorial regulation of greenhouse gas emissions. *City of New York*, 993 F.3d at 91; *Am. Elec. Power Co. v. Connecticut* (*AEP*), 564 U.S. 410, 421 (2011).

Congress has at least partially displaced that federal common law with the Clean Air Act. *AEP*, 564 U.S. at 428; *City of New York*, 993 F.3d at 95 ("[T]he Clean Air Act displaces federal common law claims concerned with domestic greenhouse gas emissions."). Although the Clean Air Act appoints the EPA, not States, the primary regulator of greenhouse-gas emissions, it leaves States a narrow but important role to play in the regulatory scheme. In particular, in some instances, States can regulate emissions that come from *within* their own borders. 42 U.S.C. § 7416; *City of New York*, 993 F.3d at 99-100 (quoting *Ouellette*, 479 U.S. at 497). But when it comes to emissions outside of their borders, States are limited to commenting on EPA's rules or each other's implementation plans or suing under the laws of the emitting State. *Id.* §§ 7607(d)(5), 7475(a)(2), 7410(a)(1).

Federal common law preempts the Act in a straightforward manner. The Act seeks to impose liability on entities that extract fossil fuels or refine crude oil based on the interstate emissions those products create. N.Y. ENV'T CONSERV. LAW § 76-0101(21). Precisely like the lawsuit in *City of New York*, the Act "does not seek to hold the Producers liable for the effects of emissions released in New York." 993 F.3d at 91. "Instead, [New York] intends to hold the Producers liable, under New York law, for the effects of emissions

made around the globe over the past" 25 years. *Id.* Indeed, New York does not have a single fossil-fuel producer to which the law could even apply. And even if New York did have in-state production, the cost-recovery demands would still primarily cover activities from out-of-State, making every single cost-recovery demand preempted. In short, the Act regulates interstate emissions regulated by federal common law and, discussed later, the Clean Air Act. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.").

Because New York's Act conflicts with federal common law in an area of "uniquely federal interest," *Tex. Indus.*, 451 U.S. at 640 (cleaned up), the Act is preempted if it hinders "an identifiable federal policy or interest," *Boyle*, 487 U.S. at 507-08. And "where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules." *Id.* at 508 (cleaned up). The Second Circuit has already explained that "national standards" are required to balance economic and environmental goals in the climate-change context. *City of New York*, 993 F.3d at 93. Because "states will invariably differ in their assessment of the proper balance between these national and international objectives, there is a real risk that subjecting the Producers' global operations to a welter of different states' laws could undermine important federal policy choices." *Id.*; *AEP*, 564 U.S. at 427; 43 U.S.C. § 1802(1). Thus, State attempts to regulate the "production, promotion, and sale of fossil fuels" are preempted when they rely on the interstate emission of greenhouse gases as part of the chain of liability. *City of New York*, 993 F.3d at 91.

The Act does just that.  It imposes strict liability for the production of fossil fuels based on "covered greenhouse gas emissions."  N.Y. ENV'T CONSERV. LAW § 76-0103(3)(b).  Indeed, a producer is liable under the Act if it is "responsible for more than one billion tons of covered greenhouse gas emissions."  *Id.* § 76-0101(21).  And "covered greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining worldwide … *and are not limited to such emissions within the state*."  *Id.* § 76-0101(8) (emphasis added).  So interstate emissions aren't just part of the chain of liability; they're the sole basis.  "Global pollution-based complaints were never intended by Congress to be handled by individual states.  Federal law governs disputes involving air and water in their ambient state."  *Mayor & City Council of Balt. v. BP PLC*, No. 24-C-18-004219, 2024 WL 3678699, at *6 (Md. Cir. Ct. July 10, 2024) (cleaned up).  Federal common law, therefore, preempts the Act.

### 2. New York's Act Mirrors New York City's Preempted Tort Suit Against Producers.

If New York believes it can act against producers (as opposed to the ultimate emitters), then it is mistaken.  Although traditional-fuel producers are one step in the supply chain before actual greenhouse-gas emission, federal common law still preempts the Act.  New York City already tried to regulate the "production, promotion, and sale of fossil fuels" rather than direct "emi[ssion of] greenhouse gases."  *City of New York*, 993 F.3d at 91 (cleaned up).  The Second Circuit rejected New York City's attempt to evade federal common law preemption.  *Id.* (concluding that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions").

New York State's effort fares no better. It doesn't matter that the Act imposes liability on fossil-fuel producers. If interstate emissions are "a link in 'the causal chain,'" then federal common law preempts. *Id.* There's no question the Act's strict-liability scheme is premised entirely on interstate greenhouse-gas emissions. N.Y. ENV'T CONSERV. LAW § 76-0101(21) (defining "responsible party" as a producer "responsible for more than one billion tons of covered greenhouse gas emissions"). So there's no functional difference between New York City's tort claim and New York State's Act in the preemption analysis. Indeed, the Act is even more obviously directed towards federally governed interstate emissions in that it *expressly* declares its concern with international emissions and pollution. But in the end, federal common law trumps both.

It also doesn't matter that the Act is a statute rather than a tort suit. "[S]tate statutes or decisions are not conclusive" when considering "a question of 'federal common law.'" *Milwaukee I*, 406 U.S. at105. The Supremacy Clause states "the Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. Federal common law is, as its name suggests, federal law. And it constitutes the "Law[] of the United States" no less than federal statutes or the Constitution. *Id.*; *City of Evansville v. Ky. Liquid Recycling, Inc.*, 604 F.2d 1008, 1017 (7th Cir. 1979) (explaining that "laws" for the purpose of federal-question jurisdiction include federal common law); *Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.*, 981 F.2d 1177, 1179 (10th Cir. 1993). The Supremacy Clause doesn't differentiate between the preemptive effect of federal law versus common law over State statutes.

What matters for preemption purposes is not whether the law is written or judge-made, but whether it is a *state law* subordinate to a *federal* one.  And courts have consistently held that federal common law preempts State statutes.  *See, e.g.*, *Lowry v. Balt. & Ohio R.R. Co.*, 707 F.2d 721, 728 (3d Cir. 1983) ("[F]ederal common law, not *state statutes or decisional law*, governs whether causes of action under the federal securities laws run with the affected securities." (emphasis added)); *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 392 (3d Cir. 2012) (explaining in a case that involved a New Jersey statute that "state law can be preempted by federal common law");  *Gaff v. FDIC*, 919 F.2d 384, 387-88 (6th Cir. 1990) (deciding that a substantive rule of federal common law applied and preempted state regulation in a commercial law case), *opinion modified on reh'g*, 933 F.2d 400 (6th Cir. 1991).  Put simply, New York can't avoid federal common law's preemptive effect by writing down its efforts to regulate interstate emissions.  Just like the New York City tort suit, the statute is preempted.

### 3.    The Clean Air Act Doesn't Authorize New York's Act.

Because the federal common law applies and conflicts with it, New York's Act is preempted unless the Clean Air Act affirmatively authorizes it.  *See City of New York*, 993 F.3d at 98.  It doesn't.  Only two provisions of the Clean Air Act are even distantly relevant, but neither greenlights an interstate emissions law like the Act.  *Id.* at 99.

First is the "states' rights" savings clause.  The savings clause says "nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution."  42 U.S.C. § 7416.  But this

clause permits States only to impose additional "standard[s] or limitation[s]" on sources *within their own borders*. *City of New York*, 993 F.3d at 99-100 (quoting *Ouellette*, 479 U.S. at 497); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 195-97 (3d Cir. 2013) (same). Any doubt about that is dispelled by *Ouellette*, in which the Supreme Court interpreted the same clause in the Clean Water Act to save only State regulation of in-state pollution sources. *See* 479 U.S. at 497. New York's Act extends well beyond its own borders—by design. Indeed, big producers cannot escape liability no matter what they do.

The second potentially relevant clause is the "citizen-suit savings clause." That clause says "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." 42 U.S.C. § 7604(e). Like the states' rights savings clause, however, the citizen-suit clause "permit[s] only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate." *City of New York*, 993 F.3d at 100 (quoting *Ouellette*, 479 U.S. at 497). But none of the targeted entities are New York sources. Thus, neither of the savings clauses shows that the Clean Air Act has "authorize[d]" New York's Act. *Id.* at 99. The cost recovery demands in the Act will always apply New York law to production and emission activities that occurred across State (or national) lines.

With the savings clauses providing no help, New York has nowhere to turn. The federal common law of interstate air pollution retains its preemptive force despite being displaced (at least in part) by the Clean Air Act. And State laws that use greenhouse-gas

emissions as a link in a chain to establish liability are preempted under the federal common law. *Id.* at 90-95. New York's Act does just that. So federal common law preempts it.

### B.     The Act Is An Unconstitutional Extraterritorial Regulation.

New York's Act is also an unlawful effort to extend its climate policy worldwide. States can only regulate in their own jurisdictions. The "legislative power of a State to act upon persons and property within the limits of its own territory," *Hoyt v. Sprague*, 103 U.S. 613, 630 (1880), does not extend to out-of-state activities that are not "intended to produce … detrimental effects within [the State]," *Strassheim v. Daily*, 221 U.S. 280, 285 (1911). *See also Nat'l Pork Producers Council v. Ross,* 598 U.S. 356, 375-76 (2023). This "feature of our constitutional order … allows 'different communities' to live 'with different local standards.'" *Nat'l Pork Producers*, 598 U.S. at 375 (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). The rule against extraterritorial regulation rests on the "original and historical understandings of the Constitution's structure and the principles of sovereignty and comity it embraces," in addition to "the Due Process Clause and the Full Faith and Credit Clause." *Id.* at 376 (cleaned up).

The Supreme Court has reaffirmed as recently as 2023 that the Constitution's structure limits "the reach of one State's power." *Nat'l Pork Producers*, 598 U.S. at 376. The Constitution's prohibition on extraterritorial legislation is inherent in having "*equal[ly] sovereign*" States. *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 246 (2019) (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013)). Each State's equal sovereignty under the Constitution creates certain constitutional "limitation[s] on the sovereignty of all of its sister States." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

31

The oldest manifestation of this rule is perhaps that "[o]ne State cannot exempt property from taxation in another." *Bonaparte v. Appeal Tax Ct.*, 104 U.S. 592, 594 (1881). Doing so would infringe on the latter State's right to control the property within its own borders and deny that State's sovereignty. But the Constitution provides a system of equally sovereign States beyond the tax context. *See Shelby Cnty.*, 570 U.S. at 544; *see N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State."); *Huntington v. Attrill*, 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the state which enacts them, and can have extra-territorial effect only by the comity of other states."). It would most obviously apply to a punitive fiscal sanction of the sort seen here. "[S]tate legislation, state policy, and judicial development of state law can only be directed at activity within the state." *Geressy v. Digit. Equip. Corp.*, 950 F. Supp. 519, 521 (E.D.N.Y. 1997).

This prohibition on extraterritorial regulation applies in full force to New York's Act. The Act purports to impose liability on actions that were taken wholly outside "the limits of [New York's] own territory." *Hoyt*, 103 U.S. at 630. Not even one of the potential "covered entities" produces traditional fuels in New York, and the Act purports to attach liability to activities across the entire globe. *See* N.Y. ENV'T CONSERV. LAW § 76-0101(8) (defining "covered greenhouse gas emissions" to include emissions "attributable to all fossil fuel extraction and refining worldwide"). Indeed, if a ton of coal is mined in Wyoming by a responsible party, transported to Texas, and produces greenhouse gases when it is burned there, New York will hold the responsible party strictly liable for the emissions that coal

created.  The Act thus violates the extraterritoriality doctrine in the same way that the doctrine is violated when "[o]ne State" attempts to "exempt property from taxation in another."  *Bonaparte*, 104 U.S. at 594.

The extraterritoriality doctrine emanates not only from the structure and history of our Constitution, but also the principles underlying the "the Due Process Clause and the Full Faith and Credit Clause," *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 818 (1985), and "the dormant commerce clause," *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 667 (4th Cir. 2018).  So the doctrine often borrows from the principles those clauses promote.  *Nat'l Pork Producers*, 598 U.S. at 375.  Two such principles help demonstrate why the Act is an especially egregious violation of the extraterritoriality doctrine.

*First*, the Act not only attempts to exert New York's legislative power outside of New York but also does so on a retroactive basis.  N.Y. ENV'T CONSERV. LAW § 76-0101(9) (defining "covered period" as the period from January 1, 2000, to December 31, 2024).  Retroactive laws are inherently suspect because they do not give notice to regulated parties of how to conduct their affairs.  *See Peralta-Taveras v. Att'y Gen.*, 488 F.3d 580, 584 n.2 (2d Cir. 2007).  And an extraterritorial retroactive law only compounds those issues.  If a State proposes an extraterritorial prospective law, regulated parties can at least conform their conduct to minimize liability or seek protection from their home State.  But a retroactive extraterritorial law deprives them of that opportunity, requiring payment for past acts that were legal under the jurisdiction of the home State.

*Second*, the Act imposes retroactive liability on conduct in States that affirmatively promoted the very conduct that New York seeks to punish.  That effort is the kind of "policy

33

of hostility to the public Acts" of another State, that the Constitution was enacted to prevent. *Carroll v. Lanza*, 349 U.S. 408, 413 (1955); *see also Nat'l Pork Producers*, 598 U.S. at 409 (Kavanaugh, J., concurring) (discussing how the "Full Faith and Credit Clause might preclude" one State from forbidding what another State expressly authorizes). As the complaint and declarations explain, the States "expressly authorized" and even affirmatively promoted such activities for the benefit of their economies. *Nat'l Pork Producers*, 598 U.S. at 409 (Kavanaugh, J., concurring). For instance, Texas subsidizes the creation of high-risk wells, *see* 16 TEX. ADMIN. CODE § 3.101, while North Dakota exempts "machinery or equipment used to produce coal from a new mine" from sales tax, N.D. CENT. CODE § 57-39.2-04.8(1). West Virginia's official policy—between 2000 and 2024 and also today—is to "encourage capital investment in the coal industry in this state and thereby increase economic development." W. VA. CODE § 11-13EE-1. The States have their own policies supporting the extraction of traditional fuels within their borders, and New York cannot decide that it knows better and penalize the same activities. *See Hoyt*, 103 U.S. at 630.

It doesn't matter that New York apparently believes traditional-fuel producers' out-of-state conduct has an effect within the State. An in-state effect is not enough to regulate out-of-state conduct. The Supreme Court has explained that States can only regulate out-of-state conduct when the act was "intended to produce and produc[ed] detrimental effects within it." *Strassheim v. Daily*, 221 U.S. 280, 285 (1911). The test is plainly conjunctive. So an out-of-State individual must both intend to have his conduct reach across the border, and it must do so and cause harm. Both factors are absent here.

The Act creates a strict-liability standard that ignores intent entirely—let alone the specific intent to cause harm in New York. N.Y. ENV'T CONSERV. LAW § 76-0103(3). And it is impossible to determine whether any particular emission actually caused harm in New York. *See AEP*, 564 U.S. at 422. As the Supreme Court has explained, "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *Id.*

The Act's illusory "nexus" requirement doesn't save it, either. The Act excludes from the definition of "responsible party" "any person who lacks sufficient contacts with the state to satisfy the due process clause of the United States Constitution." N.Y. ENV'T CONSERV. LAW § 76-0101(21). This "nexus" requirement, however, applies to a "person['s]" contacts with New York and not the activities being punished. *Id.* Thus, a corporation may have sufficient contacts with New York under the Act and yet be punished for activities wholly outside of the State. Indeed, because New York does not produce any traditional fuels, the Act will *only* be applied to such entities. So every single cost recovery demand that New York issues will be demanding payment for activities wholly outside of New York. *Cf. Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236-37 (11th Cir. 2001) (identifying "Due Process constraints on a state legislature's ability to regulate subject matters and transactions beyond the state's boundaries"). And even if, somehow, the Defendants could point to production within New York, each cost recovery demand would still include activities wholly outside the State and would thus be preempted. The Constitution doesn't permit that reach.

C.    **The Act Violates the Foreign-Affairs Doctrine.**

The Constitution also doesn't permit States to regulate foreign affairs. Instead, it places the foreign-affairs powers in the federal government, preempting State actions that interfere with those powers. *See Zschernig v. Miller*, 389 U.S. 429, 442-43 (1968) (Stewart, J., concurring). "Our system of government … imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941)). In other words, the Constitution entrusts the "field of foreign affairs" to "the President and the Congress," not individual States. *Id.* at 432. Although States may interact with other nations, they cannot do so when "there is evidence of clear conflict [with] the policies" adopted by the federal government. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003). And beyond preempting State laws that conflict with the federal government's foreign-affairs positions, the foreign-affairs doctrine also preempts all State laws that concern foreign affairs "when a state law … has no serious claim to be addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc) (citing *Garamendi* 539 U.S. at 426). In those situations, an outright conflict is not necessary because a State had no power to regulate to begin with.

The foreign-affairs doctrine preempts the Act. *First*, the Act is contrary to the foreign-policy positions of the federal government. *See Zschernig*, 389 U.S. at 432-33; *Garamendi*, 539 U.S. at 419 n.11 ("[T]he Constitution entrusts foreign policy exclusively to the National Government."). The Act expressly contemplates demanding money from "worldwide" entities for their extraction of traditional fuels. N.Y. ENV'T CONSERV. LAW

§ 76-0101(8).  Potential targets include companies all over the globe, to include companies owned by foreign sovereigns.  And even if the Act did not attempt to secure payments from foreign nations themselves, it nonetheless regulates activities in foreign jurisdictions because it applies to the production of traditional fuels worldwide, regardless of their connection to New York.  Thus, production activities that take place exclusively in foreign nations (and where the fuels are burned in those same nations) give rise to liability under the Act.

This effort to impose liability on foreign activities intrudes upon the federal government's foreign affairs power by "bypass[ing] the various diplomatic channels that the United States uses to address" climate, "such as the U.N. Framework and the Paris Agreement." *City of New York*, 993 F.3d at 103.  The bypass is especially egregious where "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level." *Id.* at 103 n.11; *see* Telephone Interview with Todd Stern, Special Envoy for Climate Change, U.S. Dep't of State (Oct. 28, 2015), https://perma.cc/E2SM-NT8R (stating that "[w]e obviously do have [a] problem with the idea, and don't accept the idea, of compensation and liability and never accepted that and we're not about to accept it now").  More generally, the federal government has often rejected unilateral emissions reductions, especially when those reductions were shown to cause harm to the economy.  *E.g.*, S.Res. 98, 105th Cong. (1997) (Byrd-Hagel resolution rejecting the Kyoto Protocol 95-0).

The federal government has made its position clear.  President Trump has called laws like the Act "significant barriers to … international trade."  Exec. Order 14260, § 1, 90

Fed. Reg. 15,513 (Apr. 8, 2025).  And the federal government seeks to enjoin enforcement of the Act.  *See* Compl., *United States v. New York*, 1:25-cv-03656 (S.D.N.Y May 1, 2025), ECF No. 1.  That's because it could "undermine the ability of the United States to speak with one voice on a matter of pressing interest around the globe … [and] could complicate the United States' relations with foreign countries concerning regulation of greenhouse gas emissions, trade policy, and exports and imports of fossil fuels." *Id.* at 27-28.  And it directly contradicts the "President's explicit judgment that energy imports should be exempt from the tariffs imposed under Executive Order 14257." *Id.* at 28.  The Act also "interferes with the United States' foreign policy on greenhouse gas regulation, including … participation in the Framework Convention and announcement of its intention to withdraw from the Paris Agreement." *Id.*

New York's attempt to unilaterally impose fines on foreign production of traditional fuels runs contrary to both federal foreign-affairs statutes and the official policy of the United States.  For instance, the Global Climate Protection Act declared that the United States should "work toward multilateral agreements" on greenhouse gas emissions, with a "coordinated national policy," including in the international arena.  *See* Pub. L. No. 100-204, Title XI, §§ 1101-1106, 101 Stat. 1331, 1407-09 (1987), re-printed as note to 15 U.S.C. § 2901. Multilateral agreements to establish an international framework to regulate greenhouse-gas emissions are wholly inconsistent with State-by-State regulation of foreign traditional-fuel production.  And more generally, the scheme directs liability towards foreign entities—including arms of sovereign governments—without meeting the strict requirements of laws like the Foreign Sovereign Immunities Act.

Allowing a single State like New York to interfere with the federal government's response to a global policy challenge like greenhouse-gas emissions "sow[s] confusion and needlessly complicate[s] the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *City of New York*, 993 F.3d at 103. The Act is designed to impose billions of dollars in after-the-fact sanctions on energy companies for the very conduct that is the focus of national diplomatic efforts.

Even if the Act did not conflict with the United States' policy to refrain from imposing retroactive penalties on private producers of traditional fuels, it would still be preempted. *See Movsesian*, 670 F.3d at 1072. The Act touches upon international relations while having "no serious claim to be addressing a traditional state responsibility." *Id.* at 1074. Again, interstate air pollution is an area traditionally reserved for the federal government. *See City of New York*, 993 F.3d at 103. That proposition is even truer for *international* air pollution. *Id.* (explaining that the fight against climate change requires a "carefully balanced scheme of international cooperation on a topic of global concern").

Put simply, the Constitution doesn't permit individual States to regulate international air pollution. When individual States attempt to do so, they step outside of their own jurisdiction and harm federal foreign-affairs interests. States' "traditional … responsibilit[ies]" only include regulating within their own borders. *Movsesian*, 670 F.3d at 1074. New York has "no serious claim to be addressing a traditional state responsibility" by reaching across State or international lines. *Id.*

### III.    The Clean Air Act Preempts The Superfund Act.

Separate and apart from the preemptive effect of federal common law (and our constitutional system), the Clean Air Act preempts New York's attempt to punish a small group of traditional-energy producers for global greenhouse gases emitted from all sources into the atmosphere.

State laws that are preempted by a federal statute may not be enforced under the Supremacy Clause. *See* U.S. CONST. art. VI, cl. 2. Indeed, "[i]t is a familiar and well-established principle that the Supremacy Clause … invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (cleaned up). Because federal law does not necessarily need to explicitly preempt state laws, *see Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987), unconstitutional interference arises when a State law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough Cnty.*, 471 U.S. at 713 (cleaned up).

The Clean Air Act "is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation" of out-of-state air pollutants. *Ouellette*, 479 U.S. at 491 (cleaned up). The Second Circuit already interpreted the Clean Air Act to "permit only state lawsuits brought under the law of the pollution's *source* state." *City of New York v. Chevron Corp.*, 993 F.3d 81, 100 (2021) (cleaned up). By extension, an attempt by a State to regulate out-of-state pollutants is prohibited (at least without an express greenlight from Congress), whether through direct attempts like an "imposition of pollution standards" or indirect attempts like imposing an "obligation to pay"

or an "award of damages." *Id.* at 92. Because New York's Act imposes liability on energy producers for greenhouse gas emissions outside of New York, the Clean Air Act preempts it. *Cf. State ex rel. Jennings v. BP Am. Inc.*, No. N20C-09-097 MMJ CCLD, 2024 WL 98888, at *9 (Del. Super. Ct. Jan. 9, 2024) (holding that "claims … seeking damages for injuries resulting from out-of-state or global greenhouse emissions and interstate pollution[] are pre-empted by the [Clean Air Act]").

### A.    The Clean Air Act Comprehensively Regulates Interstate Carbon Emissions.

States were never responsible for regulating interstate air pollution. Before the Clean Air Act, federal common law governed the field of interstate air pollution regulation. "For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91 (collecting cases). Federal common law applies to "interstate … disputes implicating the conflicting rights of States." *Tex. Indus. Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). These cases implicate "an overriding federal interest in the need for a uniform rule of decision" as well as "basic interests of federalism." *Illinois v. City of Milwaukee* (*Milwaukee I*), 406 U.S. 91, 105 n.6 (1972). So "the interstate … nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641; *Milwaukee I*, 406 U.S. at 105 n.6 (explaining that federal law and "not the varying common law of the individual States" must apply when a controversy invokes "the environmental rights of a State against improper impairment by sources outside its domain").

The Clean Air Act's passage confirms that States are not to regulate out-of-state air pollutants. Congress enacted the Clean Air Act to address a national concern over air

pollution.  *See* 42 U.S.C. § 7401(b)(1) (describing how the purpose of the Clean Air Act was to "protect and enhance the quality of the Nation's air resources").  While States have "the primary responsibility" to prevent and control "air pollution … *at its source*" under the Clean Air Act, *id.* § 7401(a)(3) (emphasis added), the Clean Air Act "delegate[s]" authority to EPA to "deci[de] whether and how to regulate" greenhouse gas emissions, and "entrusts" to EPA the "complex balancing" of "competing interests" from "environmental benefit[s]" of regulation to "our Nation's energy needs and the possibility of economic disruption." *AEP Co. v. Connecticut*, 564 U.S. 410, 426-27 (2011).  And in *Massachusetts v. EPA,* the Supreme Court held that the Clean Air Act authorized EPA to regulate greenhouse gases as a category of "air pollutant[s]," 549 U.S. 497, 528-29 (2007).  EPA has since regulated greenhouse gases, such as carbon dioxide.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014).

So State law has "traditionally *not* occupied" the area of *interstate* air pollution.  *City of New York*, 993 F.3d at 98-99.  And the Clean Air Act leaves only a "slim reservoir" of state authority to regulate emissions: State-imposed liability must be based on "the law of the pollution's *source* state."  *Id.* at 100 (cleaned up) (quoting *Ouellette*, 479 U.S. at 497); *see also AEP*, 564 U.S. at 429.  Thus, New York can regulate air pollutants coming from New York, but it can't police out-of-state emissions.

*Ouellette* is illustrative.  In *Ouellette*, the Supreme Court held that the Clean Water Act "pre-empt[ed]" a tort suit under Vermont law seeking relief for injuries caused by pollution emitted in New York.  479 U.S. at 484.  The Court found that the Clean Water Act's "comprehensive" and "pervasive regulation" of water pollution meant that the Clean

Water Act precluded "applying the law of an affected State" to impose liability on "an out-of-state source." *Id.* at 492, 494. And although the Clean Water Act has a savings clause, which permits states to adopt and enforce stricter standards than required by the Clean Water Act, 33 U.S.C. § 1370, that could be enforced only if "pursuant to the law of the *source* [s]tate," *Ouellette*, 479 U.S. at 497. "An interpretation of the saving clause that preserved actions brought under an affected [downstream] State's law" would "upset[] the balance of public and private interests so carefully addressed by the Act," and "would be incompatible with the Act's delegation of authority and [] comprehensive regulation of water pollution." *Id.* at 494-95, 500.

The same principles govern preemption under the Clean Air Act, which establishes a similar framework for addressing air pollution. In *AEP*, the Court addressed the effect of the Clean Air Act on the federal law governing air pollution, holding that "suits brought by one State to abate pollution emanating from another State" are "meet for federal law governance." 564 U.S. at 421-22. Relying on *Ouellette*, the Court instructed lower courts to determine the availability of state-law claims because of the "preemptive effect of the federal Act." *Id.* at 429 (citing *Ouellette*, 479 U.S. at 489).

Since *Ouellette* and *AEP*, lower courts have consistently held that the Clean Air Act preempts state laws that police out-of-state emissions. *See, e.g.*, *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 692-93 (6th Cir. 2015) (relying on *Ouellette* to find that "claims based on the common law of a non-source state … are preempted by the Clean Air Act"); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 196 (3d Cir. 2013) (finding "no meaningful difference between the Clean Water Act and the Clean Air Act for …

preemption analysis"); *N.C., ex rel. Cooper v. TVA*, 615 F.3d 291, 306 (4th Cir. 2010) (recognizing that *Ouellette*'s "holding is equally applicable to the Clean Air Act").

The Second Circuit applied *Ouellette*'s interpretation to the Clean Air Act to find that the Act "does not authorize" suits "seeking to recover damages for the harms caused by global greenhouse gas emissions … under New York law." *City of New York*, 993 F.3d at 91, 99. Critical to the Second Circuit's analysis is that the Clean Air Act's "comprehensive statutory scheme … anoints the EPA as the primary regulator of domestic greenhouse gas emissions." *Id.* at 99 (cleaned up). The Second Circuit noted that the Clean Air Act employs a "cooperative federalist approach," which meant that each State had the opportunity "to take the first cut at determining how best to achieve EPA emissions standards *within its domain*." *Id.* (cleaned up). And "[l]ike the nearly identical savings clauses in the Clean Water Act," the Clean Air Act's savings clauses "permit states to create and enforce their own emissions standards applicable to in-state polluters" and allows "state lawsuits brought under the law of the pollution's source state." *Id.* at 99-100 (cleaned up). So the Clean Air Act preempted New York City's attempt to impose "New York nuisance standards on emissions emanating simultaneously from all 50 states and the nations of the world." *Id.* at 100.

**B.    New York's Act Impermissibly Imposes Liability Under New York Law for Out-Of-State Greenhouse Gas Emissions.**

The Act is both field- and conflict-preempted. The Clean Air Act is a comprehensive scheme that regulates air pollution emissions between the States. It does not leave room for States to regulate out-of-State emissions outside of the Clean Air Act's parameters.

At the threshold, the Supreme Court's presumption against preemption of State law does not apply to the Act. That applies only when a State is regulating a subject "traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008); *United States v. Locke*, 529 U.S. 89, 108 (2000) ("[T]here is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers" if it is outside the traditional subjects of State regulation.). As explained above, the area of interstate air pollution has traditionally been occupied by federal law. Instead of starting with a presumption that the Act is valid, this Court should start with the presumption that it is beyond the State legislature's reach. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

### 1.    The Act Is Field-Preempted.

State laws are preempted when Congress has "exclusive[ly]" occupied that field and thus "foreclose[d] any state regulation in the area." *Arizona v. United States*, 567 U.S. 387, 399, 401 (2012). "The intent to displace state law altogether can be inferred" for two reasons. *Id.* (cleaned up). *First*, Congress intends to displace state law when it enacts "a framework of regulation so pervasive … that Congress left no room for the States to supplement it." *Id.* (cleaned up). *Second*, Congress's intent to displace can be inferred "where there is a federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* at 399 (cleaned up).

To resolve this case, the Court needs only to copy what the Second Circuit did in *City of New York*. There, the Second Circuit held that the Clean Air Act is a "comprehensive statutory scheme that anoints the EPA as the 'primary regulator of

[domestic] greenhouse gas emissions.'" *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428). So the Clean Air Act must expressly "authorize" state regulation of interstate air pollution. *Id.* But rather than "take advantage of the slim reservoir of state" regulation by bringing a nuisance suit under "the law of the pollution's *source* state," *id.* at 100 (cleaned up), New York seeks to regulate interstate air pollution. The Act targets "emissions attributable to all fossil fuel extraction and refining worldwide … and are not limited to such emissions within the state." N.Y. ENV'T CONSERV. LAW § 76-0101(8). So New York wants to hold traditional energy liable under New York law "for the effects of emissions made around the globe"—something the Second Circuit already found was precluded by the Clean Air Act. *City of New York*, 993 F.3d at 92.

### 2.     The Act Is Conflict-Preempted.

The Superfund Act also conflicts with "the text and structure of the" Clean Air Act. *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). "[C]onflict pre-emption exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (cleaned up). New York's attempt to impose retroactive, strict liability for harms allegedly tied to global emissions conflicts with the Clean Air Act's "comprehensive statutory scheme." *City of New York*, 993 F.3d at 99.

Start again from first principles. Congress gave EPA the task of "primary regulator of greenhouse gas emissions." *AEP*, 564 U.S. at 428. In doing so, Congress had to make an "informed assessment of competing interests." *Id.* at 427. EPA must determine the

"appropriate amount of regulation in any particular greenhouse gas-producing sector" by weighing "the environmental benefit potentially achievable" against "our Nation's energy needs and the possibility of economic disruption." *Id.* The Clean Air Act also uses technology-forcing standards "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(2); *see West Virginia v. EPA*, 597 U.S. 697, 708, 726-27 (2022); Wendy E. Wagner, *The Triumph of Technology-Based Standards*, 2000 U. ILL. L. REV. 83, 84 n.4 (2000).

New York's Act scuttles Congress' "carefully drawn" regulatory scheme. *City of New York*, 993 F.3d at 100 (quoting *Ouellette*, 479 U.S. at 494). The Clean Air Act tasks EPA to set nationwide standards when it determines that emissions meet statutory standards for regulations. And the Clean Air Act prescribes that the way to do that is through setting standards, such as the NAAQS, New Source Standards, or Existing Source Standards. 42 U.S.C. § 7401(a)(3). Doing so incentivizes private industry to create new methods of technology to reduce emissions and allows the entities with the best emission-reducing technology to produce more energy. But the Act upsets this model by imposing its own nationwide standard of retroactive strict liability on the producers of traditional energy. That's true even when those fuels are burned at levels approved by EPA.

EPA's recent proposal to rescind its 2009 Endangerment Finding under the Clean Air Act doesn't change this analysis. *See Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 Fed. Reg. 36,288 (Aug. 1, 2025). When EPA has "the power to decide" a question, it has a "statutorily implicit" "power to reconsider"

unless Congress has limited that discretion. *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023) (cleaned up). And under current law, EPA decides "*whether* and how to regulate" interstate emissions. *AEP*, 564 U.S. at 426 (emphasis added). If EPA "decline[d] to regulate carbon-dioxide emissions altogether," the States would still "have no warrant … to upset the Agency's expert determination." *Id.* EPA's regulatory decision does not change whether the Clean Air Act preempts New York's Act.

The Clean Air Act's "cooperative federalism" approach confirms that the Act squarely conflicts with the Clean Air Act. The Clean Air Act starts by finding that "air pollution *at its source* is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3) (emphasis added). The Second Circuit explained that "at its source" refers to the States' regulation of polluters within their own borders. *City of New York*, 993 F.3d at 88 ("[S]tates are given a meaningful role in regulating greenhouse gases and other emissions from sources *within their borders*." (emphasis added)).

The Clean Air Act specifies the role States play in regulating interstate air pollution. It allows "[S]tates to comment[] on proposed EPA rules or on another [S]tate's emission plan." *City of New York*, 993 F.3d at 88. And the "Good Neighbor Provision" in the National Ambient Air Quality Standards program requires upwind states to reduce emissions that affect air quality in downwind states because downwind states "lack authority to control" the "influx of out-of-state pollution." *EPA v. EME Homer City Gen.*, 572 U.S. 489, 495 (2014); *see* 42 U.S.C. § 7410(a)(2)(D). If the State Implementation Plan fails to sufficiently protect its neighbor State from air pollution, then EPA will impose its own Plan unless the State corrects the error first. *Id.* § 7410(c)(1); *EME Homer City Gen.*, 572 U.S. at 498.

Elsewhere, the Clean Air Act permits States to petition EPA for action in interstate pollution. *See, e.g.*, 42 U.S.C. § 7506a(a) (permitting States to petition EPA when "interstate transport of air pollutants" from other States contributes to a violation of a NAAQ standard). So the Clean Air Act allows States to regulate out-of-state emissions in narrowly prescribed ways, but even then, the Clean Air Act tasks EPA with acting—not the States.

Permitting New York to impose this kind of nationwide liability would supplant carefully calibrated federal rules under the Clean Air Act with a patchwork of State-level determinations. *City of New York*, 993 F.3d at 100; *see Ouellette*, 479 U.S. at 496-97 (permitting States to regulate out-of-state pollution "undermine[s] [the] regulatory structure" provided by the Clean Water Act and "lead[s] to chaotic confrontation between sovereign states"). Some States would regulate more, some less—undermining the Clean Air Act's integrated approach to air pollution control and regulation. Worse, New York's law could pave the way for a tit-for-tat approach in interstate regulations. So New York is attempting to "do indirectly what they could not do directly—regulate the conduct of out-of-state sources." *Ouellette*, 479 U.S. at 495.

Finally, the Act regulates pollution even though New York has characterized it as a remedial statute. Although New York may wish to spend the money from the cost-recovery demands, it is still imposing liability based on the very same emissions that the Clean Air Act targets. The Second Circuit already foreclosed this semantic tactic as "ignor[ing] economic reality": "[R]egulation can be effectively exerted through an award of damages," which can be " a potent method of governing conduct and controlling policy." *City of New York*, 993 F.3d at 92 (cleaned up). New York's Act is "even more ambitious" than "a

standard of care or emission restrictions" because it "impose[s] strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released." *Id.* at 93. The only way to avoid liability is "to cease global production altogether." *Id.* However New York packages its law—"compensatory or regulatory"—it still forces traditional energy producers "to adopt different or additional means of pollution control from those required by the" Clean Air Act. *Ouellette*, 479 U.S. at 498 n.19.

**CONCLUSION**

The Court should grant Plaintiffs summary judgment on Counts I and II.

Respectfully submitted,

Dated: October 31, 2025

JOHN B. MCCUSKEY
ATTORNEY GENERAL OF WEST VIRGINIA

*/s/ Caleb B. David*
Michael R. Williams
  *Solicitor General*
Caleb B. David
  *Deputy Solicitor General*
Spencer J. Davenport*
  *Assistant Solicitor General*

Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
caleb.b.david@wvago.gov
spencer.j.davenport@wvago.gov

*Counsel for State of West Virginia*

STEVE MARSHALL
  ATTORNEY GENERAL OF ALABAMA

*/s/ Robert M. Overing*
Robert M. Overing*
  *Deputy Solicitor General*

Office of the Attorney General
of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Robert.Overing@AlabamaAG.gov

*Counsel for State of Alabama*

TIM GRIFFIN
  ATTORNEY GENERAL OF ARKANSAS

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson*
  *Solicitor General*

Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-3661
Autumn.Patterson@Arkansasag.Gov

*Counsel for the State of Arkansas*

51

CHRISTOPHER M. CARR
  ATTORNEY GENERAL OF GEORGIA

Stephen J. Petrany
  *Solicitor General*

*/s/ Elijah O'Kelley*
Elijah O'Kelley*
  *Assistant Solicitor General*

Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
  ATTORNEY GENERAL OF IDAHO

*/s/ Michael A. Zarian*
Michael A. Zarian #12418ID*
  *Deputy Solicitor General*

Office of the Idaho Attorney General
700 W. Jefferson St., Suite 210,
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

*Counsel for the State of Idaho*

BRENNA BIRD
  ATTORNEY GENERAL OF IOWA

*/s/ Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

KRIS W. KOBACH
  ATTORNEY GENERAL OF KANSAS

*/s/ Anthony J. Powell*
Anthony J. Powell*
  *Solicitor General*

Office of the Kansas Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel.: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

Russell Coleman
  Attorney General of Kentucky

/s/ Victor B. Maddox
Victor B. Maddox (KBA No. 43095)*
Jason P. Woodall (KBA No. 95013)*

Kentucky Office of the Attorney General
310 Whittington Parkway, Suite 101
Louisville, KY 40222
(502) 696-5300
Victor.Maddox@ky.gov
Jason.Woodall@ky.gov

*Counsel for Commonwealth of Kentucky*

Liz Murrill
  Attorney General of Louisiana

/s/ J. Benjamin Aguiñaga
J. Benjamin Aguiñaga*
  *Solicitor General*

Office of the Louisiana Attorney General
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6705
AguinagaB@ag.louisiana.gov

*Counsel for State of Louisiana*

Lynn Fitch
  Attorney General of Mississippi

/s/ Justin L. Matheny
Justin L. Matheny*
  *Deputy Solicitor General*

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

Catherine Hanaway
  Attorney General of Missouri

/s/ Louis J. Capozzi
Louis J. Capozzi *
  *Solicitor General*

Office of The Missouri Attorney General
Solicitor General
Office of Missouri Attorney General
815 Olive Street
St Louis, MO 63101
717-802-2077
Email: louis.capozzi@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ Christian B. Corrigan
Christian B. Corrigan*
  Solicitor General

Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov

Counsel for State of Montana

DREW H. WRIGLEY
  ATTORNEY GENERAL OF NORTH DAKOTA

/s/ Philip Axt
Philip Axt*
  Solicitor General

600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

Counsel for the State of North Dakota

MICHAEL T. HILGERS
  ATTORNEY GENERAL OF NEBRASKA

/s/ Zachary A. Viglianco
Zachary A. Viglianco*
  Principal Deputy Solicitor General

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
zachary.viglianco@nebraska.gov

Counsel for State of Nebraska

DAVE YOST
  ATTORNEY GENERAL OF OHIO

/s/ Mathura Sridharan
Mathura Sridharan *
  Solicitor General

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
Email: mathura.sridharan@ohioago.gov

Counsel for the State of Ohio

GENTNER DRUMMOND
  ATTORNEY GENERAL OF OKLAHOMA

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II*
  Solicitor General

Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

Counsel for State of Oklahoma


MARTY J. JACKLEY
  ATTORNEY GENERAL OF SOUTH DAKOTA

/s/ Emily Greco
Emily Greco*
  Assistant Attorney General

South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
605-773-3215
emily.greco@state.sd.us

Counsel for State of South Dakota


ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

/s/ J. Emory Smith, Jr.
J. Emory Smith, Jr.*
  Solicitor General

Office of the Attorney General of
South Carolina
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-3680
esmith@scag.gov

Counsel for State of South Carolina


JONATHAN SKRMETTI
  ATTORNEY GENERAL AND REPORTER OF
TENNESSEE

/s/ J. Matthew Rice
J. Matthew Rice*
  Solicitor General

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
615-532-6026
Email: matt.rice@ag.tn.gov

Counsel for State of Tennessee

KEN PAXTON
  ATTORNEY GENERAL OF TEXAS

Brent Webster
*First Assistant Attorney General*

Ralph Molina
*Deputy First Assistant Attorney General*

Austin Kinghorn
*Deputy Attorney General for Legal Strategy*

*/s/ Ryan G. Kercher*
Ryan G. Kercher*
  *Chief, Special Litigation Division*
Texas Bar No. 24060998

Zachary Berg*
  *Special Counsel*
Tex. State Bar No. 24107706

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Kercher@oag.texas.gov
Zachary.Berg@oag.texas.gov
Kathleen.Hunker@oag.texas.gov

*Counsel for State of Texas*

DEREK E. BROWN
  ATTORNEY GENERAL OF UTAH

*/s/ Gary T. Wight*
Gary T. Wight (Utah Bar No. 10994)*
  *Assistant Attorney General*

1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah*

56

KEITH G. KAUTZ
  ATTORNEY GENERAL OF WYOMING

/s/ Ryan Schelhaas
Ryan Schelhaas*
  Chief Deputy Attorney General

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

Counsel for State of Wyoming

WEST VIRGINIA COAL ASSOCIATION AND
AMERICA'S COAL ASSOCIATIONS
By Counsel

/s/ Christopher M. Hunter
Robert G. McLusky, WVBN 2489*
Christopher M. Hunter, WVBN 9768*

Jackson Kelly, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
(304) 340-1381
rmclusky@jacksonkelly.com
chunter@jacksonkelly.com

Counsel for West Virginia Coal Association
and America's Coal Associations

GAS AND OIL ASSOCIATION OF WEST VIRGINIA,
INC.
By Counsel

/s/ Ivan L. London
Ivan L. London*
William E. Trachman*
Alexander Khoury

Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
916-284-3255
ilondon@mslegal.org
wtrachman@mslegal.org
akhoury@mslegal.org

Counsel for Gas and Oil Association of West
Virginia, Inc.

*pro hac vice

ALPHA METALLURGICAL RESOURCES, INC.
By Counsel

/s/ Michael W. Kirk
Michael W. Kirk*
Adam P. Laxalt*
Brian W. Barnes*
Megan M. Wold*

Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
mkirk@cooperkirk.com
alaxalt@cooperkirk.com
bbarnes@cooperkirk.com
mwold@cooperkirk.com

Counsel for Plaintiff
Alpha Metallurgical Resources, Inc.