**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**ALBANY DIVISION**

---

STATE OF WEST VIRGINIA, *et al.*,

               *Plaintiffs*,

      v.

LETITIA JAMES, in her official capacity as the
Attorney General of New York, *et al.*,

               *Defendants*,

No. 1:25-cv-00168-BKS-DJS

---

## <u>STATEMENT OF INTEREST OF THE UNITED STATES</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTERESTS OF THE UNITED STATES ..................................................................1

ARGUMENT ..............................................................................................................2

I.      The Superfund Act Violates The Federal Constitution.......................................2

      A.      State Law Cannot Govern Out-of-State Greenhouse Gas
                Emissions. ...............................................................................................2

      B.      The Superfund Act Exceeds Constitutional Limits on
                Extraterritorial Regulation. ....................................................................3

      C.      The Foreign Affairs Doctrine Preempts the Superfund Act. ..................6

            1.      The Superfund Act conflicts with U.S. foreign policy. .............6

            2.      The Superfund Act intrudes into the field of foreign affairs
                        without addressing a traditional state responsibility.................10

II.     The Clean Air Act Preempts The Superfund Act. ...........................................11

      A.      The Superfund Act Impermissibly Regulates in the Field of
                Interstate Greenhouse Gas Emissions. ..................................................11

      B.      The Superfund Act Conflicts with the Clean Air Act...........................12

CONCLUSION.........................................................................................................15

## TABLE OF AUTHORITIES

**Case**                                                                 **Page(s)**

*Am. Elec. Power Co., Inc. (AEP) v. Connecticut*,
    564 U.S. 410 (2011) .......................................................................... passim

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ........................................................ 6, 8, 10, 11

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ............................................................................... 6

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021) .............................................................. passim

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ............................................................................... 8

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) ............................................................................... 4

*EPA v. EME Homer City Generation*,
    572 U.S. 489 (2014) ............................................................................. 14

*Franchise Tax Bd. v. Hyatt*,
    587 U.S. 230 (2019) ........................................................................... 2, 3

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025) .................................................................................. 3

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) .................................................................. 5

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
    988 F.3d 114 (2d Cir. 2021) .................................................................. 4

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ........................................................................ 6, 7, 10

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979) ............................................................................... 5

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972) ........................................................................... 3, 11

iii

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ................................................................................... 3, 12, 14, 15

*Japan Line, Ltd. v. Cnty. of Los Angeles,*
    441 U.S. 434 (1979) ................................................................................................ 10

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................................................................................ 13

*Morrison v. Nat'l Australia Bank Ltd.,*
    561 U.S. 247 (2010) ................................................................................................ 10

*Movsesian v. Victoria Versicherung AG,*
    670 F.3d 1067 (9th Cir. 2012) ................................................................ 6, 9, 10, 11

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) .......................................................................................... 3, 4, 5

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981) .................................................................................................. 2

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
    592 F.3d 954 (9th Cir. 2010) ................................................................................. 11

*Young v. Masci,*
    289 U.S. 253 (1933) .................................................................................................. 5

*Zschernig v. Miller,*
    389 U.S. 429 (1968) .......................................................................................... 10, 11

**Statutes**

28 U.S.C. § 517 ............................................................................................................... 1

42 U.S.C. § 7401(a)(3) ............................................................................................. 13, 14

42 U.S.C. § 7410(a)(2)(D)(i) .......................................................................................... 14

42 U.S.C. § 7426(b) ....................................................................................................... 14

42 U.S.C. § 7506a(a) ...................................................................................................... 14

S.2129-B, Chapter 679, Laws of 2024 as amended by S.824 (Feb. 28, 2025),
    N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105 ................................................. 1

N.Y. Envtl. Conserv. Law § 76-0101(8) .............................................................. 3, 4, 11, 12

iv

Pub. L. No. 100-204, 101 Stat. 1331 (1987) (reprinted at 15 U.S.C. § 2901 note) ....................... 7

**Other Authorities**

*Declaring a National Energy Emergency*,
    Exec. Order 14156, 90 Fed. Reg. 8,433 (Jan. 20, 2025) ........................................................... 7

*Putting America First in International Environmental Agreements*,
    Exec. Order 14162, 90 Fed. Reg. 8,455 (Jan. 20, 2025) ........................................................... 8

S. Res. 98, 105th Cong., 1st Sess. (July 25, 1997) ....................................................................... 8

Senate-ratified United Nations Framework Convention on Climate Change,
    S. Treaty Doc. No. 102- 38, 1771 U.N.T.S. 107 .............................................................. 7, 8, 9

Kyoto Protocol (Dec. 10, 1997), 37 I.L.M. 22 (1998) ................................................................. 8

## INTERESTS OF THE UNITED STATES

This case presents important questions about whether the federal Constitution and Clean Air Act preclude New York's Climate Change Superfund Act, S.2129-B, Chapter 679, Laws of 2024 as amended by S.824 (Feb. 28, 2025), N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105. The United States has a substantial interest in the matter because it directly implicates the United States' sovereign interest in the supremacy of federal law and the proper division of power between the national government and the states. The United States accordingly submits this statement of interest as authorized under 28 U.S.C. § 517.

On its face and by design, New York's Superfund Act targets nationwide and global greenhouse gas emissions and related conduct—thus exceeding the State's authority and intruding on areas that federal law reserves exclusively for federal control. To begin, the federal Constitution restricts states' ability to regulate beyond their borders, especially when the subject of regulation is interstate pollution. It also vests the federal government with exclusive authority over foreign affairs, which encompasses topics such as greenhouse gas emissions, energy, and climate change. And as the attached declaration from the Deputy Secretary of State explains in more detail, the Superfund Act "directly conflicts with . . . U.S. foreign policy in multiple respects." Declaration of Deputy Secretary of State Christopher Landau ("Landau Decl.") ¶ 15. Finally, the Superfund Act is preempted by the Clean Air Act, which vests the U.S. Environmental Protection Agency with exclusive authority over domestic air pollutant emissions that cross state lines.

In short, extending New York law to redress climate-related harms allegedly caused by activities that overwhelmingly occurred beyond state and national borders violates federal law and overrides policy choices made by the federal government and New York's sister states. And when individual states attempt to regulate out-of-state emissions through statutes that vary in application

from state to state, they undermine the important goals of efficiency and predictability in the system established by Congress and the Constitution. Because Plaintiffs seek to uphold these vital federal interests, the Court should grant their motions for partial summary judgment.

## ARGUMENT

### I.    The Superfund Act Violates The Federal Constitution.

The United States agrees with Plaintiffs that the Superfund Act violates the federal Constitution. Interstate and global air pollution are inherently federal issues that the Constitution assigns exclusively to the federal government. More generally, the Constitution limits the ability of states to regulate extraterritorial conduct. And the federal foreign affairs power preempts state laws that conflict with U.S. foreign policy or intrude on foreign affairs without addressing a traditional state responsibility. For each of these reasons, the Superfund Act is unconstitutional.

### A.    State Law Cannot Govern Out-of-State Greenhouse Gas Emissions.

The Supreme Court has long recognized that "our federal system does not permit [certain] controvers[ies] to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). This includes areas in which "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Id.* For these subjects, the "basic scheme of the Constitution . . . demands" a federal rule of decision. *Am. Elec. Power Co., Inc. (AEP) v. Connecticut*, 564 U.S. 410, 421 (2011); *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 246 (2019) (explaining that "the Constitution implicitly forbids" states from applying their own law in certain areas).

This is why, since the Founding, federal law has applied to disputes involving cross-boundary pollution, which implicate "uniquely federal interests." *City of New York v. Chevron Corp.*, 993 F.3d 81, 90–92 (2d Cir. 2021) (cleaned up) (collecting cases). There is no history or tradition

of states regulating interstate, much less global, pollution. And for good reason: If each state could apply its own law in this area, the result would be "an irrational system of regulation" that "lead[s] to chaotic confrontation between sovereign states" and "uncertainty" over the governing legal standard, as polluters would have to comply with the laws "of all states potentially affected by" an otherwise "lawful discharge." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496–97 (1987) (quotation marks omitted). Because the structure of our Constitution and "basic interests of federalism" require "a uniform rule of decision" for "controvers[ies]" involving interstate pollution, they "demand[] . . . applying federal law . . . and not the varying . . . law of the individual States." *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 107 n.9 (1972); *City of New York*, 993 F.3d at 91–92 (stressing "the overriding need for a uniform rule of decision on matters influencing national energy and environmental policy" (cleaned up)). Our constitutional structure therefore precludes New York's Superfund Act, which (like the tort suit in *City of New York*) targets emissions emanating "simultaneously across just about every jurisdiction on the planet," not just emissions within the state. *City of New York*, 993 F.3d at 92; *see* N.Y. Envtl. Conserv. Law § 76-0101(8) (declaring that the Act's scope is "not limited to . . . emissions within the state").

### B.  The Superfund Act Exceeds Constitutional Limits on Extraterritorial Regulation.

More generally—putting aside the inherently federal nature of interstate pollution—the Superfund Act exceeds the "territorial limits" on "state authority under the Constitution's horizontal separation of powers." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023). "State sovereign authority is bounded by the States' respective borders." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025). "Each State's equal dignity and sovereignty under the Constitution implies certain constitutional limitations on the sovereignty of all of its sister States." *Hyatt*, 587 U.S. at 245.

This rule against extraterritorial regulation is "implicit in [the Constitution's] structure." *Id.* at 247; *Pork Producers*, 598 U.S. at 376 & n.1.  But it also finds expression in certain constitutional provisions, including the Commerce Clause, which "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (plurality op.); *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021) (Commerce Clause bars laws that have "the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question").

New York ignores these principles.  Far from incidentally affecting extraterritorial activity by regulating in-state sales, *cf. Pork Producers*, 598 U.S. at 374–76 & n.1, the Superfund Act on its face targets "all fossil fuel extraction and refining worldwide" and holds companies strictly liable for all emissions "attributable to" such "worldwide" conduct—not just "emissions within the state."  N.Y. Envtl. Conserv. Law § 76-0101(8).  And the regulated conduct bears no discernible connection to New York that could justify the Act's extraterritorial reach.  *See Pork Producers*, 598 U.S. at 376 n.1; *Edgar*, 457 U.S. at 642.  That is because the medium transmitting New York's alleged injuries is the Earth's entire atmosphere, where "[g]reenhouse gases once emitted 'become well mixed,'" making it impossible to trace any particular activity outside New York to any particular injury within it.  *AEP*, 564 U.S. at 422 (citation omitted); *City of New York*, 993 F.3d at 92 ("Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere." (record citation omitted)).  Indeed, New York cannot trace its asserted injuries to any specific source of emissions—let alone to the specific extraction and refining activity that is even further down the alleged causal chain.  After all, the

4

mixing of greenhouse gases in the atmosphere means that "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422. Any connection between a company's out-of-state conduct and alleged injuries within New York is therefore far too attenuated to support the Superfund Act's universal reach. *Cf. Young v. Masci*, 289 U.S. 253 (1933) (direct and traceable connection from out-of-state conduct to in-state harm).

Consider the upshot of New York's position. If the Superfund Act stands, then nothing prevents other states from enacting identical laws—as Vermont has done, and as several states are considering.[1] The ensuing balkanization—in which states impose crippling costs on lawful energy production in other states—would destroy the national market for energy and nullify Congress's power over interstate commerce, all while bankrupting the Nation's largest energy producers.

The federal Constitution was designed to protect our Nation from such a fate. *See, e.g.*, *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979) (noting that the Framers of the Constitution sought "to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation"); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 190 (1824) ("The power over commerce . . . was one of the primary objects for which the people of America adopted their government[.]"); *Pork Producers*, 598 U.S. at 404 (Kavanaugh, J., concurring in part and dissenting in part) (explaining that "the Framers . . . adopted a new Constitution" to "create a national economic market and overcome" the "state interference with interstate commerce" that "was cutting off the lifeblood of the Nation"). True, "our constitutional order . . . allows different communities to live with different *local* standards." *Pork Producers*, 598 U.S. at 375 (cleaned up, emphasis added). But whatever New York's desired energy policy, the Constitution forbids it from imposing its preferences on *other* states. While "Congress

---

[1] *See Polluters Pay: How States Are Filling the Federal Climate Funding Gap in 2025*, NCEL (Mar. 3, 2025), https://perma.cc/82CT-482U.

has ample authority to enact such a policy for the entire Nation, it is clear that no single [s]tate"
like New York can do so. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996) (footnote
omitted).

### C.    The Foreign Affairs Doctrine Preempts the Superfund Act.

New York's attempt to regulate global emissions also collides with the Foreign Affairs
Doctrine. Under that doctrine, a state law is conflict-preempted "when it conflicts with an express
federal foreign policy." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir.
2012) (en banc) (citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003)). And "even in
the absence of any express federal policy," a state law is field-preempted "if it intrudes on the field
of foreign affairs without addressing a traditional state responsibility." *Id.* at 1072. That is because
"the Constitution entrusts foreign policy exclusively to the National Government." *Garamendi*,
539 U.S. at 419 n.11.

The Act fails for both reasons. It clashes with "our nation's foreign policy goals" and
"circumvent[s] Congress's" and the President's "own expectations and carefully balanced scheme
of international cooperation on a topic of global concern." *City of New York*, 993 F.3d at 103;
Landau Decl. ¶¶ 14–20 (explaining how the Superfund Act conflicts with U.S. foreign policy).
And it does not address a traditional state responsibility, instead regulating "a uniquely interna-
tional problem of national concern" that is "not well-suited to the application of state law." *City
of New York*, 993 F.3d at 85–86. The Foreign Affairs Doctrine therefore preempts it.

### 1.    The Superfund Act conflicts with U.S. foreign policy.

State law is preempted when there is a "likelihood that state legislation will produce some-
thing more than incidental effect in conflict with express foreign policy." *Garamendi*, 539 U.S at
420. Because foreign affairs is the "exclusive responsibility" of the national government, *Hines*

6

*v. Davidowitz*, 312 U.S. 52, 63 (1941), the threshold for establishing such conflict is low. That threshold is easily met here.

To begin, the Superfund Act is "out of place given that Congress created a comprehensive scheme designed to address greenhouse gas emissions—the Clean Air Act—which it declined to extend beyond our borders." *City of New York*, 993 F.3d at 103. Because "the Clean Air Act contemplates the need for foreign nations to promulgate reciprocal legislation," the Superfund Act "circumvent[s] Congress's own expectations and carefully balanced scheme of international co-operation on a topic of global concern." *Id.* What is more, in the Global Climate Protection Act, Congress directed the executive branch to "work toward multilateral agreements" on greenhouse gas emissions, with a "coordinated national policy," including in the international arena. *See* Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331, 1407–09 (1987) (reprinted at 15 U.S.C. § 2901 note); Landau Decl. ¶ 4. The federal government has been carefully coordinating and refining that policy for decades. Since 1992, for example, the United States has been party to the Senate-ratified United Nations Framework Convention on Climate Change, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107, which creates a framework for international cooperation and contemplates protocols and other agreements to address greenhouse gas emissions, Landau Decl. ¶ 5.

The Superfund Act—and the state-by-state regulatory regime it helps create—is the antithesis of a "coordinated national policy." Worse, the Act "directly conflicts with . . . U.S. foreign policy in multiple respects." Landau Decl. ¶ 15. Earlier this year, the President declared a national energy emergency, finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Declaring a National Energy Emergency*, Exec. Order No. 14156, § 1, 90 Fed. Reg. 8,433, 8,434 (Jan. 20, 2025). "An affordable and reliable domestic

7

supply of energy," the President explained, "is a fundamental requirement for the national and economic security of any nation." *Id.* at 8,433.  To that end, the President has (among other things) ordered the withdrawal of the United States from the 2015 Paris Climate Agreement, which seeks to curb global greenhouse gas emissions.  *Putting America First in International Environmental Agreements*, Exec. Order No. 14162, §§ 1–3(a), 90 Fed. Reg. 8,455, 8,455 (Jan. 20, 2025).

The Superfund Act exacerbates the national energy emergency by imposing crushing penalties on global energy production, "thereby undermining crucial U.S. policy and national security interests in increasing affordable domestic energy" and the President's express determination that more production is imperative to our national security and foreign policy.  Landau Decl. ¶¶ 12–13, 15.  It also undercuts the United States' policy decision to abstain from restrictive measures to reduce global greenhouse gas emissions, such as through the Kyoto Protocol of 1997, which sets binding greenhouse gas emission reduction targets on certain Framework Convention parties, and the Paris Agreement.  Landau ¶ 17; S. Res. 98, 105th Cong., 1st Sess. (July 25, 1997) (disapproval of Kyoto Protocol); 90 Fed. Reg. at 8,455 (directing withdrawal from the Paris Agreement).

The conflict doesn't stop there.  When it comes to international cooperation, the Superfund Act "bypass[es] the various diplomatic channels that the United States uses to address" global greenhouse gas emissions, *City of New York*, 993 F.3d at 103, and compromises the Nation's capacity to "speak . . . with one voice" on the world stage, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000).  For example, New York seeks to regulate global greenhouse gas emissions by circumventing the Framework Convention and "employ[ing] a different, state system of economic pressure" on energy companies.  *Garamendi*, 539 U.S. at 423–24 (cleaned up).  The Act also "harms the federal government's capacity to speak with one voice when conducting commercial and political relations with foreign governments on issues such as climate change, regulation

8

of greenhouse gas emissions, energy production, and national security." Landau Decl. ¶ 19. For instance, the Act seeks to regulate global greenhouse gas emissions despite the United States having made foreign policy decisions to address that issue of global concern through a purpose-built international agreement—the Framework Convention—and to refrain from participating in certain other international efforts to do the same. Landau Decl. ¶ 17.

The Superfund Act also "undermines important ongoing diplomacy to advance U.S. interests." Landau Decl. ¶ 16. For example, "in international climate-change negotiations, the United States has long opposed the establishment of liability and compensation schemes at the international level." Landau Decl. ¶ 16; *see also City of New York*, 993 F.3d at 103 n.11 (noting that "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level"). The Act "interferes with this longstanding position by establishing just such a program and therefore foments new frictions in international climate negotiations by targeting fossil fuel companies for actions they took overseas." Landau Decl. ¶ 16. In other words, the Act "expresses a distinct political point of view on a specific matter of foreign policy" that contradicts the view of the National government. *Movsesian*, 670 F.3d at 1076. This "obviously sow[s] confusion and needlessly complicate[s] the nation's foreign policy." *City of New York*, 993 F.3d at 103.

Finally, the Superfund Act, "by imposing costs on energy producers for global greenhouse gas emissions, threatens to harm foreign relations between the United States and foreign countries where such producers are based or have substantial operations." Landau Decl. ¶ 18. "Because foreign fossil fuel producers that have a connection with New York will necessarily be affected by this Act, their home countries may seek to respond to the Act through their relations with the United States, including expressing their concerns through diplomatic engagements or retaliating

through increased costs on U.S. fossil fuel producers operating in those countries." Landau Decl. ¶ 18; *see, e.g.*, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 269 (2010); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 450 (1979) (explaining that affected foreign nations "may retaliate against American-owned instrumentalities present in their jurisdictions"). "These types of actions could impair the Executive Branch's ability to achieve the President's foreign policy goals, especially related to energy." Landau Decl. ¶ 18.

All this establishes a clear conflict with express U.S. foreign policy—or, at the very least, a "likelihood" that the Superfund Act will have a "more than incidental effect" on foreign policy, which is all that is required for foreign affairs preemption. *Garamendi*, 539 U.S at 420. "These foreign policy harms," moreover, "would multiply if other states started enacting similar laws, as Vermont recently did." Landau Decl. ¶ 20. Such a state-by-state regime would make it "even more difficult—if not impossible—to maintain a coherent national position on the regulation of global greenhouse gas emissions." Landau Decl. ¶ 20.

## 2. The Superfund Act intrudes into the field of foreign affairs without addressing a traditional state responsibility.

The Act is preempted for another, independent reason: New York is intruding into a field occupied by federal law without addressing a traditional state responsibility. The national government enjoys *exclusive* domain over foreign affairs. *See Zschernig v. Miller*, 389 U.S. 429, 436 (1968); *Hines*, 312 U.S. at 63. And global greenhouse gas emissions is a subject that falls squarely within that domain, presenting "a uniquely international problem of national concern" that "is simply beyond the limits of state law." *City of New York*, 993 F.3d at 85, 92.

The Superfund Act's plain text reveals that it does not address a traditional state responsibility, even though the "general subject area of the statute"—mitigating the effects of pollution—may fit that bill. *Movsesian*, 670 F.3d at 1074. "Courts have consistently struck down state laws

10

which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010); *Garamendi*, 539 U.S. at 425–26 (insurance); *Zschernig*, 389 U.S. at 437–38 (descent of property); *City of New York*, 993 F.3d at 91 (rejecting the City's attempt to frame the dispute as "merely a local spat about the City's eroding shoreline, which will have no appreciable effect on national energy or environmental policy"). And the Superfund Act is no "garden variety" pollution regulation. *Von Saher*, 592 F.3d at 964. The greenhouse gas emissions covered by the Act expressly "include those emissions attributable to all fossil fuel extraction and refining *worldwide*," N.Y. Envtl. Conserv. Law § 76-0101(8) (emphasis added), even though global emissions is "a uniquely international problem" that is "beyond the limits of state law," *City of New York*, 993 F.3d at 85, 92. On its face, then, the Act works "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Zschernig*, 389 U.S. at 432.

\*       \*       \*

Because the Superfund Act (1) conflicts with the express foreign policy of the United States and (2) intrudes into the field of foreign affairs without addressing a traditional state responsibility, it is preempted under the Foreign Affairs Doctrine. *Movsesian*, 670 F.3d at 1071–72.

## II.    The Clean Air Act Preempts The Superfund Act.

On top of these constitutional defects, the Clean Air Act preempts New York's attempt to impose liability for greenhouse gas emissions originating in other states.

### A.    The Superfund Act Impermissibly Regulates in the Field of Interstate Greenhouse Gas Emissions.

As explained above, federal law has always occupied the field of interstate air pollution regulation. Before the Clean Air Act, federal common law governed the field. *Milwaukee*, 406 U.S. at 103, 105 n.6; *AEP*, 564 U.S. at 421; *City of New York*, 993 F.3d at 90–95. And "resorting

11

to state law on a question previously governed by federal common law is permissible only to the extent authorized by federal statute." *City of New York*, 993 F.3d at 99 (cleaned up).

As the Second Circuit explained in *City of New York*, the Clean Air Act authorizes only a "slim reservoir" of state regulation in this area:  State-imposed liability must be based on "the law of the pollution's *source* state."  993 F.3d at 100 (cleaned up) (quoting *Ouellette*, 479 U.S. at 497). Because the City sought to impose "New York nuisance standards on emissions emanating simultaneously from all 50 states," the Second Circuit held that the Clean Air Act preempted the claims. *Id.*

So too here.  The Superfund Act openly targets "emissions attributable to all fossil fuel extraction and refining *worldwide* by" certain entities and declares that its scope is "*not limited to such emissions within the state*."  N.Y. Envtl. Conserv. Law § 76-0101(8) (emphasis added).  New York is thus candid about its "inten[t] to hold [businesses] liable, under New York law, for the effects of emissions made around the globe over the past [three decades]."  *City of New York*, 993 F.3d at 92.  The Superfund Act is preempted on this basis alone.

**B.    The Superfund Act Conflicts with the Clean Air Act.**

The Act also conflicts with the text, structure, and purposes of the Clean Air Act.  *Ouellette*, 479 U.S. at 494.  "The Clean Air Act is a comprehensive statutory scheme that anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions.'"  *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428).  EPA is thus responsible for deciding whether and how to regulate such emissions on a nationwide basis.  *AEP*, 564 U.S. at 426.  This is no small task, as determining the "appropriate amount of regulation in any particular greenhouse gas-producing sector" requires "informed assessment of competing interests."  *Id.* at 427.  On the one hand is "the environmental benefit potentially achievable," and on the other is "our Nation's energy needs and

12

the possibility of economic disruption." *Id.* Through the Clean Air Act, Congress "entrust[ed] such complex balancing to EPA in the first instance." *Id.*

The Superfund Act thwarts the discretion Congress gave EPA to balance environmental, economic, and energy concerns in regulating air pollutants. *AEP*, 564 U.S. at 427; *City of New York*, 993 F.3d at 93. The Clean Air Act grants EPA authority to set nationwide standards, based on its expert judgment, when it determines that emissions meet applicable statutory standards for regulation. And when EPA makes that determination, the Clean Air Act provides detailed instructions on the nature of resulting regulations and relevant considerations. *See, e.g.*, *AEP*, 564 U.S. at 424. New York, through the Superfund Act, wrests that authority from EPA by imposing its own nationwide standard of retroactive strict liability for harms allegedly tied to global emissions, a standard neither Congress nor EPA authorized. *See* 42 U.S.C. § 7401(a)(3) (specifying "air pollution control at its source," not by imposing retroactive liability for out-of-state emissions).

Indeed, state regulation in this area conflicts with the Clean Air Act even if EPA determines that regulation is *not* appropriate. That is because "the decision *whether* and how to regulate" interstate emissions rests with EPA, not individual states. *AEP*, 564 U.S. at 426 (emphasis added); *Massachusetts v. EPA*, 549 U.S. 497, 528–29 (2007). In fact, "[t]he Clean Air Act . . . permits emissions *until* EPA acts," so even if EPA were "to decline to regulate [greenhouse gas] emissions altogether," states would still "have no warrant . . . to upset the Agency's expert determination." *AEP*, 564 U.S. at 426. And more fundamentally, even if Congress had *barred* EPA from regulating interstate emissions of carbon dioxide and other greenhouse gases under the Clean Air Act, the statute still does not "authorize" resort to *state law* to regulate those emissions. *City of New York*, 993 F.3d at 99.

13

The Superfund Act also squarely conflicts with the Clean Air Act's comprehensive system for regulating cross-boundary air pollution, under which each state is alone responsible for controlling air pollution within its borders. *See* 42 U.S.C. § 7401(a)(3). Congress added to the Clean Air Act's National Ambient Air Quality Standards ("NAAQS") program the "Good Neighbor Provision"—which requires upwind states to reduce emissions that affect air quality in downwind states, *id.* § 7410(a)(2)(D)(i)—precisely *because* downwind states "lack authority to control" the "influx of out-of-state pollution," *EPA v. EME Homer City Generation*, 572 U.S. 489, 495 (2014); *see also id.* (observing that Congress added the Good Neighbor Provision to address "a complex problem: air pollution emitted in one State, but causing harm in other States").

The Clean Air Act thus contemplates no role for states reaching out and applying their law in *other* states. Rather, the Clean Air Act affords affected states specific avenues for voicing their cross-boundary pollution concerns to EPA—for example, by petitioning EPA for action on interstate pollution after the agency has identified a criteria pollutant under the NAAQS program. *See, e.g.*, 42 U.S.C. § 7506a(a) (permitting states to petition EPA when "interstate transport of air pollutants" from other states contributes to a violation of a NAAQ standard in the petitioning state); *id.* § 7426(b) (similar). Allowing states to regulate out-of-state emissions in other ways works an end-run around these statutory provisions and clashes with the text, structure, and objectives of the Clean Air Act by "undermin[ing] [its] carefully drawn" terms. *Ouellette*, 479 U.S. at 494; *City of New York*, 993 F.3d at 100.

Consider, too, if laws like the Superfund Act were upheld. The Act provides a blueprint for other states to enact their own liability regimes. Vermont has already enacted a similar law, and several other states are considering their own legislation. If the fifty states (and the thousands of political subdivisions within them) could apply their own laws in this area, the Nation would be

14

left with a chaotic patchwork of conflicting regulations—some states would regulate more, some less—that undermine the Clean Air Act's integrated approach to air pollution control and regulation. *See Ouellette*, 479 U.S. at 496–97; *City of New York*, 993 F.3d at 90–95.

Such chaos would also enable New York and other states to "do indirectly what they could not do directly—regulate the conduct of out-of-state sources" through the imposition of crippling liabilities, thereby forcing out-of-state companies to "change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495. And "these liabilities would attach even though the source had complied fully with its state and federal . . . obligations." *Id.* That dynamic would "undermine [the] regulatory structure" of the Clean Air Act and "effectively override . . . the policy choices made by" the federal government and other states, *id.* at 495–97, not to mention throttle national energy production.

## CONCLUSION

New York's Superfund Act usurps federal authority and clashes with important federal interests. The United States respectfully requests that the Court grant Plaintiffs' motions for partial summary judgment.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
JUSTIN D. HEMINGER
*Acting Deputy Assistant Attorney General*

/s/ *Riley W. Walters*
RILEY W. WALTERS (Bar ID 706914)
*Counsel to the Acting Assistant Attorney General*
JOHN K. ADAMS
*Senior Counsel to the Acting Assistant Attorney General*
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442
Riley.Walters@usdoj.gov

November 7, 2025
Washington, D.C.

16

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the United States

District Court for the Northern District of New York through the CM/ECF system, which will send

a Notice of Electronic Filing to registered CM/ECF participants.

Dated:  November 7, 2025
        Washington, D.C.

/s/ *Riley W. Walters*
RILEY W. WALTERS (Bar ID 706914)
*Counsel to the Acting Assistant Attorney General*
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-5442
Riley.Walters@usdoj.gov

17