# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF WEST VIRGINIA, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> LETITIA JAMES, in her official capacity as the Attorney General of New York, *et al.*, <br><br> *Defendants,* | No. 1:25-cv-00168 |

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> LETITIA JAMES, in her official capacity as the Attorney General of New York, *et al.*, <br><br> *Defendants.* | No. 1:25-cv-01307 |

## DECLARATION OF CHRISTOPHER LANDAU
## DEPUTY SECRETARY OF STATE OF THE UNITED STATES OF AMERICA

I, Christopher Landau, declare as follows:

1.      I am the Deputy Secretary of State of the United States of America. In that capacity, I am the principal deputy, adviser, and alter ego to the Secretary of State, the President's chief foreign affairs advisor. I serve as Acting Secretary of State in the Secretary's absence, and I assist the Secretary in the formulation and conduct of U.S. foreign policy and in giving direction

to all elements of the Department of State. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a. I have served in this role since March 25, 2025, and previously served as United States Ambassador to Mexico, among other positions.

2.    I am familiar with the New York statute at issue in this case, the Climate Change Superfund Act, N.Y. Envtl. Conserv. Law §§ 76-0101 to 76-0105 (McKinney's 2025).

**A.    Background**

3.    The Department of State leads the development of the United States' foreign policy and engages in diplomacy on behalf of the United States.

4.    In 1987, Congress enacted the Global Climate Protection Act. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), reprinted as note to 15 U.S.C. § 2901. The Global Climate Protection Act provides that the United States should "work toward multilateral agreements" on the issue of greenhouse gas emissions. *Id.* § 1103(a)(4), 101 Stat. at 1408. It assigns the President and EPA responsibility for devising a "coordinated national policy on global climate change." *Id.* § 1103(b), 101 Stat. at 1408. It also tasks the President and the Secretary of State with coordinating climate change policy in the international arena. *Id.* § 1103(c), 101 Stat. at 1409.

5.    The United States is a party to the United Nations Framework Convention on Climate Change of 1992 (the "Framework Convention"). *See* https://unfccc.int/resource/docs/convkp/conveng.pdf (last visited May 28, 2025). The Framework Convention was ratified by the President with the advice and consent of the Senate. *See* Senate Daily Digest Regarding Treaty Doc. 102-38: "United Nations Framework Convention on Climate Change."

2

6.      The United States is not a party to the Kyoto Protocol of 1997, which imposes upon parties legally binding greenhouse gas emissions limitations and reduction targets that are listed in Framework Convention Annex I (a list that includes the United States).  Although the United States signed the Kyoto Protocol, President Clinton never submitted it to the Senate for advice and consent.  Instead, the Senate passed a unanimous resolution expressing disapproval of any protocol or other agreement that provides for disparate treatment of parties based on their development status for the imposition of new commitments to limit or reduce greenhouse gas emissions.  S. Res. 98, 105th Cong. (1997).

7.      In April 2016, Secretary of State John Kerry signed the Paris Agreement, http://unfccc.int/files/essential_background/convention/application/pdf/english_paris_agreement. pdf (last visited May 28, 2025).  The Paris Agreement calls for significant reductions in greenhouse gas emissions.  As an executive agreement, the Paris Agreement was not submitted to the Senate for advice and consent.

8.      On March 28, 2017, President Trump described how the United States would seek to reconcile the Nation's environmental, economic, and strategic concerns.  *See* Exec. Order 13,783, 82 Fed. Reg. 16,093 (Mar. 28, 2017).  On June 1, 2017, he announced the U.S. intent to withdraw from the Paris Agreement.

9.      On November 4, 2019, the United States deposited a notification of withdrawal from the Paris Agreement.  Press Release, U.S. Dept. of State, *On the U.S. Withdrawal from the Paris Agreement* (Nov. 4, 2019).

10.      On February 19, 2021, President Biden announced that the United States had rejoined the Paris Agreement.  Press Release, U.S. Dept. of State, *The United States Officially Rejoins the Paris Agreement* (Feb. 19, 2021).

**B.    Current U.S. Foreign Policy**

11.    President Trump has taken multiple actions that make clear the U.S. foreign policy with respect to energy and climate change. On January 20, 2025, President Trump directed the U.S. Ambassador to the United Nations to submit notification of the United States' withdrawal from the Paris Agreement. *See* Putting America First in International Agreements, Executive Order 14162, § 3(a), 90 Fed. Reg. 8455, 8455 (Jan. 20, 2025).

12.    On the same day, President Trump also declared a national energy emergency pursuant to the National Emergencies Act, 50 U.S.C. 1601 *et seq.*, on the basis that insufficient energy production is a threat to national security and economic prosperity. *See* Declaring a National Energy Emergency, Exec. Order 14156, § 1, 90 Fed. Reg. 8,433, 8,434 (Jan. 20, 2025). The President further identified an "active threat to the American people from high energy prices" and determined that "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." *Id.*

13.    President Trump has determined that "[i]t shall be the policy of my Administration to make America energy dominant," and in furtherance of this policy, the United States "must expand all forms of reliable and affordable energy production," including fossil fuels. Establishing the National Energy Dominance Council, Executive Order 14213, § 1, 90 Fed. Reg. 9,945 (Feb. 14, 2025). He established the National Energy Dominance Council, which includes the Secretary of State, to provide the President with recommendations for increasing affordable energy production, including through elimination of unnecessary regulation and promoting awareness of "the national security concerns with removing reliable and affordable energy sources." *Id.* §§ 3-4.

14.    President Trump has also identified problematic overreach by states seeking to enact "burdensome and ideologically motivated 'climate change' or energy policies that threaten American energy dominance and our economic and national security" and aim to "dictate interstate and international disputes over air, water, and natural resources."  Protecting American Energy from State Overreach, Exec. Order 14260, § 1, 90 Fed. Reg. 15513, 15513 (April 8, 2025).

15.    New York's Climate Change Superfund Act, which seeks to hold fossil fuel companies strictly liable for their past emissions of greenhouse gases from anywhere in the United States or globally, directly conflicts with that U.S. foreign policy in multiple respects. The Climate Change Superfund Act would increase costs for energy producers with ties to New York, which could in turn increase energy costs for U.S. consumers, thereby undermining crucial U.S. policy and national security interests in increasing affordable domestic energy.

16.    The Climate Change Superfund Act also undermines important ongoing diplomacy to advance U.S. interests.  For example, in international climate-change negotiations, the United States has long opposed the establishment of liability and compensation schemes at the international level.  The Climate Change Superfund Act interferes with this longstanding position by establishing just such a program and therefore foments new frictions in international climate negotiations by targeting fossil fuel companies for actions they took overseas.

17.    The Climate Change Superfund Act further interferes with the United States' foreign policy on greenhouse gas regulation, including but not limited to the United States' participation in the Framework Convention and announcement of its intention to withdraw from the Paris Agreement.

5

18.    The Climate Change Superfund Act, by imposing costs on energy producers for global greenhouse gas emissions, threatens to harm foreign relations between the United States and foreign countries where such producers are based or have substantial operations.  Because foreign fossil fuel producers that have a connection with New York will necessarily be affected by this Act, their home countries may seek to respond to the Act through their relations with the United States, including expressing their concerns through diplomatic engagements or retaliating through increased costs on U.S. fossil fuel producers operating in those countries.  These types of actions could impair the Executive Branch's ability to achieve the President's foreign policy goals, especially related to energy.

19.    The Climate Change Superfund Act also harms the federal government's capacity to speak with one voice when conducting commercial and political relations with foreign governments on issues such as climate change, regulation of greenhouse gas emissions, energy production, and national security.  It hampers what President Trump has lauded as the ability of the United States to "grow its economy and maintain jobs for its citizens while playing a leadership role in global efforts to protect the environment." Exec. Order 14162, § 1, 90 Fed. Reg. at 8455.

20.    These foreign policy harms would multiply if other states started enacting similar laws, as Vermont recently did, because it would become even more difficult—if not impossible—to maintain a coherent national position on the regulation of global greenhouse gas emissions.

I declare under penalty of perjury that the foregoing is true and correct.

6

Christopher Landau