**FULLERTON EXHIBIT B**

# References

*Exhibit B-1.* Berry, Steven, Martin Gaynor, and Fiona Scott Morton (2019). Do Increasing Markups Matter? Lessons from Empirical Industrial Organization. *Journal of Economic Perspectives* 33(3): 44–68. https://doi.org/10.1257/jep.33.3.44

*Exhibit B-2.* Borenstein, Severin, A. Colin Cameron, and Richard Gilbert (1997). Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes? *The Quarterly Journal of Economics*, 112(1), 305–339. https://doi.org/10.1162/003355397555118

*Exhibit B-3.* Christopher P. Chambers, and John Rehbeck (2025). Testing profit maximization in the U.S. cement industry. *Journal of Economic Behavior and Organization* 231: 106773. https://doi.org/10.1016/j.jebo.2024.106773

*Exhibit B-4.* Cronin, Julie Ann, Don Fullerton, and Steven Sexton (2019). Vertical and Horizontal Redistributions from a Carbon Tax and Rebate. *Journal of the Association of Environmental and Resource Economists* 6(S1): S169-S208. http://dx.doi.org/10.1086/701191

*Exhibit B-5.* Fowlie, Meredith, Mar Reguant, and Stephen P. Ryan (2016). Market-Based Emissions Regulation and Industry Dynamics. *Journal of Political Economy*, 124(1): 249–302. http://dx.doi.org/10.1086/684484

Goulder, Lawrence H., and Marc A.C. Hafstead (2017). *Confronting the Climate Challenge: US Policy Options*, New York: Columbia University Press.

*Exhibit B-6.* Howard, Peter H., and Minhong Xu (2022). Enacting the "Polluter Pays" Principle: New York's Climate Change Superfund Act and Its Impact on Gasoline Prices. Institute for Policy Integrity, New York University School of Law. https://policyintegrity.org/publications/detail/enacting-the-polluter-pays-principle

*Exhibit B-7.* Kitzmueller, Markus, and Jay Shimshack (2012). Economic perspectives on corporate social responsibility. *Journal of Economic Literature* 50(1):51–84. http://dx.doi.org/10.1257/jel.50.1.51

Kolstad, Charles D. (2000). *Environmental Economics*. Oxford UK: Oxford University Press.

Mankiw, N. Gregory (2018). *Principles of Economics*. 8th edition. Independence, KY: Cengage.

*Exhibit B-8.* Taylor, Reid B., and Erich Muehlegger (2025). The Effects of Competition in the Retail Gasoline Industry. Cambridge, MA: NBER Working Paper No. 33569.

Tirole, Jean (1988). *The Theory of Industrial Organization*. Cambridge, MA: MIT Press.

Fullerton Exhibit B-1 — Steven Berry et al. (2019)

Fullerton Exhibit B-2 — Severin Borenstein et al. (1997)

Fullerton Exhibit B-3 — Christopher P. Chambers & John Rehbeck (2025)

Fullerton Exhibit B-4 — Julie Ann Cronin et al (2019)

Fullerton Exhibit B-5 — Meredith Fowlie et al. (2016)

Fullerton Exhibit B-6 — Peter H. Howard & Minhong Xu (2022)

Fullerton Exhibit B-7 — Markus Kitzmueller & Jay Shimshack (2012)

Fullerton Exhibit B-8 — Reid B. Taylor & Erich Muehlegger (2025)

Exhibit B-1

*Journal of Economic Perspectives—Volume 33, Number 3—Summer 2019—Pages 44–68*

# Do Increasing Markups Matter? Lessons from Empirical Industrial Organization

Steven Berry, Martin Gaynor, and Fiona Scott Morton

**M**any economists and policymakers are expressing concern over the possibility of increasing monopoly power in the US and the world economy. There have been decades of research in industrial organization devoted to understanding how one can (and cannot) reliably learn about the causes and consequences of market power and markups—that is, a positive difference between price and marginal cost.

Starting about 30 years ago (Bresnahan 1989), the field of industrial organization adopted methods for understanding firm conduct and markets on the basis of the relevant economic primitives: demand, cost, and pricing conduct. Thus, under the assumptions that firms maximize profits and have to cover their total costs, the equilibrium price (and other outcomes, such as product choice, location, quality, and innovation) will be determined by demand, marginal costs, and fixed (possibly sunk) costs, along with the conditions of competition that shape pricing behavior. These conditions are modeled using modern game theory to incorporate imperfect competition, product differentiation, multiproduct firms, and firm entry, as well as a host of industry-specific institutions.

■ *Steven Berry is the David Swensen Professor of Economics, Yale University, New Haven, Connecticut. Martin Gaynor is the E. J. Barone University Professor of Economics and Public Policy, Carnegie Mellon University, Pittsburgh, Pennsylvania. Fiona Scott Morton is the Theodore Nierenberg Professor of Economics, Yale School of Management, New Haven, Connecticut. All three authors are Research Associates, National Bureau of Economic Research, Cambridge, Massachusetts. Their email addresses are steven.berry@yale.edu, mgaynor@cmu.edu, and fiona.scottmorton@yale.edu.*

[†] For supplementary materials such as appendices, datasets, and author disclosure statements, see the article page at
https://doi.org/10.1257/jep.33.3.44                    doi=10.1257/jep.33.3.44

However, a number of recent studies of markups instead employ an analytical approach that was broadly rejected by the field of industrial organization more than 30 years ago: the "structure-conduct-performance" paradigm. We begin by discussing the shortcomings of this approach, which involves regressions with an outcome such as markups or profits on the left-hand side and a measure of market concentration on the right-hand side, along with various control variables. This approach faces severe measurement problems and worse conceptual problems. As we will explain, there are numerous, quite different economic scenarios, with different welfare implications, that can result in a positive correlation between industry concentration and markups.

We then turn to some research that avoids the problems of the structure-conduct-performance approach. Although we mention several approaches, our main focus is on recent studies taking an industrial organization approach. As we will show, studies built on economic primitives sometimes describe a situation in which large firms are changing products and production methods, including the mix of marginal and fixed costs, over time. In some cases, the welfare effects for consumers are ambiguous; in others, larger firms seem to raise markups without a corresponding consumer benefit. In some of these cases, mergers may be playing a role in increasing markups. The strength of these industry-level studies is that they offer detailed insights into causes of higher markups; the corresponding downside is that without a surge of additional studies, it can be difficult to draw inferences about overall levels and trends in markups across the economy.

Building on these industrial organization studies, we summarize some of the main possible causes of expanding markups rooted in the underlying economic primitives. Possibilities include a rise in fixed or sunk costs, network effects, monopsony effects in labor markets, an increase in rent-seeking behavior, and globalization effects. As an example, higher fixed (or sunk) costs can lead to fewer firms in a market, which can result in softer competition, higher prices, and reduced consumer welfare. On the other hand, in some cases, higher fixed (or sunk) costs can be the endogenous outcome of improved products or of improved production technology that lowers marginal cost (Sutton 1991). In this case, observed higher markups may or may not be associated with higher prices and reduced consumer welfare.

In the final section of the article, we turn to antitrust enforcement and competition policy. We examine this not only because weakened antitrust policy offers a potential explanation for rising markups, but also because even if the main explanations lie elsewhere, antitrust policy offers some policy levers to address the rise in markups. Given the uncertainties about whether there has been an increase in markups and about the size of that increase, and given that these seem likely to vary across industries, our policy recommendations are focused on those that are beneficial under a wide range of conditions—for example, assuring that market entry is not blocked, that dominant incumbent firms don't engage in conduct to disadvantage rivals and harm competition, and that anticompetitive conduct in labor markets is not permitted. We offer the important caveat that regulatory, trade, and tax policies may also prove important in addressing any harms associated with increased markups.

## Problems with Some Recent Studies of Market Power

Early empirical research in industrial organization from the 1950s into the 1970s employed the structure-conduct-performance paradigm to study how the extent of competition affected market outcomes. This empirical implementation of the paradigm typically involved regression analysis. The dependent variable was a market outcome such as profits, markups, or prices. The key explanatory variable sought to capture the structure of the market with a measure of concentration—usually the Herfindahl–Hirschman index, which is the sum of squared market shares. The regression also included a range of control variables intended to capture other exogenous reasons for variation. Structure is thus related to performance, with (unobservable) conduct captured as the estimated relationship between structure and performance. In this regression, the coefficient on the concentration measure is intended to capture how the toughness of competition changes as market concentration changes.

Within the field of industrial organization, the structure-conduct-performance approach has been discredited for a long time (Bresnahan 1989; Schmalensee 1989). But outside of industrial organization, the paradigm seems to have been readopted in recent years. Much of the recent attention to increasing markups or other market outcomes focuses on exactly this kind of evidence (for example, Furman 2015; Azar, Marinescu, and Steinbaum 2017; Barkai 2017; Bessen 2017; Gutiérrez and Philippon 2017a, b; Smith 2017; Azar et al. 2018; Benmelech, Bergman, and Kim 2018; Furman and Orszag 2018; Grullon, Larkin, and Michaely forthcoming). Such work sometimes proceeds without addressing the problems that led the field of industrial organization to reject the structure-conduct-performance approach.

Given the intuitive relationship between market concentration and firm performance, why did industrial organization reject the structure-conduct-performance paradigm? Researchers using the structure-conduct-performance approach were well aware of its limits at the time, as emphasized by Schmalensee (1989). We start with a discussion of measurement problems. The most important point, though, is that there are multiple causal paths that can explain a given correlation between concentration and other market outcomes. This implies that the very question— "What is the effect of concentration on prices or markups?"—is not well posed.

Measuring concentration is inherently difficult because economic markets are not observed directly in the data. For example, industrial classifications in the Census often fail to reflect well-defined economic markets. It is fairly clear that "software" is not a single industry, but much less clear how to divide it into separate industries. Other problems arise from geography. If Census data in an industry show a large number of small firms, this may represent a situation where they are in direct competition with one another or a situation where they operate in quite separate geographic or product markets. The Census does not measure degrees of product differentiation or homogeneity, or any measures of product-level prices.

Measuring economic outcomes was another problem for research in the structure-conduct-performance tradition. Most measures of profits use accounting

Case 1:25-cv-00168-BKS-DJS    Document 229-4    Filed 12/20/25    Page 16 of 301

*Do Increasing Markups Matter? Lessons from Empirical Industrial Organization*    47

measures, which are not economic profits. Markups are rarely directly observed in firm-level data at all, in part because firms' accounting structures are not set up to measure the economic concept of product-level marginal cost (Fisher and McGowan 1983). Attempts to estimate marginal cost involved additional, difficult measurement problems with regard to the size of fixed costs, sunk costs, and depreciation. In a best-case scenario, measured markups involve the markup of price over average variable cost.

Some researchers in the structure-conduct-performance tradition came to regressions using price as the dependent variable, rather than accounting profits or markups. But then, comparing prices across industries led to a call for industry-level structure-conduct-performance studies (Weiss 1990). Researchers understood that the nature of competition differs substantially from one industry to the next. For example, prices are determined in the food distribution industry via second price auction, in health care via bilateral bargaining, and in retail as posted prices. It's unclear what sorts of inferences are possible from estimates that aggregate across industries with such fundamental differences.

But even if the structure and output variables were measured with precision and the analysis was within a single industry, structure-conduct-performance researchers beginning with Demsetz (1973) often grappled with the problem of interpreting their regressions. For example, Ravenscraft (1983) regressed firm-level markups on firm market share and industry concentration, finding a coefficient on market share that was positive and significantly different from zero, but a near-zero (or even negative) coefficient on industry concentration. Still, it was hard to give any definitive interpretation of such regressions. Imagine that large firms have high fixed costs and low marginal costs, and low marginal costs are associated with higher markups (in part because the price needs to recover the high fixed costs). This can create a correlation between firm size or the Herfindahl–Hirschman index for an industry and markups.

One way of approaching the Demsetz (1973) empirical critique is that concentration is econometrically endogenous, suggesting a search for possible instruments. However, in many cases it is not at all clear what variables are excluded from the "concentration-markup" regression, which naturally depends on all elements of demand and marginal cost.

However, the critique runs deeper than concerns over endogeneity. Different changes in primitives, with very different positive and normative implications, can produce the same observed correlations between concentration and markups. Demsetz (1973) emphasized the path from improved marginal cost to the joint outcome of concentration and measured accounting markups. This path can exist even in a model of perfect competition with heterogeneous upward-sloping marginal cost curves. In contrast, the original structure-conduct-performance researchers emphasized the path from exogenous mergers to the joint outcome of high concentration, higher prices, and reduced consumer welfare, which offers an equally coherent story. One can also tell a story in a differentiated products context, in which a reduction in search or trade costs may shift market share toward firms

with high-quality products, increasing both concentration and consumer welfare (as emphasized in Autor et al. 2017).

In short, there is no well-defined "causal effect of concentration on price," but rather a set of hypotheses that can explain observed correlations of the joint outcomes of price, measured markups, market share, and concentration.[1] As Bresnahan (1989) argued three decades ago, no clear interpretation of the impact of concentration is possible without a clear focus on equilibrium oligopoly demand and "supply," where supply includes the list of the marginal cost functions of the firms and the nature of oligopoly competition.

Some of the recent literature on concentration, profits, and markups has simply reasserted the relevance of the old-style structure-conduct-performance correlations. For economists trained in subfields outside industrial organization, such correlations can be attractive. Our own view, based on the well-established mainstream wisdom in the field of industrial organization for several decades, is that regressions of market outcomes on measures of industry structure like the Herfindahl–Hirschman index should be given little weight in policy debates. Such correlations will not produce information about the causal estimates that policy demands. It is these causal relationships that will help us understand what, if anything, may be causing markups to rise.

## Detailed Industry Studies of Market Power

What kind of studies might provide better-grounded evidence on the underlying causes of shifts in concentration or markups?

As a starting point, we might seek to establish a descriptive baseline for analysis, without jumping to causal statements. Is concentration in general rising across many firms and industries or a relatively small number? Are accounting markups rising? Are prices rising? What are the descriptive correlations across these variables? The answers to these questions can often point to fruitful areas for detailed study as well as rule out concerns that are unsupported by the facts. We can then consider approaches to interpreting these fact patterns that may lead us to firmer policy conclusions.

---

[1] As a more specific example, in the Cournot model, the Lerner index of price-cost markups is equal to the Herfindahl–Hirschman index divided by the absolute value of the market demand elasticity (Cowling and Waterson 1976). If we could somehow empirically identify an industry-specific coefficient on the Herfindahl–Hirschman index in a regression of the correctly measured Lerner index on concentration, we would learn only one demand parameter, not nearly enough to know (for example) how a merger would affect industry markups. Even within the Cournot model, reductions in marginal cost will produce one kind of joint effect on the Herfindahl–Hirschman index and markups, whereas a merger will produce an altogether different set of joint effects (Farrell and Shapiro 1990). Most industries are, of course, not well approximated by the Cournot model, and extracting causal predictions from those industries is even harder.

As an example, Ganapati (2018a) builds on and extends recent work to address some of these correlational issues. In common with other authors, he finds a rising economy-wide trend toward increased concentration. Using industry-level price indices, in a difference-in-difference analysis he finds that "concentration increases are positively correlated to productivity and real output growth, uncorrelated with price changes and overall payroll, and negatively correlated with labor's revenue share." Autor et al. (2017) use firm-level panel data to document that the increase in concentration is largely due to reallocation of market share toward the preexisting set of large and productive firms. This change is associated with a decrease in the labor share. They provide a model that attributes these correlations to the rise of "superstar" productive firms. Although a number of authors report findings of increasing concentration across a wide range of industries, this finding is not universal. For example, Rossi-Hansberg, Sarte, and Trachter (2019) find falling concentration in local product markets, in part because entry of national firms will increase competition in local markets.

As an alternative, there has been a recent wave of "production function" approaches to measuring markups. These studies often use data from the financial accounts of firms to estimate firm-level production functions, which in turn serve as a basis to estimate the size of markups. One advantage of this approach is that it directly addresses the issue of markups in the economy as a whole. Another advantage is that these papers do not use measures of industry concentration, and thus they do not suffer from the fundamental methodological flaws of papers that use the structure-conduct-performance paradigm. However, a corresponding disadvantage of broad-based approaches to estimating markups by using financial accounting data or aggregate data is that modeling and estimation approaches that fail to model industry-specific characteristics restrict the range of answers that we can learn from data. We believe that this research provides persuasive evidence that markups have been rising, although open questions remain about the magnitude and causes of the effect. In this symposium, the articles by Susanto Basu and by Chad Syverson discuss this approach in detail.[2]

However, the main focus of this article is to discuss what we can conclude from industry-specific studies about the sizes and causes of markups and therefore what policy responses would be appropriate. In these industry-level studies, it may be plausible to identify markups from data on prices and output, together with data

---

[2]Prominent examples of this production function approach with US data include De Loecker and Eeckhout (2017, 2018a); Hall (2018); and Eggertsson, Robbins, and Getz Wold (2018). For example, De Loecker and Eeckhout (2017) in their primary analysis use firm-level financial statements from Compustat, including measures of sales, spending on inputs, capital stock, and industry classifications. Studies using this general approach on international data include De Loecker and Eeckhout (2018a) and Calligaris, Criscuolo, and Marcolin (2018). All of these papers find evidence of positive and rising markups. These studies show not just that markups are rising overall, but the fact that the rise in markups is due to a small number of firms. Again, for additional details, see the articles by Basu and by Syverson in this symposium. For other careful discussions, see also Yurukoglu (2018) and Raval (2019), as well as De Loecker and Eeckhout (2018b) for a response to criticisms.

on demand and cost shifters and some industry-appropriate assumptions about competitive behavior. Detailed industry studies can provide direct evidence on the causes and consequences of imperfect competition. The relatively narrow focus of industry-specific studies may frustrate economists who are accustomed to working with all firms in one model and dataset, as is often the case in macroeconomics and finance. But the nature of the demand, costs, and competitive setting that affect firm choices is inherently heterogeneous.

Here, we do not try to review the vast literature in this area, but instead focus on a few recent studies that illustrate some contexts in which this research is done and how the welfare implications of such research can be ambiguous, combining elements of lower cost, improved quality, and decreased competition.

As a first example, Ganapati (2018b) studies the large wholesaling sector of the economy. Ganapati notes that, in 2012, wholesalers accounted for 50 percent of sales to downstream buyers in the US manufactured goods market and that, contrary to prominent examples of large retailers disintermediating wholesalers, the wholesale sector overall was growing in size. As the wholesale sector has grown, it has become more concentrated, and accounting markups have increased. This has happened largely due to increases in the market shares of the largest wholesalers. This increase in concentration has been accompanied by increased spending on information technology, by the opening of warehouses closer to consumers, and by increased dual sourcing from domestic and foreign sources. Purely from the descriptive data, this story seems more complicated than either "perfect competition" or a classic Cournot-style oligopoly story of increased homogeneous goods concentration leading to higher prices and reduced output.

To interpret these trends, Ganapati (2018a) applies a series of standard empirical industrial organization models of demand, pricing, and entry. These models are fitted to detailed US Census data, with identification coming from "supply and demand"-style instrumental variable methods (Berry and Haile 2014). In particular, he uses data on the number of wholesalers by type and location, on market size, and on shifters of marginal cost. Ganapati concludes that the growth in the wholesale sector is driven by a combination of lower marginal costs and increased demand, which is in turn driven by an improved warehouse network as well as improved sourcing quality from both domestic and foreign locations.

The benefits of these improvements for downstream customers are constrained by lessened competition that yields an increase in markups over marginal cost. In Ganapati's (2018a) entry model, improved product quality and lower marginal costs are associated with higher fixed costs that are created by the firm's location, quality, and sourcing decisions (similar to the "endogenous fixed cost" models of Sutton 1991). However, Ganapati does not attempt to attribute these fixed costs to any specific source. They could be the information technology costs of improved logistics or the sunk costs of building out a warehouse structure. Alternatively, they could represent a rent due to oligopolistic behavior and (perhaps) first-mover advantages in establishing wholesale networks. The findings indicate that in this sector, while concentration and markups are rising, quality is rising and costs are falling, thus

leading to a setting that is not easy to evaluate. Research on a number of other prominent industries finds patterns with similarly ambiguous welfare implications.

Note that, unlike in the structure-conduct-performance or the production function approaches mentioned above, Ganapati is able to make statements about demand, marginal costs, and fixed costs. While these statements depend on a significant number of maintained assumptions, they lead to a rich story about the underlying forces behind markup changes, and they lead to both positive and normative implications associated with those changes. Ganapati's work on wholesaling reveals an evolving industry with endogenous trade-offs in product quality, marginal costs, and fixed costs.

The airline industry provides another example in which increasing markups are associated with some degree of product improvement and marginal cost decline (Berry 1990), but it also illustrates that poorly policed mergers can increase prices. Debates over airline mergers often pivot on the negative effects of increased markups on some concentrated nonstop routes versus the potential for improved route structures leading to better choices and increased competition on other (often connecting) itineraries.[3] Borenstein (1990) notes the strong evidence that prices rose after at least two Reagan-era mergers of airlines with largely overlapping route networks. A more recent airline merger wave has consolidated the remaining legacy carriers into three large firms that face competition from Southwest Airlines and a group of new, low-cost carriers. We await a full academic evaluation of these mergers. The many years of near-zero-profit operations of major airlines (Borenstein 2011), lasting up until the demand boom and merger wave of recent years, suggest that for a long time, high markups over marginal cost in the industry were offset by the costs of running large hub-and-spoke networks. These networks create large benefits by providing low-priced and convenient connections through hubs to many destinations. But they also have allowed airlines to charge high markups on many direct flights out of hub airports (Berry, Carnall, and Spiller 2006).

Airlines, then, provide a rich but mixed example of the sources of markups. Running a hub-and-spoke network does involve endogenous fixed and sunk costs, but the possible effects of mergers on prices suggest a large role for antitrust policy in reducing harmful effects on consumers. The firms that provide local cable television and internet broadband may offer another example of monopoly rents (from deregulated physical connections at the household level) plus improved product quality (from new channels and increased speed), with markups protected in large part by the high fixed cost of adding new wired connections at the household level. It may well be that consumer surplus (and "output") is increasing in this industry, but not by as much as it would under alternative regulatory structures.

In other industry studies, higher concentration and markups do not seem to be accompanied by any improvement in quality. For example, many studies have shown that hospital consolidation between close competitors leads to substantial

[3]These debates follow the emphasis on improved airline product quality in Carlton, Landes, and Posner (1980) versus the emphasis on airline market power in Borenstein (1990).

increases in price and markups without improving quality (for example, Town and Vistnes 2001; Capps, Dranove, and Satterthwaite 2003; Gowrisankaran, Nevo, and Town 2015; Ho and Lee 2017) or leads to reductions in quality in price-regulated markets such as Medicare or the English National Health Service (Kessler and McClellan 2000; Cooper et al. 2011; Gaynor, Moreno-Serra, and Propper 2013; Gaynor, Propper, and Seiler 2016). For an overall review of this literature, see Gaynor, Ho, and Town (2015). With the exception of the associations identified by Cooper at al. (2019), research has not focused on identifying the major industry-wide factors driving higher hospital prices or markups. There has been little work examining entry or recovery of fixed costs (for an exception, see Abraham, Gaynor, and Vogt 2007) or whether fixed costs are rising. Moreover, it should be noted that separately identifying costs and rents is a challenge in the hospital industry. Many hospitals (particularly the largest) are not-for-profit; thus, rents tend to be spent and to appear as expenses (as is true for not-for-profit firms in general). Identifying and understanding the major factors driving increased hospital markups constitute a key next step in understanding this market.

A final issue is that when markups are measured as a ratio of prices to marginal costs, the rise in markups may be driven by very low marginal costs, as in a number of media and internet markets. For example, Waldfogel (2015) documents that in the recorded music industry, digitization lowered marginal distribution costs and the fixed costs of production, although "quality" is still produced via endogenous fixed costs. These lower costs led to an explosion of product variety. In such media and internet information markets, the "macro-production markup," measured as the ratio of price to marginal cost, may go to near infinity as the marginal cost of the product declines to near zero, as long as the price remains clearly positive. Similarly, monopsony power can in principle also be a driver of increased markups via reduced marginal costs.

We have provided examples of three kinds of results from detailed industry studies. In some cases, such as wholesaling, investments may be generating product quality improvement together with a shift from marginal to fixed costs, yielding an improvement in consumer welfare. In other industries, such as airlines, markups may be associated with some quality improvement, but some mergers have also clearly resulted in price increases. In other markets, such as hospitals, there is no evidence that consolidation is resulting in systematic product quality improvements or clear cost reductions, but there is strong evidence of price increases (or quality reductions). The diversity of results across these industries is evidence of the value and richness that can be obtained from careful industry studies. It also serves as a caution of the difficulties of drawing useful inferences from aggregate studies across industries.

Industrial organization industry studies, taken as a whole, do provide evidence against some particularly simple or stylized models. These studies clearly reject models that would closely approximate perfect competition. Similarly, these studies emphasize important game-theoretic oligopoly features of markets, rejecting simple interpretations associated with the "Chicago School" of antitrust (for example, Bork 1978).

Instead, these industrial organization studies also suggest a nuanced reality in which large firms are in fact changing products and production methods, including the mix of marginal and fixed costs, over time. The industry studies seem to suggest that "fixed costs" are often actually sunk costs that are built up through time via investments in networks, product quality, geographic location, and so forth. An interesting question is how this possible reallocation from marginal to fixed costs affects labor demand. Another important question is whether the share of labor in variable costs is higher or lower than the share of labor in fixed costs.[4]

Of course, the discussion here covers just a small collection of industry studies. In our view, industry-level studies are required to understand the forces shaping markets in the modern economy and thereby to craft appropriate policies. These studies will have to take on broader segments of the overall economy if they are to fully respond to questions about aggregate markup trends. Also, while many existing industrial organization industry-level studies provide information on the level of markups, we would welcome a surge of industry-level research focused on trends in markups in order to discover where they are rising and why. By their nature, detailed industry studies will tend to produce estimates and explanations for markups that are more complex than those advanced in studies making use of broad-based financial accounting data or Census data aggregated across large numbers of firms in very different industries. Focusing at the industry level allows researchers to study the ways in which firms seek to create competitive advantages with a mixture of strategies, including investment in fixed capital, changes in product quality, geographic advantage, and consolidation by merger.

## Factors Leading to Rising Markups

It seems plausible that some of the primitives of modern industrial organization—cost conditions, demand conditions, and pricing environment—have been changing over the past few decades. For example, the adoption of information technology is often a fixed cost involving hardware, such as servers, or software, such as enterprise resource planning software. Thus, firms and industries for which information technology has grown in importance have rising fixed costs, which leads to rising markups and can lead to markets dominated by one or a small number of large firms. On the demand side, the growing importance of network effects can lead to one or a small number of firms dominating a market and thus commanding

[4]As a contrast with this portrayal of evolving industries, a number of studies of markups are based on stronger assumptions. As one example, consider the (intentionally) highly stylized model of Autor et al. (2017). In that model, firms exogenously differ in their Hicks-neutral productivity shocks. There is a fixed labor requirement, common to all firms, which explains the negative correlation between firm size and the labor share. Motivated by the results from their firm-level production-side data, they then state that changes in industry average markups over time are explained by a reallocation of market share (as through lower trade or search costs). As more consumers purchase from the largest firms, the fixed labor requirement is spread over yet more units, raising markups still further.

higher markups. With regard to firm conduct, increased managerial exploitation of market power can lead to rising markups, as can the documented slow decline in US antitrust enforcement (for example, Baker 2019). In this section, we consider the available evidence on the factors that have been leading to rising markups.

**Rising Fixed and Sunk Costs**

We have already mentioned the models of Shaked and Sutton (1982) and Sutton (1991), where fixed (and often sunk) costs at the firm level partly reflect endogenous choices of product quality, production techniques, and marketing. Under the assumptions of these models, industries do not deconcentrate even as market size grows because there is always an incentive for some firm to become large, relative to the market, by making a sunk investment that drives up demand for its product.

Sutton (1991) gives examples where the better product does not involve much higher marginal cost (or can even involve reduced marginal cost), and therefore competition from lower-quality competitors does not compete away the markup of the firm producing the high-quality product. He argues that, during the period from the late nineteenth to the mid-twentieth century, decreasing transportation costs and national marketing strategies allowed many consumer goods products to trade higher fixed costs for national sales dominance. These firms maintained high markups and high national market shares in the absence of important scale economies of production. If Census data on production had existed during that period, they might have revealed a trend of increasing markups in consumer goods markets, with much of the markup attributable to a small number of "superstar" products.

What changes in the past few decades might allow firms to pursue a similar strategy of higher fixed costs and sustained market dominance? If a rise in the quality of services can be achieved with higher spending on information technology, and if a large component of information technology spending represents fixed costs, then the proportion of fixed to variable cost will be rising across the decades of increasing technological advancement. For example, Bessen (2017) provides evidence that customized software—used routinely by large corporations today—requires large up-front fixed sunk costs. Calligaris, Criscuolo, and Marcolin (2018) find higher markups in more digitally intensive industries and that differences in markups between digitally intensive and nonintensive industries have grown.

These patterns are consistent with the hypothesis that rising fixed sunk costs and lower marginal costs due to increases in information technology investments could be a significant driver of increasing markups. In studying this hypothesis, how can researchers measure fixed and sunk costs? As noted, industrial organization economists have often been suspicious of attempts to directly measure fixed costs from accounting or Census data because accounting rules do not follow economic principles for expensing, depreciation, rents on existing assets, and so forth.[5] Thus,

---

[5] This point is related to arguments in Fisher and McGowan (1983) and Schmalensee (1989) about general problems with depreciation, accounting data, and measured components of profit and cost.

Case 1:25-cv-00168-BKS-DJS    Document 229-4    Filed 12/20/25    Page 24 of 301

*Do Increasing Markups Matter? Lessons from Empirical Industrial Organization*    55

industry-level studies typically estimate fixed (or sunk) costs as a kind of residual that explains the observed equilibrium market structure (or pattern of entry and exit; see Bresnahan and Reiss 1990; Berry 1992; Ciliberto and Tamer 2009; Berry, Eizenberg, and Waldfogel 2016). Fixed costs are bounded above by the level that would render existing firms unprofitable and below by the level that would induce incremental entry.

However, this approach treats fixed costs as exogenous. In some instances, a firm can choose its fixed costs, such as its level of advertising and promotion or of research and development. Treating fixed costs as endogenous is also consistent with evidence for the increased importance of intangible assets, which include management effectiveness, business processes, intellectual property, branding, and the effective use of information technology, as documented by Corrado, Hulten, and Sichel (2009), Haskel and Westlake (2017), and Bhandari and McGrattan (2018). Firms' market shares are positively correlated with their intangible assets, as Crouzet and Eberly (2018) demonstrate. Moreover, they show that in some sectors, such as consumer goods, higher intangible assets are positively correlated with higher productivity, while in other sectors, such as health care, intangible assets are correlated with higher measured markups. A rising role for intangible assets will further complicate the use of accounting data to discuss markups, since these markups may be treated in an inconsistent fashion in accounting data (Yurokoglu 2018).

The welfare consequences of increasing sunk and fixed costs in an industry are complex, are probably industry specific, and may vary across antitrust and regulatory regimes. On the consumer side, higher fixed costs may enable a rise in product quality, which is generally good. However, fixed costs may be duplicated by competitors, such that oligopoly generates excessive entry from the social welfare perspective (Mankiw and Whinston 1986; Berry and Waldfogel 1999). Moreover, better products may contribute to higher markups, especially if the high fixed (or sunk) costs limit the number of competing firms and drive up prices. Alternatively, higher markups can reflect falling marginal costs rather than higher prices.

On the firm side, fixed costs must be offset by positive markups in order for the firm to survive. Therefore, industries with high markups may or may not be profitable. Profits in excess of those necessary to cover current fixed costs might reflect a return on past investments; indeed, the expectation of a current stream of profits may have been necessary to bring forth a socially valuable innovation. In other cases, current profits may reflect a rent on past luck or may result from a past sunk investment that is preventing socially desirable entry (for the modern game theory of sunk costs and entry barriers, see Tirole 1988). It is difficult to see how cross-industry studies can capture the industry-level complexity that results from high fixed and sunk costs.

The distributional consequences of higher fixed costs, perhaps combined with lower marginal costs, can be equally complex. For example, it is easy to imagine cases where labor is particularly associated with variable product costs, while (for example) fixed costs are associated with the employment of software engineers and with returns to various forms of intellectual property. In some cases, imputed

fixed costs may reflect rents that do not serve an efficiency-enhancing purpose. For example, one possible rent involves a return to a (possibly lucky) first-mover advantage in a network industry, as we discuss in the next subsection.

In our opinion, both industry studies and accounting data studies point to the broad category of endogenously increasing fixed and sunk costs as an important, perhaps the most important, source of the apparent pattern of rising global markups. In the next section, we focus on the specific case of network effects, which create particular complexities.

**Network Effects**

Network effects have become important in many sectors of the economy. In particular, they are often strongly present in digital platforms (US Bureau of Economic Analysis 2018), where many consumers rely on platforms with user-provided content regarding restaurants, hotels, traffic, and news. Network effects lead to markets dominated by one or a small number of firms, as in social media.

A rising importance of network effects can lead to weaker competition and thus higher markups in various ways. First, network effects tend to lead to consumer lock-in, enhancing firms' short-run market power while making new entry difficult. Second, network effects can make fixed costs more important, including expansions of information technology, distribution, delivery, and promotion in order to reach a larger number of customers. Third, the aggregation of eyeballs and consumer information by platforms may give an advantage to the dominant business in selling advertising and thus may perpetuate a concentrated market structure (Bergemann and Bonatti 2018). For these reasons, the locus of competition in network markets often turns out to be *for* the market, not *in* the market. Once a firm has come to dominate a network market, its market position is not easily eroded.

The lucky first mover in a market with network effects will benefit from these effects. Thus, markups in this instance include a rent on that luck, and there is no reason to believe that the (expected) market rent was required to generate the initial investment effort. Of course, the network can also create substantial consumer surplus. The policy question is whether some alternative antitrust or regulatory structure could improve the market outcome while retaining the consumer benefits.

**Growing Monopsony Power**

Claims have been made that the concentration of employers is growing in labor markets and that more concentrated employer markets are associated with lower wages (Azar, Marinescu, and Steinbaum 2017; Azar et al. 2018; Posner, Weyl, and Naidu 2018).[6] To the extent that these forces trended toward more monopsony power or more exercise of monopsony power over recent decades, the declining cost of labor, typically a variable cost, may have contributed to the trend in markups.

---

[6]The finding is not universal. Lipsius (2018) and Rinz (2018) find that employer concentration has fallen, implying that monopsony power has fallen, not risen.

There is long-standing evidence of monopsony power in some labor markets, notably the markets for nurses (Sullivan 1989; Currie, Farsi, and MacLeod 2005; Staiger, Spetz, and Phibbs 2010), teachers (Ransom and Sims 2010), and fast-food workers (Card and Krueger 1994). However, there is evidence that the extent of monopsony power in the labor market has grown over the years (Manning 2003). Some possible reasons include declines in union membership, in the powers available to unions, and in legal remedies available to individual workers—all of which have weakened worker bargaining power (Farber et al. 2018). There is also some evidence of the use of outsourcing by firms ("fissuring") to facilitate wage discrimination in a way that leads to lower average wages and higher markups (Weil 2011). There is speculation that the rise of the "gig" economy may be holding down worker wages as well (Dube and Kaplan 2010; Chen et al. 2017). Another feature of labor markets that likely grew over past decades but has been uncovered only recently is the use of noncompete clauses by employers in some industries (Starr, Prescott, and Bishara 2019), particularly for low-wage workers in fast-food and other franchises (Krueger and Ashenfelter 2018).[7]

A main difficulty in this area is that most of the existing studies of monopsony and wages follow the structure-conduct-performance paradigm; that is, they argue that greater concentration of employers can be applied to labor markets and then proceed to estimate regressions of wages on measures of concentration. For the same reasons we discussed above, studies like this may provide some interesting descriptions of concentration and wages but are not ultimately informative about whether monopsony power has grown and is depressing wages.

Recently, efforts have been made to take a sounder empirical approach. Card et al. (2018) review the evidence on labor markets and reconcile a variety of empirical results via a model of "differentiated jobs" that recalls industrial organization models of differentiated products. Azar, Berry, and Marinescu (2019) estimate an industrial organization–style model of differentiated job vacancy demand at the level of the job applicant applying for a specific job title within a commuting zone. They find moderately positive levels of firm market power even in labor markets that are not highly concentrated. However, this work estimates levels of labor market power, not trends over time.

Linkages can also arise between mergers and increased monopsony power. Prager and Schmitt (2019) examine the effect of mergers in the hospital industry and find evidence that mergers between nearby hospitals depress wage growth for workers with hospital-job-specific skills (but not for workers with general job market skills).

---

[7] The Washington State attorney general has challenged these noncompete agreements and by 2019 had achieved many dozens of settlements to not enforce and to remove the provisions. Also, the US Department of Justice has recently prosecuted multiple cases of firms explicitly agreeing not to hire away each other's workers (the "no poach" agreements), as well as naked collusion to fix wages that occurred over many years. One of the first of this recent group of cases involved many of the top employers among the Silicon Valley tech firms such as Apple, Google, Adobe, Intel, Intuit, and Pixar (*In re: High-Tech Employee Antitrust Litigation*, N.D. Cal. Case 11-CV-02509-LHK [2015]).

At present, the extent to which any decreased competition in the labor market is a major driver of increased markups is not clear, and research that sheds light on this question would be most welcome.

**Increased Rent Seeking**

Yet another potential explanation for higher markups is that managers are increasingly better trained (perhaps in economics or MBA programs) to find and exploit situations where their firms face inelastic demand. Firms in many industries, including airlines, entertainment, and retail, have improved over time in their ability to price discriminate, presumably raising some markups while lowering others, with an uncertain implication for the distribution of markups. Traditionally, the economics profession has treated these situations as arbitrage of informational rents that guide economic activity and lead to an increase in efficiency (an idea attributed to Friedrich von Hayek). But once exposed to public scrutiny, these instances are often portrayed and perceived as exploitation of consumers.

Some firms have gone beyond more aggressive price discrimination and have raised prices by engaging in holdup of a relationship-specific investment or by reneging on agreements that are not sufficiently protected by contract. In one example, pharmaceutical industry CEO Martin Shkreli sharply increased the price of a generic drug in a marketplace where it takes several years for a competitor to be approved by the Food and Drug Administration (Pollack 2015). In another example, holders of standard essential patents demanded high royalties from handset makers after networks implementing the standard were fully built out and could not be changed (Scott Morton and Shapiro 2016). In yet another example, hedge funds bought up the television stations that were needed to re-pack spectrum, so it could be used by wireless carriers, and strategically withheld those stations to raise the price of their assets (Doraszelski et al. 2017). And physicians who are out-of-network with a certain insurer charge patients in the in-network hospital where they work three times as much as in-network physicians would charge (for an example of out-of-network billing for emergency care, see Cooper, Scott Morton, and Shekita 2017). When one of the outsourcing companies that perfected this strategy was written up in the *New York Times* and the strategy became public (Creswell, Abelson, and Sanger-Katz 2017), insurers used the subsequent call for regulation to improve their bargaining positions in new contracts, and the outsourcing company's profits fell.

To the extent that firms and their managers are becoming more sophisticated in their pursuit of inelastic niches where they can create and exploit market power, the relevant markups will rise. Research that sheds some light on the extent of this phenomenon, whether it has grown, and whether and to what extent it has contributed to increased markups would be beneficial.

**Globalization**

Although globalization is not our focus here, it may also be part of the explanation of rising markups for the highest-markup firms. A market that contains some firms that globalize and others that do not could generate this pattern. Firms with a

global supply chain will have access to lower-cost inputs and may then achieve economies of scale, leading to a higher markup. If such a globalized firm gains market share at the expense of domestic rivals, industry markups will rise. Thus, increased globalization may play a role in both increasing markups and the unequal distribution of the increase. Uncovering what effects globalization may have had on markets and markups seems a potentially fruitful area for future research.

## Antitrust Enforcement

There were undoubtedly some cases of overly aggressive enforcement of antitrust laws in the 1960s and 1970s; in one much-discussed case, courts upheld blocking a merger that would have resulted in a combined market share of 7.5 percent (*United States v. Von's Grocery Company*, 384 US 270 [1966]). However, courts in recent decades have been steadily dialing back antitrust enforcement, both through economic assumptions built in to jurisprudence and through practical changes such as raising the pleading standards for plaintiffs (Baker 2019; Gavil 2019). Mergers in markets with more than two firms are much less likely to be challenged now than in past decades (Kwoka 2016). The recent *Ohio v. American Express Company* (138 S. Ct. 2274 [2018]) Supreme Court ruling has been interpreted by some as possibly ending the government's ability to bring an antitrust case against a platform that operates in a two-sided market (Open Markets 2018).

The decline of antitrust enforcement in recent decades may be a contributor to rising markups, although more research is needed to substantiate this conclusion firmly (Kulick 2017; Baker 2019; Wollmann 2019). However, antitrust enforcement and competition policy is important in this context because, unlike shifts in fixed costs and technology, it can be directly addressed with legislation. Moreover, regardless of the role of changing antitrust enforcement in explaining a rise in markups, higher markups imply a world that may require increased antitrust vigilance.

Here, we provide an overview of some commonly mentioned concerns about underenforcement of antitrust laws that are especially applicable to the large, high-markup firms most at issue: vertical restraints, coordinated effects, digital platforms, exploitation of intellectual property, acquisition of potential competitors, and exclusionary conduct. These issues have been discussed in more detail in a number of policy venues (Baker 2019; Scott Morton et al. 2019; Federico, Scott Morton, and Shapiro forthcoming; Shapiro in this issue). We then offer some concluding thoughts on the appropriate perspective of antitrust enforcement given the current state of knowledge in these areas.

### Some Specific Concerns about Underenforcement of Antitrust Laws

The term *vertical restraints* describes contracts between firms with a vertical relationship that may have anticompetitive effects depending on the type of restraint, the party using it, market structure, and so forth (Segal and Whinston 2000; Conlon and Mortimer 2013; Asker 2016; Crawford et al. 2018). These issues seem

potentially important in the current situation where certain markets have come to be dominated by one or a small number of large firms. A common situation is that high-markup platform firms succeed by offering valuable (often digital) goods and services to consumers, but then competition issues arise when the platform either begins to supply the complementary products itself or contracts over price, quality, or technology in a way that limits the independent complements on the platform. Raising rivals' costs, foreclosure, and exclusion are among the possible theories of harm that can be raised in this setting. The Vertical Merger Guidelines of the US Department of Justice were last updated in 1984, and the federal agencies rarely bring such cases. The government litigated its first vertical merger case in 40 years in 2018, arguing that the proposed vertical merger between AT&T and Time Warner was anticompetitive, but lost convincingly at the federal appeals court level (*United States v. AT&T Inc., DirecTV Group Holdings, LLC, and Time Warner Inc.*, 310 F. Supp. 3d 161 [2018]).

The term *coordinated effects* refers to a situation in which concentrated industries or sectors may be more susceptible to tacit collusion (Tirole 1988). Recent empirical work has found tacit collusion to be unexpectedly prevalent (Ciliberto and Williams 2014; Miller and Weinberg 2017; Schmitt 2018), but in general, the economics profession has contributed little to this policy area. In a world with trends toward concentration, more understanding and measurement of tacit collusion would be valuable.

The rise of *digital platforms* has been an important change in the economy, sparking rising calls from some quarters for antitrust action against firms such as Amazon, Facebook, and Google (Khan 2017; Wu 2018; Hughes 2019). The European Commission has been active in this area, raising issues that include allegations of exclusionary bundling, anticompetitive exclusive contracts, vertical foreclosure, and anticompetitive mergers. In our view, establishing robust theories of harm and tools to evaluate the evidence for or against digital platforms is a valuable activity for the antitrust agencies as well as academic economists. However, US antitrust agencies have not been active in this area, with the exception of the investigation by the Federal Trade Commission that led to a settlement but no case (US Federal Trade Commission 2013).

Firms may *exploit intellectual property* by using patents or other intellectual property to engage in exclusionary conduct in related markets. For example, branded drugs have long used patent litigation settlements as a way to pay generic rivals to stay out of the market (called "reverse payments" or "pay for delay"). It took 18 years from the time the Federal Trade Commission first identified this strategy to the time when the US Supreme Court ruled that it can, under certain conditions, be illegal (*FTC v. Actavis, Inc.*, 570 US 136 [2013]). Pharmaceutical firms have also used "patent thickets" and "product hopping" (for example, changing dosages or packaging) to prevent competitive entry or substitution. Patent litigation can be used as a strategy by firms with large portfolios to discourage investment and innovation or to partner with an incumbent firm to disadvantage rivals: as one example, the Federal Trade Commission successfully sued Qualcomm for such tactics involving

a key semiconductor device used in smartphones (for background, see the case summary and links on the Federal Trade Commission's website at https://www.ftc.gov/enforcement/cases-proceedings/141-0199/qualcomm-inc). A similar result occurs when a standard-setting organization for an industry sets a standard that requires the use of an essential patent—and then the firm holding that patent denies rivals access to the patent on fair, reasonable, and nondiscriminatory terms. In work on causes behind a rise in dominant firms and a fall in US business dynamism, Akcigit and Ates (2019) suggest that one cause is "a heavy use of intellectual property protection by market leaders to limit the dissemination of knowledge."

*Acquisition of potential competitors* when they are still small can be a way for a dominant firm to improve quality or to fold a complement into its core product—or just to block a future potential entrant. Traditional antitrust enforcement has often focused on whether a merger led to an immediate significant increase in market share, not on how it affected potential or nascent competition. But when a market is subject to strong network effects, competition is *for* the market, and the possibility that the nascent entrant could contest the incumbent is an important source of competition. Frequently mentioned anecdotes include big tech companies' acquisitions of small firms in adjacent product markets, such as Facebook's acquisitions of Instagram and WhatsApp. In a study of the pharmaceutical industry, Cunningham, Ederer, and Ma (2018) conclude that about 6.4 percent of pharma acquisitions are "killer acquisitions," where the acquisition eliminates entry by a potential competitor. However, both the probability and the value of potential entry are uncertain, and research on identifying or measuring these effects in different settings would be extremely useful.

*Exclusionary conduct* arises when large incumbent firms with low marginal costs undertake activities that deter entry or disadvantage existing rivals. Two of the many possible examples of exclusionary conduct especially relevant in the current context include most-favored-nation contracts and refusals to deal.

Most-favored-nation (MFN) contracts (a term lifted from international trade treaties) specify that a seller must give the buyer who has such a contract as good a price as that seller gives to any other buyer. This may appear procompetitive. But notice that MFN contracts make price discounts more costly for the seller—any discount to any other buyer must also be provided to the buyer with the MFN contract. For example, imagine the firms interacting on a large digital platform, like hotels, agree to sign an MFN contract with the platform (Boik and Corts 2016; Baker and Scott Morton 2018). If a rival digital platform with a lower commission (say, 10 percent instead of 25 percent) enters and contracts with the same hotels, the hotel room must be priced as high on the low-margin platform as it is on the high-margin platform, and the lower-cost distribution channel may fail to gain traction. These practices have been challenged in Europe, but not in the United States (Mantovani, Piga, and Reggiani 2017).

Refusals to deal and foreclosure can be attempts to weaken competition. The European Commission's case against Google's search engine illustrates this issue (European Commission 2017). Suppose a provider of local service listings is

a complement to general search; namely, a consumer can search on Google and find a Yelp page that holds the desired information. Displaying the Yelp page and letting consumers learn about it may allow Yelp to establish an independent relationship with consumers. The platform can use its rules to determine the display of organic results and the selection of ads shown, and in this way, it may be able to steer consumers away from such a complement. The platform could have a financial interest in doing so because of the risk that consumers learn to go straight to Yelp, reducing single-homing and the market power of the platform. This strategy might be even more attractive if the platform sells its own (vertically integrated) similar local search product and can divert revenues from local search advertising to itself by steering customers to its own product. (Or perhaps it could raise its rival's costs by requiring it to purchase an ad in order to obtain consumers.) Foreclosure strategies of this type can reduce competition in either the underlying platform market or, possibly, in competition among services provided on the platform.

As the economy becomes increasingly digital, possessing data can be another way to limit competition. For example, health-care systems often refuse or make it difficult to transmit patients' data to alternative health-care providers, with the explicit goal of retaining patients (Savage, Gaynor, and Adler-Milstein 2019). Anti-competitive use of data is another method of exclusion. The US Department of Justice recently settled a case against a large hospital system for employing clauses in its contracts with insurers that prevented insurers from providing patients information or incentives that would direct them to lower-cost or higher-value hospitals (*United States and the State of North Carolina v. Carolinas Healthcare System*; see US Department of Justice 2016). Another such case is being pursued by the attorney general in California (*People of the State of California Ex Rel. Xavier Becerra v. Sutter Health*; see California Department of Justice 2018).

**Moving Forward with Antitrust Enforcement in a Situation of Uncertainty**

Much of the evidence regarding rising markups seems to us plausible and worthy of further investigation, although uncertainty remains as to the most important causes. But this uncertainty should not imply inaction in antitrust policy (for a decision-theoretic approach to antitrust enforcement, see Baker 2015). We do know that competitive markets are generally beneficial for consumers. We also know that market power, once acquired, can be durable due to many of the economic and strategic issues discussed above. In particular, a substantial game-theoretic literature emphasizes the role of sunk costs in maintaining high markups (Tirole 1988). There are many examples in US economic history, including IBM and Microsoft, in which substantial market power persisted over decades.

Our view is that the policy focus should be on forms of antitrust enforcement that are robust to the magnitudes that future research on these issues may uncover. We believe that the most useful focus for antitrust enforcers around the globe should be on conditions of entry, including acquisitions by existing firms of recent or potential entrants, along with exclusionary conduct. Without rules to ensure there is competition on the merits, existing market power can be leveraged

to create future market power and generate the durability that appears in the data. Consistent, vigorous antitrust enforcement is needed to ensure that concentration does not perpetuate itself because entry is not protected.

It's worth remembering that government agencies besides the antitrust authorities at the Federal Trade Commission and the US Department of Justice can have significant impacts on entry, market structure, and competition. For example, rules from the Food and Drug Administration hinder entry of biosimilar drugs. The Department of Health and Human Services permits higher fees to be charged for the same physician service if the service is provided in a doctor's office owned by a hospital and permits hospitals (but not doctors) to obtain substantial discounts on expensive drugs (like those for treating cancer) that are administered by physicians (the Section 340B program). These policies unintentionally encourage consolidation, since hospitals and physician practices can share the rents from these regulatory loopholes if the practices are owned by hospitals. Rules from the US Department of Transportation (2017) affect the transparency of airline fees. The US Patent and Trademark Office's decision to issue low-quality patents enables the activities of patent trolls. The Federal Communications Commission sets rules that give multichannel video programming distributors greater or lesser power to limit content provision by online video providers. At the state level, legislatures respond to the desires of incumbent car dealers by passing laws preventing the entry of new car brands into the state (*Tesla Motors, Inc. v. Johnson et al.*, W.D. Mich. Civil Action 16-cv-1158 [2017]; Gavil, Feinstein, and Gaynor 2014).

In summary, a wave of industry-level econometric studies will be needed to help us understand shifts in markups, the underlying causes, and more broadly how markets in our modern economy are functioning and evolving. Many of the likely causes of rising markups in this article involve economic shifts that do not have any direct policy response. But whatever the underlying cause and size of rising markups, promoting competition along the lines mentioned here seems to us to be, at present, the most appropriate policy response.

■ *We thank Al Klevorick, Carl Shapiro, and Chad Syverson, as well as Editor Enrico Moretti, Coeditor Gordon Hanson, and Managing Editor Timothy Taylor for helpful comments and suggestions that substantially improved the paper. The usual caveat applies.*

*64    Journal of Economic Perspectives*

# References

**Abraham, Jean Marie, Martin Gaynor, and William B. Vogt.** 2007. "Entry and Competition in Local Hospital Markets." *Journal of Industrial Economics* 55(2): 265–88.

**Akcigit, Ufuk, and Sina T. Ates.** 2019. "What Happened to U.S. Business Dynamism?" Becker Friedman Institute Working Paper. https://bfi.uchicago.edu/working-paper/what-happened-to-u-s-business-dynamism/.

**Asker, John.** 2016. "Diagnosing Foreclosure Due to Exclusive Dealing." *Journal of Industrial Economics* 64(3): 375–410.

**Autor, David, David Dorn, Lawrence F. Katz, Christina Patterson, and John Van Reenen.** 2017. "The Fall of the Labor Share and the Rise of Superstar Firms." NBER Working Paper 23396.

**Azar, José, Steven Berry, and Ioana Marinescu.** 2019. "Estimating Labor Market Power." Unpublished.

**Azar, José, Ioana Marinescu, and Marshall I. Steinbaum.** 2017. "Labor Market Concentration." NBER Working Paper 24147.

**Azar, José, Ioana Marinescu, Marshall I. Steinbaum, and Bledi Taska.** 2018. "Concentration in US Labor Markets: Evidence from Online Vacancy Data." NBER Working Paper 24395.

**Baker, Jonathan B.** 2015. "Taking the Error Out of 'Error Cost' Analysis: What's Wrong with Antitrust's Right." *Antitrust Law Journal* 80(1): 1–38.

**Baker, Jonathan B.** 2019. *The Antitrust Paradigm: Restoring a Competitive Economy.* Cambridge, MA: Harvard University Press.

**Baker, Jonathan B., and Fiona Scott Morton.** 2018. "Antitrust Enforcement against Platform MFNs." *Yale Law Journal* 127(7): 1742–2203.

**Barkai, Simcha.** 2017. "Declining Labor and Capital Shares." https://www.london.edu/faculty-and-research/academic-research/d/declining-labor-and-capital-shares.

**Benmelech, Efraim, Nittai Bergman, and Hyunseob Kim.** 2018. "Strong Employers and Weak Employees: How Does Employer Concentration Affect Wages?" NBER Working Paper 24307.

**Bergemann, Dirk, and Alessandro Bonatti.** 2018. "Markets for Information: An Introduction." Cowles Foundation Discussion Paper 2142. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3240310.

**Berry, Steven.** 1990. "Airport Presence as Product Differentiation." *American Economic Review* 80(2): 394–99.

**Berry, Steven.** 1992. "Estimation of a Model of Entry in the Airline Industry." *Econometrica* 60(4): 889–917.

**Berry, Steven, Michael Carnall, and Pablo T. Spiller.** 2006. "Airline Hubs: Costs, Markups and the Implications of Customer Heterogeneity," in *Competition Policy and Antitrust,* edited by Darin Lee, 183–214. Advances in Airline Economics 1. Bingley, UK: Emerald Group.

**Berry, Steven, Alon Eizenberg, and Joel Waldfogel.** 2016. "Optimal Product Variety in Radio Markets." *RAND Journal of Economics* 47(3): 463–97.

**Berry, Steven, and Philip A. Haile.** 2014. "Identification in Differentiated Products Markets Using Market Level Data." *Econometrica* 82(5): 1749–97.

**Berry, Steven, and Joel Waldfogel.** 1999. "Free Entry and Social Inefficiency in Radio Broadcasting." *RAND Journal of Economics* 30(3): 397–420.

**Bessen, James E.** 2017. "Information Technology and Industry Concentration." Boston University School of Law, Law and Economics Research Paper 17-41. https://ssrn.com/abstract=3044730.

**Bhandari, Anmol, and Ellen R. McGrattan.** 2018. "Sweat Equity in U.S. Private Business." NBER Working Paper 24520, Federal Reserve Bank of Minneapolis Staff Report 560.

**Boik, Andre, and Kenneth S. Corts.** 2016. "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry." *Journal of Law and Economics* 59(1): 105–34.

**Borenstein, Severin.** 1990. "Airline Mergers, Airport Dominance, and Market Power." *American Economic Review* 80(2): 400–404.

**Borenstein, Severin.** 2011. "Why Can't US Airlines Make Money?" *American Economic Review* 101(3): 233–37.

**Bork, Robert H.** 1978. *The Antitrust Paradox.* New York: Free Press.

**Bresnahan, Timothy F.** 1989. "Empirical Studies of Industries with Market Power." Chap. 17 in *Handbook of Industrial Organization,* vol. 2, edited by Richard Schmalensee and Robert Willig, 1011–57. Amsterdam: Elsevier.

**Bresnahan, Timothy F., and Peter C. Reiss.** 1990. "Entry in Monopoly Markets." *Review of Economic Studies* 57(4): 531–53.

**California Department of Justice.** 2018. "Attorney General Becerra Sues Sutter Health for Anti-competitive Practices That Increase Prices for California Families." Press Release, Office of the Attorney General, California Department of Justice, March 30, 2018. https://oag.ca.gov/news/press-releases/attorney-general-becerra-sues-sutter-health-anti-competitive-practices-increase.

**Calligaris, Sara, Chiara Criscuolo, and Luca Marcolin.** 2018. "Mark-Ups in the Digital Era." Organisation for Economic Co-operation and Development (OECD) Science, Technology and Industry Working Paper 2018/10.

**Capps, Cory, David Dranove, and Mark Satterthwaite.** 2003. "Competitition and Market Power in Option Demand Markets." *RAND Journal of Economics* 34(4): 737–63.

**Card, David, Ana Rute Cardoso, Joerg Heining, and Patrick Kline.** 2018. "Firms and Labor Market Inequality: Evidence and Some Theory." *Journal of Labor Economics* 36(S1): S13–70.

**Card, David, and Alan B. Krueger.** 1994. "Minimum Wages and Employment: A Case Study of the Fast-Food Industry in New Jersey and Pennsylvania." *American Economic Review* 84(4): 772–93.

**Carlton, Dennis W., William M. Landes, and Richard A. Posner.** 1980. "Benefits and Costs of Airline Mergers: A Case Study." *Bell Journal of Economics* 11(1): 65–83.

**Chen, M. Keith, Judith A. Chevalier, Peter E. Rossi, and Emily Oehlsen.** 2017. "The Value of Flexible Work: Evidence from Uber Drivers." NBER Working Paper 23296.

**Ciliberto, Federico, and Elie Tamer.** 2009. "Market Structure and Multiple Equilibria in Airline Markets." *Econometrica* 77(6): 1791–828.

**Ciliberto, Federico, and Jonathan W. Williams.** 2014. "Does Multimarket Contact Facilitate Tacit Collusion? Inference on Conduct Parameters in the Airline Industry." *RAND Journal of Economics* 45(4): 764–91.

**Conlon, Christopher T., and Julie Holland Mortimer.** 2013. "Efficiency and Foreclosure Effects of Vertical Rebates: Empirical Evidence." NBER Working Paper 19709.

**Cooper, Zack, Stuart V. Craig, Martin Gaynor, and John Van Reenen.** 2019. "The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured." *Quarterly Journal of Economics* 134(1): 51–107.

**Cooper, Zack, Stephen Gibbons, Simon Jones, and Alistair McGuire.** 2011. "Does Hospital Competition Save Lives? Evidence from the English NHS Patient Choice Reforms." *Economic Journal* 121(554): F228–60.

**Cooper, Zack, Fiona Scott Morton, and Nathan Shekita.** 2017. "Surprise! Out-of-Network Billing for Emergency Care in the United States." NBER Working Paper 23623.

**Corrado, Carol, Charles Hulten, and Daniel Sichel.** 2009. "Intangible Capital and U.S. Economic Growth." *Review of Income and Wealth* 55(3): 661–85.

**Cowling, Keith, and Michael Waterson.** 1976. "Price–Cost Margins and Market Structure." *Economica* 43(171): 267–74.

**Crawford, Gregory S., Robin S. Lee, Michael D. Whinston, and Ali Yurukoglu.** 2018. "The Welfare Effects of Vertical Integration in Multichannel Television Markets." *Econometrica* 86(3): 891–954.

**Creswell, Julie, Reed Abelson, and Margot Sanger-Katz.** 2017. "The Company behind Many Surprise Emergency Room Bills." *New York Times,* July 24, 2017. https://www.nytimes.com/2017/07/24/upshot/the-company-behind-many-surprise-emergency-room-bills.html.

**Crouzet, Nicolas, and Janice Eberly.** 2018. "Intangibles, Investment, and Efficiency." *AEA Papers and Proceedings* 108(1): 426–31.

**Cunningham, Colleen, Florian Ederer, and Song Ma.** 2018. "Killer Acquisitions." https://ssrn.com/abstract=3241707.

**Currie, Janet, Mehdi Farsi, and W. Bentley MacLeod.** 2005. "Cut to the Bone? Hospital Takeovers and Nurse Employment Contracts." *Industrial and Labor Relations Review* 58(3): 471–93.

**De Loecker, Jan, and Jan Eeckhout.** 2017. "The Rise of Market Power and the Macroeconomic Implications." NBER Working Paper 23687.

**De Loecker, Jan, and Jan Eeckhout.** 2018a. "Global Market Power." NBER Working Paper 24768.

**De Loecker, Jan, and Jan Eeckhout.** 2018b. "Some Thoughts on the Debate about (Aggregate) Markup Measurement." http://www.janeeckhout.com/wp-content/uploads/Thoughts.pdf.

**Demsetz, Harold.** 1973. "Industry Structure, Market Rivalry, and Public Policy." *Journal of Law and Economics* 16(1): 1–9.

**Doraszelski, Ulrich, Katja Seim, Michael Sinkinson, and Peichun Wang.** 2017. "Ownership Concentration and Strategic Supply Reduction." NBER Working Paper 23034.

**Dube, Arindrajit, and Ethan Kaplan.** 2010. "Does Outsourcing Reduce Wages in the Low-Wage Service Occupations? Evidence from Janitors and Guards." *Industrial and Labor Relations Review* 63(2): 287–306.

**Eggertsson, Gauti B., Jacob A. Robbins, and Ella Getz Wold.** 2018. "Kaldor and Piketty's Facts: The Rise of Monopoly Power in the United States." NBER Working Paper 24287.

**European Commission.** 2017. "Google Search (Shopping)." Case AT.39740. http://ec.europa.eu/competition/elojade/isef/case_details.cfm?proc_code=1_39740.

**Farber, Henry S., Daniel Herbst, Ilyana Kuziemko, and Suresh Naidu.** 2018. "Unions and Inequality over the Twentieth Century: New Evidence from Survey Data." NBER Working Paper 24587.

**Farrell, Joseph, and Carl Shapiro.** 1990.

"Horizontal Mergers: An Equilibrium Analysis." *American Economic Review* 80(1): 107–26.

**Federico, Giulio, Fiona Scott Morton, and Carl Shapiro.** Forthcoming. "Antitrust and Innovation: Welcoming and Protecting Disruption." Chap. 4 in *Innovation Policy and the Economy*, vol. 20, edited by Josh Lerner and Scott Stern. Chicago: University of Chicago Press.

**Fisher, Franklin M., and John J. McGowan.** 1983. "On the Misuse of Accounting Rates of Return to Infer Monopoly Profits." *American Economic Review* 73(1): 82–97.

**Furman, Jason.** 2015. "Business Investment in the United States: Facts, Explanations, Puzzles, and Policies." Technical Report, Council of Economic Advisers, Executive Office of the President of the United States.

**Furman, Jason, and Peter Orszag.** 2018. "A Firm-Level Perspective on the Role of Rents in the Rise in Inequality." Chap. 1 in *Toward a Just Society: Joseph Stiglitz and Twenty-First Century Economics*, edited by Martin Guzman, 19–47. New York: Columbia University Press.

**Ganapati, Sharat.** 2018a. "Oligopolies, Prices, Output, and Productivity." https://ssrn.com/abstract=3030966.

**Ganapati, Sharat.** 2018b. "The Modern Wholesaler: Global Sourcing, Domestic Distribution, and Scale Economies." https://www.tuck.dartmouth.edu/uploads/content/Ganapati_Wholesalers_2016_copy.pdf.

**Gavil, Andrew I.** 2019. "Crafting a Monopolization Law for Our Time." *Competitive Edge* (blog), Washington Center for Equitable Growth, March 27, 2019. https://equitablegrowth.org/competitive-edge-crafting-a-monopolization-law-for-our-time/.

**Gavil, Andy, Debbie Feinstein, and Marty Gaynor.** 2014. "Who Decides How Consumers Should Shop?" *Competition Matters* (blog), US Federal Trade Commission, April 24, 2014. https://www.ftc.gov/news-events/blogs/competition-matters/2014/04/who-decides-how-consumers-should-shop.

**Gaynor, Martin, Kate Ho, and Robert J. Town.** 2015. "The Industrial Organization of Health-Care Markets." *Journal of Economic Literature* 53(2): 235–84.

**Gaynor, Martin, Rodrigo Moreno-Serra, and Carol Propper.** 2013. "Death By Market Power: Reform, Competition, and Patient Outcomes in the National Health Service." *American Economic Journal: Economic Policy* 5(4): 134–66.

**Gaynor, Martin, Carol Propper, and Stephan Seiler.** 2016. "Free to Choose? Reform, Choice, and Consideration Sets in the English National Health Service." *American Economic Review* 106(11): 3521–57.

**Gowrisankaran, Gautam, Aviv Nevo, and Robert Town.** 2015. "Mergers When Prices Are Negotiated: Evidence from the Hospital Industry." *American Economic Review* 105(1): 172–203.

**Grullon, Gustavo, Yelena Larkin, and Roni Michaely.** Forthcoming. "Are US Industries Becoming More Concentrated?" *Review of Finance.*

**Gutiérrez, Germán, and Thomas Philippon.** 2017a. "Declining Competition and Investment in the U.S." NBER Working Paper 23583.

**Gutiérrez, Germán, and Thomas Philippon.** 2017b. "Investment-less Growth: An Empirical Investigation." *Brookings Papers on Economic Activity* 2017(Fall): 89–169.

**Hall, Robert E.** 2018. "New Evidence on the Markup of Prices over Marginal Costs and the Role of Mega-firms in the US Economy." NBER Working Paper 24574.

**Haskel, Jonathan, and Stian Westlake.** 2017. *Capitalism without Capital: The Rise of the Intangible Economy.* Princeton, NJ: Princeton University Press.

**Ho, Kate, and Robin S. Lee.** 2017. "Insurer Competition in Health Care Markets." *Econometrica* 85(2): 379–417.

**Hughes, Chris.** 2019. "It's Time to Break Up Facebook." *New York Times*, May 9, 2019. https://www.nytimes.com/2019/05/09/opinion/sunday/chris-hughes-facebook-zuckerberg.html.

**Kessler, Daniel P., and Mark B. McClellan.** 2000. "Is Hospital Competition Socially Wasteful?" *Quarterly Journal of Economics* 115(2): 577–615.

**Khan, Lina.** 2017. "Amazon's Antitrust Paradox." *Yale Law Journal* 126(3): 710–805.

**Krueger, Alan B., and Orley Ashenfelter.** 2018. "Theory and Evidence on Employer Collusion in the Franchise Sector." NBER Working Paper 24831.

**Kulick, Robert B.** 2017. "Ready-to-Mix: Horizontal Mergers, Prices, and Productivity." US Census Bureau Center for Economic Studies Working Paper CES-WP-17-38. https://ssrn.com/abstract=2637961.

**Kwoka, John E. Jr.** 2016. "The Structural Presumption and the Safe Harbor in Merger Review: False Positives, or Unwarranted Concerns?" https://ssrn.com/abstract=2782152.

**Lipsius, Ben.** 2018. "Labor Market Concentration Does Not Explain the Falling Labor Share." https://ssrn.com/abstract=3279007.

**Mankiw, N. Gregory, and Michael D. Whinston.** 1986. "Free Entry and Social Inefficiency." *RAND Journal of Economics* 17(1): 48–58.

**Manning, Alan.** 2003. *Monopsony in Motion: Imperfect Competition in Labor Markets.* Princeton, NJ: Princeton University Press.

**Mantovani, Andrea, Claudio A. Piga, and Carlo**

Case 1:25-cv-00168-BKS-DJS    Document 229-4    Filed 12/20/25    Page 36 of 301

*Do Increasing Markups Matter? Lessons from Empirical Industrial Organization* 67

**Reggiani.** 2017. "The Dynamics of Online Hotel Prices and the EU Booking.com Case." Networks, Electronic Commerce and Telecommunications (NET) Institute Working Paper 17-04. https://ssrn.com/abstract=3049339.

**Miller, Nathan H., and Matthew C. Weinberg.** 2017. "Understanding the Price Effects of the MillerCoors Joint Venture." *Econometrica* 85(6): 1763–91.

**Open Markets.** 2018. "Open Markets Statement on Ohio v. American Express Decision." Press Release, June 25, 2018. https://openmarketsinstitute.org/releases/open-markets-statement-ohio-v-american-express/.

**Pollack, Andrew.** 2015. "Drug Goes From $13.50 a Tablet to $750, Overnight." *New York Times,* September 20, 2015. https://www.nytimes.com/2015/09/21/business/a-huge-overnight-increase-in-a-drugs-price-raises-protests.html.

**Posner, Eric A., Glen Weyl, and Suresh Naidu.** 2018. "Antitrust Remedies for Labor Market Power." *Harvard Law Review* 132(2): 536–601.

**Prager, Elena, and Matt Schmitt.** 2019. "Employer Consolidation and Wages: Evidence from Hospitals." Washington Center for Equitable Growth Working Paper Series. https://equitablegrowth.org/working-papers/employer-consolidation-and-wages-evidence-from-hospitals/.

**Ransom, Michael R., and David P. Sims.** 2010. "Estimating the Firm's Labor Supply Curve in a 'New Monopsony' Framework: School Teachers in Missouri." *Journal of Labor Economics* 28(2): 331–55.

**Raval, Devesh.** 2019. "Testing the Production Approach to Markup Estimation." https://ssrn.com/abstract=3324849.

**Ravenscraft, David J.** 1983. "Structure–Profit Relationships at the Line of Business and Industry Level." *Review of Economics and Statistics* 65(1): 22–31.

**Rinz, Kevin.** 2018. "Labor Market Concentration, Earnings Inequality, and Earnings Mobility." US Census Bureau Center for Administrative Records Research and Applications Working Paper 2018-10. https://www.census.gov/library/working-papers/2018/adrm/carra-wp-2018-10.html.

**Rossi-Hansberg, Esteban, Pierre-Daniel Sarte, and Nicholas Trachter.** 2019. "Diverging Trends in National and Local Concentration." https://www.princeton.edu/~erossi/DTNLC.pdf.

**Savage, Lucia, Martin Gaynor, and Julia Adler-Milstein.** 2019. "Digital Health Data and Information Sharing: A New Frontier for Health Care Competition?" *Antitrust Law Journal* 82(2): 592–621.

**Schmalensee, Richard.** 1989. "Inter-industry Studies of Structure and Performance." Chap. 16 in *Handbook of Industrial Organization,* vol. 2,

edited by Richard Schmalensee and Robert Willig, 951–1009. Amsterdam: Elsevier.

**Schmitt, Matt.** 2018. "Multimarket Contact in the Hospital Industry." *American Economic Journal: Economic Policy* 10(3): 361–87.

**Scott Morton, Fiona, Pascal Bouvier, Ariel Ezrachi, Bruno Jullien, Roberta Katz, Gene Kimmelman, A. Douglas Melamed, and Jamie Morgenstern.** 2019. *Committee for the Study of Digital Platforms: Market Structure and Antitrust Subcommittee Report. Draft.* Chicago: Stigler Center for the Study of the Economy and the State, University of Chicago Booth School of Business. https://research.chicagobooth.edu/-/media/research/stigler/pdfs/market-structure---report-as-of-15-may-2019.pdf.

**Scott Morton, Fiona, and Carl Shapiro.** 2016. "Patent Assertions: Are We Any Closer to Aligning Reward to Contribution?" Chap. 4 in *Innovation Policy and the Economy,* vol. 16, edited by Josh Lerner and Scott Stern, 89–133. Chicago: University of Chicago Press.

**Segal, Ilya R., and Michael D. Whinston.** 2000. "Naked Exclusion: Comment." *American Economic Review* 90(1): 296–309.

**Shaked, Avner, and John Sutton.** 1982. "Relaxing Price Competition through Product Differentiation." *Review of Economic Studies* 49(1): 3–13.

**Smith, Noah.** 2017. "America's Superstar Companies Are a Drag on Growth." *Bloomberg,* September 1, 2017. https://www.bloomberg.com/opinion/articles/2017-09-01/america-s-superstar-companies-are-a-drag-on-growth.

**Staiger, Douglas O., Joanne Spetz, and Ciaran S. Phibbs.** 2010. "Is There Monopsony in the Labor Market? Evidence from a Natural Experiment." *Journal of Labor Economics* 28(2): 211–36.

**Starr, Evan, J. J. Prescott, and Norman Bishara.** 2019. "Noncompetes in the U.S. Labor Force." University of Michigan Law and Economics Research Paper 18-013. https://ssrn.com/abstract=2625714.

**Sullivan, Daniel.** 1989. "Monopsony Power in the Market for Nurses." *Journal of Law and Economics* 32(2): S135–78.

**Sutton, John.** 1991. *Sunk Costs and Market Structure: Price Competition, Advertising, and the Evolution of Concentration.* Cambridge, MA: MIT Press.

**Tirole, Jean.** 1988. *The Theory of Industrial Organization.* Cambridge, MA: MIT Press.

**Town, Robert, and Gregory Vistnes.** 2001. "Hospital Competition in HMO Networks." *Journal of Health Economics* 20(5): 733–53.

**US Bureau of Economic Analysis.** 2018. "Initial Estimates Show Digital Economy Accounted for 6.5 Percent of GDP in 2016." *BEA Wire,* March 15, 2018.

https://www.bea.gov/news/blog/2018-03-15/initial-estimates-show-digital-economy-accounted-65-percent-gdp-2016.

**US Department of Justice.** 2016. "Justice Department and North Carolina Sue Carolinas Healthcare System to Eliminate Unlawful Steering Restrictions." Press Release 16-665, Office of Public Affairs, US Department of Justice, June 9, 2016. https://www.justice.gov/opa/pr/justice-department-and-north-carolina-sue-carolinas-healthcare-system-eliminate-unlawful.

**US Department of Transportation.** 2017. "DOT Withdraws Two Proposed Rulemakings." News Digest DOT 91-17, Press Office, US Department of Transportation, December 7, 2017. https://www.transportation.gov/briefing-room/dot9117.

**US Federal Trade Commission.** 2013. "Google Agrees to Change Its Business Practices to Resolve FTC Competition Concerns in the Markets for Devices Like Smart Phones, Games and Tablets, and in Online Search." Press Release, Office of Public Affairs, US Federal Trade Commission, January 3, 2013. https://www.ftc.gov/news-events/press-releases/2013/01/google-agrees-change-its-business-practices-resolve-ftc.

**Waldfogel, Joel.** 2015. "Digitization and the Quality of New Media Products: The Case of Music." Chap. 14 in *Economic Analysis of the Digital Economy*, edited by Avi Goldfarb, Shane M. Greenstein, and Catherine E. Tucker, 407–42. Chicago: University of Chicago Press.

**Weil, David.** 2011. "Enforcing Labour Standards in Fissured Workplaces: The US Experience." *Economic and Labour Relations Review* 22(2): 33–54.

**Weiss, Leonard, ed.** 1990. *Concentration and Price.* Cambridge, MA: MIT Press.

**Wollmann, Thomas G.** 2019. "Stealth Consolidation: Evidence from an Amendment to the Hart-Scott-Rodino Act." *American Economic Review: Insights* 1(1): 77–94.

**Wu, Tim.** 2018. *The Curse of Bigness: Antitrust in the New Gilded Age.* New York: Columbia Global Reports.

**Yurukoglu, Ali.** 2018. "Discussion of 'The Rise of Market Power and the Macroeconomic Implications' by De Loecker and Eeckhout." Presented at the NBER Winter Industrial Organization Meeting, February 9–10, 2018, Stanford, CA.

# Exhibit B-2



Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes?

Author(s): Severin Borenstein, A. Colin Cameron and Richard Gilbert

Source: *The Quarterly Journal of Economics*, Feb., 1997, Vol. 112, No. 1 (Feb., 1997), pp. 305–339

Published by: Oxford University Press

Stable URL: https://www.jstor.org/stable/2951284

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Oxford University Press* is collaborating with JSTOR to digitize, preserve and extend access to *The Quarterly Journal of Economics*

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

# DO GASOLINE PRICES RESPOND ASYMMETRICALLY
# TO CRUDE OIL PRICE CHANGES?*

SEVERIN BORENSTEIN
A. COLIN CAMERON
RICHARD GILBERT

We test and confirm that retail gasoline prices respond more quickly to increases than to decreases in crude oil prices. Among the possible sources of this asymmetry are production/inventory adjustment lags and market power of some sellers. By analyzing price transmission at different points in the distribution chain, we attempt to shed light on these theories. Spot prices for generic gasoline show asymmetry in responding to crude oil price changes, which may reflect inventory adjustment effects. Asymmetry also appears in the response of retail prices to wholesale price changes, possibly indicating short-run market power among retailers.

## I. INTRODUCTION

The 1990–1991 Persian Gulf crisis and other recent oil market disruptions have brought to attention the response of retail gasoline prices to fluctuations in world oil prices. Some observers have asserted that gasoline prices react more quickly to increases in crude oil prices than to decreases. In this paper we test for asymmetry in the speed of retail price responses and find supporting evidence. Although such a pricing pattern could indicate market power at some level of the distribution chain, the connection is not immediately apparent. Lags in the adjustment of price to input cost changes are not consistent with simple models of either competitive markets or monopoly.

The transmittal of a price change from crude oil to retail gasoline depends on the response in many intermediate margins. Most service stations and "jobbers" who handle intermediate transactions are not owned by refiners, and thus, they set prices independently of the upstream firms.[1] Even when the production

*For helpful discussions and comments, the authors thank Anthony Brown, James Huccaby, Lawrence Katz, Bruce McDiarmid, Adrian Pagan, Simon Potter, Frank Wolak, and seminar participants at the University of California at Davis, the University of California at Berkeley, the University of California at Los Angeles, the University of Chicago, Stanford University, and the National Bureau of Economic Research. Michael Schwarz, Kathryn Myronuk, Rika Onishi Mortimer, and Troy Parades provided excellent research assistance. The authors gratefully acknowledge support from the University of California Energy Institute. The authors alone are responsible for any errors that remain.
1. Although a refiner cannot set prices at retail outlets that it does not own and operate, nonlinear wholesale pricing and and other incentives from refiners

© 1997 by the President and Fellows of Harvard College and the Massachusetts Institute of Technology.
*The Quarterly Journal of Economics,* February 1997.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

and distribution process occurs wholly within one firm, a company faces opportunity costs at every point in the process. Because market transactions occur and price data are available at most points in the production and distribution process, we observe measures of these direct or opportunity costs.

In the next section we describe the United States gasoline production and distribution process in greater detail and, in this context, discuss the sources and appropriateness of the data that we analyze. In Section III we test for and find that retail gasoline prices increase faster when the crude oil price rises than they decline when the crude price declines. In Section IV we present theories that could link such asymmetries to each of the distribution tiers.

By analyzing the price response at each level of distribution, in Section V we attempt to distinguish between the competing explanations for the asymmetric response. We find indication of an asymmetry in the transmission of crude oil price changes to the changes in the spot price for generic gasoline, although adjustments in both directions occur very quickly. At the next level of transmission, however, we find little evidence of asymmetry: wholesale gasoline prices respond about equally quickly to decreases as to increases in spot prices for generic gasoline. Combining these two transmissions, we find that wholesale gasoline prices respond significantly faster to crude price increases than to decreases. Finally, in the transmission of price changes from wholesale to retail, we find evidence of asymmetry: retail prices change more quickly in response to wholesale price increases than to wholesale price decreases.

## II. The Production and Distribution of Gasoline

The production and distribution of gasoline in the United States is illustrated in Figure I. Motor gasoline is one of many products that can be made from refining crude oil, along with diesel fuel, kerosene, jet fuel, heating oil, and other products. The mix of outputs can be altered by changing refining processes, but the scope for such output substitution, while maintaining efficient production, is limited. During our sample period gasoline

---

are commonly used in an effort to lessen the double marginalization problem. See Shepard [1993] for a detailed description of the contractual relationships between refiners and dealers and Temple, Barker, and Sloan, Inc. [1988] for a description of common distribution practices.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

25-cv-00168-BKS-DJS    Document 229-4    Filed 12/20/25    Page 42



FIGURE I
Structure of the United States Gasoline Industry

averaged about 45 percent (by volume) of refined output at
United States refineries [Energy Information Administration
1991, p. 16]. Gasoline is produced by over 100 United States
refiners, with the largest company accounting for about 10 per-
cent of United States production, and the four largest producing
about 31 percent of the total [Dougher 1992, p. 80].

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

Gasoline produced at United States refineries, as well as the 5 percent of United States gasoline consumption that is imported, is distributed through many channels. Refiners often sell large quantities of generic gasoline directly from the refinery to distributors or other refiners in spot transactions. Gasoline may be shipped to the distribution terminal in a city and sold there as "branded" gasoline (with company-specific additives and with the right to use the refiner's name at resale) at a branded "terminal" (also known as branded "rack") price. Gasoline from a name-brand refinery may also be sold as generic gasoline at the terminal, without permission to use the refiner's name. Finally, "unbranded" refineries—those that do not operate their own chain of retail outlets—sell unbranded gasoline at their city terminals for resale at unbranded stations, i.e., stations that do not carry the name of a major refiner.

Once gasoline arrives at the city terminal, it can be distributed directly by the refiner ("direct-supplied") or through middlemen know as jobbers. About 55 percent of United States gasoline is distributed by jobbers or through other companies that are not controlled by refiners [Temple, Barker, and Sloan, Inc. 1988, p. 19]. A typical jobber supplies stations of many different brands and generally owns many of the stations it supplies. A jobber might, for instance, supply five Shell stations, three Chevron stations, and five unbranded stations, some of which the jobber owns and operates. All gasoline sold at the Shell stations must be purchased at the local Shell terminal by the jobber, and similarly for the Chevron stations. The unbranded stations can be supplied with the product of either Chevron or Shell, or gasoline from an unbranded refinery. At the margin the branded refiner competes with unbranded refiners, which only sell gasoline at the terminal for resale at unbranded stations. Unbranded gasoline prices discipline branded gasoline prices, which seldom differ by more than one cent per gallon at the terminal.[2]

Some gasoline is not purchased by jobbers, but is transported from the terminal to the retailer by the refiner. Most of these direct-supplied stations are operated by an independent franchisee, but some are owned and operated by the refiner. About 17 percent of United States gasoline is sold through refiner-operated stations [Temple, Barker, and Sloan 1988, p. 19]. For company-

---

2. Branded terminal prices exceed unbranded terminal prices by an average of about 1/4¢ in our data set.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

operated stations no financial transaction occurs at the point of delivery, while franchisees purchase the delivered gasoline at a "dealer tankwagon" price.

At each point in the distribution process, many arm's-length transactions occur between companies. The prices of these exchanges indicate both the direct costs to the buyers and the shadow costs that vertically integrated firms face. Major refining companies, for instance, must frequently decide between refining additional crude oil or buying generic gasoline on the spot market, presumably equating the costs of these two sources on the margin. Thus, we use market transaction prices as indicators of the economic cost of the product at each stage of distribution.

The cost of crude oil can be represented by the daily spot market price of West Texas Intermediate (WTI) crude oil. More than 80 percent of oil traded worldwide is now traded at a spot price or under a contract with a price tied to the spot price [Razavi 1989]. WTI is the benchmark crude oil watched most closely in the United States. One criticism of using the spot price is that there is not an actual marketplace for spot crude oil transactions or real-time reporting of prices. Rather there are many independent trades that take place at different locations among well-informed traders. The price reported as the spot price is taken from a survey of traders each day, as reported by *Dow Jones International Petroleum Report* and published in the *Wall Street Journal*.[3] We have also constructed a price change series using nearest-contract futures prices for sweet crude oil, contracts that are traded on the New York Mercantile Exchange. This series has a correlation of 0.95 with the change in WTI spot prices. The results of our analysis are not altered by the use of futures prices instead of spot prices.

Generic gasoline prices are reflected in the spot gasoline prices for delivery to New York and the Gulf Coast.[4] As with crude oil, gasoline spot prices are determined by a daily survey of major traders, as reported by *Oil Buyers' Guide* and published in the *Wall Street Journal*. We use the New York spot price for our analysis, but the results change very little if we instead use the Gulf Coast spot prices or a series constructed from nearest-contract

3. Ravazi [1989] discusses potential reporting errors. Support for the reliability of these spot prices, however, is evident from the fact that many long-term contracts are indexed by this price.

4. The two prices have a correlation of 0.99 over our sample period. The daily price changes have a correlation of 0.74.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

*QUARTERLY JOURNAL OF ECONOMICS*

futures prices of gasoline traded on the New York Mercantile Exchange.

The branded city terminal prices are averages of 33 cities east of the Rocky Mountains from weekly surveys conducted by Lundberg Survey, Inc. on Friday of each week. Spot markets are not as well established in the West, and the spot and futures commodity prices that we have are for delivery in the East, so we omit cities in the western United States from our analysis.

As mentioned above, there is often one more transaction point for gasoline, when the product is delivered and sold to the retailer at a dealer tankwagon price. Unfortunately, the data available on these transactions are incomplete—they cover only direct-supplied stations and are probably unreliable. Refiners admit that they frequently discount off of the posted dealer tankwagon price.

Retail gasoline prices present a number of data problems. The retail price we use is the average of unleaded regular self-service gasoline prices in 33 United States cities east of the Rocky Mountains collected semimonthly by Lundberg Survey on either the first and third or second and fourth Friday of each month. As with all prices in this study, the Lundberg prices are exclusive of excise or sales taxes, are in current dollars, and are for Friday. The first complication with the retail price data is that all but one of the cities are surveyed only once each month, either always in the first survey or always in the second survey of the month. The first survey average price for each month is the average of seventeen cities, and the second is the average of seventeen cities, with one city (Atlanta) appearing in both surveys. In the econometric analysis that includes retail prices, we include separate dummy variables for the second through twenty-fourth survey of the year. In addition to controlling for seasonal effects, these correct for the set of cities in the first survey possibly having a different mean price than the set of cities in the second surveys.[5] The second complication is caused by the irregular sampling period. About 85 percent of the surveys occur two weeks after the prior survey, but 15 percent occur three weeks later. Though the results we present do not include correction for irregularly observed time series, earlier attempts to do so, reported in our 1992 work-

5. The estimated difference in average prices was never statistically significant. Tests for changes in this difference over time did not indicate that it changed significantly within our sample.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms



FIGURE II
Time Series of Gasoline and Crude Oil Prices

ing paper, indicate that this has little effect on our results. Further tests, reported in the Appendix, also lead to this conclusion.[6]

Figure II presents the semimonthly movements of prices for retail, terminal, and spot market unleaded gasoline, and spot WTI crude oil over our sample period from January 1986 to December 1992. This figure indicates that retail gasoline prices are less volatile than upstream gasoline prices or spot crude oil prices. The standard deviations of semimonthly changes in average retail, average terminal, spot market gasoline, and spot market crude oil prices are, respectively, 2.94¢, 3.77¢, 5.87¢, and 3.89¢. The smoother retail prices are indicative of the lags that we find in the adjustment of retail prices to changes in upstream prices and to the less-than-full adjustment that retail prices exhibit, e.g., a 1¢ increase in the spot price of gasoline or crude oil leads to a long-run increase in retail gasoline prices of less than

6. While weekly retail price data would be strongly preferred, the semimonthly Lundberg Survey data are the best available retail gasoline survey data. Other sources, in particular the *Oil and Gas Journal Database* employed in a number of studies, use wholesale prices to estimate approximate retail prices. Concerns about data reliability led to retail price data being dropped from the *Oil and Gas Journal Database* in 1992. Such data are clearly inappropriate for measuring the response of retail gasoline prices to changes in upstream prices.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

1¢.[7] The much greater standard deviation for spot gasoline than for the other prices may reflect the rapid response of this price to both supply and demand shocks. Crude oil spot prices are more insulated from demand shocks. We find later that terminal and retail prices respond to supply shocks with significant lags.

### III. ESTIMATING THE RESPONSE OF GASOLINE PRICES TO OIL PRICE CHANGES

#### A. A Simple Lag Adjustment Model

We begin the empirical analysis of gasoline pricing by testing the common belief that retail gasoline prices adjust more quickly to increases than to decreases in crude oil prices. To estimate the rate at which gasoline prices adjust to crude oil price changes, we start by assuming a simple linear long-run relationship between retail gasoline and crude oil prices, $R = \phi_0 + \phi_1 C + \varepsilon$, where $R$ is the retail gasoline price per gallon, $C$ is the price of crude oil per gallon, and $\varepsilon$ is a normal and i.i.d. error term. We specify a relationship that is linear rather than log in nominal prices because the latter would imply that the crude-retail margin increases with the price of crude oil, which does not appear to be supported by the data.[8] The results we present, however, are very similar to those that obtain when the analysis is carried out with log values.[9]

We recognize that the adjustment of retail prices to changes in crude prices is not instantaneous, but we assume that the adjustment function is time-invariant during our sample period and is independent of the absolute magnitude of the crude oil price

7. This comparison of the standard deviation of *average* terminal and retail prices with the standard deviation of upstream prices is appropriate because the standard deviation of average terminal and retail prices are negligibly affected by idiosyncratic (city-specific) variation in each city's terminal and retail prices. Thus, these standard deviations for downstream prices are attributable almost entirely to nationwide effects. For instance, if all upstream price changes were passed through instantly and completely, we would expect the standard deviation of the *average* retail price to be about equal to the standard deviation of spot gasoline, but smaller than the standard deviation for retail price in any one city, which would include idiosyncratic city effects.

8. For instance, when the price of crude oil declined to about $12 per barrel in 1986, retail margins stabilized at about the same level as when crude was above $20 per barrel.

9. The linear specification has the drawback that it implies a constant nominal margin. We include a linear time trend in the final regression, which is a reasonably good approximation of the price index change over our sample period. Of course, in other periods of higher or more variable inflation, or over longer time periods, the linear model would not be tenable. We also have carried out the analysis using deflated prices (using the consumer price index or the producer price index) and have found very similar results.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

change. Defining $\Delta C_t = C_t - C_{t-1}$ and $\Delta R_t = R_t - R_{t-1}$, the adjustment could be modeled as

(1)
$$\Delta R_t^t = \beta_0 \Delta C_t$$
$$\Delta R_{t+1}^t = \beta_1 \Delta C_t$$
$$\vdots \qquad \vdots$$
$$\Delta R_{t+n}^t = \beta_n \Delta C_t,$$

where the superscript on $\Delta R$ indicates that it is solely the change resulting from the period $t$ change in crude oil price and $n$ is the number of periods it takes for retail prices to complete adjustment to the period $t$ change in crude oil prices.

Under these assumptions the total change in retail gasoline price in any period $t$ will depend on the crude oil price changes in the previous $n$ periods:

(2)
$$\Delta R_t = \Delta R_t^t + \Delta R_t^{t-1} + \ldots + \Delta R_t^{t-n}$$
$$= \sum_{i=0}^{n} \beta_i \Delta C_{t-i}.$$

Equation (2), however, imposes symmetric responses to increases and decreases in crude oil prices. Recognizing that the adjustment process could be different for increases than for decreases, we instead assume that

(3a)
$$\Delta R_t^t = \beta_0^+ \Delta C_t$$
$$\Delta R_{t+1}^t = \beta_1^+ \Delta C_t$$
$$\vdots \qquad \vdots$$
$$\Delta R_{t+n}^t = \beta_n^+ \Delta C_t$$

if $\Delta C_t > 0$, and

(3b)
$$\Delta R_t^t = \beta_0^- \Delta C_t$$
$$\Delta R_{t+1}^t = \beta_1^- \Delta C_t$$
$$\vdots \qquad \vdots$$
$$\Delta R_{t+n}^t = \beta_n^- \Delta C_t,$$

if $\Delta C_t \le 0$.[10]
Defining

10. The choice of assigning the $\Delta C_t = 0$ cases to the estimates of $\beta^+$ or $\beta^-$ will have no effect on the parameter estimates, because no change due to the zero change in crude oil prices will be expected, by assumption.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

$$(4) \qquad \Delta C_t^+ = \max\{\Delta C_t, 0\} \quad \text{and} \quad \Delta C_t^- = \min\{\Delta C_t, 0\},$$

a simple empirical model for the adjustment of retail gasoline prices to crude oil price changes, allowing for the possibility of asymmetric adjustment rates, would then be

$$(5) \qquad \Delta R_t = \sum_{i=0}^{n} \left( \beta_i^+ \Delta C_{t-i}^+ + \beta_i^- \Delta C_{t-i}^- \right) + \varepsilon_t,$$

where $\varepsilon$ is assumed to be an i.i.d. error term.

A number of econometric issues must be addressed before proceeding with estimation. The issues that we discuss here arise in the estimation of all of the downstream price transmissions. They lead to specification of a model more general than (5).

## B. Restrictions Imposed on the Lag Response Structure

The additive lag structure we use places few constraints on the adjustment path, allowing it to be even nonmonotonic. It also allows an intertemporal independence: if the price of crude oil increases by 10¢ per gallon in week $t$ and decreases by the same amount in week $t + 1$, our model would not necessarily cause the direction of adjustment to reverse when the crude oil price does. The retail price could continue to rise in week $t + 1$.[11] This contrasts with a standard partial adjustment model, an approach that has been used by previous authors studying adjustments to oil price changes.

If the long-run equilibrium relationship is assumed to be $R = \phi_0 + \phi_1 C + \varepsilon$, then we could estimate a partial adjustment model such as

$$(6) \qquad R_t - R_{t-1} = \beta \left( \phi_0 + \phi_1 C_{t-1} - R_{t-1} \right) + \varepsilon_t.$$

Bacon [1991] tests for asymmetry in adjustment rates by including a quadratic term in the adjustment process,

$$(7) \quad R_t - R_{t-1} = \beta_1 \left( \phi_0 + \phi_1 C_{t-1} - R_{t-1} \right) + \beta_2 \left( \phi_0 + \phi_1 C_{t-1} - R_{t-1} \right)^2 + \varepsilon_t,$$

so that the test of $\beta_2 = 0$ is the test of whether adjustment to increases and decreases in crude oil prices occurs equally quickly. The partial adjustment model, however, imposes equal proportional adjustments toward the new equilibrium in all periods after a shock to crude oil prices, a serious constraint. Furthermore, Bacon's method for diagnosing asymmetry with a quadratic

---

11. This would occur in (5) if $\beta_1^+ > \beta_0^-$.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

term imposes a structure on the asymmetry, implying that the asymmetry becomes *proportionally* larger as the difference between the current retail price and the long-run equilibrium price increases.

## C. Incorporating the Long-Run Relationship between Gasoline and Crude Prices

The principal advantage of the partial adjustment model over the lag adjustment model presented in (5) is that the partial adjustment model takes account of the long-run relationship between the prices of the upstream and downstream goods, and the tendency to revert toward that relationship. To address this, we estimate (5) with an error-correction term. The error-correction term is the one-period lagged residual from the relationship $R_t = \phi_0 + \phi_1 C_t$. The regression is then

$$(8) \quad R_t - R_{t-1} = \sum_{i=0}^{n} \left( \beta_i^+ \Delta C_{t-i}^+ + \beta_i^- \Delta C_{t-i}^- \right) + \theta_1 \left( R_{t-1} - \phi_0 - \phi_1 C_{t-1} \right) + \varepsilon_t.$$

## D. Accounting for the Joint Production of Gasoline and Other Petroleum Products

Due to joint production, the price of gasoline will depend to some extent on the demand for other refined products. The effect could be positive or negative; while some substitutability among outputs is possible, leading for instance to a positive effect of heating oil demand on gasoline prices, the scope for substitution is limited. If companies refine more crude oil in order to produce more heating oil, the output will include more gasoline, thus depressing the price of gasoline. The latter effect is thought to be more significant in the refining industry.[12]

Despite the role that prices of other petroleum products may play in determining the price of gasoline, it is unlikely that omitting other refined product prices in estimating the adjustment of gasoline to crude oil price changes will lead to significant bias. The exogenous determinants of changes in other refined product prices are principally demand shifts, which are not likely to be

---

12. The complex interdependence of supply and demand for petroleum products is reflected in the following observation from the *Petroleum Economist* [August 1988, p. 280]: "Gasoline is becoming increasingly tight and straining upgrading capacity, chiefly as a result of the increased proportion of low-lead or unleaded requirements, but this simply creates surplus problems for the other products and accounts for caution on throughput levels even with superficially attractive refining margins."

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

correlated over a one-to-ten week period with changes in the price of crude oil.

Nonetheless, we checked the sensitivity of our results to exclusion of other refined product prices by including the current and lagged changes in heating oil prices—the other major refined product and the one for which demand is probably most volatile—in regressions of downstream gasoline prices on crude oil prices. For the same reasons that heating oil prices are likely to influence gasoline price, gasoline prices are likely to influence heating oil prices, so we instrumented for heating oil prices with a measure of heating degree days in the northeastern region. Regressions in both levels and differences indicated that heating oil margins (the price of heating oil minus the price of crude oil) have a significantly negative impact on gasoline prices at each level of the distribution chain. This is consistent with the industry wisdom that gasoline and heating oil are production complements on the relevant margin.

Inclusion of heating oil margins in the adjustment functions had virtually no impact on the estimated asymmetries in the adjustment of gasoline products to crude oil price changes. This is not surprising, since changes in heating oil margins were not significantly correlated with crude prices over our sample period. Of course, the joint production issue does not arise in estimating the response of terminal or retail prices to changes in upstream *gasoline* prices.

### E. Possible Endogeneity of Upstream Prices

There is reason for concern that crude oil prices could be correlated with the error term in an equation such as (8). Such a correlation could be present if unobserved determinants of the retail (downstream) price were also correlated with the crude (upstream) price. This would not arise from seasonal or cyclical variation in upstream and downstream prices since we control for seasonal effects directly and measures of economic or money supply growth are never statistically significant when included. Similarly, it seems unlikely that idiosyncratic location-specific shocks to retail demand would be correlated with the price of crude oil, which is determined over the long run in a world market. Nonetheless, local demand shocks could affect upstream prices in the short run if transportation lags caused a short-term severing of the connection between local crude (or other upstream) prices and the world price for the upstream product.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

To control for this possible endogeneity, we have identified three valid identifying instruments. Two are spot crude oil prices in England, which reflect world oil prices, but presumably are not affected by idiosyncratic demand shocks in the United States.[13] The third instrument is the six-month-ahead crude oil futures price.[14] Since any disconnection between local upstream prices and world prices should be transitory, the six-month-ahead futures price for crude oil (New York delivery) should not be affected by such shocks.[15]

Using these instruments, we carried out Hausman-Wu tests for exogeneity of the contemporaneous change in the upstream price in all of the transmissions that we estimated.[16] We found significant evidence of endogeneity in all but one of the transmissions, and the one remaining case indicated that exogeneity could be rejected at the 15 percent level. Thus, we proceed with estimation by two-stage least squares. The estimated price adjustments and asymmetries are very similar, however, when the endogeneity is ignored and estimation is carried out using ordinary least squares.

## F. The Estimated Model and Cumulative Adjustment Functions

We estimate by two-stage least squares the equation,

$$
\begin{aligned}
(9) \quad \Delta R_t = \sum_{i=0}^{n} \left( \beta_i^+ \Delta C_{t-i}^+ + \beta_i^- \Delta C_{t-i}^- \right) + \sum_{i=1}^{n} \left( \gamma_i^+ \Delta R_{t-i}^+ + \gamma_i^- \Delta R_{t-i}^- \right) \\
+ \theta_1 \left[ R_{t-1} - \left( \phi_0 + \phi_1 C_{t-1} + \phi_2 TIME_t + \sum_{j=2}^{P} \left( \eta_j SRVY_{j,t} \right) \right) \right] + \varepsilon_t,
\end{aligned}
$$

where $\Delta C_t^+$ and $\Delta C_t^-$ are treated as endogenous and the six instruments that identify the regression are the associated increase and decrease change variables created from Brent and Forties crude spot prices in England and the six-month ahead futures

---

13. These are Brent crude and Forties crude spot prices in Northwest Europe for main loading ports in England, as reported (in U. S. dollars) in the *Wall Street Journal*.

14. This is the price of the sixth-nearest light sweet crude oil futures contract on the New York Mercantile Exchange on the date of observation, as reported in the *Wall Street Journal*.

15. This is reflected in the fact that the week-to-week change in the six-month-ahead futures price has a standard deviation of only 1.92, compared with 3.03 for the week-to-week change in the spot price of crude oil.

16. To do this, we created "increase" and "decrease" variables for each of the identifying instruments, just as we did with the crude oil price. Thus, there were six excluded exogenous variables that identified the two contemporaneous crude oil change variables that were taken to be endogenous.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

price.[17] This model additionally includes signed lagged changes in retail prices, necessary to ensure that the error term is white noise, and a richer specification of the long-run model. *TIME* is a time trend included because the data are levels of nominal prices, as discussed above. The *SRVY* variables are dummy variables for the particular survey of the year, with $P$ equal to 24 for semi-monthly data and equal to 52 for weekly data. These pick up seasonal influences, and the difference in the cities surveyed for the first versus second surveys of the month when retail data are used.

Model (9) can be rearranged to be linear in the variables, though not in the parameters:

$$(10) \quad \Delta R_t = -\theta_1\phi_0 + \sum_{i=0}^{n}\left(\beta_i^+\Delta C_{t-i}^+ + \beta_i^-\Delta C_{t-i}^-\right) + \sum_{i=1}^{n}\left(\gamma_i^+\Delta R_{t-i}^+ + \gamma_i^-\Delta R_{t-i}^-\right)$$
$$-\sum_{j=2}^{P}\left(\theta_1\eta_j SRVY_{j,t}\right) + \theta_1 R_{t-1} - \theta_1\phi_1 C_{t-1} - \theta_1\phi_2 TIME_t + \varepsilon_t.$$

From estimation of this equation we can directly obtain estimates of the $\beta$'s, $\gamma$'s, and $\theta_1$ necessary for construction of the cumulative adjustment function. To incorporate in the cumulative adjustment function the reversion toward a long-run relationship, we also need an estimate of $\phi_1$. The coefficient on $C_{t-1}$ divided by the coefficient on $R_{t-1}$ is a consistent estimate of $\phi_1$. Augmented Dickey-Fuller tests, presented in the Appendix, indicate that the price series are individually I(1) and pairwise cointegrated.

The specific procedure for determining the lag length to be used in the estimation and tests for white noise residuals are detailed in the Appendix. The lag length should be long enough to capture complete adjustment and ensure white noise residuals. We include *TIME* and the *SRVY* variables to guard against the possibility that our results are due to omitted trends or seasonal effects.[18]

Our empirical analysis is focused on the resulting cumula-

---

17. Since the six instruments are more than necessary to identify the two endogenous variables, we also tested sequentially the exclusion restriction on each of the identifying instruments by including in the regression the increase/decrease pair of variables from a given instrument. In each case, neither the increase variable, the decrease variable, nor the pair jointly were significant at the 10 percent level.

18. The *TIME* variable is significant at the 5 percent level in three of the five reported regressions, those in which crude oil is the upstream price. The survey variables are jointly significant at the 5 percent level in the same three regressions. For consistency, we include *TIME* and the *SRVY* variables in all five regressions, but the cumulative adjustment functions change little if they are excluded.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

tive adjustment functions rather than on the parameter estimates. These measure the adjustment of retail gasoline (or other downstream) prices to a one-unit change in crude oil (or other upstream) prices. The cumulative adjustment function is a nonlinear function of the parameters, as the adjustment in the $n$th period after a change in the crude oil price will be the sum of the estimated response parameter from (10) ($\beta_n^+$ or $\beta_n^-$), the effects of the resulting changes in retail prices ($\gamma_n^+$ or $\gamma_n^-$), and the error correction effects over the $n$ weeks. To arrive at an estimate of the full adjustment path, we construct cumulative adjustment functions for both increases and decreases in the price of crude oil, by methods explained in the Appendix. Standard errors for points on the cumulative adjustment function are derived using the delta method.[19]

## G. Asymmetric Retail Price Responses to Crude Oil Price Changes

We estimate equation (10) by two-stage least squares using semimonthly retail and crude oil prices, both expressed in cents per gallon, from March 1986 through the end of 1992. The data used begin with March 1986 for all regressions so that the sample size can be standardized across regressions with different lag lengths. The procedure to determine lag length, presented in the Appendix, indicated that inclusion of two-period lagged changes in retail and crude prices was appropriate. The results of this estimation, excluding the 23 survey dummy variables, are shown in the first column of Table I.

The regression results indicate that the contemporaneous response of retail prices to crude oil price changes, the Upstream$_0^+$ and Upstream$_0^-$ coefficients, is much greater for increases in crude prices than for decreases. To fully analyze later responses, however, one must include the indirect effects that would show up from lagged changes in retail prices and the effect of the reversion toward a long-run relationship.

The estimated cumulative adjustment functions are shown in Figure III. One period of a half-month is represented as two weeks on the graph. The line with plus signs is the estimated retail price response (in cents per gallon) to a one-time one cent

19. We have also estimated the 95 percent confidence bounds using a bootstrap method, similar to that described by Freedman [1984], with very similar results.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

*QUARTERLY JOURNAL OF ECONOMICS*

TABLE I
ESTIMATES OF PRICE ADJUSTMENT EQUATIONS

| Downstream price: | Retail | Spot gas | Terminal Spot gas | Terminal Crude | Retail Terminal |
|---|---|---|---|---|---|
| Upstream price: | Crude | Crude | | | |
| Periodicity: | Semi-monthly | Weekly | Weekly | Weekly | Semi-monthly |
| Observations: | 164 | 351 | 351 | 351 | 164 |
| $\Delta \text{Upstream}_0^+$ | 0.549 | 0.888 | 0.593 | 0.558 | 0.623 |
| | (0.084) | (0.135) | (0.075) | (0.063) | (0.069) |
| $\Delta \text{Upstream}_{-1}^+$ | 0.246 | 0.691 | 0.041 | 0.178 | 0.357 |
| | (0.087) | (0.140) | (0.058) | (0.062) | (0.083) |
| $\Delta \text{Upstream}_{-2}^+$ | 0.022 | −0.161 | 0.058 | | −0.101 |
| | (0.088) | (0.136) | (0.048) | | (0.079) |
| $\Delta \text{Upstream}_{-3}^+$ | | | | | −0.024 |
| | | | | | (0.076) |
| $\Delta \text{Upstream}_0^-$ | −0.181 | 1.088 | 0.182 | 0.210 | 0.199 |
| | (0.136) | (0.143) | (0.081) | (0.071) | (0.120) |
| $\Delta \text{Upstream}_{-1}^-$ | 0.236 | −0.239 | 0.145 | 0.203 | 0.251 |
| | (0.098) | (0.127) | (0.048) | (0.052) | (0.080) |
| $\Delta \text{Upstream}_{-2}^-$ | 0.028 | −0.286 | −0.001 | | 0.065 |
| | (0.100) | (0.116) | (0.040) | | (0.080) |
| $\Delta \text{Upstream}_{-3}^-$ | | | | | −0.133 |
| | | | | | (0.070) |
| $\Delta \text{Downstream}_{-1}^+$ | −0.314 | −0.055 | 0.180 | 0.289 | −0.507 |
| | (0.123) | (0.096) | (0.090) | (0.077) | (0.109) |
| $\Delta \text{Downstream}_{-2}^+$ | 0.069 | −0.009 | −0.203 | | 0.174 |
| | (0.119) | (0.098) | (0.089) | | (0.107) |
| $\Delta \text{Downstream}_{-3}^+$ | | | | | 0.004 |
| | | | | | (0.095) |
| $\Delta \text{Downstream}_{-1}^-$ | 0.127 | −0.070 | 0.310 | 0.332 | −0.086 |
| | (0.131) | (0.094) | (0.092) | (0.077) | (0.112) |
| $\Delta \text{Downstream}_{-2}^-$ | 0.396 | 0.279 | 0.042 | | 0.271 |
| | (0.119) | (0.091) | (0.081) | | (0.087) |
| $\Delta \text{Downstream}_{-3}^-$ | | | | | 0.103 |
| | | | | | (0.077) |
| $\text{Upstream}_{-1}$ | 0.141 | 0.131 | 0.229 | 0.081 | 0.278 |
| | (0.040) | (0.037) | (0.034) | (0.020) | (0.054) |
| $\text{Downstream}_{-1}$ | −0.175 | −0.183 | −0.254 | −0.118 | −0.262 |
| | (0.045) | (0.037) | (0.039) | (0.024) | (0.054) |
| Time | 0.225 | 0.326 | 0.011 | 0.165 | −0.015 |
| | (0.109) | (0.113) | (0.044) | (0.056) | (0.069) |
| $R^2$ | 0.663 | 0.589 | 0.646 | 0.630 | 0.916 |

Two-stage least squares estimates with $\Delta \text{Upstream}_0^+$ and $\Delta \text{Upstream}_0^-$ are treated as endogenous. Identifying instruments are positive and negative change variables from England crude oil spot markets and six-month-ahead crude oil futures market.

Asymptotic standard errors are in parentheses.

Fixed seasonal effects (described in the text) are not presented.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms



FIGURE III
Crude-to-Retail Cumulative Adjustments

per gallon increase in crude oil prices. Thus, a one cent increase in crude oil prices leads to a 0.55¢ increase in the first two weeks and a further 0.12¢ increase in the next two weeks, for a 0.67¢ increase after four weeks, and so on. The line with triangles is the estimated retail price response to a decrease in crude prices. The increases seem to be passed along faster than the decreases.

These cumulative adjustment functions are estimated with an imperfect degree of confidence. In Figure III we also present estimates of the 95 percent confidence bounds for the cumulative adjustment functions. The lighter dotted lines are the bounds for responses to a unit increase and the lighter dashed lines are the bounds for response to a negative unit change. After ten weeks the functions are not significantly different from one another and are not significantly different from the estimated long-run adjust-ment factor of about 0.81. As one would expect, the estimates of these cumulative functions get noisier further away from the date of the crude oil price change. Still, the functions seem to be suffi-ciently different as to indicate an asymmetric adjustment speed.

One possible test of the symmetry of response is to compare the cumulative adjustment functions with one another at a given point after the crude oil price change. This is not particularly in-formative, however, about the underlying issue of how such an asymmetry affects consumer costs overall. Instead, we compare

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

the gain to consumers from a given decrease in crude oil prices over the lifetime of the price adjustment with the loss to consumers over the adjustment process from an equal size increase in oil prices.

For instance, a one cent per gallon increase in the price of oil is estimated to increase gasoline prices by 0.55¢ at two weeks after the crude oil price increase, while a one cent per gallon decrease in the price of crude is estimated to *increase* gasoline prices by 0.18¢ at the same point. Thus, two weeks after a crude oil price change by one cent, a consumer's costs would have increased by 0.73¢ (= 0.55 − (−0.18)) more per gallon when crude prices increase than her costs would have decreased when crude prices decrease. Similarly, at week 4 the difference would be 0.67¢ − 0.28¢ = 0.39¢ per gallon. Integrating the differences in cumulative adjustments over the life of the adjustment yields an estimate of the asymmetry in cost to the consumer:

$$(11) \qquad \Delta \text{ Consumer Cost} = A_n = \int_{j=0}^{n} \left( B_j^+ - B_j^- \right) dj,$$

where $B_j^+$ and $B_j^-$ are the estimated cumulative adjustments at time $j$ to a one cent increase and decrease, respectively, in crude oil price. Under simple linear interpolation between estimated adjustment points, $A_n$ is the difference in the areas under the two cumulative adjustment curves in Figure III from week 0 to week $n$.

Figure IV presents the estimated $A_n$ and their 95 percent confidence bounds. It indicates that the total cost asymmetry rises to week 6 and then remains roughly constant around 2.6¢ per one cent crude price change per gallon bought each week. The asymmetry is significantly different from zero at the 5 percent level until after week 10. Thus, if a consumer uses ten gallons of gasoline per week,[20] a 5¢ per gallon increase in crude oil prices (equivalent to a $2.10 per barrel crude oil price increase) costs the consumer $1.30 more over the life of the adjustment than a 5¢ per gallon decrease saves her.[21] The asymmetry implies that variability in crude oil prices, even if there is no systematic increase or decrease in price, is costly to consumers.[22]

---

20. This is about the United States average per vehicle during our sample period [Energy Information Administration 1991, p. 7].
21. $1.30 is the 2.6 asymmetry multiplied by the 5 cent crude price change multiplied by ten gallons consumed per week.
22. When estimated in logs, the asymmetry also is significantly different from zero at the 5 percent level until after week 8. Retail price appears to adjust fully to increases in crude after four weeks (about a 0.6 percent long-run change

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms



FIGURE IV
Crude-to-Retail Cumulative Adjustment Asymmetry

The fact that the asymmetric adjustment process indicates greater costs for consumers than would occur with symmetric adjustment does not imply either market power or supernormal profits among sellers at any point of the production process. Although two of the hypotheses discussed in the next section suggest that temporary market power could explain the asymmetry, other explanations consistent with competitive markets are also plausible.

Finally, it is worth commenting on the fact that the ten-week transmission of an $x$ cent change in the price of a gallon of crude oil is less than $x$ cents. This sort of "incomplete" adjustment over the ten weeks recurs in many of our subsequent estimates of price transmission through the points of distribution. In this case it could be attributed to the fact that there is substitution in inputs and outputs in the refining process. The scope for substitution is extremely small, however, in cases of upstream and downstream gasoline prices, e.g., the response of terminal prices to spot gasoline price.

---

in retail for a 1 percent change in crude oil price), but continues to adjust to decreases out to week 10. When the level regression is estimated by OLS rather than 2SLS, the asymmetry is significantly different from zero at the 5 percent level until after week 6. The total cost asymmetry rises to week 6 and then remains at about 1.6¢ per one cent crude price change per gallon bought each week.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

*QUARTERLY JOURNAL OF ECONOMICS*

At least two other explanations are possible. First, the transmission we observe could reflect only the short-run adjustment to the upstream cost change. If the short-run supply curve is upward sloping, we would expect only partial transmission of a price change over the period observed. For instance, an increase in oil prices might be partially passed along to terminal prices in the short run, but also lead to losses among some or all refiners. As refiners exit the market, price would rise farther in the long run, which we would not observe in a ten-week adjustment. Still, our estimate of the long-run relationship between the upstream and downstream prices, $\phi_1$ would then reflect full passthrough. While the estimate of $\phi_1$ is not significantly different from one in the crude-retail transmission, it is significantly below one in all of the transmissions that do not involve retail prices.

An alternative explanation, one consistent with $\phi_1 < 1$, is that the downstream industry under observation experiences industry diseconomies of scale, so that the industry supply curve downstream is upward sloping even in the long run. In that case the adjustment we observe in the first ten weeks could be all that actually occurs.

## IV. EXPLANATIONS FOR ASYMMETRIC RETAIL PRICE ADJUSTMENTS

We have identified three hypotheses that might explain departures from symmetric adjustments of retail gasoline prices to changes in crude oil prices. These hypotheses differ in the assumed degree of economic sophistication of the agents and in the incentives that the agents are assumed to face. They also differ in the competitive structure that is assumed at various points along the distribution chain. Most importantly, they differ in their implications for selling margins at different points in the distribution chain. These differences yield the predictions that could enable us to differentiate among them.

HYPOTHESIS 1. Prices are sticky downward because when input prices fall the old output price offers a natural focal point for oligopolistic sellers.

In response to a negative cost shock, a firm might choose to maintain a prior price until demand conditions force a change. This is a variant of the "trigger price" model of oligopolistic coordination [Green and Porter 1984]. In that model each firm restricts its output to a level below the competitive (Nash) output

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

if, and only if, the market price is above a threshold level. In the retail gasoline market each firm chooses its selling price with imperfect information about the prices charged by others. Firms may choose to maintain prices above competitive (Nash) levels if their sales remain above a threshold level. A drop in sales would indicate price cutting by rival firms and would justify a price reduction as an optimal competitive response. Tirole [1988] provides an analytical description of this "trigger sales" model.[23]

The model can explain asymmetric pricing behavior by retail gasoline outlets. A significant positive crude price shock would trigger retail price increases, otherwise, retail margins would become negative. Retail prices need not respond immediately to a negative crude price shock. However, over time, random shocks in demand would lead retailers to cut their prices in an equilibrium response to the threat of price cutting by rival firms.

While appealing, there are several deficiencies in this theory. A trigger sales model explains how retailers may sustain prices above competitive levels, but the model does not explain how retailers will coordinate on a particular price. There are multiple equilibria with prices above the competitive level. A price that firms charged before a shock lowers wholesale prices is a natural focal point for coordination, but that price is not a unique oligopoly equilibrium. An apparently troublesome aspect of the trigger sales model is that when coordination breaks down, retailers abruptly lower price to the competitive level. This is not inconsistent with a gradual reduction in *average* market prices, however, because the breakdown in coordination can begin locally and then spread to other retailers. With numerous clusters of interdependent firms, average prices can exhibit a gradual decline toward competitive levels following a negative cost shock.

An oligopolistic coordination equilibrium of the kind described here is consistent with a rapid response of prices to positive cost shocks and a slow response to negative shocks. The response to cost shocks would be asymmetric because retailers would refrain from cutting prices in response to a negative shock and would instead rely on prevailing prices as a focal point for oligopolistic coordination. Retailers would not exercise similar restraint after a positive cost shock. Given the typically thin margins in gasoline distribution, retailers would operate at a loss if

---

23. See Tirole [1988, p. 264]. See our working paper [1992] for an application of the Tirole model to the gasoline retailing market.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

they did not raise prices after a significant positive cost shock. Thus, a price increase after a significant positive cost shock is profit maximizing without regard to the pricing behavior of other retailers.

The theory is sufficiently general that it might describe the price change transmission mechanism from spot crude oil to spot gasoline, from spot gasoline to gasoline sold at the city terminals, or from terminal gasoline to final retail sale. Upon closer scrutiny, however, the theory is unlikely to describe the transmission of crude oil price changes to changes in the spot gasoline market. The spot gasoline market is supplied to some extent by nearly all of the United States refiners.[24] Concentration in the gasoline refining industry is quite low nationally, and sales in the spot market are for generic gasoline, so it seems unlikely that tacit collusion could persist among those who produce gasoline sold in the spot market.

The oligopolistic coordination theory could possibly explain asymmetric terminal price movements in response to spot gasoline or crude oil price changes, if such an asymmetry exists. In fact, this seems to be the implication of complaints that the major oil refining companies collude to slow passthrough of oil price decreases. There is, however, an important check on oligopolistic coordination in the sale of even branded product at the terminals. If a refiner's branded price at the terminal gets too high relative to the spot price from gasoline, the refiner will quickly see two effects: (1) it will lose most or all sales for use other than branded resale, i.e., marginal sales on which it competes with unbranded gasoline; and (2) branded resellers of the refiner's product, jobbers and retailers, will suffer reduced margins or reduced sales and will pressure the refiner to lower its price.[25]

The theory seems most likely to describe the reaction of retail prices to changes in the wholesale or terminal price. Sellers are spatially and otherwise differentiated. They face many competitors, only some of which can be monitored at low cost. If stations in an area are operating at competitive margins and then the wholesale price of gasoline declines, it seems plausible that each

---

24. Although transaction prices are not posted per se, they are constantly monitored, and they necessarily track the prices for gasoline futures, which are traded on the New York Mercantile Exchange, quite closely. See Ng and Pirrong [1992].
25. See Borenstein and Gilbert [1993] for a more thorough analysis of competition among refiners on a national and local level.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

station might maintain its retail price until it sees convincing evidence (in the form of lower sales) that competing stations have lowered price. The sellers are certainly not price takers, and the buyers are not completely informed about the price of each seller.[26]

HYPOTHESIS 2.  Production lags and finite inventories of gasoline imply that negative shocks to the future optimal gasoline consumption path can be accommodated more quickly than positive shocks.

If half of all world oil reserves suddenly disappeared, the long-run competitive price of gasoline would increase greatly, and consumption would decrease greatly. Oil companies could accommodate that change quickly by raising gasoline prices. Since refinery production schedules cannot be adjusted immediately—such responses generally take at least two to four weeks to implement—the result would be a short-run building up of finished gasoline inventories. In contrast, if world oil reserves doubled overnight, the short-run response in the gasoline market would be limited by available supplies of finished gasoline.

Essentially, this argument relies on an asymmetry between the short-run cost of decreasing inventories versus increasing inventories. While it is clear that inventories must be nonnegative so the cost of decreasing inventories must increase substantially at some point, the elasticity of the marginal cost of increasing inventories is less clear. If, for instance, storage adjustment marginal costs were decreasing at low levels of reserves and constant at all higher levels, as would be the case if refiners had substantial excess storage capacity, then the asymmetry in storage adjustment costs would exist. These asymmetric adjustment costs also could be a local or regional phenomenon since there can be significant transportation bottlenecks, and pipelines carry oil products in only one direction.

Reagan and Weitzman [1982] present such a model with asymmetric inventory adjustment costs due to the nonnegativity constraint on inventories. They find that in the short run prices should respond more to situations of excess demand than to excess supply, because the ability and incentive for competitive

---

26. See Shepard [1991], Borenstein [1991], and Borenstein and Shepard [1996a] for evidence of price discrimination and local market power among retail gasoline sellers.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

*QUARTERLY JOURNAL OF ECONOMICS*

firms to respond with inventory (quantity) adjustments is greater in the case of excess supply. Bresnahan and Spiller [1986] develop a related theoretical model that explains "backwardation," the premium of spot prices over futures prices. They note that arbitrage constrains the amount by which futures prices can exceed current spot prices (known as a "contango" condition, the opposite of backwardation), because all current consumption can be shifted into the future. By contrast, the only future consumption that can be shifted to the current period—the arbitrage that would limit backwardation—is the current inventories that would otherwise be held to the next period. Borenstein and Shepard [1996b] examine the role of production lags and inventory adjustment costs in explaining the lagged response of wholesale gasoline prices to crude oil price changes. Using futures market and terminal price data, they find evidence that these factors play an important role in the lagged response of wholesale gasoline prices.

This inventories theory could explain asymmetry in the adjustment of spot gasoline prices to spot crude oil prices or in the adjustment of terminal prices to the upstream spot prices. It is unlikely to be relevant to an asymmetry that could occur between terminal price and retail price changes, because service stations do not generally set price in order to ration scarce inventories. Service stations can almost always order and receive delivery of gasoline on less than 48 hours notice.[27]

HYPOTHESIS 3. Volatile crude oil prices create a signal-extraction problem for consumers that lowers the expected payoff from search and makes retail outlets less competitive.

When a consumer knows that crude oil prices or retail gasoline prices are currently volatile, he or she may be more likely to believe that an increase in one station's retail price reflects crude oil price changes, rather than a change in the station's relative price in the retail market. Thus, the expected gain from search in reaction to a retail price increase may be smaller when crude oil prices are known to be volatile than when they are fairly stable. Each retailer realizes that this implies a temporary de-

27. At least two major refiners we have spoken with say that they set no minimum quantity for delivery to their branded stations, although one does require that the stations to which it delivers have underground storage tanks of at least a minimum size, and it is customary for a station to order sufficient quantity to fill its tanks. The most active stations receive deliveries every day or two, while those selling less volume may get supplied only once every one to two weeks.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

cline in the elasticity of demand it faces and thus increases its margin. This temporarily increased market power of retailers may dampen the rate of passthrough of upstream price decreases and exacerbate the rate of passthrough of upstream price increases, possibly even resulting in temporary "overshooting" on increases. Since this is a theory of costly search, it applies to retail margins, but has little to say about refiner or wholesaler margins.

Bénabou and Gertner [1993] formalize a theory of costly endogenous search and conclude that common cost shocks among competing firms (or economywide inflation) can increase or decrease the equilibrium amount of consumer search, and thus increase or decrease competition among sellers. They find that search is more likely to decrease due to common cost shocks if the cost of search is high to begin with.

These three hypotheses do not exhaust the possible explanations for the asymmetric response of retail gasoline to crude oil prices. Still, variations on these theories have been suggested either directly in the context of gasoline pricing, as is the case for Hypotheses 1 and 2, or more broadly, but with obvious application to the gasoline market, e.g., Hypothesis 3. Recognizing that we will not in this study be able to identify the single model that describes the actual transmission process from crude oil to retail gasoline prices, we seek instead to narrow the field by ruling out common explanations that are not supported by a more detailed analysis of the data.

## V. Identifying the Asymmetric Transmission of Price Adjustments

To shed light on the asymmetry hypotheses, we consider in turn the following transmissions: crude oil to spot gasoline, spot gasoline to city terminal (wholesale) gasoline, crude oil to city terminal gasoline, and city terminal to retail gasoline. Two-stage least squares estimates of (10) (with the appropriate upstream and downstream variables) using data from March 1986 to the end of 1992 are presented in columns 2 to 5 of Table I. The first three of these transmissions are estimated using weekly data, and the last using semimonthly data.

The first price transmission we investigate for asymmetry is from changes in crude oil prices to changes in the commodity price for generic gasoline. The spot and futures gasoline markets

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

are used by independent refiners and marketers of gasoline to obtain and sell gasoline, as well as by firms interested in hedging risk or speculating on future shocks to gasoline demand or supply. They are also used by the major refiners to balance excess supply or demand for their branded product. With the proper additives and the appropriate insignia on the side of the delivery truck, generic gasoline bought in the spot market can be marketed by a major refiner as its own namebrand gasoline.

The large number of participants in the gasoline spot and futures markets, and the generic nature of the product, make these markets quite competitive. Since the refined gasoline product is traded in these markets, price will reflect not only the cost of inputs in making gasoline, particularly the cost of crude oil, but also the short-run constraints on delivery due to production or transportation bottlenecks, refinery outages, and the availability of gasoline inventories. If asymmetric production and inventory adjustment costs, as explained in Hypothesis 2, are responsible for the asymmetry of retail price adjustment to crude oil price changes, one might expect this to be evident in the relationship between the spot gasoline price and spot crude oil prices. Hypotheses 1 and 3 would not be supported by an asymmetry in spot gasoline price adjustment, because of the low search costs and competitiveness in the spot gasoline market.

The estimates, represented in Figure V, exhibit an asymmetry in the adjustment of gasoline spot prices to changes in crude oil spot prices. The asymmetry rises to almost 2.0¢ (per 1¢ change in crude oil spot price). Due to the noisy estimates, however, the asymmetry is never significantly different from zero at the 5 percent level, although it is nearly so at week 4.[28]

The adjustment of generic gasoline prices to changes in crude oil prices appears to occur very quickly, and the cumulative adjustment is fairly symmetric at the end of week 1. At two weeks, however, there is a noticeable asymmetry. One might wonder, however, whether this might be an artifact of the spot price data collection.[29] To check this, we compared the results with those using the nearest-contract futures price series and found very similar results.

28. We also have estimated this adjustment function using daily data and have found very similar results.
29. Ng and Pirrong [1992] find that new information in refined petroleum product markets generally affects prices in the futures market before it appears in the spot market. The lag they find, however, is only about two days.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

*DO GASOLINE PRICES RESPOND ASYMMETRICALLY?*    331



FIGURE V
Crude-to-Spot Gasoline Cumulative Adjustments

These results appear to violate weak form efficiency in the spot (or futures) unleaded gasoline markets. It appears that the change in today's crude oil price can be used to predict next week's change in the unleaded gasoline commodity price. Although this interpretation is correct, it may not be possible to trade profitably on this information. The reason again relates to the level of inventories and the marginal cost of changing inventory levels. If gasoline inventories are low, then a decrease in crude oil prices might not be immediately transmitted downstream because the very short-run scarcity value of the gasoline exceeds its eventual replacement cost. Arbitraging may not be possible because the higher short-run price reflects the temporary scarcity.[30]

The asymmetry in the gasoline commodity price adjustment to crude oil price changes is probably part of the cause for the asymmetric adjustment of retail prices to crude oil price changes. It is consistent with the theory that production and inventory adjustment costs explain part of the asymmetric retail price adjust-

30. Bresnahan and Suslow [1985] demonstrate the presence of similar predictable price changes in the copper market. More recently, Deaton and Laroque [1992] have found similar results in studying price series for thirteen commodities.

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms



FIGURE VI
Spot Gasoline-to-Terminal Cumulative Adjustments

ment. There are other possible interpretations, but in any case, this component of the explanation probably cannot be attributed to Hypotheses 1 or 3.

Figure VI indicates that the transmission of gasoline prices from the spot gasoline market to the city terminals displays some evidence of asymmetry in the first few weeks, but then the speed of negative adjustment becomes greater causing the asymmetry to decline and possibly reverse. After three weeks, however, the asymmetry is not statistically significant. Even at its peak (week 3), however, this cumulative asymmetry is only about 0.5, a small part of the overall asymmetry. This result conflicts with Hypothesis 1 to the extent that it might explain an asymmetry in the price-adjusting behavior of the major branded refiners. If crude oil price decreases facilitated coordination among the major refiners of gasoline that induce the retail price asymmetry described in Section III, then transmission of changes from the generic spot gasoline market—for which production is very competitive—to branded terminal prices would be expected to exhibit that asymmetry.

The net result in the transmission of crude oil prices to branded city terminal gasoline prices is shown in Figure VII. This figure indicates an asymmetry out to city terminals that is statis-

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms



FIGURE VII
Crude-to-Terminal Cumulative Adjustments

tically significant for at least ten weeks and is of the same sign
as we found in the crude-to-retail asymmetry, but not quite so
large. It climbs gradually to about 2.0¢ by week 10, although it
is barely significant at the 5 percent level by then.

The transmission process from terminal to retail prices ap-
pears to be a smaller, but also significant, source of the asymme-
try in retail price response to spot crude oil price changes. Figure
VIII indicates that terminal price increases are transmitted to
retail prices significantly more quickly than terminal price de-
creases over the first four weeks. The cost asymmetry is esti-
mated to be about 1¢ at four or six weeks for every 1 cent change
in the terminal price, but it is not statistically significant after
four weeks. The estimated asymmetry then declines somewhat,
and the estimates become much noisier. The pattern of the
terminal-retail asymmetry is similar to the crude-retail asymme-
try, and it is about two-fifths as large at its peak.

The estimated terminal-retail asymmetry is consistent with
Hypothesis 1, as it relates to the retail gasoline market, and Hy-
pothesis 3, that the consumers' signal-extraction problem re-
sulting from noisy common input prices temporarily lowers the
elasticity of demand faced by retail outlets. This may result in
retailers increasing prices more quickly and decreasing prices

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms



FIGURE VIII
Terminal-to-Retail Cumulative Adjustments

more slowly in response to input price changes than would occur
if consumers were perfectly informed.

## VI. CONCLUSION

The evidence we have gathered supports the common belief
that retail gasoline prices respond more quickly to increases in
crude oil prices than to decreases. Establishing the points in the
distribution chain at which the asymmetries occur could be a
powerful tool in distinguishing between possible explanations for
the phenomenon. The adjustment of spot gasoline markets to
changes in crude oil prices appears to be responsible for some of
the asymmetry. This asymmetry also is reflected in the adjust-
ment of terminal prices to crude oil price changes. In the response
of branded terminal prices to changes in spot gasoline prices—
the transmission over which branded refiners are likely to have
the most control—there is very little asymmetry, and it dissi-
pates quickly. The asymmetry in adjustment of retail gasoline to
terminal price changes contributes significantly, but explains less
than half of the overall adjustment asymmetry.

The response of spot and terminal gasoline prices is possibly
due to asymmetries in the cost of inventory adjustment. Terminal

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

gasoline prices should fully incorporate information about inventories, however, so the explanation for the asymmetry in retail adjustment to changes in wholesale gasoline prices must be found elsewhere. This result is consistent with the theoretical work of Bénabou and Gertner [1993], which demonstrates that consumers may search less when the common input prices of all retailers become more variable, causing short-run decreases in the elasticity of demand that each retailer faces. It is also consistent with a model of sticky downward price adjustment in an oligopoly with imperfect monitoring.

APPENDIX

We consider four price series: spot crude oil (crude), spot gasoline (spot gas), branded city terminal gasoline (terminal), and retail gasoline (retail). The first three price series are weekly, and the fourth is semimonthly. All are measured in cents per gallon exclusive of taxes and are observed on a Friday. Five transmission mechanisms are analyzed: crude-retail, crude-spot gasoline, spot gasoline-terminal, crude-terminal, and terminal-retail. The two mechanisms involving retail are analyzed with semimonthly data, while the other three use weekly data. The analysis estimates models from 3/7/86 to 11/20/92 (weekly data) or 12/18/92 (semimonthly data). Analysis of the weekly data only goes to 11/20/92, because no data were available for 11/27/92. We estimate equation (10) for each of these relationships.

*Unit Root Tests.* The price series data $y_t$ are expected to trend upward with overall inflation in the sample period. The price index is about linear in time during our sample, so the natural null hypothesis is a unit root process with positive drift, a stochastic trend, while the alternative is a deterministic time trend. The augmented Dickey-Fuller (ADF) test [1979], which corrects for possible autocorrelation of order $p$ in $y_t$, is based on the usual ordinary least squares (OLS) $t$-ratio for the coefficient of $y_{t-1}$ in the regression of $\Delta y_t$ on a constant, time trend, $y_{t-1}$, $\Delta y_{t-1}$, ..., $\Delta y_{t-p+1}$. The lag length $p$ is eight periods for weekly data and four periods for semimonthly data. The 5 percent critical value is given in, for example, Hamilton [1984], Table B.6, Case 4. For crude, spot gas, and terminal the $t$-statistics are, respectively, $-4.29$, $-2.96$, and $-2.39$, compared with a 5 percent critical value of $-3.66$, while for the semimonthly retail data the $t$-

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

statistic is $-3.53$, compared with a 5 percent critical value of $-3.68$. At significance level 5 percent the null hypothesis—that the coefficient on $y_{t-1}$ is zero—is not rejected for spot gasoline, terminal, and retail, and is rejected for crude. While the evidence for a unit root is mixed, in all cases the coefficient of $y_{t-1}$ lies between $-0.10$ and zero, close enough to zero that we assume a unit root and treat all prices as first difference trend stationary.

*Cointegration Tests.* Cointegration was tested by an ADF test using the $t$-ratio on the coefficient of $u_{t-1}$ in an OLS regression of $\Delta u_t$ on a constant, $u_{t-1}, \Delta u_{t-1}, \ldots, \Delta u_{t-m}$, where the lag length is that used in the stationarity tests and $u_t$ is the residual from OLS regression of the downstream price on the upstream price, a constant, and a time trend. Critical values of MacKinnon [1991] were obtained using the CDF procedure in PC-TSP. If the null hypothesis of a unit root is rejected, we conclude that the series are cointegrated. For crude-spot gasoline, spot gasoline-terminal, and crude-terminal, the test statistics were, respectively, $-3.51$, $-5.99$, and $-3.33$, compared with a 5 percent critical value of $-3.81$. Using semimonthly data for crude-retail and terminal-retail, the test statistics were $-4.53$ and $-6.40$ compared with a 5 percent critical value of $-3.84$. The null hypothesis of no cointegration is easily rejected at 5 percent for three of the five transmissions (including crude-retail), is rejected at 10 percent for crude-spot gas, and is rejected at 15 percent for crude-terminal. We treat all the transmissions as cointegrated.

*Lag Length Tests.* A conservative test procedure for lag length was adopted to ensure that the chosen lag length was sufficiently long to capture the adjustment process. We restricted $m_c = m_r = m$, and progressively added lags, choosing $m = m^*$ such that we could not reject by conventional $F$-tests at 10 percent against the model with $m = m^* + 1$. Relaxing the restriction $m_c = m_r$ makes very little difference to the results. Our reported results use lag lengths of one period for crude-terminal, three periods for terminal-retail, and two periods for all others.

*Autocorrelated Error Tests.* The analysis assumes that the errors are white noise. We tested for this by the Breusch-Godfrey LM test for autocorrelated errors in models with lagged dependent variables. The test was applied to the residuals from model (10). The null hypothesis of no serial correlation against serial correlation up to third order could not be rejected at the 10 per-

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

cent level of significance in any of the regressions. For the time series of residuals from all models, the first four autocorrelation coefficients for the residuals were less than 0.08 in absolute value.

*Cumulative Adjustment Function.* In a fully symmetric version of (10), the $k$-period cumulative response $B$ to a one-time 1 cent change in the price of crude oil is given by

$$(A1) \quad B_0 = \beta_0$$
$$B_1 = B_0 + \beta_1 + \theta_1(B_0 - \phi_1) + \gamma_1 B_0$$
$$B_2 = B_1 + \beta_2 + \theta_1(B_1 - \phi_1) + \left[\gamma_1(B_1 - B_0) + \gamma_2 B_0\right]$$
$$\vdots \qquad \vdots$$
$$B_k = B_{k-1} + \beta_k + \theta_1(B_{k-1} - \phi_1) + \sum_{i=1}^{k}(B_{k-1} - B_{k-i-1}).$$

The cumulative adjustment after $t$ periods is the sum of (1) the adjustment through period $t - 1$, (2) the impact this period of contemporaneous changes in the upstream price, (3) the effect of being away from the long-run response (the error correction term), and (4) the effects of lagged changes in retail.

For an initial crude price increase in the asymmetric model (10), all of the $\beta_i$ on the right-hand side of (A1) are replaced by $\beta_i^+$, and the $\gamma_i$ are replaced by $\gamma_i^+$ or $\gamma_i^-$ depending on the sign of the term they multiply. The result is

$$(A2) \quad B_0^+ = \beta_0^+$$
$$B_1^+ = B_0^+ + \beta_1^+ + \theta_1(B_0 - \phi_1) + \gamma_1^+ MAX(0, B_0) + \gamma_1^- MIN(0, B_0)$$
$$B_2^+ = B_1^+ + \beta_2^+ + \theta_1(B_1 - \phi_1) + \gamma_1^+ MAX(0, B_1 - B_0)$$
$$\qquad + \gamma_1^- MIN(0, B_1 - B_0) + \gamma_2^+ MAX(0, B_0) + \gamma_2^- MAX(0, B_0)$$
$$\vdots \qquad \vdots$$
$$B_k^+ = B_{k-1}^+ + \beta_k^+ + \theta_1(B_{k-1} - \phi_1)$$
$$\qquad + \sum_{i=1}^{k}\left(\gamma_i^+ MAX\left(0, (B_{k-i} - B_{k-i-1})\right)\right)$$
$$\qquad + \gamma_i^- + MIN\left(0, (B_{k-1} - B_{k-i-1})\right).$$

Similar adjustments are made for an initial decrease. The figures provided in the text are offset from this by one unit, as it

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

is more natural to think of the response beginning in period 1 rather than in period 0.

*Inccnsistent Periodicity of the Retail Price Data.* We do not attempt to adjust the terminal-retail or crude-retail adjustment regressions for the inconsistent periodicity of the observations. Instead we treat the data as biweekly, even though one-sixth of the observations lag the previous observation by three weeks instead of two. Our 1992 working paper implemented a correction for the longer and inconsistent periodicity of the retail data and found it had little effect on the parameter estimates and no effect on the conclusions.

To further explore the possible effect of the retail data, we reestimated the adjustments for which we have weekly data— spot gasoline-crude, terminal-crude, and terminal-spot gasoline—using only the observations for dates on which we also have retail price. The cumulative adjustment functions from these estimates were very similar to those from estimates using weekly data. In all three cases the estimated asymmetry from the inconsistent periodicity data had the same sign and basic shape as we found using the weekly data series. In all three cases the asymmetry point estimates using the semimonthly data fell completely within the 95 percent confidence bounds of the estimates using weekly data.

UNIVERSITY OF CALIFORNIA AT BERKELEY AND THE NATIONAL BUREAU OF ECONOMIC RESEARCH
UNIVERSITY OF CALIFORNIA AT DAVIS
UNIVERSITY OF CALIFORNIA AT BERKELEY

REFERENCES

Bacon, Robert W., "Rockets and Feathers: The Asymmetric Speed of Adjustment of U. K. Retail Gasoline Prices to Cost Changes," *Energy Economics,* XIII (1991), 211–18.
Bénabou, Roland, and Robert Gertner, "Search with Learning from Prices—Does Increased Inflationary Uncertainty Lead to Higher Markups?" *Review of Economic Studies,* LX (1993), 69–93.
Borenstein, Severin, "Selling Costs and Switching Costs: Explaining Retail Gasoline Margins," *RAND Journal of Economics,* XXII (1991), 354–69.
Borenstein, Severin, A. Colin Cameron, and Richard Gilbert, "Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes?" NBER Working Paper No. 4138, 1992.
Borenstein, Severin, and Richard Gilbert, "Uncle Sam at the Gas Pump: Causes and Consequences of Regulating Gasoline Distribution," *Regulation,* XVI (1993), 63–75.
Borenstein, Severin, and Andrea Shepard, "Dynamic Pricing in Retail Gasoline Markets," *RAND Journal of Economics,* XXVII (1996a), 429–51.
Borenstein, Severin, and Andrea Shepard, "Sticky Prices, Inventories, and Mar-

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

ket Power in Wholesale Gasoline Markets," NBER Working Paper No. 5468, 1996b.

Bresnahan, Timothy F., and Pablo T. Spiller, "Futures Market Backwardation under Risk Neutrality," *Economic Inquiry,* XXIV (1986), 429–41.

Bresnahan, Timothy F., and Valerie Y. Suslow, "The Volatility of Copper Prices," *International Economic Review,* XXVI (1985), 409–24.

Deaton, Angus, and Guy Laroque, "On the Behaviour of Commodity Prices," *Review of Economic Studies,* LIX (1992), 1–23.

Dickey, D. A., and W. A. Fuller, "Distribution of the Estimators for Autoregressive Time Series with a Unit Root," *Journal of the Americal Statistical Association,* LXXIV (1979), 427–31.

Dougher, Rayola, "Market Share and Individual Company Data for U. S. Energy Markets: 1950–1991," American Petroleum Institute Discussion Paper No. 014R, 1992.

Energy Information Administration, *The Motor Gasoline Industry: Past, Present, and Future* (Washington, DC: United States Government Printing Office, 1991).

Freedman, David A., "On Bootstrapping Two-Stage Least Squares Estimates in Stationary Linear Models," *Annals of Statistics,* III (1984), 827–42.

Green, E., and R. Porter, "Non-cooperative Collusion under Imperfect Price Information," *Econometrica,* LII (1984), 87–100.

Hamilton, James D., *Time Series Analysis* (Princeton, NJ: Princeton University Press, 1984).

MacKinnon, James, "Critical Values for Cointegration Tests," in R. F. Engle and C. W. J. Granger, eds., *Long-Run Economic Relationships: Readings in Cointegration* (Oxford: Oxford University Press, 1991), pp. 267–76.

Ng, Victor K., and Stephen Craig Pirrong, "Disequilibrium Adjustment, Volatility, and Price Discovery: Spot-Futures Price Relations in Refined Petroleum Products," University of Michigan Working Paper, 1992.

Razavi, Hossein, "The New Era of Petroleum Trading: Spot Oil, Spot-Related Contracts, and Futures Markets," World Bank Technical Paper No. 96, 1989.

Reagan, Patricia B., and Martin L. Weitzman, "Asymmetries in Price and Quantity Adjustments by the Competitive Firm," *Journal of Economic Theory,* XXVII (1982), 410–20.

Shepard, Andrea, "Price Discrimination and Retail Configuration," *Journal of Political Economy,* XCIX (1991), 30–53.

——, "Contractual Form, Retail Price and Asset Characteristics," *RAND Journal of Economics,* XXIV (1993), 58–77.

Temple, Barker, and Sloan, Inc. "Gasoline Marketing Practices in the 1980s: Structure, Practices, and Public Policy," prepared for the American Petroleum Institute, Washington, DC, 1988.

Tirole, Jean, *The Theory of Industrial Organization* (Cambridge, MA: MIT Press, 1988).

This content downloaded from
132.174.249.27 on Wed, 22 Oct 2025 16:37:41 UTC
All use subject to https://about.jstor.org/terms

Exhibit B-3

# *Research paper; Testing profit maximization in the U.S. cement industry; (2025) 231 EJNEBO*

March 2025

**Section:** Vol. 231 ISSN: 0167-2681

**Length:** 5467 words

**History:** Received: January 11, 2024; Revised: August 5, 2024; Accepted: October 6, 2024

**Author:**

Christopher P. Chambers [a] *Christopher.Chambers@georgetown.edu*

John Rehbeck [b] *rehbeck.7@osu.edu*

[a]Department of Economics, Georgetown University, United States of America

[b]Department of Economics, The Ohio State University, United States of America

# Body

## ABSTRACT

Motivated by a commonly held intuition that the cement industry is not competitive, we perform a revealed preference test to examine whether the United States cement industry could have been profit maximizing from 1993-1998. Rather than looking at technical efficiency, we create and examine a measure of necessary competitive price taking profit loss of the cement industry using information on aggregate output and aggregate inputs. One contribution of this paper is to compile a comprehensive dataset of United States cement producers, cement production, cement inputs data, and input/output prices. In particular, we combine data found in the U.S. Mines Geological Yearbooks, the Portland Cement Association, the American Energy Review, and the St. Louis Federal Reserve. Assuming technology is static, non-negative profits for firms, and a priori knowledge of inputs/outputs, we find the U.S. cement industry had a necessary competitive price taking profit loss of 755.1 million 1996 dollars.

## FULL TEXT

### 1. Introduction

The purpose of this paper is to formally confirm the commonly held intuition that the cement industry is not competitive. We develop a novel revealed preference methodology to do so. For example, [Ryan, 2012] and [Miller et al., 2017] claim that the cement industry is concentrated.

---

[Ryan, 2012] S.P. Ryan; The costs of environmental regulation in a concentrated industry; Econometrica; Vol. 80, 3; (2012), pp. 1019-1061.Ryan, S. P. (2012). The costs of environmental regulation in a concentrated industry. Econometrica, 80(3):1019-1061.

[Miller et al., 2017] N.H. Miller, M. Osborne, G. Sheu; Pass-through in a concentrated industry: empirical evidence and regulatory implications; Rand J. Econ.; Vol. 48, 1; (2017), pp. 69-93.Miller, N. H., Osborne, M., and Sheu, G. (2017). Pass-through in a concentrated industry: empirical evidence and regulatory implications. The RAND Journal of Economics, 48(1):69-93.

Research paper,Testing profit maximization in the U.S. cement industry

While revealed preference tests of profit maximization have existed since ([Afriat, 1972]), there have been few applications in practice. The reason for this is that acquiring information on firm level inputs/outputs and prices is often difficult.[1] In contrast, aggregate inputs and input prices for an industry within a year are often easier to access from government agencies.[2] Using aggregate data, these applications often check whether the weak axiom of profit maximization is satisfied and compute measures of technological efficiency. However, these applications often do not account for which firms are present in the industry. Moreover, when firm level data are not observed, estimates of technological efficiency are difficult to interpret since individual firms may have different production technologies. This paper applies recent nonparametric methods of [Chambers and Rehbeck, 2021] to examine whether the U.S. cement industry could be profit maximizing from 1993-1998 using data from Ryan (2012) as well as newly gathered data on prices and quantities of physical inputs to cement such as limestone, marl, labor hours, and energy.

As mentioned previously, measures of technological efficiency are difficult to interpret when firm production is unobserved. Thus, we develop a notion of *necessary competitive price taking profit loss* to quantify the size of violations of profit maximization within the market. This measure can roughly be described as the amount of profit that was necessarily lost by firms without making any assumptions on individual firm technologies. We consider two measures: One for the market as a whole and one for firms. The measure for the market as a whole computes the minimum additional profit that could have been earned by using alternative revealed feasible production processes. The measure for firms gives the smallest weighted profit each firm could have earned by using alternative revealed production processes. In both cases, the necessary competitive price taking profit loss is essentially the money that firms leave on the table by choosing production plans that do not profit maximize. These measures may also be easier to describe to those outside of the industry being tested since the measures are in dollars rather than percentage of lost production.

We examine profit maximization of the United States cement industry using aggregate data on the United States cement producers, cement production, cement inputs data, and input/output prices. We gather data from the U.S. Mines Geological Yearbooks, the Portland Cement Association, the American Energy Review, and the St. Louis Federal Reserve from 1993-1998 for our main test. In particular, this dataset enriches aggregate data relative to work of Ryan (2012) which uses a dynamic parametric model to analyze the effect of environmental policies on the cement industry. Details on data collection methods are collected in Appendix B.

Assuming static production technologies, non-negative profits, and known inputs/outputs, we find that the U.S. cement industry is not profit maximizing. For this case, we find from 1993-1998 that the market necessary competitive price taking profit loss is $755.1 million.[3] Surprisingly, we find that if we allow firm production sets to weakly increase over time and do not require non-negative profits, then the data *can* be rationalized by profit maximization. However, for the years 1993-1998 we observe little technological change of cement kilns and we expect firms would shut down if they did not make positive profit so these assumptions do not match the data. We discuss this further in Section 4.2.

---

[Afriat, 1972] S.N. Afriat; Efficiency estimation of production functions; Internat. Econom. Rev.; Vol. 13, 3; (1972), pp. 568-598.Afriat, S. N. (1972). Efficiency estimation of production functions. International Economic Review, 13(3):568-598.

[1] There are some exceptions. For example, [Chavas and Aliber, 1993] is able to collect detailed input/output data of farmers in Wisconsin.

[2] For example, [Hailu and Veeman, 2001] is able to collect detailed information of aggregate inputs/outputs and prices for the Canadian paper and pulp industry.

[Chambers and Rehbeck, 2021] C. Chambers, J. Rehbeck; Nonparametric market supply with variable participants; (2021).Chambers, C. and Rehbeck, J. (2021). Nonparametric market supply with variable participants.

[3] Within the paper, we use 1996 dollars for comparison to the work of Ryan (2012).

Research paper,Testing profit maximization in the U.S. cement industry

The classical work on this notion is due to Afriat (1972) and [Hanoch and Rothschild, 1972], with an exposition by [Varian, 1984]. Other works include [Diewert and Parkan, 1983] and The primitive in these works consists of a collection of production decisions *for a single firm*, together with prices: these are the observations. Afriat (1972) characterizes profit-maximizing firm behavior via an axiom called the *weak axiom of profit maximization*, which states that for any given observed price/production pair, the firm would garner weakly less profits by switching production to any other observed production level. Our contribution is to study aggregated market-level production data, where the novelty is that we know which firms are present in a given observation. Were these firms to stay the same across observations, the fact that profit-maximization behavior aggregates across firms would mean the weak axiom of profit maximization would again be necessary and sufficient as a test of profit maximization. The change in firms from observation to observation provides a novel source of variation for our problem.

The remainder of the paper proceeds as follows. Section 2 defines the model of market profit maximization and describes the test. Section 3 defines a measure of necessary competitive price taking profit loss that measures in dollars how large errors of profit maximization would be for *any* production set. Section 4 outlines the illustrative empirical analysis on the cement industry and provides the results. Section 5 contains our final remarks. All proofs are in Appendix A.

## 2. Model

We consider a model of profit maximization with market level data. There is a finite set of commodities, denoted by . There is also a finite set of *potential firms*, indexed by . A *market supply observation* is a triple consisting of , where and comprises the participants in the market, lists the *market prices*, and gives the *net outputs* in the market. We will sometimes refer to as the *market supply.* A *market supply dataset* is a finite collection of market supply observations, . Often, we occasionally interpret the indices of temporally, so that means that observation was taken prior to observation .

In this paper, we examine whether a market supply dataset could have been generated by price taking profit maximizing firms. For a market supply dataset and a firm , we define the set of observations in which firm is a participant as . This object is important since a firm will only have a chance to violate profit maximization when it participates in the market.

We say a market supply data set is *profit rationalizable* if for every , there is a production set such that firm is profit maximizing for each , so there is where and the sum of net outputs across all firms equals the market supply so for all

The production set is fully nonparametric and encodes what the firm can produce with a given set of net outputs. We can think of this as being generated by various production processes at the firm.[4] The condition for the benchmark model of profit rationalizability requires that there is no way to shift industry production within firms across observations in a way that increases profits. In particular, the statement of the result gives a condition on transition matrices over the periods each firm participates. A *transition matrix* is a nonnegative matrix whose rows sum to ; for example, is a transition matrix if for all , . The result on transition matrices follows by renormalizing Lagrange multipliers from a linear programming duality as shown in Chambers and Rehbeck (2021). Below is the

---

[Hanoch and Rothschild, 1972] G. Hanoch, M. Rothschild; Testing the assumptions of production theory: a nonparametric approach; J. Polit. Econ.; Vol. 80, 2; (1972), pp. 256-275.Hanoch, G. and Rothschild, M. (1972). Testing the assumptions of production theory: a nonparametric approach. Journal of Political Economy, 80(2):256-275.

[Varian, 1984] H.R. Varian; The nonparametric approach to production analysis; Econometrica; Vol. 52, 3; (1984), pp. 579-597.Varian, H. R. (1984). The nonparametric approach to production analysis. Econometrica, 52(3):579-597.

[Diewert and Parkan, 1983] W.E. Diewert, C. Parkan; Linear programming tests of regularity conditions for production functions; Quantitative Studies on Production and Prices; Springer; (1983), pp. 131-158.Diewert, W. E. and Parkan, C. (1983). Linear programming tests of regularity conditions for production functions. In Quantitative studies on production and prices, pages 131-158. Springer.

[4] We note that [1] does not assume that firms leave the market when they make zero profit.

Research paper,Testing profit maximization in the U.S. cement industry

formal statement of the main result. We present below the test for aggregate profit maximization from Chambers and Rehbeck (2021) absent any structural hypothesis on the production sets.

1. *The market supply dataset is profit rationalizable.*

2.

    (a) *For all,*

    (b) *For all and all,.*

3. *For every set with and every set of transition matrices with, if for every and every,*

    (1)

    *then*

The important thing to note is that the second condition gives a linear program to check the profit maximizing conditions. The third condition is based on a duality result which will help us later interpret the measure of necessary competitive price taking profit loss. Next, we describe how to alter this test when there are additional assumptions on the production sets.

## 2.1. Structure on production sets

There are several restrictions on production sets that are of interest to test. We present these cases below. For the vector and a set , we use the notation to be all entries of for dimensions in the set . We focus on when inputs and output constraints are ex-ante known and when production sets are increasing. An increasing production set means that the technology of producing cement is weakly increasing with respect to time.

- *Input/Output constraints:* We ask that for all that are inputs so and are outputs so .

- *Nonnegative profits:* We ask that for all , all , that .

- *Increasing Production Sets:* We ask that for all and that production sets satisfy .

We discuss how these conditions can be imposed by altering the linear program in Theorem 1. First, the input/output constraints simply need to be added to the linear program in Theorem 1. Similarly, the non-negative profits constraint can be added to the linear program. The increasing production sets require altering the constraint in Theorem 1.2.b to: For all and all with , . All of these are linear and are easy to implement.

## 3. Necessary competitive price taking profit loss

Before performing the empirical analysis, we develop the notion of an approximate profit maximizing firm and show how to use this to find measures of *necessary competitive price taking profit loss* for the market and firms. We define *necessary competitive price taking profit loss* to be the smallest amount of profit lost from imperfect optimization for price taking profit maximizing firms. This gives a measure of how far the market is from profit maximization in a similar spirit to efficiency indexes developed by Debreu et al., 1974, Farrell, 1957, Afriat, 1967, Charnes et al., 1978, Varian, 1990, and Färe and Grosskopf, 1995.

---

Debreu et al., 1974 G. Debreu; Excess demand functions; J. Math. Econom.; Vol. 1, 1; (1974), pp. 15-21.Debreu, G. et al. (1974). Excess demand functions. Journal of Mathematical Economics, 1(1):15-21.

Farrell, 1957 M.J. Farrell; The measurement of productive efficiency; J. R. Stat. Soc. Ser. A (General); Vol. 120, 3; (1957), pp. 253-281.Farrell, M. J. (1957). The measurement of productive efficiency. Journal of the Royal Statistical Society: Series A (General), 120(3):253-281.

Afriat, 1967 S.N. Afriat; The construction of utility functions from expenditure data; Internat. Econom. Rev.; Vol. 8, 1; (1967), pp. 67-77.Afriat, S. N. (1967). The construction of utility functions from expenditure data. International economic review, 8(1):67-77.

Research paper,Testing profit maximization in the U.S. cement industry

Our focus on the minimal amount of necessary competitive price taking profit loss is primarily for convenience, since it can be checked by linear programming and is easy to interpret. For example, any welfare measure that incorporates firm profits and assumes profit maximization will necessarily have errors that are at least as large as the necessary competitive price taking profit loss in the market.

Before defining an *approximate profit maximizer*, recall that a firm  with production set  is profit maximizing at observation  when there is a  such that for all . An *approximate profit maximizer* is similar to a profit maximizer, except we allow the firm to make profit maximization errors. Formally, the firm  with production set  at observation  is approximately profit maximizing at level  when for all . In other words, the firm potentially loses  dollars by not maximizing. This notion is related to other concepts studying approximate maximizers in revealed preference theory ( Dziewulski, 2018 ; Allen and Rehbeck, 2019 ), but we consider these ideas in the case of profit maximization. The approximation error is both observation and firm specific.

We now use the approximation errors when firms profit maximize to define a notion of *necessary profit loss* (NPL). We consider NPL measures that depend on the whole market and those that depend on individual firms. The *market level necessary competitive price taking profit loss* (m-NPL) will be the total amount of profit that is necessarily lost by all firms. The *firm level necessary competitive price taking profit loss* (f-NPL) is defined to be the smallest worst case (across firms) profit loss of a firm in the market. These measures address how far the market and firms are respectively from the conditions of profit maximization. We now give formal definitions of the m-NPL and f-NPL.

The market necessary competitive price taking profit loss (m-NPL) of a market supply dataset  is defined as

The firm necessary competitive price taking profit loss (f-NPL) of a market supply dataset  is defined as

The m-NPL and f-NPL are both zero when firms are profit maximizing and non-zero otherwise. One interpretation of these numbers is that the m-NPL gives a lower bound on errors for profit maximizing errors with market data. Importantly, these errors could affect welfare measures that include firm profits. Similarly the f-NPL provides a bound on errors in profit maximization for all firms. One can impose nonnegative profit maximization, increasing production sets, and firm constraints when checking for either NPL by varying the constraints as discussed in Section  2.1.

Before proceeding, we give dual formulations of both the m-NPL and the f-NPL. In particular, the dual formulation of the m-NPL affords a meaningful use of the variables in  Theorem 1.

*The m-NPL is given by:subject towhere eachis a transition matrix.*

In terms of interpretation, the m-NPL is the largest profit a firm could make by re-optimizing production using production processes that are observed to be feasible. Mathematically, the variables  and  are dual variables (Lagrange multipliers) where the  can be made transition matrices through a renormalization. At optimal solutions to

---

Charnes et al., 1978  A. Charnes, W.W. Cooper, E. Rhodes; Measuring the efficiency of decision making units; European J. Oper. Res.; Vol. 2, 6; (1978), pp. 429-444.Charnes, A., Cooper, W. W., and Rhodes, E. (1978). Measuring the efficiency of decision making units. European journal of operational research, 2(6):429-444.

Varian, 1990  H.R. Varian; Goodness-of-fit in optimizing models; J. Econometrics; Vol. 46, 1-2; (1990), pp. 125-140.Varian, H. R. (1990). Goodness-of-fit in optimizing models. Journal of Econometrics, 46(1-2):125-140.

Färe and Grosskopf, 1995  R. Färe, S. Grosskopf; Nonparametric tests of regularity, farrell efficiency, and goodness-of-fit; J. Econometrics; Vol. 2, 69; (1995), pp. 415-425.Färe, R. and Grosskopf, S. (1995). Nonparametric tests of regularity, farrell efficiency, and goodness-of-fit. Journal of Econometrics, 2(69):415-425.

Dziewulski, 2018  P. Dziewulski; Just-noticeable difference as a behavioural foundation of the critical cost-efficiency index; (2018).Dziewulski, P. (2018). Just-noticeable difference as a behavioural foundation of the critical cost-efficiency index.

Allen and Rehbeck, 2019  R. Allen, J. Rehbeck; Assessing misspecification and aggregation for structured preferences; (2019).Allen, R. and Rehbeck, J. (2019). Assessing misspecification and aggregation for structured preferences. Working Paper.

Research paper,Testing profit maximization in the U.S. cement industry

the original m-NPL problem (say ), or to the dual problem (say , ), the standard complementary slackness conditions hold, so that for  and  with ,  only in the case the constraint binds; that is when the optimal  and  has Further,  specifies the rate at which the m-NPL would decrease were we to allow a small violation of this particular profit maximization constraint. Thus, if  and it were possible to increase production of outputs holding other inputs fixed, then the m-NPL would decrease. Likewise, the variable  specifies the rate at which the m-NPL would decrease were we to decrease . In particular, if , this means that decreasing  would actually *increase* the m-NPL, so that increasing  would decrease the m-NPL. Intuitively, this suggests the firm could decrease their use of good  as an input for period  to move closer to profit maximizing behavior.

The next theorem gives the dual characterization of the f-NPL. Here, the notation  is a member of  whose coordinates sum to one (so, a probability on ). In particular, this gives the lowest weighted average of profit that could have been earned by re-optimizing to feasible production processes.

*The f-NPL is given bysubject towhere eachis a transition matrix and.*

## 4. Empirical analysis

We use the tests developed in Section  2 and the necessary competitive price taking profit loss measures in Section  3 to examine whether the cement industry in the United States between 1993 to 1998 is profit maximizing.[5] The cement industry is well known to be a concentrated industry and prices can vary depending on the region. For these reasons, one would not expect market level data to satisfy profit maximization.[6] Thus, this application informs whether the nonparametric test of market profit maximization outlined here can discriminate failures of profit maximization in practice.

Empirically, we find that the US cement industry from 1993-1998 is not profit maximizing for any production set when assuming firms earn non-negative profits. This shows the conditions are strong enough to refute profit maximization within an industry where violations are thought to occur. The rest of this section overviews the United States cement industry and provides details on the size of violations from profit maximization using the necessary competitive price taking profit loss measures introduced in Section  3.

### 4.1. United States cement industry overview

At a high level, the cement manufacturing process uses inputs of raw materials, energy, and labor to product cement as an output. We include information from all of these inputs in the main analysis. We treat cement as a homogeneous good as it has strict standards of production.[7] As a percentage of total mass, the main raw material of cement is limestone (approximately 84%) while other materials make up the rest of the physical inputs.[8]

In addition to the cement industry being a good candidate to refute profit maximization, it is also of economic importance. The cement industry accounted for 1.3% of all U.S. anthropogenic carbon dioxide emissions in 2000 ( Van Oss and Padovani, 2003). This fact has lead to the cement industry receiving attention when studying environmental

---

[5] Additionally we have data from 1980-1998. For data quality reasons, we focus on the time period from 1993-1998. Results for the full set of data are in Appendix C.

[6] For example, the largest four firms accounted for 32.5% of production in 1997 ( Ryan). That prices vary by state can be seen looking at the cement entry of the United States Geological Survey Minerals Yearbook.

[7] For the study, we examine sales of all cement which includes both Portland and masonry cement. Both Portland and masonry cement have strict standards of production by ASTM International ( ASTM International C150/C150M-18, 2018, 2018a; ASTM International C91/C91M-18, 2018, 2018b).

[8] The percentage of total mass of limestone in the production of cement is derived from Table 3 in Van Oss and Padovani, 2002. The interested reader can find additional details on the cement industry in  Van Oss and Padovani (2002).

Research paper,Testing profit maximization in the U.S. cement industry

policy (See   Ryan (2012) and   [Fowlie et al., 2016]). This literature studies responses of cement production to changes in environmental policy using regional data since the market is concentrated and there is variation in prices across regions. To gain traction on these problems, the economic models often impose functional form restrictions on the production set for each firm.[9] This paper complements the existing literature by showing that even without specifying structure on the production set of each firm, industry wide cement production is not profit maximizing.

We now discuss the data used to conduct the empirical analysis. We include information on cement output, raw material inputs, energy inputs, and labor inputs. The complete list of goods we include in the analysis is summarized in   Table 1. We examine the cement industry using yearly aggregate data for the cement industry. The data on the amounts of inputs and outputs are readily available from the U.S. Mines Geological Yearbook and the Portland Cement Association. The U.S. Mines Geological Yearbook also contains information on the prices of cement and raw materials. The average yearly price of energy inputs was collected from the American Energy Review. We use average yearly manufacturing wages from the St. Louis Federal Reserve as the price of labor inputs. Lastly, we gathered information on the firms that participate in the cement industry from the Portland Cement Association. Additional details on data collection are in Appendix B.

One important feature of market level data is that firms may enter/exit the industry while their production is unobserved. We provide some descriptive details on firm entry between 1993-1998. For this time period, there are 118 different firms that participated in the cement industry. We display in   Table 2 the number of firms that participate in the cement industry each year and how many entered/exited the industry relative to the previous year. There is a large number of firms (118) relative to the number of time periods (6).

There is some entry/exit in the industry during this time period, but not much. Of the three firms who entered, two of them only operated grinding facilities. Similarly, two of the three firms who exited only operated grinding facilities. Since kilns are responsible for creating clinker which is the precursor to cement, these can be considered as relatively small firms. For the remaining firm who entered in 1994, we note it has one kiln (below the median of 2 in 1994), below median clinker capacity, and below median grinding facilities. For the remaining firm who exited in 1994, we note that it has one kiln (below median of 2 in 1993), above median clinker capacity, and below median grinding facilities.

### 4.2. Results

We examine a variety of different structural conditions when checking whether the data are described by price taking profit maximization in   Tables 3 and 4   Tables 3 and 4. Within these tables, the two rows denote whether we impose a static technology or an increasing technology. In contrast, the columns denote whether there are no restrictions on inputs/outputs, restrictions on input/output, or restrictions on input/outputs and non-negative profits. Within each entry of the tables, we present either market or firm level necessary competitive price taking profit loss.

We examine both when there is a static production set and when the production set increases. We examine each of these conditions with the restrictions of non-negative profits and restricting goods to be inputs/outputs. In particular cement is restricted to be an output while the other goods are assumed inputs. The results on the m-NPL are presented in   Table 3. We note that the weakest test of this model with increasing production sets is able to profit rationalize the model without restricting profits to be non-negative. However, the restriction of allowing *all* firms to have weakly increasing production sets every period is likely too weak and does not match the structure of the

---

[Van Oss and Padovani, 2003]  H.G. Van Oss, A.C. Padovani; Cement manufacture and the environment part II: environmental challenges and opportunities; J. Ind. Ecol.; Vol. 7, 1; (2003), pp. 93-126.Van Oss, H. G. and Padovani, A. C. (2003). Cement manufacture and the environment part ii: environmental challenges and opportunities. Journal of Industrial ecology, 7(1):93-126.

[Fowlie et al., 2016]  M. Fowlie, M. Reguant, S.P. Ryan; Market-based emissions regulation and industry dynamics; J. Polit. Econ.; Vol. 124, 1; (2016), pp. 249-302.Fowlie, M., Reguant, M., and Ryan, S. P. (2016). Market-based emissions regulation and industry dynamics. Journal of Political Economy, 124(1):249-302.

[9] The restrictions of   Ryan (2012) and   Fowlie et al. (2016) are on the cost function which effectively limits the production set of each firm.

Research paper,Testing profit maximization in the U.S. cement industry

cement industry. For example, the main technology used in the production of cement are large kilns to produce heat that facilitates the chemical reactions used to produce cement. During the time period from 1993-1998, only six kilns were updated. Thus, we believe the static technology better represents the information we have on the production sets.

For models that assume static production sets, the m-NPL is $755.1 million when one has restrictions on inputs/outputs and non-negative profit maximization. Recall that m-NPL is a summation of all profit losses for all firms across all time periods. Therefore, $755.1 million is the amount of profit that is needed to rationalize the market data from 1993-1998 while imposing competitive price taking profit maximizing firms when the inputs and outputs are known and firms make non-negative profit. One interesting feature of the test is that the constraints on which goods are inputs and outputs does not affect the analysis. For some comparison on the magnitude of the m-NPL, the dynamic structural work of  Ryan (2012) finds welfare errors of $300 million when comparing the results to a static structural model that incorporates regional pricing and competition. These values are not directly comparable since ( Ryan) uses a structural model while the analysis here is non-parametric. However, the magnitude of error from assuming profit maximization of the industry is more than twice the size of the errors from dynamic versus static considerations. Since most welfare calculations include industry profit, this could have large effects on welfare comparisons when one assumes profit maximization at the aggregate when there is regional price variation and competition.

Next, we examine the f-NPL in  Table 4. The f-NPL is substantially smaller than the m-NPL, which is expected as it is a measure for a single firm. Also, we note that the m-NPL is not far from the number of firms times the f-NPL.[10] This suggests that the best way to distribute profit maximizing errors is to give about the same amount of error to each firm. The error in profit maximization to a firm is $6.566 million for static firm production sets, restrictions on inputs/outputs, and non-negative profit maximization.

## 5. Conclusion

In this paper, we construct a test of market profit maximization when a researcher has knowledge of market supply, market prices, and firm participation. Roughly, the test examines whether firms could improve profits by re-optimizing using known production processes. We extend the test to examine restrictions on the production sets, non-negative profit maximization, and weakly increasing production sets. We then develop notions of approximate profit maximizer and necessary competitive price taking profit loss to measure how far the market and firms are from profit maximization in terms of optimization error. We these results to show that the U.S. Cement industry is not profit maximizing when assuming non-negative profits and that the necessary competitive price taking profit loss for the market is $755.1 million dollars for the conditions that most closely match the market (static firm production sets, input/output constraints, and non-negative profits).

None.

## Appendix A. Proofs

    1. For each  and ,

    2. For each  and binary ,

    3. For each , , and ,

    1. For all  and , .

    2. For all  and , .

    3. For all , .

    4. For all , .

---

[10] To see this, note .

Research paper,Testing profit maximization in the U.S. cement industry

**Appendix B. Supplementary data**

Supplementary material related to this article can be found online at *https://doi.org/10.1016/j.jebo.2024.106773*.

**Appendix B. Supplementary data**

The following is the Supplementary material related to this article.

This is the online supplementary material.

CONTACT: Corresponding author.

# References

Ryan, 2012  S.P. Ryan; The costs of environmental regulation in a concentrated industry; Econometrica; Vol. 80, 3; (2012), pp. 1019-1061.Ryan, S. P. (2012). The costs of environmental regulation in a concentrated industry. Econometrica, 80(3):1019-1061.

Miller et al., 2017  N.H. Miller, M. Osborne, G. Sheu; Pass-through in a concentrated industry: empirical evidence and regulatory implications; Rand J. Econ.; Vol. 48, 1; (2017), pp. 69-93.Miller, N. H., Osborne, M., and Sheu, G. (2017). Pass-through in a concentrated industry: empirical evidence and regulatory implications. The RAND Journal of Economics, 48(1):69-93.

Afriat, 1972  S.N. Afriat; Efficiency estimation of production functions; Internat. Econom. Rev.; Vol. 13, 3; (1972), pp. 568-598.Afriat, S. N. (1972). Efficiency estimation of production functions. International Economic Review, 13(3):568-598.

Chavas and Aliber, 1993  J.-P. Chavas, M. Aliber; An analysis of economic efficiency in agriculture: a nonparametric approach; J. Agric. Resour. Econ.; (1993), pp. 1-16.Chavas, J.-P. and Aliber, M. (1993). An analysis of economic efficiency in agriculture: a nonparametric approach. Journal of Agricultural and Resource Economics, pages 1-16.

Hailu and Veeman, 2001  A. Hailu, T.S. Veeman; Non-parametric productivity analysis with undesirable outputs: an application to the Canadian pulp and paper industry; Am. J. Agric. Econ.; Vol. 83, 3; (2001), pp. 605-616.Hailu, A. and Veeman, T. S. (2001). Non-parametric productivity analysis with undesirable outputs: an application to the canadian pulp and paper industry. American Journal of Agricultural Economics, 83(3):605-616.

Chambers and Rehbeck, 2021  C. Chambers, J. Rehbeck; Nonparametric market supply with variable participants; (2021).Chambers, C. and Rehbeck, J. (2021). Nonparametric market supply with variable participants.

Hanoch and Rothschild, 1972  G. Hanoch, M. Rothschild; Testing the assumptions of production theory: a nonparametric approach; J. Polit. Econ.; Vol. 80, 2; (1972), pp. 256-275.Hanoch, G. and Rothschild, M. (1972). Testing the assumptions of production theory: a nonparametric approach. Journal of Political Economy, 80(2):256-275.

Varian, 1984  H.R. Varian; The nonparametric approach to production analysis; Econometrica; Vol. 52, 3; (1984), pp. 579-597.Varian, H. R. (1984). The nonparametric approach to production analysis. Econometrica, 52(3):579-597.

Diewert and Parkan, 1983  W.E. Diewert, C. Parkan; Linear programming tests of regularity conditions for production functions; Quantitative Studies on Production and Prices; Springer; (1983), pp. 131-158.Diewert, W. E. and Parkan, C. (1983). Linear programming tests of regularity conditions for production functions. In Quantitative studies on production and prices, pages 131-158. Springer.

Research paper,Testing profit maximization in the U.S. cement industry

Debreu et al., 1974  G. Debreu; Excess demand functions; J. Math. Econom.; Vol. 1, 1; (1974), pp. 15-21.Debreu, G. et al. (1974). Excess demand functions. Journal of Mathematical Economics, 1(1):15-21.

Farrell, 1957  M.J. Farrell; The measurement of productive efficiency; J. R. Stat. Soc. Ser. A (General); Vol. 120, 3; (1957), pp. 253-281.Farrell, M. J. (1957). The measurement of productive efficiency. Journal of the Royal Statistical Society: Series A (General), 120(3):253-281.

Afriat, 1967  S.N. Afriat; The construction of utility functions from expenditure data; Internat. Econom. Rev.; Vol. 8, 1; (1967), pp. 67-77.Afriat, S. N. (1967). The construction of utility functions from expenditure data. International economic review, 8(1):67-77.

Charnes et al., 1978  A. Charnes, W.W. Cooper, E. Rhodes; Measuring the efficiency of decision making units; European J. Oper. Res.; Vol. 2, 6; (1978), pp. 429-444.Charnes, A., Cooper, W. W., and Rhodes, E. (1978). Measuring the efficiency of decision making units. European journal of operational research, 2(6):429-444.

Varian, 1990  H.R. Varian; Goodness-of-fit in optimizing models; J. Econometrics; Vol. 46, 1-2; (1990), pp. 125-140.Varian, H. R. (1990). Goodness-of-fit in optimizing models. Journal of Econometrics, 46(1-2):125-140.

Färe and Grosskopf, 1995  R. Färe, S. Grosskopf; Nonparametric tests of regularity, farrell efficiency, and goodness-of-fit; J. Econometrics; Vol. 2, 69; (1995), pp. 415-425.Färe, R. and Grosskopf, S. (1995). Nonparametric tests of regularity, farrell efficiency, and goodness-of-fit. Journal of Econometrics, 2(69):415-425.

Dziewulski, 2018  P. Dziewulski; Just-noticeable difference as a behavioural foundation of the critical cost-efficiency index; (2018).Dziewulski, P. (2018). Just-noticeable difference as a behavioural foundation of the critical cost-efficiency index.

Allen and Rehbeck, 2019  R. Allen, J. Rehbeck; Assessing misspecification and aggregation for structured preferences; (2019).Allen, R. and Rehbeck, J. (2019). Assessing misspecification and aggregation for structured preferences. Working Paper.

ASTM International C150/C150M-18, 2018, 2018a  R. ASTM International C150/C150M-18, 2018; Standard Specification for Portland Cement; ASTM International, West Conshohocken, PA (2018).International, A. (2018a). Astm c150/c150m-18 standard specification for portland cement.

ASTM International C91/C91M-18, 2018, 2018b  R. ASTM International C91/C91M-18, 2018; Standard Specification for Masonry Cement; ASTM International, West Conshohocken, PA (2018).International, A. (2018b). Astm c91/c91m-18 standard specification for masonry cement.

Van Oss and Padovani, 2002  H.G. Van Oss, A.C. Padovani; Cement manufacture and the environment: part I: chemistry and technology; J. Ind. Ecol.; Vol. 6, 1; (2002), pp. 89-105.Van Oss, H. G. and Padovani, A. C. (2002). Cement manufacture and the environment: part i: chemistry and technology. Journal of Industrial Ecology, 6(1):89-105.

Van Oss and Padovani, 2003  H.G. Van Oss, A.C. Padovani; Cement manufacture and the environment part II: environmental challenges and opportunities; J. Ind. Ecol.; Vol. 7, 1; (2003), pp. 93-126.Van Oss, H. G. and Padovani, A. C. (2003). Cement manufacture and the environment part ii: environmental challenges and opportunities. Journal of Industrial ecology, 7(1):93-126.

Fowlie et al., 2016  M. Fowlie, M. Reguant, S.P. Ryan; Market-based emissions regulation and industry dynamics; J. Polit. Econ.; Vol. 124, 1; (2016), pp. 249-302.Fowlie, M., Reguant, M., and Ryan, S. P. (2016). Market-based emissions regulation and industry dynamics. Journal of Political Economy, 124(1):249-302.

Research paper,Testing profit maximization in the U.S. cement industry

# Classification

**Language:** ENGLISH

**Document Type:** Full-length article

**Publication Type:** Journal

**Journal Code:** JEBO

**Subject:** ECONOMY & ECONOMIC INDICATORS (90%); ECONOMICS (89%); PAPER & PACKAGING SECTOR PERFORMANCE (89%); PRICES (89%); PRODUCTIVITY (89%); SCIENTIFIC METHOD (89%); ENVIRONMENTAL REGULATION & POLICY (77%); ECONOMIC NEWS (73%); GOVERNMENT & PUBLIC ADMINISTRATION (73%); INTERNATIONAL RELATIONS & NATIONAL SECURITY (73%); GOVERNMENT BODIES & OFFICES (50%); Profit maximization; Revealed preference; Linear programming

**Organization:** PORTLAND CEMENT ASSOCIATION (59%)

**Industry:** CEMENT & CONCRETE PRODUCTION (90%); PAPER & PACKAGING (89%); PAPER & PACKAGING SECTOR PERFORMANCE (89%);  (89%); PULP MILLS (87%); PAPER MFG (78%); PAPER MILLS (71%); PULP INDUSTRY (64%); AGRICULTURE (63%)

**Geographic:** WISCONSIN, USA (79%); UNITED STATES (92%)

**Load-Date:** April 29, 2025

Journal of Economic Behavior and Organization
Copyright 2025 Published by Elsevier All Rights Reserved

**End of Document**

Exhibit B-4

# Vertical and Horizontal Redistributions from a Carbon Tax and Rebate

Julie Anne Cronin, Don Fullerton, Steven Sexton

**Abstract:** Are carbon taxes regressive? To calculate effects of a carbon tax on each family's expenditures, plus distributional effects of three revenue-recycling mechanisms, we employ the US Treasury Distribution Model. It includes 322,000 tax returns, matched social security information, imputations from the Consumer Expenditure Survey, and an input-output matrix to calculate output prices. Accounting for statutory indexing of federal transfer programs, the calculated carbon tax burden as a fraction of consumption is progressive. Rebate of revenues via transfers makes it even more progressive. Within each decile, we find large variation in energy demands such as for heat in winter and cooling in summer. As a result, commonly ignored horizontal redistributions within deciles are shown to exceed vertical redistributions between deciles. Rebates via transfers widen horizontal redistributions. Some reforms deliver net income gains to the poorest families on average, even as a majority of those poor families incur losses.

JEL Codes: H22, H23, Q48, Q52, Q54, Q58

Keywords: tax incidence, climate policy, revenue-neutral, tax reform, energy expenditures

A MARKET-BASED PRICING POLICY such as a carbon tax or tradable permit program can reduce emissions at less cost than commonly employed mandates like a renewable-fuel standard or energy efficiency standard (see Goulder and Parry 2008; Aldy et al. 2010; or the exception in Goulder et al. 2016). Despite potentially greater efficiency, however, carbon pricing has found little favor among US policy makers.

Julie Anne Cronin is at the US Treasury Department. Don Fullerton is at the University of Illinois and the National Bureau of Economic Research (dfullert@illinois.edu). Steven Sexton is at Duke University. For helpful suggestions, we thank Aparna Mathur, Janet McCubbin, Gilbert Metcalf, Adele Morris, Ian Parry, Dan Phaneuf, David Weisbach, anonymous referees, and participants at two NBER workshops. The Sloan Foundation and National Bureau of Economic Research provided financial support of the research conducted for this project by Don Fullerton and Steven Sexton, and the US Department of the Treasury provided use of tax return data by Treasury employees, including Julie Anne Cronin, to calculate summary statistics

Received February 19, 2017; Accepted May 30, 2018; Published online January 23, 2019.

JAERE, volume 6, number S1. © 2019 by The Association of Environmental and Resource Economists. All rights reserved. 2333-5955/2019/06S1-0007$10.00    http://dx.doi.org/10.1086/701191

One concern is that carbon pricing likely raises the price of electricity and other carbon-intensive goods that constitute relatively high fractions of low-income family budgets (Metcalf 2009; Grainger and Kolstad 2010).

In response, economists point out that measured regressivity depends on how household income is defined and measured, on the consumer and producer shares of tax incidence, and on other features of policies. Moreover, they note that distributional objectives can be preserved by complementary changes to government taxes and transfers. In the United States, regressivity of a carbon tax can be neutralized by increasing progressivity of income taxes or use of the Earned Income Tax Credit (EITC). As Mankiw (2009, 22) observed, "The economists in the Treasury Department are fully capable of designing a package of tax hikes and tax cuts that together internalize externalities and leave the overall distribution of the tax burden approximately unchanged."

While vertical redistributions between high- and low-income groups can perhaps be avoided by changes in tax and transfer programs, horizontal redistributions between families of comparable incomes may be more problematic. Because of heterogeneity of income sources and expenditures, any package of reforms is likely to create winners and losers within each income group. Retired workers' losses from a carbon tax are not offset by an expanded EITC or reduced income tax. Even if retirees could be compensated by expansion of social security benefits, poor families in harsh climates still bear a higher carbon tax burden than families of similar means residing in temperate areas with less energy use for home temperature control. And any attempt to target rebates to those who spend more on energy may implicitly encourage use of energy, diminishing efficiency of the carbon tax.

This paper assesses the capacity of existing transfer mechanisms to mitigate vertical and horizontal redistributions following the imposition of an energy tax. To do so, we account for the ways families vary—both within and across income groups—in their energy use, tax liability, and transfer program participation (see Blonz et al. 2011). We show the extent to which income-targeted transfers undercompensate some families and overcompensate others. In particular, we find that the average tax change in a decile conceals considerable heterogeneity within it. Because of large tax cuts for a minority of families, some reforms that produce average tax reductions across most deciles nevertheless yield small tax increases to majorities in each decile.[1]

---

shown in the paper. These confidential tax return data cannot be disclosed. Neither Fullerton nor Sexton had access to any individual tax return data. Views contained herein are ours and do not necessarily reflect the views or positions of the Sloan Foundation, the NBER, or the US Department of the Treasury.

1. While we document the empirical variation of tax burdens and the further wide variation of transfer receipts, Sallee (2018) provides a useful theory showing the implausibility of achieving a Pareto improvement. Thus his paper and ours are complements, and a complete analysis could make use of both.

Economists have engaged in vociferous debate about the merits of horizontal equity as a policy criterion. Our intent is not to resolve this normative debate but only to report the extent of such redistributions. Policy makers may want to know if a reform introduces large gains and losses within income groups, as some may view these horizontal redistributions as capricious. And though disparate effects of a carbon tax may be viewed as consequences of household choices, additional disparity may arise from the use of the revenues to increase transfers.

Poterba (1991) first demonstrated the expected disparate effects of energy taxes across households of similar means by documenting variation in their gasoline expenditures. Rausch et al. (2011) have estimated variation in carbon tax burdens within income groups, but they did not look at effects of transfers intended to offset those burdens. Morris and Mathur (2015) consider reforms to address vertical distributions and regional disparities. To our knowledge, no scholarly research explores the extent to which both vertical and horizontal redistributions can be mitigated by reforms to tax and transfer programs.

One explanation for this omission is the absence of a publicly accessible data set that provides the necessary information to evaluate the horizontal redistributions from income-targeted reforms. For a large sample of households, the US Consumer Expenditure Survey (CEX) provides sufficient detail on purchases of various commodities whose prices are differentially affected by a carbon tax. However, it does not include detailed and verified information on income sources, taxes paid, and transfers received. Public-use tax returns are available with sufficient income and tax information, but they include scant information on transfers and expenditures.[2] Fortunately for our purposes, however, the US Treasury Distribution Model (TDM) has undertaken extensive imputations to construct a data set with the necessary heterogeneity across a large, representative sample of families with differing expenditures, sources of income, taxes paid, and transfers received.

This paper uses the US Treasury's merged file of 300,000 tax returns plus 22,000 nonfiler "information returns" that captures those whose income is below the tax-filing threshold.[3] Information returns permit the estimation of consumption for some of the poorest individuals in the country. Analysis proceeds with an exact match of the social security number associated with each of these 322,000 returns to their social security benefits received and payroll taxes paid. Each return is also matched to a

---

2. The National Bureau of Economic Research maintains a TAXSIM model that uses anonymized samples of Treasury tax returns. These data exclude very high earners and do not include the high-fidelity imputations of nonstandard income that the Treasury Distribution Model incorporates. See http://www.nber.org/~taxsim/.

3. Treasury's Distribution Model uses only nondependent returns. The analysis below applies a weight to each return, where weights vary from 1 to 1,000. The resulting weighted data set represents 172 million US families.

record of a similar family in the CEX, whose expenditure shares are attributed to the tax return family, with further imputations for transfer program participation and receipts (e.g., Temporary Assistance for Needy Families, TANF, and Supplemental Nutrition Assistance Program, SNAP). The burdens of a carbon tax are determined for these families by calculating carbon tax impacts on market prices for each consumption good and, then, computing the changes in family expenditures implied by price changes.[4]

Family burdens are calculated for each of four policy simulations that all include the same carbon tax, but three of which include alternative mechanisms of recycling net carbon tax revenues. Specifically, our carbon tax is combined with (1) no revenue recycling except for changes in transfers that are mandated by existing law to account for consumer price increases, (2) recycling of net carbon tax revenue via per capita rebate,[5] (3) revenue recycling via a 5.9% increase in the EITC and all existing transfers, and (4) equal shares of net revenue spent on a cut in the payroll tax and an increase in social security benefits. For each potential reform, we show distributional effects across and within deciles. To the extent that revenue-rebate mechanisms like those considered here prevent extreme or capricious burdens, policy makers can take advantage of the efficiency afforded by market-based policies like taxes that minimize the cost of reducing carbon emissions without sacrificing distributional objectives.

This analysis is limited in various ways. First, our paper does not measure efficiency effects of a carbon tax, as these are extensively covered elsewhere with careful analysis of behavioral changes. Instead, we measure detailed distributional effects of a carbon tax reform, which can be addressed most simply by assuming no changes in behavior. Thus, each family's added burden is calculated as their observed expenditure on each consumption good times the price increase for that good.[6] A convenience of this ap-

---

4. See similar methods in Metcalf (2009), Grainger and Kolstad (2010), or Mathur and Morris (2014).

5. A lump-sum rebate was proposed by the Climate Leadership Council, which includes James A. Baker, Henry Paulson, George P. Shultz, Marty Feldstein, and Greg Mankiw. Their proposal reportedly would eliminate nearly all of the Obama administration's climate policies in exchange for a carbon tax that starts at $40 per ton and increases with time (though it would not change other energy policies). Revenue is returned in the form of a quarterly check from the Social Security Administration to "every American." We take that to mean a per capita rebate. See https://www.washingtonpost.com/news/energy-environment/wp/2017/02/07/senior-republican-leaders-propose-replacing-obamas-climate-plans-with-a-carbon tax/?postshare=621486571915785&tid=ss_tw&utm_term=.ecdad205b56a.

6. Ideally, distributional effects could be measured by money-metric utility or the trapezoid loss in consumer surplus. But with no behavioral model, we focus on first-order effects rather than second-order effects of responses that may include households and firms substituting away from energy-intensive consumption and input use. Accounting for such substitutions would be analytically costly, as it would require many more elasticity assumptions, including assumptions about how price responsiveness for various goods and services varies by income. Nonetheless,

proach is that none of our distributional results depends on the size of the carbon tax rate. Because quantities are fixed, doubling the tax would double the size of all absolute burdens with no change in relative burdens.

Second, we ignore changes in factor prices. Focus instead centers on household diversity in consumption of energy-intensive goods and in transfers received. Others study general equilibrium impacts on factor and output prices, but usually with a limited number of household groups. The purpose of the present study is to shift from a limited number of household types to analysis of 322,000 families, which is accomplished only by limiting the analysis in other ways.[7]

Third, we have one year's cross-section of data on consumption spending and transfer receipts, not a panel or other means to construct a long-run measure of well-being. Annual income is a poor measure of well-being, as low-income groups may include not only the perennially poor but also the young who will earn more later, the elderly who earned more earlier, and those with volatile income who are observed in a bad year. Instead, we rely upon annual consumption to account for consumption smoothing (Poterba 1989). Consumption is far from a perfect measure of permanent income, not least because of borrowing constraints and information problems, but it is better than annual income as a measure of family well-being.

Fourth, the merged data set does not include information on each family's geographic location, housing and appliance vintages, or commuting distance to work—characteristics thought to affect exposure to carbon taxes. Thus, we cannot analyze compensation schemes tied to household characteristics other than income sources and transfer receipts. Nevertheless, the final section of this paper discusses redistribu-

---

such behavioral responses can bear on the regressivity of carbon taxes, as in West and Williams (2004).

7. We focus on long-run redistributions from differences in spending patterns and transfer receipts, as if looking at a post-adjustment equilibrium with a carbon tax (or cap-and-trade or other climate policy). In the short run, a new policy can substantially affect the market value of durable goods investments, like homes or automobiles, or it may affect unemployment and the value of industry-specific training. Moreover, rents from free permit allocations are reflected in firm profits and stock prices, benefiting shareholders who tend to be relatively well off (Parry 2004). Potential impacts of carbon pricing on the coal industry and Appalachian communities built around the coal industry have figured centrally in recent US elections, as have impacts on energy-intensive suburban communities (e.g., Glaeser and Kahn 2010; Stone 2015; Cass 2016; Ummel 2016). Even in the long run, a general equilibrium (GE) model could calculate changes in relative factor prices for labor and capital. Beck et al. (2015) review recent GE literature showing that the long-run wage/rental ratio could change in either direction, depending on assumptions and calibration of parameters like factor shares and substitution elasticities. A GE model with individual household data is difficult, though not impossible (Rausch et al. 2011), but such an effort here still would not definitively show whether the wage/rental ratio rises or falls. Note, however, that we do capture important effects on the sources side, namely, the increased transfer benefits from indexing, central to Beck et al. (2015).

tion and efficiency implications of family-specific compensation schemes based on these family characteristics.

Fifth, we do not account for the distribution of carbon policy benefits or of changes in other policies. Because carbon emissions are correlated with emissions of local pollutants that directly impact human health, a carbon tax may result in "cobenefit" reductions in local pollution emissions, yielding heterogeneous local benefits that depend on polluter responses and air transport. A consideration of these benefits is beyond the scope of this paper.

Finally, our analysis relies on benchmark measures of carbon intensity for consumption categories from 2007. Carbon intensities are likely to change with time, perhaps in response to policy, and these trends may further change family burdens from carbon taxes. The share of US electricity generated by natural gas plants has increased substantially in recent years, while the share of coal-fired generation declined. Thus electricity may become less carbon intensive, but the falling share of nuclear generation mitigates this effect. We cannot project future carbon intensities of all consumption goods, so our analysis is necessarily backward looking.

Notwithstanding these limitations, this analysis yields three key findings. First, despite the fact that electricity constitutes a high fraction of spending for poor families, we find that a US carbon tax is progressive, not regressive as commonly assumed. In fact, its progressivity is a necessary consequence of the following four basic points: (1) once consumption is adopted as the measure of well-being, then a uniform consumption tax is not regressive but proportional; (2) as shown below, our calculated family total carbon consumption is not clearly concentrated in high or low consumption deciles, which, with the first point, makes a carbon tax nearly proportional;[8] (3) transfers in the United States are indexed to correct for increases in consumer prices that accompany a carbon tax; and (4) transfers are a larger fraction of income for lower deciles.[9]

A second key finding is that the generally ignored horizontal redistributions are larger than the commonly studied vertical redistributions among the lower half of

---

8. In our data, the sum of direct and indirect carbon consumption is not a disproportionate share of low-decile total consumption, as is found in previous studies (e.g., Mathur and Morris 2014). One difference is that the TDM adjusts for imputed consumption, which is also part of our measure of income. Second, as described below, Treasury is able to preserve the accuracy of income information reported on tax returns when estimating consumption. Third, the TDM imputation from the CEX accounts for family size, which affects returns to scale in consumption and the family's relative well-being. Without this correction, a large share of spending on carbon-intensive goods could be due to a family's low income or to having few family members (and thus not benefiting from returns to scale).

9. Others discuss these points separately and show how each can help make the carbon tax progressive. See, e.g., Fullerton et al. (2012), Beck et al. (2015), and Parry (2015), who also compares these effects for the United States and other countries. Our main contributions here are that we combine all four points simultaneously, use detailed calculations from the TDM, and provide the first calculations of horizontal effects from combined carbon tax and rebates.

the consumption distribution. This result follows readily from the fact that the carbon tax is progressive but not very progressive. The average burden rises from only 0.45% of consumption in the poorest decile to 0.80% of consumption in the richest decile. In contrast, heterogeneity of consumption within the first four deciles is larger. Intuitively, any decile may contain some families that live in moderate climates along the coasts and other families that are dependent upon electricity-powered air conditioning in the summer and fossil-fueled heat in the winter.

Third, across most deciles, any of the three mechanisms we study to rebate carbon tax revenues causes horizontal redistributions that are larger than those imposed by the carbon tax itself. Family size and, thus, per capita rebates vary within all deciles, but this variation is larger as a percentage of consumption for those in low consumption deciles. Similarly, transfer receipts are a large fraction of income for the average family in poor deciles, but some families in those deciles receive small transfers or no transfers at all. Thus, a uniform increase in all existing transfers overcompensates some poor families for their carbon tax burden and provides no compensation to other poor families for their carbon tax burden.

The first section below reviews distributional studies of carbon taxes and discusses the policy interest in vertical and horizontal equity. Section 2 describes our data and methods used to simulate carbon taxes and rebates. Section 3 discusses measures of income and reports summary statistics. Section 4 describes simulations, while section 5 provides results. Section 6 explores further issues, while section 7 concludes.

## 1. OVERVIEW OF DISTRIBUTIONAL EFFECTS OF CARBON POLICIES AND REBATES

Conventional wisdom holds that carbon-pricing programs like tradable permits or carbon taxes burden the poor relative to the rich (e.g., Metcalf 2009; Grainger and Kolstad 2010; Rausch et al. 2011; Williams et al. 2015). Consumer expenditure data from the United States and many European countries demonstrate that poor households devote greater shares of incomes to energy purchases than do others (Flues and Thomas 2015; Pizer and Sexton 2019). Yet, recent literature shows that such distributional concerns may be misplaced or at least exaggerated.[10] Measures of regressivity are diminished when evaluated according to lifetime income or permanent income, or a proxy such as annual expenditures. In contrast, annual incomes fluctuate with spells of unemployment, changes in health status and family conditions, other shocks, and well-known life-cycle effects in earnings and savings (Poterba 1989; Bull et al. 1994; Hassett et al. 2009). According to the permanent income hypothesis of Friedman (1957), the

---

10. Energy taxes in developing countries can be progressive because the poor cannot afford air conditioners and cars (Sterner 2012; Pizer and Sexton 2019). Also, Parry et al. (2017) estimate that an increase in India's coal tax would be progressive. Many poor households are not connected to the grid, and so households among the lowest decile of consumption devote budget shares to electricity that are half those of the richest households.

smoothing of household consumption over time implies that annual consumption is better than annual income as a proxy for permanent income. For this reason, carbon tax regressivity can be exaggerated when using annual income rather than annual total consumption to classify families from rich to poor.

The vertical redistributions that do attend the introduction of carbon taxes can be diminished by complimentary reforms of tax and transfer programs that utilize carbon tax revenues. For example, Metcalf (1999) and Dinan (2012) consider how to offset regressivity using existing tax code and transfer programs or lump-sum rebates. Metcalf (2009) develops a revenue-neutral tax reform package that raises $90 billion from a $15 tax per ton of carbon dioxide ($CO_2$) and returns the revenue through a tax credit of up to $560 per worker. Mathur and Morris (2014) find that refunding merely 11% of revenues can fully compensate the poorest quintile of households—on average—for the added cost of a $15 per ton tax on $CO_2$ emissions. However, such revenue recycling for the sake of equity comes at the cost of forgone economic efficiency of the tax. Efficiency would dictate that carbon tax revenues be used to reduce the most distorting taxes, which tend to be progressive taxes.[11] Carbon tax regressivity can be exacerbated rather than ameliorated by efficient reductions in progressive taxes like those on personal income, corporate income, and capital income.

When the distributional impacts of many and various tax and expenditure programs are evaluated, attention is focused on vertical impacts with little attention to horizontal impacts. For carbon pricing, considerable variations in burdens are caused by household heterogeneity in energy demands, income sources, and transfer program receipts. Pizer and Sexton (2019) observe that variation in energy consumption within income groups generally exceeds variation across income groups in the United States, Mexico, and United Kingdom. In the United States, some of the poorest households devote nearly 20% of total spending to electricity, while other poor households incur no direct electricity expenses at all (i.e., when electricity is included in rent). Overall, variation is induced by differences in household size, homeownership status, climate, electricity-generating infrastructure, home size and vintage, vehicle miles traveled, and energy efficiency of durable goods, among other characteristics. This household heterogeneity introduces carbon tax burden differences that cannot be fully overcome without direct efficiency implications.

While differences in energy use lead to disparity in carbon tax burdens among otherwise similar households, Williams et al. (2015) find in a general equilibrium setting that variation in carbon tax burdens depends on the rebate of revenues. Heterogeneity from income sources such as transfers is potentially easier to remedy because of income reporting requirements and opportunities to target refunds according to income sources. Nevertheless, this targeting can be complicated by variation within an income

---

11. See Bovenberg and de Mooij (1994), Goulder (1995), Parry (1995), Goulder et al. (1999), Parry and Bento (2000), Fullerton and Metcalf (2001), Bovenberg and Goulder (2002), Cramton and Kerr (2002), Goulder (2002), and Carbone et al. (2013).

group's benefit eligibility, take-up rates, and actual transfer receipts. Only 32% of families in our lowest decile receive EITC benefits.[12] Alternatively, carbon tax burdens might be offset by use of programs like Medicare, SNAP, and the Special Supplemental Nutrition Program for Women, Infants and Children (WIC). However, recipients of these programs are a minority of families in all income groups. Only 19% of the poorest US families receive SNAP benefits, while 16% receive social security income.[13]

High rates of payroll tax liability and of social security recipiency among most income groups suggest that a combination of payroll tax reductions and expanded social security benefits could offset carbon tax burdens for nearly all but the poorest families. But horizontal redistributions among the poorest families may prove particularly difficult to remedy. Among the poorest families, 27% neither incur payroll tax liabilities nor receive social security benefits. Thus, the design of a carbon tax that avoids horizontal redistributions—particularly among the lowest-income families—is not straightforward.

The underpinnings of policy interest in vertical equity are much stronger than those of horizontal equity. As justification for vertical redistribution, philosophers since Bentham ([1802] 1978) have articulated the concept of diminishing marginal utility of income within the utilitarian social welfare framework. Less obvious, however, is the theoretic foundation for horizontal equity—the belief that equals should be treated equally. Musgrave (1959, 1990), for instance, contends that tax changes yielding better horizontal equity results are to be preferred to other changes for which vertical equity outcomes are comparable. A problem, of course, is how to define "equals." Those with the same income may pay different tax because of different behavior—such as marriage, homeownership, or consumption of carbon-intensive goods. If it is to mean equal in every respect, then their tax would indeed be the same (Kaplow 1989, 1992). Moreover, as Kaplow points out, pursuit of horizontal equity may give preference for common outcomes over those in which individual welfare levels are higher but heterogeneous.[14]

---

12. On EITC participation, see Eissa and Hoynes (2011). Benefit recipiency rates here are based on our US Treasury data. Only 19% of families in the lowest decile receive SNAP benefits, while 16% receive Supplemental Security Income. Incomplete take-up rates observed across transfer programs are attributed to welfare stigma, transaction costs, and imperfect information (Currie 2006). Others estimate that $6.7 million each year goes unclaimed by those eligible (Bhargava and Manoli 2015). Estimates of unemployment insurance take-up range from 53% to 71% (Anderson and Meyer 1997).

13. SNAP and social security benefits are included in the Treasury's cash income measure. Recipients will therefore be ranked higher than otherwise-similar nonrecipients. In Treasury's model, 46% of families in the second-lowest income decile receive either SNAP or social security benefits, compared to 33% in the lowest income decile.

14. Horizontal equity does appear in social welfare functions of Slesnick (1989) or Auerbach and Hassett (2002). For applications of these ideas to environmental policy, see Pizer and Sexton (2019) or Fischer and Pizer (2017).

We do not try to resolve the philosophical debate about horizontal equity. Instead, given that horizontal equity is an important consideration in policy debates, and that policy makers continue to grapple with how to "treat equals equally," we aim only to show what *are* the vertical and horizontal redistributions caused by alternative carbon tax and rebate reform packages.

## 2. TREASURY'S DISTRIBUTION MODEL

The Office of Tax Analysis of the US Department of the Treasury has constructed a data set and model that we refer to as Treasury's Distribution Model (TDM). We use it to estimate impacts of a US carbon tax and of alternative rebate mechanisms. In this section, we describe the model in four main steps (summarized here and described further below).[15] First, the TDM uses 300,000 individual income tax returns and 22,000 information returns for a total of 322,000 families (weighted to represent a population of 172 million families). Each family's annual consumption spending is calculated as cash income minus income taxes, payroll taxes, and an estimate of savings. Second, each tax family is matched to a similar family in the CEX data, and that CEX family's expenditure shares for 33 consumption categories are applied to the total expenditures of the tax family to calculate expenditures on each category of goods. Third, the direct and indirect impacts of a carbon tax on the prices of each of 389 consumption categories are estimated using a partial equilibrium, input-output model. Direct impacts are increases in energy prices due to the tax, whereas indirect effects reflect the increase in the prices of other goods and services as the cost of their energy inputs rises. And finally, these price changes are used to compute post-carbon-tax expenditures. Expenditures change only because of commodity price changes; quantities are assumed to be unchanged.[16]

Our use of tax returns mitigates measurement error in family income and consumption, and it affords reliable determinations of tax liability, both of which are important for our tax reform simulations.[17] Still, the data are imperfect, and various subcategories of income and consumption must be imputed, as explained in this section.

---

15. See Cronin (1999) for a complete description of Treasury's Distribution Model.

16. Note two points here. First, each of the 389 consumption categories for which the price rises due to the carbon tax must be mapped into the 33 consumption categories for each family. Second, the assumption that quantities are fixed might not matter much for overall regressivity if actual demand elasticities are similar across deciles. If demand is more price-inelastic for poor families than for rich ones, however, then burdens can be more regressive than measured here (West and Williams 2004).

17. Survey data may underreport income, and use of such data, without correction, can lead to implausibly high ratios of consumption to income (e.g., Toder et al. 2011). The majority of income reported on tax returns is reported by third parties and verified by the IRS (including wages, interest, capital gains, and social security income).

The accuracy of these imputations, however, is likely superior to other approaches because of the richness of Treasury data.

The TDM starts with a stratified random sample of 300,000 individual nondependent income tax returns drawn from among 143 million returns filed for 2010.[18] These returns are supplemented with tax records for 22,000 similarly sampled nonfilers using "information returns," including Forms W-2 filed by employers and various Forms 1099. Tax families are generated from these individual information returns based on filing status in previous years, age, targets for the nonfiling population from the Social Security Administration, and targets for nonfiling family structure based on the census. Together, these income tax and information returns are used to represent a population of 334 million people, or 172 million families, 28 million of whom do not file an individual income tax return.[19] The sample for 2010 is extrapolated to 2017 based on expected population size, national income, inflation, employment, and interest rates.

By employing individual tax returns and information returns for nonfilers, this approach benefits from reliable reporting. However, because some income is untaxed or unreported, a full measure of family welfare requires imputation of some income.[20] Imputed "cash income" includes such employer-provided fringe benefits as military service allowances, transportation and education benefits, as well as employer contri-

---

18. Our unit of analysis is the tax family. Each tax family includes the taxpayer, his or her spouse (if married), and any dependents living in the household or away at college. Tax families outnumber households, because some households include more than one tax family. An analysis based on households will rank two-family households higher in the income distribution than each single-family household, all else equal.

19. The tax sample has two components: first is a random sample of social security number (SSN), and second is an oversample of high-income returns and returns with certain low-probability characteristics such as negative income or a high number of capital gains transactions. Oversampled strata receive lower weights. The highest-income returns have a weight of one (all are included in the sample). Treasury uses the same sample design to choose nonfilers from information returns for individuals who do not file an income tax return. If an individual with one of the random SSN ending-digits receives a W2 or a 1099 but does not file an income tax return because they are below the filing threshold, then they are included in the sample. Weights are adjusted in the extrapolation to hit population and family structure targets from Social Security Administration data and census data.

20. Assignment of non-tax-based income items is subject to greater measurement error than the tax-based items but, to the extent possible, Treasury uses tax data to make informed imputations. For example, military allowances are only allocated to taxpayers who are in the military. And, qualifying for welfare assistance in the imputations depends on having taxable income and demographic characteristics on a tax return that are consistent with each welfare program's requirements. See Cronin (1999) for a description of income imputations in the TDM.

butions to health and life insurance policies.[21] Medical Expenditure Survey data and administrative records of the Department of Health and Human Services are used to impute Medicare, Medicaid, and workers' compensation health benefits. The Current Population Survey (CPS) is used to impute transfer benefits, including SNAP, WIC, TANF, and Low Income Home Energy Assistance Program (LIHEAP).[22] Saving or dissaving is imputed from the Survey of Consumer Finances (SCF).[23]

For each of these simulated tax families, consumption is computed as cash income less tax payments and savings (or dissaving), where cash income includes wages and salaries, net income from a business or farm, taxable and tax-exempt interest, dividends, rental income, realized capital gains, cash or near-cash transfers from government, distributed retirement benefits, and employer fringe benefits. It is assumed that family consumption is equal to at least half of the federal poverty level corresponding to family size. Families whose estimated consumption falls short of this threshold are assumed to finance this minimum consumption from unmeasured transfers or debt financing. This assumption has the effect of increasing the average consumption of the poorest 10% of families by almost 50%.

In order to estimate carbon tax burdens across families, each family is matched to a record of the CEX that reports expenditures across 33 categories of goods, the prices of which change with the introduction of a carbon tax. The match is based on cells in the CEX defined by marital status, five age categories, five categories of family size, and 18 expenditure ranks (from lowest 5% to top 10%). These distinctions yield 900 combinations or cells to which CEX records belong—and to which each tax family is assigned. Only CEX records from 2010–12 that include four quarters of expenditures are employed, yielding 4,943 records that match to 704 of the CEX cells; no CEX records match any of the remaining 196 cells. The median CEX cell includes four CEX records, though some contain as many as 99 CEX records. Each tax family is randomly assigned to a CEX expenditure record from its corresponding CEX cell. For tax families whose characteristics match to an empty CEX cell, expenditure records are selected from among those of the next lowest expenditure rank. This nearest neighbor match is employed in fewer than 1% of records. The tax family's total expenditures are then allocated among the 33 categories by assuming that the tax family has the same expenditure shares as the family in the matched CEX record. To these im-

---

21. A measure of "economic income" could include accrued but unrealized capital gains, income unreported on tax returns, and imputed net rent of owner-occupied housing. Those kinds of income are difficult to attribute accurately across families, however, and "economic income" is difficult for general users of Treasury's distribution tables to understand. Family economic income may be larger, but the rankings of families by cash income are similar.

22. For each transfer program, the TDM uses CPS data and a logistic regression to estimate the probability that a family in the tax data would receive a particular transfer (e.g., SNAP). For more detail, see Cronin (1999).

23. Forty savings rates are imputed that vary by marital status, age, and income.

Table 1. Effects of a Carbon Tax on Fuel Commodity Prices

| Commodity Prices | Price ($2017) Various Units[a] | Carbon Tax $25/mt CO2[b] | Percent Increase due to Carbon Tax[c] |
|---|---|---|---|
| Petroleum | $48.41/bbl | $12.90/bbl | 27% |
| Natural gas | $2.95/mcf | $1.29/mcf | 44% |
| Coal | $35.16/ton | $46.86/ton | 133% |

Note. mt = metric ton; bbl = barrel; mcf = thousand cubic feet.
[a] Projections by the Office of Tax Analysis (OTA) of the US Treasury.
[b] Based on carbon content of 53.12 kg/mcf (natural gas), 1,874 kg/ton (average coal), 0.43 mt/bbl petroleum). Source for natural gas: http://www.eia.gov/environment/emissions/co2_vol_mass.cfm. Source for coal and petroleum: https://www.epa.gov/energy/ghg-equivalencies-calculator-calculations-and-references.
[c] Based on the assumption of 100% pass-through of the tax.

puted expenditures are added consumption from employer fringe benefits that cover costs not reported in the CEX, including transportation and education benefits, as well as employer-paid child care and insurance benefits. Addition of this fringe consumption most substantially increases consumption in the health category, which rises from 8% of total out-of-pocket expenditures to 17% of total consumption.

The carbon tax burden for each family is readily calculated, given their consumption expenditures and the calculated price changes for each of the 33 consumption goods. Treasury employs an input-output model to compute the price change for each consumption good according to the price changes of the intermediate inputs for each consumption category.[24] The carbon tax directly impacts the price of fuels, according to their carbon intensities. Using estimates of carbon intensity from the US Energy Information Administration and the Environmental Protection Agency, Treasury calculated that a $25 tax per metric ton of $CO_2$ would increase the price of coal by 133% (see table 1). Petroleum prices rise by 27%, and natural gas prices by 44%. These price increases are greater than those estimated in Metcalf (2007) and used by Hassett et al. (2009) for a $15 tax per metric ton of $CO_2$. Metcalf (2007) estimates that such a tax would increase the price of coal by 91%, the price of petroleum by 13%, and the price of natural gas by 6% relative to average prices in 2005. The much higher 44% price increase for natural gas in our analysis is the result of both a higher carbon tax rate and a much lower price for natural gas in our more recent year (expected to continue into 2017).[25]

24. For similar models, see, e.g., Fullerton (1996), Metcalf (1999, 2009), Hassett et al. (2009), and Mathur and Morris (2014). Treasury starts with a $25 tax per metric ton of carbon dioxide to calculate price changes (Horowitz et al. 2017). As described below, however, we scale Treasury's price calculations to a somewhat lower tax rate that yields a gross revenue of exactly $100 billion and that raises the price level by approximately 1%.

25. The Henry Hub natural gas spot price was $13.05 per million Btu in December 2005 but is projected to be only $2.95 in 2017.

These fuels are intermediate inputs to production of most other goods, so their estimated price increases induce increases in other product prices. To determine indirect price changes, the Treasury employs the most recent US Bureau of Economic Analysis benchmark input-output tables. These 2007 tables show how much of each output is produced by each of 389 industries and how much of each is used in production by each industry. Fuel price increases are applied at the extraction level for oil and gas and at the mining level for coal. When the price increases are initially applied, firms in the 389 industries pass all of their costs along to the purchaser.[26] This assumption results in output price increases across the 389 industries, which leads to another round of price hikes. Treasury iterates on this process, using the 389 industry input-output tables, until the price changes being observed are sufficiently small. Then, to obtain the final purchaser price of the good, they apply margins for transportation, retail, and wholesale trade.[27] The price changes for the 389 outputs are then mapped to changes in the 33 consumption goods defined in the CEX and imputed to the TDM.[28] Calculated price changes from the carbon tax are reported in the last column of table 2; earlier columns show corresponding price changes in previous studies. The table uses bold for the four carbon-intensive goods with the largest percentage price increases: electricity (9.0%), natural gas (14.8%), home heating oil (14.5%), and gasoline (14.8%). Other large price changes are for mass transit (4.6%) and air transport (5.5%). Most indirect price increases are less than 1% and are omitted (except for housing and health).

### 3. MEASURES OF INCOME AND SUMMARY STATISTICS

To measure redistributions across income groups, we need to choose a measure of "income" to rank families and divide them into deciles. The most common measure

---

26. In fact, Treasury splits oil and gas in the Benchmark I-O table, so they are actually using 390 industries. Also, as noted in our introduction, burdens could depend partly on changes in wage/rental ratios (e.g., Beck et al. 2015; or papers in Parry et al. 2015). Finally, we note that much of the power sector is still subject to price regulation, and the marginal fuels that determine prices can be different from baseload fuels.

27. These margins are provided by the Bureau of Economic Analysis (BEA) as part of the input-output tables, and the prices for these margins also increase with the imposition of the carbon tax. For example, $100 spent on a particular good at producer prices might translate to $120 for a final purchaser when retail and transportation costs are added. The price increases for that good and the margins are separately estimated and, then, aggregated to obtain the final purchasing price.

28. The mapping from the BEA's Personal Consumption Expenditure (PCE) to the CEX is based on a concordance between the PCE and CEX categories as provided by the Bureau of Labor Statistics (BLS). The latest available BLS concordance uses the PCE 2002 benchmark, but Treasury updated its mapping to the 2007 benchmark and had to make adjustments to map consumption categories not included in the CEX (health consumption in particular).

Table 2. Changes in Consumption Category Prices due to Carbon Tax

| Commodity | Hassett et al. (2009) ($15/mt, 2005 Prices, 2003 Consumption) (%) | Mathur and Morris (2014) ($15/mt, 2010 Prices) (%) | Treasury (2016) ($25/mt, 2017 Prices) (%) |
|---|---|---|---|
| Coal | Nearly 100 | | 133 |
| Petroleum | 13 | | 27 |
| Natural gas | 7 | | 44 |
| Family consumption good: | | | |
| Food at home | .70 | .83 | 1.46 |
| Food at work | .86 | 1.05 | 1.46 |
| Tenant occupied dwelling | .31 | .17 | .88 |
| **Electricity** | **12.55** | **5.21** | **9.01** |
| **Natural gas** | **12.28** | **18.92** | **14.83** |
| Water | .63 | .46 | 2.45 |
| **Home heating oil** | **9.56** | **6.10** | **14.51** |
| Health | .39 | .32 | .55 |
| **Gasoline** | **7.73** | **4.72** | **14.81** |
| Mass transit | .90 | .75 | 4.61 |
| Air transportation | 1.86 | 2.01 | 5.46 |
| Other recreation services | .51 | .31 | 1.14 |
| Higher education | .30 | .44 | 1.32 |

Note. Bold indicates the four carbon-intensive goods with the largest percentage price increases.  mt = metric ton.

employed in studies over past decades is a measure of annual income (preferably a more inclusive measure than taxable income). Yet annual income is not a good measure of who is doing well or poorly. Each group is an aggregation of very dissimilar individuals, many of whom are only temporarily in that annual income decile. If those with positive income shocks save more of annual income than those with negative income shocks, then classification by annual income exaggerates the regressivity of energy taxes that raise commodity prices (Poterba 1989; Bull et al. 1994; Sterner 2012).

In contrast, under the permanent income hypothesis (Friedman 1957), annual consumption is less sensitive to shocks and exhibits less severe life-cycle patterns.[29] There-

_____

29. Bull et al. (1994) observe in US CEX data that consumption closely follows income, exhibiting a "marked hump-shaped pattern" over lifetimes, rather than remaining relatively flat

fore, a more meaningful measure of well-being might be a measure such as permanent income or lifetime income. Yet, such measures can be very difficult to estimate.[30] To the extent that the permanent income hypothesis is violated, and consumption does increase in the middle part of consumer lifetimes (e.g., Bull et al. 1994), then our low-consumption deciles may include young or old households whose lifetime consumption is understated. If carbon intensity of household consumption were strongly correlated with age, then our estimates of distributional impacts could be biased. For instance, if young and old families tend to have more carbon-intensive consumption than middle-aged families, then our estimates would overstate burdens in our low-consumption deciles (progressivity biased downward). In later tables, we consider the robustness of our results to life-cycle consumption by looking only at those who are 40–49 years old.

Here, we have only one year of data for each tax family, but even these data can provide a reasonable proxy for lifetime income. Suppose that each household does consider its expected future annual incomes, that it employs a present-value budget constraint to choose current annual consumption, and that annual consumption exhibits diminishing marginal utility. Under these conditions, Poterba (1991) points out that households will choose a smooth consumption pattern that reflects permanent income. As a consequence, annual consumption is a good proxy for permanent income, or at least it is better than annual income as a proxy for permanent income. Therefore, we stratify families according to total annual consumption rather than annual income. (In fact, table 5 is the only table that classifies families by annual income, in order to compare implications of using annual income or annual consumption measures.)

For families classified into annual consumption deciles, the TDM's distribution of income and consumption at 2017 levels is reported in table 3.[31] In total, consumption is equal to 70% of income. The 10% of families with the highest annual consumption accrue 44.3% of total cash income and consume 36% of all goods and services. The

---

as posited by the permanent income hypothesis. Therefore, they account for energy tax incidence on lifetime consumption by adjusting current household consumption to reflect the typical lifetime consumption profiles for similar households.

30. Fullerton and Rogers (1994) and other studies calculate tax incidence using overlapping-generations models of households classified by an estimate of lifetime income—the present value of all wage income plus inheritances. The measure can be estimated for different households using as many years as possible from the Panel Survey of Income Dynamics (PSID). Hassett et al. (2009) develop a measure of lifetime income following Bull et al. (1994).

31. Cash income includes transfers for alimony, social security, unemployment compensation, and nontaxable transfers from the government, including the insurance value of Medicaid and Medicare and benefits from the following programs: SNAP, WIC, TANF, and Low Income Home Energy Assistance Program (LIHEAP).

Table 3. Distribution of Cash Income and Consumption, by Consumption Decile

| Adjusted Family Consumption Decile | 2017 Consumption Range[a] | Percent Distribution of Cash Income | Percent Distribution of Consumption |
|---|---|---|---|
| 1[b] | $0 to $11,405 | 1.0 | 1.8 |
| 2 | $11,405 to $15,559 | 1.9 | 2.9 |
| 3 | $15,559 to $19,810 | 2.8 | 3.8 |
| 4 | $19,810 to $24,961 | 3.8 | 4.9 |
| 5 | $24,961 to $31,181 | 5.2 | 6.2 |
| 6 | $31,181 to $38,226 | 6.8 | 7.7 |
| 7 | $38,226 to $46,220 | 8.8 | 9.5 |
| 8 | $46,220 to $57,267 | 11.3 | 11.8 |
| 9 | $57,267 to $75,827 | 15.4 | 15.0 |
| 10 | over $75,827 | 44.3 | 36.3 |
| Total[b] | | 100.0 | 100.0 |

[a] The consumption range is shown on a single-person family equivalent basis. Families are ranked according to consumption adjusted for family size, using a square root of family size adjustment. A family of four with $40,000 of consumption would be equivalent to a family of one with $20,000 of consumption.

[b] Families with negative income are excluded from the first decile but included in the total.

poorest 10% of families by that measure have only 1% of income and consume 1.8% of all goods and services. Cash incomes are more skewed toward the rich than are consumption levels, because high-income families bear greater tax burdens and save more than low-income families.

For each consumption good listed in table 2, a row of table 4 shows each decile's expenditure on that good as a fraction of its total expenditure. The greatest consumption shares for all deciles are in food, housing, and health. Consumption shares for health decline markedly across deciles, from 32% for the poorest 10% of families to 10% for the richest families. Total food consumption shares vary less, from 14% for the poorest families to 10% for the richest families. Mass transit constitutes less than 1% of expenditures across deciles. Expenditures on the most energy-intensive goods comprise in total less than 11% of overall consumption across deciles (including the four goods in bold that had the largest price increases in table 2, namely, electricity, natural gas, home heating oil, and gasoline). As observed in other studies, electricity shares diminish with income. As reported in table 4, they do so only modestly, from 4.1% to 2.9%. The other three most energy-intensive goods have no discernible pattern or have shares that increase from the poorer to the richer deciles. For example, gasoline expenditure shares increase from the first to the eighth decile, reflecting the ability of higher income groups to afford personal vehicle travel. Overall, the ex-

Table 4. Consumption Shares by Consumption Categories for Each Decile

| Consumption Category | Percent of Total Consumption, by Consumption Decile | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | All Families | 1 Poor | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 Rich |
| Food at home | 10.9 | 14.0 | 13.5 | 12.7 | 12.2 | 11.7 | 11.3 | 10.9 | 11.2 | 11.0 | 9.9 |
| Food at work | .0 | .0 | .0 | .0 | .0 | .0 | .1 | .1 | .0 | .0 | .0 |
| Tenant occupied dwelling | 18.6 | 19.6 | 20.4 | 19.4 | 19.3 | 18.8 | 18.8 | 18.1 | 17.6 | 17.8 | 19.0 |
| **Electricity** | **3.2** | **4.1** | **4.1** | **3.9** | **3.6** | **3.5** | **3.4** | **3.1** | **3.3** | **3.3** | **2.9** |
| **Natural gas** | **.9** | **.9** | **1.0** | **1.1** | **1.1** | **1.0** | **1.0** | **1.0** | **1.0** | **.9** | **.9** |
| Water | 1.2 | 1.2 | 1.1 | 1.2 | 1.2 | 1.1 | 1.1 | 1.2 | 1.3 | 1.2 | 1.1 |
| **Home heating oil** | **.3** | **.2** | **.2** | **.2** | **.4** | **.4** | **.4** | **.3** | **.3** | **.3** | **.4** |
| Health | 17.3 | 31.6 | 26.2 | 23.1 | 23.2 | 24.2 | 23.8 | 22.3 | 19.9 | 17.4 | 9.8 |
| **Gasoline** | **5.5** | **4.0** | **5.0** | **5.8** | **5.7** | **5.5** | **5.4** | **5.8** | **6.0** | **5.6** | **5.4** |
| Mass transit | .5 | .4 | .3 | .3 | .3 | .4 | .5 | .6 | .5 | .5 | .5 |
| Air transportation | .6 | .4 | .6 | .2 | .2 | .3 | .4 | .5 | .6 | .7 | .8 |
| Other recreation services | .9 | .3 | .4 | .5 | .5 | .6 | .6 | .8 | .9 | .9 | 1.2 |
| Higher education | 1.0 | .4 | .5 | 1.1 | 1.5 | 1.0 | .7 | .7 | .5 | .6 | 1.5 |

Note. Bold highlights the four goods that had the largest price increases in table 2.

penditure share for any reasonable aggregation of energy-intensive goods is roughly flat across consumption deciles.

## 4. CALCULATIONS FOR POLICY ALTERNATIVES

All simulations include an illustrative $100 billion carbon tax, either with no rebate or with one of three revenue-neutral types of rebate.[32] In all cases commodity prices rise relative to factor incomes to cover firms' extra costs of purchasing energy inputs and other energy-intensive intermediate inputs.[33] We assume that the government uses

---

32. Starting with Treasury estimates of all price changes for a $25 tax per metric ton of $CO_2$, we scale them to a $100 billion revenue total (consistent with Horowitz et al. 2017). The resulting tax is about $20 per metric ton of $CO_2$ and corresponds roughly to a 1% increase in price level, assuming no change in quantities consumed.

33. Standard Treasury analyses such as in Horowitz et al. (2017) assume no changes in the price level, as is consistent with revenue-estimating assumptions. Instead, the tax is passed back to factor incomes, and relative output prices adjust. Carbon-intensive goods become relatively more expensive, and less carbon-intensive goods become relatively less expensive. On a present value basis, without bequests, the two methods are theoretically equivalent. In both cases, transfer income is largely held harmless (and we assume 100% held harmless). That is, when the tax is passed forward, transfer income is indexed for the price level increase; when the tax is passed back onto factor incomes, transfer income is unaffected. As Horowitz et al. (2017) explain, however, progressivity of the carbon tax measured against annual income appears higher in their case with no price level increase than in our case, because our price level increase means family

some of the $100 billion revenue to index government transfer programs and tax parameters for those price increases.[34] Indexing of transfer programs requires government expenditures of $15.5 billion. Indexing of tax parameters lessens net revenues by $8.1 billion. This indexing is required to avoid inflation-induced "bracket creep" that would occur if taxpayers were pushed into higher tax rate brackets as nominal wages rise (but as purchasing power remains the same).

The remaining $76.4 billion in carbon tax revenues is an overall burden, or it is used according to one of the three rebate scenarios meant to represent attempts to offset the perceived or actual regressivity of the carbon tax. In effect, we ask: what if policy makers decide to offset the regressivity of the carbon tax by using the revenue to help low-income families cover the extra cost of goods that constitute a relatively high fraction of low-income family budgets. We assume that all of this remaining $76.4 billion of revenue is (1) a burden of the carbon tax with no rebate, (2) used to fund a lump-sum rebate equal to $229 per person,[35] (3) used to fund a proportional increase in all transfer program generosity,[36] or (4) used in equal proportions to reduce payroll taxes and to increase social security benefits.

The carbon tax alone might be expected to have a regressive incidence, but we show how this vertical redistribution depends on assumptions. To offset perceived regres-

---

burdens appear higher in years when annual income is low and consumption therefore exceeds income (e.g., by borrowing or dissaving). This distinction matters little in our paper, because we eschew annual income in favor of annual consumption to categorize families.

34. We abstract from monetary policy. Whether output prices rise or factor incomes fall can be equivalent, depending on what happens to real transfers and bequests. Essentially, we assume that all transfers are indexed for inflation so that when product prices rise, transfer income is held harmless in real terms. Statutes require such indexing for SNAP, social security benefits, workers' compensation, and veterans' benefits. Other transfers are not indexed automatically, but we assume indexing of LIHEAP, TANF, and WIC. This additional indexing increases expenditures by $0.5 billion of a total $15.5 billion in expenditures for indexed transfers. Although transfer income is then unchanged in real terms, transfer recipients who consume relatively carbon-intensive commodities still bear a burden from relative price changes due to the carbon tax. And conversely, transfer recipients who consume relatively few carbon-intensive commodities will face lower burdens.

35. We consider a lump-sum rebate, as it is a common proposal (e.g., Climate Leadership Group, n. 4) and topic of researchers (e.g., Rausch et al. 2011). A reviewer points out, however, that a lump-sum rebate raises the total cost of a carbon tax relative to a policy that uses its revenue to fund reductions in distortionary taxes. The costs of a carbon tax can even exceed those of standards-based policies, because of greater effects on energy prices and a greater "tax interaction effect" (e.g., Goulder 1995, 2013; Goulder et al. 1999; Goulder and Williams 2003).

36. Here, we increase existing transfer receipts by 5.9%, rather than expand eligibility to additional families. The maximum EITC in 2017 for a childless worker was $510, while the maximum for a worker with one qualifying child was $3,400. Mathur and Morris (2017) demonstrate that revenue from a tax of $32/ton $CO_2$ could hold the poor harmless and fund an expansion of the EITC to childless earners.

sivity, many discuss a refundable tax credit per person that functions as a lump-sum rebate (see n. 4). Because this tax credit is a rebate per capita, larger families receive larger payments that may affect horizontal redistribution. The fixed magnitude of the per capita rebate also ensures that this form of revenue recycling will diminish any regressivity of the carbon tax.

A hypothetical lump-sum rebate has been analyzed in other studies of the vertical distributional effects of a carbon tax. Yet actual policy may instead use existing transfer mechanisms to target the revenue toward low-income family budgets. Therefore, the next simulation increases only existing transfers and the EITC. The $76.4 billion in net carbon tax revenue is enough to increase by 5.9% all real payments for the EITC and all cash transfers.[37] In fact, either of these first two simulations might represent a preferred mechanism to address the vertical redistribution of the carbon tax, and either might be shown to represent a better mechanism to address horizontal redistribution.

The last simulation uses half of net carbon tax revenues to reduce payroll taxes and half to increase social security benefits.[38] Payroll taxes decline 3.9%, and social security benefits increase 3.7%. This simulation is intended to mitigate both regressivity and within-decile heterogeneity in tax changes. The payroll tax reduction compensates primarily low-wage workers for the higher costs of consumption, whereas the increase in social security benefits targets other low-income individuals who are not working. Though this simulation targets both workers and nonworkers, it may nevertheless fail to compensate sufficiently some families such as young unemployed families. It could also overcompensate some families, particularly those drawing high fractions of their incomes from social security. Such families benefit from the indexing of social security benefits as well as from this direct increase in benefit rates.

## 5. RESULTS

Consider first the incidence of a carbon tax without recycling net revenues, which serves as a baseline against which to compare the three alternative rebate simulations. Distinguishing our analysis is the combination of (1) detail on 322,000 diverse families, (2) showing additional tax burden in each decile as a percentage of annual consumption, and (3) indexing of transfer payments and income tax brackets.[39] As shown in table 5, the latter two features both serve to diminish measured regressivity of the

---

37. Transfers include social security, supplemental security income, wage replacement from workers compensation, SNAP, WIC, LIHEAP, TANF, veterans' benefits, unemployment compensation, and general state assistance.

38. A proportional cut in payroll taxes paid is equivalent to a cut in the effective tax rate with no change in tax base.

39. Dinan (2012) and Fullerton et al. (2012) account for inflation indexing of transfers but not of income tax bracket parameters. Brackets are indexed to price levels by statute—to avoid taxing more income at higher rates when prices and wages both rise. Thus, indexing results in lower revenues relative to a world in which taxes are not indexed.

Table 5. Comparing Carbon Tax Distributions Ranked by Income and Consumption Before and After Indexing Transfers and Tax Parameters

| Decile | Ranked by Adjusted Family Cash Income | | | | Ranked by Adjusted Family Consumption | | | |
| | Before Indexing | | After Indexing | | Before Indexing | | After Indexing | |
| | Tax Change as % of Income (1) | Tax Change as % of Consumption (2) | Tax Change as % of Income (3) | Tax Change as % of Consumption (4) | Tax Change as % of Income (5) | Tax Change as % of Consumption (6) | Tax Change as % of Income (7) | Tax Change as % of Consumption (8) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1.21 | .86 | .71 | .50 | 1.08 | .89 | .54 | .45 |
| 2 | .99 | .97 | .54 | .52 | 1.03 | .96 | .58 | .54 |
| 3 | .94 | .99 | .49 | .52 | .95 | 1.01 | .55 | .58 |
| 4 | .89 | .99 | .50 | .55 | .89 | 1.00 | .54 | .61 |
| 5 | .83 | .97 | .52 | .61 | .82 | .97 | .55 | .65 |
| 6 | .78 | .96 | .56 | .69 | .76 | .96 | .56 | .71 |
| 7 | .76 | .97 | .58 | .74 | .74 | .98 | .57 | .75 |
| 8 | .73 | .99 | .57 | .78 | .72 | 1.00 | .55 | .76 |
| 9 | .66 | .97 | .52 | .78 | .65 | .96 | .50 | .74 |
| 10 | .52 | .94 | .45 | .81 | .53 | .94 | .46 | .80 |
| Total | .67 | .96 | .51 | .73 | .67 | .96 | .51 | .73 |

Note. The carbon tax is scaled to hit $100 billion without indexing. The tax is assumed to be passed forward to consumers in the form of price increases on consumption goods, with the relative price increase of each good dependent on the carbon intensity of its inputs. Since total consumption is about $10 trillion, the $100 billion carbon tax increases the general price level by about 1%. Government transfers and certain parameters in the individual income tax are indexed. As a result, the general price increase of 1% increases government transfer expenditures by about $15.5 billion and decreases individual income tax receipts by about $8.1 billion. Together, all else equal, these two provisions would be expected to decrease carbon tax revenue by roughly $23.5 billion.

carbon tax. Even with no revenue-recycling mechanism, they jointly convert the carbon tax from regressive to progressive.

The first column of table 5 shows annual incidence of a carbon tax without indexing, with families ranked by annual income, and with tax burden shown as a percentage of annual income. This incidence appears very regressive: the carbon tax is 1.21% of income for the bottom income decile but only 0.52% of income for the top income decile.[40] The third column accounts for the indexing provisions but still ranks by annual income and still measures the added burden as a percentage of income. Then measured regressivity diminishes: the carbon tax is 0.71% of income for the bottom decile and 0.45% of income for the top decile. When the added burden is divided by consumption, in the fourth column, the carbon tax with indexing is progressive, even when families are still ranked by income: the carbon tax is 0.50% of consumption for the lowest annual income decile and 0.81% for the top annual income decile.

In the right half of table 5, the same families are instead ranked by annual consumption. When column 8 takes each burden as a percentage of consumption and accounts for indexing, the carbon tax is slightly more progressive: the burden rises almost monotonically from 0.45% of consumption for the lowest consumption decile to 0.80% of consumption for the highest decile.[41]

All other tables use this ratio of net burden to consumption, so column 8 from table 5 is repeated in table 6, as column 2, along with other results for our first case, the carbon tax with indexing but no rebate. The first column of table 6 shows that the average family in the first decile has an added tax burden of $51, while the average family in the richest decile has $1,757 of extra tax.[42] Then the third column shows the standard deviation (SD) of the tax change, and the fourth column shows this

---

40. As is standard in Treasury distribution tables, rankings by cash income and consumption have been adjusted by equivalence scales to account for both the number of persons in the family and returns to scale in sharing resources. Each family's income or consumption is divided by the square root of the number of persons in the family, to approximate the true level of well-being for individuals in the family. Thus, a family of four with $40,000 of income is ranked as having the same effective income or consumption as a family of one with $20,000 of income. This adjustment is the same as is used by the Congressional Budget Office (see the appendix in CBO 2016). For further details on the effects of the family size adjustment, see Cronin et al. (2012). This adjustment only pertains to the ranking of each family. The unit is still the family, and we have equal numbers of families in each decile.

41. "Progressive" is defined by a ratio of burden to income that rises with income (annual consumption is our proxy for permanent income). This ratio in column 8 falls slightly from decile 8 to 9, but otherwise rises monotonically from each decile to the next. However, this ratio may fall with income from one family to the next within a decile.

42. A different question is the cost of protecting each decile from any burden. Our results are weighted to represent all 172 million US families, so each decile contains 17.2 million. In the lowest decile, for example, the average burden is $51 (after indexing), so full compensation to them could conceivably cost only $877 million ($51 × 17.2 million).

Table 6. Incidence by Decile of Carbon Tax with Indexing and No Rebates

| Consumption Decile | Average Change in Tax Burden (1) | Tax Change as % of Consumption (2) | Standard Deviation of Burden (3) | Coefficient of Variation of Consumption (in %) (4) | Families with a Tax Decrease (in %) (5) |
|---|---|---|---|---|---|
| 1 | $51 | .45 | $64 | .56 | 13.6 |
| 2 | $95 | .54 | $103 | .59 | 15.4 |
| 3 | $134 | .58 | $152 | .66 | 14.9 |
| 4 | $178 | .61 | $195 | .66 | 13.9 |
| 5 | $245 | .65 | $213 | .57 | 12.0 |
| 6 | $330 | .71 | $250 | .54 | 7.9 |
| 7 | $434 | .75 | $342 | .59 | 4.9 |
| 8 | $544 | .76 | $360 | .51 | 3.0 |
| 9 | $674 | .74 | $422 | .47 | 2.0 |
| 10 | $1,757 | .80 | $22,725 | 10.37 | .8 |

SD as a percentage of mean family consumption. Each family's extra burden reduces its annual consumption, so the SD of the burden is the SD of consumption within the decile. Therefore, in the fourth column, the coefficient of variation (CV) of consumption is this SD of the tax change divided by mean consumption.

The SD increases from $64 for the first decile to $422 for the ninth decile. Between these deciles, mean consumption in the denominator of the CV rises faster than SD in its numerator, so the CV falls from 0.56% to 0.47% from the first to the ninth decile (though not monotonically). For the top decile, however, both the SD and CV increase dramatically (to $22,725, or 10.37% of consumption). This variation within the top decile is difficult to interpret, because the top decile is very heterogeneous and family income or consumption is virtually unbounded. Some families in Treasury's confidential tax return data have extremely high income, consumption, and taxes. Thus, the decile's standard deviations are large for income, for energy consumption, and for burdens of a carbon tax.[43] The added variation within this top decile can

---

43. In Treasury's raw data, some families have large negative income and negative taxes because of loss offsets, but most of those families have large wealth and only temporary losses. Because these families are not representative of the lowest income decile, they are not included when calculating results for the lowest decile (but they are included in the totals). Thus, income is bounded from above and from below in all of the first nine deciles, but not in the top decile. Because of this extreme variation within the top decile, other studies using tax data have separated the top 1% of income from the rest of this top decile. We do not focus on the top 1% or bottom 1% (except for one policy scenario in table 8 below). We have good tax data for the top 1%, but Treasury imputes data for nonfilers in the bottom 1%. Also, we have to match each of

Table 7. Incidence by Decile of Carbon Tax with Indexing and Per Capita Rebate

| Consumption Decile | Average Change in Tax Burden (1) | Tax Change as % of Consumption (2) | Standard Deviation of Burden (3) | Coefficient of Variation of Consumption (in %) (4) | Families with a Tax Decrease (in %) (5) |
|---|---|---|---|---|---|
| 1 | −$294 | −2.59 | $203 | 1.79 | 100.0 |
| 2 | −$325 | −1.86 | $236 | 1.35 | 99.7 |
| 3 | −$297 | −1.29 | $262 | 1.14 | 96.6 |
| 4 | −$258 | −.88 | $281 | .96 | 90.1 |
| 5 | −$206 | −.55 | $252 | .67 | 80.2 |
| 6 | −$125 | −.27 | $237 | .51 | 66.8 |
| 7 | −$33 | −.06 | $276 | .48 | 52.4 |
| 8 | $71 | .10 | $280 | .39 | 37.8 |
| 9 | $204 | .23 | $347 | .38 | 23.1 |
| 10 | $1,270 | .58 | $22,718 | 10.37 | 7.2 |

be compared across reforms, in tables 6–10, but the added variation in the top decile is not comparable to added variation in other deciles.

Finally, in table 6, the last column (col. 5) shows the percentage of families with a negative net burden ("percent winners"). This addition of a carbon tax with no rebate might be expected to create only positive burdens, but indexing provisions effectively raise all families' transfers—including social security—by a single price index with one set of weights for all consumption goods. Therefore, any family with little or no need for air conditioning or heat may actually have little extra carbon tax burden but receive a net gain from increased transfers that reflect the nationwide average increase in costs of consumption goods. Transfer income as a fraction of total consumption falls monotonically from the first to the tenth decile. Percent winners falls monotonically from 15.4% at the second decile to 0.8% at the tenth decile. Among the first decile, 13.6% of families experience a decrease in tax burdens.

When carbon tax revenues are refunded in a per capita lump-sum payment, as shown in table 7, the net additional burden as a percentage of consumption is even more clearly progressive. In fact, the average family in each of the first seven consumption deciles receives a net reduction in tax. The average reduction in tax burden for the

the 322,000 tax families to one of the 4,900 CEX families, where the CEX has few if any observations in the top or bottom 1% of income. Moreover, existing literature about the top or bottom 1% have focused on extreme inequality itself, and particularly on changes to income of the top 1% over recent decades, whereas our interest is on overall vertical and horizontal redistributions from a carbon tax.

poorest 10% of families is $294, or 2.59% of consumption. The richest families experience a net tax burden increase of $1,270 per year, equal to 0.58% of their consumption.

However, not all of the poorest 10% of families enjoy net tax reductions under this lump-sum rebate. The full distribution of tax changes as a percentage of consumption within select deciles is presented in figure 1a. This figure includes a gray vertical line to denote the boundary between winners and losers, and it plots the distribution of outcomes for five deciles: the first, second, fifth, ninth, and tenth. For each decile, we calculate the share of its population experiencing a tax change as percentage of consumption in each 1% range (such as zero up to 1% more tax, or those between 1% and 2% more tax). The figure plots those shares for nine discrete bins, from a net tax cut of greater than 6% to a net tax increase greater than 3%.

The figure shows that 7% of the poorest families receive net tax cuts of more than 4% of consumption, while 0.01% bear more burden. In the highest decile, the figure shows less heterogeneity in tax changes as a percentage of consumption among families. Eighty-five percent of them experience a tax increase of zero to 1% of consumption, while 8% incur extra burdens of 1% to 2% of consumption, and 7% get tax cuts of up to 1% of consumption. Thus, intra-class variation seems to diminish with income.

To investigate this variation further, the third column of table 7 reports the standard deviation of the tax change within each decile. This SD increases from $203 for the lowest decile to $347 for the ninth decile, while the CV falls monotonically from 1.79% for the poorest decile to 0.38% for the ninth decile. The SD is broadly similar for the carbon tax alone in table 6 and with the per capita rebate in table 7. It rises from the first to the fourth deciles. But the CV within the first five deciles is larger when using carbon revenue for per capita rebates. Even though family size varies in all deciles, this variation in family size implies variation in per capita rebates that is a greater percentage of consumption in low consumption deciles. An alternative to per capita rebates could be the same rebate per family, or rebates that use equivalence scales to offset the burden measured in effective consumption for each person.

Next, table 8 considers the case where carbon revenues are returned via the same 5.9% increase in the EITC and all transfer benefits (above and beyond indexing of transfers). This reform also results in a progressive distribution of burdens as shown in the second column, where the net burden is negative for eight deciles and positive only for the top two deciles. Because transfers are a larger fraction of income for those in lower deciles, progressivity is mostly greater than in table 6 for the carbon tax alone.[44] But the increase in EITC and all transfers is not as progressive as the per capita rebate in table 7. Although transfers are important sources of income in lower

---

44. The net gain as a percentage of consumption rises from decile 1 to 2, because the first decile has more single person families that receive smaller transfers and are less likely to be eligible.

**(a)**



**(b)**



**(c)**



Figure 1. Distribution of net tax changes by decile for each rebate policy. *a*, Carbon tax with per capita rebate (CT2). *b*, Carbon tax with proportional increase in transfers (CT3). *c*, Carbon tax with payroll tax cut and social security benefits increase (CT4). For each of three carbon tax

Table 8. Incidence by Decile of Carbon Tax with Indexing and Proportional Increase in EITC and Transfers

| Consumption Decile[a] | Average Change in Tax Burden (1) | Tax Change as % of Consumption (2) | Standard Deviation of Burden (3) | Coefficient of Variation of Consumption (in %) (4) | Families with a Tax Decrease (in %) (5) |
|---|---|---|---|---|---|
| 1 | −$109 | −.96 | $233 | 2.05 | 53.0 |
| 2 | −$187 | −1.07 | $339 | 1.93 | 58.5 |
| 3 | −$224 | −.97 | $469 | 2.04 | 53.5 |
| 4 | −$254 | −.87 | $613 | 2.09 | 47.7 |
| 5 | −$212 | −.56 | $736 | 1.96 | 40.0 |
| 6 | −$108 | −.23 | $813 | 1.74 | 33.7 |
| 7 | −$31 | −.05 | $913 | 1.59 | 32.6 |
| 8 | −$5 | −.01 | $1,022 | 1.46 | 34.2 |
| 9 | $59 | .06 | $1,155 | 1.26 | 33.8 |
| 10 | $1,090 | .50 | $22,773 | 10.39 | 26.1 |

[a] The bottom 1% experience an average net tax change of −$104, or −0.97% of consumption. The standard deviation is $255, and the coefficient of variation of consumption is 2.38%. For the top 1%, the average net tax change is $6,211, or 0.73% of consumption. The standard deviation is $71,661, and the coefficient of variation of consumption is 8.42%.

deciles, many transfers are not means tested. As a result, the lowest decile receives about 5% of transfer income, whereas the top decile receives 13%. Average family size, in contrast, does not vary much across deciles.

With the rebate via transfers in table 8, the largest net tax cuts accrue to families in the third, fourth, and fifth consumption deciles ($212 to $254). In contrast, the poorest families receive only a $109 tax reduction on average, a little more than one-third the size of the tax reduction they received under the lump-sum per capita rebate. The richest families pay $1,090 more in tax on average, equal to a half percent of their annual consumption. This reform avoids average tax changes as a percentage of consumption greater than 1%, with the exception of the second decile where the average tax cut is 1.07% of consumption.

Figure 1*b* shows that this relatively more equal treatment of families across deciles comes at the cost of greater heterogeneity of tax impacts within each decile. Looking at impacts within the poorest decile, 47% of families experience a tax increase, even

rebate policy simulations, the figure reports the inter-decile distribution of net tax changes as a percentage of consumption for select consumption deciles (first, second, fifth, ninth, and tenth). For each discrete bin of net tax change percentage on the horizontal axis, it depicts on the vertical axis the percentage of the decile population calculated to experience a net tax change in that bin.

though the long negative tail of this distribution leads to an average net reduction in taxes that is about 1% of consumption. Existing transfers for some poor families are small or zero, so a proportional increase in such transfers adds to heterogeneity of impacts within this group. That is, larger transfers can offset the positive additional carbon tax burden only for some families. While some families face higher carbon tax burdens with no additional transfers, more than 25% of these poorest families enjoy an overall net tax cut equal to more than 2% of consumption.

The average family in each of the first eight deciles enjoys a net tax cut, yet figure 1*b* and table 8 show that 42% to 66% of families within each of these deciles experience tax increases (sometimes over 2% of consumption). Comparing figure 1*a* and 1*b* indicates that each selected decile exhibits more variation in tax treatment under the transfer expansion than under the lump-sum rebate. In fact, every coefficient of variation of consumption is greater with the transfer expansion in table 8 than with either the lump-sum rebate in table 7 or no rebate in table 6. In other words, the use of transfers to rebate carbon tax revenue introduces more intra-class variation in consumption than does the carbon tax itself.[45]

For our final reform, table 9 shows the carbon tax when revenue is recycled in equal shares to payroll tax reductions and increases in social security benefits. This package is slightly progressive from deciles 4 to 10, but not from deciles 1 to 4. Still, it yields a small net tax cut for the first nine deciles and a tax increase only for the richest decile. The poorest 10% of families experience an average tax reduction of $18/year, or 0.16% of consumption. The average family in the richest decile is hit by a tax increase of $704, or 0.32% of consumption. Across all deciles, the largest net tax cut for the average family is in the fourth and fifth deciles, each of which receives a tax cut equal to $113 (or 0.38% and 0.30% of consumption, respectively).

Compared to the other reforms, it most nearly approximates a proportional tax reform while avoiding the most dramatic intra-class variation in tax changes. It compensates workers for their extra carbon tax burden through the payroll tax reduction, and it compensates retirees with enhanced social security benefits. It does not compensate the nonworking, nonelderly poor, though they benefit from the indexing of transfers. As a result, gains to the poor are more limited than in the other proposed reforms, while the losses to the rich are also more limited.

---

45. Our paper is not about extreme inequality or about recent changes to the income share of the top percentile, but our note to table 8 shows some effects of this policy scenario on the top and bottom 1% of the consumption distribution. Effects for the bottom 1% are similar to those of the bottom 10%, probably because the Treasury had to impute much information for the lowest-income nonfilers by using CEX and transfer program information from other families in the first decile. Likewise, the distribution of tax changes for the top 1% is similar to those of the top decile. These numbers have insufficient accuracy, which is why we have not emphasized them.

Table 9. Incidence by Decile of Carbon Tax with Indexing, Half of Net Revenue to Payroll Tax Reduction, and Half to Social Security Benefits Increase

| Consumption Decile | Average Change in Tax Burden (1) | Tax Change as % of Consumption (2) | Standard Deviation of Burden (3) | Coefficient of Variation of Consumption (in %) (4) | Families with a Tax Decrease (in %) (5) |
|---|---|---|---|---|---|
| 1 | −$18 | −.16 | $153 | 1.33 | 31.6 |
| 2 | −$44 | −.25 | $228 | 1.29 | 36.9 |
| 3 | −$74 | −.32 | $309 | 1.33 | 37.6 |
| 4 | −$113 | −.38 | $388 | 1.32 | 40.6 |
| 5 | −$113 | −.30 | $437 | 1.15 | 38.8 |
| 6 | −$89 | −.19 | $471 | 1.01 | 37.7 |
| 7 | −$70 | −.12 | $543 | .94 | 40.1 |
| 8 | −$81 | −.11 | $593 | .83 | 43.0 |
| 9 | −$86 | −.09 | $664 | .73 | 47.8 |
| 10 | $704 | .32 | $22,616 | 10.31 | 34.9 |

Looking at table 9 where nine deciles gain, a conventional analysis of the incidence from this third reform might suggest that the vast majority of families benefit. But further analysis of heterogeneous tax treatment within each decile reveals the opposite. The last column in table 9 shows that a majority of families in all deciles experience tax increases (though fig. 1*c* shows for select deciles that most of these extra taxes are only up to 1%). In fact, tax increases apply to 68% of the poorest families, a share that is greater than for any other decile.

For the 17.2 million families in the poorest decile, 92,000 (0.5%) receive tax cuts or benefit increases equal to 5% of consumption or more. Gains greater than 10% of consumption are enjoyed by 27,000 families. Heterogeneity in tax changes as a percentage of consumption declines across most deciles in table 9 or figure 1*c*. None of the richest families receives a tax cut greater than 5% or an increase greater than 3% of consumption. Outcomes vary less within deciles from this refund than from any other refund considered here, but intra-class variation is still greater than with no refund (except in the top decile).[46] Meanwhile, the CV of consumption is larger than in the case with no refund for the first nine deciles, and it is twice as large for the first five deciles.

The distributional impacts of all these reforms are summarized in figure 2. For each reform, a whisker bar is used to depict the range from the 10th to 90th percentile of the distribution of tax changes within each decile, and an *x* is used to show the median tax change as a percentage of consumption. It is evident in the figure that the

---

46. In this reform, the coefficient of variation of consumption for the top consumption decile is lower than in any other rebate scenario modeled in this paper, but only barely.

S198    *Journal of the Association of Environmental and Resource Economists*    March 2019



Figure 2. Distribution of the change in tax burdens as a % of consumption by decile, for a carbon tax with and without rebates (range of each bar is 10th to 90th percentile)

third proposed reform that rebates revenues through EITC and transfers (CT3 in the figure) induces considerably more variation in tax changes within every group than does any other policy considered. This variation appears to be largest in the third and fourth consumption deciles. The second-most variation in every decile is created by the fourth proposal that rebates revenues through payroll taxes and social security benefits (CT4). In contrast, the carbon tax without rebate (CT1) has the lowest variation in the middle 80th percentile range of impacts among low-income groups. The second reform (CT2), with per capita rebate, yields the largest median tax reduction as a percentage of income for the poorest 70% of the income distribution. And, among the revenue recycling options, it induces the least additional variation in the middle 80th percentile range of impacts among all groups.

One additional point from figure 2 is that the richest decile has the shortest whisker bars of any decile, that is, the least variation between the 10th and 90th percentile of the gain or loss as a percentage of consumption within the decile. Yet its standard deviation as a percentage of consumption is far higher than any other decile (the CV,

for all four reforms). The reason is that the richest 10% within this richest decile have significantly more consumption and therefore more change in burden than others within the middle 80% of the decile.

While prior literature disagrees on "horizontal equity" as a normative goal, that debate was about variation in the level of tax burden for those at the same level of well-being, while we show only variation in the change of tax burden. We could, for example, show how each reform package changes the SD of total tax within each decile. For two reasons, such calculations are avoided. First, that analysis would have to look at "similar" families within some range of consumption, and yet even a strictly proportional tax would naturally result in a range of tax burdens across that range of consumption. Thus, we see no reason for interest in whether a reform helps to equalize existing tax burdens of all families across a range of consumption. Second, even if we could identify multiple families with identical means, it is not evident that a reasonable objective for climate policy is to equalize the preexisting total tax burden. Still, some might hold that avoidance of capricious gains and losses is a worthy objective of climate policy.

## 6. FURTHER EXPLORATIONS

In order to address the sensitivity of our results to use of consumption as a proxy for permanent income, we evaluate distributional effects for only those families whose primary filer is aged 40–49 (both for the carbon tax alone in table 10 and for the case with EITC and transfer expansion in table 11). The idea is to control for the life cycle of consumption by considering families at a similar stage of the life cycle but among whom consumption may still differ. For ease of comparison, each table first reports effects for all families (from prior tables) and then for only those with filers aged 40–49. Qualitatively, results for both reforms are unchanged by looking at only this age group. Comparing column 2 to column 1 in both tables demonstrates that the magnitudes of mean tax changes as percentage of consumption are raised by considering only 40–49-year-olds, but the pattern of vertical distribution is similar. The tax change as percentage of consumption still increases nearly monotonically from the lowest to highest decile, with or without conditioning on age. Comparing columns 4 to columns 3 in both tables shows that variation within deciles is lower for those aged 40–49 than for all families, but again the pattern is similar: for those middle-aged, just like all families, the CVs for the carbon tax with rebates through transfers are all larger than for the carbon tax alone (especially for the first five deciles). Also, the percentage of families that enjoy tax decreases is shown in column 6 for those aged 40–49. Again, these results for both reforms are similar to those for all families in column 5: the percentage who are winners rises from decile 1 to 2 and then falls almost monotonically.

Overall, even if the patterns are similar, these results indicate that mid-life-cycle families are less likely to gain from the tax changes, and they experience larger tax

Table 10. Incidence by Decile of a Carbon Tax with Indexing and No Rebates, for All Families and for Those with Primary Filer Aged 40–49

| Consumption Decile | Tax Change as % of Consumption (1) | Tax Change as % of Consumption Ages 40–49 (2) | Coefficient of Variation of Consumption (in %) (3) | Coefficient of Variation of Consumption (in %) Ages 40–49 (4) | Families with a Tax Decrease (in %) (5) | Families with a Tax Decrease (in %) Ages 40–49 (6) |
|---|---|---|---|---|---|---|
| 1 | .45 | .65 | .56 | .55 | 12.2 | 5.0 |
| 2 | .54 | .67 | .59 | .58 | 14.3 | 7.4 |
| 3 | .58 | .74 | .66 | .65 | 14.1 | 4.0 |
| 4 | .61 | .81 | .66 | .46 | 13.4 | 1.5 |
| 5 | .65 | .86 | .57 | .50 | 11.7 | .7 |
| 6 | .71 | .86 | .54 | .48 | 7.6 | .7 |
| 7 | .75 | .88 | .59 | .45 | 4.7 | .3 |
| 8 | .76 | .88 | .51 | .39 | 2.8 | .3 |
| 9 | .74 | .88 | .47 | .36 | 1.9 | .1 |
| 10 | .80 | .85 | 10.37 | 5.20 | .8 | .4 |

Table 11. Incidence by Decile of a Carbon Tax with Indexing and Proportional Increase in EITC and Transfers, for All Families and Those with Primary Filer Aged 40–49

| Consumption Decile | Tax Change as % of Consumption (1) | Tax Change as % of Consumption Ages 40–49 (2) | Coefficient of Variation of Consumption (in %) (3) | Coefficient of Variation of Consumption (in %) Ages 40–49 (4) | Families with a Tax Decrease (in %) (5) | Families with a Tax Decrease (in %) Ages 40–49 (6) |
|---|---|---|---|---|---|---|
| 1 | −.96 | −.62 | 2.05 | 1.70 | 51.4 | 48.7 |
| 2 | −1.07 | −.64 | 1.93 | 1.59 | 57.5 | 54.1 |
| 3 | −.97 | −.33 | 2.04 | 1.55 | 52.7 | 43.8 |
| 4 | −.87 | .06 | 2.09 | 1.37 | 47.2 | 29.2 |
| 5 | −.56 | .47 | 1.96 | 1.10 | 39.8 | 15.4 |
| 6 | −.23 | .62 | 1.74 | .95 | 33.6 | 9.8 |
| 7 | −.05 | .74 | 1.59 | .72 | 32.5 | 6.1 |
| 8 | −.01 | .73 | 1.46 | .74 | 34.2 | 6.2 |
| 9 | .06 | .76 | 1.26 | .68 | 33.8 | 5.2 |
| 10 | .50 | .79 | 10.39 | 5.22 | 26.0 | 3.6 |

changes. This result may reflect this age group's higher consumption and lower transfer receipts. But results also suggest that the vertical redistribution we observe in the main analysis is not likely to be biased by our use of consumption as a proxy for permanent income.

We now turn to explore our result that horizontal redistributions within deciles are larger than redistributions between deciles—even for the carbon tax alone and especially with rebate of revenue via transfers. Table 12 helps explain this result. The top panel shows the SD within each decile for spending on each energy good as a per-

Table 12. Variation in Energy Expenditure by Type, and Transfer Receipts by Type

| Consumption Decile | SD within Each Decile of Spending or Receipts as % of Mean Family Consumption | | | | |
|---|---|---|---|---|---|
| | Energy Expenditures | | | | |
| | Heating Oil | Natural Gas | Electricity | Gasoline | Total |
| 1 | 1.2 | 1.9 | 3.9 | 4.3 | 7.38 |
| 2 | 1.0 | 1.8 | 3.7 | 5.2 | 7.99 |
| 3 | 1.3 | 1.9 | 3.3 | 5.2 | 7.64 |
| 4 | 1.6 | 1.9 | 2.9 | 4.8 | 6.90 |
| 5 | 1.6 | 1.7 | 2.5 | 4.4 | 6.31 |
| 6 | 1.6 | 1.5 | 2.4 | 4.3 | 6.06 |
| 7 | 1.5 | 1.5 | 2.3 | 4.8 | 6.45 |
| 8 | 1.7 | 1.5 | 2.3 | 4.3 | 6.18 |
| 9 | 1.4 | 1.2 | 2.3 | 3.9 | 5.59 |
| 10 | 7.7 | 9.7 | 43.2 | 59.1 | 107.18 |
| | Transfer Receipts | | | | |
| | EITC | Social Security | SSI | SNAP | Total |
| 1 | 9.18 | 26.76 | 8.14 | 11.62 | 30.09 |
| 2 | 10.93 | 26.38 | 8.74 | 9.65 | 28.07 |
| 3 | 7.78 | 27.22 | 7.99 | 8.06 | 28.60 |
| 4 | 4.81 | 27.12 | 7.01 | 6.26 | 28.72 |
| 5 | 2.86 | 24.64 | 5.68 | 4.37 | 26.80 |
| 6 | 1.37 | 21.60 | 4.28 | 3.00 | 23.61 |
| 7 | .47 | 19.44 | 3.38 | 1.87 | 20.88 |
| 8 | .17 | 17.87 | 2.76 | 1.35 | 19.07 |
| 9 | .07 | 15.76 | 2.26 | .51 | 17.09 |
| 10 | .01 | 7.48 | .79 | .07 | 8.97 |

Note. The "total" column is not the sum of entries in that row. Rather, it uses each family's total energy spending to calculate the SD within the decile as a fraction of mean family total consumption spending.

centage of mean family consumption (SD/cons).[47] This statistic for each fuel is over 1% of consumption in every decile. The first nine deciles do not differ much from each other, but the tenth decile has a larger SD/cons (because consumption itself is unbounded in this decile). Electricity differs from other fuels in that the SD/cons declines monotonically from the first decile to the ninth, because home cooling and use of appliances vary more in lower deciles. The lowest decile's highly variable energy spending helps explain its high variability of carbon tax burden. Gasoline contributes most among fuels to total intra-decile variation, likely reflecting heterogeneity in personal vehicle travel and commuting distances.

The lower panel of table 12 shows SDs of select transfer receipts and of total transfer receipts, each as a percentage of consumption. The greatest variation in receipts of existing transfer programs is due to these selected transfers (EITC, Social Security, SSI, and SNAP). Social security income varies considerably more than receipts of other transfers, because only some in every decile are retired. Even the variability of total transfer receipts is only marginally larger than the variability of social security receipts. Thus, carbon tax rebates that expand social security benefits will increase variation in horizontal distributions. The SD/cons for transfer receipts are substantially larger than for energy expenditures (except in the top decile). Because this heterogeneity in transfer receipts declines from poor to rich, any rebate that expands transfer programs will induce greater variation in tax changes among the poor. EITC variation within the first three deciles is large (see n. 35). Since it exceeds variation of total energy spending, the oft-proposed rebating of carbon tax revenues via enhanced EITC benefits is likely to increase heterogeneity in horizontal distributions among the poor more than does the carbon tax itself.

### 7. CONCLUSION

The four simulations evaluated here hardly represent the breadth of potential tax reforms, but our analysis nonetheless provides important insights. First, contrary to the common belief that a carbon tax in the United States is regressive, we show that it is progressive—even without rebate of revenue—when vertical effects are measured against consumption as a proxy for permanent income and when accounting for the statutory indexing of transfers and tax brackets.

Second, we find that a distributional analysis focused on vertical burdens can yield misleading conclusions about welfare changes for majorities of families, including the poorest. Because the usual rebate mechanisms can provide large gains as a percentage of consumption for some poor families, an aggregate decile statistic that reports a tax

---

47. The last column is not the sum of the row, but the SD for total fuel spending over total consumption. This number exceeds the square root of the sum of squared fuel-specific SDs, implying that fuel expenditures are not independent across categories and that expenditures are positively correlated across two or more of the categories.

cut for the average family conceals the fact that many or most of them receive tax increases. Our simulations show that this phenomenon holds not just for the lowest deciles, but across many deciles. Thus, the micro-level analysis performed here is essential for policy makers to be able to know if a tax reform that delivers an overall tax cut to poor families also leaves most of them worse off.

Third, while the carbon tax alone creates disparity of net tax changes within each decile, any of our three revenue-recycling mechanisms increase these horizontal disparities for at least half of the population. The reform that rebates half of revenues to payroll tax reductions and half to social security benefits expansion nearly achieves distributional neutrality from a vertical perspective, but it widens the horizontal disparities relative to the carbon tax alone (for all but the richest decile). Among revenue-recycling reforms, the per capita rebate has the lowest disparities within most deciles. It is also the most progressive reform, providing relatively large percentage reductions in taxes for the poor at the expense of small percentage increases in taxes for the rich.

Fourth, while Treasury's Distribution Model affords high-fidelity assessments of rebate mechanisms that utilize income channels, the data preclude study of rebate mechanisms based on family characteristics that could better reduce disparities among families of similar means. In particular, we do not know the age or insulation of a family's dwelling nor the energy efficiency of its appliances and vehicles. We do not observe each family's weather, commuting distance, or built environment (e.g., commuter rail or electricity grid). These characteristics affect household carbon emissions and, were they known to us, could be used to design household-specific rebates to offset carbon tax burdens. While carbon tax rebates based upon these characteristics could reduce intra-class variation in net burden outcomes, they would also affect efficiency by reducing the price signal induced by the carbon tax—at least along some margins. For example, compensating owners of energy-inefficient furnaces or cars for high carbon taxes diminishes their incentives to buy efficient durables. Likewise, compensation for extra burdens in areas with extreme climates could reduce the incentive to weatherproof or to move. Still, the efficiency cost of such transfers may be quite low, if they were targeted only to low-income families.

To avoid these incentive problems, possibly, a carbon tax could be complemented by a one-time transfer to families based on age, location, size of their homes, and the vintages of their cars and appliances. If it were a surprise, and not continued, this one-time transfer might not affect incentives for future conservation, energy efficiency investments, and purchases of smaller homes in more temperate climates. Such a payment would be extremely difficult to implement in practice, however, and many may believe that heavy energy users "ought" to pay for it.

Finally, given its reliance upon Treasury's Distribution Model, this analysis is inevitably focused on distributional impacts of a US carbon tax. Worldwide, as 100 parties to the Paris Agreement implement carbon pricing instruments to reduce emissions and achieve their Intended Nationally Determined Contributions, the prospects of

imminent carbon pricing in the United States are dim. Elsewhere, 40 countries and 20 subnational governments already price carbon (World Bank 2016). The results of this analysis are relevant to planners elsewhere who are concerned about vertical and horizontal redistributions from a carbon tax, and they are most relevant to planners in developed countries where the poor have access both to energy and to government transfers. We show that heterogeneity can complicate efforts to return carbon tax revenues via existing transfers in ways that do not increase disparity of tax changes within an income group.

## REFERENCES

Aldy, Joseph E., Alan J. Krupnick, Richard G. Newell, Ian W. H. Parry, and William A. Pizer. 2010. Designing climate mitigation policy. *Journal of Economic Literature* 48 (4): 903–34.

Anderson, Patricia M., and Bruce D. Meyer. 1997. Unemployment insurance takeup rates and the after-tax value of benefits. *Quarterly Journal of Economics* 112 (3): 913–37.

Auerbach, Alan J., and Kevin A. Hassett. 2002. A new measure of horizontal equity. *American Economic Review* 92 (4): 1116–25.

Beck, Marisa, Nicholas Rivers, Randall Wigle, and Hidemichi Yonezawae. 2015. Carbon tax and revenue recycling: Impacts on households in British Columbia. *Resource and Energy Economics* 41 (August): 40–69.

Bentham, Jeremy. (1802) 1978. Principles of the Civil Code. In *Property: Mainstream and critical positions*, ed. C. B. Macpherson. Toronto: University of Toronto Press.

Bhargava, Saurabh, and Dayanand Manoli. 2015. Psychological frictions and the incomplete take-up of social benefits: Evidence from an IRS field experiment. *American Economic Review* 105 (11): 3489–529.

Blonz, Joshua, Dallas Burtraw, and Margaret A. Walls. 2011. How do the costs of climate policy affect households? The distribution of impacts by age, income, and region. Resources for the Future Discussion paper 10–55, Washington, DC.

Bovenberg, A. Lans, and Ruud A. de Mooij. 1994. Environmental levies and distortionary taxation. *American Economic Review* 84 (4): 1085–89.

Bovenberg, A. Lans, and Lawrence H. Goulder. 2002. Environmental taxation and regulation in a second-best setting. In *Handbook of public economics*, ed. Martin Feldstein and Alan J. Auerbach. Amsterdam: North Holland.

Bull, Nicholas, Kevin A. Hassett, and Gilbert E. Metcalf. 1994. Who pays broad-based energy taxes? Computing lifetime and regional incidence. *Energy Journal* 15 (3): 145–64.

Carbone, Jared C., Richard D. Morgenstern, Roberton C. Williams III, and Dallas Burtraw. 2013. Deficit reduction and carbon taxes: Budgetary, economic, and distributional impacts. Resources for the Future, Washington, DC.

Cass, Oren. 2016. Who pays the bill for the Obama climate agenda? Manhattan Institute, New York. http://www.manhattan-institute.org/sites/default/files/IB-OC-0416.pdf.

CBO (Congressional Budget Office). 2016. The distribution of federal taxes and household income, 2013. https://www.cbo.gov/publication/51361.

Cramton, Peter, and Suzi Kerr. 2002. Tradable carbon permit auctions: How and why to auction not grandfather. *Energy Policy* 30 (4): 333–45.

Cronin, Julie-Anne. 1999. U.S. Treasury distributional analysis methodology. US Department of the Treasury, Washington, DC. https://www.treasury.gov/resource-center/tax-policy/tax-analysis/Documents/WP-85.pdf.

Cronin, Julie-Anne, Portia DeFilippes, and Emily Y. Lin. 2012. Effects of adjusting distribution tables for family size. *National Tax Journal* 65 (4): 739–58.

Currie, Janet. 2006. The take-up of social benefits. In *Public policy and the income distribution*, ed. Alan J. Auerbach, David Card, and John M. Quigley. New York: Russell Sage Foundation Publications, 80–148.

Dinan, Terry. 2012. Offsetting a carbon tax's costs on low-income households. CBO Working paper 2012-16, Congressional Budget Office, Washington, DC.

Eissa, Nada, and Hilary Hoynes. 2011. Redistribution and tax expenditures: The earned income tax credit. *National Tax Journal* 64 (2): 689–730.

Fischer, Carolyn, and William A. Pizer. 2017. Equity effects in energy regulation. Working paper, Duke University.

Flues, Florens, and Alastair Thomas. 2015. The distributional effects of energy taxes. OECD Taxation Working paper, Organization for Economic Cooperation and Development, Paris.

Friedman, Milton. 1957. The permanent income hypothesis. In *A theory of the consumption function*, ed. Milton Friedman. Princeton, NJ: Princeton University Press.

Fullerton, Don. 1996. Why have separate environmental taxes? *Tax Policy and the Economy* 10:33–70.

Fullerton, Don, Garth Heutel, and Gilbert E. Metcalf. 2012. Does the indexing of government transfers make carbon pricing progressive? *American Journal of Agricultural Economics* 94 (2): 347–53.

Fullerton, Don, and Gilbert E. Metcalf. 2001. Environmental controls, scarcity rents, and pre-existing distortions. *Journal of Public Economics* 80 (2): 249–67.

Fullerton, Don, and Diane L. Rogers. 1994. *Who bears the lifetime tax burden?* Washington, DC: Brookings Institution.

Glaeser, Edward L., and Matthew E. Kahn. 2010. The greenness of cities: Carbon dioxide emissions and urban development. *Journal of Urban Economics* 67 (3): 404–18.

Goulder, Lawrence H. 1995. Effects of carbon taxes in an economy with prior tax distortions: An intertemporal general equilibrium analysis. *Journal of Environmental Economics and Management* 29 (3): 271–97.

———, ed. 2002. *Environmental policy making in economies with prior tax distortions*. Northampton: Edward Elgar.

———. 2013. Climate change policy's interactions with the tax system. *Energy Economics* 40: S3–S11.

Goulder, Lawrence H., Marc A. C. Hafstead, and Roberton C. Williams III. 2016. General equilibrium impacts of a federal clean energy standard. *American Economic Journal: Economic Policy* 8 (2): 186–218.

Goulder, Lawrence H., and Ian W. H. Parry. 2008. Instrument choice in environmental policy. *Review of Environmental Economics and Policy* 2 (2): 152–74.

Goulder, Lawrence H., Ian W. H. Parry, Roberton C. Williams III, and Dallas Burtraw. 1999. The cost-effectiveness of alternative instruments for environmental protection in a second-best setting. *Journal of Public Economics* 72 (3): 329–60.

Goulder, Lawrence H., and R. C. Williams III. 2003. The substantial bias from ignoring general equilibrium effects in estimating excess burden, and a practical solution. *Journal of Political Economy* 111 (4): 898–927.

Grainger, Corbett A., and Charles D. Kolstad. 2010. Who pays a price on carbon? *Environmental and Resource Economics* 46 (3): 359–76.

Hassett, Kevin A., Aparna Mathur, and Gilbert E. Metcalf. 2009. The incidence of a U.S. carbon pollution tax: A lifetime and regional analysis. *Energy Journal* 30 (2): 155–78.

Horowitz, John, Julie-Anne Cronin, Hannah Hawkins, Laura Konda, and Alex Yuskavage. 2017. Methodology for analyzing a carbon tax. Working paper (January). US Department of the Treasury, Washington, DC. https://www.treasury.gov/resource-center/tax-policy/tax-analysis/Documents/WP-115.pdf.

Kaplow, Louis. 1989. Horizontal equity: Measures in search of a principle. *National Tax Journal* 42 (2): 139–54.

———. 1992. A note on horizontal equity. *Florida Tax Review* 1 (3): 191–96.

Mankiw, N. Gregory. 2009. Smart taxes: An open invitation to join the Pigou club. *Eastern Economic Journal* 35 (1): 14–23.

Mathur, Aparna, and Adele C. Morris. 2014. Distributional effects of a carbon tax in broader U.S. fiscal reform. *Energy Policy* 66:326–34.

———. 2017. A U.S. carbon tax and the Earned Income Tax Credit: An analysis of potential linkages. Brookings Climate and Energy Economics Discussion paper, Brookings Institution. https://www.brookings.edu/wp-content/uploads/2017/01/es_20170127_carbontaxeitc.pdf.

Metcalf, Gilbert E. 1999. A distributional analysis of green tax reforms. *National Tax Journal* 52 (4): 655–81.

———. 2007. A green employment tax swap: Using a carbon tax to finance payroll tax relief. Policy brief. Brookings Institution and World Resources Institute, Washington, DC.

———. 2009. Designing a carbon tax to reduce U.S. greenhouse gas emissions. *Review of Environmental Economics and Policy* 3 (1): 63–83.

Morris, Adele, and Aparna Mathur. 2015. The distributional burden of a carbon tax: Evidence and implications for policy. In *Implementing a U.S. carbon tax: Challenges and debates*, ed. Ian Parry, Adele Morris, and Roberton C. Williams III. New York: Routledge.

Musgrave, Richard A. 1959. *The theory of public finance*. New York: McGraw-Hill.

———. 1990. Horizontal equity, once more. *National Tax Journal* 43 (2): 113–22.

Parry, Ian W. H. 1995. Pollution taxes and revenue recycling. *Journal of Environmental Economics and Management* 29 (3): S64–S77.

———. 2004. Are emissions permits regressive? *Journal of Environmental Economics and Management* 47 (2): 364–87.

———. 2015. Carbon tax burdens on low-income households: A reason for delaying climate policy? CESifo Working paper no. 5482, Munich.

Parry, Ian W. H., and Antonio M. Bento. 2000. Tax deductions, environmental policy, and the "double dividend" hypothesis. *Journal of Environmental Economics and Management* 39 (1): 67–96.

Parry, Ian W. H., Adele Morris, and Roberton C. Williams III, eds. 2015. *Implementing a U.S. carbon tax: Challenges and debates*. New York: Routledge.

Parry, Ian W. H., Victor Mylonas, and Nate Vernon. 2017. Reforming energy policy in India: Assessing the options. IMF Working paper 17–103, International Monetary Fund. https://www.imf.org/en/Publications/WP/Issues/2017/05/03/Reforming-Energy-Policy-in-India-Assessing-the-Options-44853.

Pizer, William A., and Steven Sexton. 2019. Distributional impacts of energy taxes. *Review of Environmental Economics and Policy* 13 (1), forthcoming.

Poterba, James M. 1989. Lifetime incidence and the distributional burden of excise taxes. *American Economic Review* 79 (2): 325–30.

———. 1991. Is the gasoline tax regressive? *Tax Policy and the Economy* 5:145–64.

Rausch, Sebastian, Gilbert E. Metcalf, and John M. Reilly. 2011. Distributional impacts of carbon pricing: A general equilibrium approach with micro-data for households. *Energy Economics* 33 (S1): S20–S33.

Sallee, James M. 2018. Pigou creates losers: On the implausibility of achieving Pareto improvements from Pigouvian taxation. Working paper, University of California, Berkeley.

Slesnick, Daniel T. 1989. The measurement of horizontal inequality. *Review of Economics and Statistics* 71 (3): 481–90.

Sterner, Thomas. 2012. Distributional effects of taxing transport fuel. *Energy Policy* 41:75–83.

Stone, Chad. 2015. The design and implementation of policies to protect low-income households under a carbon tax. Center on Budget and Policy Priorities, Washington, DC. http://www.cbpp.org/sites/default/files/atoms/files/9-21-15climate.pdf.

Toder, Eric, Jim Nunns, and Joseph Rosenberg. 2011. Methodology for distributing a VAT. Research report, Tax Policy Center, Urban Institute and Brookings Institution. http://www.taxpolicycenter.org/sites/default/files/alfresco/publication-pdfs/1001533-Methodology-forDistributing-a-VAT.PDF.

Ummel, Kevin. 2016. Impact of CCL's proposed carbon fee and dividend policy: A high-resolution analysis of the financial effect on U.S. households. Citizens Climate Lobby, Coronado, CA. https://citizensclimatelobby.org/wp-content/uploads/2016/05/Ummel-Impact-of-CCL-CFD-Policy-v1_4.pdf.

West, Sarah E., and Roberton C. Williams III. 2004. Estimates from a consumer demand system: Implications for the incidence of environmental taxes. *Journal of Environmental Economics and Management* 47 (3): 535–58.

Williams, Roberton C., III., Hal Gordon, Dallas Burtraw, Jared C. Carbone, and Richard D. Morgenstern. 2015. The initial incidence of a carbon tax across income groups. *National Tax Journal* 68 (1): 195–214.

World Bank. 2016. *State and trends of carbon pricing 2016*. Washington, DC: World Bank.

# Exhibit B-5

# Market-Based Emissions Regulation and Industry Dynamics

Meredith Fowlie

*University of California, Berkeley, and National Bureau of Economic Research*

Mar Reguant

*Northwestern University and National Bureau of Economic Research*

Stephen P. Ryan

*University of Texas at Austin and National Bureau of Economic Research*

We assess the static and dynamic implications of alternative market-based policies limiting greenhouse gas emissions in the US cement industry. Our results highlight two countervailing market distortions. First, emissions regulation exacerbates distortions associated with the exercise of market power in the domestic cement market. Second, emissions "leakage" in trade-exposed markets offsets domestic emissions reductions. Taken together, these forces can result in social welfare losses under policy regimes that fully internalize the emissions externality. Market-based policies that incorporate design features to mitigate the exercise of market power and emissions leakage deliver welfare gains when damages from carbon emissions are high.

## I. Introduction

In the absence of a coordinated global agreement to curtail greenhouse gas emissions, regional market-based climate change policy initiatives are emerging. Examples include the Emissions Trading Scheme (ETS) in the European Union and California's greenhouse gas (GHG) emissions trad-

Electronically published January 5, 2016
[ *Journal of Political Economy*, 2016, vol. 124, no. 1]
© 2016 by The University of Chicago. All rights reserved. 0022-3808/2016/12401-0002$10.00

ing program. In these "cap-and-trade" programs, regulators impose a cap on the total quantity of emissions permitted and distribute a corresponding number of tradable emissions permits. To mitigate potentially adverse competitiveness impacts and to engender political support for the program, it has become standard to allocate some percentage (or all) of these emissions permits for free to industrial stakeholders (Joskow and Schmalensee 1998; Hahn and Stavins 2011). In this paper, we explore both the static and dynamic implications of several different permit allocation mechanisms.

A particularly appealing quality of the cap-and-trade approach to regulating industrial emissions is that, provided that a series of conditions are met, an emissions trading program designed to equate marginal abatement costs with marginal damages will achieve the socially optimal outcome (Dales 1968; Montgomery 1972).[1] Unfortunately, policy makers do not work in first-best settings in which the conditions required for optimality are always satisfied. Real-world policy settings are typically characterized by several preexisting distortions that complicate the design of efficient policy. In this paper, we focus on two distortions in particular.

First, many of the industries currently regulated under existing and planned emissions regulations are highly concentrated. In a seminal paper, Buchanan (1969) argues that a first-best policy designed to completely internalize external damages should be used only in "situations of competition" because concentrated industries are already producing below the socially optimal level, and the loss of consumer and producer surplus induced by further restricting output can overwhelm the gains from emissions mitigation. An important counterpoint is offered by Oates and Strassmann (1984), who argue that the welfare gains from a Pigouvian tax (or a first-best cap-and-trade program) will likely dwarf the potential losses from noncompetitive behavior. There has been surprisingly little work done to empirically investigate this trade-off between incentivizing pollution abatement and exacerbating the preexisting distortion associated with the exercise of market power in concentrated industries subject to emissions regulations.

Second, regional climate change policies are textbook examples of "incomplete" regulation. When an emissions regulation applies to only a subset of the sources that contribute to the environmental problem, regulated sources can find it more difficult to compete with producers operating in jurisdictions exempt from the regulation. Shifts in production and associated "emissions leakage" can substantially offset, or paradoxically even reverse, the reductions in emissions achieved in the

---

[1] Conditions include zero transaction costs, full information, perfectly competitive markets, and cost minimization behavior.

regulated sector. This leakage is particularly problematic when emissions damages are independent of the location of the source, as is the case with GHGs.[2]

These complications have engendered a lively policy debate about how to design and implement climate change mitigation policies. Policy makers have been exploring several different approaches to (partially) compensating firms for their compliance costs via allocations of free emissions permits. Under a grandfathering regime, permits are freely distributed to regulated sources on the basis of predetermined criteria, such as historic emissions. Under so-called "dynamic updating," permits are allocated in proportion to firms' output in the previous period. Using emissions permits to incentivize production can mitigate product market surplus losses and reduce emissions leakage (see Bernard, Fischer, and Fox 2007; Holland 2012).

Designing a policy that strikes the appropriate balance between curbing domestic GHG emissions and protecting the competitive position of emissions-intensive manufacturing sectors requires detailed knowledge of the structure and dynamics of the industries subject to the regulation. In this paper, we focus on an industry that has been at the center of the debate about US climate change policy and international competitiveness: Portland cement. Cement is one of the largest manufacturing sources of domestic carbon dioxide emissions (Kapur et al. 2009).[3] The industry is highly concentrated, making the industry potentially susceptible to the Buchanan critique. Moreover, import penetration in the domestic cement market has exceeded 20 percent in recent years, giving rise to concerns about the potential for emissions leakage (Van Oss and Padovani 2003; USGS 2010).

A distinguishing feature of this paper is its emphasis on industry dynamics. We extend the dynamic oligopoly framework developed in Ryan (2012) as the foundation for our analysis. In our model, strategic domestic cement producers compete in spatially segregated regional markets. Some of these markets are trade exposed, whereas other landlocked markets are sheltered from foreign competition. Firms make optimal entry, exit, and investment decisions in order to maximize their expected stream of profits conditional on the strategies of their rivals. Conditional on capital investments, producers compete each period in homogeneous quantities. Regional market structures evolve as firms enter, exit,

---

[2]  The damaging effects of GHG emissions are global; damages are a function of the level of emissions, but not the location. However, the same processes that generate GHG emissions also generate more locally damaging copollutants. Accounting for the effects of these local copollutants is beyond the scope of this analysis.

[3]  Carbon dioxide ($CO_2$) is the primary GHG emitted by industrial activities, but others are also emitted. Because GHGs are typically measured in terms of $CO_2$ equivalents, we will use the terms "greenhouse gas" and "carbon dioxide" interchangeably.

and adjust production capacities in response to changing market conditions.

Our model is estimated using 25 years of detailed data on the Portland cement industry. In the benchmark model we estimate, GHG emissions are unconstrained. We use this model to simulate the dynamic industry response to four counterfactual, market-based emissions policy designs: permit auctioning (isomorphic to a carbon tax), grandfathering, dynamic allocation updating, and a border tax adjustment (BTA), which penalizes imports according to their average carbon content.

We begin by assuming that these policies will be designed such that the equilibrium permit price (or tax) is set equal to the assumed social cost of carbon (SCC) emissions. Under this assumption, we find that all four policy designs actually reduce net social welfare for SCC values below \$40 per ton of $CO_2$. Echoing Buchanan (1969), the combination of emissions leakage and welfare losses in the product market exceed the benefits of carbon mitigation. Losses are particularly acute for the auction/carbon tax scenario in which firms bear the full cost of compliance. Policy-induced disinvestment and exit further concentrate the ownership of productive capacity in the product market. The magnitude of the losses is substantial (\$18 billion under auctioning/carbon tax when the carbon value is \$30). Grandfathering helps slow the rate of firm exit but does nothing to incentivize cement production. Consequently, grandfathering also results in substantial welfare losses at carbon values below \$60.

Policies that allocate free permits in proportion to production do substantially better because the implicit production subsidy mitigates both the exercise of market power in the product market and emissions leakage. As damages per ton of $CO_2$ rise above \$40, these updating and BTA regimes become welfare improving. The BTA regime outperforms dynamic updating at high carbon values because the tax on imports more effectively mitigates emissions leakage and improves domestic terms of trade.

Consistent with the theory of the second best, policy outcomes could be improved if the SCC is only partially internalized by firms. Output-based, dynamic permit allocation updating essentially embeds this idea; firms are refunded a fraction of their compliance costs. We investigate these policy design trade-offs from an optimal taxation perspective. We solve for the optimal level of carbon prices, and the associated level of welfare gains, under the various regimes we consider. We find that these market-based policies can deliver welfare gains if the compliance costs (per ton of emissions) borne by firms fall substantially below the true social cost of emissions.

This paper begins to address what Millimet, Roy, and Sengupta (2009) identify as a "striking gap in the literature on environmental regulation."

Very little work has been done to bring recent advances in the structural estimation of dynamic models to analyses of industrial responses to environmental regulation. Our paper differs from past work in both the methods we use and the relationships we emphasize.[4] Our approach emphasizes dynamic industry responses to policy interventions and the interplay between emissions regulations and preexisting distortions associated with the exercise of market power in the cement market. We estimate an empirically tractable dynamic model of the US cement sector in order to obtain estimates of key parameters such as investment costs. We contrast our dynamic policy simulations with a static modeling framework in which firms can alter production levels, but industry structure (i.e., technological characteristics, production capacities, etc.) is held fixed. These two modeling frameworks predict substantively different welfare effects, thus highlighting the role of dynamic processes in determining the long-run welfare effects of these environmental policies.

The paper is organized as follows: Section II introduces the conceptual framework for our applied policy analysis. Section III provides some essential background on the US Portland cement industry. We introduce the model and a detailed description of the alternative policy designs we consider in Section IV. We present the estimation and computational methodology in Section V. Simulation results are summarized in Section VI. We conclude with a discussion of the results and directions for future research in Section VII.

## II.    Conceptual Framework

To build intuition for the basic economic forces at work in our empirical setting, we first present a simple, static model. Figure 1 shows a domestic monopoly producer (right panel) facing a competitive fringe of importers (left panel). The thick black, kinked line in the right panel represents the residual demand curve faced by a domestic monopolist. This curve is constructed by subtracting the import supply curve from the market aggregate demand curve. The thick black line below it represents the corresponding marginal revenue curve.

In the absence of any emissions regulation, the domestic monopolist sets residual marginal revenue equal to marginal cost and produces

---

[4] A growing literature examines the impacts of emissions trading programs on highly concentrated, trade-exposed, and emissions-intensive industries. Several of these studies have assessed impacts of the EU ETS on European cement producers. For example, Demailly and Quirion (2006) and Szabo et al. (2006) use a bottom-up model of the cement industry to examine impacts of alternative policy designs on industry profits, emissions, and emissions leakage. More recently, Ponssard and Walker (2008) specify a static oligopoly model of a regional European cement industry to examine the short-run responses of European cement producers to the ETS.



Fig. 1.—Emissions-intensive, trade-exposed monopoly

output $Qd_{base}$ at price $P_{base}$. Foreign producers supply $Qf_{base}$ at this price. Total quantity, $Q_{base}$, is equal to $Qd_{base} + Qf_{base}$. This is the baseline against which we will compare the alternative policy outcomes. Note that the distortions associated with the exercise of market power in the domestic market manifest in two ways. First, the domestic firm restricts output in order to drive up the equilibrium product price. Second, production is not allocated optimally across domestic and foreign producers; marginal production costs differ across domestic and foreign producers.

Now suppose that production generates harmful emissions of a global pollutant. For ease of exposition, we assume a constant emissions rate per unit of output $e$ and a constant marginal social cost of emissions $\tau$ across domestic and foreign production.[5] The curve labeled $MC_\tau$ captures both private marginal costs and the monetized value of the damages from the domestic firm's emissions: $MC_\tau = MC + \tau e$. Without import competition, the socially optimal level of output would be defined by the intersection of $MC_\tau$ and aggregate demand.

Competition from foreign imports further complicates the picture. The broken line labeled $MC_f + \tau e_f$ represents the total social costs associated with foreign production. The downward-sloping broken line in the right panel represents the residual demand curve that incorporates the emissions externality associated with foreign production. The intersection of this residual demand curve and $MC_\tau$ defines the socially efficient product price $P^*$. The socially optimal import quantity is $Qf^*$. The socially optimal level of domestic consumption is $Q^*$.

Suppose that the domestic policy maker has the authority to regulate domestic, but not foreign, producers. We first consider a policy regime in which the domestic monopolist is required to pay a fee of $\tau$ per unit of emissions. This increases the monopolist's variable operating costs by $\tau e$. The monopolist will choose to produce $Qd_\tau$; the equilibrium product price is $P_\tau$.

Figure 1 illustrates how this emissions regulation can reduce welfare (consistent with the theory of the second best). Intuitively, the costs associated with further exacerbating the exercise of market power in the domestic market can outweigh the benefits associated with the policy-induced emissions abatement. When domestic producers are required to pay $\tau$ per unit of output, domestic production drops even further below optimal levels.

The welfare effects of this policy can be decomposed into three components. Consider first the change to domestic producer and consumer surplus. The policy-induced reduction in consumer surplus that is not transferred to domestic producers is represented by area $ABCD$. In this

---

[5] Note that this $\tau$ value is intended to capture global damages from GHG emissions (Working Group on Social Cost of Carbon 2013).

trade-exposed market, the introduction of the emissions regulation increases the import market share. This induces "rent leakage," or transfer of surplus from domestic to foreign stakeholders. We assume that increases in foreign producer surplus do not factor into the domestic policy maker's objective function because they accrue outside her jurisdiction. Policy-induced reductions in domestic producer surplus that are not transferred to the government as tax revenue are given by *BGHF*.

Of course, the primary purpose of the emissions policy is to reduce emissions and associated damages. A second welfare component captures the value of the emissions reductions achieved domestically. This value is represented by area *EFGH* (shaded with diagonal lines) in the right panel of figure 1. In this case, the policy-induced loss in domestic economic surplus exceeds this value by an amount represented by the shaded area *AEFDC*.

A third welfare component accounts for the effect of the policy on foreign emissions. Here we assume that the policy-induced increase in import supply is met entirely by an increase in foreign production levels (vs. a reallocation of foreign production across jurisdictions). Emissions leakage is represented by the shaded region in the left panel. Taken together, the total welfare loss induced by the policy is represented by area *AEFDC* plus the damages associated with emissions leakage (represented by the shaded area in the left panel).

Although a complete internalization of the carbon externality by domestic producers results in a net welfare loss in figure 1, this will not always be the case in an industrial context characterized by both imperfect competition and exposure to competition from unregulated imports. As the marginal social cost of emissions increases and/or the import supply responsiveness attenuates, the policy can induce benefits (such as reduced emissions damages) that outweigh the costs (such as forgone producer and consumer surplus).

In the more detailed analysis that follows, we will be interested in analyzing the welfare implications of augmenting an emissions price $\tau$ with a domestic production subsidy *s*. This policy feature alleviates the market power distortion by incentivizing domestic output, while also mitigating, or even eliminating, emissions and rent leakage.[6] Figure 1 depicts the equilibrium outcome under a market-based emissions regulation that augments the emissions fee $\tau$ with an output-based rebate (or subsidy) *s*. The production subsidy incentivizes an increase in do-

---

[6] Policy makers have started to experiment with rebating tax revenues and allocating emissions permits on the basis of production. For example, in Sweden, revenues from an emissions tax are fully refunded to the industries that paid the tax on the basis of their energy use (Sterner and Hoglund 2000). In existing and planned emissions trading programs in Australia, California, and Europe, permits are freely allocated to trade-exposed industries on the basis of output.

mestic production (domestic output is $Qd_{\tau-s}$). In addition to mitigating the exercise of market power, rent and emissions leakage are reduced because the subsidy acts to improve the terms of trade (relative to the regime that administers only the emissions fee).

Although the level of aggregate domestic consumption $Q^*$ and the equilibrium product price $P^*$ in this output-based rebating scenario are equal to those in the first-best case, allocative efficiency is not achieved. Foreign imports still capture too much of the domestic market share; the marginal cost of domestic production is much lower than the marginal cost of importers. This highlights an important economic point: one generally needs as many policy instruments as market failures in order to achieve efficiency. While the tax on emissions and the production subsidy address the emissions externality and the exercise of market power in the domestic product market, respectively, an additional policy instrument is needed to address the asymmetry in compliance requirements across domestic and foreign producers.

*Applying the framework.*—To more realistically simulate the response of domestic cement producers to alternative policy interventions, several of the simplifying assumptions that facilitate the graphical exposition must be relaxed. We highlight two of these assumptions here.

First, whereas figure 1 features a domestic monopolist, regional cement markets in the United States are supplied by more than one domestic firm. Much of the intuition underlying the simple static monopoly case should apply in the case of a static oligopoly (Ebert 1992).[7] A second modification pertains to industry dynamics. Figure 1 depicts static, short-run responses to market-based policy intervention. Over a longer time frame, firms can alter their choice of production scale, technology, entry, exit, or investment behavior in response to an environmental policy intervention. The welfare effects of a market-based emissions policy can look quite different across otherwise similar static and dynamic modeling frameworks.

On one hand, incorporating industry dynamics into the simulation model can improve the projected welfare effects of a given emissions regulation. Intuitively, the short-run economic costs of meeting an emissions constraint can be significantly reduced once firms are able to re-optimize production processes, adjust investments in capital stock, and so forth. On the other hand, incorporating industry dynamics may result in estimated welfare effects that are strictly more negative than those generated using static models. First, in an imperfectly competitive industry, emissions regulation may further restrict already suboptimal levels of investment, thus exacerbating the distortion associated with the exercise

---

[7] In certain situations, the oligopoly response to the policy could be more nuanced. For example, if firms are highly asymmetric and the inverse demand function has an extreme curvature, it is possible for the optimal tax rate to exceed marginal damage (Levin 1985).

of market power. Second, a dynamic model can aggravate the extent of leakage to unregulated areas by accelerating exit and retirement of regulated production units in the domestic market.

## III.    Research Context

The US domestic Portland cement industry has been at the center of the debate about domestic climate change policy and international competitiveness. Cement is one of the largest manufacturing sources of domestic $CO_2$ emissions (Kapur et al. 2009). Policies designed to internalize the social costs associated with GHG emissions could result in major changes to the industry's cost structure. For example, if we assume a cost of carbon in the neighborhood of $40 per ton, complete internalization of the emissions externality would almost double average variable operating costs.

### A.    The US Portland Cement Industry

Portland cement "clinker" is made by heating ground limestone and clay to a temperature of around 1,400 degrees Celsius. Cement is then produced by grinding this clinker, along with gypsum, to produce an extremely fine powder. Concrete, an essential construction material used widely in building and highway construction, is basically a mixture of aggregates (e.g., sand and gravel), water, and Portland cement.

The US Portland cement industry is highly concentrated, making it potentially susceptible to the Buchanan critique. The top five companies collectively operate 54.4 percent of US clinker capacity, with the largest company representing 15.9 percent of all domestic clinker capacity. Moreover, import penetration in the domestic cement market has exceeded 20 percent in recent years, giving rise to concerns about the potential for emissions leakage (Van Oss and Padovani 2002; USGS 2010).

The US cement industry is fragmented into regional markets. This fragmentation is primarily due to transportation economies. The primary ingredient in cement production, limestone, is ubiquitous and costly to transport. To minimize input transportation costs, cement plants are generally located close to limestone quarries. Land transport of cement over long distances is also not economical because the commodity is difficult to store (cement pulls water out of the air over time) and has a very low value-to-weight ratio. It is estimated that 75 percent of domestically produced cement is shipped less than 110 miles (Miller and Osborne 2010).[8]

---

[8] Most cement is shipped by truck to ready-mix concrete operations or construction sites in accordance with negotiated contracts. A much smaller percentage is transported by train or barge to terminals and then distributed.

259

*Domestic demand.*—Demand for cement comes primarily from the ready-mix concrete industry, which accounts for over 70 percent of cement sales. Other major consumers include concrete product manufacturers and government contractors. Since 1960, domestic demand has been fluctuating between 60,000 and 100,000 tons. Demand for domestic cement tends to reflect the cyclical nature of the larger economy, and construction activity in particular. In the construction sector, cement faces competition from alternatives such as asphalt, clay brick, rammed earth, fiberglass, steel, stone, and wood (Van Oss and Padovani 2003). Another important class of substitutes are the so-called supplementary cementitious materials (SCMs) such as ferrous slag, fly ash, silica fume, and pozzolana (a reactive volcanic ash). Concrete producers can use these materials as partial substitutes for clinker.[9]

*Trade exposure.*—Whereas overland transport of cement is very costly, sea-based transport of clinker is relatively inexpensive. In the 1970s, technological advances made it possible to transport cement in bulk quantities safely and cheaply by barge and in large ocean vessels. Since that time, US imports have been growing steadily. Over the period 1980–2006, the import market share has increased from below 3 percent to over 25 percent. Canada is currently the largest supplier of imported cement, followed by China, Korea, and Mexico (USGS 2012, fact sheet). Exposure to import competition in regional markets has given rise to growing concerns about unilateral climate policy.

*Carbon dioxide emissions from cement production.*—Cement producers are among the largest industrial emitters of airborne pollutants, second only to power plants in terms of the criteria pollutants currently regulated under existing cap-and-trade programs (i.e., nitrogen oxide and sulfur dioxide). The cement industry is also one of the largest manufacturing sources of domestic $CO_2$ emissions (Kapur et al. 2009). Worldwide, the cement industry is responsible for approximately 7 percent of anthropogenic $CO_2$ emissions (Van Oss and Padovani 2003).

Approximately half of the $CO_2$ associated with the manufacture of cement is directly released as a by-product of the chemical process that transforms limestone to clinker. Fossil fuel combustion at cement manufacturing operations accounts for approximately 45 percent of the industry emissions. Trace amounts of $CO_2$ are released during the grinding phase.

Carbon dioxide emissions intensities, typically measured in terms of metric tons of emissions per metric ton of clinker, vary across cement

[9] The substitution of SCM for clinker can actually improve the quality and strength of concrete. Substitution rates range from 5 percent in standard Portland cement to as high as 70 percent in slag cement. These blending decisions are typically made by concrete producers and are typically based on the availability of SCM and associated procurement costs (Van Oss 2005; Kapur et al. 2009).

producers. Much of the variation is driven by variation in fuel efficiency. The oldest and least-fuel-efficient kilns are "wet-process" kilns. As of 2006, there were 47 of these wet kilns in operation (all built before 1975; PCA 2006). "Dry process" kilns are significantly more fuel efficient, primarily because the feed material used has a lower moisture content and thus requires less energy to dry and heat. The most modern kilns, dry kilns equipped with preheaters and precalciners, are more than twice as fuel efficient as the older wet-process kilns.

*Emissions abatement.*—Several recent studies assess the potential for carbon emissions reductions in the cement sector.[10] Using different scenarios, baseline emissions, and future demand forecasts, all reach similar conclusions. Although there is no "silver bullet," there are four key levers for carbon emissions reductions.

The first set of strategies involve energy efficiency improvements. The carbon intensity of clinker production can be reduced by replacing older equipment with current state-of-the-art technologies. Converting all existing kilns to more efficient, state-of-the art technology could achieve reductions in domestic $CO_2$ emissions on the order of 15 percent.[11]

A second set of carbon mitigation strategies involve substitution. One form of substitution increases the use of alternative construction materials such as wood or brick, thus reducing demand for cement. Alternatively, the amount of clinker needed to produce a given amount of cement can be reduced by the use of SCM such as coal fly ash, slag, and natural pozzolans.[12] It is estimated that the increased use of blended cement could feasibly reduce carbon emissions by a third over the time frame we consider (Mahasenan, Dahowski, and Davidson 2005).

Fuel switching offers a third emissions abatement strategy. Less carbon-intensive fuels, such as waste-derived fuels or natural gas, could replace coal as the primary kiln fuel. Although there are limits to the substitutability of fuels, it is estimated that fuel switching can reduce the carbon intensity of cement production by as much as 25 percent (World Business Council for Sustainable Development 2010).

Finally, $CO_2$ emissions can be separated and captured during or after the production process and subsequently sequestered. This abatement option is unlikely to play a significant role in the near term given that sequestration technologies are in an early stage of technical development and are relatively costly.

---

[10] A comprehensive list of studies can be found at http://www.wbcsdcement.org/pdf/technology/References%20FINAL.pdf.

[11] These calculations are based on estimated emissions intensities. See online app. C for details.

[12] When part of the cement content of concrete is replaced with SCM, the extent of the emissions reduction is proportional to the extent to which SCM replaces clinker. Substitution rates as high as 75 percent are possible.

We explicitly model the replacement of older kiln technology with current, state-of-the-art technology. We assume that all new entrants adopt new, state-of-the-art equipment. This assumption finds empirical support in the data. Our specific assumptions about the emissions intensities of old and new production equipment are described in online appendix C.

We implicitly capture the substitution of alternative materials for cement clinker in our policy simulations. SCMs and substitute construction materials were widely used throughout our study period. Although we do not explicitly model the substitution of SCMs for clinker, this substitution is captured, to some extent, by our estimated demand elasticity.

Ideally, a model designed to simulate industry response to emissions regulations would capture all viable carbon abatement strategies. Unfortunately, we cannot estimate the costs associated with responses that have yet to be observed in the data. Consequently, fuel switching and carbon sequestration are not represented in our analysis. Although these options are not expected to play as significant a role as efficiency improvements or substitution, this omission will bias upward our estimates of the economic costs imposed by the emissions regulations we analyze.

## B.   Market-Based Emissions Regulation

We analyze both static and dynamic industry response to the introduction of market-based emissions regulation. Our primary focus is a multisector, nationwide cap-and-trade program. A defining feature of the program is a cap that imposes a binding constraint on the quantity of carbon emissions released by sources in the program. A corresponding number of pollution permits are issued. To remain in compliance, regulated sources must hold permits to offset uncontrolled emissions. These permits are traded freely in the marketplace.

Having defined the emissions cap, the regulator must decide how to allocate or distribute the emissions permits. We are particularly interested in exploring the efficiency implications of alternative emissions permit allocation approaches. The first policy design we analyze is a cap-and-trade program in which permits are allocated via a uniform price auction. Within our modeling framework, this policy design is mathematically equivalent to a carbon tax.

Many industry stakeholders vehemently oppose a policy regime that would auction all permits (at least in the near term). In existing and planned emissions trading programs, the majority of permits are distributed gratis to regulated firms. This motivates the study of our second policy regime, "grandfathering," where permits are freely allocated according to predetermined factors, such as historic emissions.

In recent years, a third design alternative has emerged. Emissions permits are allocated for free to eligible firms using a periodically up-

dated, output-based formula. This dynamic allocation updating is being used to mitigate leakage and associated competitiveness impacts in trade-exposed, emissions-intensive industries. The incentives created by this dynamic allocation updating rule are quite different from those associated with grandfathering or auctioning because updating confers an implicit production subsidy.

Finally, BTAs offer an alternative approach to mitigating emissions leakage in trade-exposed, emissions-intensive industries. These import taxes are intended to penalize the emissions embodied in foreign imports, thus "leveling the carbon playing field." Although BTAs face formidable legal challenges (see, e.g., Fischer and Fox 2009), we consider this policy design feature because it has the potential to play an important role in leakage mitigation.

## IV.   Model

The basic building block of the model is a regional cement market.[13] Let $\overline{N}$ be the maximal number of active firms in the market. Each market is described by two $\overline{N} \times 1$ state vectors, $s$ and $e$. The vector $s$ describes the productive capacity of the firms in the market. Firms can adjust their capacity over time, by means of entry, exit, investment, and disinvestment. Firms with zero capacity are considered to be potential entrants.

The vector $e$ describes the emissions rate of each firm. We assume that there are three discrete levels of emissions rates, corresponding to the three major types of production technology (wet, dry, and state-of-the-art dry) in the cement industry. Incumbents may be of any technology type, while we assume that all new entrants are endowed with the frontier technology.

Firms obtain revenues from the product market. They incur costs from production, entry, and new investment. We model timing as an infinite horizon model with each discrete decision period being 1 year. Firms discount the future at rate $\beta$. In each period, first, incumbent firms decide whether or not to exit the industry on the basis of their exit cost shock. Second, potential entrants receive both investment and entry cost shocks, while incumbents who have decided not to exit receive investment cost shocks. All firms then simultaneously make entry and investment decisions. Third, incumbent firms compete over quantities in the product market. At the end of the period, firms enter and exit, and investments mature.

We assume that firms that decide to exit produce in the period before leaving the market and that adjustments in capacity take one period to

---

[13] The model is based on Ryan (2012), to which we add imports, divestment, emissions technologies, and environmental policies.

realize. We also assume that each firm operates independently across markets.[14]

## A.  Static Payoffs

Firms compete in quantities in a homogeneous goods product market. Firms face a constant-elasticity aggregate demand curve:

$$\ln Q_m(P_m; \alpha) = \alpha_{0m} + \alpha_1 \ln P_m, \tag{1}$$

where $Q_m$ is the aggregate regional market quantity, $P_m$ is price, $\alpha_{0m}$ is a market-specific intercept, and $\alpha_1$ is the elasticity of demand.

For firms in trade-exposed regional markets, residual demand is more elastic, as they also face import competition. The import supply curve is given by

$$\ln M_m(P_m; \rho) = \rho_0 + \rho_1 \ln P_m, \tag{2}$$

where $M_m$ measures annual import supply in market $m$ and $\rho_1$ is the elasticity of import supply. Here we assume that the elasticity of import supply is an exogenously determined parameter.[15] Domestic firms in import-exposed markets face a residual demand curve formed by subtracting off the import supply curve from the market-level demand curve. For clarity, we omit the $m$ subscript in what follows.

In the model, each firm chooses the level of annual output that maximizes its static profits given the outputs of the competitors, subject to capacity constraints that are determined by dynamic capacity investment decisions:

$$\bar{\pi}(s,\ e,\ \tau; \alpha,\ \rho,\ \delta) \equiv \max_{q_i \leq s_i} P\left(q_i + \sum_{j \neq i} q_j^*; \alpha,\ \rho\right) q_i - C_i(q_i; \delta) \\ -\ \varphi(q_i,\ e_i,\ \tau), \tag{3}$$

where $P(Q; \alpha,\ \rho)$ is the inverse of residual demand. The profit $\bar{\pi}(s, e, \tau; \alpha, \rho, \delta)$ defines the equilibrium static profits of the firm for a given level of capacity and kiln type. If all firms produce positive quantities, then the equilibrium vector of production is unique, as the best-response curves are downward sloping.

---

[14] This assumption explicitly rules out more general behavior, such as multimarket contact as considered in Bernheim and Whinston (1990) and Jans and Rosenbaum (1997).

[15] In fact, firms that own a majority of the domestic production capacity in the United States are also among the largest importers. It is possible that domestic climate policy could induce a structural shift in the supply of imports to the domestic market. We return to this issue in Sec. VI.E.

The cost of output, $q_i$, is given by the following function:

$$C_i(q_i; \delta) = \delta_{i1} q_i + \delta_2 \mathbb{1}(q_i > \nu s_i)(q_i/s_i - \nu)^2. \tag{4}$$

Variable production costs consist of two parts: a constant marginal cost, $\delta_{i1}$, and an increasing function that binds as quantity approaches the capacity constraint.[16] We assume that costs increase with the square of the percentage of capacity utilization and parameterize both the penalty, $\delta_2$, and the threshold at which the costs bind, $\nu$. This second term, which gives the cost function a "hockey stick" shape, accounts for the increasing costs associated with operating near maximum capacity, as firms have to cut into maintenance time in order to expand production beyond utilization level $\nu$.

The term $\varphi(q_i, e_i, \tau)$ represents the environmental compliance costs faced by the firm. The carbon cost, $\tau$, is an exogenous parameter intended to capture the monetized damages associated with an incremental (1-ton) increase in carbon emissions.[17] Importantly, we assume a constant real carbon price over our relatively short (30-year) time horizon. In our model, there is no technological innovation over time, nor is there economic growth. Thus, some of the standard justifications for implementing a policy regime in which the compliance cost per unit of emissions increases over time do not apply in our case.

The policy designs we analyze can be classified into one of four categories: auctioning/carbon tax, grandfathering, output-based rebating, and an auctioning regime augmented with a border tax adjustment.

*Emissions tax or emissions trading with auctioned permits.*—The first policy regime we analyze is an emissions tax or an emissions cap-and-trade program in which all emissions permits are allocated via a uniform price auction. In the tax regime, regulated firms must pay a tax $\tau$ for each ton of emissions. In the emissions trading regime, the equilibrium permit price is $\tau$; under our assumption that cement firms are price takers in the

---

[16] Note that we do not consider fixed costs of production and operation. The reason is that we do not observe sufficient periods of operation without production (mothballing), which are required to separately identify those parameters from the distribution of exit costs.

[17] The exogeneity assumption seems appropriate as the domestic cement industry is a relatively small player in a potential economywide emissions market, such that changes in industry net supply of or demand for permits cannot affect the equilibrium market price. Keohane (2009) estimates the slope of the marginal abatement cost curve in the United States (expressed in present-value terms and in 2005 dollars) to be $8.0 \times 10^7$ dollars per gross ton of $CO_2$ for the period 2010–50. Suppose that this curve can be used to crudely approximate the permit supply function. If all the industries deemed to be "presumptively eligible" for allowance rebates reduced their emissions by 10 percent for this entire 40-year period, the permit price would fall by approximately $0.25 per ton. This also assumes that mitigation in the cement industry is not offsetting distortionary mitigation in another industry. In Sec. VI.D, we calculate the welfare costs associated with achieving given levels of abatement in the cement industry alone.

permit market, a change in the net supply of or demand for permits from the domestic cement industry does not affect this price. The environmental compliance cost to the firm is given by

$$\varphi(q_i,\ e_i,\ \tau) = \tau e_i q_i. \tag{5}$$

*Grandfathering.*—In this policy scenario, a share of emissions permits are allocated for free to incumbent firms that predate the carbon trading program. Firm-specific permit allocation schedules are determined at the beginning of the program and are based on historic emissions. The environmental compliance cost to the firm in this regime is

$$\varphi(q_i,\ e_i,\ \tau) = \tau(e_i q_i - A_i), \tag{6}$$

where $A_i$ is the total emission permits that the firm receives for free from the regulator.

Note that the first-order conditions associated with static profit maximization under grandfathering are identical to those under auctioning. This highlights the so-called "independence property," which implies that firms' short-run production and abatement decisions will be unaffected by the choice of either auctioning permits or allocating them freely to firms in a lump sum (Hahn and Stavins 2011). Dynamically, however, both mechanisms generally generate different long-run outcomes, primarily because of the exit decision being distorted by the transfer of valuable assets to incumbent firms under grandfathering.

When permits are grandfathered in a cap-and-trade program, policy makers must decide ex ante how to deal with both firms that exit and new entrants.[18] We assume that the share of emissions allowances allocated to a firm is proportional to the installed kiln capacity at the outset of the program, $s_{i0}$. However, if firms divest part of their historic capacity, they give up part of their initial allocation, that is, $A_i = \psi_g \cdot e_i \min\{s_{i0},\ s_i\}$, where $\psi_g$ is a parameter converting capacity into permits.[19] Furthermore, we assume that a firm forfeits its future entitlements to free permits when it exits the market.[20] Finally, we assume that new entrants are not entitled to free permits.[21]

---

[18] See Dardati (2016) for a recent contribution studying the effects of these policies.

[19] We include this feature to better represent some of the trade-offs faced when implementing grandfathering. In the EU ETS, the allocation of free permits is reduced dynamically if firms divest part of their grandfathered capacity.

[20] Note that if firms were to keep all their permits indefinitely, then this mechanism would be dynamically welfare equivalent to auctioning, although distributionally different, so the independence property would apply. In the EU ETS, most states require firms to forfeit their free permits upon closure.

[21] In practice, policies regarding free permit allocations to free entrants and former incumbents vary. In the EU ETS, policies governing the free allocation of permits to entrants vary across member states.

*Output-based allocation updating/rebating.*—The third policy regime we analyze incorporates output-based rebating. Permits are allocated (or tax revenues are recycled) per unit of production on the basis of an industry-specific emissions intensity benchmark. The environmental compliance cost to the firm becomes

$$\varphi(q_i,\ e_i,\ \tau) = \tau \cdot (e_i - \psi_d) \cdot q_i, \tag{7}$$

where $\psi_d$ controls the proportion of emissions rebated to the firm. Equation (7) illustrates that output-based updating operates as a discount on the amount of permits (or tax payments) required to achieve compliance. Alternatively, one can think of this as a production subsidy.

*Border tax adjustment with auctioned permits.*—The fourth and final policy design that we consider layers a BTA on top of the standard tax/auctioning regime. This BTA mechanism imposes a tax on emissions embodied in cement imports equal to the tax imposed on domestic emissions. This effectively levels the carbon playing field with international competitors. The BTA regime is equivalent to the auctioning regime in terms of the function $\varphi(q_i, e_i, \tau)$. However, domestic firms now face a different residual demand, as the import supply is shifted to the left as follows:

$$\ln M(P; \rho,\ \tau) = \rho_0 + \rho_1 \ln(P - \tau e_M), \tag{8}$$

where $e_M$ is the emissions rate on imported cement.

## B.  *Dynamic Decisions*

Firms have the opportunity to adjust capacity in each period. Firms can increase or decrease their capacity through costly investments, denoted by $x_i$. The cost function associated with these investments is given by

$$\Gamma(x_i; \gamma) = \gamma_{i1} + 1(x_i > 0)(\gamma_2 x_i + \gamma_3 x_i^2) + 1(x_i < 0)(\gamma_4 x_i + \gamma_5 x_i^2). \tag{9}$$

Firms face both fixed and variable investment and divestment costs. The fixed costs capture the idea that firms may have to face significant setup costs, such as obtaining permits or constructing support facilities, that accrue regardless of the size of the change in capacity. The fixed investment cost is drawn each period from the common distribution $F_\gamma$, which is distributed normally with mean $\mu_\gamma$ and standard deviation $\sigma_\gamma$, and is private information to the firm. Firms also face variable adjustment costs that scale with the size of the capacity change.

Firms also make market participation decisions, denoted by $a_i$. When a firm changes market participation status, it receives a transfer $\Phi(a)$ that varies depending on their current status and chosen action:

$$\Phi(a_i; \kappa_i, \phi_i) = \begin{cases} -\kappa_i & \text{if the firm is a new entrant} \\ \phi_i & \text{if the firm exits the market.} \end{cases} \quad (10)$$

Firms that enter the market pay a fixed cost of entry, $\kappa_i$, which is private information and is drawn from the common distribution of entry costs, $F_\kappa$. Firms exiting the market receive a payment of $\phi_i$, which represents net proceeds from shuttering a plant, such as selling off the land and paying for an environmental cleanup. This value may be positive or negative, depending on the magnitude of these opposing payments. The scrap value is private information, drawn anew each period from the common distribution, $F_\phi$. All the shocks that firms receive each period are mutually independent.

Collecting the costs and revenues from a given firm, the per-period payoff function is

$$\pi_i(a, x, s, e; \theta, \tau) = \bar{\pi}_i(s, e; \alpha, \rho, \delta, \tau) - \Gamma(x_i; \gamma_i) + \Phi(a_i; \kappa_i, \phi_i), \quad (11)$$

where $\theta$ denotes the vector of parameters in the model, and the permit price is $\tau$.

To close the dynamic elements of the model, it is necessary to specify how transitions occur between states as firms engage in investment, entry, and exit. We assume that changes to the state vector through entry, exit, and investment take one period to occur and are deterministic. The first part is a standard assumption in discrete time models and is intended to capture the idea that it takes time to make changes to physical infrastructure of a cement plant. The second part abstracts away from depreciation, which does not appear to be a significant concern in the cement industry, and uncertainty in the time to build new capacity.[22]

## C. Equilibrium

In each time period, firm $i$ makes entry, exit, production, and investment decisions. Since the full set of dynamic Nash equilibria is unbounded and complex, we restrict the firms' strategies to be anonymous, symmetric, and Markovian, meaning that firms condition only on the current state vector and their private shocks when making decisions, as in Maskin and Tirole (1988) and Ericson and Pakes (1995). We describe the equilibrium Bellman equations in online appendix A.

To compute the equilibrium of the model, we develop parametric approximation methods for the computation of dynamic games. In particular, we interpolate the value function using cubic splines. The equilib-

---

[22] It is conceptually straightforward to add uncertainty over time-to-build in the model, but assuming deterministic transitions greatly reduces the computational complexity of solving for the model's equilibrium.

rium is computed separately for every market and environmental policy considered. The interested reader can find a detailed description of the methodology in online appendix B, where we also discuss the main strengths and limitations of this methodology (see also Doraszelski and Pakes 2007; Farias, Saure, and Weintraub 2012; Arcidiacono et al. 2013).

### D.   Welfare Measures

Within a regional market, it is useful to decompose the net welfare impact of a policy intervention into the three components introduced in Section II.

We define the following per-period equilibrium welfare measures:

$$w_1(s, e, \tau; \theta) = \int_0^{Q*} P(z; \alpha)dz - P(Q^*; \alpha)Q^* \\ + \sum_i \Pi_i(a^*, x^*, s, e, \tau; \theta) \quad (12a) \\ + \sum_i \varphi(q_i^*, e_i, \tau) + \tau_M e_M M,$$

$$w_2(s, e, \tau; \theta) = w_1(s, e, \tau; \theta) - \tau \sum_i e_i q_i^*, \quad (12b)$$

$$w_3(s, e, \tau; \theta) = w_2(s, e, \tau; \theta) - \tau e_M M(P^*; \rho). \quad (12c)$$

Welfare measure $w_1$ captures the domestic economic surplus of cement consumption: consumer surplus, producer surplus, and government revenues. Note that government revenues include the carbon price paid by importers ($\tau_M$), which will be zero under most mechanisms but equal to $\tau$ in the BTA case. We assume that domestic policy makers exclude profits earned outside their jurisdiction from any welfare analysis.

Welfare measure $w_2$ accounts for both economic surplus changes and the costs associated with domestic emissions. In a cap-and-trade system in which aggregate emissions are fixed, any increase in emissions from the cement industry must be offset by emissions abatement in other covered sectors. Equation (12b) implicitly assumes that the permit supply curve facing the cement industry is locally flat. We further assume that other covered sectors are undistorted.[23]

Finally, welfare measure $w_3$ adds a penalty for emissions leakage at the cost of carbon $\tau$. Both domestic emissions and the emissions associated with foreign imports are penalized at the SCC.

[23] Some of the other industries subject to climate change regulation might also be at risk for emissions leakage and imperfect competition. We return to this assumption in Sec. VI.

We will focus on comparing the net present value (NPV) of these welfare measures against the baseline case in which no emissions regulation is in place. We define $w_0(s, e, \tau; \theta)$ as the per-period welfare in the baseline case. The NPV welfare measures that we consider are

$$W1 = \sum_{t=1}^{T} \beta_S^t (w_{1t}(s,\ e,\ \tau; \theta) - w_{0t}(s,\ e,\ \tau; \theta)), \tag{13}$$

where $\beta_S$ is social discount factor; $W2$ and $W3$ are defined analogously.

## V.    Data and Estimation

This section begins with a discussion of the data. We then turn to the estimation, which proceeds in several steps. We first estimate the so-called static parameters: the parameters of the demand function, import supply, and parameters used to characterize the cost structure. Next, we estimate the policy functions that describe firms' entry, exit, and investment choices. These policy functions are then used to find the dynamic parameter values that reconcile observed investment, entry, and exit choices with our model of profit maximization. This section concludes with a description of how we calibrate the parameters that define the counterfactual environmental policies.

### A.    Data

Our cement industry data come from two main sources: the US Geological Survey (USGS) and the Portland Cement Association (PCA). The USGS collects establishment-level data from all domestic Portland cement producers. These data, aggregated regionally to protect the confidentiality of the respondents, are published in annual volumes of the *Minerals Yearbook*. Kiln-level data are available from the *Plant Information Survey* (PIS), an annual publication of the PCA. The PIS provides information on the location, vintage, kiln type, primary fuel, and operating capacity of each operating kiln.

Firm-level data on entry, exit, and capacity adjustment are an important input to our analysis. We obtain kiln-level information from the annual PIS and cross-validate this information using the annual summaries published by the USGS. Over the 25-year study period, we observe 11 plant entries and 51 exits, with an implied entry and exit rate of 2.2 percent and 2.0 percent, respectively.[24] We observe 144 capacity increases (i.e.,

---

[24] To compute the entry rate, we consider that there is one potential entrant in every period; therefore, we divide by 20 markets times 25 periods. To compute the exit rate, we divide by the number of active firm yearly observations in the sample.

investment in one or more new kilns). We observe 95 capacity decreases. Overall, the total capacity adjustment rate is 6.6 percent.[25]

We choose not to use the regional definitions adopted by the USGS in our analysis. In recent years, increased consolidation of asset ownership has led to higher levels of data aggregation in the USGS reports. Instead, we follow the US EPA (2009) and use city-centered market definitions derived from industry-accepted limitations of economic transport as well as company-specific Securities and Exchange Commission 10k filings, which include information regarding markets served by specific plants. We reweight the USGS data on prices and quantities by kiln capacity in each region to form less aggregate measures of production and prices. For example, if kiln capacity in USGS market A is equally divided between EPA markets B and C, production quantities in market A are equally divided between our defined markets B and C. For computational reasons, in the counterfactual analysis, we focus on markets with five or fewer firms. These markets are listed in table 1.[26]

Table 1 reports the regional market-level summary statistics using PCA data from 2006. The table helps to highlight interregional variation in market size, emissions intensity, and trade exposure. Notably, the degree of import penetration varies significantly across inland and coastal areas. As expected, import penetration rates tend to be highest along the markets with direct coastal ports versus those served by inland waterways.

We also collect data on electricity rates, coal prices, natural gas prices, and wage rates to serve as instruments in our demand estimation. Energy prices are collected from the US Energy Information Administration, while the wage rates are derived from the US Census Bureau's County Business Patterns. All prices are adjusted to year 2000 constant dollars.

### B.  Static Parameters

*Demand.*—Following Ryan (2012), we estimate the following demand equation:

$$\ln Q_{mt} = \alpha_m + \alpha_1 \ln P_{mt} + \alpha_2 X_{mt} + \varepsilon_{1mt}. \tag{14}$$

---

[25] In the data, we periodically observe year-to-year fluctuations in kiln-level operating capacities. In particular, we often observe kiln capacities declining the year before a major capacity addition. We interpret small fluctuations of less than 10 percent as noise in the data. As such, these small, short-lived fluctuations are smoothed out of the data.

[26] In restricting our attention to those regional markets with five or fewer incumbent firms, we omit four markets from the analysis: Atlanta, Baltimore, Los Angeles, and San Antonio. Our sample covers approximately 70 percent of the market. We have repeated all of the analysis including only markets with three or fewer firms and four or fewer firms, and the conclusions of our work are robust to the subset of markets considered. See table F.7 in the online appendix for results under alternative subsets of the data.

TABLE 1
DESCRIPTIVE STATISTICS FOR REGIONAL MARKETS (Based on 2006 Data)

| Market | Number of Firms | Aggregate Annual Capacity | Average Emissions Rate | Import Market Share |
|---|---|---|---|---|
| Birmingham | 5 | 1,288 | .94 | .35 |
| Chicago | 5 | 972 | .98 | .04 |
| Cincinnati | 3 | 875 | .93 | .21 |
| Dallas | 5 | 1,766 | 1.05 | 0 |
| Denver | 4 | 998 | .95 | 0 |
| Detroit | 3 | 1,749 | 1.02 | .19 |
| Florida | 5 | 1,297 | .93 | .35 |
| Kansas City | 4 | 1,661 | .95 | 0 |
| Minneapolis | 1 | 1,862 | .93 | .2 |
| New York/Boston | 4 | 1,033 | 1.16 | .45 |
| Phoenix | 4 | 1,138 | .93 | .13 |
| Pittsburgh | 3 | 614 | 1.08 | 0 |
| Salt Lake City | 2 | 1,336 | 1.01 | 0 |
| San Francisco | 4 | 931 | .93 | .18 |
| Seattle | 2 | 607 | 1.05 | .65 |
| St. Louis | 4 | 1,358 | 1.05 | 0 |

NOTE.—Capacity is measured in thousands of tons of cement. Emissions rates are defined as tons of $CO_2$ per ton of produced cement.

The dependent variable is the natural log of the total market demand in market $m$ in year $t$. The coefficient on market price, $\alpha_1$, is the elasticity of demand. We instrument for the potential endogeneity of price using supply-side cost shifters: coal prices, natural gas prices, electricity rates, and wage rates. The matrix $X_{mt}$ includes demand shifters such as population and economic indicators. We estimate the parameters of the demand equation using the annual USGS data over the period 1981–2009 using limited-information maximum likelihood.

Table 2 summarizes the estimation results for several specifications, with robust standard errors reported in parentheses. The first specification includes only regional market fixed effects. The point estimate for the elasticity of demand is $-2.03$.[27] This specification omits several factors that presumably shift demand, such as population, unemployment, and measures of construction activity. Subsequent specifications 2–5 include these factors. Our point estimate of the own-price demand elasticity is somewhat sensitive to the inclusion of these covariates, varying between $-0.9$ and $-2.0$.

[27] The estimate is higher in absolute value than some other demand elasticities reported in the literature. For example, Jans and Rosenbaum (1997) estimate a domestic demand elasticity of $-0.81$. Using data from 12 European countries over the period 1990–2005, Sato, Neuhoff, and Neumann (2008) estimate a demand elasticity of $-1.2$. Using USGS data from the southwestern United States, Miller and Osborne (2010) estimate an aggregate demand elasticity of $-0.16$. On the other hand, Foster, Haltiwanger, and Syverson (2008) estimate several similar high demand elasticities for homogeneous goods industries, such as $-5.93$ for ready-mixed concrete, cement's downstream industry.

TABLE 2
INSTRUMENTAL VARIABLE ESTIMATION OF DEMAND ELASTICITY

|  | SPECIFICATION | | | | |
|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) |
| Log price | −2.03 | −.89 | −1.47 | −.92 | −1.10 |
|  | (.28) | (.22) | (.17) | (.18) | (.18) |
| Log population |  | 1.34 |  |  |  |
|  |  | (.14) |  |  |  |
| Log units |  |  | .51 |  | .40 |
|  |  |  | (.04) |  | (.07) |
| Log unemployment |  |  |  | −.65 | −.29 |
|  |  |  |  | (.05) | (.09) |
| First-stage *F*-test | 132.19 | 113.73 | 199.75 | 170.47 | 193.11 |

NOTE.—Huber-White robust standard errors are in parentheses. The unit of observation is a market-year. Market fixed effects are included in all specifications. The sample runs from 1980 to 2009.

We select specification 1 as our preferred specification; it is the most parsimonious and consistent with the dynamic structural estimation. Our theoretical model does not explicitly capture changes in population or building activity over time. Given the critical role that the demand elasticity plays in our analysis, we perform a series of robustness checks in which we simulate policy outcomes over a range of possible demand elasticity values.

*Imports.*—For trade-exposed markets, defined as markets in which we see imports claiming some nonzero market share, we estimate the following import supply schedule using limited-information maximum likelihood:

$$\ln M_{mt} = \rho_0 + \rho_1 \ln P_{mt} + \rho_{2m} + \rho_3' \ln Z_{mt} + \varepsilon_{2mt}. \qquad (15)$$

The dependent variable is the log of the quantity of cement shipped to market $m$ in year $t$. The average price paid for imported cement is $P_{mt}$. These data are reported by customs district, which may contain several ports of entry. Each port of entry is matched to a regional market as described above. The model is estimated using data from the period 1993–2009.[28]

We instrument for the import price using gross state product, new residential construction building starts, and state-level unemployment. The matrix $Z_{mt}$ includes other plausibly exogenous factors that affect import supply. To capture transportation costs, we subtract the average customs price from the average cost, insurance, and freight price of the cement shipments. This residual price accounts for the transportation cost on a per-unit basis, as well as the insurance cost and other shipment-related charges. The $Z_{mt}$ matrix also includes coal and oil prices to capture

---

[28] District-level data on imports from earlier years contain many missing values.

variation in production costs. Region dummy variables capture regional differences.

The most parsimonious specification includes only regional fixed effects. The estimated import supply elasticity is 2.47 (see table 3). This parameter is imprecisely estimated, with a standard error of 1.64. An alternative specification includes a series of supply shifters, including coal prices, oil prices, and a measure of the cost of transporting the cement from the supply country to the import district in the United States. Including these controls does not significantly affect our point estimate.

Presumably, the degree of import competition varies across trade-exposed regional markets. For example, one might expect import responsiveness to vary across markets served primarily by terminals on inland waterways versus coastal markets supplied via marine terminals. Unfortunately, because publicly available data on cement imports are noisy and highly aggregated, we are unable to estimate market-specific supply elasticities. We can, however, allow for regional variation in the level of imports supplied at a given cement price. We obtain market-specific intercepts by fitting import supply curves at the market level while fixing the elasticity coefficient at 2.5.[29]

*Production costs.*—We use the estimated demand and import parameters, together with the restrictions on behavior implied by the Cournot oligopolistic model, to estimate the firms' production costs in equation (3). For each firm $i$ in market $j$ at time $t$, the estimator minimizes two equally weighted moments: the sum of squared differences between the observed quantities and the predictions of the model, and the sum of squared differences between marginal cost and marginal revenue at the equilibrium level of output.[30] If a firm has multiple plants in a single market, we treat that firm as having a single plant with capacity equal to the sum of capacity in each of those facilities.

There are three basic parameters in the cost function: the constant foundation of the marginal cost curve, $\delta_1$; the increasing marginal cost parameter, $\delta_2$, which is incurred as the firm produces close to maximum capacity; and the threshold, $\nu$, determining when $\delta_2$ enters the cost function. To bound the threshold as a percentage of installed capacity, we estimate $\tilde{\nu}$ in a logit transformation $\nu = \exp(\tilde{\nu})/[1.0 + \exp(\tilde{\nu})]$. The parameters are estimated using general method of moments. Standard

---

[29] According to personal communication from D. Burtraw in 2011, the EPA assumes an import supply elasticity of 3.94 when analyzing the impacts of environmental regulations on the cement sector. In the interest of understanding why our estimates differ, we obtained data and code from the EPA analysis. There are two main reasons why our elasticity estimates differ. First, the EPA analysis uses weighted two-stage least squares vs. limited-information maximum likelihood to estimate a very similar import supply specification. Second, whereas we use data on all cement imports, EPA analysts use data from the five largest trade partners only.

[30] Experimentation with alternative weights did not change the results significantly.

TABLE 3
INSTRUMENTAL VARIABLE ESTIMATION OF IMPORT ELASTICITY

| | SPECIFICATION | | | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Log price | 2.47 | 2.85 | 2.52 | 3.00 |
| | (1.64) | (2.50) | (1.28) | (1.12) |
| Log transport | | .75 | .45 | .47 |
| | | (.26) | (.13) | (.12) |
| Log coal price | | .01 | −.06 | .11 |
| | | (.12) | (.15) | (.14) |
| Log oil price | | .33 | .36 | −10.66 |
| | | (.25) | (.18) | (4.40) |
| Regional dummies | Yes | No | Yes | Yes |
| Yearly dummies | No | No | No | Yes |

NOTE.—Huber-White robust standard errors are reported in parentheses. The unit of observation is a market-year. The sample runs from 1993 to 2009.

errors for production costs (and all following parameters) are calculated by bootstrapping complete market histories, with replacement, 200 times. When computing standard errors, we hold elasticity of demand and import supply at their empirical means.[31]

The results from the estimation are included in table 4. Baseline marginal costs are estimated to be $47 per ton of cement. At an average price of $75 per ton of cement during our sample period, this implies a gross margin of $28 per ton, or 37 percent, over the range before the increasing marginal costs start. This markup seems reasonable for a capacity-constrained industry with extremely high sunk costs. The estimated threshold for those capacity costs is at 87 percent of annual capacity, which, combined with the high additional production costs after that point, is roughly consistent with the idea that cement plants typically shut down for a month and a half for maintenance per year.

To assess the plausibility of these estimated production costs, we collected the annual financial statements for Cemex, one of the largest cement producers in our sample. Over the years 2010, 2011, and 2012, Cemex reports gross combined profits of $12.377 billion on revenues of $43.183 billion, for a profit margin of 28.6 percent.[32] Furthermore, the EPA reports engineering estimates of average production costs of $44.4 per ton of produced cement, which is close to our point estimate.[33] In

[31] As part of an extensive sensitivity analysis, point estimates of production and dynamic costs for different combinations of elasticities are provided in tables F.2 and F.3 in the online appendix.

[32] While our estimated margins are higher than Cemex's reported margins, this could be partly explained by our assumption that fixed costs of production are zero and also the fact that we have evaluated the margins using the marginal cost on the flat (cheapest) part of the cost function.

[33] See RTI International (2009). An average cost of $50.30 in 2005 dollars is reported, which we convert into 2000 dollars.

TABLE 4
MARGINAL COST ESTIMATES

|  | Estimate | Bootstrapped Standard Error |
|---|---|---|
| Marginal cost ($/000 ton) | 46.99 | .82 |
| Capacity cost ($/extra % utilization) | 803.65 | 60.92 |
| Utilization threshold estimate | 1.889 | .040 |
| Implied utilization % threshold | .869 | .005 |

sum, these marginal cost estimates lie within an economically reasonable range.

### C. Dynamic Parameters

To estimate the dynamic parameters, we follow the two-step empirical strategy laid out in Bajari, Benkard, and Levin (2007) and used in Ryan (2012). First, we estimate the policy functions that describe firm investment, entry, and exit behaviors as a function of economic state variables. Second, we project these policy functions onto our underlying structural model via forward simulation.

*Policy functions.*—To estimate the investment policy function, we follow the approach in Ryan (2012) and use an $(s, S)$ rule model. The $(s, S)$ model is designed to capture lumpy adjustment behavior—periods of inactivity followed by large discrete changes in capacity—and consists of two latent equations: a target equation, $T(s)$, and a band equation, $B(s)$, which is defined to be nonnegative. The target equation sets the level of capacity a firm adjusts to, conditional on making a change, while the band equation controls when the firm will make a change. Letting the current capacity at time $t$ be denoted by $s_t$, the policy function for incumbent firms is

$$s_{t+1} = \begin{cases} T(s_t) & \text{if } s_t < T(s_t) - B(s_t) \text{ or } s_t > T(s_t) + B(s_t) \\ s_t & \text{else.} \end{cases} \quad (16)$$

Entrants adjust to $T(s_t)$. The target and band equations are, respectively,

$$\ln T_{imt}(s) = \eta_1 + \eta_2 1(i \text{ entrant}) + \eta_3[1 - 1(i \text{ entrant})]\ln\text{Capacity}_i + \eta_4 MT_m + \varepsilon_{Timt} \quad (17)$$

and

$$\ln B_{imt}(s) = \eta_5 + \eta_6 \ln\text{Capacity}_i + \eta_7 MT_m + \varepsilon_{Bimt}. \quad (18)$$

The target capacity depends on whether the firm is an entrant to the market, the firm's current log-transformed capacity, and a "market tightness"

variable $MT$. Market tightness is defined as the ratio of current aggregate market capacity to the maximum aggregate market capacity ever observed in our sample for that market. This measure is designed to capture deviations from the long-run sustainable size in the market. This is a market-specific measure; market tightness in a given market is measured relative to that market's maximum size.

The investment policy functions are estimated using linear regression. Information about capacity targets is revealed in the data when either a new firm enters or an incumbent makes a capacity adjustment. The band is equal to the size of the adjustment for incumbents.[34] The results from estimation are shown in table 5.

The parameters are generally estimated with precision for both the target and band equations, parameters having the expected signs. Higher market tightness is associated with lower levels of adjustment, while new entrants are more likely to enter at higher capacity levels, all else equal. Larger firms become increasingly larger than smaller firms conditional on making an adjustment. The adjustment band increases with current capacity and decreases with market tightness. The latter parameter implies that firms will be increasingly likely to make small adjustments as the market tightness increases, which is consistent with firms viewing the gains from delaying profitable investments as declining in the competitiveness of the market.

To estimate the entry and exit policy functions, we use probit regressions. We assume that there is at most one potential entrant in each period, while each incumbent firm has the opportunity to exit in each period. The explanatory variables are the same as above: intercepts, market tightness, and own capacity for current incumbents. The results from the estimation are shown in table 6.

Our estimates reflect that entry is a low-probability event under most market circumstances. Market tightness has a large, negative, and precisely estimated coefficient, reflecting that the probability of entry declines dramatically as relative market capacity grows. For example, when market tightness is 50 percent, the probability of entry is 10.5 percent, while it declines to 1.1 percent when market tightness increases to 80 percent. Exit is also a rare event, although the relatively low exit probabilities are due in part to the fact that more firms take draws from the distribution of exit costs as compared to entry costs. Own capacity is negatively related to the exit probability, while market tightness increases the probability that a firm will exit the market. To put these numbers in context, we report exit probabilities at varying levels of market tightness and firm size.

---

[34] The band is not relevant for the entry decision. In our model, firms are not allowed to enter without investing, so the statistical information associated with the decision to invest upon entry is captured by the fixed cost of entry.

TABLE 5
INVESTMENT POLICY ESTIMATES

|  | Estimate | Bootstrapped Standard Error |
|---|---|---|
| Target equation: |  |  |
| Intercept | 5.16 | .45 |
| Entry dummy | 1.59 | .47 |
| Ln own capacity | .87 | .06 |
| Market tightness ($MT$) | −.67 | .20 |
| Target variance | .14 | .02 |
| Band equation: |  |  |
| Intercept | −.20 | .81 |
| Ln own capacity | 1.02 | .13 |
| Market tightness ($MT$) | −1.53 | .59 |
| Band variance | .64 | .08 |

TABLE 6
ENTRY AND EXIT POLICY ESTIMATES

|  | Estimate | Bootstrapped Standard Error |
|---|---|---|
| Entry equation: |  |  |
| Intercept | .47 | .60 |
| Market tightness ($MT$) | −3.45 | .84 |
| Probability entry, $MT = .5$ | .105 | .034 |
| Probability entry, $MT = .8$ | .011 | .004 |
| Exit equation: |  |  |
| Intercept | 2.23 | .99 |
| Ln own capacity (ln 000 ton) | −.74 | .13 |
| Market tightness ($MT$) | .76 | .53 |
| Probability exit, cap = 800, $MT = .5$ | .009 | .003 |
| Probability exit, cap = 1,500, $MT = .5$ | .002 | .001 |
| Probability exit, cap = 800, $MT = .8$ | .017 | .004 |
| Probability exit, cap = 1,500, $MT = .8$ | .005 | .002 |

*Forward simulation.*—To simulate the firms' strategies going forward and compute their NPV, we first set the firms' discount factor, $\beta = 0.90$.[35] We then utilize the forward-simulation procedure laid out in Bajari et al. (2007). The intuition behind their estimator is, first, to use forward simulation to compute expectations about future outcomes, given all firms'

[35] We have investigated setting the discount factor both higher and lower by reestimating the model on a subset of the data. Table F.1 in the online appendix reports the estimates at alternative discount factors. As expected, lowering the discount rate to $\beta = 0.85$ leads to smaller investment costs, entry costs, and exit costs, while the opposite is true for raising it to $\beta = 0.95$, but the differences in the estimated parameters in this range were relatively minor. It is important to note that our results would become increasingly sensitive to our assumption about the discount rate as it grows toward one.

equilibrium strategies, and then, in a second step, to find parameters that make the observed behavior of firms consistent with profit maximization.

We forward simulate the continuation values under both the observed policy functions and four different perturbations. The first two perturbations manipulate when a firm invests: the first requires the firm to invest with certainty in the first period regardless of the draw of the fixed costs; the second is the mirror policy, where the firm is restricted to not invest. We also consider two alternative policies with (independent) marginal perturbations of both the probability of investment and the level of investment.[36] Additionally, we also impose a rationality constraint that the expected continuation value must be positive. Finally, we complement the inequalities with equalities derived from the indifference conditions for the marginal entering and exiting firms. Since all parameters enter linearly in the profit function, we use a robust solver (IBM's ILOG CPLEX Optimizer) that ensures that we find the globally optimal solution. The results of the estimation are shown in table 7.

Investment costs are roughly in line with the accounting costs cited in Salvo (2005), which reports a cost of $200 per ton of installed capacity. The implied cost of a cement plant is also in line with plant costs reported in newspapers and trade journals. For example, on October 15, 2010, it was reported that the most recent expansion of the Texas Industries New Braunfels cement plant, increasing capacity from 900,000 tons per year to 2.3 million tons per year, was pegged at a cost of $276 million in 2000 dollars, which implies a cost of $197 per ton of installed capacity, which is a little higher than our estimate of $171 per ton.[37]

The distribution of fixed costs of adjustment has an estimated mean of $48.5 million and a standard deviation of $28.5 million; the expected fixed cost of adjustment below the fourth percentile (the empirical rate of investment) is about $-1.43 million. The estimated variable investment costs for a 1.4 million ton per year expansion is $238 million, very close to the costs reported by the aforementioned New Braunfels plant.

For entry costs, we find that the distribution of entry fixed costs has a mean of $75.0 million with a standard deviation of $27.9 million. This implies that the entry costs at the 2nd percentile, which is close to the empirical probability of entry, are equal to $17.6 million. For an entrant that invests in a 1 million ton per year plant, this implies that the total initial investment outlays would be on the order of $189 million.

---

[36] We construct a sample of inequalities based on these perturbations. We take approximately 500 firm-market configurations based on years 1985, 1990, 1995, 2000, and 2005. For each of these 500 market configurations, we compute continuation values associated with each of the six inequalities by forward simulating market outcomes 1,000 times over a period of 30 years. This results in approximately 3,000 inequalities.

[37] Source: KGNB Radio (New Braunfels, TX; http://kgnb.am/radio/news/txi-resume -expansion-new-braunfels-cement-plant-120).

TABLE 7
DYNAMIC COST ESTIMATES

| | Estimate | Bootstrapped Standard Error |
|---|---|---|
| Investment estimates: | | |
| Capacity investment cost ($/ton) | 171 | 55 |
| Adjustment fixed cost ($000) | 48,525 | 17,081 |
| Adjustment fixed cost SD ($000) | 28,536 | 8,298 |
| Adjustment fixed cost, 4% draw | −1,433 | 4,894 |
| Adjustment total cost, 1.4 million ton addition, 4% draw | 237,895 | 73,550 |
| Entry estimates: | | |
| Entry fixed cost ($000) | 75,032 | 79,823 |
| Entry fixed cost SD ($000) | 27,948 | 24,508 |
| Entry fixed cost, 2% draw | 17,633 | 41,025 |
| Entry total cost, plant 1 million ton, 2% draw | 188,582 | 23,152 |
| Exit estimates: | | |
| Exit scrap value ($000) | −151,825 | 61,718 |
| Exit scrap value SD ($000) | 89,231 | 45,130 |
| Exit scrap value, 2% draw | 31,434 | 37,239 |
| Exit total scrap, plant 1 million ton, 2% draw | 202,382 | 17,469 |

For exiting firms, the estimated mean of the distribution of fixed exit costs is −$152 million. This distribution has a standard deviation of $89.2 million, which implies that firms receiving favorable draws will be paid to exit. This makes sense, as exiting firms are predicted to have positive profits and therefore must perceive that their outside option is relatively favorable compared to staying as an incumbent. Combined with the sell-off of capacity upon exit, the value to an exiting firm would be on the order of $202 million.

*Goodness of fit.*—The results above suggest that our model is broadly consistent with external measurements of firms' static and dynamic costs. Table 8 presents two additional measures of dynamic fit. To compare the performance across simulations, we take the market configuration in 2005 as our baseline, as it is the one used in our simulations and policy experiments.

Column 1 reports the empirical moments in the data. Capacities are measured in 2005, while changes in investment, divestment, entry, and exit rates are evaluated between 1981 and 2005. Column 2 reports the moments generated when we forward simulate the policy functions in the Bajari et al. estimation procedure. Column 3 reports moments generated when we solve and simulate the dynamic programming model under the baseline policy. Both sets of moments are generated by simulating the evolution of the industry 1,000 times over a 30-year horizon and averaging outcomes, taking the configuration of markets in 2005 as the starting point. The main difference between the two is that the Bajari et al. policy simulation uses the policy functions estimated in the data to

TABLE 8
Comparison of Actual and Simulated Moments

| | Actual Data (1) | Bajari et al. Policy (30 Years) (2) | Simulation (30 Years) (3) |
|---|---|---|---|
| Average firm capacity | 1,224 | 1,126 | 1,128 |
| SD firm capacity | 727 | 465 | 426 |
| Average market capacity | 4,964 | 4,806 | 4,554 |
| SD market capacity | 1,928 | 1,509 | 1,540 |
| Average investment | 376 | 112 | 393 |
| Investment SD | 394 | 64 | 243 |
| Average divestment | −151 | −130 | −643 |
| Divestment SD | 214 | 90 | 528 |
| Investment rate | .045 | .066 | .015 |
| Divestment rate | .039 | .009 | .014 |
| Entry rate | .018 | .052 | .006 |
| Exit rate | .019 | .011 | .002 |

Note.—Investment, divestment, and capacities measured in thousands of tons. Capacity levels and market structure from 2005 are used for the comparison. See the text for details on how the moments are generated.

simulate firms' decisions, whereas column 3 uses policy functions from the computed equilibrium of the theoretical model.

Column 2 measures how well the Bajari et al. approach does in capturing the essential dynamics of the industry, which is important for the forward simulation in the estimation, while column 3 measures how well our theoretical model explains and replicates those dynamics at the parameter estimates. These two measures of fit complement each other, as a good fit in the policy functions is necessary, but not sufficient, for a good fit in the theoretical model.

Our model performs well in fitting the market structure in the data. We come close to matching the average market size and average firm size, as well as their standard deviations, with both the empirical policy simulations and the counterfactual model. This implies that our model and estimates are not artificially introducing some long-run trends in our simulations, which could be a concern.[38] These particular moments are vitally important, as consumer welfare and producer surplus directly depend on these outcomes.

We match the size of investment and divestment adjustments relatively well, although not perfectly. On the one hand, the Bajari et al. policy

[38] We use demand and import conditions as of 2000 to capture recent market conditions outside of the construction boom. Alternatively, we could have used average demand and import parameters during the whole period (1981–2005). In such a case, we find that firms intuitively reduce their capacities (from 2005 levels), bringing them closer to average capacities in the data during the whole period. We decided to use the latest years as a baseline as we are ultimately interested in policy experiments going forward.

function does well at matching divestment but understates the size of the investments. On the other hand, the simulations predict investment sizes very well but overstate some of the divestment sizes, with few firms significantly reducing their size. The empirical investment and divestment rates are also somewhat larger than those predicted by the theoretical model, while the policy functions tend to modestly overstate investment rates. Importantly, while the investment rate is higher in the policy functions, this is offset by smaller predicted movements for each change. Conversely, the lower investment rate in the theoretical model is partially offset by larger adjustments when firms do make investments.

Two factors are worth keeping in mind when evaluating the goodness of fit of the investment, entry, and exit rates. The empirical distribution of firms starts in 1981, when there were more, smaller, dirtier, and older firms as compared to 2000. The turnover rate of the industry in this earlier period was thus greater than it was in 2000. The lower entry and exit rates in our simulations can be partially explained by the fact that the industry has consolidated into fewer, larger, cleaner, and younger firms in the last three decades. A second issue is that our model may miss some important year-to-year fluctuations in the economic environment as a result of dynamic factors such as directed technical change, the housing bubble, and changing economic conditions in the import sector.

## D. Environmental Parameters

Additional parameters in the simulation model include the SCC $\tau$, the social discount factor, $\beta_s$, technology-specific emissions rates, and the policy parameters that define each allocation mechanism.

*Social cost of carbon and social discount rate.*—Given the uncertainty inherent in the estimation of damages from carbon emissions, it is important to consider a range of values of $\tau$. The range of values we choose to consider, \$5–\$65 per ton of $CO_2$, is informed by an ongoing interagency process designed to produce estimates of SCC for use in policy analysis (Working Group on Social Cost of Carbon 2013). Online appendix D discusses the outcomes of this process and the typical social discount rates used in policy evaluation.

For expositional ease, we will assume that policies are designed such that the carbon price reflects the true SCC. Thus, the carbon tax or permit price and the SCC are assumed to be one and the same. In Section VI.C, we relax this assumption and hold the assumed SCC value constant across scenarios associated with different permit prices/tax levels. We set the social discount rate $\beta_s$ at 0.97.

*Emissions rates.*—Both the Intergovernmental Panel on Climate Change and the World Business Council for Sustainable Development's Cement Sustainability Initiative (2011) have developed protocols for estimating

emissions from clinker production. We use these protocols to inform kiln technology-specific estimates of $CO_2$ emissions rates (denoted in tons of $CO_2$ per ton of cement): 1.16 for wet-process kilns, 0.93 for dry-process kilns, and 0.81 for state-of-the-art kilns. Online appendix C explains these emissions rate calculations in more detail. The emissions rate on imported cement, $e_M$, is estimated using an import volume weighted average of estimated foreign cement producers' emissions intensities (Worrell et al. 2001).

*Policy parameters.*—We begin by calibrating the policy designs we consider to match existing and proposed policy regimes. We then extend the analysis to consider design parameters that are more consistent with second-best policy making.

In the grandfathering regime, firms receive an annual permit allocation proportional to their preprogram capacity level. We choose $\psi_g$ such that this allocation is equal to 42.5 percent of their emissions-weighted initial capacity, which translates into approximately 50 percent of historic annual emissions.[39] In the auctioning regime, this $\psi_g$ is set to zero.

In the policy scenario that incorporates output-based rebating, permits are allocated per unit of production on the basis of an emissions intensity benchmark, denoted by $\psi_d$. We adopt the benchmark that was chosen for European cement producers in the third phase of the EU ETS (2013–20): 0.716 permit per metric ton of clinker.[40] This translates into a reduction in compliance costs (per unit of clinker output) of between 62 percent for wet kilns and 77 percent for the most common dry-process kiln technology.[41]

## VI.   Simulation Results

This section begins with a summary of how key market outcomes (domestic production capacity, cement prices, emissions) are affected by the introduction of market-based policies designed to reduce GHG emissions. All simulation results are summarized relative to the base case in which GHG emissions are unregulated. We then summarize the net welfare effects of the policies. The section concludes with a discussion of optimal carbon pricing, abatement curves, and a series of robustness checks.

We report simulation results graphically for the range of SCC values that have been deemed policy relevant (Working Group on Social Cost

---

[39] The utilization rate of cement kilns is around 85 percent in our sample and is very homogeneous across plants.

[40] Available from http://eurlex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2011:130 :0001:0045:EN:PDF. For comparison, in California's Greenhouse Gas Trading Program, a more generous benchmark of 0.786 allowance per metric ton of clinker is used.

[41] Importantly, permits are rebated on the basis of clinker (vs. cement) production, thus eliminating incentives to reduce carbon intensity through increased use of SCM.

of Carbon 2013).[42] However, our inferences at high carbon prices are quite far from historical experience. The higher the assumed carbon price, the less plausible our partial equilibrium approach and all of the implications that come with it, such as the exogenous demand parameters, capital costs, and productive technology. This caveat notwithstanding, evaluating outcomes over this range of SCC values serves to illustrate the countervailing forces that shape interactions between market structure and carbon regulation.

To highlight the importance of accounting for industry dynamics, we contrast the results of our dynamic simulations with a simulation exercise that holds industry structure fixed. We take a standard approach to constructing the static benchmark (US EPA 1999). We simulate equilibrium outcomes in a single period and assume that these simulated static outcomes would be observed each year of the 30-year time horizon. In this static model, firms can alter production levels, but production capacity, technology operating characteristics, and so forth are held constant at baseline levels.

## A.    Simulated Market Outcomes

*Production capacity.*—Figure 2*A* plots total domestic production capacity (summed across markets and averaged across years) as a function of the exogenous permit price, $\tau$. The left panel, which corresponds to the static simulations, highlights the fact that domestic production capacity is held fixed at baseline levels in the static model.

The right panel shows how domestic production capacity varies with the carbon price once industry dynamics are introduced. Policy-induced reductions in installed capacity are most pronounced under the auctioning/tax regime. As $\tau$ increases, a growing number of firms elect to disinvest or exit the market completely. Augmenting this policy with a BTA mitigates the loss of domestic market share to foreign producers, thus slowing the rate of exit and disinvestment.

One important result, highlighted by this and subsequent figures, is that equilibrium outcomes under the grandfathering and auctioning regimes differ substantively. In other words, the so-called independence property fails to hold when industry dynamics are accounted for.[43] Under the grandfathering regime, an incumbent firm receives a lump-sum transfer each period in the form of a free permit allocation. The firm

---

[42] See table F.4 in the online appendix for numerical values for a sample of markets and carbon price levels, which include bootstrapped standard errors on the simulation results.

[43] The independence property states that the market equilibrium in a cap-and-trade system is independent of the initial distribution of emissions permits. This is closely related to the more general principle that when markets are complete, outcomes remain efficient even after lump-sum transfers among agents (Hahn and Stavins 2011).



FIG. 2.—Market outcomes: A, capacity; B, cement prices; C, domestic emissions; D, emissions leakage. These figures show the static (left panel) and discounted present values (right panel) of industrywide capacity, average prices, total domestic emissions, and total emissions leakage, respectively. The dynamic figures were calculated by simulating the industry forward 30 years and discounting using a rate of 3 percent per year.



FIG. 2 (*Continued*)

forfeits this entitlement if it chooses to exit or disinvest. This lowers the exit and disinvestment thresholds for incumbents relative to the auctioning regime. As carbon prices increase, the allocation of grandfathered permits becomes increasingly valuable, and firms find it increasingly profitable to forgo production and simply sell their allocations on the open market; this explains the nonmonotonic level of capacity under the grandfathering regime. At very high values of $\tau$, permit endowments are so valuable that domestic production capacity remains at baseline levels.

Another noteworthy result pertains to the policy that incorporates the output-based subsidy. When compared to the auctioning regime, output-based updating induces much smaller reductions in domestic production capacity. The reason is that contingent rebating confers an implicit subsidy of 0.716 permit per unit of production. For a firm of an average emissions intensity of 0.97, the net cost to the firm is only 25 percent of the carbon price. Thus, the equilibrium production capacity under the output-based rebating regime at any given carbon price is roughly the capacity level observed under auctioning at a carbon price four times smaller.[44]

*Cement prices.*—Figure 2$B$ plots quantity-weighted average cement prices as a function of $\tau$. In both the static and dynamic simulations, cement price increases are most pronounced under the auction/tax regime that incorporates a BTA. Under this policy, both foreign and domestic firms bear the complete cost of compliance; no compensation in the form of contingent rebates or lump-sum transfers is offered.

A notable feature in the static left panel of figure 2$B$ is that the cement price is virtually unaffected at carbon prices below \$15. In the benchmark case, many domestic firms are capacity constrained and are earning scarcity rents. An increase in variable operating costs reduces scarcity rents but does not affect domestic production levels or equilibrium prices. In contrast, when firms have the ability to disinvest in response to an increase in operating costs, we observe price impacts even at low levels of $\tau$.

Cement price increases are more significant in the dynamic simulations. As firms reduce production capacity through divestment and/or exit in response to policy-induced increases in operating costs, regional cement markets become more concentrated, and the distortions associated with the exercise of market power became more pronounced. Whereas there is a distinct increase in production capacity under grandfathering at higher carbon prices, there is no associated decrease in cement prices. The reason is that capacity is relatively underutilized at high carbon prices in the grandfathering regime. Grandfathering creates an incentive to remain in the market so as to maintain the permit entitlement.

---

[44] Note that, if all firms had the same emissions rate $e$, the output-based updating regime at a price $\tau$ would be exactly equivalent to the auctioning regime at a price $[(e - 0.716)/e]\tau$.

*Domestic emissions.*—Figure 2*C* shows how the emissions from domestic cement production decrease with $\tau$. The vertical axes measure domestic $CO_2$ emissions summed across regional markets and averaged across time periods. Domestic emissions are lowest under the auctioning regime that provides domestic producers no compensation for the costs they incur to comply with the regulation. This drives down levels of domestic cement production and associated emissions. Augmenting the auctioning regime with a BTA mitigates impacts on domestic competitiveness, thus increasing both domestic production levels and emissions.

In the static simulations, emissions outcomes are identical across the grandfathering and auctioning regimes. In the dynamic simulations, domestic emissions levels are higher under grandfathering. Intuitively, regional cement markets have a higher expected number of active firms under grandfathering, leading to higher levels of domestic production and associated emissions.

*Emissions leakage.*—Figure 2*D* summarizes policy-induced changes in emissions from foreign producers. To compute these emissions leakage measures, we assume that the increase in demand for cement imports represents purely additional production at foreign suppliers rather than a reallocation of foreign production that once supplied their local markets. We revisit this assumption in the next subsection.

Focusing on the dynamic simulations (right panel), emissions leakage is most significant under the auctioning regime. Domestic producers are required to fully internalize the externality with no compensation, whereas the operating cost structure of foreign producers is unaffected. As foreign producers gain market share, emissions from foreign cement production increase relative to the baseline. Grandfathering slows the rate of domestic capacity reduction relative to auctioning, mitigating emissions leakage. Similarly, output-based rebating significantly reduces the net cost of compliance per unit of output, also reducing leakage.

Notably, we find negative leakage rates under the regime that incorporates a BTA. In other words, the introduction of this policy reduces emissions among foreign producers relative to the unregulated baseline. This occurs because we assume complete pass-through of environmental compliance costs by foreign producers whereas pass-through of environmental compliance costs among strategic domestic producers is incomplete. Consequently, when emissions from domestic and foreign producers are penalized at the same rate, we see a decrease in cement imports. The extent of negative leakage is reduced when dynamic industry responses are accounted for. The reason is that policy-induced increases in the cement price are larger, resulting in higher import supply levels at any given carbon price.

*Market outcomes over time.*—Our dynamic simulation model can also be used to generate trajectories of market outcomes over time under alter-

native policy regimes. Figures 3*A* and 3*B* chart the evolution of domestic production capacity and domestic quantity, respectively, assuming a carbon price of \$45 per ton of $CO_2$.

In our model, there is no technological innovation over time (except through entry of new efficient plants), nor is there growth in domestic cement demand over time. In other words, aside from policy-induced changes in market structure, economic operating conditions are stable over the 30-year time horizon we consider. Consequently, most of the industry response to a counterfactual policy intervention occurs in the years immediately following the policy change. This adjustment is not immediate because of year-to-year variation in firms' draws from the distributions of investment, entry, and exit costs. It is also notable that the adjustment takes longer in the grandfathering case, where incentives to divest are attenuated by the payoffs of keeping free allowances. These graphs also show that these outcomes are very stable in the baseline case, which is reassuring and suggestive that our simulations are internally consistent with our assumption that the economic environment is unchanging in the baseline.[45]

The graphs in figure 3*A* illustrate how the distributional differences arising in the short run between auctioning and grandfathering can have product market implications in the longer run. At period 0, both production and capacity are the same, as the static production incentives of the two mechanisms are equivalent. However, as time passes, firms disinvest and exit at faster rates under the auctioning regime. Capacity constraints bind and production in the auctioning case falls below production in the grandfathering case. Note that differences in capacity across the auctioning and grandfathering regimes are far more stark than differences in production. Production capacity is underutilized in the grandfathering case; firms have an incentive to keep their grandfathered investments in operation, even if they are not fully utilized.

## B.   *Decomposing Changes in Welfare*

Having considered the effects of counterfactual emissions regulations on specific market outcomes, we next consider the related welfare implications of these policies. Policy-induced welfare changes are decomposed into the three component parts introduced in Section II.

*W1: Domestic economic surplus.*—As a point of departure we consider policy-induced changes in domestic producer surplus, domestic consumer surplus, and any revenues raised by the government through emissions taxation or permit sales. The left panel of figure 4*A* corresponds to the

---

[45] This is not necessarily the case; e.g., misspecification bias in our model could imply that firms should systematically be larger or smaller than their empirical counterparts.



Fig. 3.—Market outcomes over time: A, capacity over time at $45 SCC; B, emissions over time at $45 SCC. These figures show the evolution of capacities over time (average across markets). Initial market structure is the same across mechanisms (see initial capacity at the same level). The figures show the transition over a period of 30 years.



Fig. 4.—Welfare measures across mechanisms: *A*, W1: domestic industry surplus plus government revenues; *B*, W2: W1 plus domestic emissions reduction; *C*, W3: W2 plus emissions leakage.





FIG. 4 (*Continued*)

static case. Because short-run production incentives are identical under grandfathering and auctioning, impacts on domestic economic surplus are identical. The addition of a BTA improves terms of trade, generates border tax revenues, and reduces policy impacts on cement prices. On balance, this mitigates losses in domestic economic surplus at high carbon prices. Because the policy that incorporates output-based rebating has only minor impacts on domestic production across the range of prices we consider, impacts on domestic economic surplus are minimal.

The right panel of figure 4A summarizes the corresponding dynamic results. Reductions in domestic economic surplus are most significant under the auctioning regime, where we observe the highest rates of exit and disinvestment, the highest cement prices, and the most significant adverse impacts on domestic competitiveness. Under the grandfathering regime, higher levels of domestic production and lower cement prices deliver a relative increase in domestic producer and consumer surplus.

In contrast to the static case, reductions in economic surplus manifest even at low carbon prices. As discussed above, when firms have the ability to disinvest in response to a policy-induced increase in operating costs, we observe impacts on cement prices, domestic production, and thus domestic economic surplus, across the range of carbon prices we consider.

*W2: Domestic economic surplus plus domestic emissions.*—Figure 4B plots changes in our second welfare measure, which incorporates the value of domestic $CO_2$ emissions reductions. The value per ton of emissions avoided is assumed to be equal to the prevailing permit price or tax. Thus, the monetary value of domestic emissions reductions is constructed by multiplying the emissions reductions summarized in figure 2C by the corresponding permit price.

In the static simulations (left panel), benefits associated with reduced domestic emissions do not offset the costs of a policy that incorporates grandfathering or auctioning at carbon prices below $40. In contrast, the value of domestic emissions reductions more than offsets the economic costs under the policy regimes that incorporate a BTA or the output-based rebate.

The dynamic simulations yield quite different results (right panel). As compared to the static case, the dynamic mechanisms of divestment and exit result in much smaller levels of production; at low carbon prices, the loss in domestic economic surplus is increasing faster than the gain in benefits. However, as $\tau$ increases, the gains from emissions abatement begin to offset losses in economic surplus. All policy regimes yield welfare gains at high carbon prices.

*W3: Domestic economic surplus plus domestic emissions plus leakage.*—Figure 4C plots the policy-induced reductions in this most comprehensive welfare measure. In the static simulations (left panel), accounting for the significant levels of emissions leakage observed at values of $\tau$ greater

than $20 exacerbates welfare costs of the grandfathering and auctioning regimes. In contrast, accounting for negative leakage amplifies the welfare gains under the policy regime that incorporates a border tax adjustment.

In the dynamic simulations (right panel), accounting for leakage decreases welfare in most cases. Output-based updating is the least-worst (but still negative) policy for the majority of carbon prices, being eclipsed by BTAs only at prices exceeding $45 per ton. Grandfathering generates marginally greater surplus relative to BTAs for low to moderate carbon prices. The auctioning/carbon tax regime generates large and negative welfare effects over the entire range of carbon prices we evaluate. Notably, the highest welfare losses, in the range of $15–$18 billion, correspond to carbon prices in the middle of the range of expected carbon prices for a US-wide carbon trading scheme.

As noted above, we assume that policy-induced changes in demand for cement imports translate directly into changes in the levels of foreign cement production. This assumption will exaggerate the impacts of these policies on emissions leakage if foreign producers accommodate changes in domestic demand for cement imports by reallocating their output. In this respect, figures 4*B* and 4*C* can be viewed as upper and lower bounds on the welfare effects of these policies.

## C.   *Policy Comparisons under Optimal Carbon Prices*

Simulation results summarized in the previous section suggest that the negative welfare effects of fully internalizing the emissions externality outweigh the benefits over a range of carbon prices. As a result, a policy maker looking to maximize welfare will want to set a permit price that falls below the true social cost. This insight helps explain why a regime that dynamically updates permit allocations to domestic producers on the basis of output welfare dominates a regime that allocates permits to domestic producers in lump-sum. As perceived by domestic firms, dynamic allocation updating lowers the effective cost per unit of emissions below the social marginal cost.

Across the four policy regimes we consider, we compute the permit price that maximizes our most comprehensive welfare measure (W3) for a given value of the true SCC. We first impose the constraint that all domestic cement producers must be treated symmetrically under the regulation. In the debates over carbon policy design and implementation, it is typically assumed that firms within a sector will face the same policy incentives. Given the structural differences across regional markets, as well as the differences in trade exposure, allowing policy incentives to vary across regional markets could be welfare improving. We therefore extend the analysis to consider policy designs that levy different carbon prices for trade-exposed coastal and trade-insulated inland markets.

Table 9 reports welfare-maximizing carbon prices and associated welfare changes at two medium-range SCC values ($20 and $45). In column 1, we impose the constraint that all cement producers face the same price. Columns 2 and 3 report the optimal prices for coastal and inland regional markets, respectively. Panel A considers the case in which the SCC is $20 per ton of $CO_2$. At this value, there is no positive carbon price at which the benefits from emissions reductions exceed the costs. This is true in inland markets and in coastal markets when the emissions externality has been internalized by foreign producers. This implies that the social costs of exacerbating the exercise of market power exceed any social gains from reducing emissions.

Panel B of table 9 conducts the same analysis setting the SCC to $45. Under the auctioning regime, the optimal permit price falls well below the true cost of carbon in order to strike the right balance between incentivizing abatement and exacerbating the distortions associated with the exercise of market power and the asymmetric treatment of domestic and foreign emissions. When this price is allowed to vary across inland and coastal markets, the price is much lower in trade-exposed markets in order to address the welfare effects of emissions leakage.

Augmenting the auctioning regime with a BTA efficiently internalizes the emissions externality associated with foreign production but leaves the distortions associated with the exercise of market power unaddressed. In coastal markets, augmenting the auctioning regime with a BTA increases the optimal carbon price from $5 per ton to $25 per ton. Note that this is higher than the optimal price in inland markets because coastal markets tend to be relatively more competitive.

TABLE 9
OPTIMAL CARBON PRICES FOR DIFFERENT MECHANISMS

| | Federal $\tau_f^*$ (1) | Coastal $\tau_c^*$ (2) | Inland $\tau_i^*$ (3) | Welfare $\Delta$ at $\tau_f^*$ (4) | Welfare $\Delta$ at $\{\tau_c^*, \tau_i^*\}$ (5) | Welfare $\Delta$ at $\tau = $ SCC (6) |
|---|---|---|---|---|---|---|
| | | | A. SCC = $20 | | | |
| Auctioning | 0 | 0 | 0 | 0 | 0 | −14,886 |
| Grandfather | 0 | 0 | 0 | 0 | 0 | −6,609 |
| Output | 0 | 0 | 0 | 0 | 0 | −2,519 |
| BTA | 0 | 0 | 0 | 0 | 0 | −6,141 |
| | | | B. SCC = $45 | | | |
| Auctioning | 5 | 5 | 15 | 905 | 1,316 | −12,890 |
| Grandfather | 10 | 5 | 35 | 1,357 | 2,259 | −5,839 |
| Output | 25 | 15 | 60 | 1,047 | 1,628 | 619 |
| BTA | 20 | 25 | 15 | 5,991 | 6,269 | 3,150 |

NOTE.—Carbon prices are in dollars and welfare in millions of dollars. Optimal carbon prices are computed on a grid including $\{0, 5, 10, 15, 20, 25, 30, 35, 40, 45, 50, 55, 60, 65\}$.

Under the regime that incorporates dynamic allocation updating, there is substantial heterogeneity in the optimal permit price between coastal and inland markets. The implicit production subsidy appears to be too low in coastal markets, as output-based updating plays a crucial role in attenuating rents and emissions leakage. On the contrary, in a regime in which all domestic firms must be treated symmetrically, this subsidy may be overly generous as suggested by the optimal inland price of $60, which is near the upper bound on the range that we consider.

The welfare change that results if carbon is priced optimally and uniformly within the cement sector is reported in column 4. Column 5 reports the welfare change that results under the differentiated carbon price. Finally, as a basis for comparison, column 6 reports the welfare change that results if the carbon price is constrained to equal the assumed SCC. In general, moving from complete internalization of the emissions externality to a regime that implements the optimal uniform carbon price confers sizable welfare gains. The additional gains from differentiating carbon prices across inland and coastal markets are not as large but are nontrivial.

### D.  Abatement Cost Curves

Throughout the analysis, we have assumed that the permit price $\tau$ reflects the marginal cost of abatement in other competitive sectors covered by the regulation and that the permit supply curve is flat in the neighborhood of the imposed cap. An alternative approach to summarizing the relative welfare effects eschews these assumptions. We compute the average cost per ton of $CO_2$ emissions abatement in the cement sector across different policy regimes. This provides a measure of the efficiency with which cement sector emissions abatement is achieved under alternative policy designs.

Figure 5 presents the average abatement cost for the mechanisms that we consider. Each point on the graph corresponds to a specific policy regime and carbon price. The graph on the left divides reductions in domestic producer and consumer surplus (W1) by the reduction in domestic emissions. The graph on the right conducts a similar exercise, although the denominator is adjusted to reflect the policy-induced change in foreign emissions.

Consistent with our findings above, cement-sector emissions abatement is least efficient under the auctioning regime. Under this regime, with firms bearing the full brunt of compliance costs, distortions associated with market power are exacerbated and any reductions in emissions that do occur come at the cost of significant surplus reductions. Average abatement costs start at close to $40 per ton once leakage is accounted for. Abatement under the grandfathering regime is somewhat more cost effective because the lump-sum transfer provides an incentive for firms



Fig. 5.—Abatement curves: *A*, abatement average cost (leakage ignored); *B*, abatement average cost (leakage-corrected)

to remain in the market (reducing market power distortions relative to auctioning). The relatively low average abatement costs associated with the BTA are striking once the effects of the policy on foreign emissions are accounted for. This reflects both terms of trade improvements and negative leakage.

*E.  Sensitivity Experiments*

In the previous analysis, we have maintained fixed demand and import supply elasticities. These estimates vary across econometric specifications and can be quite noisy. Furthermore, one could imagine that these elasticity values could change endogenously as carbon policy becomes more stringent.

   In order to assess the robustness of our estimates to different elasticities, we recompute all the calculations of market equilibria for a range of elasticity values. For computational reasons, we focus our attention on the smaller markets. We analyze how the welfare metric W3 changes with these parameters. To summarize, we find that the main results and comparative statics across allocation mechanisms are robust to changes in demand and import elasticities.

   *Demand elasticities.*—The demand elasticity plays an important role in determining, among other outcomes, gross consumer surplus, the extent of the distortion arising from the exercise of market power, and the extent to which leakage occurs under a given emissions policy. Table F.5 in the online appendix presents welfare changes (W3) for a combination of carbon prices and demand elasticities. In the columns, we report equilibrium outcomes for the different sensitivities. In the rows, we present welfare outcomes for different allocation mechanisms and carbon price values. Our baseline results are reported in the middle column ($\eta = 2$).

   For low carbon prices, welfare effects of the policies we consider are more negative when demand is relatively more elastic because a given permit price has a larger impact on economic surplus. At higher carbon prices, negative welfare effects are attenuated, or turn positive, when demand is more elastic. Intuitively, as reductions in emissions play a more significant role in determining welfare at higher carbon prices, welfare effects start increasing with the elasticity of demand.

   Aside from these changes in levels, it is important to emphasize that relative welfare comparisons across mechanisms do not generally change with the demand elasticity. As before, for low levels of carbon prices, an output-based updating allocation dominates, whereas for larger carbon prices the BTA mechanism becomes more attractive. The auctioning mechanism, on the other hand, is the least favorable across specifications.

   Table F.5 can also be used to address concerns about the effects of carbon policy on the structure of domestic cement demand. Whereas

our model effectively holds demand shifters constant, we might expect that the emissions policies we consider would affect the prices of cement substitutes. One can use table F.5 to get a rough idea of how our estimates of welfare effects within the cement sector may change as the structure of demand changes.

If cement will become differentially more expensive (as compared to substitutes) as carbon prices rise, one can imagine that demand elasticity will become larger. Therefore, one can simply start the baseline elasticity at the zero carbon price and trace down the table, letting the elasticity increase with the carbon price. While this approach does not explicitly model interactions between climate policy and markets for cement substitutes, it provides a simple way to examine the sensitivity of our results to our partial equilibrium modeling assumptions. Intuitively, if demand becomes more elastic as carbon prices increase as a result of increased substitution, the benefits from the policy are larger.

*Import supply elasticities.*—The import supply elasticity parameter is another key parameter in our model that is not precisely estimated. Similarly to the own-price elasticity of domestic cement demand, there is also the possibility that importing firms could respond to the policy by expanding investment in import terminals, foreign production capacity, or improved transport practices. By allowing for a more or less responsive supply curve, we proxy for these kinds of responses.

Table F.6 in the online appendix recomputes estimated welfare effects for a range of import supply elasticity values. Our baseline results are reported in the middle column ($\eta = 2.5$). Changing the import supply elasticity has two important implications. First, in trade-exposed markets, an increase in the import supply elasticity increases the elasticity of the residual demand curve faced by domestic producers, all else equal, which can be beneficial for competition. Second, the more responsive import supply is to a change in the cement price, the greater the emissions and rent leakage. We find that the latter effect dominates for most mechanisms and price ranges, and thus a more elastic import supply reduces welfare. Notably, this is not the case for the BTA mechanism, which is most effective at mitigating leakage. The qualitative findings in the paper are robust to these effects.

## VII.   Conclusion

We use an empirically tractable dynamic model of the domestic Portland cement industry to evaluate the welfare impacts of incomplete, market-based regulation of carbon dioxide emissions. We assess the implications of several alternative policy designs, including those that incorporate both an emissions disincentive, in the form of a tax or an obligation to hold an emissions permit, and a production incentive.

We find that both the magnitude and the sign of the welfare effects we estimate depend critically on how the policy is implemented and what we assume for the social cost of carbon. Under market-based policy regimes that incorporate neither a border tax adjustment nor an implicit production subsidy, our results echo Buchanan (1969). At SCC values below \$40 per ton of $CO_2$, market-based emissions regulation that requires domestic producers to fully internalize the emissions externality exacerbates the distortions associated with the exercise of market power in the domestic product market to such an extent that reductions in domestic economic surplus exceed the benefits of emissions reductions. Emissions leakage in trade-exposed regional markets further undermines the benefits of these programs.

Notably, we find that policy designs that incorporate both an emissions penalty and a production incentive in the form of a rebate welfare dominate more traditional policy designs at SCC values below \$40. Intuitively, the production incentive works to mitigate leakage in trade-exposed cement markets and the distortion associated with the exercise of market power. A policy that penalizes emissions embodied in foreign imports induces negative leakage given our assumption that imports respond competitively, whereas domestic producers behave strategically. Consequently, this policy delivers sizable welfare gains at high carbon prices.

Policy makers are very interested in understanding how proposed climate change policies would affect highly concentrated, emissions-intensive sectors such as the cement industry. The scale and scope of these policy interventions are unprecedented, making it difficult to anticipate how industry will respond and what that response will imply for social welfare. This paper illustrates important forces that shape the interaction of industry structure, trade flows, and proposed carbon regulations. Our results provide valuable insights into the efficiency and distributional properties of leading policy design alternatives.

### References

Arcidiacono, P., P. Bayer, F. Bugni, and J. James. 2013. "Approximating High-Dimensional Dynamic Models: Sieve Value Function Iteration." *Advances Econometrics* 31 (December): 45–96.

Bajari, P., C. L. Benkard, and J. Levin. 2007. "Estimating Dynamic Models of Imperfect Competition." *Econometrica* 75:1331–70.

Bernard, A. L., C. Fischer, and A. Fox. 2007. "Is There a Rationale for Output-Based Rebating of Environmental Levies?" *Resource and Energy Econ.* 29 (2): 83–101.

Bernheim, B. D., and M. D. Whinston. 1990. "Multimarket Contact and Collusive Behavior." *RAND J. Econ.* 21 (1): 1–26.

Buchanan, J. M. 1969. "External Diseconomies, Corrective Taxes, and Market Structure." *A.E.R.* 59 (1): 174–77.

Dales, J. H. 1968. *Pollution, Property, and Prices*. Toronto: Univ. Toronto Press.

Dardati, E. 2016. "Pollution Permit Systems and Firm Dynamics: Does the Allocation Scheme Matter?" *Internat. Econ. Rev.* 57 (February).

Demailly, D., and P. Quirion. 2006. "CO2 Abatement, Competitiveness and Leakage in the European Cement Industry under the EU ETS: Grandfathering versus Output-Based Allocation." *Climate Policy* 6 (1): 93–113.

Doraszelski, U., and A. Pakes. 2007. "A Framework for Applied Dynamic Analysis in IO." In *Handbook of Industrial Organization*, vol. 3, edited by M. Armstrong and R. Porter, 1888–1966. Amsterdam: Elsevier.

Ebert, U. 1992. "Pigouvian Tax and Market Structure: The Case of Oligopoly and Different Abatement Technologies." *Finanzarchiv/Public Finance Analysis* 49 (2): 154–66.

Ericson, R., and A. Pakes. 1995. "Markov Perfect Industry Dynamics: A Framework for Empirical Work." *Rev. Econ. Studies* 62 (1): 53–82.

Farias, V., D. Saure, and G. Weintraub. 2012. "An Approximate Dynamic Programming Approach to Solving Dynamic Oligopoly Models." *RAND J. Econ.* 43:253–82.

Fischer, C., and A. K. Fox. 2009. "Comparing Policies to Combat Emissions Leakage: Border Tax Adjustments versus Rebates." Discussion Paper no. DP-09-02, Resources for the Future, Washington, DC.

Foster, L., J. Haltiwanger, and C. Syverson. 2008. "Reallocation, Firm Turnover, and Efficiency: Selection on Productivity or Profitability?" *A.E.R.* 98 (1): 394–425.

Hahn, R., and R. Stavins. 2011. "The Effect of Allowance Allocations on Cap-and-Trade System Performance." *J. Law and Econ.* 54 (4): S267–S294.

Holland, S. P. 2012. "Emissions Taxes versus Intensity Standards: Second-Best Environmental Policies with Incomplete Regulation." *J. Environmental Econ. and Management* 63 (3): 375–87.

Jans, I., and D. I. Rosenbaum. 1997. "Multimarket Contact and Pricing: Evidence from the U.S. Cement Industry." *Internat. J. Indus. Org.* 15:391–412.

Joskow, P., and R. Schmalensee. 1998. "The Political Economy of Market-Based Environmental Policy: The U.S. Acid Rain Program." *J. Law and Econ.* 41:37–84.

Kapur, A., H. Van Oss, G. Keoleian, S. Kesler, and A. Kendall. 2009. "The Contemporary Cement Cycle of the United States." *J. Material Cycles and Waste Management* 11 (2): 155–65.

Keohane, N. O. 2009. "Cap and Trade, Rehabilitated: Using Tradable Permits to Control U.S. Greenhouse Gases." *Rev. Environmental Econ. and Policy* 3 (1): 42–62.

Levin, D. 1985. "Taxation within Cournot Oligopoly." *J. Public Econ.* 27 (3): 281–90.

Mahasenan, N., R. Dahowski, and C. Davidson. 2005. "The Role of Carbon Dioxide Capture and Sequestration in Reducing Emissions from Cement Plants in North America." In *Greenhouse Gas Control Technologies*, vol. 1, edited by B. Eliasson, P. Riemer, and A. Wokaun. Amsterdam: Elsevier Sci.

Maskin, E., and J. Tirole. 1988. "A Theory of Dynamic Oligopoly I: Overview and Quantity Competition with Large Fixed Costs." *Econometrica* 56:549–69.

Miller, N. H., and M. Osborne. 2010. "Competition among Spatially Differentiated Firms: An Estimator with an Application to Cement." Working Paper no. 10-2, Econ. Analysis Group, Antitrust Div., US Dept. Justice, Washington, DC.

Millimet, D. L., S. Roy, and A. Sengupta. 2009. "Environmental Regulations and Economic Activity: Influence on Market Structure." *Ann. Rev. Resource Econ.* 1:99–117.

Montgomery, D. W. 1972. "Markets in Licenses and Efficient Pollution Control Programs." *J. Econ. Theory* 5 (3): 395–418.

Oates, W. E., and D. L. Strassmann. 1984. "Effluent Fees and Market Structure." *J. Public Econ.* 24 (1): 29–46.

PCA (Portland Cement Association). 1980–2006. "U.S. and Canadian Portland Cement Industry: Plant Information Summary." Technical report, Portland Cement Assoc., Skokie, IL.

Ponssard, J. P., and N. Walker. 2008. "EU Emissions Trading and the Cement Sector: A Spatial Competition Analysis." *Climate Policy* 8:467–93.

RTI International. 2009. "Regulatory Impact Analysis: National Emissions Standards for Hazardous Air Pollutants from the Portland Cement Manufacturing Industry." Report, RTI Internat., Research Triangle Park, NC.

Ryan, S. P. 2012. "The Cost of Environmental Regulation in a Concentrated Industry." *Econometrica* 80 (3): 1019–61.

Salvo, A. 2005. "Inferring Conduct under the Threat of Entry: The Case of the Brazilian Cement Industry." Working paper, London School Econ.

Sato, M., K. Neuhoff, and A. Neumann. 2008. "Demand Response from $CO_2$ Prices in Energy-Intensive Industries." Working paper, Dresden Univ. Technology.

Sterner, T., and L. Hoglund. 2000. "Output-Based Refunding of Emission Payments: Theory, Distribution of Costs, and International Experience." Discussion paper no. DP-00-29, Resources for the Future, Washington, DC.

Szabo, L., I. Hidalgo, J. C. Ciscar, and A. Soria. 2006. "CO2 Emission Trading within the European Union and Annex B Countries: The Cement Industry Case." *Energy Policy* 34 (1): 72–87.

US EPA (US Environmental Protection Agency). 1999. "OAQPS Economic Analysis Resource Document." Technical report, Office Air Quality Planning and Standards Innovative Strategies and Economics Group, Environmental Protection Agency, Washington, DC.

———. 2009. "Regulatory Impact Analysis: National Emission Standards for Hazardous Air Pollutants from the Portland Cement Manufacturing Industry." Technical report, Office Air Quality Planning and Standards, Research Triangle, NC.

USGS (US Geological Survey). 2010. "Mineral Commodity Summaries 2010." Technical report, US Geological Survey, Washington, DC.

———. 2012. "Mineral Commodity Summaries 2012." Technical report, US Geological Survey, Washington, DC.

Van Oss, H. G. 2005. "Background Facts and Issues Concerning Cement and Cement Data." Technical report, US Dept. Interior, US Geological Survey, Washington, DC.

Van Oss, H. G., and A. Padovani. 2002. "Cement Manufacture and the Environment." *J. Indus. Ecology* 6 (1): 89–106.

———. 2003. "Cement Manufacture and the Environment, Part II: Environmental Challenges and Opportunities." *J. Indus. Ecology* 7 (1): 93–126.

Working Group on Social Cost of Carbon. 2013. "Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866." Technical report, Working Group on Social Cost of Carbon, Washington, DC.

World Business Council for Sustainable Development. Various years. "CO2 Accounting and Reporting Standard for the Cement Industry." Technical report, World Business Council for Sustainable Development, Geneva.

———. 2010. "Cement Technology Roadmap 2009." Technical report, World Business Council for Sustainable Development, Geneva.

Worrell, E., L. Price, N. Martin, C. Hendriks, and L. O. Meida. 2001. "Carbon Dioxide Emissions from the Global Cement Industry." *Ann. Rev. Energy and the Environment* 26 (1): 303–29.

# Exhibit B-6

POLICY BRIEF



# Enacting the "Polluter Pays" Principle

## New York's Climate Change Superfund Act and Its Impact on Gasoline Prices



Peter H. Howard, Ph.D.
Minhong Xu, Ph.D.
November 2022

Copyright © 2022 by the Institute for Policy Integrity.
All rights reserved.

Institute for Policy Integrity
New York University School of Law
Wilf Hall, 139 MacDougal Street
New York, New York 10012

Peter H. Howard, Ph.D., is Economics Director at the Institute for Policy Integrity at New York University School of Law, where Minhong Xu, Ph.D., is an Economic Fellow.

This report does not necessarily reflect the views of NYU School of Law, if any.

# Executive Summary

This policy brief analyzes how New York State's recently proposed Climate Change Superfund Act (the Act) is most likely to affect consumer gasoline prices. The Act establishes compensatory payments that would apply to fossil-fuel companies, including natural gas and coal companies, based on their historical contributions to the existing stock of greenhouse gases in the atmosphere (New York State Senate, 2022). The Act requires the state to place these payments in an adaptation fund to pay for green infrastructure that will help the state prepare for climate change.

The Act is unlikely to alter the price of gasoline at the pump in New York or the price of crude oil more generally. The Act's compensatory payments would be based on companies' historical contributions to the existing stock of greenhouse gas emissions such that these payments would reflect past sales of petroleum, and not current or future sales. Oil companies would therefore treat these payments as one-time fixed costs. Regardless of market structures, oil companies are unable to pass on increases in fixed costs to consumers due to economic incentives and competition (Nicholson, 2004, p. 205; Ritz, 2015).[1] Due to profit motivations, oil companies have significant incentives to leave their production levels and retail gasoline prices unchanged, even if firms may make operational changes in response to the Act.

The structure of the oil market in New York and globally is also unlikely to change in response to the Act. The Act applies only to large companies with significant operating revenue and large market capitalizations. Oil company profits will likely remain positive, particularly given their recent record profits, and thus widespread bankruptcies and consolidation are unlikely. Beyond the design of the Act, oil companies would also be unable to retaliate against New York by raising retail gasoline prices in the state due to the interconnectedness of the national and global energy markets and existing U.S. antitrust laws.

The Act could have a minor effect on retail gasoline prices by changing expectations about future liability, but even the direction of this effect is unclear. On the one hand, if the passage of the Act causes firms to increasingly anticipate future compensatory payments in New York based on current production decisions, the resulting expectations of increased marginal production costs could affect consumer prices in the state. On the other hand, firms may already anticipate that they will face liability for their contributions to climate change, such that failure to impose such charges may increase expectations of future policies that impose compensatory payments. Thus, it is unclear how actions taken now by New York State will impact perceptions of the likelihood of future policies. The recent rise in climate lawsuits nationally and globally combined with oil companies' internal carbon prices strongly suggest that oil companies already anticipate financial liability for their contribution to climate change and that New York's Act represents only a tiny portion of their overall liability risk.

Finally, as climate change is likely to disrupt energy markets (Clarke et al., 2018; Howard and Livermore, 2021; Rode et al., 2021), revenue generated by the Act will likely temper future energy cost impacts in the state. The Act's compensatory payments will be placed into a climate change adaptation fund for green infrastructure. Infrastructure projects launched as a result of this fund will likely lower energy companies' future expected costs in New York, including for the distribution of petroleum and the production and distribution of future oil substitutes. Thus, future energy prices related to transportation will likely be lower in the state as a result of the Act's ability to stimulate adaptation to future impacts of climate change.

---

[1] Nicholson (2009. P. 205) states that "fixed costs play an important role in determining the firm's profitability in the short run, but…they play no role in determining how firms will react to changing prices because they must pay the same amount in capital costs no matter what they do." Ritz (2015) states that "From a theory viewpoint, this does not matter since changes in fixed costs do not affect prices, so any evidence for asymmetric pass-through must be due to changes in marginal costs."

Overall, the Act is likely to have a negligible impact on current and near-term oil prices, while potentially lowering future energy prices in New York, including for transportation.

# 1. Introduction

There is a longstanding scientific consensus that carbon dioxide and other greenhouse gas emissions contribute to climate change, which imposes considerable risk on societies around the world (New York State Department of Environmental Conservation, 2022; United States Global Change Research Program, 2018; Pörtner et al., 2022; Howard and Sterner, 2017). According to the U.S. government's National Climate Assessment (United States Global Change Research Program, 2018), climate change has already caused a wide range of damages for the Northeastern United States, including New York, and additional damages will continue for generations. Since 1900, the average surface temperature in New York has increased by 2.4°F, sea levels around the New York coastline and water levels in the Hudson River have risen by one foot, and precipitation has increased in the state, while snow cover in the wintertime is declining. Scientists expect these trends to persist, along with more frequent extreme weather events and a continued shift in native and invasive animal and plant species (New York State Department of Environmental Conservation, 2022).

Climate change will impact human and ecosystem health as well as many economic sectors, including the energy sector (Howard, 2014; Howard and Livermore, 2021; Pörtner et al., 2022). Substantial adaptation expenditures will be required to reduce exposure to these harms.

The Act aims to collect adaptation funds for New York from large fossil-fuel companies that are historically responsible for greenhouse gas emissions and sufficiently connected to the state of New York. This is consistent with the "polluter pays" principle that the polluter should bear the cost of their pollution. Often this comes in the form of the polluter compensating those impacted by the pollution or paying to prevent damages from the pollution. The principle is both an economic concept, which improves market efficiency, and a legal principle. A U.S. legal example is federal "Superfund" Law upon which the Act is based, which holds companies financially liable for the cleanup of their hazardous waste (Schwartz, 2010; Ambec and Ehlers, 2016).

## New York's Climate Change Superfund Act

In May of 2022, New York State Assemblyman Jeffrey Dinowitz and New York State Senator Liz Krueger introduced the Climate Change Superfund Act to the state legislature. At the time of this policy brief's publication, the Act, also known as Senate Bill S9417, was in the Environmental Conservation Committee of the New York State Senate.

New York's recently proposed Act would require compensatory payments, assessed on firms that engaged in the extraction, production, refinement, and/or sale of petroleum from 2000 to 2018. Firms would be charged a share of $30 billion based on their proportional responsibility for global emissions of greenhouse gases emitted during this period. The Act measures greenhouse gas emissions in carbon dioxide equivalence, using emission factors based on fossil fuel type (i.e., coal, natural gas, or oil). Firms that emitted less than one billion metric tons during the covered period would be exempt from the payments. The Act imposes this liability on domestic and foreign responsible parties that are sufficiently connected to the state of New York. Firms subject to the fees could elect to pay over a nine-year period.

Currently, it is not entirely clear which oil companies will be covered by the Act. Firms will be assessed compensatory payments if they have "sufficient connection with the state to satisfy the nexus requirements of the United States Con-

stitution" (New York State Senate, 2022).[2] Companies that sell oil in New York are sufficiently connected to the state, while the designation is less clear for companies operating in parts of New York's oil supply chain outside the state both domestically and internationally (Rothschild, 2022).

## The Oil Industry

Based on the Act's coverage, the analysis in this brief focuses on the current structure of two related oil markets: the global crude oil market and the New York State retail gasoline market.[3] This subsection provides a brief overview of these two markets.

Global average annual petroleum production was 26.6 billion barrels from 2017 to 2021 (see Figure 1). The dominant players in the global crude oil market have traditionally been two overlapping organizations: the Organization of Petroleum Exporting Countries (OPEC), an intergovernmental organization of the 13 largest oil-producing and exporting countries; and OPEC+, a more loosely affiliated set of 24 countries. The former is responsible for 40% of global oil production and controls 80% of proven petroleum reserves, while the latter represents 61% of global oil production and 90% of global proven reserves (OPEC, 2022a; OPEC, 2022b); see Figure 2. Historically, OPEC countries have acted as a cartel to restrict supply and keep prices high (Tietenberg and Lewis, 2018, pp. 148-152). The combination of OPEC's supply restrictions and the fracking boom led the United States to become the world's largest oil producer starting in 2018, as it retook that mantel from Russia and Saudi Arabia (see Figure 3). The United States has approximately 2.3% to 2.5% of global oil reserves (US EIA, 2022b; OPEC, 2022a).

### Figure 1. Global and OPEC Oil Production.
*Source: OPEC (2022b).*



---

[2] Under Supreme Court precedent, parties must have "certain minimum contacts" with a forum state that wishes to exert jurisdiction over them. International Shoe Co. v. State of Washington, 326 U.S. 310, 316–17 (1945). To satisfy this standard, the party must have engaged in some act by which it "purposefully avails itself of the privilege of conducting activities within the forum State." J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 877 (2011). For specific jurisdiction, the harm at issue must be connected to these activities and contacts within the state. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).

[3] This brief does not address the impact of this Act on natural gas or coal prices. The electricity sector predominantly uses coal and natural gas for generation, while the transportation sector uses gasoline. Hence, the impacts of the Act on these other energy sources are unlikely to interact with its impacts on the oil industry, as these markets have little overlap in New York. At the national and global scales, there is some overlap between crude oil and natural gas on the production side, as wells frequently jointly produce them (US EIA, 2013).



Figure 2. Share of Global Oil Production.
*Source: OPEC. (2022b)*



Figure 3. Oil Production of the Three Largest Oil Producing Countries.
*Source: OPEC. (2022b)*

In 2020, the United States accounted for 20% of total global oil consumption. The next two largest consumers are China (14%) and India (5%) (US EIA, 2022c).

New York consumes a significant share of retail gasoline in the United States, while producing virtually none. Of the 50 states, New York is ranked fifth in petroleum consumption, equivalent to 3.2% of national consumption and less than 1% of global consumption. New York ranked fourth in motor gasoline and jet fuel consumption. Most of the state's petroleum consumption comes in the form of retail gasoline (77%), though residential and commercial heating (16%) and industrial uses (7%) also represent significant shares (US EIA, 2022a).

In contrast, New York only produces 0.01% of U.S. crude oil and has no oil refineries, importing all of its petroleum from refineries in the Eastern United States (e.g., New Jersey and Pennsylvania), the Gulf Coast, the Midwest, and Canada. Thus, oil companies operating in New York State focus primarily on importing and selling fuel. In 2020, there were 4,959 gas stations in the state (US EIA, 2022a). Suppliers comprise many large U.S. and European oil companies, including ExxonMobil, British Petroleum (BP), Citgo, Shell, ConocoPhillips, and Phillips 66.[4]

## 2. Economic Theory of Prices in the Short Run to Medium Run

According to economic theory, firms set production quantities (and prices) to maximize their profits, subject to market demand. Regardless of the market structure, the profit-maximizing quantity and price of any good are a function of demand and the variable cost of production. As compensatory payments would not vary with firms' current production decisions, these payments would be considered fixed costs for oil firms. The proposed payments thus will not affect the equilibrium price or quantity of retail gasoline in the short run to medium run when firms are unable to exit or enter the industry, such that market structure is held constant (Nicholson, 2004, p. 205; Ritz, 2015).

### General Theory

Economic theory indicates that an oil firm selects a production level to maximize its profits (total revenues minus total costs). Total costs are the sum of variable costs and fixed costs (Perloff, 2008, p. 205). Regardless of market structures, profit maximization for a firm occurs at a production level that equates the marginal revenue with the marginal cost, which are the revenue and cost of producing one additional barrel of oil, respectively (Nicholson, 2004, p. 251; Perloff, 2008, p. 458; Pindyck and Rubinfeld, 2013, p. 285, 288; Nicholson and Snyder, 2008, p. 543).[5] As the marginal revenue of a firm depends on the production decisions of other firms, the exact solution varies with the market structure, which is characterized by the number of firms and their total cost functions. However, in any market structure, fixed costs do not affect the equilibrium quantity, as they are not part of marginal revenues or marginal costs. Similarly, fixed costs do not determine the equilibrium price, as they are not part of the equilibrium quantity when market structure is constant in the short-run to medium-run or the demand curve upon which the market clearing price is determined. As the existing stock of greenhouse gases in the atmosphere form the basis of the proposed compensatory payments, these payments are part of the fixed costs of production and thus will not affect current or future variable production costs. See Appendix A for mathematical derivations discussed in this subsection.

### Applying Theory to the Oil Industry

Empirical research can help characterize the structures of the two oil markets of interest – the global crude oil market and the New York retail gasoline market. In the global crude market, researchers traditionally classified OPEC as a monopolist (Li, 2010). However, recent empirical evidence points to a Stackelberg oligopoly model holding historically, where OPEC is the dominant firm that leads with its production decisions and non-OPEC producers are a competitive fringe that follow its lead (Li, 2010; Huppmann and Holz, 2010; Golombek et al., 2018). More recent evidence proposes a more competitive global market since the mid-2000s, in which the fracking boom led the United States to be the largest global energy producer and the 2008 financial crisis reduced global oil demand (Huppmann and Holz, 2010; Frondel

---

[4]  In 2012, ConocoPhillips spun off its midstream and downstream operations into Phillips 66. However, as the Act applies to fossil fuels sold between 2000 to 2018, both companies are likely responsible for emissions during the covered period (ConocoPhillips, 2012). Of the remaining major United States' oil producers, Chevron does not appear to have retail operations in New York (ScrapHero, 2022).

[5]  Specifically, each oil firm increases its quantity produced until the marginal decrease in profits from the resulting price decline is offset by the increase in profits due to a growth in the quantity of the goods demanded.

and Horvath. 2019; Berk and Cam, 2020; Balke et al. 2020). Even then, OPEC still influences prices while non-OPEC producers act as an increasingly important competitive fringe (Frondel and Horvath. 2019). Meanwhile, mixed evidence exists about regional market power at the retail level for gasoline in the United States with only some studies supporting competitive markets (Deltas, 2008; Houde, 2010; Bumpass et al., 2015; Eleftheriou et al., 2019).

Given the wide range of possibilities, this analysis considers several market structures starting from two market structure extremes – a perfectly competitive market and a monopoly. Firms treat the price as given in a perfectly competitive market, such that individual firm's production decisions do not affect it (Nicholson, 2004, p. 312). In equilibrium, prices equal marginal production costs (see Figure 4). In the case of a monopoly, there is only one firm, which recognizes that it alone influences prices, such that it determines the equilibrium quantity by equating marginal revenue with marginal cost (see Figure 5). As fixed costs, compensatory payments do not influence the equilibrium quantity decision or the corresponding equilibrium price in either of these extreme cases.[6]

Figure 4. Equilibrium Price and Quantity in a Perfectly Competitive Industry.

*The demand curve in a perfectly competitive industry is horizontal at the market price, $P_c$, indicating perfectly elastic demand. All firms can sell any quantity at the market price but not at a higher price because of an infinite number of firms in the market. In this figure, total cost is quadratic, such that marginal cost is linear. Total quantity produced in the industry, $Q_c$, occurs where price equals marginal cost. In a perfectly competitive industry, price also equals average cost in equilibrium, such that there are zero economic profits and firms have no incentive to enter or exit the industry.*



---

[6]   The demand curve is not a function of fixed costs, which are paid by producers.

Figure 5. Equilibrium Price and Quantity for a Monopoly.

*A monopoly firm produces at a quantity $Q_m$ that equates marginal revenue and marginal cost to maximize profits. The downward sloping linear demand curve (with half the slope of the linear marginal revenue curve) determines the equilibrium market clearing price $P_m$. In this figure, total cost is quadratic, such that marginal cost is linear. The firm's profit is represented by the light grey area in the figure.*



Unlike these extremes, the New York retail gasoline and global crude oil markets may be more characteristic of oligopoly models, where a limited number of firms with some market power produce an outcome somewhere between the monopoly and perfect-competition equilibriums (Nicholson and Snyder, 2008, p. 523). In the New York retail gasoline market, there are several large retail gasoline companies with market power and no clear market leader, such that all gasoline distributors and retailers in the state make production decisions simultaneously.[7] Assuming a Nash equilibrium (Perloff, 2008, p, 454),[8] no firm has an incentive to change its quantities, holding all other firms' decisions constant. Again, compensatory payments do not impact the equilibrium quantities and price as part of fixed costs.

---

[7]  Companies may exhibit power at a sub-state level in New York, as ExxonMobil does appear to have more gas stations in cities and towns across the state, though any definitive statement is difficult given the incomplete nature of the data available (ScrapHero, 2022). Furthermore, gas stations may have spatial market power due to their strategic geographic location

[8]  In a Nash equilibrium, no firm has the incentive to adjust its quantity produced, as each firm cannot increase its profits if other firms hold their quantities fixed.

In the global crude oil market, empirical evidence supports an oligopoly model where firms make production decisions sequentially instead of simultaneously. Specifically, OPEC is the dominant firm making production decisions prior to other producers and to which non-OPEC firms simultaneously respond by choosing their production quantities following the leader's announcement of a decision (Nicholson and Snyder, 2008, p. 543).[9] In this sequential decisionmaking framework, compensatory payments still do not impact the equilibrium quantities and prices, given that they are fixed costs. Although it is unclear whether compensatory payments would apply to all or some oil companies in OPEC nations, as discussed in Section 1, the above result applies to the full range of scenarios.

See Appendix B for mathematical derivations discussed in this subsection.[10]

# 3. Oil Industry Consolidation in the Long Run

In the long run, oil firms may enter and exit the industry. Thus, contemplated compensatory payments can potentially affect consumer prices through anticompetitive behavior, as additional consolidation in the market may allow firms to charge excess prices or further increase existing price premiums (Nicholson, 2004, pp. 269-269). However, this kind of consolidation is unlikely empirically given the relatively small size of the payments relative to oil firms' revenue, market capitalization, and profits.

## Economic Theory on Exiting the Industry

In the above section, we held constant market structures. In theory, the introduction of compensatory payments and the corresponding increase in fixed costs can decrease firm profits and result in smaller positive profits (see Figure 6) or negative profits (see Figure 7) for assessed firms over the nine-year assessment period. In this latter case, firms may leave the industry in the long run (Nicholson, 2004, p. 205; Perloff, 2008, p. 268-2070; Pindyck and Rubinfeld, 2013, p. 233, 288-290, pp. 293). If an oligopoly holds, the exiting of firms can lead to less oil production and higher oil prices, as the number of firms declines and the remaining firms obtain a higher degree of market power (Nicholson and Snyder, 2008, p. 523). In the extreme case where the oil industry initially consists of only two firms and one goes bankrupt or the other firm purchases it, the consolidation shifts the market equilibrium from a duopoly to a monopoly (see Figure 8). As discussed below, however, this theoretical possibility is highly unlikely in reality.

---

[9]   It is easy to observe this dominance in the real world where OPEC and OPEC+ meet and announce their production decisions and set production targets (Northam, 2022).

[10]  There is an alternative type of oligopoly model in which firms compete by setting prices instead of quantities. We do not discuss this option here, as there is no evidence that it applies to oil companies. Furthermore, the results are comparable to the perfectly competitive case as the firms compete and drive the price down until price equals marginal cost, regardless of the number of firms (Nicholson, 2004, p. 398). Again, compensatory payments as part of fixed costs do not impact equilibrium price or quantity.

Figure 6. Impact of Compensatory Payments on Monopoly Equilibrium with Positive Profits After Shift.

*Given the same monopoly firm in Figure 5, the average cost curve shifts up to  with the introduction of compensatory payments, as fixed costs increase. Given the unchanged marginal cost despite an increased fixed cost, the equilibrium quantity quantity (Qm') and price (Pm')  remains the same as Figure 5 under the equilibrium condition that marginal revenue equals marginal cost. The dark grey area represents the firm's profit in the figure, which remain positive, but smaller than the profits prior to the compensatory payments (the light grey area).*



**Figure 7. Impact of Compensatory Payments on Monopoly Equilibrium with Negative Profits After Shift.**

*Given the same monopoly firm in Figure 5, the average cost curve shifts up to  with the introduction of compensatory payments, as fixed costs increase. Given the unchanged marginal cost despite an increased fixed cost, the equilibrium quantity quantity (Qm'') and price (Pm'')  remains the same as Figure 5 under the equilibrium condition that marginal revenue equals marginal cost. The dark grey area represents the firm's profit in the figure, which become negative, in contrast to the positive profits prior to the introduction of the compensatory payments (the light grey area).*



**Figure 8. Equilibria by Number of Firms in the Industry.**

*This figure displays multiple equilibria under different market structures, where the number of firms in the industry is 1 (monopoly), 2 (duopoly), n>2 (oligopoly), and infinite (perfectly competitive), respectively.* As the number of firms increases, the remaining firms obtain a lower degree of market power, leading to more oil production and lower oil prices.



## Empirical Evaluation of Consolidation Incentives in the Oil Industry

In reality, the proposed compensatory payments are unlikely to lead to any consolidation in the oil industry, regardless of which firms the state assesses.

It is unclear which firms New York will assess the compensatory payments, though the impact on business operations and sector profitability will be minimal given the sector's relative size. Assessed firms' annual operating revenue and profits are likely to be vastly larger than the annual compensatory payments of $3.3 billion for nine years, regardless of whether the state assesses only U.S. firms or all large oil firms worldwide; see Table 1. For companies operating in New York, which will clearly be assessed, annual compensatory payments represent an upper bound of 5.6% of their average annual profits of $59 billion from 2010 to 2021 (Sönnichsen, 2022e – 2002i).[11] Furthermore, none of these companies' profits would shift from positive to negative, assuming a division of the $3.3 billion between these companies based on their relative greenhouse gas emissions in 2017 (see Figure 9).[12]

Like revenue, the total compensatory payments of $30 billion also make up a relatively small share of domestic and international oil firms' market capitalization; see Table 1. The largest American and European oil companies operating in New York have a market capitalization of approximately $1 trillion; total compensatory payments represent 3.1% of this value. These small shares indicate that the compensation payments will have a negligible effect on firms' major decisions, such as exit or entry, or even smaller decisions, such as operational changes.

### Table 1. Relative Size of Compensatory Payments to Oil Firms' Revenues, Profits and Market Capitalization

| Economic Indicator | | U.S. Oil Firms | Largest U.S. and European Oil firms Operating in NY[a] | All Large Oil Firms Globally |
|---|---|---|---|---|
| Average Annual Revenue | 2022 USD | $158 billion | *Not Available* | $2.6 trillion |
| | % of annual payments | 2.1% | | 0.1% |
| | Relevant time-period | 2016-2020 | | 2020-2021 |
| Average Annual Profits | 2022 USD | $55 billion | $59 billion | $300 billion |
| | % of annual payments | 6.1% | 5.6% | 1% |
| | Relevant time-period | 2010 to 2021 | 2010 to 2021 | 2021 – 2022[b] |
| Total Market Capitalization | 2022 USD | $1.3 trillion | $1 trillion | $3.8 trillion |
| | % of total payments | 2.4% | 3.1% | 0.8% |
| | Relevant time-period | October of 2022 | October of 2022 | October of 2022 |

[a] *Excludes Citgo and 7-Eleven due to lack of data*
[b] *Only first two quarters of fiscal year 2022*
*Source: Sönnichsen (2021; 2022a – 2002l); Puri-Mirza (2022); Statista Research Department (2022)*

[11]  Due to lack of data, these calculations excludes Citgo and 7-Eleven.
[12]  If we divide annual compensatory payments using relative shares of total greenhouse emissions in 2017, each firm's annual compensatory payments equal between 3.6% and 10.3% of annual average profits between 2010 and 2021. Ideally, this analysis would use greenhouse gas emissions data for each company in every relevant year, but this data is not easily available. To check our results, we redo the calculation using net profits in 2017, which matches the year of our greenhouse gas emissions data. In this case, we find that oil company's annual compensatory payments equal between 5.5% and 15.5% of profits in 2017, except for ConocoPhillips, which earned negative profits in 2017 prior to the implementation of the compensatory payments.
    A similar type of analysis can be done using total revenue as a proxy for greenhouse emissions, as long as oil prices and the emission concentrations per barrel of oil are similar across companies. If we divide annual compensatory payments using relative shares of total revenue in 2022, each firm's annual compensatory payments equal between 3.3% and 14.6% of annual average profits between 2010 and 2021. We redo the calculation using net profits in 2021, which matches the year of our total revenue data. In this case, we find that oil company's annual compensatory payments equal between 3.1% and 18.5% of profits in 2021.

Figure 9. Net Income of Largest Oil Companies Operating in New York.

*Grey lines represent the profits of the largest foreign oil companies operating in New York, while the red, orange, and yellow lines represent the largest American companies operating in New York. Source: Sönnichsen (2022e – 2002i)*



The analysis above almost certainly overestimates oil companies' liability. Critically, the Act's assessments applies to natural gas and coal companies in addition to oil companies, contrary to the assumptions in the calculations above, implying a far smaller assessment on the oil industry. Furthermore, the oil industry recently received record revenues and profits in 2022, exceeding the averages used in the calculations above (Carrington, 2022). Moreover, ongoing rapid inflation will likely lead to further price increases for oil, further eroding the relative share of compensatory payments to the above key indicators.[13] Finally, the Act further mitigates the likelihood of firms leaving the industry due to negative profits by exempting from compensatory payments those that emitted less than one billion metric tons. Thus, the Act excludes the oil companies operating in New York with the smallest profits margins from payments.[14]

Even if a qualifying firm did face net financial losses (i.e., negative profits), that firm would not necessarily be forced out of the market. As seen in Figure 9, individual firms have experienced negative profits in some years, such as 2015 and 2020, though these firms did not leave the market and often earned positive profits in the following years.[15] If firms expect losses to be short lived, as is the case with the proposed compensatory payments that would stretch out to a maximum of nine years, they do not necessarily exit the industry.[16]

---

[13] General inflation is at 8.2% in the first quarter of 2022, which is its highest rate since the 1970s (US Bureau of Labor Statistics, 2022a). However, energy inflation is much higher at around 20% to 30% depending on the source (United States Bureau of Labor Statistics, 2022a-c).

[14] Using a subset of oil companies operating in New York (Shell, BP, ExxonMobil, Phillips 66, and ConocoPhillips) and the United States (plus, Chevron and Marathon), we find a strong correlation between greenhouse gas emissions (Fletcher et al., 2018) and profits (Sönnichsen, 2022g – 2022l) in 2017. Similarly, we find a positive correlation between profits and revenues for the subset of companies in New York (Shell, BP, ExxonMobil, Phillips 66, and ConocoPhillips) in 2021. As companies face relatively the same oil prices and emission factors, revenue should be a good approximation of emissions. Thus, profits and emissions appear positively correlated for oil companies operating in the United States.

[15] A compensatory payment can only be responsible for negative profits, and thus a firm exiting the industry, if the firm's profits are positive without the payments and negative with them.

[16] "A firm need not always earn a profit in the short-run … Note that the firm is losing money when its price is less than average total cost at the profit-maximizing output … In that case, if there is little chance that conditions will improve, it should shut down and leave the industry … Will shutting down always be the sensible strategy? Not necessarily. The firm might operate at a loss in the short-run because it expect to become profitable again in the future, when the price of its product increases or the cost of production falls." (Pindyck and Rubinfeld, 2013, p. 288-290).

Even if firms did seek to consolidate or exit the industry because of the compensatory payments, their ability may be limited. With respect to consolidation, any attempt to increase market power and force up prices would be regulated by antitrust laws,[17] though the overall incentives for companies to consolidate as a result of the Act are small to non-existent, as discussed above. Furthermore, while firms can avoid certain types of fixed costs in the long run by exiting the market (i.e., unsunk costs), exiting is not a means to avoid compensatory payments according to the current text of the proposed law. Specifically, the law has no bankruptcy or insolvency clause, such that New York will likely collect as a creditor the assessed amount to the greatest extent possible under the law following the example of the EPA (United States Environmental Protection Agency, 2022).[18]

Though firms are unlikely to consolidate or exit the industry due to the compensatory payments, some firms may sell assets or take other steps as a reaction to the proposed fees. Firms can accomplish these types of ownership-related transactions without disrupting operations. Indeed, even when they make operational changes, owners of these revenue-generating assets have strong incentives to continue their operations at their profit-maximizing levels.

## 4. Retaliation

Oil companies assessed compensatory payments may wish to retaliate by raising oil prices in New York State. However, they would be limited in their ability to do so by the interconnectedness of national and global energy markets. First, if oil companies ever retaliated, global oil prices would rise along with New York oil prices as the global marketplace determines wholesale crude oil price. The ability to retaliate would also be limited by competition, as New York is less likely to assess some or all foreign oil firms in the global petroleum market. Moreover, the relatively free movement of oil and other forms of energy implies arbitrage opportunities if oil companies attempt to manipulate regional retail oil prices. Again, if such retaliation occurred, nonlocal oil retailers would likely enter the New York retail market lured by above-average returns created by higher prices pushing New York retail oil prices back towards the existing equilibrium (Perloff, 2008, p. 268-2070; Pindyck and Rubinfeld, 2013, 302-304). Finally, coordinated anti-competitive behavior where multiple firms collude to punish a regulator and its constituents is illegal under New York and federal antitrust laws.[19]

## 5. Expectations

A fourth pathway for compensatory payments to affect prices involves expectations. The imposition of compensatory payments may lead firms to adjust their expectations about future liabilities based on their production in the future.

As the future is uncertain, oil companies make production decisions to maximize expected profits accounting for future company liability (Nicholson, 2004; Perloff, 2008; Pindyck and Rubinfeld, 2013). In this case, an increase in the probability of future liability will decrease the equilibrium quantity produced and vice versa (see Appendix C for mathematical derivations). However, it is unclear how the passage of the proposed Act would affect expectations, and thus, crude oil and retail gasoline prices. If the imposition of these compensatory payments leads firms to anticipate other, future compensatory payments based on their current and future production, the equilibrium quantity will decline as firms expect higher marginal production costs. However, it is unclear how the current action will affect future actions by New

---

[17] Federal law "prohibits any agreement among competitors to fix prices, rig bids, or engage in other anticompetitive activity." (United States Department of Justice, 2005). New York State law contains a similar prohibition (New York State Attorney General).

[18] The sufficient connection requirement applies to the covered period of greenhouse gas emissions, i.e., to the 2000 to 2018 period. Therefore, if a large oil company declares bankruptcy in 2023, it would still be sufficiently connected to the state after bankruptcy if it sold gasoline in New York during the covered period.

[19] See footnote 17.

York State (or other entities). Given the ambiguous direction of the signal, there is no strong reason to believe that any anticipation effect would lead to an equilibrium increase in prices.

## Reasons for Firms to Expect Liability for Greenhouse Gas Emissions

In fact, oil firms may already have strong reasons to expect liability or regulation beyond New York's regulatory decisions. In particular, the Paris Agreement, existing domestic climate policies, state and local greenhouse gas emission targets, and energy and environmental regulations, provide strong signals that the United States and other nations are taking action on climate change. Economists predict that more aggressive, additional action will be taken relative to current policy (Rennert et al., 2022).

Beyond regulation, many entities have been seeking to hold fossil fuel companies liable for climate impacts (Zhongming et al., 2021), as the public increasingly believes that energy companies are responsible for climate change (Gorbach et al., 2022). The United Nations identified 864 cases of climate litigation across 24 countries in 2017, which increased to 1,550 across 38 countries plus the European Union in 2020. Historically, most cases are in the United States with only a small portion of these cases against corporations, focusing on such topics as corporate liability, disclosure, and green-washing. As of 2020, more than a dozen corporate liability cases were still active in the United States with no such case yet decided on its merits at that time (Zhongming et al., 2021).

In addition, the United Nations and Organisation for Economic Co-operation and Development (OECD) recognize that climate impacts may represent human rights violations. Likewise, the Philippines Human Rights Commission finds that companies are morally responsible for climate change and legally liable; even if international legal liability does not apply, countries can pass laws and hold entities liable in their domestic legal systems (Benjamin, 2021; Zhongming et al., 2021). These liability lawsuits and other climate litigation may result in additional regulations, delays, bans, and financial costs, including compensation or adaptation requirements (Zhongming et al., 2021). Thus, regardless of whether New York passes the Act, oil companies will rationally assume the possibility of future legal liability for past, current, and future emissions.

## Evidence Oil Firms Already Internalizing Liability Risks

Many oil companies, along with an increasing number of firms in the energy sector and beyond, have used "internal carbon prices," assigning either a real or theoretical monetary penalty for emissions in internal processes such as cost-benefit analyses of investment decisions (Harpankar, 2019; Bartlett et al., 2021). The largest oil companies operating in New York all have internal carbon prices: BP uses $50/metric ton, increasing to $100, $200, and $250 in 2030, 2040, and 2050, respectively (CDP, 2021a); Shell uses $125/metric ton with the value increasing as high as $200 by 2050 depending on the origin country of the project (CDP, 2022); ConocoPhillips uses $40/metric ton with no variation by geography unless the origin country has a higher price (CDP, 2021b); ExxonMobil reportedly used $60/metric in the past and planned to increase this amount to $80/ton, though the company stopped reporting its internal carbon price after being sued for using lower internal carbon prices than reported to shareholders (Schapiro, 2014; Brown, 2018).[20] Beyond these New York-based oil companies, many other major oil companies have an internal carbon price, including Chevron, Devon, Total, Ameren, and Excel (Davis, 2013).

---

[20] This lawsuit points to the fact that companies may report these internal prices and not use them. Even then, oil companies never set older carbon prices at levels that would be transformational (Chang, 2017), which may explain why some feel that the values are insufficient (Li et al, 2022).

While companies often have legal, normative, and competitive reasons to adopt internal carbon prices, empirical evidence and company statements indicate that regulatory risk and liability concerns frequently motivate these decisions (Chang, 2017; Harpankar, 2019; Bento and Gianfrate, 2020; Bartlett, 2021; Gorbach et al., 2022; Schapiro, 2014; CDP, 2021a; CDP, 2021b; CDP, 2022).[21] Often, companies' internal carbon prices are higher than the carbon tax or price used by jurisdictions or countries, as these companies factor in expectations about future regulatory risk (Trinks et al., 2022; Schapiro, 2014). Consequently, internal carbon prices tend to be higher in high-emitting industries with long-run investment cycles, such as the oil, gas, and utilities sectors (Ahluwalia, 2017; Chang, 2017; Bento and Gianfrate, 2020; Bartlett, 2021; Fan et al., 2021; Trinks and Scholtens, 2022).[22] In the last five years, the internal carbon prices of oil companies, e.g., BP and Shell, have rapidly increased along with regulatory risks (Schapiro, 2014; Parnell, 2020; Bartlett et al., 2021; Bento and Gianfrate, 2022; Li et al., 2022), which is unsurprising as fossil-fuel companies and utilities are the most regulated sectors of the economy and have strong expectations of future regulation (Bartlett et al., 2021).

Regardless of New York's decision, other entities are likely to ramp up climate regulations and lawsuits. As these pressures continue, oil companies will face higher costs and expected costs, which will potentially reduce the quantity of oil supplied and increase corresponding prices. Given the global nature of this marketplace, the potential for New York to impose a second round of compensatory payments in the future will have little overall impact on the current and future production decisions of oil companies. In fact, many multi-national energy and utility companies likely have already adopted internal carbon pricing assumptions for their New York operations due to regulations in other jurisdictions (Harpankar, 2019; Trinks and Scholtens, 2022), which far exceed the current market price in the New York power sector.[23] Therefore, it appears that the Act will have at most a very limited effect on industry expectations and prices.

## 6. Impacts of Spending the Revenue

The foregoing analysis focuses on the incidence of compensatory payments and does not account for how the state spends any resulting revenue. The New York State government could spend this revenue in ways that indirectly affect demand or production costs of retail gasoline in New York, which would in turn affect prices. Moreover, if New York legislature does not pass the Act to establish the adaptation fund, taxpayers may need to pay for necessary updates of New York's climate-vulnerable infrastructure (despite their lack of direct responsibility). This in turn has general equilibrium effects by impacting consumer spending, including gasoline demand, as well as consumer welfare implications. We set aside these general equilibrium effects, as the direction of the impact is unclear, except to note that these are secondary in nature.

In addition to general equilibrium effects, the Act places the funds from these proposed compensatory payments into a climate change adaptation fund for green infrastructure (New York State Senate, 2022; Lisa, 2022), which would aid New York in adapting to climate change. To the extent that these funds address the impacts of climate change on the energy sector of New York, energy producers and distributors will have lower marginal costs in the future due to a more

---

[21] In addition to the risk of changing regulations and policy, there are also risks of changing social norms and technology (Fan et al., 2021).

[22] According to this same research, oil companies and others in high-emitting industries are more likely to adopt internal carbon prices relative to companies in low-emitting industries.

[23] In the power sectors of New York and eleven other Northeastern and Mid-Atlantic states, the Regional Greenhouse Gas Initiative (RGGI) operates and manages a market that sets the market price for carbon dioxide. Specifically, RGGI is a multi-state cap-and-trade program for carbon dioxide emissions from the power sector. The current market price is $13.45 (RGGI, 2022a; 2022b).

resilient production and distribution system (Howard and Livermore, 2021).[24] This translates into lower future energy prices for consumers, including in the transportation sector.

## Conclusion

In summary, this analysis finds that the Climate Change Superfund Act will have little to no impact on retail gasoline prices in New York. Economic theory shows that holding oil companies liable for past emissions will not lead to production or price changes in the local, national, or international energy markets, holding the structure of these markets constant. Empirical evidence shows that total compensatory payments for emissions from 2000 to 2018 are relatively small compared to oil company revenue, market capitalization, and profits. Therefore, the Act is unlikely to result in consolidation or bankruptcy within the industry. Expanding beyond market incentives in a static environment to consider dynamic issues, such as leadership and retaliation, the analysis finds that competitive pressures greatly restrict the ability of firms to manipulate prices. Furthermore, while expectations about future liability could impact current oil production and its corresponding price regionally and globally, there is no clear reason to suspect that passing the Act will lead to higher oil prices in the near term.

Finally, it is important to note that levying compensatory payments on companies is not a substitute for policies to reduce future emissions (like carbon pricing or regulations). State and national policies to reduce emissions remain an essential response to the many grave risks associated with climate change. Such policies will lead to higher fossil-fuel prices, though this is necessary to lower demand for pollution-intensive fuels and incentivize the transition away from these fuels.[25]

---

[24] Economists expect climate change to significantly impact both demand and supply of energy (Howard, 2014). On the demand side, economists expect climate change to decrease energy demand in the winter for heating, while increasing electricity demand in the summer for air conditioning, though studies differ on the estimated net impact for the United States (Clarke et al., 2018; Rennert et al., 2020). In New York, the net impact on oil demand is likely negative from decreased heating (Rode et al., 2021), as New York uses a significant portion of its oil for heating, though the net impact of climate change on oil demand is uncertain due to unobserved feedbacks, behavior changes, and future regulations (Howard and Livermore, 2021). On the supply side, climate change will impact the costs of renewables and fossil fuels, including energy infrastructure used for production, distribution, and generation (Howard and Livermore, 2021). It is difficult to determine the net effects of climate change on the cost of supplying energy, including oil extraction, processing, and distribution, such that the magnitude of the impact is unclear (Howard, 2014). Regardless, adapting to this future will lead to lower marginal costs and prices in the future energy market.

[25] If policymakers have concerns about the impact of such policies on citizen welfare, particularly for low-income groups, they can adopt a revenue-neutral, carbon tax. The use of climate dividends can greatly benefit the most disadvantaged groups in society, as they consume the least amount of energy per capita and are the most vulnerable to climate impacts (Carattini et al., 2017).

# References

Ahluwalia, M. B. (2017). The business of pricing carbon: How companies are pricing carbon to mitigate risks and prepare for a low-carbon future. Center for Climate and Energy Solutions. Retrieved from https://www.c2es.org/wp-content/uploads/2017/09/business-pricing-carbon.pdf

Ambec, S., & Ehlers, L. (2016). Regulation via the Polluter-pays Principle. *The Economic Journal*, 126(593), 884-906. doi: https://doi.org/10.1111/ecoj.12184.

Balke, N. S., Jin, X., & Yücel, M. (2020). The shale revolution and the dynamics of the oil market. Federal Reserve Bank of Dallas. doi: https://doi.org/10.24149/wp2021

Bartlett, N., Coleman, T., & Schmidt, S. (2021). Putting a price on carbon: The state of internal carbon pricing by corporates globally. Carbon Disclosure Project. Retrieved from https://cdn.cdp.net/cdp-production/cms/reports/documents/000/005/651/original/CDP_Global_Carbon_Price_report_2021.pdf?1618938446

Benjamin, L. (2021). Carbon major companies and liability for loss and damage. In M. Doelle & S. L. Seck (Eds.). *Research handbook on climate change law and Loss & damage* (pp. 391-409). doi: https://doi.org/10.4337/9781788974028.00028

Bento, N., & Gianfrate, G. (2020). Determinants of internal carbon pricing. *Energy Policy*, 143, 111499. doi: https://doi.org/10.1016/j.enpol.2020.111499

Berk, I., & Çam, E. (2020). The shift in global crude oil market structure: A model-based analysis of the period 2013–2017. *Energy policy*, 142, 111497. doi: https://doi.org/10.1016/j.enpol.2020.111497

Brown, Tristan R. (2018). Exxon Mobil is hit with its most important climate lawsuit yet. Seeking Alpha. Retrieved from https://seekingalpha.com/article/4215387-exxon-mobil-is-hit-important-climate-lawsuit-yet

Bumpass, D., Ginn, V., & Tuttle, M. H. (2015). Retail and wholesale gasoline price adjustments in response to oil price changes. *Energy Economics*, 52, 49-54. doi: https://doi.org/10.1016/j.eneco.2015.08.030

Carattini, S., Carvalho, M., & Fankhauser, S. (2017). How to make carbon taxes more acceptable. Grantham Research Institute on Climate Change and the Environment, London School of Economics and Political Science. Retrieved from https://www.lse.ac.uk/GranthamInstitute/wp-content/uploads/2017/12/How-to-make-carbon-taxes-more-acceptable.pdf

Carrington, D. (2022, July 21). Revealed: oil sector's 'staggering' $3bn-a-day profits for last 50 years. *The Guardian*. Retrieved from https://www.theguardian.com/environment/2022/jul/21/revealed-oil-sectors-staggering-profits-last-50-years

Chang, V. (2017). Private firm incentives to adopt internal carbon pricing. *Journal of Public International Affairs*, 1, 56-77. Retrieved from https://jpia.princeton.edu/sites/g/files/toruqf1661/files/resource-links/jpia_2017.pdf#page=56

Clarke, L., Eom, J., Marten, E. H., Horowitz, R., Kyle, P., Link, R., … Zhou, Y. (2018). Effects of long-term climate change on global building energy expenditures. *Energy Economics*, 72, 667-677. doi: https://doi.org/10.1016/j.eneco.2018.01.003

Climate Disclosure Project [CDP]. (2021a). bp CDP climate change questionnaire 2021. Retrieved from https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/sustainability/group-reports/bp-cdp-climate-change-questionnaire-2021.pdf

Climate Disclosure Project [CDP]. (2021b). ConocoPhillips – climate change 2021. Retrieved from https://static.conocophillips.com/files/resources/2021-cdp-climate-change-report.pdf

Climate Disclosure Project [CDP]. (2022). CDP climate change 2022 information request – Shell plc. Retrieved from https://www.shell.com/sustainability/transparency-and-sustainability-reporting/voluntary-reporting-standards-and-esg-ratings/_jcr_content/par/textimage_733954230.stream/1659542026753/8f1664153918d3ed25a040f3e8d96d39fb044619/cdp-2022-climate-change-submission.pdf

ConocoPhillips. (2012). ConocoPhillips' board of directors approves spin-off of Phillips 66. Retrieved from https://www.conocophillips.com/news-media/story/conocophillips-board-of-directors-approves-spin-off-of-phillips-66/

Cronin, J., Anandarajah, G., & Dessens, O. (2018). Climate change impacts on the energy system: A review of trends and gaps. *Climatic change*, 151(2), 79-93. doi: 10.1007/s10584-018-2265-4

Davis, C. (2013, December 5). ExxonMobil, big operators already pricing U.S. carbon emissions. *Natural Gas Intelligence*. Retrieved from https://www.naturalgasintel.com/exxonmobil-big-operators-already-pricing-u-s-carbon-emissions/

Deltas, G. (2008). Retail gasoline price dynamics and local market power. *The Journal of Industrial Economics*, 56(3), 613-628. doi: https://doi.org/10.1111/j.1467-6451.2008.00350.x

Egan, M. (2017, May 1). Saudis take 100% of America's largest oil refinery. *CNN Business*. Retrieved from https://money.cnn.com/2017/05/01/investing/saudi-arabia-buys-largest-oil-refinery-port-arthur/index.html

Eleftheriou, K., Nijkamp, P., & Polemis, M. L. (2019). Asymmetric price adjustments in US gasoline markets: impacts of spatial dependence on the 'rockets and feathers' hypothesis. *Regional Studies*, 53(5), 667-680. doi: https://doi.org/10.1080/00343404.2018.1463093

Fan, J., Rehm, W., & Siccardo, G. (2021). The state of internal carbon pricing. Retrieved from https://www.mckinsey.com/capabilities/strategy-and-corporate-finance/our-insights/the-state-of-internal-carbon-pricing

Fletcher, L., Crocker, T., Smyth, J., and Marcell, K. (2018). Beyond the cycle: Which oil and gas companies are ready for the low-carbon transition? Climate Disclosure Project. Retrieved from https://www.cdp.net/en/investor/sector-research/oil-and-gas-report

Frondel, M., & Horvath, M. (2019). The U.S. fracking boom: Impact on oil prices. *The Energy Journal*, 40(4). doi: 10.5547/01956574.40.4.mfro

Golombek, R., Irarrazabal, A. A., & Ma, L. (2018). OPEC's market power: An empirical dominant firm model for the oil market. *Energy Economics*, 70, 98-115. doi: https://doi.org/10.1016/j.eneco.2017.11.009

Gorbach, O. G., Kost, C., & Pickett, C. (2022). Review of internal carbon pricing and the development of a decision process for the identification of promising Internal Pricing Methods for an Organisation. *Renewable and Sustainable Energy Reviews*, 154, 111745. doi: https://doi.org/10.1016/j.rser.2021.111745

Harpankar, K. (2019). Internal carbon pricing: rationale, promise and limitations. *Carbon Management*, 10(2), 219-225. doi: https://doi.org/10.1080/17583004.2019.1577178

Houde, J. F. (2010). Gasoline markets. In S.N. Durlauf & A.E. Blume (Eds). *The New Palgrave Dictionary of Economics*. Palgrave Macmillan.

Howard, P. (2014). Omitted damages: What's missing from the social cost of carbon. Institute for Policy Integrity. Retrieved from https://policyintegrity.org/files/publications/Omitted_Damages_Whats_Missing_From_the_Social_Cost_of_Carbon.pdf

Howard, P. H., & Livermore, M. A. (2021). Climate–Society feedback effects: Be wary of unidentified connections. *International Review of Environmental and Resource Economics*, 15(1-2), 33-93. doi: http://dx.doi.org/10.1561/101.00000129

Howard, P. H., & Sterner, T. (2017). Few and not so far between: A meta-analysis of climate damage estimates. *Environmental and Resource Economics*, 68(1), 197-225. doi: https://doi.org/10.1007/s10640-017-0166-z

Huppmann, D., & Holz, F. (2010). Global oil markets revisited – Cartel or Stackelberg market? Retrieved from https://www.diw.de/documents/dokumentenarchiv/17/diw_01.c.362721.de/holz_vfs2010.pdf

IBIS World. (2022, March 30). Global oil & gas exploration & production - Market size 2005–2028. Retrieved from https://www.ibisworld.com/global/market-size/global-oil-gas-exploration-production/

Krauss, C. (2013, April 4). Texas Refinery Is Saudi Foothold in U.S. Market. *New York Times*. Retrieved from https://www.nytimes.com/2013/04/05/business/texas-refinery-is-saudi-foothold-in-us-market.html

Krauss, C. (2021, May 12). How the colonial pipeline became a vital artery for fuel. *New York Times*. Retrieved from https://www.nytimes.com/2021/05/10/business/colonial-pipeline-ransomware.html

Li, M., Trencher, G., & Asuka, J. (2022). The clean energy claims of BP, Chevron, ExxonMobil and Shell: A mismatch between discourse, actions and investments. PloS one, 17(2), e0263596. doi: https://doi.org/10.1371/journal.pone.0263596

Li, R. (2010). The role of OPEC in the world oil market. *International Journal of Business and Economics*, 9(1), 83-85. Retried from https://www.resourcegovernance.org/sites/default/files/The%20Role%20of%20OPEC%20in%20the%20World%20Oil%20Market.pdf

Lisa, K. (2022, May 27). Fossil fuel giants would pay New York state $30 billion under new climate bill. *Spectrum News 1*. Retrieved from https://spectrumlocalnews.com/nys/central-ny/politics/2022/05/27/fossil-fuel-giants-to-pay-state--30b-under-new-climate-bill

New York State Attorney General. (2022). Antitrust Enforcement. Retrieved from https://ag.ny.gov/antitrust/antitrust-enforcement

New York State Department of Environmental Conservation. (2022). Climate Change Effects and Impacts. Retrieved from https://www.dec.ny.gov/energy/94702.html

New York State Senate. 2022. S9417, 2021-2022 Legislative Session. Retrieved from https://www.nysenate.gov/legislation/bills/2021/s9417

Nicholson, W. (2004). *Intermediate microeconomics and its application.* Mason, OH: Thomson South-Western

Nicholson, W., & Snyder, C. M. (2008). *Microeconomic theory: Basic principles and extensions.* Mason: OH: Thomson South-Western.

Northam, J. (2022, October 5). Russia and Saudi Arabia agree to massive cuts to oil output. Here's why it matters. *National Public Radio.* Retrieved from https://www.npr.org/2022/10/05/1126754169/opec-oil-production-cut

Obradovich, N., & Rahwan, I. (2019). Risk of a feedback loop between climatic warming and human mobility. *Journal of the Royal Society Interface* 16 (158), 20190058.

Organization of the Petroleum Exporting Countries [OPEC] (2022a). Annual Statistical Bulletin, Table 3.1: World proven crude oil reserves by country. Retrieved from https://asb.opec.org/data/ASB_Data.php

Organization of the Petroleum Exporting Countries [OPEC] (2022b). Annual Statistical Bulletin, Table 3.5: World crude oil production by country. Retrieved from https://asb.opec.org/data/ASB_Data.php

Parnell, J. (2020, June 16). BP adopts $100 carbon price assumption for 2030, with big implications for clean energy. *Greentech Media.* Retrieved from https://www.greentechmedia.com/articles/read/european-oil-majors-ready-to-scale-up-energy-transition-investment

Parry, M.L., Canziani, O., Palutikof, J., Van der Linden, P., & Hanson, C. (Eds.). (2007). *Climate change 2007: Impacts, adaptation and vulnerability. Contribution of working group II to the fourth assessment report of the intergovernmental panel on climate change.* Cambridge, UK: Cambridge University Press. Retrieved from https://www.ipcc.ch/site/assets/uploads/2018/03/ar4_wg2_full_report.pdf

Perloff, J.M. (2008). *Microeconomics: Theory & applications with calculus.* Boston, MA: Pearson Addison Wesley.

Pindyck, S.R. & Rubinfeld, D.L. (2013). *Microeconomics.* London, UK: Pearson Education, Inc. Retrieved from https://edisciplinas.usp.br/pluginfile.php/4292722/mod_resource/content/1/%288th%20Edition%29%20%28The%20Pearson%20Series%20in%20Economics%29%20Robert%20Pindyck%2C%20Daniel%20Rubinfeld-Microecon.pdf

Pörtner, H.-O., Roberts, D. C., Tignor, M.M.B., Poloczanska, E.S., Mintenbeck, K., Alegría, A., … Rama, B. (Eds.). (2022). *Climate change 2022: Impacts, adaptation and vulnerability. Contribution of working group II to the sixth assessment report of the intergovernmental panel on climate change.* Retrieved from https://report.ipcc.ch/ar6/wg2/IPCC_AR6_WGII_FullReport.pdf

Rennert, K., Errickson, F., Prest, B. C., Rennels, L., Newell, R. G., Pizer, W., … Anthoff, D. (2022). Comprehensive evidence implies a higher social cost of $CO_2$. *Nature*, 610, 687–692. doi: https://doi.org/10.1038/s41586-022-05224-9

Regional Greenhouse Gas Initiative [RGGI]. (2022a). Welcome. Accessed November 2022. Retrieved from https://www.rggi.org

Regional Greenhouse Gas Initiative [RGGI]. (2022b). Allowance prices and volumes. Retrieved from https://www.rggi.org/auctions/auction-results/prices-volumes

Research and Markets. (2021, March 4). Global $7425.02 billion oil and gas markets, 2015-2020, 2020-2025F, 2030F. *Global News Wire*. Retrieved from https://www.globenewswire.com/news-release/2021/03/04/2187025/0/en/Global-7425-02-Billion-Oil-and-Gas-Markets-2015-2020-2020-2025F-2030F.html

Ritz, R.A. (2015). The simple economics of asymmetric cost pass-through. MIT Center for Energy and Environmental Policy Research. CEEPR Working Paper 2015-009. Retrieved from https://ceepr.mit.edu/wp-content/uploads/2021/09/2015-009.pdf

Rode, A., Carleton, T., Delgado, M., Greenstone, M., Houser, T., Hsiang, S., ... Yuan, J. (2021). Estimating a social cost of carbon for global energy consumption. *Nature*, 598(7880), 308-314. doi: https://doi.org/10.1038/s41586-021-03883-8

Rothschild, R. (2022). Memorandum: State polluter pays climate Superfund program. Institute for Policy Integrity.

Schapiro, M. (2014, September 23). Oil companies quietly prepare for a future of carbon pricing. *Yale Environment 360*. Retrieved from https://e360.yale.edu/features/oil_companies_quietly_prepare_for_a_future_of_carbon_pricing

Schwartz, P. (2010). The polluter-pays principle. In M. Fitzmaurice, D.M. Ong, & P. Merkouris (Eds.). *Research handbook on international environmental law*. doi: https://doi.org/10.4337/9781849807265.00021

ScrapHero. (2022, November 7). 10 Largest gas stations in New York in 2022 based on Locations. Retrieved from https://www.scrapehero.com/location-reports/top-gas-stations-in-new-york-usa/

Sönnichsen, N. (2021, December 6). Revenue of leading global energy companies FY 2020/21. Statista. Retrieved from https://www.statista.com/statistics/664868/global-top-energy-companies-by-revenue/

Sönnichsen, N. (2022a, August 29). U.S. gas and oil industry annual revenue 2010-2020. Statista. Retrieved from https://www.statista.com/statistics/294614/revenue-of-the-gas-and-oil-industry-in-the-us/

Sönnichsen, N. (2022b, October 17). Leading U.S. oil and gas producers based on market cap Oct 2022. Statista. Retrieved from https://www.statista.com/statistics/241625/top-10-us-oil-and-gas-companies-based-on-market-value/

Sönnichsen, N. (2022c, October 17). Leading oil and gas producers based on market cap October 2022. Statista. Retrieved from https://www.statista.com/statistics/272709/top-10-oil-and-gas-companies-worldwide-based-on-market-value/

Sönnichsen, N. (2022d, August 18). Major oil companies' quarterly net profits 2021-2022, by company. Statista. Retrieved from https://www.statista.com/statistics/1326419/quarterly-net-profit-of-leading-world-oil-companies/

Sönnichsen, N. (2022e, April 20). Shell's net profit/loss 2008-2021. Statista. Retrieved from https://www.statista.com/statistics/260287/shells-net-income/

Sönnichsen, N. (2022f, March 31). BP's net profit 2005-2021. Retrieved from https://www.statista.com/statistics/268399/profit-of-bp-since-2003/

Sönnichsen, N. (2022g, April 27). ExxonMobil's net profit 2001-2021. Statista. Retrieved from https://www.statista.com/statistics/264120/net-income-of-exxon-mobil-since-2001/

Sönnichsen, N. (2022h, March 31). ConocoPhillips' net profit 2010-2021. Statista. Retrieved from https://www.statista.com/statistics/277067/net-income-of-conocophillips/

Sönnichsen, N. (2022i, March 8). Phillips 66's net profit/loss 2012-2021. Statista. Retrieved from https://www.statista.com/statistics/1214264/phillips-66-net-income/

Sönnichsen, N. (2022j, March 8). Chevron Corporation's net profit/loss 2008-2021. Statista. Retrieved from https://www.statista.com/statistics/277059/net-income-of-chevron-corporation/

Sönnichsen, N. (2022k, March 8). Marathon Oil's net profit/loss 2007-2021. Statista. Retrieved from https://www.statista.com/statistics/217647/net-income-of-marathon-oil/

Sönnichsen, N. (2022l, March 8). Valero Energy's net profit/loss 2009-2021. Statista. Retrieved from https://www.statista.com/statistics/218204/income-of-valero-energy-corporation/

Statista Research Department. (2022, August 5). Biggest companies in the world by market value 2022. Statista. Retrieved from https://www.statista.com/statistics/263264/top-companies-in-the-world-by-market-capitalization/

Tietenberg, T., & Lewis, L. (2018). Environmental and natural resource economics. New York, NY; Abingdon, Oxon: Routledge.

Tol, R. S. (2009). The economic effects of climate change. *Journal of Economic Perspectives*, 23(2), 29-51. doi: 10.1257/jep.23.2.29

Trinks, A., Mulder, M., & Scholtens, B. (2022). External carbon costs and internal carbon pricing. *Renewable and Sustainable Energy Reviews*, 168, 112780. doi: https://doi.org/10.1016/j.rser.2022.112780

United States Bureau of Labor Statistics. (2022a). Consumer price index for all urban consumers: Energy in U.S. city average (CPIENGSL). FRED, Federal Reserve Bank of St Louis. Retrieved from https://fred.stlouisfed.org/series/CPIENGSL

United States Bureau of Labor Statistics. (2022b). Databases, tables & calculators by subject: CPI for all urban consumers (CPI-U). Retrieved from https://data.bls.gov/timeseries/CUUR0000SA0

United States Bureau of Labor Statistics. (2022c). Charts: 12-month percentage change, Consumer Price Index, selected categories, September 2022, not seasonally adjusted. Retrieved from https://www.bls.gov/cpi/

United States Department of Justice. (2005). Price fixing, bid rigging, and market allocation schemes: What they are and what to look for. An Antitrust Primer. Retrieved from https://www.justice.gov/atr/file/810261/download

United States Energy Information Administration [US EIA]. (2013). Drilling often results in both oil and natural gas production. Retrieved from https://www.eia.gov/todayinenergy/detail.php?id=13571

United States Energy Information Administration [US EIA]. (2022a). New York State energy profile. Retrieved from https://www.eia.gov/state/print.php?sid=NY

United States Energy Information Administration [US EIA]. (2022b). US crude oil and natural gas proved reserves, year-end 2020. Retrieved from https://www.eia.gov/naturalgas/crudeoilreserves/

United States Energy Information Administration [US EIA]. (2022c). What countries are the top producers and consumers of oil? Retrieved from https://www.eia.gov/tools/faqs/faq.php?id=709&t=6

United States Environmental Protection Agency. (2022). Recovering costs from parties in bankruptcy. Retrieved from https://www.epa.gov/enforcement/recovering-costs-parties-bankruptcy

United States Global Change Research Program. (2018). Impacts, risks, and adaptation in the United States: Fourth national climate assessment, Volume II. U.S. Global Change Research Program, Washington, DC, USA, 1515. doi: 10.7930/NCA4.2018

Van Vuuren, D. P., Bayer, L. B., Chuwah, C., Ganzeveld, L., Hazeleger, W., van den Hurk, B., ... & Strengers, B. J. (2012). A comprehensive view on climate change: Coupling of earth system and integrated assessment models. *Environmental research letters*, 7(2), 024012. Doi: 10.1088/1748-9326/7/2/024012

Wagner, G., & Schlenker, W. (2022). Declining crop yields limit the potential of bioenergy. *Nature*, 609(7926), 250-251. doi: https://doi.org/10.1038/d41586-022-02344-0

Xu, S., Wang, R., Gasser, T., Ciais, P., Peñuelas, J., Balkanski, Y., ... & Zhang, R. (2022). Delayed use of bioenergy crops might threaten climate and food security. *Nature*, 609(7926), 299-306. doi: https://doi.org/10.1038/s41586-022-05055-8

Zhongming, Z., Linong, L., Xiaona, Y., Wangqiang, Z., & Wei, L. (2021). Global climate litigation report: 2020 status review. United Nations Environment Programme. Sabin Center for Climate Change Law. Retrieved from https://wedocs.unep.org/bitstream/handle/20.500.11822/34818/GCLR.pdf?sequence=1&isAllowed=y

# Appendices

## Appendix A

Economic theory indicates that each oil firm selects their oil production level ($q_i$) to maximize their profits ($\Pi_i$). Profits equal total revenue ($TR_i$) minus total costs ($TC_i$), such that firm $i$'s profit is

$$\Pi_i = TR_i - TC_i = q_i P(Q) - C_i(q_i)$$

where the market price $P(Q)$ is a function of the aggregate quantity of oil produced by all firms $Q$, total revenue for firm $i$ equals the product of this market price and its quantity produced, i.e., $TR_i = q_i P(Q)$, and total production costs for firm $i$ is a function of firm $i$'s quantity produced $C_i(q_i)$. The total quantify of oil produced equals the sum of oil produced by all $N$ firms in the oil industry, such that $Q = \sum_{j=1}^{N} q_j$. Total costs of firm $i$ equal the sum of variable productions costs $V_i(q_i)$ and fixed production costs $F_i$, which are costs that vary and do not vary with firm $i$'s quantity produced, respectively (Perloff, 2008, p. 205). Therefore, firm $i$'s profit is:

$$\Pi_i = q_i P \left( \sum_{j=1}^{N} q_j \right) - V_i(q_i) - F_i.$$

In this static model of firm profits, the Act's proposed compensatory payments would be part of the fixed costs of production, $F_i$. Because existing stock of greenhouse gases in the atmosphere form the basis of these payments, these payments would not affect current or future variable production costs.

Profit maximization for each firm occurs when the derivative of its profit function with respect to its quantity produced equals zero (Nicholson, 2004, p. 249). Therefore,

$$\frac{\partial \Pi_i}{\partial q_i} = P(Q) + q_i \frac{\partial P}{\partial Q} \sum_{j=1}^{N} \frac{\partial Q}{\partial q_j} \frac{\partial q_j}{\partial q_i} - \frac{\partial V_i(q_i)}{\partial q_i} = 0$$

where $\frac{\partial V_i(q_i)}{\partial q_i} = MC_i(q_i)$ is the marginal production cost of *firm i*, i.e., the cost of firm $i$ producing one additional barrel of oil, and $\frac{\partial q_j}{\partial q_i}$ is how firm i perceives the response of firm $j$ to firm $i$'s quantity decision. With some simplifying assumptions, we can rearrange this expression to the following form:

$$(1) \quad P(Q) + q_i \frac{\partial P}{\partial Q} \Big[ 1 + \sum_{i \neq j} \frac{\partial q_j}{\partial q_i} \Big] = MC_i(q_i)$$

where this expression equates the marginal revenue (the left side of the equation and depicted as $MR_i(q_i, Q)$) with the marginal cost of the firm producing one additional unit of quantity (Nicholson, 2004, p. 251; Perloff, 2008, p. 458; Pindyck and Rubinfeld, 2013, p. 285, 288; Nicholson and Snyder, 2008, p. 543). The exact solution depends on the structure of the market, which is characterized by the number of firms and their total cost functions. Even so, fixed costs clearly do not impact the equilibrium quantity, as $F_i$ is missing from the above expression that determines the equilibrium quantity and its corresponding equilibrium price determined on the demand curve.

## Appendix B

Firms treat the price as given in a fully competitive market, such that individual firms' production decisions do not affect it (Nicholson, 2004, p. 312). When $\frac{\partial P}{\partial Q} = 0$ in equation (1), $MC_i(q_i) = P(Q)$ determines the equilibrium quantity, where marginal production costs equals the price (Pindyck and Rubinfeld, 2013, pp. 285-287). See Figure 4.

In the case of a monopoly, there is only one firm that recognizes that it can alone influence prices. In this case, the following equation determines the equilibrium quantity:

$$P(Q) + Q\,\frac{\partial P(Q)}{\partial Q} = MC(Q)$$

where the left-hand side is the marginal revenue change from producing one additional barrel of oil accounting for the additional revenue from one more barrel of oil sold and the resulting decline in price for all other barrels of oil sold. See Figure 5.

Thus, as part of fixed costs, compensatory payments do not influence the equilibrium quantity decision or the corresponding equilibrium price in both extreme cases.

In a Cournot oligopoly model that best represents the New York retail gasoline market, we assume simultaneous decision making and a Nash equilibrium (Perloff, 2008, p, 454). Thus, no firm has an incentive to adjust their production quantity, as each firm cannot increase its profits if other firms hold their quantities fixed. Equivalently, $\frac{\partial q_j}{\partial q_i} = 0$, such that

$$P(Q) + q_i\,\frac{\partial P}{\partial Q} = MC_i(q_i),$$

Solving for $q_i$, we derive each firm's optimal response function to other firms' quantity decisions, and then solve for a steady state in which all firms have no incentive to change their quantities holding all other firms' decisions constant. Again, it is clear from the lack of fixed costs that charging oil firms the compensatory payments does not impact the equilibrium quantities and prices assuming that the number of firms is fixed and unaffected by the payments.

In the global crude oil market, empirical evidence supports a Stackelberg oligopoly model, in which OPEC is the dominant firm that moves before the other firms know how to respond. The equilibrium condition for the Stackelberg leader, which we label firm *k*, is

$$P(Q) + q_i \frac{\partial P}{\partial Q} \left[ 1 + \sum_{i \neq k} \frac{\partial q_j}{\partial q_k} \right] = MC_i(q_i)$$

where $\frac{\partial q_j}{\partial q_k}$ is firm *j*'s best response function to firm *k*'s quantity decision. The equilibrium condition for the non-dominant firms matches the Cournot equilibrium in the previous paragraph (Nicholson and Snyder, 2008, p. 543). Again, fixed costs do not enter the optimization decision. Given the dynamic nature of Stackelberg equilibriums, this also points to the generality of these results moving from static to dynamic equilibria holding the market structure constant over time (Perloff, 2008, pp. 506-507).

Above all, compensatory payments and fixed costs do not determine equilibrium quantities of firms or the equilibrium price in the short-run to medium run when market structure is constant, regardless of this structure. As these oil companies engaged in a past course of conduct that contributed to current harm, the compensatory payments act as a levy based on that ongoing harm, whereas the historical nature of the conduct eliminates any forward-looking incentive for companies to change their behavior. Thus, the profit-maximizing quantities and prices of retail gasoline would remain unchanged by the Act.

## Appendix C

As the imposition of compensatory payments may lead firms to adjust their expectations about future payments, firm *i* maximizes their expected profits as follows:

$$\max_{q_i} \mathbf{E}(\Pi_i) = \max_{q_i} \sum_{m=1}^{2} \rho_m \left[ q_i P \left( \sum_{j=1}^{N} q_j \right) - V_i(q_i) - F_{i,m} \right]$$

where $F_{i,m}$ is the fixed cost conditional on future company liability and $\rho_m$ is the probability of event *m* occurring where there are only two possible states: no future liability (*m=1*) and future liability (*m=2*). Specifically, fixed costs are a function of two terms

$$F_{i,m} = F_i + \vartheta_m \frac{q_i}{Q}$$

where $\vartheta_m$ is oil company's future climate liability that equals zero in the first state and some positive amount in the second state. Note that this latter term is not really fixed any longer, and instead varies with quantity.

The following equation shows that a change in expectations, as reflected in a change in the probability of future liability, can impact the current optimal production decision under uncertainty. The first order condition for profit maximization equals

$$\frac{\partial \mathbf{E}(\Pi_i)}{\partial q_i} = \sum_{m=1}^{2} \rho_m \left[ P(Q) + q_i \frac{\partial P}{\partial Q} \sum_{j=1}^{N} \frac{\partial Q}{\partial q_j} \frac{\partial q_j}{\partial q_i} - \frac{\partial V_i(q_i)}{\partial q_i} - F_i - \vartheta_m \left[ \frac{Q - q_i}{Q^2} \right] \right] = 0$$

where $\vartheta_1 = 0$ and $\vartheta_2 > 0$. If the Act affects oil company's expectations about the probability of the future likelihood of climate liability, then

$$\frac{\partial \mathbf{E}(\Pi_i)}{\partial q_i \partial \rho_2} = -\vartheta_2 \left[ \frac{Q - q_i}{Q^2} \right] < 0$$

Thus, actions that increase in the probability of future liability will decrease the equilibrium quantity produced. Vice versa, actions that decrease the probability of future liability will increase the equilibrium quantity produced. The latter appears more likely, though a more conservative assumption would be that the probability is constant and unaffected by New York's decision to pass the Act.



Institute for Policy Integrity
New York University School of Law
Wilf Hall, 139 MacDougal Street, New York, New York 10012
policyintegrity.org

Exhibit B-7

*Journal of Economic Literature 2012, 50:1, 51–84*
http:www.aeaweb.org/articles.php?doi=10.1257/jel.50.1.51

# Economic Perspectives on Corporate Social Responsibility

## Markus Kitzmueller and Jay Shimshack*

*This paper synthesizes the expanding corporate social responsibility (CSR) literature. We define CSR from an economic perspective and develop a CSR taxonomy that connects disparate approaches to the subject. We explore whether CSR should exist and investigate conditions when CSR may produce higher welfare than other public good provision channels. We also explore why CSR does exist. Here, we integrate theoretical predictions with empirical findings from economic and noneconomic sources. We find limited systematic empirical evidence in favor of CSR mechanisms related to induced innovation, moral hazard, shareholder preferences, or labor markets. In contrast, we uncover consistent empirical evidence in favor of CSR mechanisms related to consumer markets, private politics, and public politics. (JEL D21, L21, M14)*

## 1. Introduction

Observers increasingly note that corporate social responsibility (CSR) has become a mainstream business activity (e.g., *The Economist* 2008). Firms are investing ever more resources in public goods provision, and many companies reduce negative externalities below levels required by law. More than half of Fortune Global 250

* Kitzmueller: World Bank Group. Shimshack: Tulane University. This project was completed while both authors were affiliated with the Federick A. and Barbara M. Erb Institute for Global Sustainable Enterprise at the University of Michigan. We also wish to thank Gary Becker, Pascal Courty, Mathew Gentzkow, Roger Gordon, Luigi Guiso, Tom Lyon, Jesse Shapiro, and three anonymous referees for helpful comments and suggestions. This work benefitted from discussions with participants in seminars at the European University Institute (Florence) and the University of Michigan (Ann Arbor).

firms now provide regular public statements exclusively discussing CSR, and approximately 10 percent of S&P 100 companies report in detail on CSR activities (Kotler and Lee 2004a; Baskin and Gordon 2005). More than one-third of large firms have voluntary external certifications for social and environmental standards, and nearly 11 percent of professionally managed U.S. investment was certified as socially responsible. It is estimated that U.S. and European markets have over 2 trillion USD and 300 billion EURO in certified socially responsible assets (Social Investment Forum 2006). Firms such as IBM, General Motors, or Microsoft even inform potential employees about their CSR efforts (Turban and Greening 1996).

CSR has also become a high profile public issue. An extensive global survey found that two-thirds of people reported that they

would like companies to contribute to social goals beyond shareholder wealth (Environics International 1999). Another survey found that 52 percent of respondents seek information about companies' CSR records (Fleishman-Hillard 2007). More than half of American consumers say that a company's social reputation influenced purchase decisions, and 70 percent of U.K. consumers state that they are willing to pay more for a product that they perceive as ethically superior (Ipsos MORI 2003). Scherer and Palazzo (2008) concisely summarize the evolving public view, "[p]aradoxically, today, business firms are not just considered the bad guys, causing environmental disasters, financial scandals, and social ills. They are at the same time considered the solution of global regulation and public goods problems."

Scholarly perceptions of CSR have evolved as well. Early work focused on whether CSR should exist. Economically-oriented work addressing CSR acknowledged the well-known incapacity of markets to ensure efficient pricing and provision of nonprivate goods and bads, but emphasized that firms could not and should not be expected to voluntarily act in a socially or environmentally responsible manner. Most famously, Friedman (1970) argued that the only responsibility of firms was profit maximization and that public preferences combined with democratic empowerment implied that governments, and not firms, should manage externalities and provide public goods. This division of corporate and government responsibility vis-à-vis society became generally known as the classical dichotomy. In contrast to Friedman (1970), early business and society scholars argued that firms ought to consider the implications of their actions for all constituencies even if such considerations reduced shareholder wealth. Influential business and society studies included the social issues

in management perspective of Wartick and Cochran (1985) and Wood (1991), as well as the stakeholder theory perspective of Freeman (1984). Since the 1970s and 1980s, related research in both broad disciplines has begun to converge to a nuanced middle ground. Most scholars now agree that social justifications for CSR may exist, but do not exist in all cases.

More recently, research has begun a shift from whether CSR should exist to why it does exist and how it affects the economy. This is a natural progression given recent increases in the scope and scale of CSR. Fundamental questions address firm-level incentives for CSR engagement, i.e., why is CSR growing so fast? A key insight within economics is that CSR is not necessarily incompatible with profit maximization, at least for a subset of firms within a separating equilibrium. While CSR to satisfy manager preferences may constitute moral hazard, CSR to satisfy nonclassical preferences of investors, employees, and consumers does not. Similarly, CSR to influence outcomes driven by public and private politics may be consistent with shareholder wealth maximization.

This paper clarifies how economists might think about CSR. Our primary emphasis is on insights from economic research, although we review several especially influential papers from other disciplines as well. Many insights relevant for an understanding of the subject were developed for the analysis of other economic and noneconomic phenomena. A key contribution of this paper is the synthesis of these diverse strands. We clearly define CSR from an economic perspective, and we develop a comprehensive taxonomy that connects formerly disparate approaches to the subject. An additional innovation is an integration of what we know about the theory of CSR with what we know about the empirics of CSR. We conclude the paper with a discussion of knowledge gaps

and implications for future research. A message of this paper is that a fundamental economic understanding of CSR is emerging.

We begin with the theory. Section 2.1.1 explores insights from public economics regarding the mechanisms underlying private (here, corporate) provision of public goods and its implications for social welfare. Following the evolution of the literature, sections 2.1.2 and 2.1.3 move from "whether CSR" to "why CSR." The main endeavor is to motivate and integrate the role of preferences in the emergence and economic justification of CSR. Section 2.2 reviews strategic CSR in depth. Insights from behavioral economics and game theory enhance our understanding of strategic interactions between stakeholders and firms, and information economics, contract theory, and industrial organization shed light on CSR participation mechanisms and strategic interactions. The second half of the paper explores the empirical account. Section 3.1 reviews the empirical organizational behavior relationships between corporate social and financial performance. We examine the evidence for not-for-profit motivations for CSR in some detail. Section 3.2 investigates observational evidence on hypotheses related to market and political drivers of strategic CSR. If firms are accepting higher costs to engage in CSR, who is paying for these higher costs? Here, we combine observational insights from labor, environmental, and business economics with results from business and society, management, and marketing. Section 4 examines CSR in an international context, although this literature is in its infancy. Section 5 concludes with a summary and an outline of research gaps.

## 2. *Theoretical Inventory*

Before entering economic analysis, the stage has to be set by defining CSR. In practice, several CSR definitions exist. The European Commission (2002) defines CSR as "a concept whereby companies integrate social and environmental concerns in their business operations and in their interaction with their stakeholders on a voluntary basis." The World Bank states: "CSR is the commitment of businesses to behave ethically and to contribute to sustainable economic development by working with all relevant stakeholders to improve their lives in ways that are good for business, the sustainable development agenda, and society at large." A notion similar to "voluntary behavior" can be found in definitions of CSR that refer to either "beyond compliance" such as those used by Vogel (2005) or McWilliams and Siegel (2001), who characterize CSR as "the fulfillment of responsibilities beyond those dictated by markets or laws," or to "self regulation" as suggested by Calveras, Ganuza, and Llobet (2007).

Attempts to define CSR reveal two basic conceptual features: First, CSR manifests itself in some observable and measurable behavior or output. The literature frequently refers to this outcome dimension as corporate social or environmental performance (CSP). Second, CSP exceeds levels set by obligatory regulation or standards enforced by law.[1] In essence, CSR is corporate social or environmental behavior that goes beyond the legal or regulatory requirements of the relevant market(s) and/or economy(s).

---

[1] Earlier attempts to develop a clear concept and establish the boundaries between definition and analysis of CSR include Locke (2002) and McWilliams, Siegel, and Wright (2006) among others. Locke (2002) structures models of CSR along two dimensions: Motivation (instrumental versus ethical) and Beneficiaries (shareholders versus stakeholders). He finds that there is significant divergence of opinion over key issues such as the role of management (contractual versus beyond contractual obligations), the relation to profits (is CSR profit enhancing?) or the scope of responsibility (direct versus indirect effects of conduct of business).

*Journal of Economic Literature, Vol. L (March 2012)*

Two important notions of this definition merit attention: First, it is independent of any conjecture about the motivations underlying CSR. While Baron (2001) takes the view that "both motivation and performance are required for actions to receive *the* CSR label," we propose that linking a particular motivation to the respective performance is required only for identifying the CSR mechanism. Second, in order to capture its complete economic relevance, this view emphasizes that CSR can be market driven or "strategic" as opposed to McWilliams and Siegel (2001), who equate CSR only with social or environmental performance "beyond market forces." In other words, CSR may be strategic, but need not be.

## 2.1 *Economic Theory and the Evolutionary Understanding of CSR*

The quest to understand CSR as an economic phenomenon began by asking (1) whether it exists, (2) when and to which extent it can be efficient, and therefore, (3) whether and when it should exist. While the fundamental proof of existence, i.e., (1), must be established empirically, (2) and (3) fit the theory agenda well. In light of the neoclassical firm paradigm, economists immediately translated (2) and (3) into one question, namely whether firms do have any social responsibility other than employing people, producing goods or services and maximizing profits. The key to answering this normative question is to compare CSR with other channels of public good provision and to establish if and when CSR will improve total welfare. Another increasingly important research strand takes a less abstract and more positive perspective on CSR and investigates the mechanisms and incentives underlying CSR. The focus is on why CSR occurs and how the underlying incentives work and interact within today's complex and global economy. Based on the role of shareholder and stakeholder preferences in the determination of

firm behavior, we can categorize CSR as strategic, not-for-profit, or the result of moral hazard. Once this distinction is established, strategic CSR mechanisms will be analyzed in depth within three conceptual boxes: Markets, Politics, and Social Norms.

### 2.1.1 *Whether CSR? A New Neoclassical Dichotomy*

The initial discussion will focus on comparative welfare implications of CSR. Due to the fact that social or environmental goods and externalities often are characterized by nonrivalry and/or nonexcludability, the classical public goods literature proves to be a natural point of departure. As CSR seems to invade the formerly undisputed government task of correcting market failure inherent in the provision of public goods or reduction of negative externalities, a reevaluation of the classical dichotomy between state and market is in order. The standard argument states that the provision of public goods should be based on public preferences or social objectives. Governments are endowed with the necessary democratic legitimacy and have the power to correct related market inefficiencies such as collective action problems or free riding. The standard argument goes on to state that private firms do not have sufficient incentives to efficiently internalize the costs they cause, but they will comply with regulation or taxation. At first sight CSR challenges this framework, but a growing literature attempts to integrate CSR into the classical public economics agenda and to characterize equilibrium attributes as well as relevant corollaries.

First of all, firms are organizations owned by shareholders, run by workers and managers, and therefore conform to the broad group of private agents. Most importantly, firms often produce a public good or an externality jointly with their main task to provide private goods or services for consumption. This may occur

either in connection with the production process of private goods (e.g., less polluting technology or safe/healthy working conditions) or as a direct attribute of the private good or service itself (e.g., less polluting cars or energy saving light bulbs). Therefore, parallels with earlier works suddenly shed new light on old insights. Buchanan referred to the joint provision of a public and private good as an "impure public good," and relevant results such as those derived by Bergstrom, Blume, and Varian (1986) can be readily translated into the CSR framework. Bergstrom, Blume, and Varian focused on the interaction between public and private, in their framework voluntary and individual, provision of the public good and the effect on overall levels of provision. They concluded that public provision crowds out its private counterpart almost perfectly. The crucial condition driving this result is that private and public provision are perfect substitutes in consumption.

Along these lines, Kotchen (2006) compares joint corporate provision of private and public goods in "green markets" [2] and separates provision of either. He derives the similar conclusion that the very same crowding out takes place between corporate provision and individual (what Bergstrom, Blume, and Varian called "private") provision, and may even lead to an overall reduction in the level of the public good if it is a gross substitute for the private good characteristic. The effect of introducing a green market on demand for the public good is driven by a price effect that proves to be always positive if the private and public goods are complements in consumption, but may be negative if they are substitutes depending upon preferences, income

distribution and the green technology. In this context, the occurrence of corporate public good provision in equilibrium can be interpreted as a welfare enhancing, neutral, or reducing shift between competing supply channels.

Remembering the strict division of labor between government and firms envisioned by the classical dichotomy, Rose-Ackerman (1996) phrases the problem as the "[b]lurring of the analytically motivated division between for-profit, nonprofit and public sectors in reality." Similarly, Besley and Ghatak (2001) notice that public goods provision has dramatically shifted from public to mixed or complete private ownership in recent years. Their analysis then leads to the conclusion that in a world of incomplete contracts (i.e., investments related to public goods provision are often noncontractible) a public good or project should be owned simply by the party that "[v]alues the benefits generated by the related investments relatively more," a result that is based on Grossman and Hart (1986) and Hart and Moore (1990). Note that this holds true irrespective of the relative importance of the investments or other aspects of the production technology. Other works relating CSR exclusively with public good provision include Bagnoli and Watts (2003) and Besley and Ghatak (2007), who define CSR as the corporate provision of public goods or curtailment of public bads independent of legal benchmarks. Besley and Ghatak (2007) outline the above mentioned direct parallel with traditional models of private provision of public goods and show that CSR will exactly reproduce the second best equilibrium levels of public good provision envisioned by the standard literature. Only if governments fail to deliver optimal levels of public good will CSR be potentially efficient. In reality, however, this is an important issue. When we think of potential relative cost advantages of firms vis-à-vis

---

[2] The definition of a "green" market is based on technologies with joint production of a private good and an environmental public good, i.e., a kind of "green" impure public good.



*Figure* 1. CSR and Welfare

governments, it appears straightforward to conclude that if economies of scope on the corporate side are absent, tasks should be segregated into specialized organizations, i.e., governments provide public goods and firms private ones, while otherwise CSR can be efficient. Of course governments can be opportunistic, corrupt, or have (re)distributional preferences, thereby creating obvious inefficiencies.

A simple thought experiment outlines the special trade-off between CSR and regulation that determines what Besley and Ghatak (2007) call the feasibility and desirability of CSR. Firms are producing a private good $x$ jointly with a public good or externality $y$. Due to allocative efficiency, markets enjoy a comparative advantage in accommodating heterogeneous shareholder and stakeholder preferences at the cost of suboptimal public good levels. Uniform regulation can achieve first best public good levels at the cost of detrimental redistribution effects. By "uniformity of regulation" we refer to uniform application of the law within a jurisdiction, i.e., to homogeneously applied rules or

restrictions to identical agents or firms. We focus on profit maximizing firms interacting with consumers although the logic will equally apply to investors, employees or downstream firms in vertical relationships. Figure 1 sets the stage.

Society is divided into agents with general preferences for the public good ("caring" groups $E$ and $F$), those without such preferences ("neutral" groups $C$ and $D$) and finally those with conditional preferences related to their consumption pattern ("caring if consuming" groups $A$ and $B$). Each person either consumes or does not consume good $x$, and caring (non)consumers feature a concave utility function $U(Y)$ with $Y$ being the sum of per consumer provision $y$. Firms can produce $y$ at constant marginal cost $c$. In the absence of regulation, competitive markets are able to reach a separating equilibrium as in Besley and Ghatak (2007). Two profit-equivalent sectors emerge with some firms engaging in CSR, charging higher prices and catering to "caring" consumers $B + E$, and others abstaining from CSR, charging lower prices and selling only to neutral consumers

*Kitzmueller and Shimshack: Economic Perspectives on Corporate Social Responsibility* 57

D. Firms in the CSR sector will provide $y^{CSR}$ per customer subject to

$$\frac{\partial U((B+E)y^{CSR})}{\partial y} = c.$$

Due to the standard public good problem, this CSR level is second best. Competition will force firms to pass on CSR costs to consumers such that a price premium of $cy$ will be charged.

Perfect government can implement the first best level of the public good, $y^* > y^{CSR}$, which would satisfy

$$(B+E)\frac{\partial U((B+E)y^*)}{\partial y} = c$$

according to Samuelson (1954). However, a government usually represents a majority of the total population and either group $(B+E+F)$ or group $(A+C+D)$ could be in the majority and determine government policy. Two possible outcomes can then occur: either a regulatory standard will be imposed on all firms or markets are left alone (Pooling). If the government does not intervene, CSR constitutes a Pareto improvement benefiting contributors $B+E$ as well as free riders $F$ without harming neutral (non) consumers. In case of regulation, neutral consumers will be forced to either pay a higher price for the private good or to forego consumption if prices exceed reservation values. Redistribution takes place from neutral $D$ to caring consumers $B$ and $E$, who now pay lower prices than under CSR,[3] while caring nonconsumers (group $F$) simply free ride on total consumer contributions. Note that regulation in the first place only makes sense if the resulting public good level will exceed its CSR counterpart. It follows

that an increase in $\frac{F}{B+D+E}$ aggravates the free riding problem under either regime, while a larger $\frac{D}{B+E(+F)}$ implies a stronger redistribution effect and eventual distortion in consumption under regulation. In absolute terms, the surplus maximizing level under regulation coincides with the first best level only if group $D$ drops out of the consumer group. Otherwise, the result will be either underprovision or overprovision of the public good w.r.t. to the first best level. In sum, the relative welfare question of when total surplus is maximized under regulation as opposed to CSR can only be answered when weighting the relative benefits and losses of social groups $B+E+F$ against those of neutral $D$, both of which in aggregate depend on the number of members in each group as well as the strength of their preferences. Note that as opposed to direct government provision via a head tax, nonconsumers without preferences for $y$, i.e., groups $A$ and $C$, are not affected by regulation and resulting higher prices of $x$. Additionally, government failure beyond free riding and externalities (e.g., bias, opportunism, or limited monitoring/enforcement) can lead to deviations from $y^*$ even under regulation and further justify CSR as a welfare optimal channel to provide public goods.

### 2.1.2 *Why CSR? Toward a Taxonomy*

An alternative approach identifies CSR as a horizontal taste parameter with private character, a view naturally tailored toward different objectives than the public good approach. These objectives include to address the set of positive questions related to why CSR actually occurs, and to decrease the levels of abstraction by accepting a second best world as the relevant analytical framework. The focus here is on interactions between strategic actors such as firms, activists, regulators, consumers or investors

---

[3] Note that the public good here must be aggregative in nature.

and how CSR may arise in a "political economy" or "stakeholder interaction" context. In other words, it is well suited to investigate corporate motivation to invest in voluntary social behavior and the exact mechanics of how preferences can translate into CSR. To get a more complete and ordered picture, this section develops a taxonomy of CSR along motivational lines and across theoretical frameworks. Furthermore, we discuss the role of extrinsic and intrinsic preferences.

Within this framework two opposing perspectives on CSR can be taken. First, CSR may constitute a special form of investment into innovation that may result in negative costs (net benefits) over time, ceteris paribus. Along these lines, Porter (1991) and Porter and van der Linde (1995) argue that environmental regulation increases costs and decreases competitiveness only in a static environment, where the firm problem reduces to one shot cost minimization under perfect information. Innovation and technological change, on the other hand, are dynamic concepts, i.e., economic and technological systems are repeatedly "shocked" out of their steady state. Therefore, a dynamic approach may "put a new free $10 bill on the table," ready to be picked up by the next firm coming along. In other words, if market economies are dynamic places with changing technologies, limited knowledge of the world or imperfect information, environmental innovation may constitute a "win win" scenario. Such innovation offsets are defined as investments and actions that address environmental or social impact—thereby producing public goods or reducing negative externalities—while at the same time improving the quality of the offered private products, the productivity of related processes and ultimately a firm's or industry's competitiveness. Theoretically, this argument relies on both the existence of dynamic inefficiencies that open up the opportunity for innovation to get more cost efficient again, and the ability to identify opportunities and overcome inertia or detrimental short term incentives.

Second, CSR can be seen as a pure form of corporate expenditure, i.e., it simply is a static cost parameter. This view is the one taken by a majority of economists and allows us to establish the taxonomy of CSR outlined in the $2 \times 2$ matrix of figure 2.

The crucial question then asks why firms voluntarily incur the costs attached to CSR. Friedman (1970) proposed that "[t]he only responsibility of business is to maximize profits." Within this narrow neoclassical firm paradigm, CSR expenditures could only be a manifestation of moral hazard towards shareholders. A business ethics literature does indeed postulate that the interests of managers or directors may drive CSR and may do so at the expense of wealth creation (Jensen 2002). However, Friedman's conclusion turns out to be too simplistic in that there are other plausible explanations of CSR. Although being costly, CSR can form part of an optimal firm strategy. First, should shareholders themselves care about social or environmental performance, they may be willing to trade monetary profits for CSR or even incur net losses by using their firm ownership as a "do good" corporate channel and alternative to direct donations. Such a perspective is consistent with the ethical, discretionary, and institutional legitimacy principles developed in the social issues in management literature (e.g., Wartick and Cochran 1985 and Wood 1991). It is also consistent with an "owners as stakeholders" perspective from the management stakeholder theory literature (Freeman 1984 and Rowley 1997). If markets do not reward such behavior, i.e., costs cannot be rolled over to stakeholders, such "not for profit CSR" amounts to a reduction or sacrifice of profits in the social interest (Reinhardt, Stavins, and Vietor 2008). A similar motivation for not for profit CSR could stem from

*Kitzmueller and Shimshack: Economic Perspectives on Corporate Social Responsibility*   59

| | | SHAREHOLDERS | |
|---|---|---|---|
| | | Social (S) preferences | Classical (C) preferences |
| STAKEHOLDERS | S | *Not for profit CSR* <br> Mixed effects on profits | *Strategic CSR* <br> Profit maximization |
| | C | *Not for profit CSR* <br> Reduction of profits | *No CSR* <br> Profit maximization |

*Figure* 2: Taxonomy (S denotes social preferences and C classic, monetary preferences)

"negative" preferences regarding profit distribution. This means that shareholders prefer spending money on CSR rather than increasing bonus payments for top management to stellar amounts. This may be especially true recently, as executive pay and banking failures are under public watch.

Second, shareholder value maximization in general, as well as profit maximization in particular, can motivate CSR. Stakeholders may be endowed with respective social, environmental or ethical preferences. Neoclassical firms cannot ignore such circumstances if they directly affect demand in product and financial markets, supply in labor markets, and/or shareholder value maximization. Such preferences might also affect firms indirectly through governments or regulators translating voter preferences into market intervention. In short, social and environmental preferences translate into some sort of action or behavior relevant to corporate profits and qualify CSR as part of corporate strategy.

CSR induced by demand side pressures or as a hedge against the risk of future regulation or activism has been termed "strategic CSR" by Baron (2001), while McWilliams and Siegel (2001) refer to the same underlying pure profit orientation of CSR, i.e., CSR in absence of social shareholder preferences, as a "theory of the firm perspective." This behavior is market driven, maximizes monetary profits, and features a reactive notion as it is induced by outside parties like consumers, employees, activists, and regulators. Purely profit oriented investors do not motivate strategic CSR, they only respond to profits determined by other (social) stakeholders.[4]

Gary S. Becker cautioned that firms that combine the profit motive with a true nonprofit consideration (including CSR) can only thrive in a competitive environment "[i]f they are able to attract employees and customers that also value these other corporate goals" (The Becker–Posner Blog February 10, 2008 "On Corporate Altruism—Becker"). While this is true for strategic CSR, not-for-profit CSR firms may very well compete with their purely profit oriented counterparts as long as shareholders have sufficient funds to sustain CSR expenditure. Here market power

---

[4] If both share- and stakeholders have similar social or environmental concerns, the relative strength of their preferences will determine who bears the cost of CSR and ultimately the net effect on CFP.

*Journal of Economic Literature, Vol. L (March 2012)*

and related profits ease the participation constraint of nonprofit shareholders.

We have seen that two "theory of the firm" relationships are of particular importance: (1) The internal one between owner and management, and (2) all relevant external relations between the firm and its stakeholders. The main critique of CSR has involved principal–agent relation (1). Friedman saw the "socially responsible firm" as a classic profit maximizer and its social contribution in goods production, employment and innovation all driven by undisturbed competition and the ultimate incentive—profits. Relationship (2) allows for the crucial updates proposed here. Social or environmental preferences may be extrinsic or intrinsic in nature, and in reality they most likely are a mix of both. Demand for CSR may reflect extrinsic motivation such as offsetting healthcare expenditures or saving on energy bills. Note that CSR can be strategic, while at the same time stakeholders might demand and pay for it based on purely monetary incentives, i.e., solar panels may be very expensive to produce, but immediately save energy costs and eventually outweigh the price premium paid by consumers. This means that there is scope but not need for going beyond the assumptions associated with homo oeconomicus.

### 2.1.3 *Preferences*

In order to separate different components of motivation driving CSR, we discuss the widening of traditional individual rational choice theory toward a broader set of attitudes, preferences and calculations. Stiglitz (1993, 2002), Becker (1993), and Camerer and Loewenstein (2003) review these issues. Benabou and Tirole (2003) as well as Besley and Ghatak (2005) assume that agents have preferences for money, social and public goods as well as reputation. A first important insight is that intrinsic motivation can act as a substitute for extrinsic, monetary incentives.

This has interesting and novel implications for pricing through the potential increase in consumers' willingness to pay, and for determining incentives in employment contracts. Benabou and Tirole (2006) find that extrinsic incentives can crowd out prosocial behavior via a feedback loop to reputational signaling concerns. The reputational concern reflects the possibility that increased monetary incentives can lead observers to interpret prosocial action as greediness rather than social responsibility, thereby making prosocial behavior a less efficient signal of social type. Also firms often rely on reputation. Kitzmueller (2008) investigates the potential effects of a CSR subsidy. If firms vary in their capacity to benefit from CSR due to different mission and cost structures, and consumers have preferences for mission driven CSR independent of one shot government incentives and cannot observe firm types, then a subsidy can reduce the effectiveness of CSR as a signal and might crowd out CSR by some firms or lead to lower total CSR depending on the distribution of firm types. Reputation also counts for managers. If society rewards social behavior not only in the marketplace but also in "a more societal environment," Baron (2008) concludes that this can aggravate the moral hazard problem and managers will have incentives to carry CSR beyond its strategic level.

Another perspective views CSR as an alternative, market based way to do social good. The key question asks why this "corporate channel" is preferred to donations or political engagement. The answer involves substitutability and comparative advantage of CSR. Andreoni (1989) compares different ways to contribute to a social good and asks whether they constitute (im)perfect substitutes. Although he compares public and direct private provision of public goods, the same analysis can be extended to compare various ways of private provision such as corporate and individual

social responsibility. The fuel of this analysis is the identification of "warm glow" preferences, i.e., utility derived from the mere fact of doing good yourself or being more directly involved rather than outsourcing it to governments or NGOs. If "warm glow" exists, public provision and direct donations are imperfect substitutes that imperfectly crowd out each other. An example of when CSR might be preferred builds on people's needs to consume certain private goods while still deriving disutility from being connected to any socially stigmatized behavior related to their purchase, the use of the good, or the firm itself (e.g., firms using child labor or acting in an environmentally hazardous manner during the production process). Such motivation might appeal to both consumers endowed with social preferences independent of their consumption pattern and those consumers who only have social conscience considerations in relation with their consumption. The former might choose CSR in order to satisfy consistency with their general outlook, while the latter care about signaling.

Also, investors can be heterogeneous in the sense that there are "[t]hose for whom corporate giving is a close substitute for personal giving and those for whom it is a poor substitute" (Baron 2007). Graff Zivin and Small (2005) focus on the relationship between CSR, investment behavior, and firm valuation. They derive a "Modigliani Miller (MM) theory of CSR," where the fraction of investors that prefers corporate philanthropy over private charitable giving drives CSR. A share constitutes a charity-investment bundle matching social and monetary preferences of investors with those of the firms' management. The main conclusion follows the spirit of MM in the sense that if all investors consider CSR and private charity as perfect substitutes, it does not matter whether the public good is provided through philanthropy or CSR. If they are imperfect substitutes, a positive level of CSR is necessary to maximize shareholder value.

A related issue is that CSR often has been connected with advertisement or public relations of firms, thereby suggesting that CSR eventually could change preferences and ultimately individual behavior. While the marketing literature has approached these issues via the concept of Corporate Social Marketing (Kotler and Lee 2004a), economists have been more cautious when it comes to endogenous preferences. Regarding preference formation, Becker (1993) concluded that "attitudes and values of adults are . . . influenced by their childhood experiences." Samuel Bowles (1998) builds the bridge from Becker's "family environment" to markets and other economic institutions influencing the evolution of values, preferences and motivations. Surveys such as Fleishman Hillard and the National Consumer League (2007) posit that the strength and active role of social or environmental preferences in a society strongly depend on demographic characteristics such as education or technological development.[5] This points towards developed countries as the cradle of CSR preferences. Not only do living standards in the developed world endow people with purchasing power, but also provide them with information through education and connection to modern communication technologies. From another perspective, this argument reflects the Maslow pyramid in the sense that only when basic needs are fulfilled do people start worrying about more indirect ones such as environmental and ethical firm behavior. We note that these social or environmental goods do not always physically affect consumers, but rather are feeding through via intrinsic, reputational concerns.

---

[5] This suggests that preferences can and do change over time and while standard welfare implications certainly hold in the short and middle run, they may change in the long run.

Another concept lending support to such a view is the Environmental Kuznets Curve as outlined originally by Grossman and Krueger (1993) and revisited later by Dasgupta et al. (2002). The curve posits an inverted-$U$ relationship between economic development, i.e., income per capita, and environmental pollution. In the initial process of industrialization, people only care about jobs and income and public environmental spending and regulations are weak and unpopular. As income rises, preferences as well as regulations begin to favor environmental protection. Arora and Gangopadhyay (1995) have built a theoretic model of overcompliance around this conjecture and showed that if the valuation of money and therefore the importance of prices decreases in income, heterogeneous preferences imply variation in the willingness to pay for CSR. Again, firms separate along the preference distribution, and in a two-firm model the introduction of a minimum regulatory standard always leads the firm serving the high income–high public preference segment to overcomply.

## 2.2 A Framework for Strategic CSR

Most analysis of CSR treats the existence of social or environmental preferences as exogenously given and focuses on the interactions between firms and stakeholders. We identify three broad theoretic channels—(1) markets, (2) politics, and (3) isomorphism—through which strategic CSR can arise. Our definition of strategic CSR implicitly assumes that the production of public alongside private goods is costly, since the theoretical contributions outlined in the remainder of this section uniquely assume a classical static environment.

### 2.2.1 Markets

There are two classical markets, the labor and product market, as well as the overarching market for information, that are all relevant to the discussion of strategic CSR. First, it is hypothesized that CSR might affect the interaction between employers and employees and alter classical labor market outcomes. Indeed, the organizational signaling work of Fombrun and Shanley (1990) formalizes this notion. In economics, CSR–labor market interactions are usually analyzed in a contract theoretic framework, where the key issues arise from information asymmetry with respect to the employees' type (screening or signaling) or actions (moral hazard). Simon (1991) was among the first to argue that agency problems may be best overcome by attempting to change and ideally align preferences of workers and principals. Further, workers may identify with their organization via matching (selection), reducing cognitive dissonance (psychology) or induced convergence of preferences (endogenous preferences). Given these alternatives, CSR could either be interpreted as a signal leading to matching or alternatively as a tool to streamline preferences over time. While the latter suggestion lacks theoretic or empirical treatment, the potential matching (selection) role of CSR has been analyzed in more detail.

Preston (1989) was able to derive an equilibrium wage differential between nonprofit and for-profit firms. The explanation is based on workers preferences for social good and their resulting willingness to trade off wages for these preferences in the form of "labor donations" (442). The higher the social benefits a nonprofit firm promises to provide, the higher the wage differential for any constant preference distribution. This supply side effect may be mitigated by nonprofit managers' discretion to pay above cost minimizing wage levels. Similarly, Bowles, Gintis, and Osborne (2001) address the role of preferences in an employer–employee relationship, where employees might have general preferences such as a sense of personal efficacy or a rate of time

*Kitzmueller and Shimshack: Economic Perspectives on Corporate Social Responsibility*   63

preference that are able to compensate for monetary incentives. Therefore, employers may be able to induce effort at lower cost. The conclusions suggest an important role of preferences in determining the cost of labor services and affecting earnings of employees and employers alike.

Besley and Ghatak (2005) establish a theoretic framework to analyze the role and interaction of monetary and nonmonetary incentives in labor contracts within the nonprofit sector. They refer to nonprofit organizations as being mission oriented and conjecture that such organizations, e.g., hospitals or universities, frequently are staffed by intrinsically motivated agents. The main conclusion from their moral hazard model with heterogeneous principals and agents is that pecuniary, extrinsic incentives such as bonus payments and the agents' intrinsic motivation can act as substitutes. In other words, a match between a mission oriented principal and an intrinsically motivated agent allows for reduced contractual bonus payments and still induces the standard second best effort level. In the case of more than two types, a better match implies a higher substitution effect between money and motivation. Brekke and Nyborg (2004), based on Brekke, Kverndokk, and Nyborg (2003), explicitly show that CSR can actually reduce moral hazard in the labor market context. More precisely, CSR serves as a screening device for firms that want to attract morally motivated agents and the offset of the agency problem is again driven by substitutability of motivation and high powered incentives. In sum, the major result of this research is the notion of reduced agency cost due to matching motivated agents and principals as well as the related substitution between extrinsic and intrinsic incentives.

An alternative explanation of lower incentive pay in the nonprofit sector also relies on matching, but here the matching occurs between skill/productivity and pay.

It is simply assumed that workers only care about money but vary in their skills. Hence, employees sort along this dimension. Stigler (1962) aimed at disentangling the quality and price variation in labor markets with imperfect information. He illustrates the existence of dispersion in wage rates for homogenous labor and how more search by workers[6] should decrease this "pure" form of dispersion. If employers search for high quality labor, "the problem of information on quality has been replacing that of information on price, and heterogeneity of quality has replaced homogeneity" (103). In this labor market, information is a two edged sword in the sense that more search equals better information and closer matches between workers' maximum productivity and incentives on one hand, while worsening employers' opportunity to pay less for superior labor quality. In sum, wage rates and the search for quality are substitutes, and it follows that higher pay attracts better applicants. Finally, Stigler points toward the potential role of nonmonetary conditions of employment that could enable firms to trade off wages and for example CSR without attracting lower quality workers. Also related to employee quality, a labor market context that connects CSR to corporate governance is explored by Cespa and Cestone (2007). They conjecture that inefficient managers can and will use CSR, i.e., the execution of stakeholder protection and relations, as an effective entrenchment strategy to protect their jobs. Their discussion of the effect of corporate governance institutions on firm value leads to the conclusion that institutionalized stakeholder relations close this "insurance" channel for

---

[6] Employees search for employers until marginal costs of search equal expected marginal return. A positive correlation of wages over time provides a strong incentive for more search by increasing the expected utility of finding a good first wage offer.

inefficient managers and increase managerial turnover and firm value. This finding also provides a rationale for the existence of special institutions such as ethical indices or social auditors.

An additional signaling role for CSR is found and discussed by Greening and Turban (2000). The message is simple: CSR can act as a positive signal to attract a quality work force and thereby serve as a competitive advantage. They draw on social identity theory (e.g., Cable and Judge 1996) by suggesting that "[j]ob applicants have higher self-images when working for socially responsive firms over their less responsive counterparts" and find that "[a]pplicants will not only be attracted to firms with positive Corporate Social Performance reputations but also will pursue jobs with such firms, . . . attempt to interview with such firms, and . . . have a higher probability of accepting a job offer from these firms." Maignan and Ferrell's (2001) corporate citizenship as marketing theory comes to similar conclusions. A relevant theoretic explanation in the economics literature is provided by Akerlof and Kranton (2000, 2005), who build a model around the psychological concept of identity, where individual utility negatively depends upon the distance between behavioral norms within a social category and the actual, respective behavior of the individual member.

CSR has been suggested to serve as a way to forestall unionization attempts. Historical evidence is provided by Davis, Whitman, and Zald (2008), who state that so called "welfare capitalism" in the first half of the twentieth century used employee health insurance, community services, housing or pension programs "[w]ith an eye on keeping labor unions out . . . and the state at arm's length" (6). Today, such conduct forms part of standard human resource management and the focus of attention clearly shifted to CSR activities tailored toward external stakeholders.

It is not only labor markets; social consumer preferences may also drive CSR. Marketing scholars drawing on theories of social and organizational identity postulate the emergence of socially responsible consumers. Such consumers, when matched with CSR firms, may be especially loyal, committed, and robust to negative information (e.g., Sen and Bhattacharya 2001 and Bhattacharya and Sen 2003).

Baron (2008) links managerial incentives with socially responsible consumers. He addresses the interaction of consumer preferences, the ability of managers, managerial incentive design, and social expenditures. The main focus is on joint determination of social expenditure and financial performance of firms. Causality can go either way and the decisive variable is whether consumers are ready to reward CSR or not. It is concluded that higher demand for social goods empowers the profit incentives of managers and their compensation will be positively correlated with social expenditure, i.e., managers are encouraged to spend socially as demand, profits, and their salary will then be maximized. If times are economically favorable and consumers value CSR, a positive correlation emerges between financial performance and CSR. Further, the level of both CSR and profits is increasing in managers' ability. In absence of consumer preferences, CSR is determined by shareholder preferences and economic circumstances determining profits. If times get bad, e.g., due to a recession, both consumers and shareholders may not find that the marginal utility of social expenditure outweighs its marginal costs. The correlation eventually becomes negative in the presence of able managers, who redirect less funds out of the smaller pot to CSR. Another comparative static that may interact with optimal CSR levels is the degree of competition in the market. Bagnoli and Watts (2003) model competitive product markets with homogeneous, socially responsible

*Kitzmueller and Shimshack: Economic Perspectives on Corporate Social Responsibility*  65

consumers. They conclude that competition for these consumers, who are willing to pay a premium for CSR, leads to private provision of public goods as a by-product and at levels that vary inversely with the degree of competitiveness in the private goods market. Furthermore, a more competitive environment in terms of prices, i.e., Bertrand as compared to Cournot competition, reduces profitability and a firm's ability to use the mark up to increase CSR. The result is less differentiation through CSR, less competitiveness, and ultimately less CSR. In sum, there exists a trade-off between efficient provision of the private good and efficient provision of the public good, i.e., the more competitive Bertrand environment leads to lower incentives for CSR.

If firms (Bertrand) compete in markets populated by heterogeneous consumers, i.e., consumers with and without preferences for CSR, Besley and Ghatak (2007) find that there exists a unique separating equilibrium where firms either serve social or neutral consumers but always make zero profits. Following up on our discussion in section 2.2.1, a few more standard results from the screening and public goods literature can be validated. The maximum sustainable level of CSR over time is achieved when the incentive compatibility constraint of caring consumers binds, while an exogenous increase of public good supply (e.g., by a government) perfectly crowds out competitive provision of CSR. Perfect governments are able to implement a Lindahl Samuelson equilibrium. However, if they fail, CSR and nonprofit provision may compete for Pareto improvement. It is also found that a small uniform regulation would leave the level of corporate public good production unchanged and redistribute contributions from social to neutral consumers, while large regulatory intervention can raise supply of the public good above second best, limited only by neutral

consumers' maximum willingness to pay for the private good.

Arora and Gangopadhyay (1995) model CSR as voluntary overcompliance with environmental regulation. Although consumers all value environmental quality, they vary in their willingness to pay a price premium for CSR depending on their income levels. Firms play a two-stage duopoly game and first decide about CSR (clean technology), and then compete a la Bertrand. Again, the subgame perfect equilibrium entails differentiation of firms through catering to different sets of consumers. Choosing technology acts as product positioning similar to the choice of product quality, and CSR is positively correlated with the income levels of either all consumer segments or of the lowest income segment. Similar to Besley and Ghatak (2007), comparative statics allow for the analysis of government policy. The main finding is that if a minimum standard is imposed, it will bind on the "worse" firm (lower CSR) while the better firm will overmeet the standard. CSR subsidies can have the same effect as standards, while taxes always reduce output (here the number of consumers served) and CSR efforts by all firms.

The commonly used notion of CSR as a means of product differentiation also emerged within the advertising and marketing literature. Firms use CSR to differentiate and advertise their product or to build brand loyalty. An interesting and relevant conjecture is that the advertising dimension of CSR may be especially strong when social efforts are unrelated to business conduct. In Navarro (1988), corporate donations to charity are identified as advertisement and CSR is meant to transmit a positive signal about firm quality and type. However, according to Becker-Olsen, Cudmore, and Hill (2006), the mere signal might not necessarily be positive as consumers may be able to identify low fit CSR as advertisement and tend to negatively perceive such CSR

efforts as greediness of firms or "greenwash" rather than genuine interest in social or environmental concerns.

### 2.2.2 *Politics*

Politics constitutes an alternative pass-through from social preferences to business outside the framework of classical market interaction with firms. There are two main subgroups, private and public politics. Private politics refers to social activism by NGOs or civil society, while public politics stands for actual or potential government engagement with firms via law and regulation. The crucial common feature of all politics is that the influence and power of the "politician," i.e., the activist or the government, derives from some sort of support by the public (or a subgroup thereof). The corporate incentive to respond to politics and change behavior even before any activist or legal action is taken stems from the threat posed by increased costs, decreased demand, and competitive disadvantage. The logic is comparable to hedging against future risk in financial markets, just here the firm insures itself against a potential campaign by an activist or regulatory action taken by a government.

Let us focus on private politics first. The existence of social or environmental activists is intimately related with information asymmetries between companies and the outside world. At a basic level, social activism poses the threat of negative publicity or revelation of negative information through an unsatisfied activist. As soon as the activist is credible and has the ability to damage a firm's reputation or cause substantial costs to the firm, the mere possibility of being targeted is sufficient to integrate CSR as part of corporate strategy. Baron (2001) refers to CSR as corporate redistribution to social causes motivated by profit maximization (1), altruism (2) or threats by an activist (3). However, it can be argued that the existence of activism qualifies CSR as an integral part of profit maximization, i.e., motivation 3 fuses in 1. The game theoretic analysis reveals that CSR induced by private politics has two qualitatively different effects on firms and sheds light on both CSR and activist strategy. First, CSR entails a direct cost effect for those firms that are targeted by an activist. Second, CSR enhances or preserves firm competitiveness. Both effects determine the effectiveness of CSR and therefore the success of activism. Strategic activists choose firms that are more likely to respond to their demands. In equilibrium only realistic demands are posed, hence ex ante agreements regarding CSR are reached and boycotts are not enacted but just serve as sufficient threats. It is not surprising that the probability of compliance (here success) positively depends on the activist's stake as well as the public saliency of the issue, and negatively on the stake of the firm and preexisting CSR levels.

An important comparative static is product differentiation acting as a measure of competition. There is a nonlinear trade-off between the direct cost effects of CSR and potential losses from an exercised boycott. Profits decrease in competition. For high levels of product differentiation (when competition is relatively low), the potential competitive disadvantage from a boycott increases with a marginal decrease in differentiation. Hence, the activist threat and the activist success rate increases. It follows that CSR will be high in these circumstances due to its relatively strong benefits. When approaching a competitive environment (i.e., Cournot competition), the positive correlation between competition and activist power may be reversed as firms have lower rents at stake and direct CSR costs weigh heavier on low profits. Finally, it is found that the existence of spillover effects from one firm to another or even the whole industry can act as an amplifier for activist power on the one hand, and motivation for (often observed) concerted nonmarket action by firms in the

*Kitzmueller and Shimshack: Economic Perspectives on Corporate Social Responsibility*  67

same industry on the other (e.g., voluntary industry standards).

In a more comprehensive setting, Baron (2009) predicts market values of firms, prices, profits, support for activists and the level of CSP in a model of product and capital markets with strategic consumers, investors and activists. Social pressure refers to the outcome of the interaction between the activist and the firm, and is arising endogenously in what resembles a general equilibrium. The new feature is that there are two types of corporation, the morally managed[7] and the self-interested one, and citizens can distinguish between strategic CSR induced by social pressure and independent, (in our taxonomy) not for profit CSR. CSR itself here acts as product differentiation. Equilibrium levels of CSR will vary across types and depend on the degree of substitutability between the various social contribution channels, i.e., invest, consume, donate or support an activist. Similar to Besley and Ghatak (2007), a separating equilibrium arises where the morally motivated firm charges high prices, produces high levels of CSR, and serves consumers with strong preferences for CSR.[8] The self-interested firm will find it optimal to maximize differentiation and do the exact opposite.

The key insight is that activists' target selection depends on the extent to which people distinguish between strategic and not-for-profit CSR, as well as how strongly citizens would react to or protect a target (reputation). It is again the stakes (possible losses from an activist action) of the relevant firm that determine its suitability as a target. In general, the activist selects a soft target, one with high stakes and therefore a higher response likelihood. Additionally, the activist will impose greater demands on softer targets (firms with higher stakes). With decreasing distinction between motivations for CSR, morally motivated firms appear to be a softer target and will be chosen by the activist unless the reputation of the self-interested firm is relatively weak. In other words, the morally motivated firm loses its advantage as consumers do not reward its ex ante commitment ex post and its stakes are higher. In contrast, with increasing distinction between motivations for CSR, social pressure will be directed toward self-interested firms who have more at stake as they are facing unfavorable ex post conditions in terms of consumers preferring morally managed to activist induced CSR. In general, less funded, low quality activists are more likely to target morally motivated firms and vice versa.

Baron and Diermeier (2007) define the "campaign" as the paradigmatic core of the analysis of competition between activists and targets. A campaign consists of the strategic activist's demand as well as the harm or reward in case of (non) compliance. The analysis reveals that demands increase in the importance of the issue and the responsiveness of the target. Demands decrease in the marginal cost of the campaign. Further, a proactive change in practice, i.e., CSR, may forestall a campaign if the activist can commit to not target the firm or shift to another target ex ante. If there are multiple targets, a race to the top in CSR may occur and an industry may find it optimal to coordinate. As a firm can always fight a campaign and reduce its success rate at a certain cost, in a repeated game they can gain a reputation for being either a soft or hard target. If types are private information, there exists an incentive to always signal to be a hard target, i.e.,

---

[7] Defined as "a corporate pattern of conduct that goes beyond normal business management and compliance with law" (1).

[8] Prices signal type and lead to consumer selection and the distribution of shareholders' social preferences determines the value of firms because it determines the ability to attract equity investment. The contributions to the activists are similarly dependent on people's social preferences and the quality of the activist.

fight and gain a hard reputation, in which case activism will be more costly and firms will oppose private and public politics more aggressively. Thus, the effectiveness of activism and other CSR drivers falls.

The impact of public interest advocacy and action either through activist groups or concerted consumer boycotts has also been analyzed from a marketing perspective (e.g., Klein, Smith, and John 2004). This literature is very similar to the economics one and its contributions are also rooted in the existence of information asymmetries. Here, CSR is often an experience or credence good for stakeholders. Marketing can be used to build reputation and avoid any form of activism that could harm business conduct. Recent innovations in marketing techniques take consumer preferences with respect to CSR into account and lead to a stepwise development from cause-related to social-cause marketing (Bloom et al. 2006), to corporate social marketing (Kotler and Lee 2004b).[9] The latter goes beyond awareness creation and raising money by aiming at behavioral change. When people benefit from such a change in their actions, positive associations with the change agent will follow. Marketing benefits will be higher the better the cause fits a firm's core markets, goods, and services. In cases of a good fit, CSR can avoid halo effects and insure the firm against negative reputation and activism. In sum, economic and marketing research equally suggest that CSR can

differentiate a product, help build reputation, and avoid private politics.

Lyon and Maxwell (forthcoming) define greenwash as "[t]he selective disclosure of positive information about a company's environmental performance, without full disclosure of negative information on these dimensions" (31). They use a Bayesian game to explore the link between greenwash and strategic activism when the relationship between expected CSR and disclosure is nonmonotonic. A firm with a low probability of a successful CSR project will find it optimal to disclose as there is a lot to win from a publicized CSR success and nothing to lose from a failed CSR attempt. A firm with a high probability of a successful CSR project will find it optimal not to disclose as they have a lot to lose from a failed CSR attempt and little to gain from a successful one. The intuition is that markets will expect those with high success probabilities to do well and those with low success probabilities to perform poorly ex ante. Furthermore, firms that are operating in an industry biased toward negative rather than positive social impact are more responsive to incentives such as NGO audits. Interestingly, if a clean firm with high probability of success has little information about its own impact, such incentives may backfire and lead to less disclosure. Dirty firms that know their impact, e.g., through the presence of an environmental management system (EMS), appear as responsive targets for a strategic NGO.

Now let the incentive to do CSR derive from the threat of public rather than private politics. Potential changes in regulation and related adjustment costs may lead firms to hedge against such an event and build a strategic "buffer zone" via overcompliance, i.e., CSR. Similarly, if firms expect stochastic shocks to their environmental or social performance, overcompliance may reduce the risk of future noncompliance. Furthermore, CSR can be used to invoke

---

[9] Cause related marketing generally refers to any type of marketing effort for a social or charitable cause, including in-house cooperations with nonprofit organizations. Social (cause) marketing is the systematic application of marketing concepts to achieve specific behavioral goals for a social good. Behavioral changes not only increase the level of the social good, but they enhance marketing objectives such as brand positioning and sales as well. The reason given by Kotler and Lee (2004a) states that when behavior change is accompanied by personal benefit, people will have a strong positive association with the company that motivated the change.

procyclicality of regulation and enforcement, i.e., to improve regulatory relations today with the aim of getting preferential treatment, e.g., better permits or less enforcement, from the respective agency tomorrow. The common strategic effects include preservation of competitive position in the event of changes in regulation as well as discouragement of such intervention.

As discussed in section 2.2, CSR might Pareto improve welfare only if governments fail in some way. Maxwell, Lyon, and Hackett (2000) introduce such inefficiencies on the public side by assuming that consumers can influence policy via lobbying at a positive cost. As a result, firms can use CSR to preempt entry of consumers into lobbying activities as their marginal utility from CSR rises beyond the benefits from "investing" into regulation (through lobbying). For this relationship to hold, lower costs of lobbying imply more stringent levels of self regulation. Self regulation in an oligopolistic industry is facilitated through coordination. However, consumers and firms are both better off without regulation only as long as strategic coordination on CSR does not undermine consumers' lobbying effect on regulation too much. The most comprehensive outline and general analysis of such interaction between CSR and public policy as well as the political life cycle is provided by Lyon and Maxwell (2004). Calveras, Ganuza, and Llobet (2007) study the interplay between activism, regulation, and CSR and find that private and public politics are imperfect substitutes. It follows that increased self regulation (i.e., CSR) can crowd out formal government regulation. It is emphasized that when society free rides on a small group of activist consumers, loose formal regulation (voted for by the majority of nonactivists) might lead to an inefficiently high externality level where activist consumers bear the related cost via high prices for socially responsible goods.

Ultimately a word of caution in this context. If different pollutants are complementary through technology, e.g., $SO_2$ and mercury, then what amounts to compliance with more stringent regulation of pollutant A might appear as CSR for pollutant B. This leverage effect of jointly determined pollutants has been addressed by Shimshack and Ward (2008), who conclude that under these circumstances observed overcompliance is driven by traditional regulatory incentives. This is not CSR, but mere compliance. Public policy should take this complementarity into account, otherwise regulatory effects appear as understated and optimal fines and policy end up being biased.

### 2.2.3 *Social Norms*

While the relevant pressure groups in the previous cases were employees, consumers, activists, and governments, the incentive to do CSR here roots in social pressures and norms within geographic communities or functional entities such as industries. It is the institutional environment and commonly (locally) accepted norms, views and values that might discipline firms into certain social behavior. Institutional factors that are potentially shaping the nature and level of CSR in a community include cultural-cognitive forces, social-normative factors as well as regulative factors. The inclusion of regulative community factors complements the analysis of public politics by testing whether differences in regulation on a community level imply different levels and nature of CSR by firms located in these communities. In other words, subsidiarity in regulation implies variation across regions (local entities), and therefore, comparing similar firms located in different regulatory environments can give hints about its correlation with CSR.

Marquis, Glynn, and Davis (2007) identify, in an institutional theoretic setting, the degree of conformity of corporate social

performance in focus, form and level within a community, as a potential explanatory variable for empirical observations concerning CSR. Such normative pressures may also arise within industries, and may lead to industry-wide self-regulatory activities. Industries that are well organized and represented by a centralized lobby might be especially able to exert pressure on firm behavior. DiMaggio and Powell (1983) similarly describe processes that lead to organizational assimilation and homogeneity of organizational forms and practices. They argue that structural change is less and less driven by competition and efficiency while the relevant modern causes of rationalization and bureaucratization go well beyond markets into institutional fitness and pressure. Related to firms, change will be stronger the more firms depend on each other (especially in terms of resource supply), the greater is the uncertainty in the industry and the more ambiguous is the mission of the firm. Isomorphic change will also be stronger the more firms within a field or industry depend on common external factors such as participation in trade unions, academic credentials as prerequisite for hiring, transactions with the state, technological uncertainty or the number of organizational or legal forms to choose from.

## 3. *The Empirical Account*

As discussed above, the theoretical study of CSR has naturally progressed from a public goods perspective on when CSR may be optimal to a stakeholder perspective on why individual firms engage in CSR. Early empirical CSR research explored the broad links between corporate social and financial performance while more recent research emphasizes mechanisms for CSR. Understanding why firms engage in CSR and which stakeholders bear the costs of CSR are the fundamental concepts.

Before reviewing the empirical account, two issues bear noting. First, much of the empirical economic literature relevant to CSR does not present itself as corporate social or corporate environmental research. The empirical economic studies most relevant to CSR often explore overcompliance, voluntary compliance, philanthropy, eco-labeling, productivity, transparency, nonprofit labor markets, and other subjects. Second, while the theoretical outcomes reviewed in the previous sections are clearly defined, empirical explorations are more ambiguous. Tests may support or refute several hypotheses simultaneously.

### 3.1 *Empirical Relationships between Corporate Social and Financial Performance*

Early empirical research related to CSR explores the overall relationships between corporate social performance and competitiveness. In essence, this literature tests Porter and van der Linde's (1995) conjecture that environmental regulations may increase competitiveness via induced innovation offsets. Studies in this area naturally focused on regulation rather than CSR because legal mandates are the literal driver in the original model. However, since the Porter theory's win–win logic applies equally to voluntary and mandatory environmental performance, empirical papers related to the Porter hypothesis shed light on whether CSR may reduce costs, ceteris paribus. There is sparse evidence that environmental performance enhances financial performance via induced innovation, and therefore CSR activities are unlikely to be costless to firms. Extensive review articles consistently report no systematic evidence that environmental performance motivates innovation, and the preponderance of empirical economic studies favor a mild negative relationship between environmental performance and overall competitiveness

(Jaffe et al. 1995, Ambec and Barla 2006, and Pasurka 2008). As Jaffe et al. (1995) put it, economists' natural skepticism regarding this free lunch is appropriate, though further research would help convince others that our conclusions are well grounded in fact.

An organizational behavior literature explores the broader relationship between corporate social and financial performance. The papers at the core of this literature test whether companies do well by doing good. Several studies survey this large literature, so we typically reference the results of Margolis, Elfenbein, and Walsh (2007) rather than individual papers. Margolis, Elfenbein, and Walsh perform an especially comprehensive meta-analysis of 192 relationships from 167 studies spanning 1972 to 2007. One way to interpret this literature in an economic context is as a coarse test of not-for-profit CSR. Not-for-profit CSR to satisfy manager preferences is consistent with the moral hazard hypothesis most often attributed to Friedman (1970). Not-for-profit CSR to satisfy investor preferences (independent of profit motives) is consistent with the sacrificing profits in the social interest perspective of Reinhardt, Stavins, and Vietor (2008). On average, the observational evidence does not support either not-for-profit CSR hypothesis. Margolis, Elfenbein, and Walsh's meta-analysis detects a modest positive average correlation between corporate social and financial performance.

A quantitative business and society literature also finds limited evidence in favor of not-for-profit CSR. For example, environmental performance at foreign-managed and absentee-managed facilities is no worse, on average, than performance at otherwise similar plants (Grant and Jones 2004; Grant, Jones, and Trautner 2004). Plants operated by individuals with plausibly lower preferences for local environmental quality produce the same amount of environmental CSR as plants operated with plausibly higher preferences for local environmental quality. Further, Davidson, Worrell, and El-Jelly (1995) finds no significant financial market impact when small groups of investors publicly announce stock divestitures for social purposes. Other investors appear immediately willing to buy divested stocks.[10] In sum, quantitative empirical data are not consistent with hypotheses suggesting that not-for-profit motivations systematically drive observed CSR.

An alternative interpretation of the social and financial performance literature is a broad test of various hypotheses predicting that CSR will enhance average profitability. While the evidence is not consistent with moral hazard, the data are also not strongly supportive of CSR having a systematic positive profitability effect. Margolis, Elfenbein, and Walsh's meta-analysis found a median correlation between social performance and financial performance of 0.08, and the authors assert that this relationship is small in practical terms. Further, the average correlation shrinks significantly when only studies that include basic controls like industry, firm size, and risk were reviewed. Margolis, Elfenbein, and Walsh also note that the detected positive average correlation between corporate social responsibility and corporate financial performance (CFP) is at least as attributable to causation from CFP to CSR as the reverse.

---

[10] A large literature explores investor reactions to both positive and negative events related to corporate social performance. Seminal quantitative papers include Hamilton (1995), Wright et al. (1995), and Klassen and McLaughlin (1996). This literature typically finds that stock prices decline in response to negative social news and increase in response to positive social news. Unfortunately, it is not possible to attribute financial market impacts to manifestations of investor preferences (and thus not-for-profit CSR) or to beliefs about the influence of these events on profitability through other channels like consumption or politics (and thus strategic CSR).

3.2 *Empirical Support for Strategic CSR*

As opposed to evidence for not-for-profit CSR and the induced innovation hypothesis, the observational evidence for strategic CSR is somewhat more favorable. Nevertheless, data on systematic large gains from CSR are limited. As Margolis, Elfenbein, and Walsh (2007) note, natural questions arise. What then explains the coexistence of corporate social and financial performance? If CSR has limited financial benefits on average, why do we observe it in the real world? Who is paying for the higher costs underlying corporate environmental and social behavior? We argue that while more research is needed, insights into these questions can already be obtained from diverse empirical literatures. In this section, we review the existing evidence.

3.2.1 *Markets*

Theory suggests that CSR might influence the interaction between employers and employees and that labor markets may bear some of the costs of CSR. A survey-based business and society literature finds that job seekers express preferences for organizations with better public images and values similar to their own. Ethics and management researchers consistently find positive associations between companies' CSR ratings and business students' self-reported opinions of employment attractiveness (Turban and Greening 1996; Backhaus, Stone, and Heiner 2002; Albinger and Freeman 2000). Similar studies find that experimentally manipulated CSR ratings are positively correlated with undergraduate management students' stated intent to pursue and accept positions (Greening and Turban 2000). Results not only support links between CSR and job seekers' behavior, but a growing survey literature indicates that current employees self-report better work attitudes and higher organizational commitment at companies associated with greater corporate citizenship (Peterson 2004).

Despite consistent qualitative survey results that suggest that CSR may influence labor markets, the quantitative empirical literature generally fails to reject a null hypothesis of small or no labor market effects. Frye, Nelling, and Webb (2006) compare executive compensation at socially responsible firms to a matched sample of other firms. Matches were based on industry and size. The authors find that CEOs at companies with ethically screened stocks earn similar total cash compensation as CEOs at matched counterparts. They also detect no significant differences in executives' long-term incentive plans and stock options.[11]

Other direct quantitative tests of the labor market impacts of CSR are limited, but existing studies on nonprofit and public interest sectors shed light on the donated labor hypothesis that is necessary for employees to significantly bear the costs of observed CSR. Many studies demonstrate that commonly observed negative wage differentials between nonprofit and for-profit organizations become small and typically statistically insignificant once controls for worker, job, and workplace characteristics are included in empirical models. Goddeeris's (1988) seminal study finds that lawyers in public-interest law are not accepting large wage sacrifices to work in the public sector. Individual characteristics appear to drive wage differentials. Recent economy-wide studies of comprehensive datasets demonstrate, on average, no systematic difference between wages in the nonprofit and for-profit sectors after controlling for individual, job, and workplace attributes (Leete 2001; Ruhm and Borkoski 2003). Some studies even discover premiums

---

[11] Frye, Nelling, and Webb (2006), as well as many other reviewed studies, make contributions beyond those discussed. We focus only on findings most relevant for our purposes.

*Kitzmueller and Shimshack: Economic Perspectives on Corporate Social Responsibility*   73

in the nonprofit sector (Holtmann and Idson 1993 and Mocan and Tekin 2003).[12] In sum, while more evidence is needed, workers at socially responsible firms do not appear to be sacrificing wages or other forms of compensation. It therefore appears unlikely that labor market effects systematically drive observed CSR.

Socially responsible consumption offers an alternative explanation for observed CSR. A well known coffee retailer offers fair trade and organic coffee for 15 and 30 percent premiums over otherwise similar products (Loureiro and Lotade 2005). Approximately one million U.S. electricity consumers chose to pay an average price premium of 1.8 cents/kWh (a roughly 16 percent premium) for green power products. Total voluntary purchases of renewable energy exceed 24 billion kWh, or about 0.6 percent of total electricity sales (Bird, Kreycik, and Friedman 2009). Additionally, a survey-based marketing literature finds that CSR influences self-reported consumer product responses and product attitudes. Brown and Dacin (1997) find that experimentally manipulated CSR information significantly influences stated perceptions of products and the corporations that offer those products. Such marketing survey results, however, appear to be driven by a subgroup of vocal individuals with strong feelings about socially responsible consumption (Mohr, Webb, and Harris 2001; Mohr and Webb 2005). Blend and van Ravenswaay (1999) find that purchase intent for eco-labeled apples is strongly influenced by consumers' overall environmental concerns. Even at a $0 premium, approximately 30 percent of consumers report no intention of buying environmentally friendly produce.

A growing stated preference economics literature is largely consistent with the marketing literature. Contingent valuation, contingent ranking, and conjoint analysis papers almost universally find that consumers, on average, express an incremental willingness to pay for environmentally friendly and socially responsible products. Consumers reveal additional values for local, organic, free trade, and eco-labeled foods including wine, potatoes, and seafood (Loureiro and Hine 2002; Loureiro 2003; Johnston and Roheim 2006). Electricity consumers state that they are willing to pay 0.6 to 2 cents/kWh, or about a 5 to 20 percent premium, for renewable energy (Goett, Hudson, and Train 2000; Roe et al. 2001). Valuations for CSR-related activities in this literature, however, are also sensitive to individual preferences. The mean or median willingness to pay discussed in most of the relevant papers may be misleading, as a detailed examination of reported results typically reveals a nonuniform distribution where some consumers report a very high willingness to pay and some report 0 willingness to pay. Further, stated preference results often vary significantly by subgroup. For example, European consumers express a willingness to pay for GMO-free organisms that is nearly 30 percent higher than U.S. consumers (Lusk et al. 2005).

A limited econometrics literature is also generally consistent with marketing survey results. In the most directly relevant study, Eichholtz, Kok, and Quigley (forthcoming) use a large sample of buildings to econometrically evaluate price premiums for green buildings. They find that those with green ratings earn rental rates that are 3 percent higher per square foot than rental rates for control buildings matched on attributes like quality and location. Sales prices are 16 percent higher. Other econometric studies find that companies in industries where final consumer goods are the primary output are

---

[12] A possible explanation for a nonprofit wage premium is a property rights hypothesis, where nonprofit workers have poorer incentives for cost minimization. Product quality offers an alternative explanation, since nonprofit organizations in the studied health and child care sectors may offer higher quality than for-profit organizations.

substantially more likely to participate in voluntary environmental programs or adopt voluntary environmental management systems, ceteris paribus (Innes and Sam 2008; Anton, Deltas, and Khanna 2004).

In sum, marketing surveys, stated preference valuation studies, and revealed behavior econometrics papers all concur that consumers' assessment of firms, evaluation of products, final consumption decisions, and willingness to pay depend on CSR records. Consumers appear to bear at least some of the costs of CSR. A further area of agreement between the diverse literatures is that the demand for CSR is not universal. While intensity of demand varies across studies and contexts, subgroups with strong feelings about socially responsible consumption drive consumption outcomes. This suggests that the ten to thirty percent of large companies externally certified as engaging in CSR may serve socially responsible customers in a kind of Tiebout sorting equilibrium.

The precise mechanisms underlying socially responsible consumption, however, remain the subject of debate. Marketing survey results suggest that CSR influences consumers' overall assessment of firms' reputation, rather than their beliefs about product attributes (Brown and Dacin 1997). Indeed, it is difficult to explain market sorting and price premia for goods produced by firms associated with free trade, divestitures from apartheid-era South Africa, and charitable contributions without reference to direct consumer preferences for corporate pro-social behavior. Much of the economics literature, however, suggests that CSR primarily influences consumers' beliefs about product attributes. Siegel and Vitaliano (2007) find that firms producing durable experience goods or credence services are considerably more likely to engage in CSR than firms selling search goods. Consumers imperfectly observe quality and reliability in markets like those for automobiles,

appliances, health care, and investment services, so CSR may be especially useful as a signal of product and service attributes in these industries. Other researchers note that consumers have difficulty understanding and differentiating CSR messages, and that personal health rather than environmental preferences are the dominant reason consumers purchase eco-labeled products (Leire and Thidell 2005). Eichholtz, Kok, and Quigley (forthcoming) find that tenants and buyers are willing to pay more for energy-efficient buildings but not for buildings that are sustainable in a broader sense.

### 3.2.2 Politics

Theory suggests that private politics may drive strategic CSR provision, and that the preferences of social advocates, environmental activists, or other stakeholders may influence CSR levels via channels outside of classical market interactions. Eesley and Lenox (2006) identify more than 300 large firms that were subject to at least one protest, boycott, letter writing campaign, proxy vote, or citizen suit between 1971 and 2003. Other researchers' samples suggest that approximately 5–10 percent of large firms were subject to boycotts and approximately 5–10 percent of large firms were subject to proxy items (Gupta and Innes 2009). A survey-based law and society literature finds that firms' environmental managers express concerns about private politics or their threat as a source of pressure. Representatives from 400 of Canada's largest firms report that their plans for dealing with environmental issues are influenced by neighborhood and community pressures, even after controlling for pressure from consumers, employees, regulators, and shareholders (Henriques and Sadorsky 1996). Kagan, Gunningham, and Thornton (2003) find that managers at pulp and paper mills report that social license stresses have a significant impact on environmental performance.

*Kitzmueller and Shimshack: Economic Perspectives on Corporate Social Responsibility* 75

The authors further argue that such pressures are unlikely to explain large changes in environmental performance over time, but they may help explain differences in social performance across firms at a given point in time.

Quantitative economic studies that explore the role of community characteristics in environmental behavior shed an indirect light on the conjecture that private politics impacts CSR levels. Broadly, studies find that community characteristics affect firms' toxic releases, air pollution abatement expenditures, and water pollution discharges, even after controlling for public regulation and demographic factors correlated with consumer preferences (Arora and Cason 1999; Becker 2004; Earnhart 2004). Results for specific mechanisms related to private politics, however, remain controversial. For example, Arora and Cason (1999) find that a proxy for the propensity for collective action and political engagement, voter turnout, meaningfully affects environmental outcomes. In contrast, Becker (2004) and Earnhart (2004) both fail to detect such a relationship. Liston-Heyes and Ceton (2007) contend that the commonly observed negative correlation between conservative politics and CSR provision supports the hypothesis that CSR is a form of political contribution. However, unexamined channels like public regulation may be equally plausible explanations.

An alternative empirical literature more directly explores relationships between private politics and CSR. The evidence here is more consistent. Financial event studies find that consumer and union boycotts result in economically important and statistically significant stock price declines among targeted firms (Pruitt and Friedman 1986; Pruitt, Wei, and White 1988; Davidson, Worrell, and El-Jelly 1995). Given these observed market effects, it is perhaps not surprising that companies themselves often respond to private politics and its threat. One third to one-half of firms targeted by stakeholder actions publicly announce subsequent behavioral changes that are broadly consistent with activist aims (Davidson, Worrell, and El-Jelly 1995; Eesley and Lenox 2006). Other companies voluntarily implement environmental management systems in response to proxy actions and other activist pressures (Gupta and Innes 2009). Effects are not necessarily limited to targeted firms alone. Innes and Sam (2008) find that the average firm in an industry that has been subjected to boycotts is substantially more likely to later participate in voluntary pollution reduction programs, so private political actions may spillover to influence behavior at nontargeted firms as well. In sum, extant evidence supports a role for private politics in the emergence and growth of CSR. The magnitude of the relationship relative to other potential CSR mechanisms, however, remains an important direction for future research.

Public politics offers an additional explanation for CSR as a response to pressures outside of classical market interactions. Economists and policymakers consistently view public monitoring and enforcement as necessary tools to secure compliance with environment, health, and safety regulations.[13] However, public regulator pressures can also spur the beyond compliance behavior necessary to satisfy the economic definition of CSR. A growing survey literature is broadly supportive. Respondents at S&P 500 firms report that second-order environmental practices like total quality management are largely attributable to market factors, but first-order practices

---

[13] Indeed, an empirical economics literature shows that these activities significantly deter subsequent violations at the sanctioned facility and at other facilities in the same jurisdiction (Magat and Viscusi 1990; Gray and Jones 1991; Gray and Deily 1996; Shimshack and Ward 2005).

like environmental staffing, audits, and internal policies are attributable to legal and regulatory factors (Khanna and Anton 2002). Respondents at U.S. and Canadian industrial sources rank the influence of public authorities on environmental performance higher than that of community organizations, activist groups, and the media (Doonan, Lanoie, and Laplant 2005; Delmas and Toffel 2008).

Several empirical economics papers more directly test the conjecture that public regulatory pressures drive CSR provision. Innes and Sam (2008) uncover evidence that plants voluntarily reduce pollution emissions in an effort to improve future interactions with regulators. The authors find that facilities with higher rates of government oversight are more likely to voluntarily participate in a toxics reduction program.[14] Observed behavior seems rational; in the Innes and Sam (2008) study, plants going beyond compliance in one period were rewarded with reduced regulatory oversight in future periods. Similarly, Decker (2003) finds that voluntary pollutant reductions shorten the time it takes firms to subsequently receive permits for major new projects and discharges. Other authors find that when environmental behavior has a stochastic component, plants intentionally overcomply to build a strategic buffer zone against accidental violation and subsequent punishment (Bandyopadhyay and Horowitz 2006; Shimshack and Ward 2008). For example, Shimshack and Ward find that plants with pollution discharges well below permitted levels reduce discharges further beyond compliance when the perceived regulatory threat increases. They also found that likely noncompliant plants respond to increased perceived regulatory threats by reducing discharges well beyond those required to meet statutory requirements alone. To summarize, the evidence supports a role for public politics as an important CSR mechanism.

## 4. *International CSR*

Both the theory and empirics of CSR in an international context are underdeveloped. Transitional economies typically have limited formal regulation, so CSR may be especially important. Further, the institutional challenges inherent in globalization have implications for CSR and its optimality. Firms are becoming increasingly global; for example, the United Nations reports that the number of multinationals grew from 37,000 to 60,000 between 1990 and 2001. Foreign affiliates increased from 170,000 to 800,000 over the same period.

CSR in an international context is related to several significant theoretical questions. Coordination problems across countries weaken the role of government provision of global public goods, suggesting that CSR may gain a comparative advantage. Disparate locations between production, consumption, and ownership establish an elevated role for preference-based CSR mechanisms. Consumers in developed countries may influence environmental and social performance of firms operating in the developing world. A necessary condition for CSR mechanisms to operate across borders is information, and the costs of information acquisition and processing may be increasing in geographic and cultural distance. There may be trade-offs between cost-motivated outsourcing and firm reputation. The quintessential example is backlash from labor-related allegations toward Nike operations in Southeast Asia. Related directions for future theoretical research include the role of NGOs in a globalizing economy with

---

[14] Other authors have found that participation in voluntary environmental programs is driven by perceived regulatory pressures. See Koehler (2007) for a review of the related literature.

CSR, the development policy implications of CSR, and the relationships between CSR and institutions, supply chains, and firm locations.

The empirical literature related to international CSR is more extensive than its theoretic counterpart. Advantages of international, and especially transitional country, empirical explorations are: (1) results are unlikely to be confounded by unobserved public regulation, and (2) nonpublic CSR mechanisms are likely to play larger roles. As Pargal and Wheeler (1996) note, without recourse to legal enforcement of existing regulations (if any), social preferences must translate into behavior via leverage provided by social pressure on workers and managers, adverse publicity, the threat [or use] of violence, recourse to civil law and pressure through politicians, local administrators, or religious leaders. The disadvantage of observational work in developing country contexts is data quality, and results are therefore often subject to concerns about measurement error, omitted variable bias, and reverse causality (Blackman 2010).

Many relevant empirical studies indirectly explore mechanisms for not-for-profit CSR and market mechanisms for strategic CSR. While more research is needed, the evidence to date is not strongly in favor of these mechanisms systematically operating in the international setting. Several studies investigated the relationship between foreign ownership and environmental performance in developing countries, and find inconclusive results. Seroa da Motta (2006) reports a positive relationship in Brazil, Aden, Kyu-Hong, and Rock (1999) finds a negative relationship in Korea, yet others find no significant relationship for several countries in Southeast Asia (Pargal and Wheeler 1996; Hettige et al. 1996). Collectively, the lack of a consistent correlation may suggest no evidence in favor of not-for-profit CSR, either through extrinsic preferences (preferences for public goods in one's own geographic area) or intrinsic preferences (altruistic preferences for public goods in another geographic area). A handful of studies explore the relationship between the environmental performance of firms producing in developing countries and the presence of exports to OECD countries. Again, research generally finds a nonresult (Hettige et al. 1996; Dasgupta, Hettige, and Wheeler 2000; Seroa da Motta 2006). This suggests no evidence that consumer preferences in developed countries influence social performance by producers in developing countries.[15]

The vast majority of the international empirical literature focuses on political mechanisms for strategic CSR, and results generally support a role for politics in developing country contexts. The literature most often studies informal regulation, which satisfies our economic definition of CSR. Quantitative studies that explore the role of community characteristics shed an indirect light on CSR and private politics. The assumption here is that community characteristics such as education, income, and voter turnout proxy for the legal institutions, political organizational ability, freedom, information accessibility, and NGO presence that are necessary to influence firm behavior (Hettige et al. 1996). The literature consistently finds a positive correlation between local income and education and firm environmental performance (Pargal and Wheeler 1996; Hettige et al. 1996; Seroa da Motta 2006). Similarly, Pargal and Wheeler (1996) and Hettige et al. (1996) discover that public firm ownership influences environmental performance,

---

[15] Note that these results are not necessarily relevant to the hypothesis that firms owned by OECD countries impose one internal standard for all of their worldwide operations, since the reviewed empirical literature explores developing country producers owned by both locals and foreigners.

suggesting that public ownership shields firms from community activism. Goldar and Banerjee (2004) also note that voting rates and literacy are positively correlated with water quality in India.

Studies more directly investigating relationships between private politics and CSR include Aden, Ahn, and Rock (1999), which finds that the number of community complaints or firm-community agreements affects abatement expenditures in Korea. Dasgupta, Laplante, and Mamingi (2001) show that capital markets in Argentina, Chile, Mexico, and the Philippines react to citizen complaints and high profile environmental spills. Other authors report that negative environmental news then influences ambient environment quality as well, even when controlling for changes in formal regulation. Surveys administered by Liu (2009) find that managers of Chinese firms report that community and NGO forces are the most important driver of changes related to enthusiastic social behavior like innovation or greening of the supply chain.

Evidence pertaining to public politics is rare. However, existing studies support public regulation as an international CSR mechanism. A growing literature demonstrates that expanding formal regulations with extensive monitoring and enforcement drive environmental performance in transitional economies (Dasgupta et al. 2001; Liu 2009). Yet, it is unclear whether these results reflect increasing compliance or increasing CSR. Aden, Ahn, and Rock (1999) provide some suggestive evidence. They show that Korean regulators appear to engage in a tit for tat strategy with firms, where facilities that perform well are subsequently rewarded with more lenient regulatory oversight and treatment. While more research is needed, the evidence to date supports politics as an important driver of CSR, while other mechanisms receive less backing.

## 5. *Discussion and Conclusions*

This paper provides a coherent framework for the economic analysis of CSR. The literature demonstrates that CSR can only achieve a second-best level of public goods provision. However, it outlines conditions under which CSR may produce higher welfare than public or other private provision channels. Beyond issues of welfare, the literature explores why CSR emerges. Our taxonomy of mechanisms connects and synthesizes formerly disparate approaches under the labels of moral hazard CSR, not-for-profit CSR, and strategic CSR. In short, the match of preferences between shareholders and stakeholders motivates different models with different implications. A broad theoretical result within the strategic CSR framework with heterogeneous preferences is a sorting equilibrium. Others assume exogenous sorting and explore the influence of market and political stakeholders within the CSR sector.

We also connect theoretical propositions with diverse empirical findings from both economic and noneconomic sources. The literature finds no systematic support for the hypothesis that CSR reduces costs, ceteris paribus. Similarly, the literature finds systematic evidence for limited not-for-profit CSR, as a manifestation of either moral hazard or shareholder preferences. For hypotheses related to strategic CSR, the evidence in favor of labor markets as drivers of CSR is mixed. In contrast, studies reveal consistent evidence that consumers bear at least some of the costs. The empirical market demand, however, is not universal, suggesting that theoretical predictions of equilibria with sorting along the CSR dimension are supported by the data. Finally, empirical evidence supports relationships between private and public politics and CSR provision. The empirical magnitudes of these latter effects, however, are poorly understood.

Despite the emergence of a coherent framework for analysis, and despite a number of clear findings, many questions related to the *whether?* and *why?* of corporate social responsibility remain incompletely answered. Most notably, as discussed in Section 4, the entire field of international CSR warrants greater attention. This research may be especially important because the international environment is characterized by limited and incoherent government oversight. The preferences and politics that motivate much of strategic CSR may differ substantively across countries as well. Cross-border externalities and cross-border preferences may interact in nonstandard ways, and therefore the international and especially developing country context is an interesting natural laboratory to explore CSR and its mechanisms. Additionally, empirical results are unlikely to be confounded by unobserved aspects of public regulation.

We have much to learn about the welfare properties of CSR, both absolutely and relative to alternative forms of public goods provision. Key theory questions include: what do different welfare definitions imply about the optimality of CSR? And, what is a good definition of welfare for the analysis of CSR? A limitation of current theoretical welfare measures is that they are confined to a static world with imperfect and incomplete information, ignorance, and/or myopia. A promising direction for future research acknowledges wedges between preferences that determine classic welfare measures and actual welfare outcomes in the real world. In the empirical account, virtually no research even attempts to assess comparative surplus or comparative outcomes between CSR and other channels for the provision of public goods. Consequently, the development of empirical strategies for evaluating welfare is promising.

Several explanations for the emergence of CSR are underdeveloped in the literature. Regarding theory, marketing and advertising studies highlight the possibility that CSR influences preference formation, while economists have traditionally assumed that exogenously formed preferences influence CSR. More complete models might acknowledge two-way causality. Traditional political economy issues such as regulatory capture, overlapping consumers and voters, and CSR as a form of political contribution are largely unexplored. Additionally, future research investigating the implications of CSR for industrial organization broadly and market structure, conduct, and performance more specifically may be promising. Regarding empirics, there is a need for more complete models that simultaneously examine CSR mechanisms and acknowledge their correlations. Most current studies explore one stakeholder or one political mechanism at a time, and so results may be subject to omitted variable bias.

While theoretical analysis lags empirical investigation in an international context, tests of more general CSR hypotheses lag behind theoretical insights. Directions for future research include tests of specific economic CSR hypotheses rather than first-order explorations of relationships between stakeholders, stakeholder characteristics, and CSR. In addition, more attention needs to be paid to the measurement of CSR. Chatterji, Levine, and Toffel (2009) examined the validity of a widely used proxy for corporate environmental responsibility, and they found that ratings may not accurately predict corporate environmental performance. Empirical research in the area should focus on detailed historical performance in addition to convenient summary statistics. A related issue is that very little research explores the actual costs of CSR to firms. Yet, these costs are essential to understanding what CSR represents in the real world.

### References

Aden, Jean, Kyu-Hong Ahn, and Michael T. Rock. 1999. "What Is Driving the Pollution Abatement Expenditure Behavior of Manufacturing Plants in

Korea?" *World Development* 27 (7): 1203–14.

Akerlof, George A., and Rachel E. Kranton. 2000. "Economics and Identity." *Quarterly Journal of Economics* 115 (3): 715–53.

Akerlof, George A., and Rachel E. Kranton. 2005. "Identity and the Economics of Organizations." *Journal of Economic Perspectives* 19 (1): 9–32.

Albinger, Heather Schmidt, and Sarah J. Freeman. 2000. "Corporate Social Performance and Attractiveness as an Employer to Different Job Seeking Populations." *Journal of Business Ethics* 28 (3): 243–53.

Ambec, Stefan, and Philippe Barla. 2006. "Can Environmental Regulations be Good for Business? An Assessment of the Porter Hypothesis." *Review of Energy Studies* 14 (2): 42–62.

Andreoni, James. 1989. "Giving with Impure Altruism: Applications to Charity and Ricardian Equivalence." *Journal of Political Economy* 97 (6): 1447–58.

Anton, Wilma Rose Q., George Deltas, and Madhu Khanna. 2004. "Incentives for Environmental Self-Regulation and Implications for Environmental Performance." *Journal of Environmental Economics and Management* 48 (1): 632–54.

Arora, Seema, and Timothy N. Cason. 1999. "Do Community Characteristics Influence Environmental Outcomes? Evidence from the Toxics Release Inventory." *Southern Economic Journal* 65 (4): 691–716.

Arora, Seema, and Shubhashis Gangopadhyay. 1995. "Toward a Theoretical Model of Voluntary Overcompliance." *Journal of Economic Behavior and Organization* 28 (3): 289–309.

Backhaus, Kristin B., Brett A. Stone, and Karl Heiner. 2002. "Exploring the Relationship between Corporate Social Performance and Employer Attractiveness." *Business and Society* 41 (3): 292–318.

Bagnoli, Mark, and Susan G. Watts. 2003. "Selling to Socially Responsible Consumers: Competition and the Private Provision of Public Goods." *Journal of Economics and Management Strategy* 12 (3): 419–45.

Bandyopadhyay, Sushenjit, and John Horowitz. 2006. "Do Plants Overcomply with Water Pollution Regulations? The Role of Discharge Variability." *B. E. Journal of Economic Analysis and Policy: Topics in Economic Analysis and Policy* 6 (1).

Baron, David P. 2001. "Private Politics, Corporate Social Responsibility, and Integrated Strategy." *Journal of Economics and Management Strategy* 10 (1): 7–45.

Baron, David P. 2007. "Corporate Social Responsibility and Social Entrepreneurship." *Journal of Economics and Management Strategy* 16 (3): 683–717.

Baron, David P. 2008. "Managerial Contracting and Corporate Social Responsibility." *Journal of Public Economics* 92 (1–2): 268–88.

Baron, David P. 2009. "A Positive Theory of Moral Management, Social Pressure, and Corporate Social Performance." *Journal of Economics and Management Strategy* 18 (1): 7–43.

Baron, David P., and Daniel Diermeier. 2007. "Strategic Activism and Nonmarket Strategy." *Journal of Economics and Management Strategy* 16 (3): 599–634.

Baskin, Jeremy, and Kathryn Gordon. 2005. "Corporate Responsibility Practices of Emerging Market Companies." Organisation for Economic Co-operation and Development Working Paper on International Investment 2005/3.

Beavis, Brian, and Ian Dobbs. 1987. "Firm Behaviour under Regulatory Control of Stochastic Environmental Wastes by Probabilistic Constraints." *Journal of Environmental Economics and Management* 14 (2): 112–27.

Beavis, Brian, and Martin Walker. 1983. "Achieving Environmental Standards with Stochastic Discharges." *Journal of Environmental Economics and Management* 10 (2): 103–11.

Becker, Gary S. 1993. "Nobel Lecture: The Economic Way of Looking at Behavior." *Journal of Political Economy* 101 (3): 385–409.

Becker, Randy A. 2004. "Pollution Abatement Expenditure by U.S. Manufacturing Plants: Do Community Characteristics Matter?" *Contributions to Economic Analysis and Policy* 3 (2).

Becker-Olsen, Karen L., B. Andrew Cudmore, and Ronald Paul Hill. 2006. "The Impact of Perceived Corporate Social Responsibility on Consumer Behavior." *Journal of Business Research* 59 (1): 46–53.

Benabou, Roland, and Jean Tirole. 2003. "Intrinsic and Extrinsic Motivation." *Review of Economic Studies* 70 (3): 489–520.

Benabou, Roland, and Jean Tirole. 2006. "Incentives and Prosocial Behavior." *American Economic Review* 96 (5): 1652–78.

Bergstrom, Theodore, Lawrence Blume, and Hal Varian. 1986. "On the Private Provision of Public Goods." *Journal of Public Economics* 29 (1): 25–49.

Besley, Timothy, and Maitreesh Ghatak. 2001. "Government versus Private Ownership of Public Goods." *Quarterly Journal of Economics* 116 (4): 1343–72.

Besley, Timothy, and Maitreesh Ghatak. 2005. "Competition and Incentives with Motivated Agents." *American Economic Review* 95 (3): 616–36.

Besley, Timothy, and Maitreesh Ghatak. 2007. "Retailing Public Goods: The Economics of Corporate Social Responsibility." *Journal of Public Economics* 91 (9): 1645–63.

Bhattacharya, C. B., and Sankar Sen. 2003. "Consumer–Company Identification: A Framework for Understanding Consumers' Relationships with Companies." *Journal of Marketing* 67 (2): 76–88.

Bird, Lori, Claire Kreycik, and Barry Friedman. 2009. "Green Power Marketing in the United States: A Status Report (2008 Data)." National Renewable Energy Laboratory Technical Report NREL/TP-6A2-46581.

Blackman, Allen. 2010. "Alternative Pollution Control Policies in Developing Countries." *Review of Environmental Economics and Policy* 4 (2): 234–53.

Blend, Jeffrey R., and Eileen O. van Ravenswaay. 1999. "Measuring Consumer Demand for Ecolabeled Apples." *American Journal of Agricultural Economics* 81 (5): 1072–77.

Bloom, Paul N., Steve Hoeffler, Kevin Lane Keller, and

Carlos E. Basurto Meza. 2006. "How Social-Cause Marketing Affects Consumer Perceptions." *MIT Sloan Management Review* 47 (2): 49–55.

Bowles, Samuel. 1998. "Endogenous Preferences: The Cultural Consequences of Markets and Other Economic Institutions." *Journal of Economic Literature* 36 (1): 75–111.

Bowles, Samuel, Herbert Gintis, and Melissa Osborne. 2001. "Incentive-Enhancing Preferences: Personality, Behavior, and Earnings." *American Economic Review* 91 (2): 155–58.

Brekke, Kjell Arne, Snorre Kverndokk, and Karine Nyborg. 2003. "An Economic Model of Moral Motivation." *Journal of Public Economics* 87 (9–10): 1967–83.

Brekke, Kjell Arne, and Karine Nyborg. 2004. "Moral Hazard and Moral Motivation: Corporate Social Responsibility as Labor Market Screening." University of Oslo Department of Economics Memorandum 25/2004.

Brown, Tom J., and Peter A. Dacin. 1997. "The Company and the Product: Corporate Associations and Consumer Product Responses." *Journal of Marketing* 61 (1): 68–84.

Buchanan, James M. 1968. "Pure and Impure Public Goods." In *The Demand and Supply of Public Goods*. Chicago: Rand McNally.

Cable, Daniel M., and Timothy A. Judge. 1996. "Person–Organization Fit, Job Choice Decisions, and Organizational Entry." *Organizational Behavior and Human Decision Processes* 67 (3): 294–311.

Calveras, Aleix, Juan-Jose Ganuza, and Gerard Llobet. 2007. "Regulation, Corporate Social Responsibility and Activism." *Journal of Economics and Management Strategy* 16 (3): 719–40.

Camerer, Colin F., and George Loewenstein. 2003. "Behavioral Economics: Past, Present, Future." In *Advances in Behavioral Economics*, ed. Colin F. Camerer, George Loewenstein, and Matthew Rabin, 3–51. New York: Russell Sage Foundation; Princeton and Oxford: Princeton University Press.

Cespa, Giovanni, and Giacinta Cestone. 2007. "Corporate Social Responsibility and Managerial Entrenchment." *Journal of Economics and Management Strategy* 16 (3): 741–71.

Chatterji, Aaron K., David I. Levine, and Michael W. Toffel. 2009. "How Well Do Social Ratings Actually Measure Corporate Social Responsibility?" *Journal of Economics and Management Strategy* 18 (1): 125–69.

Commission of the European Communities. 2002. "Communication from the Commission Concerning Corporate Social Responsibility: A Business Contribution to Sustainable Development." COM (2002) 347.

Dasgupta, Susmita, Hemamala Hettige, and David Wheeler. 2000. "What Improves Environmental Compliance? Evidence from Mexican Industry." *Journal of Environmental Economics and Management* 39 (1): 39–66.

Dasgupta, Susmita, Benoit Laplante, and Nlandu Mamingi. 2001. "Pollution and Capital Markets in Developing Countries." *Journal of Environmental Economics and Management* 42 (3): 310–35.

Dasgupta, Susmita, Benoit Laplante, Nlandu Mamingi, and Hua Wang. 2001. "Inspections, Pollution Prices, and Environmental Performance: Evidence from China." *Ecological Economics* 36 (3): 487–98.

Dasgupta, Susmita, Benoit Laplante, Hua Wang, and David Wheeler. 2002. "Confronting the Environmental Kuznets Curve." *Journal of Economic Perspectives* 16 (1): 147–68.

Davidson, Wallace N., Dan L. Worrell, and Abuzar El-Jelly. 1995. "Influencing Managers to Change Unpopular Corporate Behavior through Boycotts and Divestitures: A Stock Market Test." *Business and Society* 34 (2): 171–96.

Davis, Gerald F., Marina V. N. Whitman, and Mayer N. Zald. 2008. "The Responsibility Paradox." *Stanford Social Innovation Review* 6 (1): 30–37.

Decker, Christopher S. 2003. "Corporate Environmentalism and Environmental Statutory Permitting." *Journal of Law and Economics* 46 (1): 103–29.

Delmas, Magali A., and Michael W. Toffel. 2008. "Organizational Responses to Environmental Demands: Opening the Black Box." *Strategic Management Journal* 29 (10): 1027–55.

DiMaggio, Paul J., and Walter W. Powell. 1983. "The Iron Cage Revisited: Institutional Isomorphism and Collective Rationality in Organizational Fields." *American Sociological Review* 48 (2): 147–60.

Doonan, Julie, Paul Lanoie, and Benoit Laplante. 2005. "Determinants of Environmental Performance in the Canadian Pulp and Paper Industry: An Assessment from Inside the Industry." *Ecological Economics* 55 (1): 73–84.

Dowell, Glen, Stuart Hart, and Bernard Yeung. 2000. "Do Corporate Global Environmental Standards Create or Destroy Market Value?" *Management Science* 46 (8): 1059–74.

Earnhart, Dietrich. 2004. "The Effects of Community Characteristics on Polluter Compliance Levels." *Land Economics* 80 (3): 408–32.

Eesley, Charles, and Michael J. Lenox. 2006. "Firm Responses to Secondary Stakeholder Action." *Strategic Management Journal* 27 (8): 765–81.

Eichholtz, Piet, Nils Kok, and John M. Quigley. Forthcoming. "Doing Well by Doing Good? Green Office Buildings." *American Economic Review*.

Environics International. 1999. "The Millennium Poll on Corporate Social Responsibility: Executive Brief." Toronto: Environics International.

Fleishman–Hillard and the National Consumers League. 2007. "Rethinking Corporate Social Responsibility." http://fleishmanhillard.com/wp-content/uploads/2007/05/csr_white_paper.pdf.

Fombrun, Charles, and Mark Shanley. 1990. "What's in a Name? Reputation Building and Corporate Strategy." *Academy of Management Journal* 33 (2): 233–58.

Freeman, R. Edward. 1984. *Strategic Management: A Stakeholder Approach*. Boston: Pittman-Ballinger.

Friedman, Milton. 1970. "The Social Responsibility of Business Is to Increase Its Profits." *The New York Times*, September 13: 32–33, 122–26.

Frye, Melissa B., Edward Nelling, and Elizabeth Webb. 2006. "Executive Compensation in Socially Responsible Firms." *Corporate Governance* 14 (5): 446–55.

Goddeeris, John H. 1988. "Compensating Differentials and Self-Selection: An Application to Lawyers." *Journal of Political Economy* 96 (2): 411–28.

Goett, Andrew A., Kathleen Hudson, and Kenneth E. Train. 2000. "Customers' Choice among Retail Energy Suppliers: The Willingness-to-Pay for Service Attributes." *Energy Journal* 21 (1): 1–28.

Goldar, Bishwanath, and Nandini Banerjee. 2004. "Impact of Informal Regulation of Pollution on Water Quality in Rivers in India." *Journal of Environmental Management* 73 (2): 117–30.

Graff Zivin, Joshua, and Arthur Small. 2005. "A Modigliani–Miller Theory of Altruistic Corporate Social Responsibility." *B. E. Journal of Economic Analysis and Policy: Topics in Economic Analysis and Policy* 5 (1).

Grant, Don, and Andrew W. Jones. 2004. "Do Foreign-Owned Plants Pollute More? New Evidence from the U.S. EPA Toxics Release Inventory." *Society and Natural Resources* 17 (2): 171–79.

Grant, Don, Andrew W. Jones, Mary Nell Trautner. 2004. "Do Facilities with Distant Headquarters Pollute More? How Civic Engagement Conditions the Environmental Performance of Absentee Managed Plants." *Social Forces* 83 (1): 189–214.

Gray, Wayne B., and Mary E. Deily. 1996. "Compliance and Enforcement: Air Pollution Regulation in the U.S. Steel Industry." *Journal of Environmental Economics and Management* 31 (1): 96–111.

Gray, Wayne B., and Carol Adaire Jones. 1991. "Are OSHA Health Inspections Effective? A Longitudinal Study in the Manufacturing Sector." *Review of Economics and Statistics* 73 (3): 504–08.

Greening, Daniel W., and Daniel B. Turban. 2000. "Corporate Social Performance as a Competitive Advantage in Attracting a Quality Workforce." *Business and Society* 39 (3): 254–80.

Grossman, Gene M., and Alan B. Krueger. 1993. "Environmental Impacts of a North American Free Trade Agreement." In *The Mexico–U.S. Free Trade Agreement*, edited by Peter M. Garber, 13–56. Cambridge and London: MIT Press.

Grossman, Sanford J., and Oliver D. Hart. 1986. "The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration." *Journal of Political Economy* 94 (4): 691–719.

Gupta, Sonam, and Robert Innes. 2009. "Determinants and Environmental Impact of Private Politics: An Empirical Analysis." Unpublished.

Hamilton, James T. 1995. "Pollution as News: Media and Stock Market Reactions to the Toxics Release Inventory Data." *Journal of Environmental Economics and Management* 28 (1): 98–113.

Hart, Oliver D., and John Moore. 1990. "Property Rights and the Nature of the Firm." *Journal of Political Economy* 98 (6): 1119–58.

Henriques, Irene, and Perry Sadorsky. 1996. "The Determinants of an Environmentally Responsive Firm: An Empirical Approach." *Journal of Environmental Economics and Management* 30 (3): 381–95.

Hettige, Hemamala, Mainul Huq, Sheoli Pargal, and David Wheeler. 1996. "Determinants of Pollution Abatement in Developing Countries: Evidence from South and Southeast Asia." *World Development* 24 (12): 1891–1904.

Holtmann, A. G., and Todd L. Idson. 1993. "Wage Determination of Registered Nurses in Proprietary and Nonprofit Nursing Homes." *Journal of Human Resources* 28 (1): 55–79.

Innes, Robert, and Abdoul G. Sam. 2008. "Voluntary Pollution Reductions and the Enforcement of Environmental Law: An Empirical Study of the 33/50 Program." *Journal of Law and Economics* 51 (2): 271–96.

Ipsos MORI. 2003. "Ethical Companies." http://www.ipsos-mori.com/researchpublications/researcharchive/849/Ethical-Companies.aspx.

Jaffe, Adam B., Steven R. Peterson, Paul R. Portney, and Robert N. Stavins. 1995. "Environmental Regulation and the Competitiveness of U.S. Manufacturing: What Does the Evidence Tell Us?" *Journal of Economic Literature* 33 (1): 132–63.

Jensen, Michael C. 2002. "Value Maximization, Stakeholder Theory, and the Corporate Objective Function." *Business Ethics Quarterly* 12 (2): 235–56.

Johnston, Robert J., and Cathy A. Roheim. 2006. "A Battle of Taste and Environmental Convictions for Ecolabeled Seafood: A Contingent Ranking Experiment." *Journal of Agricultural and Resource Economics* 31 (2): 283–300.

Kagan, Robert A., Neil Gunningham, and Dorothy Thornton. 2003. "Explaining Corporate Environmental Performance: How Does Regulation Matter?" *Law and Society Review* 37 (1): 51–90.

Kathuria, Vinish. 2007. "Informal Regulation of Pollution in a Developing Country: Evidence from India." *Ecological Economics* 63 (2–3): 403–17.

Khanna, Madhu, and Wilma Rose Q. Anton. 2002. "What Is Driving Corporate Environmentalism: Opportunity or Threat?" *Corporate Environmental Strategy* 9 (4): 409–17.

Kitzmueller, Markus. 2008. "Incentives and Corporate Provision of Public Goods." Unpublished.

Klassen, Robert D., and Curtis P. McLaughlin. 1996. "The Impact of Environmental Management on Firm Performance." *Management Science* 42 (8): 1199–1214.

Klein, Jill Gabrielle, N. Craig Smith, and Andrew John. 2004. "Why We Boycott: Consumer Motivations for Boycott Participation." *Journal of Marketing* 68 (3): 92–109.

Koehler, Dinah A. 2007. "The Effectiveness of Voluntary Environmental Programs—A Policy at a Crossroads?" *Policy Studies Journal* 35 (4): 689–722.

Kotchen, Matthew J. 2006. "Green Markets and Private Provision of Public Goods." *Journal of Political*

*Economy* 114 (4): 816–34.

Kotler, Philip, and Nancy Lee. 2004a. *Corporate Social Responsibility: Doing the Most Good for Your Company and Your Cause*. Hoboken, N.J.: Wiley.

Kotler, Philip, and Nancy Lee. 2004b. "Best of Breed." *Stanford Social Innovation Review* 1 (4): 14–23.

Leete, Laura. 2001. "Whither the Nonprofit Wage Differential? Estimates from the 1990 Census." *Journal of Labor Economics* 19 (1): 136–70.

Leire, Charlotte, and Åke Thidell. 2005. "Product-Related Environmental Information to Guide Consumer Purchases—A Review and Analysis of Research on Perceptions, Understanding and Use among Nordic Consumers." *Journal of Cleaner Production* 13 (10–11): 1061–70.

Liston-Heyes, Catherine, and Gwen C. Ceton. 2007. "Corporate Social Performance and Politics: Do Liberals Do More?" *Journal of Corporate Citizenship* 25: 95–108.

Liu, Yong. 2009. "Investigating External Environmental Pressure on Firms and Their Behavior in Yangtze River Delta of China." *Journal of Cleaner Production* 17 (16): 1480–86.

Locke, Richard M. 2002. "Note on Corporate Citizenship in a Global Economy." Massachusetts Institute of Technology Industrial Performance Center Working Paper IPC-02-008.

Lockett, Andy, Jeremy Moon, and Wayne Visser. 2006. "Corporate Social Responsibility in Management Research: Focus, Nature, Salience and Sources of Influence." *Journal of Management Studies* 43 (1): 115–36.

Loureiro, Maria L. 2003. "Rethinking New Wines: Implications of Local and Environmentally Friendly Labels." *Food Policy* 28 (5–6): 547–60.

Loureiro, Maria L., and Susan Hine. 2002. "Discovering Niche Markets: A Comparison of Consumer Willingness to Pay for Local (Colorado Grown), Organic, and GMO-Free Products." *Journal of Agricultural and Applied Economics* 34 (3): 477–87.

Loureiro, Maria L., and Justus Lotade. 2005. "Do Fair Trade and Eco-Labels in Coffee Wake Up the Consumer Conscience?" *Ecological Economics* 53 (1): 129–38.

Lusk, Jayson L., Mustafa Jamal, Lauren Kurlander, Maud Roucan, and Lesley Taulman. 2005. "A Meta-analysis of Genetically Modified Food Valuation Studies." *Journal of Agricultural and Resource Economics* 30 (1): 28–44.

Lyon, Thomas P., and John W. Maxwell. 2004. *Corporate Environmentalism and Public Policy*. Cambridge and New York: Cambridge University Press.

Lyon, Thomas P., and John W. Maxwell. Forthcoming. "Greenwash: Corporate Environmental Disclosure under Threat of Audit." *Journal of Economics and Management Strategy*.

Magat, Wesley A., and W. Kip Viscusi. 1990. "Effectiveness of the EPA's Regulatory Enforcement: The Case of Industrial Effluent Standards." *Journal of Law and Economics* 33 (2): 331–60.

Maignan, Isabelle, and O. C. Ferrell. 2001. "Corporate Citizenship as a Marketing Instrument—Concepts, Evidence and Research Directions." *European Journal of Marketing* 35 (3–4): 457–84.

Margolis, Joshua D., Hillary Anger Elfenbein, and James P. Walsh. 2007. "Does It Pay to Be Good? A Meta-analysis and Redirection of Research on the Relationship between Corporate Social and Financial Performance." Unpublished.

Margolis, Joshua D., and James P. Walsh. 2003. "Misery Loves Companies: Rethinking Social Initiatives by Business." *Administrative Science Quarterly* 48 (2): 268–305.

Marquis, Christopher, Mary Ann Glynn, and Gerald F. Davis. 2007. "Community Isomorphism and Corporate Social Action." *Academy of Management Review* 32 (3): 925–45.

Maxwell, John W., Thomas P. Lyon, and Steven C. Hackett. 2000. "Self-Regulation and Social Welfare: The Political Economy of Corporate Environmentalism." *Journal of Law and Economics* 43 (2): 583–617.

McWilliams, Abagail, and Donald S. Siegel. 2001. "Corporate Social Responsibility: A Theory of the Firm Perspective." *Academy of Management Review* 26 (1): 117–27.

McWilliams, Abagail, Donald S. Siegel, and Patrick W. Wright. 2006. "Corporate Social Responsibility: Strategic Implications." *Journal of Management Studies* 43 (1): 1–18.

Mocan, H. Naci, and Erdal Tekin. 2003. "Nonprofit Sector and Part-Time Work: An Analysis of Employer–Employee Matched Data on Child Care Workers." *Review of Economics and Statistics* 85 (1): 38–50.

Mohr, Lois A., and Deborah J. Webb. 2005. "The Effects of Corporate Social Responsibility and Price on Consumer Responses." *Journal of Consumer Affairs* 39 (1): 121–47.

Mohr, Lois A., Deborah J. Webb, and Katherine E. Harris. 2001. "Do Consumers Expect Companies to Be Socially Responsible? The Impact of Corporate Social Responsibility on Buying Behavior." *Journal of Consumer Affairs* 35 (1): 45–72.

Navarro, Peter. 1988. "Why Do Corporations Give to Charity?" *Journal of Business* 61 (1): 65–93.

Pargal, Sheoli, and David Wheeler. 1996. "Informal Regulation of Industrial Pollution in Developing Countries: Evidence from Indonesia." *Journal of Political Economy* 104 (6): 1314–27.

Pasurka, Carl. 2008. "Perspectives on Pollution Abatement and Competitiveness: Theory, Data, and Analyses." *Review of Environmental Economics and Policy* 2 (2): 194–218.

Paton, David, and Donald S. Siegel. 2005. "The Economics of Corporate Social Responsibility: An Overview of the Special Issue." *Structural Change and Economic Dynamics* 16 (3): 309–12.

Peterson, Dane K. 2004. "The Relationship between Perceptions of Corporate Citizenship and Organizational Commitment." *Business and Society* 43 (3): 296–319.

Porter, Michael E. 1991. "America's Green Strategy." *Scientific American* 264 (4): 168.

*Journal of Economic Literature, Vol. L (March 2012)*

Porter, Michael E., and Claas van der Linde. 1995. "Toward a New Conception of the Environment–Competitiveness Relationship." *Journal of Economic Perspectives* 9 (4): 97–118.

Preston, Anne E. 1989. "The Nonprofit Worker in a For-Profit World." *Journal of Labor Economics* 7 (4): 438–63.

Pruitt, Stephen W., and Monroe Friedman. 1986. "Determining the Effectiveness of Consumer Boycotts: A Stock Price Analysis of Their Impact on Corporate Targets." *Journal of Consumer Policy* 9 (4): 375–87.

Pruitt, Stephen W., K. C. John Wei, and Richard E. White. 1988. "The Impact of Union-Sponsored Boycotts on the Stock Prices of Target Firms." *Journal of Labor Research* 9 (3): 285–89.

Reinhardt, Forest L., Robert N. Stavins, and Richard H. K. Vietor. 2008. "Corporate Social Responsibility through an Economic Lens." National Bureau of Economic Research Working Paper 13989.

Roe, Brian, Mario F. Teisl, Alan Levy, and Matthew Russell. 2001. "US Consumer's Willingness to Pay for Green Electricity." *Energy Policy* 29 (11): 917–25.

Rose-Ackerman, Susan. 1996. "Altruism, Nonprofits, and Economic Theory." *Journal of Economic Literature* 34 (2): 701–28.

Rowley, Timothy J. 1997. "Moving Beyond Dyadic Ties: A Network Theory of Stakeholder Influences." *Academy of Management Review* 22 (4): 887–910.

Ruhm, Christopher J., and Carey Borkoski. 2003. "Compensation in the Nonprofit Sector." *Journal of Human Resources* 38 (4): 992–1021.

Samuelson, Paul A. 1954. "The Pure Theory of Public Expenditure." *Review of Economics and Statistics* 36 (4): 387–89.

Scherer, Andreas Georg, and Guido Palazzo. 2008. "Globalization and Corporate Social Responsibility." In *The Oxford Handbook of Corporate Social Responsibility*, edited by Andrew Crane, Abagail McWilliams, Dirk Matten, Jeremy Moon, and Donald S. Siegel, 413–31. Oxford and New York: Oxford University Press.

Sen, Sankar, and C. B. Bhattacharya. 2001. "Does Doing Good Always Lead to Doing Better? Consumer Reactions to Corporate Social Responsibility." *Journal of Marketing Research* 38 (2): 225–43.

Seroa da Motta, Ronaldo. 2006. "Analyzing the Environmental Performance of the Brazilian Industrial Sector." *Ecological Economics* 57 (2): 269–81.

Shimshack, Jay P., and Michael B. Ward. 2005. "Regulator Reputation, Enforcement, and Environmental Compliance." *Journal of Environmental Economics and Management* 50 (3): 519–40.

Shimshack, Jay P., and Michael B. Ward. 2008. "Enforcement and Over-Compliance." *Journal of Environmental Economics and Management* 55 (1): 90–105.

Siegel, Donald S., and Donald F. Vitaliano. 2007. "An Empirical Analysis of the Strategic Use of Corporate Social Responsibility." *Journal of Economics and Management Strategy* 16 (3): 773–92.

Simon, Herbert A. 1991. "Organizations and Markets." *Journal of Economic Perspectives* 5 (2): 25–44.

Social Investment Forum Industry Research Program. 2006. "2005 Report on Socially Responsible Investing Trends in the United States: 10-Year Review." Washington, D.C.: Social Investment Forum.

Stigler, George J. 1962. "Information in the Labor Market." *Journal of Political Economy* 70 (5 Part 2): 94–105.

Stiglitz, Joseph E. 1993. "Post Walrasian and Post Marxian Economics." *Journal of Economic Perspectives* 7 (1): 109–14.

Stiglitz, Joseph E. 2002. "Information and the Change in the Paradigm in Economics." *American Economic Review* 92 (3): 460–501.

The Economist. 2008. "Just Good Business: A Survey of Corporate Social Responsibility." *The Economist*. January 19.

Turban, Daniel B., and Daniel W. Greening. 1996. "Corporate Social Performance and Organizational Attractiveness to Prospective Employees." *Academy of Management Journal* 40 (3): 658–72.

Vogel, David. 2005. *The Market for Virtue: The Potential and Limits of Corporate Social Responsibility*. Washington, D.C.: Brookings Institution Press.

Wartick, Steven L., and Philip L. Cochran. 1985. "The Evolution of the Corporate Social Performance Model." *Academy of Management Review* 10 (4): 758–69.

Wood, Donna J. 1991. "Social Issues in Management: Theory and Research in Corporate Social Performance." *Journal of Management* 17 (2): 383–406.

Wright, Peter, Stephen P. Ferris, Janine S. Hiller, and Mark Kroll. 1995. "Competitiveness through Management of Diversity: Effects on Stock Price Valuation." *Academy of Management Journal* 38 (1): 272–87.

Exhibit B-8



Federal Reserve
Bank of Dallas

# The Effects of Competition in the Retail Gasoline Industry

Reid Taylor and Erich Muehlegger

**Working Paper 2509**                    **March 2025**

Research Department

https://doi.org/10.24149/wp2509

Working papers from the Federal Reserve Bank of Dallas are preliminary drafts circulated for professional comment. The views in this paper are those of the authors and do not necessarily reflect the views of the Federal Reserve Bank of Dallas or the Federal Reserve System. Any errors or omissions are the responsibility of the authors.

# The Effects of Competition in the Retail Gasoline Industry[*]

Reid Taylor[†] and Erich Muehlegger[‡]

February 26, 2025

### Abstract

We estimate the effect of competition on incumbent firm pricing by using high frequency price data and the precise geographic location for all gas stations in California. Using an event study design, we find that the entry of a new station is associated with a 2.5 cent decrease in prices at incumbent stores, which equates to a 7% reduction in estimated retail markups. The effects are immediate, persistent, and show no sign of deterrence or limit pricing behavior. In contrast, nearby exit results in precisely estimated null effects on prices with no evidence of predatory pricing in the lead up to the station departure. We show that these results are consistent across all fuel blends, dissipate with distance, and are driven by less concentrated markets. Finally, we explore the asymmetric effects, showing that the difference cannot be attributed to difference in branding, proximity to highway, or data quality idiosyncrasies, although we find suggestive evidence that exit tends to happen in more competitive markets and amongst less heavily trafficked stations.

**JEL codes:** D40, L11, L81, Q41, R32

**Keywords:** competition, entry, exit, retail gasoline, market structure

---

[*] The views expressed here should not be interpreted as reflecting the opinions of the Federal Reserve Bank of Dallas or the Federal Reserve System.

[†] Corresponding author: Reid Taylor, Federal Reserve Bank of Dallas, Research Department, 2200 N. Pearl St., Dallas, TX 75201, USA. Email: reidbtaylor@gmail.com.

[‡] Erich Muehlegger, University of California, Davis and NBER, Department of Economics, 1 Shields Ave., Davis, CA 95616, USA. Email: emuehlegger@ucdavis.edu.

# 1   Introduction

The competitive effect of entry and exit is a central question in industrial organization. Although most models of competition predict that increased competition tends to lower prices, the impact of changes in competition depends on the nature of competition, as does the symmetry or asymmetry between the effects of entry and exit. In this paper, we estimate the effects of station entry and exit in local markets for retail gasoline in California. Quantifying the extent of these effects is of direct policy importance, given immediate concerns about high gasoline prices and competition within the state and longer-run interest in understanding how a shift towards alternative fuel vehicles might impact retail gasoline prices. Yet, theory on the relationship between market composition, entry, and prices in retail fuel markets provides ambiguous guidance ((Barron et al. 2004)). Moreover, empirically estimating the impact of changes in market size in this setting has traditionally been a challenge due to the endogeneity of market structure. Profit maximizing firms are attracted to markets with higher prices and profit margins. Moreover, entering and exiting firms might differ on both observable and unobservable characteristics. Endogenous selection biases cross-sectional estimates for the causal effect of market size on price ((Tappata and Yan 2017)).

To calculate the reduced-form causal effect of market size, we use a panel of daily station-level prices and the precise geographic location for the universe of California gas stations from 2014-2018 with geographic and temporal variation in exposure to changes in the number of nearby competitors through entry and exit. The resulting data set includes over 700 new station entry and station exit events and 35 million price observations. In the spirit of Arcidiacono et al. (2020), we use both difference-in-differences and event-study designs to compare the change in prices at incumbent stations before and after a competing station enters or exits the market, using stations that do not face entry or exit as the control group. We are able to control for the endogenous location decision of entering and exiting firms by including a rich panel of station and day-of-sample fixed effects and, city-specific linear time trends. Under the assumption that the exact

1

timing of the entry or exit events is conditionally exogenous, the coefficient is identified by within-station variation in the number of nearby competitors. Our event study results support this key identifying assumption – markets with and without entry or exit follow parallel trends in the periods leading up to the respective event. In addition, we find little evidence of turnover, that the effect of entry or exit on competition is attenuated by entry or exit of other stations in the periods preceding, following, or simultaneous with the original entry and exit.

We find that increased market competition reduces prices, but that the effects of entry and exit are asymmetric. Entry of a new gas station nearby is associated with a 2.5 cent reduction in gas prices at nearby (less than 1 mile away) incumbent stations, representing a 7% reduction in average retail markups over the sample period. Our event study specification highlights that the effect of entry is immediate, occurring the month following the entry event, and persistent, lasting for years. It is present for all grades of gasoline and attenuates with the distance between the incumbent stations and the entrant, consistent with prior literature on the tight spatial nature of retail gasoline competition. Lastly, we find suggestive evidence of heterogeneity across types of stations – notably, that high volume hypermart stations (i.e. Costco) have a stronger entry effect on incumbents than branded and unbranded entrants.

In sharp contrast, we estimate precise null effects of station exit on nearby incumbent station pricing. Across grades, distances and station types, we find little evidence that exit events lead incumbent stations to raise prices. We explore this asymmetry by comparing the nature of entry and exit events. We find little evidence that the asymmetry in the effect of entry and exit is attributable to observable station characteristics or to the identification of entry and exit events. But we do find evidence that entry events tend to occur in more concentrated markets, where we estimate the impact of a change in competition to be greater. In addition, we find suggestive evidence that the exiting stations differ from incumbent (or entering) stations on unobservable dimensions, as reflected by the frequency of missing pricing observations pre-exit. If, prior to exit, these low-reporting stations tend to exert less competitive pressure on neighboring firms, their exit might not impact prices.

2

Our work contributes to a recent, growing literature that uses station-level data to estimate the effect of market size on retail fuel prices. Although there has long been interest in entry and exit in retail fuel markets, (e.g., (Barron et al. 2004, Tappata and Yan (2017)), estimation, in the spirit of Arcidiacono et al. (2020), has until recently been limited by a lack of granular price data in settings with changes in market structure ((Haucap et al. 2017)). Here, our work complements a growing series of papers that estimate the effect of station entry in Spain (Bernardo (2018), González and Moral (2023)), Germany ((Fischer et al. 2023)), Mexico ((Davis et al. 2023)) and Australia (Ormosi et al. (2024)) using high-frequency administrative data. We contribute to this literature in two respects.

First, recent papers focus almost exclusively on the impact of station entry on prices. Our paper provides some of the first evidence of the effect of both entry and *exit* events and is the first (to our knowledge) to highlight the asymmetry in the impacts of station entry and exit on incumbent prices.[1] Our focus on the asymmetric response to entry and exit complements the recent work by Ormosi et al. (2024), who study entry and exit effects in Western Australia, but focus on how the magnitude of entry and exit events relates to the income level of the local market.

The asymmetry in the impact of entry and exit is particularly relevant in light of the broader energy transition away from fossil fuels. As society moves towards reducing its reliance on fossil fuels, quantifying how markets will be impacted by a shift towards electrified transportation is paramount. Although gasoline demand is expected to decrease over time as the market penetration of electric vehicles increases, millions of gasoline-powered cars will still be operating on California's roads in the years to come. Our paper offers some preliminary insight into the potential short-term effects of market structure on the gasoline prices should the energy transition leads to falling demand for liquid transportation fuels and modest station exit. If, as our findings suggest, exiting stations have little impact on incumbent pricing, the short-term impacts of station exit might be muted.

---

[1]Although we are not aware of other papers that focus upon the asymmetric effects of entry and exit in retail gasoline, the asymmetric speed with which gasoline prices rise and fall, termed rockets and feathers, has long been studied. (see e.g., Borenstein et al. (1997), Lewis and Noel (2011))

In a related vein, an increasing number of local jurisdictions are seeking to impose supply-side restrictions as part of the energy transition. Starting with Petaluma in 2021, a number of local jurisdictions in California have banned the construction of new gas stations and restricted the expansion of existing stations. Although we find limited impacts of station exit, our results suggest that banning *entry* of new stations would lead to counterfactually higher prices.

Second, our work provides the first event-study-based causal estimates of the effect of market size and station entry on pricing in California. As such, our work contributes to the understanding of competition and market power in the California gasoline market. For the past two decades, gasoline in California has been significantly more expensive than gasoline in the rest of the country, after accounting for higher excise taxes, state-specific environmental regulations[2], and high entry costs due to zoning laws and high land values. This gap has drawn scrutiny from academics (e.g., (Borenstein et al. 2004) examines wholesale market power, (Hastings 2004; Taylor et al. 2010) examine vertical mergers, among others) and spurred investigations from the California Energy Commission[3] and the California Department of Justice[4]. In particular, the California Energy Commission report concludes that over the last several decades "the primary cause of the residual price increase is simply that California's retail gasoline outlets are charging higher prices" Although we find that incumbents lower their prices after the entry of a new competitor, the effect sizes are modest relative to the residual price gap estimated by the CEC.

The paper proceeds as follows: Section 2 presents the data used in the empirical study, Section 3 discusses the empirical strategy, Section 4 presents the estimation results, Section 5 discusses robustness and extensions, and Section 6 concludes.

---

[2]For three decades, stations in California, by regulation, must sell a special blend of gasoline (CARBOB), distinct from the fuel sold in surrounding states. California's unique gasoline blend regulations are served almost exclusively by the few in-state refineries.

[3]https://www.energy.ca.gov/sites/default/files/2019-11/Gas_Price_Report.pdf

[4]https://oag.ca.gov/antitrust/gasoline

## 2  Data

To calculate the effect of entry and exit on pricing, we analyze a panel of daily retail gasoline prices in California from the Oil Price Information Service (OPIS) covering the years 2014-2018. We observe daily prices for each fuel blend with the precise geographic coordinates for each station and a unique site identifier linked to each station's geographic location. The identifier remains consistent when a store undergoes renovations, changes ownership, or changes store or fuel branding, allowing us to not confound station changes that do not alter the number of competitors in the market with entry or exit. For convenience, in the rest of the paper we use the terminology "station" to refer to the unique site where a gas station is located.

The data include information on 9,716 stations in California. We exclude stations with less than 14 total price observations over the 4-year sample period as well as four stations for which geographic coordinates are unavailable. This results in a panel of 9,539 stations, with over 35 million price observations across the three major grades of gasoline.

The OPIS data also reports the brand of fuel sold at each station. We follow the California Energy Commission in classifying brands into three categories.[5] "Branded" stations sell gasoline under the brand of a company that refines petroleum products, specifically Chevron, Shell, 76, Exxon Mobil, and Valero. Branded fuels are marketed to consumers using refining company signage and include proprietary additives that are blended into the fuel.[6] The term "unbranded" refers to gasoline sales that are sold under brands other than that of the refining company. Unbranded stations purchase gasoline from suppliers at the "rack" (i.e., wholesale terminal) and are not contractually obligated to purchase branded gasoline from a specific refiner. Finally, we use the term "hypermart" to refer to gasoline sold by Costco, Walmart, Sam's Club, Safeway or other large retailers.

---

[5] https://www.energy.ca.gov/sites/default/files/2020-02/2020-01_Petroleum_Watch.pdf

[6] Although we observe the brand under which gasoline is sold, we do not observe the whether the store is independently owned, franchised, directly owned by a petroleum company or sells gasoline under the brand on a consignment basis.

Figure 1: Price Observations by Station: 2014-2018



(a) Observation Count                    (b) % of Potential Observation

Notes: Data sourced from the Oil Price Information Service (OPIS)

Prices in OPIS are collected through monitored fleet credit card transactions, customer reports, and direct feeds from stations. OPIS reports prices for three gasoline grades—regular, mid-grade, and premium—which correspond to 87, 89, and 91 octane levels in California. OPIS reports a single price per station per day for each fuel type. However, a price is not observed every day for each station or each fuel blend sold. Panel (a) of Figure 1 shows the distribution of observation counts by station for the sample period 2014-2018 (1,825 days) for regular gasoline. Data coverage is high, with the median store having 1,756 prices reported. In fact, 75% of stores report more than 1,500 price observations over the sample period. To account for differential start and stop dates across stations during the sample period, Panel (b) of Figure 1 displays the number of price observations as a percent of potential reporting days for each station using the number of days spanned between the first and last price observations as the denominator. The median station reports prices for 97% of its respective sample period, and 75% of stations have prices reported on more than 86% of potential days.

## 2.1  Classification of Entering and Exiting Stations

To our knowledge, there does not exist an official public source of gas station operation dates in California.[7]  We therefore leverage the high frequency of the OPIS data to identify entering or exiting stations. Conceptually, we classify entering or exiting stations based on the date of the first or last observed price.[8]  We use the location IDs assigned by OPIS to track each station over time. The location IDs allow us to create a continuous series for each station, even if the station rebrands or is renovated.

Figure 2: Month of First and Last Observation by Station



(a) First Observation                                 (b) Last Observation

Notes: Data sourced from Oil Price Information Service (OPIS)

For each station, we determine the date of the earliest price observation and the date of the last observed price during our sample period. Figure 2 graphs the number of stations by month of the first price observation in panel (a) and the number of stations by month of the last observation in panel (b). Panel (a) excludes January 2014 and panel (b) excludes December 2018 since the overwhelming majority of first and last observations fall in these two months, as to be expected.

---

[7]while business permit data or underground tank information can be used to locate stations, these sources lack the pertinent temporal component of on-site business operations which is the relevant metric of entry and exit for competing firms. State tax data on gas stations are reported at the owner level, and thus do not contain store-level information across multiple stores under the same ownership. State surveys conducted by the California Energy Commissions are annual, lacking any information on the date of entry or exit.

[8]In this design, stations that go dormant for a period but later resume reporting prices during the sample are not considered as an exit followed by a subsequent re-entry.

Classifying entry and exit based on the first and last date of reported prices creates three potential sources of measurement error. First, for entering and exiting stations, we might misestimate the exact date of entry or exit if the date of entry or exit does not align with the start or end of price reporting. Due to the high frequency and coverage of the OPIS data and the multiple ways in which the OPIS data is collected (through transaction data, crowd-sourced reporting, and brand partnerships), we think this is unlikely to significantly bias our results. After our calculated entry date or prior to our calculated exit date, the median station classified as entering or exiting reports prices on 78% of days.

Second, because prices are not reported for every station, every single day, a non-entering or -exiting station might appear to enter the sample after January 1, 2014 or leave the sample before December 31, 2018. Inappropriately classifying these stations as entrants and exits would attenuate our results. To mitigate the likelihood of false-positives, we classify a station as an entrant if the station has an initial price observation after March 1, 2014. Likewise, we classify a station as exiting the market if we last observe a reported price for the station before November 1, 2018.[9] This results in 484 unique stations having an entry date during the sample and 348 unique station exits.

Finally, there is also the possibility that a station goes unreported to OPIS and, consequently, never appears in our data. To assess this possibility, we validate the OPIS data by bench-marking the number of stations and the change in the number of stations over time against two other measures for California: The Census Bureau's County Business Patterns data and the estimated number of stations calculated by the California Energy Commission. The County Business Patterns data reports the number of businesses as of the week of March 12th of the appropriate year broken out by NAICS code. The data show a *net* increase of 228 gas stations in California from March 2014-March 2019. The CEC also undertakes an effort to estimate the number of stations in California based on returns from the A15 survey and other government data sources. For the same period, the CEC estimates a net increase of 190 stations in the state and around 10,000 gas stations in total,

---

[9]As a robustness check, we replicate our analysis using even more conservative bounds – six months from the start and end of our sample period and find qualitatively identical results.

virtually identical to our calculations based on the OPIS data.

## 2.2  Patterns of Entry and Exit

Using the entry date, exit date, and geographic location for each station, we define the relevant market as the 1-mile radius circle around a station and calculate the number of competing stations at the station-date level.[10] Panel (a) of Figure 3 shows the number of entry events within 1 mile experienced by incumbent stations, conditional on experiencing at least 1 entry event. While 85% of stations do not experience a market entry during the sample period, experiencing multiple entries is also rare as 88% of stations that do experience entry only have 1 entrant during the sample period. Similarly, in Panel (b), 85% of stations do not experience a nearby exit, and 87% of those that do, only experience a single exit. To avoid contamination of our estimated effects from previous events, we focus on the first entry or exit event observed during the sample period in the subsequent analysis. Appendix Figure A2 shows the distribution of initial market sizes for the full sample of stations. Markets contain relatively few stations, with the median store having four other gas stations within a 1-mile radius. There are stations which operate in monopoly markets and one station located in downtown Los Angeles with 19 competitors within 1 mile. 10% of stations are located in markets with 8+ other stations. Appendix Figure A3 reports the number of entry events experienced by incumbent stations by their initial market size. The majority of entries occur in markets with 3-8 competitors and are the only entrant during the sample period. Finally, Figure A4 graphs the CDF for the distance between the incumbent station and the location of the first station entering or exiting within one mile - the distribution of distance is nearly uniform.

---

[10]A visual representation of the 1 mi. market definitions for Sonoma County, CA is shown in Appendix Figure A1. We also report results using other distance measures, varying from .5 to 10 miles.

Figure 3: Entries and Exits Experienced by Station: 2014-2018



(a) Number of Entrants                    (b) Number of Exits

Notes: Data sourced from Oil Price Information Service (OPIS)

The causal estimates we present using both a difference-in-differences and event study design would be attenuated if the arrival of a gas station were simply a replacement for a nearby exiting firm within the same market. The same is true for an exiting station and subsequent entry. In the extreme, perfectly timed entry and exit would not contribute to identification as our measure of competition would not be impacted since the station count would remain constant across time.

Figure 4: Effect of Station Entry and Exit on Market Size

(a) Entry                    (b) Exit

Notes: Coefficient estimates for the effect of station entry (Panel (a)) and exit (Panel (b)) within 1 mile of an incumbent station on the number of competitors within 1 mile are shown. Event time t=-1 is the month prior to the event. Coefficients are estimated from a linear regression of station count on a panel of event time dummy variables, day-of-sample fixed effects, and station fixed effects. Standard errors are clustered at the city level. Data are sourced from the Oil Price Information Service (OPIS) for all stations in California for 2014-2018.

10

We can directly test for other correlated changes in the number of nearby stations by running an event study model, regressing the number of competitor stations within 1 mile on event time indicators for the first entry event and the first exit event, separately. We report estimated coefficients and standard errors in Figure 4 with entries in panel (a) and exits in panel (b). The regression includes station and day-of-sample fixed effects. Results suggest no evidence of exits preceding entry events, as indicated by precisely estimated zeros for the event-time coefficients leading up to the timing of entry. If there were significant exit preceding entry events, we would expect a downward sloping line above zero leading up to event-time zero as the market size decreases. At the time of entry, the station count increases by 1 eliminating simultaneous entry and exit as a source of bias. The change in market size is persistent over the post-period with minimal decay in the store count up to 1 year after the event, ruling out exit by the new station or another station, or additional entry in the post-period. This also aligns with the earlier descriptive analysis, which showed very few stations experienced multiple entries. Results for exit events are qualitatively similar, with only slight evidence of leading entries in the market. At the time of the exit, there is no evidence of simultaneous entry, and no evidence of lagging entry or subsequent exits in the year following the initial station exit event. With this evidence, we are confident that the identified entry and exit events represent a true shift in the competitive landscape.

Turning to geography, station entry and exit occurs throughout California. Figure 5 shows the location of the entrant gas stations in blue and exiting gas stations in orange. Although entry and exit are more concentrated in urban areas and along the I-5 and CA-99 corridors in the Central Valley, entry appears to largely match the locations of existing stations and not simply concentrated in new markets. We observe entry in remote and rural parts of the state, however these events will only contribute to identification of the parameters in the empirical analysis if they are located sufficiently close to an incumbent station.

Figure 5: Map of Station Entry and Exit: 2014-2018



(a) Entries                                    (b) Exits

Notes: Entrant stations are shown in Panel (a) by blue dots, with exiting stations represented by orange dots in Panel (b). Grey dots reflect incumbent stations that neither enter nor exit during the sample. Data sourced from the Oil Price Information Service (OPIS).

The main concern with previous cross-sectional analyses is that entry and exit are likely to occur in locations that differ from markets that do not observe a structural market change. Failure to account for these differences can lead to omitted variable bias. We test for baseline differences in observable characteristics, by combining demographic data from the 2014 American Community Survey's 5-year estimates with station characteristics taken from the OPIS data and the California Energy Commission's A15 survey.

In Table 1, we report the mean and standard deviation for a collection of variables at the station-level in the top panel, and at the tract level in the bottom panel. In both cases, we compare stations or tracts which enter (or have an entrant in the case of tracts) to exits with the difference in means and the accompanying p-value reported in Column 3. Focusing first on the station char-

Table 1: Baseline Differences By Entry or Exit Status

|  | Entry | Exit | Difference |
|---|---|---|---|
| *Station Characteristics* | | | |
| Station Count | 484 | 348 | |
| Branded Gas | 0.250 | 0.345 | -0.095 |
| | (0.433) | (0.476) | (0.003) |
| Hypermart | 0.052 | 0.023 | 0.029 |
| | (0.222) | (0.150) | (0.026) |
| # of Competitors | 3.479 | 4.569 | -1.090 |
| | (3.094) | (3.259) | (0.000) |
| Distance to Highway | 1,323 | 796 | 527 |
| | (3,041) | (1,423) | (0.001) |
| < .25 Mile to Highway | 0.510 | 0.563 | -0.053 |
| | (0.500) | (0.497) | (0.131) |
| Service Bay | 0.013 | 0.065 | -0.052 |
| | (0.114) | (0.247) | (0.006) |
| Car Wash | 0.160 | 0.119 | 0.041 |
| | (0.367) | (0.325) | (0.191) |
| Convenience Store | 0.660 | 0.662 | -0.002 |
| | (0.474) | (0.474) | (0.971) |
| Kiosk | 0.052 | 0.060 | -0.007 |
| | (0.223) | (0.238) | (0.725) |
| Restaurant | 0.082 | 0.060 | 0.022 |
| | (0.274) | (0.238) | (0.338) |
| Supermarket | 0.036 | 0.035 | 0.001 |
| | (0.186) | (0.184) | (0.947) |
| *Tract Characteristics* | | | |
| Tract Count | 435 | 319 | |
| Gas Price | 3.958 | 3.975 | -0.016 |
| | (0.152) | (0.178) | (0.210) |
| Income (Median) | 55,182 | 55,626 | -444 |
| | (24,118) | (25,880) | (0.811) |
| Income (Mean) | 69,056 | 72,416 | -3,360 |
| | (27,739) | (35,018) | (0.158) |
| Poverty Rate | 19.912 | 19.996 | -0.084 |
| | (12.403) | (13.100) | (0.929) |
| Households | 1,957 | 1,921 | 36 |
| | (958) | (922) | (0.600) |
| House Value (Median) | 275,643 | 330,559 | -54,916 |
| | (177,797) | (228,081) | (0.000) |
| % No Vehicle | 7.024 | 8.381 | -1.358 |
| | (6.513) | (8.210) | (0.015) |
| % Commuting by Vehicle | 86.245 | 84.977 | 1.268 |
| | (10.509) | (11.208) | (0.116) |
| Commute Time | 26.812 | 25.495 | 1.317 |
| | (7.112) | (6.113) | (0.007) |

Notes: Means and standard deviations for station-level and tract-level characteristics are reported in Columns 1 and 2. The difference in means is shown in Column 3 with the associated p-value reported below. Data are sourced from the 2014 American Community Survey 5-year estimates, the Oil Price Information Service, and the California Energy Commission.

13

acteristics, we report that entering stations are more likely to sell unbranded gasoline and to be a hypermart than exiting stations. They also have fewer competitors within the 1 mile market. In terms of station amenities, entrants have fewer attached service bays for repairs, but more car washes and restaurants than exiting stations.

Turning toward tract characteristics, we see that gas prices in the first 3-months of our sample in tracts that experience an entry are indistinguishable from prices in tracts that experience exit. Census tracts that experience entry have similar household income and poverty rates, and housing density as tracts that experience station exit. However, tracts where exits occur have higher house values. Focusing on related driving characteristics, we see that tracts with entry have lower rates of households with no vehicle and higher rates of people commuting via vehicle with longer commutes.

The baseline demographic differences between locations that do and do not observe market size changes highlight the need to account for the inherent market characteristics to address the endogenous entry, exit, and continuing operation decisions of stations. Additionally, to the extent that there are unobservable demographic characteristics that are correlated with both station entry and demand for gasoline, cross-sectional regressions of price on the number of competitors are likely to yield biased estimates of the effect.

# 3   Empirical Strategy

The localized nature of gasoline station competition allows for the geographic and temporal variation in exposure to station entry and exit across firms to form the basis of a difference-in-differences estimation for the causal effect on incumbent pricing. Following prior work by Arcidiacono et al. (2020), we treat the exact timing of the entry or exit of a new gasoline station as a short-run exogenous shift in the market structure for incumbent firms after conditioning on the inherent market structure.

Importantly, we include a rich panel of fixed effects to account for unobserved variable bias

inherent to the endogenous location decision of entering and exiting firms. By restricting the model to identification from within station variation in the number of nearby competitors, over time, the model accounts for factors important to the location decision such as the overall price level in the market, local price elasticity of demand, local traffic patterns, and relevant customer characteristics.

Formally, we estimate:

$$P_{st} = \alpha + \beta N_{st} + \sigma_s + \delta_t + \Phi_c(t) + \varepsilon_{st} \qquad (1)$$

where the main outcome variable is the retail price in dollars per gallon at station $s$ on day $t$ and $N_{st}$ is the count of competitors to station $s$ on day $t$, increasing upon entry and decreasing with nearby exit. In our preferred specifications, we define the relevant market as the 1-mile radius circle around the incumbent station, consistent with prior literature (Lewis 2015; Davis et al. 2023; Fischer et al. 2023; Hastings 2004; Bernardo 2018; Carranza et al. 2015; Barron et al. 2004). We focus on the price of regular-grade unleaded gasoline, which in 2018 accounted for roughly 70% of retail sales in California.

Station fixed effects ($\sigma_s$) are included to capture time-invariant differences between locations, such as station amenities and size, location effects, and distance to the wholesale terminal which largely drives differences in input costs. Day-of-sample fixed effects ($\delta_t$) capture state-wide daily shocks to both input costs, such as oil prices and refinery supply shocks, as well as common daily shocks to product demand. Lastly, in the preferred specifications, we include a city-specific linear time trend, $\Phi_c(t)$, to account flexibly for city-level trends that may be correlated with price and station demand. We cluster standard errors at the city-level to account for common shocks across units.

The specification above constrains the impact of entry and exit on prices to be the same magnitude magnitude (although of opposite sign). Relaxing this assumption, we also estimate the following static difference-in-differences specification:

$$P_{st} = \alpha + \mathbb{1}Entry_{st} + \sigma_s + \delta_t + \Phi_c(t) + \varepsilon_{st}, \qquad (2)$$

15

and the corresponding specification for station exits. The specification replaces the station count variable with an indicator variables for the first entry or exit experienced by the incumbent.

Equations (1) and (2) are two-way fixed effects (TWFE) estimators, in which stations that do not experience a change to market size within 1 mile during the sample period and previously treated stations both serve as control units for stations that experience entry or exit. To address the potential bias of TWFE estimators in a setting with staggered, heterogeneous treatment, we implement the regression-based estimator from Gardner et al. (2024) that provides results that are robust to heterogeneous, staggered treatments while providing similar confidence intervals to standard TWFE estimators if treatment effects are homogeneous. In contrast, alternative estimators rely on estimating effects for each cohort immediately before and after treatment non-parametrically to ensure appropriate control units are used in estimation. These approaches are computationally inefficient in the presence of many treated cohorts, defined by the exact date of entry in our current data specification. Additionally, to the extent that there is any mismeasurement of the exact date of entry or exit, these methods can yield biased estimates.

The approach in Gardner et al. (2024) regresses the outcome, gas prices in our setting, on group and period indicators using only untreated and not-yet-treated observations. In the second stage, the previously estimated group and period effects are subtracted from the outcome variables to create a new residualized outcome variable which is then regressed on the event-time treatment variables. This results in familiar event-study coefficients comparable to the results from the two-way fixed effects approach.

Identification of the main coefficient of interest, $\beta$, as the causal effect of a change in the number of nearby stations on prices requires two main assumptions. First, the main identifying assumption requires entry and exit to be conditionally uncorrelated with the error term. Specifically, conditional on station fixed effects, time fixed effects, and time trends, the changes in station count are exogenous.

$$E[\varepsilon_s | \sigma_s, \delta_t, \Phi_c(t), N_{st}] = 0 \qquad (3)$$

This requires that there were no other factors correlated with the timing of the station entry or

16

exit that also impacted the pricing of nearby stations. Although this assumption cannot be directly tested, demonstrating that the treatment and control follow common trends in the pre-treatment period offers a falsification test of the assumption. Secondly, the differences-in-differences framework assumes stable unit treatment values which requires that there is no spillover of treatment onto control units outside of the impacted market. This is plausibly satisfied in our setting due to the local geographic nature of gas station competition, limiting the spillover price effects from treatment units to the larger pool of control observations.

To better examine the price dynamics of entry and exit, and to document the lack of differential pre-treatment trends, we estimate the following event study model for station entries, and the equivalent analog for exit events separately:

$$P_{st} = \alpha + \sum_{k=-24}^{24} \beta_k \mathbb{1}\left[Entry_{st} = k\right] + \sigma_s + \delta_t + \Phi_c(t) + \varepsilon_{st} \tag{4}$$

setting event time indicators for the number of months before and after the first nearby entry or exit observed at station $s$. End points are binned to include 24 or more months before/after the event.

The event study approach offers a complement to the difference-in-difference specifications in equations (1) and (2). Notably, the event-study specification offers direct evidence on whether pre-treatment trends are parallel for treated and control stations. If the prices in markets that observe entry or exit follow a different trend over time than the "control" locations, differential trends would bias the difference-in-difference estimators. Precisely estimated null effects in the time periods leading up to the entry or exit event provide support that treatment and control markets were following common trends. In addition, the event study specification allows for the effect of entry or exit to evolve dynamically, illustrating whether prices change quickly or gradually following a change in the competitive landscape. As before, we estimate event studies using the estimator from Gardner et al. (2024).

The models specified above provide estimates of the average treatment on the treated (ATT) when the identification assumptions are satisfied. Given the baseline differences in treatment and

control areas shown in Table 1, the estimated coefficient represents an internally valid estimate of the causal effect of entry or exit at locations where firms decide to enter or exit.

# 4 Results

## 4.1 Station Count Results

We present the estimates for the relationship between nearby station counts and the pricing of incumbent stations in the top panel of Table 2. Column 1 presents the coefficients estimated from the simple linear regression of price (in dollars per gallon) on the station count variable as an initial point of comparison. Columns 2 - 4 add station fixed effects and day-of-sample fixed effects. Our preferred specification in column 5 further adds city-specific linear time trends.

In column 1, we estimate an economically small, but statistically significant negative relationship between market size and prices. The addition of an additional station within one mile lowers prices at incumbent firms by 0.6 cents. However, this specification fails to account for the endogenous relationship between price and entry/exit, leading the estimate to likely be biased.

In column 2, we include station-level fixed effects to control for market characteristics plausibly correlated with station density. In this specification, identification arises from within-station variation. An additional nearby competitor is now associated with a significant 6.7 cent decrease in prices. Relative to column 2, the attenuation of the estimates in column 1 is consistent with the hypothesis that station density is endogenously higher in high-price regions, leading to a likely bias in the estimate.

In column 3, we now add day-of-sample fixed effects to the naive regression to account for daily location-invariant shocks that affect all stations, such as changes in input costs, refinery outages and major weather events. Unsurprisingly, day-of-sample fixed effects account for roughly 80 percent of the variation in prices.

Column 4 is the canonical two-way fixed effects model including both day-of-sample fixed effects and station fixed effects. With the inclusion of both station and day-of-sample fixed effects,

18

Table 2: Effect of Changes in Competition on Incumbent Pricing

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Station Count | -0.006*** | -0.067*** | -0.005** | -0.012*** | -0.010*** | |
|  | (0.002) | (0.021) | (0.002) | (0.003) | (0.003) | |
| R Sq. | 0.001 | 0.163 | 0.809 | 0.956 | 0.958 | |
| Obs. | 14,749,777 | 14,749,777 | 14,749,777 | 14,749,777 | 14,749,777 | |
| Entry | -0.128*** | -0.310*** | -0.044*** | -0.023*** | -0.020*** | -0.025*** |
|  | (0.011) | (0.023) | (0.010) | (0.004) | (0.004) | (0.004) |
| R Sq. | 0.005 | 0.170 | 0.809 | 0.956 | 0.958 | |
| Obs. | 14,749,777 | 14,749,777 | 14,749,777 | 14,749,777 | 14,749,777 | 14,748,218 |
| Exit | -0.066*** | -0.193*** | -0.003 | 0.002 | 0.001 | 0.000 |
|  | (0.014) | (0.030) | (0.011) | (0.004) | (0.004) | (0.005) |
| R Sq. | 0.001 | 0.165 | 0.808 | 0.956 | 0.958 | |
| Obs. | 14,749,777 | 14,749,777 | 14,749,777 | 14,749,777 | 14,749,777 | 14,749,777 |
| Station FE | No | Yes | No | Yes | Yes | Yes |
| Day of Sample FE | No | No | Yes | Yes | Yes | Yes |
| Linear Time Trend | No | No | No | No | Yes | No |
| Estimator | TWFE | TWFE | TWFE | TWFE | TWFE | DID2S |

Notes: The table reports estimates for the effect of a change in nearby competitors within 1-mile on incumbent pricing for regular unleaded gasoline in dollars per gallon. The top panel uses the daily count of nearby stations as the independent variable. The panels for Entry and Exit use an indicator variable for the dates after the first nearby entry or exit. Column 1 reports estimates from a simple linear regression. Columns 2-5 report results with the addition of the fixed effects listed in the panel below. Column 6 uses the two-stage DID estimator from Gardner et al. (2024). Data are sourced from the Oil Price Information Service (OPIS) for all stations in California for 2014-2018. Model standard errors are reported in parentheses and clustered at the city level. *** = significant at 1 percent level, ** = significant at 5 percent level, * = significant at 10 percent level.

we estimate an additional competitor reduces prices by roughly 1.2 cents per gallon. Relative to the larger point estimate in column 2, the inclusion of day-of-sample fixed effects in addition to station fixed effects controls for statewide trends in prices and station density. Since, on net, station density has increased and prices fell over our study period, the coefficients in column 2 are biased downwards relative to the two-way fixed effects estimates in column 4.

Column 5 represents the preferred specification, showing results are robust to the further inclusion of a city-specific linear time trend. An additional competitor within one mile results in a 1.0 cent reduction in incumbent prices, which represents around a 2.5% reduction in firm markups during the sample period which average 40 cents.[11] These estimates control for potential selection if entry or exit are correlated with local demand or price trends. The robustness of the coefficient to the inclusion of a city-specific linear time trend between columns 4 and 5 provides support that treatment and control markets are not trending differentially.

## 4.2  Effects of Entry and Exit

In the second and third panels of Table 2, we present results from estimating equation (2), regressing incumbent prices on indicator variables that reflect the period after the first entry or exit within one mile faced by the station. As with the results based on station counts, column 1 presents the results from a bivariate regression that omits fixed effects and columns 2 - 5 successively add station fixed effects, day-of-sample fixed effects, and city-specific linear time trends.

We focus attention on columns 4 and 5 that control for both time-invariant and station-invariant unobservables and identify the coefficient on the entry and exit indicators from within-station variation relative to statewide trends in prices. Here, we find that the earlier estimated impacts from the regression using changes in nearby station count operate entirely through the impacts of entry. In our preferred specification, the pricing of an incumbent firm falls by 2.0 cents per gallon following the entry of a new competitor within 1 mile. In contrast, we find little evidence that incumbent pricing changes following the exit of a competitor, estimating a precise null

---

[11]California Energy Commission estimates of CA gasoline price breakdown and margins.

effect. By breaking out the entry and exit effect separately, we can see that the prior results using the nearby station count as the regressor, which uses variation from both entry and exit events for identification, attenuated the effect due to asymmetric effects by event type. In column 6 we show that results for both entry and exit are robust to estimation using the estimator from Gardner et al. (2024) to account for the staggered treatment timing.

The event study specification, formalized in equation (4), allows us to examine the speed with which incumbent prices change after the entry or exit of a nearby competitor, and post-event pricing dynamics over time. In addition, the event study design allows us to visually and statistically assess the assumption that the treatment and control evolved along common trends in the pre-treatment period. This provides support for the identifying assumption of the difference-in-differences framework, that prices for control and treated stations would have evolved along similar patterns, in the absence of the treatment.

Figure 6a presents results for the first entry event experienced by a given incumbent station, and Figure 6b reports results for the first exit event experienced during the sample period. We plot the coefficients from the Gardner et al. (2024) estimator in red, as well as the coefficients of the canonical TWFE estimator in black.

21

Figure 6: Effect of Station Entry and Exit Within 1 Mi. on Incumbent Pricing-DID2S



(a) Station Entry

(b) Station Exit

Notes: Coefficient estimates for the effect of station entry (in Panel A) and station exit (in Panel B) within 1 mile of an incumbent station on incumbent pricing of regular unleaded gasoline are shown. Results from the canonical TWFE estimator are shown in black. Results from the Gardner et al. (2024) two-stage DID estimator are shown in red. Data are sourced from the Oil Price Information Service (OPIS).

Examining the pre-treatment point estimates, we see that prices for treated and control stations were parallel prior to treatment. Point estimates for the event-time coefficients for the months prior to both entry and exit events are close to zero and all time periods include zero within the confidence intervals. The null estimates consistent across periods before entry also provide supporting

evidence that incumbents do not lower prices in anticipation of entry. Rather, incumbents only drop prices at the start of new operations and accommodate entry. Likewise, the lack of an effect in the periods before exit provides evidence that stations do not successfully engage in predatory pricing to force the exit of a nearby station.

Examining the post-treatment coefficients for entry (in Figure 6a), we see that the price set by an incumbent stations falls discretely and immediately after the entry of a new, nearby competitor. The entry of a station is associated with a sharp drop in the price at incumbents of 2.7 cents. Effects are precisely estimated and persistent over the long run suggesting that the entry of a new station results in a quick shift to a new, lower price equilibrium. Figure 6b shows precisely estimated null effects for exit events which stand in contrast to the negative estimated effects of entry. In both cases, we see that the results from the robust estimator from Gardner et al. (2024) perform better than the TWFE estimator; we see tighter confidence intervals around 0 in the pre-treatment periods, and stronger evidence of a persistent negative price effect upon entry. As such, in the event studies that follow, we only report results using the estimator from Gardner et al. (2024).

## 4.3    Do the effects of entry and exit vary by proximity and fuel grade?

We next explore whether the effects of entry or exit on the pricing of incumbent firms vary on two dimensions: (1) geographic proximity to the entrant, and (2) by grade of gasoline. Gasoline stations compete in a geographically differentiated market with nearby stations in closer competition than more distant stations (Houde (2012), Chandra and Tappata (2011), Eckert and West (2005)). If entrants impose a competitive impact on the pricing of incumbent firms, we would expect, all else equal, for the effects to be greatest when an incumbent faces nearby entry rather than a more distant entrant. Similarly, the exit of a more distant competitor should have reduced effects. In addition, stations sell different grades of gasoline. As noted above, regular unleaded gasoline (with an octane level of 87), represents around 70% of motor gasoline sales in California. Premium (91 octane) accounts for roughly 25% of motor gasoline sales, with mid-grade accounting for the remainder. Building on past work that finds variation in the elasticity of demand, by

23

grade of gasoline, (Yatchew and No (2001)), as well as evidence of substitution between grades of gasoline (Hastings and Shapiro (2013)), entry or exit might differentially affect incumbent pricing for each grade of gasoline.

To estimate variation in the effects of entry by proximity, we extend the specification in equation (2). As with the earlier specification, we proxy for station competition using the straight-line distance between an incumbent station and an entrant. Although this abstracts from the nuances of local road networks and commuting flows, leveraged in Houde (2012); Davis et al. (2023), this approach can be easily implemented for all incumbent stations state-wide.

We run regressions for each distance bucket separately designating treatment as the month of the first entry/exit that occurs between the minimum and maximum distance for the bucket. We present the point estimates and standard errors from the regression using the two-stage estimator in Gardner et al. (2024) for entry in Figure 7a and exit in Figure 7b. As with the estimates in Table 2 derived from equation (2), stations that do not experience any entry or exit serve as controls.

Figure 7: Effect of Station Entry and Exit on Incumbent Pricing, by Distance



(a) Station Entry

(b) Station Exit

Notes: Coefficient estimates for the effect of station entry (in Panel A) and exit (in Panel B) by distance from incumbent station on incumbent pricing of regular unleaded gasoline are shown. Coefficients are estimated by running separate regressions by distance bucket using the two-stage DID estimator in Gardner et al. (2024). Data are sourced from the Oil Price Information Service (OPIS).

Results vary by distance, as expected, with the strongest entry effects observed for events occurring within a quarter-mile of the incumbent. The effect monotonically increases towards zero as the distance from the station increases, with economically irrelevant effects after 7 miles. This is consistent with prior research which shows retail gas competition is highly localized. We again estimate null effects for the exit of a nearby station across all distances.

Identification of causal estimates in our setting relies on the SUTVA assumption. Our distance results show that this assumption is valid for most distances with limited spatial spillovers of entry. As a robustness check, we can exclude control stations which do not have entry within 1 mi., but do experience an entry within the 7 mi. cutoff for significant effects shown above. Appendix Figure A5 reports the coefficients and shows that estimated results are even stronger at the time of entry, persist at the increased level, and still satisfy the pre-trends assumption. Confidence intervals remain similar in magnitude despite the reduction in sample size.

Second, we estimate the effects of entry and exit separately for the different grades of gasoline. We present estimates for the effect on incumbent pricing for all three grades for entry in Figure 8a and exit in Figure 8b. We find qualitatively consistent results across the three grades. For entries, point estimates for the price decrease are steepest for regular gasoline, followed by mid-grade and then premium at each post-treatment time period. However, we cannot statistically reject that all three blends have the same coefficient. As was the case for regular gasoline, exit events are not associated with statistically distinguishable changes to incumbent pricing for either of the other two blends.

Figure 8: Effect of Station Entry and Exit on Incumbent Pricing, by Blend



(a) Station Entry



(b) Station Exit

Notes: Coefficient estimates for the effect of station entry (in Panel A) and station exit (in Panel B) within 1 mile of an incumbent station on incumbent pricing by gasoline blend type. The regression is estimated using the two-stage DID estimator in Gardner et al. (2024). Data are sourced from the Oil Price Information Service (OPIS).

27

# 5   Asymmetry of Entry and Exit Effects.

In the preceding section, we presented evidence that prices at incumbent stations decline significantly and immediately following the entry of a competing station. The impact on incumbent pricing attenuates with the distance to the new competitor and the effects are largely consistent across different grades of gasoline. In contrast, we find little evidence that station exit causes prices to rise, finding consistent, precisely estimated null effects across distances and grades. Although models of symmetric competition largely suggest symmetric impacts of entry and exit on incumbent pricing, we explore four potential sources of heterogeneity that help to explain the difference in the effect of entry and exit on incumbent pricing, and, in particular, the null effects observed for exit.

First, as we noted when discussing Table 1, stations that exit the market tend to exit from locations that are systematically different than those chosen by entering stations. A long literature (e.g., Seim (2006)) highlights the geographic element of endogenous entry decisions – firms choose to enter markets in which they can more easily differentiate themselves from their competitors. In our setting, we observe that entry is more likely to occur in locations with fewer competitors and further from highways. To the extent that heterogeneity exists in the magnitude of the effects of entry and exit that is correlated with location, the null results for exit might be partially explained by heterogeneity in the types of locations that stations exit compared to the locations that stations enter.

Second, entering and exiting stations may differ on observable and unobservable dimensions that impact competitiveness and the degree to which their entry or exit might impact incumbent pricing. Observably, entering stations differ from those that exit in ways that impact competitiveness. As noted earlier, stations that exit are more likely to be branded than stations that enter. If the competitive effect of a station is systematically correlated with branding, the null effect we observe for exiting stations might be explained by compositional differences in the types of stations that enter and exit markets.

Stations may also vary on unobservable characteristics correlated with the competitiveness or attractiveness of the stations. In a model of endogenous exit with heterogeneous costs or productivity (e.g., Asplund and Nocke (2006)), stations with idiosyncratically higher costs or lower productivity will tend to have lower profits and, all else equal, be more likely to exit the market. If, prior to exit, these stations tend to exert less competitive pressure on neighboring firms, their exit might not impact prices to the same degree as an entering station.

Finally, we consider mismeasurement of exiting firms as a source of attenuation bias that might explain the null result observed for exit. Although our counts of entering and exiting firms largely align with administrative counts from the Census Bureau and California Energy Commission, if stations with continuing operations lack (for whatever reason) reported prices during the last two months of our sample, we would mis-classify them as exiting stations.

## 5.1   Geographic heterogeneity in the location of entry and exit

In Table 1, we noted that the locations where stations enter and exit are systematically different, varying with proximity to highways and the density of nearby stations. We consider the compositional differences in the markets in which stations enter and exit, first by estimating the event study model separately for entry and exit events near and far from highways. Specifically, we compare the effect of an entry or exit within a quarter mile of a highway on incumbents, to events that occur further away.

In Figure 9a, we observe modest differences in the effect of entry. Incumbent stations that face new competition from entrants located within 1/4 of a mile of a highway lower prices significantly more than do incumbent stations facing competition from an entrant located far from highways. Notably, although we find some heterogeneity when splitting the sample by the highway proximity for entering stations, the composition differences would tend to reduce, rather than augment the asymmetry we find – entering stations are more likely to be located *farther* rather than near to highways than exiting stations. As before, we fail to find a meaningful heterogeneity in the impact of exiting firms, splitting the sample by the highway proximity and plotting the estimated

29

coefficients in Figure 9b.

Figure 9: Effect of Station Entry and Exit, by Distance to Highway



(a) Station Entry

(b) Station Exit

Notes: Coefficient estimates for the effect of station entry (in Panel A) and station exit (in Panel B) within 1 mile by distance from the entering/exiting station to the nearest highway on incumbent pricing of regular unleaded gasoline are shown using the two-stage DID estimator in Gardner et al. (2024). Data are sourced from the Oil Price Information Service (OPIS).

There is not a consensus in the literature on the effect of changes to market size on price levels in gas markets. Canonical work by Bresnahan and Reiss (1991) on competition in homogeneous goods markets suggests that entry into smaller, consolidated markets results in larger competitive

effects and that this effect dissipates as the number of competitors in a market increases. However, Armstrong and Vickers (2022) and Barron et al. (2004) show that this result can reverse in search models with price dispersion depending on the search costs involved. We test for heterogeneous effects of entry and exit across the number of competitors in our setting by estimating equation 2 separately by the number of competitors faced by the incumbent station.

Figure 10 plots the coefficients for entry (in panel A) and exit (in panel B) based on the number of competitors faced by the incumbent station at the beginning of our sample. In Panel A, we find that incumbent stations facing zero, two, three or four competitors within one mile lower prices upon entry of an additional competitor. These cases make up the majority of the entry events we observe – roughly two-thirds of the incumbents affected by entry face fewer than five competitors at the start of the sample period. We see little evidence that entry impacts the prices of incumbent stations that initially face more than four competitors. This, perhaps by coincidence, aligns with the findings in Bresnahan and Reiss (1991) which found little competitive impact on incumbent firms of entry once five competitors were present in a local market. In retail gasoline markets, Tappata and Yan (2017) finds a similar threshold of market size for entry effects.

Figure 10: Effect of Station Entry and Exit on Incumbent Pricing, by Initial Market Size



(a) Station Entry

(b) Station Exit

Notes: Coefficient estimates for the effect of station entry (in Panel A) and exit (in Panel B) within 1 mile of an incumbent station on incumbent pricing of regular unleaded gasoline are shown using the two-stage DID estimator in Gardner et al. (2024). Coefficients are estimated by running separate regressions by the number of initial competitors faced by the incumbent. Data are sourced from the Oil Price Information Service (OPIS).

For exit events, we do find a relationship between market concentration and the impact of exit on incumbent pricing with some positive effects for incumbent firms facing relatively few initial competitors. Notably, point estimates suggest that incumbent stations with one or two competitors raise prices by roughly five cents per gallon when one of the competitors exits, although only the

estimate for the latter is statistically significant. Yet, these cases account for a relatively small fraction (15%) of the roughly 350 exit events in the sample. We find robust null effects of exit for the remaining 85% of cases, the vast majority of which are settings in which the incumbent faced competition from more than three stations prior to the exit event. As a point of comparison, incumbents with one or two competitors comprised a larger fraction (roughly 25%) of those affected by entry.

## 5.2    Heterogeneity in entering and exiting station characteristics

We next examine whether the asymmetry in the effects of entry and exit can be attributed to compositional differences in the types of branding of entering and exiting stations. Comparing entering and exiting stations in Table 1, entering stations are less likely to sell branded gasoline. Traditionally, unbranded gasoline is sold at a discount compared to branded gasoline. This heterogeneity in pricing can lead to differential effects of competition. Additionally, there has been an increase in the entry of high-volume stations referred to as hypermarts, such as Kroger, Costco, and Sam's Club. These stations sell unbranded gasoline and are characterized by having numerous pumps and high sales volume, further contributing to potential differences in competitive dynamics.

In Figure 11a, we test for heterogeneous entry effects for stations that sell unbranded vs. branded gasoline at the time of their entry and effects for hypermart entries only. Entry of a nearby unbranded station results in the familiar immediate 2-cent reduction in incumbent prices while the estimated effect for branded stations is slightly lower at 3 cents, however due to the standard errors for the estimates, we cannot reject statistically similar effects. For the entry of a nearby hypermart, the estimated entry effect is greater, at 5 cents on incumbent stations. In Figure 11b, we test for heterogeneous exit effects by the station's gas branding. Here, we omit the results for hypermarkets as only a handful of hypermarts exit the sample. As with our baseline results, we find precise null exit effects for both branded and unbranded stations.

33

Figure 11: Effect of Station Entry and Exit, by Station Category



(a) Station Entry

(b) Station Exit

Notes: Coefficient estimates for the effect of station entry (in Panel A) and exit (in Panel B) within 1 mile on incumbent pricing of regular unleaded gasoline by station brand type are shown using the two-stage DID estimator in Gardner et al. (2024). Hypermarts are omitted from Panel B as there are too few hypermarts that exit the sample. Data are sourced from the Oil Price Information Service (OPIS).

In Figure 12, we compare the effects of the entry or exit of a station on nearby stations that share the same store branding, for example, two nearby 7-eleven branded stations regardless of the fuel type they choose to sell. Although we continue to find null effects for exiting stations, we find modestly larger impacts of entrants on incumbent stations with the same brand. In Appendix Figure A6, we report nearly identical results when we instead compare the brand of gasoline sold

34

by the stations.

Figure 12: Effect of Station Entry and Exit by Station Branding



(a) Station Entry

(b) Station Exit

Notes: Coefficient estimates for the effect of station entry (in panel A) and exit (in panel B) within 1 mile of an incumbent station on incumbent pricing using the two-stage DID estimator in Gardner et al. (2024) are shown. Results are plotted separately for incumbent stations that share and do not share the same store brand as the entering or exiting station at the time of the event. Data are sourced from the Oil Price Information Service (OPIS).

## 5.3    Selection of exiting stations

Next, we consider whether selection plays a role in explaining the null effects of exit we observe. If, prior to exit, marginal stations exert little competitive pressure on nearby stations, either

because they are not cost-competitive or fail to offer a "product" (inclusive of station attributes) that is attractive to potential customers, their exit might not impact prices at neighboring stations.

We return to the OPIS data to construct a proxy for the "unobserved competitiveness" of exiting stations by examining the frequency with which exiting stations report prices. OPIS collects price data through different streams, two of which, card swipes and consumer-reported prices through GasBuddy, require a customer to use (or observe prices) at a station. To the extent that an exiting station is unattractive to customers, prices may be observed less frequently prior to exit.

As illustrative evidence, we calculate the frequency of reported prices for each station in the OPIS data. Figure A3 graphs the CDF for incumbent stations (in blue) and exiting stations (in red). As noted in Section 2, prices tend to be regularly reported for the vast majority of stations in the OPIS data – the median station in the OPIS data has an observed price on 97% of days. We see this reflected in the CDF for incumbent stations, for which the OPIS data reports prices almost every day. In sharp contrast, we see that price reporting is much less regular for exiting stations.[12] On average OPIS reports a price roughly every other day for the median exiting station, starkly less than the (close to) flawless reporting for the median incumbent station.

---

[12]As before, when calculating the frequency for exiting stations, we only include in the denominator of the calculation the number of days prior to our observed exit.

Figure 13: Frequency of reported prices



Notes: The CDF for the percent of potential days a station has a valid price reported in the OPIS data is shown. The percentage is calculated as the number of price observations divided by the number of days spanned between the first and last price observation for a station. Exit stations exit at some point during our sample. Incumbents neither exit nor enter during the sample period.

To examine the role of selection, we split exiting stations based on the frequency with which OPIS reports prices prior to station exit. We then estimate the impact of station exit on nearby station pricing for exiting stations with above-median reporting frequency and below-median reporting frequency. Event study coefficients for the high and low-frequency exiting stations are plotted together in Figure 14. Comparing the estimates for high frequency exiting stations (in black) and low frequency exiting stations (in red), we find suggestive evidence that the exit of a "high-frequency" station impacts incumbents differently than the exit of a "low-frequency" station. The point estimate for the impact of the exit of the high-frequency stations is consistently above that of the low-frequency stations consistent with the narrative that these stations are more likely to be relevant competitors in their markets.

Figure 14: Effect of Station Exit, by Reporting Frequency



Notes: Coefficient estimates for the effect of station exit within 1 mile of an incumbent station on incumbent pricing, separated by exiting stations with above and below median reporting frequency prior to exit, are shown. Data are sourced from the Oil Price Information Service (OPIS) for all stations in California for 2014-2018.

## 5.4   Misclassification of exiting stations

Finally, we consider whether misclassification of exiting stations might provide an explanation for the null results we observe for exit events. As discussed in the data section, we impute the entry and exit dates of stations from the first and last price observations in the data and classify a station as having exited if we do not observe a price for that station during the last two months of our sample period. If a station has highly sporadic price observations, we could misclassify the first or last observation as an entry or exit, when in reality they had subsequent observations outside the bounds of our sample.

To test this, we make two sample restrictions to increase our confidence that we are identifying actual exit events. First, we no longer consider any station that has less than 25% of potential days with a reported price as an exit. Secondly, we originally did not consider first price observations in the first 3 months or last observations in the last 2 months of the sample to be entries or exits, and instead considered these stations to be active throughout the entire sample. We increase that restriction to no longer consider entries and exits in the first and last 6 months of the sample. As

an example, a station whose last price is reported in August 2018 will no longer be considered an exiting station.

In figure 15 we find little difference in our estimates after excluding the exiting stations for which misclassification might be the most prevalent. We continue to find a null effect of exit on incumbent station pricing.

Figure 15: Effect of Station Exit on Incumbent Pricing



Coefficient estimates for the effect of station exit within 1 mile of an incumbent station on incumbent pricing are shown. Original estimates are shown in black. The specification with additional sample restrictions shown in red excludes exiting stations that report a price on less than 25% of days and does not consider stations that exit events in the final 6-months of the sample. Data are sourced from the Oil Price Information Service (OPIS) for all stations in California for 2014-2018.

# 6   Conclusion

Using daily price data and the timing of the entry of new gas stations and exit of existing gas stations, we estimate the effect of market size changes on the pricing for incumbent stations. The use of high-frequency data and the ability to restrict identification to within-station variation allows the difference-in-differences and event study approaches to account for the endogenous entry and

exit decisions of firms. We find that an increase in market size from entry is associated with a statistically significant 2-cent decrease in the price at incumbent stations, reflecting a 5% decrease in average retail markups. This is compared to a precise null effect for the exit of a nearby firm. Both results are robust to various specifications, new estimators that correct for heterogeneous treatment effects and differential treatment timing in the two-way fixed effects specification, and across the various blends of gasoline sold. The results are strongest for the closest entries and dissipate as the market definition broadens. These results are in line with and of similar magnitude to recent studies in other countries (Davis et al. 2023; Fischer et al. 2023).

In contrast, we estimate precise null effects for exit. We note two features that might help to explain the asymmetry between the effects of entry and exit in our setting. First, entry tends to occur in more concentrated markets than exit, where the impact of a change in competition is greater. In addition, we find suggestive evidence that exiting stations differ from incumbent (or entering) stations. Although there are no differences on observable dimensions that explain the null effects for exit, we find differences when separating exiting stations based on the frequency with which prices are reported. Notably, when stations with more frequently reported prices exit, prices rise at incumbent stations. As OPIS reporting relies (as least partially) on transaction data and cloud-sourced price reports, the frequency with which prices are reported serves as a potential proxy for unobservable station characteristics. If infrequently-reporting stations tend to exert less competitive pressure on neighboring firms, their exit might not impact prices.

This paper contributes to the growing body of evidence documenting the competitive effect in retail gasoline markets and offers, to our knowledge, the first causal estimates for the effect of entry and exit of gasoline stations in California. This result is important for policy discussions surrounding market power of retail gas stations. Additionally, this work contributes to the policy discussion surrounding the energy transition, showing that restricting needed expansion of fueling infrastructure could lead to a distortionary price effect while also enriching owners of existing legacy infrastructure.

40

# References

**Arcidiacono, Peter, Paul B Ellickson, Carl F Mela, and John D Singleton**, "The Competitive Effects of Entry," *American Economic Journal. Applied Economics*, 2020, *12*, 175–206.

**Armstrong, Mark and John Vickers**, "Patterns of competitive interaction," *Econometrica*, 2022, *90* (1), 153–191.

**Asplund, Marcus and Volker Nocke**, "Firm turnover in imperfectly competitive markets," *The Review of Economic Studies*, 2006, *73* (2), 295–327.

**Barron, John M., Beck A. Taylor, and John R. Umbeck**, "Number of sellers, average prices, and price dispersion," *International Journal of Industrial Organization*, 11 2004, *22*, 1041–1066.

**Bernardo, Valeria**, "The effect of entry restrictions on price: evidence from the retail gasoline market," *Journal of Regulatory Economics*, 2 2018, *53*, 75–99.

**Borenstein, Severin, A Colin Cameron, and Richard Gilbert**, "Do gasoline prices respond asymmetrically to crude oil price changes?," *The Quarterly journal of economics*, 1997, *112* (1), 305–339.

**_ , James Bushnell, and Matthew Lewis**, "Market Power in California's Gasoline Market," *CSEM Working Paper*, 2004, *132*.

**Bresnahan, Timothy F and Peter C Reiss**, "Entry and Competition in Concentrated Markets," *Journal of Political Economy*, 1991, *99*, 977–1009.

**Carranza, Juan Esteban, Robert Clark, and Jean François Houde**, "Price controls and market structure: Evidence from gasoline retail markets," *Journal of Industrial Economics*, 2015, *63*, 152–198.

**Chandra, Ambarish and Mariano Tappata**, "Consumer search and dynamic price dispersion: an application to gasoline markets," *The RAND Journal of Economics*, 2011, *42* (4), 681–704.

**Davis, Lucas W, Shaun McRae, and Enrique Seira**, "The Competitive Effects of Entry in the Deregulated Mexican Gasoline Market," *Working Paper*, 2023.

**Eckert, Andrew and Douglas S West**, "Price uniformity and competition in a retail gasoline market," *Journal of Economic Behavior & Organization*, 2005, *56* (2), 219–237.

**Fischer, Kai, Simon Martin, and Philipp Schmidt-Dengler**, "The Heterogeneous Effects of Entry on Prices," 2023.

**Gardner, John, Neil Thakral, Linh T Tô, Luther Yap, Michael Briskin, Kyle Butts, Carolina Caetano, Gregorio Caetano, Brantly Callaway, Scott Cunningham, David Drukker, Len Goff, Zhanyuan Tian, Tao Wang, and Taylor Wright**, "Two-Stage Differences in Differences," 2024.

**González, Xulia and María J. Moral**, "Competition and Competitors: Evidence from the Retail Fuel Market," *The Energy Journal*, 9 2023, *44.*

**Hastings, Justine S.**, "Vertical relationships and competition in retail gasoline markets: Empirical evidence from contract changes in Southern California," *American Economic Review*, 3 2004, *94*, 317–328.

**Hastings, Justine S and Jesse M Shapiro**, "Fungibility and consumer choice: Evidence from commodity price shocks," *The quarterly journal of economics*, 2013, *128* (4), 1449–1498.

**Haucap, Justus, Ulrich Heimeshoff, and Manuel Siekmann**, "Fuel prices and station heterogeneity on retail gasoline markets," *Energy Journal*, 2017, *38*, 81–103.

**Houde, Jean Francois**, "Spatial differentiation and vertical mergers in retail markets for gasoline," *American Economic Review*, 2012, *102*, 2147–2182.

**Lewis, Matthew and Michael Noel**, "The speed of gasoline price response in markets with and without Edgeworth cycles," *Review of Economics and Statistics*, 2011, *93* (2), 672–682.

**Lewis, Matthew S**, "Odd Prices at Retail Gasoline Stations: Focal Point Pricing and Tacit Collusion," *Journal of Economics and Management Strategy*, 9 2015, *24*, 664–685.

**Ormosi, Peter L, Farasat AS Bokhari, Sean Ennis, and Franco Mariuzzo**, "Does increasing concentration hit poorer areas more? a study of retail petroleum markets," *The Journal of Industrial Economics*, 2024.

**Seim, Katja**, "An empirical model of firm entry with endogenous product-type choices," *The RAND Journal of Economics*, 2006, *37* (3), 619–640.

**Tappata, Mariano and Jing Yan**, "Competition in Retail Petrol Markets," *Australian Economic Papers*, 9 2017, *56*, 201–218.

**Taylor, Christopher T., Nicholas M. Kreisle, and Paul R. Zimmerman**, "Vertical relationships and competition in retail gasoline markets: Empirical evidence from contract changes in southern california: Comment," *American Economic Review*, 6 2010, *100*, 1269–1276.

**Yatchew, Adonis and Joungyeo Angela No**, "Household gasoline demand in Canada," *Econometrica*, 2001, *69* (6), 1697–1709.

# A    Appendix: Figures

Appendix Figure A1: Map of Gasoline Stations in Sonoma County: 2014-2018



Notes: The 1 mi. market definition for stations in Sonoma county, California are shown. Data sourced from Oil Price Information Service (OPIS)

Appendix Figure A2: Initial Market Size by Station



Notes: The number of other stations within 1 mile on the date of the earliest reported price observation is shown.

Appendix Figure A3: Number of Entrants per Incumbent Station by Initial Market Size

|  |  | Number of Entrants | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  |  | 0 | 1 | 2 | 3 | 4 | 5 | Total |
|  | 0 | 783 | 43 | 3 | 1 | 0 | 0 | 830 |
|  | 1 | 781 | 81 | 12 | 3 | 0 | 0 | 877 |
|  | 2 | 968 | 124 | 9 | 3 | 0 | 0 | 1,104 |
|  | 3 | 1,084 | 163 | 25 | 2 | 0 | 0 | 1,274 |
|  | 4 | 919 | 158 | 19 | 1 | 1 | 0 | 1,098 |
|  | 5 | 970 | 153 | 15 | 2 | 6 | 1 | 1,147 |
|  | 6 | 765 | 120 | 9 | 2 | 1 | 0 | 897 |
|  | 7 | 636 | 165 | 14 | 2 | 0 | 0 | 817 |
| Initial | 8 | 438 | 101 | 13 | 7 | 2 | 0 | 561 |
| Market | 9 | 289 | 54 | 12 | 0 | 0 | 0 | 355 |
| Size | 10 | 207 | 37 | 11 | 0 | 0 | 0 | 255 |
|  | 11 | 114 | 25 | 2 | 0 | 0 | 0 | 141 |
|  | 12 | 57 | 16 | 1 | 1 | 0 | 0 | 75 |
|  | 13 | 48 | 13 | 0 | 0 | 0 | 0 | 61 |
|  | 14 | 16 | 6 | 1 | 1 | 0 | 0 | 24 |
|  | 15 | 9 | 3 | 0 | 0 | 0 | 0 | 12 |
|  | 16 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
|  | 17 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
|  | 19 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | Total | 8,091 | 1,263 | 146 | 25 | 10 | 1 | 9,536 |

Notes: The number of entrants experienced for each station is shown by the initial market size for the incumbent station.

46

Appendix Figure A4: Distance from Incumbent Station to Entrant/Exiting Station



Notes: The figure plots the CDF of the distance from the incumbent station to the identified entrant or exiting station. Data sourced from Oil Price Information Service (OPIS)

Appendix Figure A5: Effect of Entry Within 1 Mi. on Incumbent Pricing Excluding Intermediate Entry Distances



Notes: Coefficient estimates for the effect of station entry within 1 mile of an incumbent station on incumbent pricing are shown. The refined control group removes control stations which experienced an entry within 7 miles during the sample. Data are sourced from the Oil Price Information Service (OPIS) for all stations in California for 2014-2018.

Appendix Figure A6: Effect of Station Entry and Exit by Gas Branding



(a) Station Entry



(b) Station Exit

Notes: Coefficient estimates for the effect of station entry (in panel A) and exit (in panel B) within 1 mile of an incumbent station on incumbent pricing are shown. Results are plotted separately for incumbent stations that share and do not share the same gasoline brand as the entering or exiting station at the time of the station closure. Data are sourced from the Oil Price Information Service (OPIS).

Looking at the store brands in the OPIS data, 38 stations operate under the Pacific Pride USA branding. These are commercially focused gas stations which service mostly fleet vehicles, require a membership and store specific payment card, and are do not have on-site attendants or convenience stores. These events can serve as a falsification test, as nearby entry of a Pacific Pride USA station should have a muted effect on stations which are mostly serving non-fleet vehicles. In Figure A7 we plot the coefficients from regressions for Pacific Pride USA stations and non-Pacific Pride USA stations. We focus on the year before and after entry due to the data further away from the event. The entry of a Pacific Pride USA station is not associated with a spillover on to the pricing of incumbent stations, leading to more precise and a deeper price effect estimate after their removal.

Appendix Figure A7: Effect of Pac Pride Entry Within 1 Mi. on Incumbent Pricing



Notes: Coefficient estimates for the effect of station exit within 1 mile of an incumbent station on incumbent pricing for Pacific Pride USA stations and all other stations are shown. Data are sourced from the Oil Price Information Service (OPIS) for all stations in California for 2014-2018.

Appendix Figure A8: Effect of Station Entry on Incumbent Pricing



Notes: Coefficient estimates for the effect of station entry within 1 mile of an incumbent station on incumbent pricing of regular unleaded gasoline are shown. Event time t=-1 is the month prior to the arrival of the entrant. Coefficients are estimated from a linear regression of price on a panel of event time dummy variables, station fixed effects, day-of-sample fixed effects, and city-specific linear time trends. Standard errors are clustered at the city level. Data are sourced from the Oil Price Information Service (OPIS) for all stations in California for 2014-2018.

Appendix Figure A9: Effect of Station Exit on Incumbent Pricing



Notes: Coefficient estimates for the effect of station exit within 1 mile of an incumbent station on incumbent pricing of regular unleaded gasoline are shown. Event time t=-1 is the month prior to the departure event. Coefficients are estimated from a linear regression of price on a panel of event time dummy variables, day-of-sample fixed effects, and city-specific linear time trend Standard errors are clustered at the city level.