## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

STATE OF WEST VIRGINIA, et al.,

                        *Plaintiffs*,

         v.

LETITIA JAMES, in her official capacity
as the Attorney General of New York, et al.,

                     *Defendants.*

No. 1:25-cv-00168-BKS-DJS

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
## MOTIONS AND IN SUPPORT OF NEW YORK'S CROSS-MOTION
## FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General of the State of New York
The Capitol
Albany, New York 12224-0341
Attorney for State Defendants

MONICA WAGNER
Deputy Bureau Chief

AYAH F. BADRAN
SABITA KRISHNAN
LAURA MIRMAN-HESLIN
JOYA SONNENFELDT
Assistant Attorneys General

*Of Counsel*
December 19, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

STATUTORY BACKGROUND ......................................................................................... 2

    The Climate Change Superfund Act ............................................................................ 2

    The Clean Air Act........................................................................................................... 4

INTERNATIONAL AGREEMENTS REGARDING CLIMATE CHANGE ................. 5

FACTUAL BACKGROUND .............................................................................................. 7

    The Economic Impacts of Cost-Recovery Demands ................................................ 7

    Greenhouse Gas Emissions .......................................................................................... 8

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT .......................................................................................................................... 10

    I.   PLAINTIFFS LACK STANDING. ...................................................................... 11

        A.    The States Fail to Demonstrate Injury.................................................... 13

            1.    The States Have Not Shown Proprietary Injuries. ............................ 13

            2.    The States Have Not Shown *Parens Patriae* Injuries........................ 16

        B.    The Associations and Alpha Fail to Demonstrate Injury That Is
Certainly Impending or a Substantial Risk of Harm............................ 18

            1.    The *West Virginia* Associations Fail to Name Any Member Who
Will Suffer Harm. ................................................................................... 18

            2.    Alpha Fails to Show Impending Injury or a Substantial Risk of
Harm. ....................................................................................................... 19

            3.    *Chamber* Associations Fail to Show that Their Members Face
Impending Injury or a Substantial Risk of Harm ............................. 21

    II. NEITHER THE CLEAN AIR ACT NOR FEDERAL COMMON LAW
PREEMPTS THE CLIMATE ACT....................................................................... 23

        A.    The Clean Air Act Does Not Preempt the Climate Act. ........................ 24

1.   The Climate Act Is an Exercise of Traditional State Responsibility. ...................................................... 25

2.   The Clean Air Act Does Not Field-Preempt the Climate Act. ........... 27

3.   The Climate Act Does Not Conflict with the Clean Air Act............... 33

B.   Federal Common Law Does Not Preempt the Act. ................................ 36

III. THE CLIMATE ACT IS NOT PREEMPTED BY THE CONSTITUTION. ...... 40

A.   The Structure of the Constitution Does Not Ban Extraterritorial Regulation. .......................................................................... 40

B.   The Climate Act Does Not Violate the Due Process Clause. ................ 43

IV. THE FOREIGN AFFAIRS DOCTRINE DOES NOT PREEMPT THE CLIMATE ACT. ....................................................................... 49

A.   The Climate Act Does Not Conflict With Foreign Policy. ..................... 50

B.   The Foreign Affairs Power Does Not Field Preempt the Climate Act. . 56

V.   THE ELEVENTH AMENDMENT BARS WEST VIRGINIA'S CLAIMS AGAINST ACTING TAX COMMISSIONER HILLER. .................................... 59

CONCLUSION ...................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*145 Marcus Blvd., Inc. v. F&H Mfg. Corp.*,
  No. 04-CV-1882, 2006 WL 8441012 (E.D.N.Y. Aug. 7, 2006) ............................... 47

*Ajami v. Solano*,
  No. 3:19-cv-00161, 2020 WL 996813 (M.D. Tenn. Feb. 28, 2020) ....................... 55

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982), WV Br. 11 ................................................................. 13, 16-17

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011) ........................................................... 25, 28, 36, 38

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*,
  903 F.3d 903 (9th Cir. 2018) ................................................................ 26

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ................................................................. 49-50, 57

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................ 28

*Askew v. Am. Waterways Operators, Inc.*,
  411 U.S. 325 (1973) ................................................................ 26

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
  512 U.S. 298 (1994) ................................................................ 55-56, 59

*Bd. of Cnty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*,
  25 F.4th 1238 (10th Cir. 2022) ............................................................. 36

*Bell v. Cheswick Generating Station*,
  734 F.3d 188 (3d Cir. 2013) ................................................................ 28

*Bonaparte v. Appeal Tax Ct.*,
  104 U.S. 592 (1881) ................................................................ 41

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988) ................................................................ 37

*Bryant v. Maffucci*,
   923 F.2d 979 (2d Cir. 1991) .......................................................................... 8

*Buckman Comm. v. Pls.*
   *' Legal Comm.*, 531 U.S. 341, 348 (2001) .................................................. 26

*Calder v. Jones*,
   465 U.S. 783 (1984) ..................................................................................... 45

*Chamber of Com. of the U.S. v. Cal. Air Res. Bd.*,
   763 F. Supp. 3d 1005 (C.D. Cal. 2025) ...................................................... 33

*Chamber of Comm. of the U.S. v. City of Seattle*,
   No. C16-0322 (RSL), 2016 WL 4595981 (W.D. Wash. Aug. 9, 2016) ................... 22

*Chew v. Dietrich*,
   143 F.3d 24 (2d Cir. 1998) ........................................................................... 47

*City & Cnty. of Honolulu v. Sunoco LP*,
   537 P.3d 1173 (Haw. 2023) ......................................................................... 31

*City of Charleston v. Brabham Oil Co.*,
   No. 2020-CP-10-03975, 2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025) ....... 39

*City of Joliet v. New W., L.P.*,
   562 F.3d 830 (7th Cir. 2009) ....................................................................... 52

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
   247 F.R.D. 296 (E.D.N.Y. 2007) ................................................................. 45

*City of New York v. Beretta U.S.A. Corp.*,
   315 F. Supp. 2d 256 (E.D.N.Y. 2004) ......................................................... 45

*City of New York v. Chevron*,
   993 F.3d 81 (2d Cir. 2021) ....................................................................passim

*City of New York v. Lexington Ins. Co.*,
   735 F. Supp. 2d 99 (S.D.N.Y. 2010) ............................................................. 9

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................................ 11, 13, 22

*Clark v. Allen*,
   331 U.S. 503 (1947) ................................................................................ 57-58

iv

*Clean Air Mkts. Grp. v. Pataki,*
  338 F.3d 82 (2d Cir. 2003) ............................................................ 32, 38

*Coal. for Competitive Elec. v. Zibelman,*
  906 F.3d 41 (2d Cir. 2018) ................................................................. 33

*Conn. Dep't of Soc. Servs. v. Leavitt,*
  428 F.3d 138 (2d Cir. 2005) ............................................................... 43

*Connecticut ex rel. Blumenthal v. United States,*
  369 F. Supp. 2d 237 (D. Conn. 2005) ................................................. 43

*Crawford v. Franklin Credit Mgmt. Corp.,*
  758 F.3d 473 (2d Cir. 2014) ................................................................. 9

*Daubert v. Merrell Dow Pharmas. Inc.,*
  509 U.S. 579 (1993) .......................................................................... 14

*Davis v. Passman,*
  442 U.S. 228 (1979) .......................................................................... 43

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) .......................................................................... 11

*Deutsch v. Turner Corp.,*
  324 F.3d 692 (9th Cir. 2003) ............................................................. 58

*District of Columbia v. Exxon Mobil Corp.,*
  89 F.4th 144 (D.C. Cir. 2023) ............................................................ 31

*Edgar v. MITE Corp.,*
  457 U.S. 624 (1982) .......................................................................... 42

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,*
  525 U.S. 155 (1999) .......................................................................... 55

*EPA v. EME Homer City Generation, L.P.,*
  572 U.S. 489 (2014) .......................................................................... 34

*Equal Vote Am. Corp. v. Pelosi,*
  397 F. Supp 3d 503 (S.D.N.Y. 2019) ................................................... 18

*Erie R.R. Co. v. Tompkins,*
  304 U.S. 64 (1938) ............................................................................ 36

*Est. of Tov v. United Nations Relief & Works Agency,*
No. 24 Civ. 4765, 2025 WL 2793701 (S.D.N.Y. Sept. 30, 2025)............................ 55

*Ex parte Young,*
209 U.S. 123 (1908) ................................................................................. 59-60

*Exxon Shipping Co. v. Baker,*
554 U.S. 471 (2008) ................................................................................. 29-30

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ................................................................................. 12-13

*Ford Motor Co. v. Mont. 8th Jud. Dist. Ct.,*
592 U.S. 351 (2021) ....................................................................................... 45

*Franchise Tax Bd. of Cal. v. Hyatt,*
587 U.S. 230 (2019) ................................................................................. 17, 38

*Fuld v. Palestine Liberation Org.,*
606 U.S. 1 (2025) ........................................................................................... 47

*Gen. Motors Corp. v United States,*
496 U.S. 530 (1990) ....................................................................................... 28

*Georgia v. Tenn. Copper Co.,*
206 U.S. 230 (1907) ................................................................................. 26, 38

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher,*
267 F.3d 1228 (11th Cir. 2001) ...................................................................... 48

*Glowczenski v. Taser Int'l, Inc.,*
928 F. Supp. 2d 564 (E.D.N.Y 2013) ............................................................. 14

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
564 U.S. 915 (2011) ....................................................................................... 47

*Hartford Enters., Inc. v. Coty,*
529 F. Supp. 2d 95 (D. Me. 2008) .................................................................. 56

*Healy v. Beer Inst.,*
491 U.S. 324 (1989) ....................................................................................... 17

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.,*
304 U.S. 92 (1938) ......................................................................................... 38

vi

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ................................................................ 50

*Hoyt v. Sprague,*
    103 U.S. 613 (1880) .............................................................. 40

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) .............................................................. 17

*Illinois v. City of Milwaukee,*
    406 U.S. 91 (1972) ................................................................ 38

*Illinois v. City of Milwaukee,*
    731 F.2d 403 (7th Cir. 1984) ................................................ 37

*In re Assicurazioni Generali, S.P.A.,*
    592 F.3d 113 (2d Cir. 2010)............................................. 50, 57

*In re Cnty. Comm'rs of Boulder City. v. Suncor Energy USA, Inc.,*
    No. 24SA206, 2025 WL 1363355 (Colo. 2025) ..................... 32

*In re Deposit Ins. Agency v. Superintendent of Banks of the State of N.Y.,*
    482 F.3d 612 (2d. Cir. 2007)............................................... 60

*In re MTBE Prods. Liab. Litig.,*
    725 F.3d at 101–102 ............................................................ 33

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ........................................ 29-30, 35, 37

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,*
    146 F.3d 66 (2d Cir. 1998)................................................. 30

*Japan Line, Ltd. v. L. A. Cnty.,*
    441 U.S. 434 (1979), US St. 10.......................................... 56

*Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.,*
    644 F.3d 934 (9th Cir 2011) ............................................... 33

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ............................................................ 27

*Knight v. N.Y. State Dep't of Corrs.*,
    No. 18-CV-7172, 2022 U.S. Dist. 2022 WL 1004186, at \*7-8 (S.D.N.Y Mar.
    30, 2022) ............................................................................................................... 14

*Kyocera Doc. Sols. Am., Inc. v. Div. of Admin.*,
    708 F. Supp. 3d 531 (D. N.J. 2023) ...................................................................... 58

*Lighthouse Res. Inc. v. Inslee*,
    429 F. Supp. 3d 736 (W.D. Wash. 2019) .............................................................. 55

*Little v. Cnty. of Nassau*,
    708 F. Supp. 3d 252 (E.D.N.Y. 2023) .................................................................... 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................ 11-12

*Marentette v. Abbott Lab'ys, Inc.*,
    886 F.3d 112 (2d Cir. 2018) .................................................................................. 24

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................................... 4, 26, 28

*Mayor & City Council of Balt. v. BP, P.L.C.*,
    31 F.4th 178 (4th Cir. 2022) ................................................................. 31, 36, 50, 59

*Mayor & City Council of Balt. v. BP P.L.C.*,
    No. 24-C-18-004219, 2024 WL 3678699 (Md. Cir. Ct. July 10, 2024) .................. 39

*McMorris v. Carlos Lopez & Assocs.*,
    995 F.3d 295 (2d Cir. 2021) .................................................................................. 22

*Medellín v. Texas*,
    552 U.S. 491 (2008) ......................................................................................... 50, 54

*Medtronic, Inc. v Lohr*,
    518 U.S. 470 (1996) ......................................................................................... 24, 26

*Merrick v. Diageo Americas Supply, Inc.*,
    805 F.3d 685 (6th Cir. 2015) ................................................................................ 28

*Miller v. James*,
    751 F. Supp. 3d 21 (N.D.N.Y 2024) ...................................................................... 23

*Minnesota v. Am. Petroleum Inst.*,
　No. 62-CV-20-3837, 2025 WL 562630 (D. Minn. Feb. 14, 2025) .......................... 32

*Mobay Corp. v. Allied-Signal, Inc.*,
　761 F. Supp. 345 (D.N.J. 1991) .............................................................. 47

*Moody v. NetChoice, LLC*,
　603 U.S. 707 (2024) .......................................................................... 10

*Movsesian v. Victoria Versicherung AG*,
　670 F.3d 1067 (9th Cir. 2012) (en banc) .................................... 50, 58-59

*N.Y. Civ. Liberties Union v. Grandeau*,
　528 F.3d 122 (2d Cir. 2008) ................................................................ 12

*N.Y. Life Ins. Co. v. Head*,
　234 U.S. 149 (1914) .......................................................................... 41

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
　804 F.3d 242 (2d Cir. 2015) ............................................................. 9-10

*Nat'l Foreign Trade Council, Inc. v. Giannoulias*,
　523 F. Supp. 2d 731 (N.D. Ill. 2007) .................................................... 58

*Nat'l Org. for Marriage, Inc. v. Walsh*,
　714 F.3d 682 (2d Cir. 2013) ................................................................ 12

*Nat'l Pork Producers Council v. Ross*,
　598 U.S. 356 (2023) ..................................................................... 40-42

*Nat'l Shooting Sports Found. v. James*,
　144 F.4th 98 (2d Cir. 2025) ................................................... 24, 32, 35

*Native Vill. of Kivalina v. Exxon Mobil Corp.*,
　No. 09-17490, 2010 WL 3299982 (9th Cir. June 30, 2010) ................... 36

*Nebraska v. Cent. Interstate Low-Level Radioactive Waste Comm'n*,
　974 F. Supp. 762 (D. Neb. 1997) ......................................................... 43

*New Jersey v. City of New York*,
　283 U.S. 473 (1931) .......................................................................... 38

*New York v. Niagara-Wheatfield Cent. Sch. Dist.*,
　119 F.4th 270 (2d Cir. 2024) .......................................................... 16-17

ix

*North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010) ............................................................... 28

*NRDC v. Nat'l Highway Traffic Safety Admin*,
    894 F.3d 95 (2d Cir. 2018) ................................................................. 14

*NRDC, Inc. v. Wheeler*,
    367 F. Supp. 3d 219 (S.D.N.Y. 2019) .................................................. 18

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*,
    489 U.S. 493 (1989) ............................................................................ 33

*Overnite Transp. Co. v. Tianti*,
    926 F.2d 220 (2d Cir. 1991) (per curiam) ........................................... 29

*Pennsylvania v. Porter*,
    659 F.2d 306 (3d Cir. 1981) ............................................................... 43

*Peralta-Taveras v. Att'y Gen.*,
    488 F.3d 580 (2d Cir. 2007) ............................................................... 49

*Platkin v. Exxon Mobil Corp.*,
    No. MER-L-001797-22, 2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025) ............ 39

*Portland Pipe Line Corp. v. City of S. Portland*,
    288 F. Supp. 3d 321 (D. Me. 2017) ..................................................... 59

*Purdue Pharma L.P. v. Kentucky*,
    704 F.3d 208 (2d Cir. 2013) ........................................................... 16-17

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997) ........................................................... 9, 20-21

*Rest. L. Ctr. v. City of New York*,
    90 F.4th 101 (2d Cir. 2024) ............................................................... 35

*Rhode Island v. Shell Oil Prods. Co.*,
    35 F.4th 44 (1st Cir. 2022) ................................................................. 36

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ............................................................................ 27

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ............................................................................ 43

*Sprietsma v. Mercury Marine,*
   537 U.S. 51 (2002) ........................................................... 53

*Strassheim v. Daily,*
   221 U.S. 280 (1911) ......................................................... 46

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ......................................................... 18

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
   451 U.S. 630 (1981) ............................................... 25, 37, 49

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ................................................... 11, 23

*Treiber & Straub, Inc. v. UPS, Inc.,*
   474 F.3d 379 (7th Cir. 2007) ........................................... 38

*United States v. Alcan Aluminum Corp.,*
   49 F. Supp. 2d 96 (N.D.N.Y. 1999) ................................ 48

*United States v. Kramer,*
   757 F. Supp. 397 (D.N.J. 1991) ..................................... 48

*United States v. Locke,*
   529 U.S. 89 (2000) ........................................................... 26

*United States v. Monsanto Co.,*
   858 F.2d 160 (4th Cir. 1988) ........................................... 46

*United States v. New York,*
   No. 1:25-cv-03656 (S.D.N.Y.) ........................................... 1

*United States v. Salerno,*
   481 U.S. 739 (1987) ......................................................... 44

*Upstate Shredding, LLC v. Ne. Ferrous, Inc.,*
   No. 3:12-CV-1015, 2016 WL 865299 (N.D.N.Y. Mar. 2, 2016)............................ 55

*Util. Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ........................................................... 4

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
   535 U.S. 635 (2002) ......................................................... 60

xi

*Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*,
   373 F.3d 241 (2d Cir. 2004) ......................................................... 9

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ........................................................... 9-10, 49

*Watson v. Emps. Liab. Assurance Corp., Ltd.*,
   348 U.S. 66 (1954) .................................................................... 45

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ............................................................. 11, 19

*Young v. Masci*,
   289 U.S. 253 (1933) .................................................................. 44

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .................................................................. 56

*Zschernig v. Miller*,
   389 U.S. 429 (1968) .............................................................. 57-58

## Constitutions

U.S. Const. amend. V ...................................................................... 43

U.S. Const. amend. XI ......................................................... 2, 11, 59-60

U.S. Const. amend. XIV .............................................................passim

U.S. Const.
   art I, § 8, cl. 3 .............................................................. 17, 39, 41-42
   art. II ...................................................................... 50, 53-54
   art IV, § 1 ...................................................................... 41-42

## Federal Statutes

28 U.S.C.
   § 1603 (b) ........................................................................ 51
   § 1604 .............................................................................. 51
   § 1605 .............................................................................. 51
   § 1607 .............................................................................. 51

42 U.S.C.
    § 7401 (a) (3) ............................................................................... 4
    § 7409 ........................................................................................ 34
    § 7410 (a).................................................................................... 34
    § 7410 (a) (2) (D) (i)................................................................... 34
    § 7411 ......................................................................................... 5
    § 7411 (b).................................................................................... 4
    § 7411 (b) (1)............................................................................. 4
    § 7411 (d).................................................................................... 4
    § 7416 ........................................................................................ 28
    § 7521 (a) (1)............................................................................. 4
    § 7543 (a).................................................................................. 24
    § 7543 (e) (1)............................................................................ 24

Clean Air Act, 42 U.S.C.
    § 7401 *et seq.* .................................................................. 1, 32, 36, 51

Clean Water Act, 33 U.S.C.
    § 1251 *et seq.* ................................................................................passim

Comprehensive Environmental Response, Compensation, and Liability Act
(CERCLA), 42 U.S.C.
    § 9601 *et seq.* ......................................................................... 46, 48

Exec. Order 14,260, of Apr. 8, 2025
    § 1, 90 Fed. Reg. 15,513 (Apr. 14, 2025) ............................................... 55

Exec. Order No. 14,156, of January 20, 2025, 90 Fed. Reg. 8,433 (Jan. 29,
2025)................................................................................................ 54

Exec. Order No. 14,257, of Apr. 2, 2025, 90 Fed. Reg. 15,041, 15,045-47 (Apr.
7, 2025)............................................................................................ 54

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891;
note at 28 U.S.C. § 1602.................................................................... 51

Global Climate Protection Act of 1987, Pub. L. No. 100-204
    §§ 1101-1106, 101 Stat. 1331, *reprinted* as note to 15 U.S.C. § 2901.............. 51-52

**State Statutes**

2024 N.Y. Sess. Laws ch. 679 § 2 (1).............................................................. 3

2024 N.Y. Sess. Laws ch. 679 § 7 .................................................................. 3

2025 N.Y. Sess. Laws ch. 100 § 1 (1) ........................................................................ 45

2025 N.Y. Sess. Laws ch. 100 § 1 (5) ........................................................................ 47

2025 N.Y. Sess. Laws ch. 100 § 1 (7) ........................................................................ 49

2025 N.Y. Sess. Laws ch. 100 § 3 ............................................................................. 60

Climate Change Superfund Act of 2024, 2024 N.Y. Sess. Laws ch. 679,
    (codified as N.Y. State Fin. Law § 97-m; N.Y. Env't Conservation Law §§
    76-0101, 76-0103, 76-0105) .................................................................... passim

N.Y. Env't Conserv. Law
    § 76-0101 (6) ..................................................................................................... 3
    § 76-0101 (8) ................................................................................................ 3, 29
    § 76-0101 (9) ................................................................................................ 3, 29
    § 76-0101 (21) ........................................................................................ 3, 44, 58
    § 76-0103 ........................................................................................................... 3
    § 76-0103 (1) ................................................................................................... 60
    § 76-0103 (2) ..................................................................................................... 3
    § 76-0103 (2) (a) .............................................................................................. 60
    § 76-0103 (2) (b) .............................................................................................. 60
    § 76-0103 (2) (c) .............................................................................................. 60
    § 76-0103 (3) (b) ................................................................................................ 3
    § 76-0103 (3) (d) (i) .......................................................................................... 22
    § 76-0103 (3) (e) .............................................................................................. 60
    § 76-0103 (3) (e) (i) ........................................................................................... 3
    § 76-0103 (4) ................................................................................................ 3, 60
    § 76-0103 (6) (f) ............................................................................................... 60
    § 76-0103 (8) ................................................................................................... 60

N.Y. State Fin. Law
    § 97-m (1) ........................................................................................................ 60
    § 97-m (2) ........................................................................................................ 60

## Federal Regulations

74 Fed. Reg. 66,496 (Dec. 15, 2009) ........................................................................... 4

80 Fed. Reg. 64,510 (Oct. 23, 2015) ............................................................................ 5

81 Fed. Reg. 35,824 (June 3, 2016) ............................................................................. 5

90 Fed. Reg. 36,288 (Aug. 1, 2025) ............................................................................ 4

**Rules**

Fed. R. Evid. 201 .................................................................................................. 30

Fed. R. Evid. 201 (b) ........................................................................................... 30

Fed. R. Evid. 702 .................................................................................................. 14

Fed R. Evid. 803 (18) ........................................................................................... 14

Fed. R. Evid. 805 .................................................................................................. 55

FRE 803(18) ......................................................................................................... 14

**Miscellaneous Authorities**

Kyoto Protocol to the United Nations Framework Convention on Climate
   Change, *opened for signature* Mar. 16, 1998, 2303 U.N.T.S. 162 (entered
   into force Feb. 16, 2005), *generally*, and arts. 2, 3, 4, 22 .......................... 5-6, 52-53

Paris Agreement, *opened for signature* Apr. 22, 2016, 3156 U.N.T.S. 79
   (entered into force Nov. 4, 2016), *generally*, and arts. 1, 3, 4, 8, 20 ............. passim

U.S. Mot. Summ. J., Attach. 3, Landau Decl. ¶¶ 15-20, United States v.
   Vermont, No. 2:25-cv-00463 (D. Vt. Sept. 15, 2025), ECF 50-3 ........................... 49

United Nations Framework Convention on Climate Change, opened for
   signature June 4, 1992, 1711 U.N.T.S. 107 (entered into force Mar. 21,
   1994), *generally*, and arts. 1, 2, 23 ................................................................ passim

## PRELIMINARY STATEMENT

Climate change has had significant impacts—including increased flooding, heat waves, and extreme storms—on New York, and the State of New York will need to spend hundreds of billions of dollars to protect New Yorkers from those harms. New York's Climate Change Superfund Act ("Climate Act") requires yet to be identified fossil fuel companies that produced the fossil fuels that contribute to climate change to compensate New York for some of those costs. In these consolidated cases, plaintiffs *West Virginia, et al.* (together, "West Virginia"), which include over twenty States ("the States"), two industry associations, and coal company Alpha Metallurgical Resources ("Alpha"), and plaintiffs *Chamber of Commerce, et al.* (together, "the Chamber"), which include three associations, challenge the Climate Act. The United States has challenged the Climate Act separately, *see United States v. New York*, No. 1:25-cv-03656 (S.D.N.Y.), and filed a statement of interest here.

Plaintiffs have moved for partial summary judgment on their first two claims, asserting that the Climate Act is preempted by the Clean Air Act and federal common law, exceeds limits on extraterritorial regulation, and is precluded by the foreign affairs doctrine. Defendants (together, "New York") have cross-moved for summary judgment dismissing the consolidated cases for lack of standing, or in the alternative, dismissing plaintiffs' first two claims on the merits and dismissing all claims against Acting Tax Commissioner Hiller.

Plaintiffs' summary judgment motions should be denied and New York's summary judgment motion should be granted. First, all plaintiffs lack standing

because they have not shown, based on admissible evidence, that they face certainly impending injury or a substantial risk of harm. Moreover, New York has submitted admissible evidence disproving the States' claim that the Climate Act will raise energy prices and lower production.

Second, even if some plaintiffs have standing, their claims fail. The Climate Act is not preempted by the Clean Air Act because the Climate Act only provides compensation for climate change harm, which the Clean Air Act does not cover. And the Climate Act is not preempted by federal common law because the Clean Air Act displaced federal common law. There is also no free-standing constitutional prohibition on "extraterritorial regulation," and the Act complies with the Due Process Clause because only fossil fuel producers with sufficient contacts with New York will receive cost recovery demands. Also, the Climate Act does not conflict with any express foreign policy and does not intrude on foreign affairs. Finally, the Eleventh Amendment bars West Virginia's claims against Hiller.

## STATUTORY BACKGROUND

### The Climate Change Superfund Act

The Legislature adopted the Climate Act in 2024 as "necessary for the general health, safety, and welfare of the people of [New York]" based on its finding that:

> [T]he state must take action to adapt to certain consequences of climate change that are irreversible, including rising sea levels, increasing temperatures, extreme weather events, flooding, heat waves, harmful algal blooms and other climate-change-driven threats .... Meeting that challenge will require a shared commitment of purpose, huge investments in new or upgraded infrastructure, and new revenue sources to pay for those investments.

2024 N.Y. Sess. Laws ch. 679 §§ 2(1), 7.

The Climate Act establishes "the climate change adaptation cost recovery program" to help offset a portion of the costs that New York State will incur to address the statewide impacts of climate change. N.Y. Env't Conserv. Law ("ECL") § 76-0103. The program will fund future adaptation projects designed to address the significant harms from climate change in New York State and promote the health and wellbeing of New Yorkers. *Id.* §§ 76-0103(2), 76-0103(3)(b). Yet to be identified fossil fuel companies that meet statutory thresholds, including "sufficient contacts with the state to satisfy the due process clause of the United States Constitution," ("responsible parties") will be required to collectively pay $75 billion into a climate adaptation fund. *Id.* §§ 76-0101(6), (21), 76-0103(3)(b).

A responsible party's share of that assessment will be proportional to its share of "covered greenhouse gas emissions," ECL § 76-0103(3)(b), which will be determined based on historic greenhouse gas emissions "attributable" to the fossil fuels that the company is responsible for having extracted or refined from 2000 to 2024, *id.* § 76-0101(8)–(9), (21). Those emissions may include both direct emissions from a party's operations and indirect emissions from the use of fossil fuels produced by a party. Responsible parties can pay the assessment in up to 25 annual payments. *Id.* § 76-0103(3)(e)(i).

The Act directs the New York Department of Environmental Conservation ("DEC") to issue regulations by June 26, 2027, including provisions to (a) gather

information to identify responsible parties; (b) determine responsible parties and their shares; and (c) issue cost recovery demands by June 30, 2028. *Id.* § 76-0103(4).

### The Clean Air Act

The Clean Air Act seeks to prevent air pollution by "reduc[ing] or eliminat[ing]" pollutants "produced or created at the source" and recognizes that such prevention is the primary responsibility of States and local governments, 42 U.S.C. § 7401(a)(3). It establishes a cooperative federalism model for EPA and States to regulate "pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014), subject to statutory standards for regulation that apply to each type of source. For stationary sources, it requires EPA to determine whether a category of sources "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare," and to establish standards of performance for new sources within such category. 42 U.S.C. § 7411(b)(1); *see also id.* § 7521(a)(1). While EPA issues standards under for new sources, States establish standards of performance for existing stationary sources, informed by EPA's emissions guidelines. *Id.* §§ 7411(b), (d).

The Supreme Court ruled in *Massachusetts v. EPA*, 549 U.S. 497, 528–29 (2007), that greenhouse gas emissions are pollutants under the mobile-source provisions of the Clean Air Act. EPA then issued an endangerment finding, 74 Fed.

Reg. 66,496 (Dec. 15, 2009),[1] and emission standards for motor vehicles, *see Util. Air Regul. Grp.*, 573 U.S. at 310–11. EPA subsequently determined that greenhouse gas emissions from certain stationary sources also endanger public health and welfare and issued regulations under 42 U.S.C. § 7411. *See, e.g.*, 80 Fed. Reg. 64,510 (Oct. 23, 2015) (power plants); 81 Fed. Reg. 35,824 (June 3, 2016) (oil and gas industry).

## INTERNATIONAL AGREEMENTS REGARDING CLIMATE CHANGE

For decades, international environmental law and agreements to which the United States is a party have recognized the "polluter pays" principle, pursuant to which a polluting entity must pay the costs that its profit-making activities impose on neighboring people and entities, as opposed to benefiting financially from costs it causes others to bear.[2] NY 56.1 ¶ 14.

In 1992, many countries, including the United States, signed the United Nations Framework Convention on Climate Change ("Framework Convention"), agreeing to "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." Art. 2, *opened for signature* June 4, 1992, 1711 U.N.T.S. 107 (entered into force Mar. 21, 1994); NY 56.1 ¶ 15. The Framework Convention is implemented through annual conferences and treaties such as the Kyoto Protocol to the United

---

[1] EPA has proposed to repeal the 2009 endangerment finding. 90 Fed. Reg. 36,288 (Aug. 1, 2025).

[2] New York refers to its contemporaneously filed Local Rule 56.1 statement of material facts as "NY 56.1"; West Virginia's statement, ECF 218, as "WV 56.1"; the Chamber's statement, ECF 216-2, as "CC 56.1"; and New York's contemporaneously filed response to West Virginia's statement as "WV 56.1 Resp."

Nations Framework Convention on Climate Change ("Kyoto Protocol"), *opened for signature* Mar. 16, 1998, 2303 U.N.T.S. 162 (entered into force Feb. 16, 2005), and the Paris Agreement, *opened for signature* Apr. 22, 2016, 3156 U.N.T.S. 79 (entered into force Nov. 4, 2016). *See* NY 56.1 ¶ 16. The United States declined to participate in the most recent annual conference in 2025 in Brazil. *Id.* ¶ 17.

The United States declined to join the 1997 Kyoto Protocol, which established legally binding obligations to reduce emissions in developed countries, Kyoto Protocol, arts. 2, 3, but did not withdraw from the Framework Convention. *See* NY 56.1 ¶ 18. The United States joined the 2015 Paris Agreement, which requires members to pursue domestic mitigation measures to meet national emission reduction goals and transparently communicate information on their progress. Paris Agreement, art. 3; *see* NY 56.1 ¶ 19. Unlike Kyoto, Paris does not have legally binding emissions reduction requirements. *See* NY 56.1 ¶ 20.

Neither the Framework Convention nor the Paris Agreement addresses intergovernmental liability for past greenhouse gas emissions. *See generally* Framework Convention; Paris Agreement; *see also* NY 56.1 ¶ 21. For example, the "loss and damage" provision in Article 8 of the Paris Agreement does not provide a basis for the liability of or compensation by any government. Paris Agreement, art. 8; *see* NY 56.1 ¶ 21. Nor do they address payments from private companies to subnational government entities like New York, as the agreements apply only to countries and regional economic integration organizations like the European Union. Framework Convention, arts. 1, 23; Paris Agreement, Arts. 1, 4, 20; *see* NY 56. 1 ¶ 22.

In January 2025, President Trump announced his intention to withdraw from the Paris Agreement, but withdrawal requires at least one year's written notice, so the earliest the withdrawal could become effective is January 2026. NY 56.1 ¶ 23.

## FACTUAL BACKGROUND

### The Economic Impacts of Cost-Recovery Demands

Because the Climate Act's cost demands will be based on greenhouses gases attributable to fossil fuels extracted or refined in the past, the demands will not affect the market price for energy. NY 56.1 ¶ 1. Standard economic models show that a company will continue to produce and sell additional goods and services if it can earn a profit, that is, if the product is sold at a price higher than the cost of producing it, which is called the marginal cost of production. *Id.* ¶ 2. The Act's cost demands impose a fixed cost, not a marginal cost, because the amount of the demand is unrelated to a company's current decisions about the quantity of fossil fuels to extract or refine. *Id.* ¶ 3. Because the demands do not affect the marginal cost of production, the Act will not affect the market price. *Id.* ¶ 4. The demands will be absorbed by fossil fuel companies and will not be passed on to consumers through increased prices. *Id.* ¶ 5.

Indeed, the Climate Act is not an economic regulation, as understood by economists, because it does not change the conduct of fossil fuel companies that will receive cost demands, or any other fossil fuel company inside or outside the United States. *Id.* ¶ 6. Moreover, because there will be no effect on market prices, demand for energy will not change as a result of the Act, and with no change in supply or demand, the Climate Act will not change energy availability in the United States. *Id.*

¶ 7. In addition, because the Act does not change the current or future marginal cost of production or prices, it will not change fossil fuel companies' expectations about future profits from extracting or refining fossil fuels, or the resulting incentive to invest in new infrastructure and innovation. *Id.* ¶ 8. And it will not affect any State's revenue from severance taxes because it will not change the price or production of fossil fuels. *Id.* ¶ 9.

### Greenhouse Gas Emissions

Climate science allows for the attribution of climate damage, including warming and other local climate hazards, to sets of emissions, including emissions of a specific company. *Id.* ¶ 10. In-state climate harms can be attributed to a specific company's greenhouse gas emissions by calculating the warming from cumulative greenhouse gas concentrations with and without the company's emissions and then using modeling to link the company's impact on warming to altered in-state hazards such as the likelihood or magnitude of extreme heat. *Id.* ¶ 11.

The process for this type of attribution begins with identifying the greenhouse gas emissions to be considered. *Id.* ¶ 12. The emissions attributable to fossil fuel companies are Scope 1 emissions, direct emissions from a company's operations, including emissions from flaring, refining and other operations; Scope 2 emissions, emissions from energy supplied to the company for its operations, including for heating and cooling; and Scope 3 emissions, which largely consist of emissions from the use of the company's products. *Id.* ¶ 13.

## STANDARD OF REVIEW

Summary judgment is appropriate "when, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Summary judgment must be denied "[i]f the evidence submitted in support of the summary judgment motion does not meet the movant's burden." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted). And "where the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the nonmoving party's case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (cleaned up).

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "The proponent of an out-of-court statement offered for its truth bears the burden of proving it fits into a hearsay exception." *Little v. Cnty. of Nassau*, 708 F. Supp. 3d 252, 265 (E.D.N.Y. 2023) (cleaned up).

If the moving party meets its initial burden, "the opposing party must set out specific facts showing a genuine issue for trial." *City of New York v. Lexington Ins. Co.*, 735 F. Supp. 2d 99, 107 (S.D.N.Y. 2010) (cleaned up). Even if there is no genuine issue as to any material fact, the movant bears the burden to show entitlement to judgment as a matter of law.

Further, when a plaintiff facially challenges a statute that has not yet been implemented or applied, *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (noting that pre-enforcement challenge is a facial challenge), it must "establish that no set of circumstances exists under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (cleaned up). Courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449–50. Facial challenges are "the most difficult challenge[s] to mount successfully," *N.Y. State Rifle*, 804 F.3d at 265 (citation omitted), in part because they "'threaten to short-circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Wash. State Grange*, 552 U.S. at 451).

## **ARGUMENT**

The Court should deny plaintiffs' partial summary judgment motions and grant New York's motion. First, plaintiffs lack standing to challenge the Climate Act because they have not met their burden to show, based on admissible evidence, that they face certainly impending injury or that there is a substantial risk of harm.

Even if they have standing, the Climate Act is not preempted by the Clean Air Act because the Climate Act only provides compensation for climate change harms, which the Clean Air Act does not cover. Nor is the Climate Act preempted by federal common law, which was displaced by the Clean Air Act.

The Constitution does not address "extraterritorial legislation" separately from the requirements of the specific clauses such as the Due Process Clause. The Climate Act ensures compliance with the Due Process Clause by requiring that fossil fuel producers that receive cost demands have sufficient contacts with New York. The Climate Act is also not precluded by the foreign affairs doctrine because the United States' foreign policy addresses ongoing greenhouse gas emissions, not the liability of private parties for climate-change harm from past emissions. Finally, the Eleventh Amendment bars West Virginia's claims against Acting Tax Commissioner Hiller.[3]

## I.    PLAINTIFFS LACK STANDING.

A plaintiff must establish that: (1) it has "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) "the injury was likely caused by the defendant"; and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). At the summary judgment stage, the plaintiff must set forth facts "supported adequately by the evidence." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 5661 (1992) (cleaned up). At least one plaintiff must have standing as to each claim. *See Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019).

A plaintiff must show that injury is "certainly impending" or a "substantial risk." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013) (cleaned up).

---

[3] New York refers to West Virginia's brief in support of its summary judgment motion, ECF 217-1, as "WV Br."; the Chamber's brief in support of its summary judgment motion, ECF 216-1, as "CC Br."; and the United States' statement of interest, ECF 222, as "US St."

"Allegations of possible future injury", *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), and even an "objectively reasonable likelihood" of future injury, standing alone are generally insufficient, *Clapper,* 568 U.S. at 410. Nor can a plaintiff typically establish standing "by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 416. When a "plaintiff's claimed injury, if any, is not, actual or imminent," its claim is also "constitutionally unripe." *Nat'l Org. for Marriage, Inc. v. Walsh,* 714 F.3d 682, 688 (2d Cir. 2013); *see also N.Y. Civ. Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008) (standing and ripeness "overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical" (cleaned up)).

If a plaintiff "challenges the government's unlawful regulation" of "*someone else,*" the plaintiff "must show that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382–83 (2024) (cleaned up). Where standing "depends on the unfettered choices made by independent actors," a plaintiff' must show on summary judgment that "those choices have been or will be made." *Lujan*, 504 U.S. at 562 (cleaned up).

 Plaintiffs fail to meet their burden to show, based on admissible evidence, that they face certainly impending injury or a substantial risk of harm. The States fail to submit admissible evidence that the Climate Act will raise energy prices and lower fossil fuel production, and New York submits admissible evidence that the Act will not have those effects. Alpha likewise fails to submit admissible evidence that its

receipt of a cost demand is certainly impending or a substantial risk. And the West Virginia and Chamber associations similarly fail to establish imminent injury for any of their members, as required for associational standing.

## A.    The States Fail to Demonstrate Injury.

The States allege that the Climate Act will injure their proprietary interests by raising energy prices and lowering tax revenue. WV Br. 11, 14–15. They also assert injury to their *parens patriae* interests due to higher energy costs for consumers and harm to the fossil fuel industry, WV Br. 17–18, and "being discriminatorily denied [their] rightful status within the federal system" based on *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 606–8 (1982), WV Br. 11. But the States have not shown those injuries based on admissible evidence and New York has submitted admissible evidence refuting them.[4]

### 1.    The States Have Not Shown Proprietary Injuries.

The States claim that the Climate Act will lead fossil fuel producers to increase prices, which will increase the States' energy costs as well as reduce consumption and production of fossil fuels, leading to lower tax revenue. WV Br. 11, 14–15. The States have not presented any admissible evidence that fossil fuel companies will raise prices or decrease production as a result of the Climate Act, as required for injuries based on third party conduct, *All. for Hippocratic Med.*, 602 U.S. at 383, and thus that price increases or lower tax revenue are not "certainly impending," *Clapper*, 568

---

[4] While the States also purport to assert a separate injury to their sovereign interests, WV Br. 11, they do not discuss that injury as distinct from the injury they assert to their quasi-sovereign interests, WV Br. 19–20.

U.S. at 409 (cleaned up). And even if the States had submitted admissible evidence, New York's contradictory evidence raises a dispute of material fact as to standing that precludes summary judgment in the States' favor.

The States primarily rely on Dr. Benjamin Zycher's opinion that the Climate Act will reduce production and increase the price of fossil fuels. WV Br. 11, 13–14; WV 56.1 ¶¶ 25–30, 32, citing Ex. 24 ("Zycher Decl.") ¶¶ 11, 12, 14–15, 41, 44, 55, ECF 217-26. For the reasons stated in New York's concurrently filed motion to strike, Zycher's testimony is inadmissible because it fails to satisfy Federal Rule of Evidence (FRE) 702 and *Daubert v. Merrell Dow Pharmas. Inc.*, 509 U.S. 579, 589–90 (1993).

The States also rely on several publications to support their assertion that the Climate Act will increase fossil fuel prices, WV Br. 11–12, 15, but those are also inadmissible. Treatises and periodicals are inadmissible hearsay unless they fall within the hearsay exception in FRE 803(18) for statements that are reliable and relied upon by an expert on direct examination or called to an expert's attention on cross-examination. *See, e.g.*, *Knight v. N.Y. State Dep't of Corrs.*, No. 18-CV-7172, 2022 U.S. Dist. 2022 WL 1004186, at *7–8 (S.D.N.Y Mar. 30, 2022) (court could only consider medical journal article on a summary judgment motion if mentioned in the testimony of an expert); *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 572–73 (E.D.N.Y 2013) (declining to consider scientific articles on summary judgment unless expert laid a proper foundation). The publications that the States cite are not relied upon by Zycher and so are not admissible under FRE 803(18).

14

The States, WV Br. 11, also rely on *NRDC v. Nat'l Highway Traffic Safety Admin*, 894 F.3d 95, 105 (2d Cir. 2018) to suggest that it is "basic economics" that the Climate Act will "make energy more expensive and less available." That court relied on "basic economics" for the proposition that imposing civil penalties discourages unlawful conduct because of the increased cost of that conduct, *id.* at 104–5, but the Climate Act does not impose a penalty on future conduct and therefore does not increase the cost of that conduct.

Even if Zycher's testimony were admissible, it is strongly contradicted by Fullerton, New York's economics expert. As Fullerton explains, Climate Act cost demands would increase prices only if they increased the marginal cost of future production, which the demands will not do because they are based on greenhouse gas emissions from fossil fuels produced from 2000 to 2024. WV 56.1 Resp. ¶ 25; *see* NY 56.1 ¶ 3. Thus, each demand is a fixed cost that will not increase future prices. Fullerton further explains that because the Climate Act will not change the profit a company earns going forward, it will not lead to a decrease in fossil fuel production or energy availability or the States' tax revenues. NY 56.1 ¶¶ 8–9; WV Resp. ¶ 25.

Fullerton also explains that Zycher's opinion is flawed because Zycher assumes that investors believe the State of New York will extend the Climate Act to operate prospectively and therefore see the Act as a tax on future emissions, not a fixed cost based on past emissions. Zycher provides no evidence, principles, or methods to support his speculation. WV 56.1 Resp. ¶ 25. Based on his speculation about investor beliefs, Zycher calculates the impact of that hypothetical tax. *Id.* ¶ 25. Fullerton

explains that that calculation is flawed and relies on baseless assumptions. *Id.* ¶¶ 25–26. Accordingly, Zycher's conclusion that the Climate Act will cause a six to twelve percent increase in market price in a market with an annual value of $4,500 billion is implausible. *Id.* Therefore, even if Zycher's testimony is admissible, there is a genuine dispute of fact regarding the States' standing that would preclude summary judgment in the States' favor.

### 2.    The States Have Not Shown *Parens Patriae* Injuries.

States suing as *parens patriae* must establish "(1) [an] injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief." *New York v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024) (cleaned up). The interests of private parties standing alone are not sovereign interests. *Snapp*, 458 U.S. at 602 (1982); *see also Purdue Pharma L.P. v. Kentucky,* 704 F.3d 208, 215 (2d Cir. 2013).

The two main categories of quasi-sovereign interests are a State's interests "in the health and well-being—both physical and economic—of its residents;" and "in securing observance of the terms under which it participates in the federal system." *Snapp,* 458 U.S. at 607–8. In *Snapp,* the Court cautioned that the latter interest is rooted in "assuring that the benefits of the federal system are not denied to its general population." *Id.* (quasi-sovereign interest in residents' ability to work in other States and participate in federal statutory employee service schemes).

The States assert quasi-sovereign interests in protecting: (1) their residents from economic injury caused by the Climate Act, WV Br. 17; (2) the fossil fuel industry

because it "supports millions of jobs" within their States, WV Br. 17; and (3) their "rightful status within the federal system," WV Br. 11, 19 (citing *Snapp*, 458 U.S. at 607). Whatever the merits of those interests, the States must demonstrate injury to a substantial segment of their populations, which they fail to do.

The States assert consumers will be harmed by higher energy prices, WV Br. 17, but as discussed above, they fail to present admissible evidence that the Climate Act will increase prices and the inadmissible evidence they provide is contradicted by New York's evidence, *see* pp. 13–15. The States also rely on the interests of fossil fuel companies, but the States have no *parens patriae* standing to assert the "interests of particular private parties," *Purdue Pharma,* 704 F.3d at 215.

The States also argue that the Climate Act denies them their "rightful status" in the federal system by punishing "lawful conduct that occurred outside of New York," WV Br. 19-20. But the States cannot establish *parens patriae* standing absent admissible, undisputed evidence of harm to their residents, *see Snapp*, 458 U.S. at 608; *Niagara-Wheatfield*, 119 F.4th at 279–282, which they have not shown. And the cases they cite, WV Br. 19–20, do not discuss standing. *See Franchise Tax Bd. of Cal. v. Hyatt,* 587 U.S. 230, 230, 236 (2019) (state immunity from private suits); *Healy v. Beer Inst.*, 491 U.S. 324 (1989) (state law basing beer prices on prices in border States violates the dormant Commerce Clause).

Accordingly, the States fail to meet their burden to establish injury to a "substantial segment of the state's population," as required for *parens patriae* standing. At best, there is a genuine issue for trial if Zycher's testimony is admissible.

### B.     The Associations and Alpha Fail to Demonstrate Injury That Is Certainly Impending or a Substantial Risk of Harm

The associations and Alpha in *West Virginia* and the associations in *Chamber* also lack standing. The associations assert associational standing, which requires them to show, among other things, that their "members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An association must show that at least one "identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009); *see also Equal Vote Am. Corp. v. Pelosi*, 397 F. Supp 3d 503, 509 (S.D.N.Y. 2019) ("an organizational plaintiff … must identify, by name, at least one member with standing").

The associations fail to show based on admissible evidence that at least one identified member faces injury that is certainly impending or a substantial risk as a result of the Climate Act. Apha lacks standing for the same reason.

#### 1.     The *West Virginia* Associations Fail to Name Any Member Who Will Suffer Harm.

None of the *West Virginia* associations identifies any members who will suffer harm as a result of the Climate Act, WV 56.1 ¶¶ 34–35, as required for associational standing. America's Coal Association does not present any evidence. The Gas and Oil Association of West Virginia makes only a general statement that the Climate Act injures its members,[5] WV 56.1, Ex. 25, Burd Decl., ECF 217-27 ¶¶ 10–11, and the

---

[5] The Gas and Oil Association of West Virginia's assertion that the Climate Act harms it, in addition to its members, WV Br. 22; Burd Decl. ¶ 11, is entirely conclusory. The association does not appear to assert standing based on its own injury, but even if it

West Virginia Coal Association states only that two unidentified members "have produced sufficient quantities of coal over the relevant time period to potentially subject them to a cost recovery demand," WV 56.1, Ex. 26, Bostic Decl., ECF 217-28, ¶ 5. Even if the West Virginia Coal Association could meet its burden by referring to unidentified members, a statement that those members could "potentially" be subject to a cost demand does not establish injury. *See Whitmore*, 495 U.S. at 158 ("Allegations of possible future injury" are insufficient for standing).

### 2. Alpha Fails to Show Impending Injury or a Substantial Risk of Harm.

Alpha asserts that it has standing to challenge the Act because it produced large amounts of coal during the covered years, which, according to Alpha, indicates New York will hold it liable as a responsible party. WV Br. 20–21. But the evidence Alpha relies upon is hearsay and even if it is admissible, it fails to establish that a determination by New York that Alpha meets the requirements for a responsible party under the Climate Act is certainly impending or a substantial risk.

A fossil fuel producer will receive a cost demand under the Climate Act only if it was responsible for more than one billion tons of covered greenhouse gas emissions from 2000 to 2024 and it has sufficient contacts with New York to satisfy due process. All of the (inadmissible hearsay) evidence Alpha relies upon at best establishes that New York could potentially find that Alpha meets the first requirement.

---

did, its conclusory assertions of harm are insufficient to meet its burden on summary judgment to prove injury in fact. *See NRDC, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 228 (S.D.N.Y. 2019) (a court cannot consider conclusory declarations on standing).

To show that it was one of the largest coal producers in the country during the relevant period, Alpha relies on (1) a database regarding the carbon dioxide equivalent attributable to Alpha from 2000 to 2024; (2) an October 2023 memorandum, "Approximate List of Covered Companies," written by two of the legislators who co-sponsored the Climate Act that names Alpha (the "October 2023 Memo"); (3) the U.S .Energy Information Administration website listing Alpha as one of the largest  U.S. producers of coal in 2011 and  2023; and (4) Alpha's 2011 annual report stating that it was then the second largest publicly-traded U.S. coal producer. WV Br. 20–21; WV 56.1, Ex. 29, Wold Decl., ECF 217-29; *id*. Exs. A–D, ECF 217-30, ECF 217-33. Alpha does not introduce these reports through an expert or otherwise attempt to establish the admissibility of this hearsay, therefore the Court should not consider it. *See Raskin*, 125 F.3d at 66 (court considers only admissible evidence on summary judgment).

Alpha does not present evidence that it meets the requirement of the Climate Act that a responsible party have sufficient contacts with the State of New York to satisfy due process. To the extent Alpha relies on the suggestion in the October 2023 Memo that the named companies have sufficient contacts, Wold Decl Ex. D at 1, the legislators' opinions about Alpha's contacts are irrelevant. The Climate Act requires DEC to make that determination after promulgating regulations to identify responsible parties with sufficient contacts. Because Alpha does not present any evidence to suggest that DEC will find that it has sufficient contacts with New York, it fails to establish a certainly impending injury or a substantial risk of injury.

### 3.     *Chamber* Associations Fail to Show that Their Members Face Impending Injury or a Substantial Risk of Harm

To show that their members have standing to challenge the Climate Act, the *Chamber* associations assert that New York is targeting their members for cost demands; that those members will have to prepare to respond and defend against those demands; and that those members are threatened with reputational harm. CC Br. 9, ECF 216-1; CC 56.1 ¶¶ 4–5, 9–10, 14–15, 19–20. The associations fail to establish based on admissible evidence that these injuries are certainly impending or at least a substantial risk. The third assertion is also conclusory, and that purported injury is not redressable by the relief that the Chamber seeks.

First, like Alpha, the associations rely upon inadmissible hearsay to assert that their members are likely to receive cost demands: (1) the October 2023 Memo, which refers to some of their members; (2) a statement during floor debate that some of their members earned staggering profits and would have to share in the costs of climate change; (3) similar statements in a legislative memorandum; and (4) a press release that includes similar statements by legislators and advocates. CC 56.1 ¶¶ 26–32. The associations do not even attempt to establish the admissibility of any of this hearsay and as a result the Court should not consider it. *See Raskin*, 125 F.3d at 66.

Even if that evidence were admissible, at best it shows that certain legislators believe that some association members should be responsible parties. But DEC, not those legislators, will determine which fossil fuel producers meet both the emissions requirement and the sufficient contacts requirement based on regulations that have

yet to be promulgated. The associations do not present evidence that DEC will find that their members meet those requirements.

Second, to the extent the associations rely on their members' "compliance costs" to prepare for and respond to cost demands, CC 56.1 ¶¶ 5, 10, 15, 20,[6] such harm cannot establish standing absent a showing that it is certainly impending, or a substantial risk, that members will receive cost demands, which the Chamber has not shown. *See Clapper*, 568 U.S. at 417 (costs to avoid surveillance insufficient); *McMorris v. Carlos Lopez & Assocs.*, 995 F.3d 295, 303 (2d Cir. 2021) (expenses to reduce risk of identity theft not cognizable injury); *Chamber of Comm. of the U.S. v. City of Seattle*, No. C16-0322 (RSL), 2016 WL 4595981, at *3–4 (W.D. Wash. Aug. 9, 2016) (expenditures to participate in rulemaking or to educate workers based on fears of hypothetical harm as a result of a government ordinance were insufficient).

The associations also assert that their members face injury because they will have to respond to information requests from DEC, Jarboe Decl. ¶ 16; Martini Decl. ¶ 19; Parrish Decl. ¶ 17; Slone Decl. ¶ 19; Swarup Decl. ¶¶ 21–22; Torrence Decl. ¶ 18, but none of those members assert they have received an information request or present any evidence that a request is certainly impending or a substantial risk.

---

[6] Specifically, the Chamber associations' members assert they will incur compliance costs because they must hire and organize "multidisciplinary teams" to review emissions data, model potential cost recovery liability, and prepare a legal defense to the demands, consider whether to disclose liability in their filings with the Securities and Exchange Commission, and participate in DEC's rulemaking process. CC Br., Attachs. 3, Cochrane Decl., ¶¶16–18, ECF 216-3; 5, Jarboe Decl. ¶¶ 14–15, 17–22, 23, ECF 216-5; 6, Martini Decl. ¶ 14–16, 18, ECF 216-6; 9, Parrish Decl. ¶¶ 17–21, ECF 216-9; 11, Slone Decl. ¶¶ 16–18, 20, ECF 216-11; 12, Swarup Decl. ¶¶ 15–17, 20, 23, ECF 216-12; 14, Torrence Decl. ¶¶ 5–6, 9, 11–17, 19, ECF 216-14.

Moreover, the Climate Act merely provides that DEC *may* request information to enable it to determine whether an entity is a responsible party. ECL § 76-0103(3)(d)(i).

Finally, the associations' conclusory assertion that their members are threatened with reputational damage by being labeled as partly responsible for climate change, CC 56.1 ¶¶ 5, 10, 15, 20,[7] is insufficient to establish harm. *See Miller v. James*, 751 F. Supp. 3d 21, 32–33 (N.D.N.Y 2024). And even assuming that the unremarkable statement that fossil fuel companies share in responsibility for climate change could cause reputational harm, the injunctive relief sought by the associations will not redress that injury, as required for standing. *TransUnion*, 594 U.S. at 423 (plaintiff must show that injury would likely be redressed by judicial relief). As the associations note, legislators and advocates have already found their members responsible, in part, for climate change, CC 56.1 ¶¶ 26–32, and an order enjoining the implementation of the Climate Act will not change that.

## II.   NEITHER THE CLEAN AIR ACT NOR FEDERAL COMMON LAW PREEMPTS THE CLIMATE ACT.

Plaintiffs and the United States argue that the Clean Air Act and federal common law preempt the Climate Act. WV Br. 24–31, 40–50; CC Br. 10–14, 19–23; US St. 2–3, 11–15, ECF 222. Their arguments rest on the incorrect premise that the Climate Act regulates out-of-state and global greenhouse gas emissions. *See, e.g.*, WV Br. 26; CC Br. 10; US St. 12–13. However, the Climate Act seeks only compensation

---

[7] *See also* Cochrane Decl. ¶ 20; Jarboe Decl. ¶ 24; Martini Decl. ¶ 20; Parrish Decl. ¶ 22; Slone Decl. ¶ 21; Torrence Decl. ¶ 20.

for harm to New York State from past emissions, which the Clean Air Act does not address. And the federal common law of interstate air pollution is displaced by the Clean Air Act, rendering it inoperative.

### A.    The Clean Air Act Does Not Preempt the Climate Act.

The preemption of a state statute by a federal statute represents "a serious intrusion into state sovereignty," and courts assume that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v Lohr*, 518 U.S. 470, 485, 488 (1996) (cleaned up). "There are three types of preemption:

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives".

*Nat'l Shooting Sports Found. v. James*, 144 F.4th 98, 108 (2d Cir. 2025) (citations omitted). The party asserting preemption bears the burden of establishing it. *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018).

As a preliminary matter, the Climate Act is an exercise of the State of New York's police power because it protects New Yorkers by funding future adaptive measures that address the harms of climate change. Plaintiffs and the United States do not argue, nor could they, that the Clean Air Act expressly preempts the Climate Act because the Clean Air Act's express preemption provisions are limited and not

relevant here.[8] Instead, they argue field and conflict preemption. WV Br. 45–50; CC Br. 19–23; US St. 11–15. Both arguments fail because the Climate Act seeks only compensation for harms to the State of New York from past emissions, which the Clean Air Act does not address.

### 1. The Climate Act Is an Exercise of Traditional State Responsibility.

Plaintiffs argue that the presumption against preemption does not apply because the Climate Act regulates interstate air pollution, which they claim is traditionally occupied by federal law. WV Br. 44–45; CC Br. 20–21, fn. 7. But the Climate Act does not regulate cross-border pollution. As the Supreme Court explained in *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"), federal common law was applied in nuisance actions "brought by one State to abate pollution emanating from another State" (collecting cases).[9]

In contrast, the Climate Act requires fossil fuel companies to compensate the State of New York for harm from past greenhouse gas emissions, not to limit or otherwise control ongoing emissions. Nor does the Act indirectly require them to control emissions by forcing them to decrease fossil fuel production or implement

---

[8] The Clean Air Act only grants EPA authority to preempt state standards "relating to the control of emissions" from new motor vehicles and nonroad engines or vehicles. 42 U.S.C. §§ 7543(a), (e)(1).

[9] The United States relies on *Tex. Industries*, 451 U.S. at 641, to assert that "'our federal system does not permit … controvers[ies]'" involving interstate pollution "'to be resolved under state law.'" US St. 11. That decision declined to establish a right to contribution under federal common law in an antitrust damages case. While the Court mentioned the federal common law of interstate pollution in a footnote, it focused on interstate water disputes. 451 U.S. at 641 n.13.

additional pollution controls. As explained by New York's economics expert, cost demands under the Act will impose a fixed cost that will not lead companies to decrease production or alter any incentives to invest or innovate, including by implementing additional pollution controls. NY 56.1 ¶¶ 3–8.

Because the Act compensates the State of New York for the impacts that climate change poses to health, safety, and well-being, it falls squarely within the State's traditional powers and is presumed constitutional. States have broad police powers to "protect the health and safety of their citizens." *Medtronic*, 518 U.S. at 475. The State of New York has a longstanding interest in "all the earth and air within its domain," *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) (enjoining industry from discharging noxious gas into State), and a "legitimate interest in combating the adverse effects of climate change on [its] residents," *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018) (citing *Massachusetts*, 549 U.S. at 522–23). The Climate Act will raise revenue and operates in a field traditionally occupied by the States, *i.e.*, protecting their territory and their residents from environmental harms. *See, e.g., Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325, 336 (1973) (sustaining Florida no-fault liability law for damages caused by oil spills, noting "[s]o far as liability without fault for damages to state … interests is concerned, the police power has been held adequate for that purpose"). Application of the presumption

against preemption is appropriate here, and, in any event, plaintiffs' claims fail with or without the application of the presumption.[10]

### 2. The Clean Air Act Does Not Field-Preempt the Climate Act.

Plaintiffs and the United States argue that the Climate Act impermissibly regulates out-of-state air emissions, a field they argue the Clean Air Act "exclusively occupies ... thus foreclosing any state regulation in the area." WV Br. 45 (cleaned up); *see also* CC Br. 19–20 (same); US St. 11 ("federal law has always occupied the field of interstate air pollution ... [b]efore the Clean Air Act"). The Climate Act does not regulate interstate air emissions nor does *City of New York v. Chevron,* 993 F.3d 81 (2d Cir. 2021) ("*City of New York*"), which plaintiffs and the United States heavily rely on, hold otherwise.

Field preemption is "rare." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). To determine if Congress "has implicitly ousted the States from regulating in a particular field, [courts] must first identify the field in which this is said to have occurred." *Id.* Field preemption applies only if the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it" in that field or the "federal interest is so dominant" in that field "that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)

---

[10] Even when courts decline to apply the presumption against preemption, they do not, as West Virginia appears to argue, WV Br. 45–46, deem a state law preempted absent a federal statute that preempts it. *See, e.g., Buckman Comm. v. Pls.' Legal Comm.,* 531 U.S. 341, 348 (2001); *United States v. Locke*, 529 U.S. 89, 108 (2000) (explaining the operation of the presumption generally).

(citations omitted).  The Clean Air Act does not occupy the field of controlling ongoing emissions of air pollutants and, even if it did, the Climate Act seeks only compensation for climate harms.

Initially, the Clean Air Act does not occupy the field of controlling emissions of air pollutants. The cases cited by plaintiffs and the United States involve only conflict preemption. *See Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694–695 (6th Cir. 2015); *Bell v. Cheswick Generating Statio*n, 734 F.3d 188, 196–197 (3d Cir. 2013); *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 306 (4th Cir. 2010). Nor do *City of New York*, 993 F.3d at 99–100; *Massachusetts v. EPA*, 549 U.S. at 528–32; and *AEP*, 564 U.S. at 426–28, on which the Chamber also relies, hold that the Clean Air Act occupies the field.

And, as the Supreme Court stated in *AEP*, the Clean Air Act entrusts the balancing of "the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption" to the "EPA in the first instance, *in combination with* state regulators." 564 U.S. at 427 (emphasis added); *see also Gen. Motors Corp. v United States*, 496 U.S. 530, 532 (1990) (the Clean Air Act is "a comprehensive national program that made the States and the Federal Government *partners* in the struggle against air pollution") (emphasis added). For example, one of the Clean Air Act's savings clauses allows States to adopt emissions standards so long as they are no less stringent than EPA's. 42 U.S.C. § 7416. In contrast, the Supreme Court held in *Arizona v. United States*, 567 U.S. 387, 401 (2012), cited by West Virginia, WV Br. 45, that a state law that imposed penalties for failure to comply with

federal non-citizen registration requirements and work without federal authorization was preempted by the comprehensive federal scheme regulating such conduct. Unlike that specific area of law, the Clean Air Act does not "reflect[] a congressional decision to foreclose any state regulation in the area." *See id.*

The two savings clauses in the Clean Air Act further demonstrate that the Act does not occupy the entire field. *Int'l Paper Co. v. Ouellett*e, 479 U.S. 481, 491–92 (1987) (Clean Water Act's savings clauses "negates the inference that Congress" "left no room for supplementary state regulation.") (cleaned up); *Overnite Transp. Co. v. Tianti*, 926 F.2d 220, 222 (2d Cir. 1991) (per curiam) (savings clause evinced "Congress' intent to allow state regulation to coexist with the federal scheme").

Even if the Clean Air Act occupied the field of controlling emissions, which it does not do, it does not address "economic loss" or "occupy the entire field of pollution remedies," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 (2008) (citation omitted), and thus does not preempt the Climate Act. In *Exxon Shipping*, Exxon admitted that the Clean Water Act, on which the Clean Air Act was modeled, *see, e.g.*, CC Br. 21–22, "does not displace compensatory remedies for consequences of water pollution." 554 U.S. at 489. The Supreme Court ruled that the Clean Water Act also does not preempt punitive damages because there is "no clear indication of congressional intent to occupy the entire field of pollution remedies." *Id.* (citation omitted). The Clean Air Act also does not address compensatory remedies for air pollution.

Plaintiffs and the United States argue that the Climate Act is field-preempted because the Act regulates interstate greenhouse gas emissions, but they do not

29

contend that the Climate Act sets emissions limits. CC Br. 20–23; WV Br. 41–45; US St. 11–15. Nor could they because the Climate Act seeks compensation from fossil fuel companies based on the greenhouse gases attributable to them from 2000 to 2024, ECL § 76-0101(8)-(9), and does not address ongoing interstate emissions.

In contrast, in *International Paper Co. v. Ouellette*, Vermont residents sued a New York paper mill for water pollution under Vermont public nuisance law, and the Supreme Court held that their claim was preempted by the Clean Water Act because the claim sought "to impose separate discharge standards on a single point source." 479 U.S. 481, 493 (1987). As the Supreme Court explained in *Exxon Shipping*, "common law nuisance claims" that sought "effluent-discharge standards different from those provided by the [Clean Water Act]" are distinguishable from a claim for "economic injury," which does "not threaten similar interference with federal regulatory goals." 554 U.S. at 489 & n.7.

Plaintiffs and the United States assert that the Climate Act indirectly regulates ongoing emissions by causing fossil fuel companies to control pollution or cease production, but production decreases or other impacts do not constitute regulations on greenhouse gas emissions. In addition, they make those assertions based on findings in other cases that are not subject to judicial notice because they are not "generally known" or "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Federal Rule of Evidence 201(b); *see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (findings in prior cases do not meet the requirements of Rule 201).

30

Thus, plaintiffs and the United States may not rely on the finding in *Ouellette*, 479 U.S. at 495–98, that public nuisance liability under Vermont law would cause a paper mill to "adopt different or additional means of pollution control" or the finding in *City of New York*, 993 F.3d at 93, that companies may "cease global production altogether" to "avoid all liability" for damages to argue that the Climate Act will have the same effects. *See, e.g.,* WV Br. 49–50; US St. 15.

Moreover, New York has demonstrated that the Climate Act's cost demands will not lead to reduced production, implementation of additional controls, or other changes in corporate or consumer conduct. NY 56.1 ¶¶ 3–8. West Virginia and the United States submitted declarations to the contrary, *see* Zycher Decl.¶¶ 11, 40; US Br., Attach. 1, Landau Decl. ("Landau Decl.") ¶ 15, ECF 221-1, but for the reasons set forth in New York's motion to strike, that testimony is inadmissible. Zycher's testimony is also flawed. WV 56.1 Resp. ¶¶ 25–26.

Plaintiffs and the United States argue that *City of New York* controls the question of whether the Clean Air Act preempts the Climate Act, WV Br. 23–31, 40–49, CC Br. 1, 11–13, 20–23, US St. 3, 11–12, but *City of New York* did not analyze preemption by the Clean Air Act. Instead, it addressed whether a state public nuisance claim preempted by federal common law "snap[ped] back into action" when the Clean Air Act displaced federal common law. 993 F.3d at 98. The court did not conduct a "traditional statutory preemption analysis" to answer that question;

instead, it reasoned that the state common law claim could be revived only by one of the Clean Air Act's savings clauses and found that it was not.[11] *Id.* at 98, 100.

Moreover, the Second Circuit's concerns in *City of New York* are not present here. The court found that the City's nuisance claim would regulate cross-border emissions, 993 F.3d at 93, and the Climate Act does not do that because it has no impact on future fossil fuel production. NY 56.1 ¶¶ 3, 6, 8. The court also ruled that the City's claim "risk[ed] upsetting the careful balance that has been struck between the prevention of global warming" and "energy production, economic growth, foreign policy, and national security." *Id.* at 93. But as explained above with respect to the Clean Air Act, pp. 25–26, and below with respect to foreign policy, pp. 52–54, neither national nor foreign policy addresses compensation for climate harm as provided by the Climate Act.

Thus, even if the Clean Air Act occupies the field of controlling greenhouse gas emissions—which New York does not concede—it does not preempt the Climate Act because the Climate Act seeks only compensation for climate harms from past emissions.

---

[11] New York reserves the right to argue that *City of New York* was wrongly decided. *See, e.g., Mayor & City Council of Balt. v. BP, P.L.C.*, 31 F.4th 178, 203 (4th Cir. 2022) ("*BP I*") (noting "legal flaw" in *City of New York*'s analysis); *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 153 (D.C. Cir. 2023) (stating that *City of New York* "cannot be squared" with Supreme Court precedent); *City & Cnty. of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1200 (Haw. 2023), *cert denied*, 145 S. Ct. 1111 (2025) (finding *City of New York*'s reasoning "not persuasive"); *In re Cnty. Comm'rs of Boulder City. v. Suncor Energy USA, Inc.*, No. 24SA206, 2025 WL 1363355, at *9–10 (Colo. 2025) (declining to follow *City of New York* and criticizing its preemption analysis); *Minnesota v. Am. Petroleum Inst.*, No. 62-CV-20-3837, 2025 WL 562630, at * 14 (D. Minn. Feb. 14, 2025) (similar).

### 3.    The Climate Act Does Not Conflict with the Clean Air Act.

A state statute is conflict-preempted if it is impossible to comply with both state and federal law or the state statute "is an obstacle to the achievement of federal objectives." *Nat'l Shooting Sports Found.*, 144 F.4th at 108 (citation omitted). For example, the court held in *Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 87–89 (2d Cir. 2003), that conditions imposed by New York on trading sulfur dioxide allowances were conflict-preempted because they imposed restrictions on the nationwide allowance trading system established under the Clean Air Act.

The burden to show conflict preemption is "heavy," and a plaintiff must establish an "actual" and "sharp conflict." *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 101–102 (citations omitted). Additionally, courts do not find conflict preemption based on "incidental effects." *See, e.g.*, *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas,* 489 U.S. 493, 516 (1989) (state law that might have "some impact on purchasing decisions and hence costs … does not without more result in conflict pre-emption"); *Coal. for Competitive Elec. v. Zibelman,* 906 F.3d 41, 56–57 (2d Cir. 2018) (state emissions credit program was not conflict-preempted because alleged effects on federal program were "(at best) incidental"); *Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.,* 644 F.3d 934, 939–940 (9th Cir 2011) (registration and fee requirements for diesel-powered engines not an emissions standard or control on emissions, preempted by the Clean Air Act); *Chamber of Com. of the U.S. v. Cal. Air Res. Bd.*, 763 F. Supp. 3d 1005, 1021–22 (C.D. Cal. 2025) (climate-related

financial disclosure law did not force emissions reductions to avoid future liability and was not preempted by the Clean Air Act).

Plaintiffs and the United States do not claim that fossil fuel companies cannot comply with both the Clean Air Act and the Climate Act but instead argue that the Climate Act is an obstacle to the Clean Air Act's objectives. CC Br. 22–23; WV Br. 46–50; US St. 12–15. They overlook the difference between the control of ongoing emissions under the Clean Air Act and compensation for harm from past emissions under the Climate Act. West Virginia contends that the Climate Act "scuttles Congress' 'carefully drawn' regulatory scheme[,]'" WV Br. 47 (citations omitted), and obstructs EPA's authority to set nationwide standards, primarily based on EPA's authority to establish a "national ambient air-quality standard" ("NAAQS") under 42 U.S.C. § 7409. *Id.* 48–49; *see also* US St. 13–14. A NAAQS for a pollutant requires States to develop plans to control emissions of that pollutant from sources within the State to meet the standard. 42 U.S.C. § 7410(a). EPA has not established a NAAQS for greenhouse gases, but even if EPA had done so, the Climate Act seeks only compensation for harms from past emissions, so the Act does not conflict with EPA's NAAQS authority.

West Virginia and the United States also claim that the Climate Act conflicts with the Clean Air Act's "Good Neighbor Provision" requiring upwind States to reduce emissions that affect air quality in downwind States, 42 U.S.C. § 7410(a)(2)(D)(i), because that requirement recognizes that downwind States "lack authority to control" the "out-of-state pollution." WV Br. 48 (citing *EPA v. EME Homer City Generation,*

*L.P.,* 572 U.S. 489, 495 (2014)); *accord* US St. 14. However, that requirement only applies to NAAQS pollutants,[12] not greenhouse gases, and in any event the Climate Act does not set an emissions reduction standard for any out-of-state sources.

The United States also argues that even if EPA were to decline to regulate greenhouse gas emissions, or Congress were to bar EPA from regulating those emissions, the Climate Act would still be preempted because the Clean Air Act does not authorize States to regulate those emission. US St. 13. But because the Climate Act seeks only compensation for climate harms, this argument also fails.

West Virginia also argues that the Climate Act is conflict-preempted because, by imposing liability for emissions that are also regulated by the Clean Air Act, it forces fossil fuel producers to "cease global production altogether," *City of New York*, 993 F.3d at 93, or "adopt different or additional means of pollution control from those required by the Act," *Ouellette*, 479 U.S. at 498 n.19. WV Br. 50. As explained above, pp. 30–31, West Virginia may not rely on these observations to demonstrate that the Climate Act will have the same impacts and, in addition, New York has demonstrated that the Climate Act will not have those impacts. But even if the Act were to have those indirect effects, which it will not, indirect effects are not emissions standards or controls that conflict with the Clean Air Act.

---

[12] Although West Virginia and the United States cite *EME Homer City Generation,* 572 U.S. at 495, in support of their argument that the Climate Act is an obstacle to the achievement of the NAAQS program and conflicts with the Good Neighbor Provision, *see* WV Br. 48; US St. 14, that case did not consider whether the Good Neighbor Provision conflict-preempted a state law; instead it found that an EPA regulation was consistent with the Good Neighbor Provision, 572 U.S. at 524.

Finally, the United States claims that every State and its political subdivisions could enact the same law, forcing companies to change their conduct. U.S. St. 14–15. This claim is speculative (and also unlikely, given that over twenty States are plaintiffs in this case). Such speculation is insufficient for the plaintiffs to carry their burden at summary judgment. *See, e.g.*, *Nat'l Shooting Sports Found.*, 144 F.4th at 112 (citation omitted) (cautioning against "speculating about hypothetical or imaginary cases in which a law might be invalid"); *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 117–18 (2d Cir. 2024) (declining to find facial preemption based on a speculative application of the challenged law).

### B.    Federal Common Law Does Not Preempt the Act.

West Virginia argues that federal common law preempts the Climate Act, and the Chamber and the United States rely on federal common law cases to argue that the Act unconstitutionally regulates interstate pollution. CC Br. 10–14; WV Br. 24–31; US St. 2–3, 11–12. But the Clean Air Act displaced federal common law, *AEP*, 564 U.S. at 423–24, so the appropriate analysis here is whether the Clean Air Act preempts the Climate Act, which it does not, *see* pp. 24–36.[13] Even if federal common law could theoretically preempt the Climate Act, it does not do so here because the Act does not regulate interstate air pollution.

First, "there is no general federal common law." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). While there has been "specialized federal common law," including

---

[13] Indeed, fossil fuel companies have argued that "the Clean Air Act displaces any federal common law claims potentially arising from greenhouse gas emissions." *See* Answering Br. for Defs.-Appellees Shell Oil Co. et al., *Native Vill. of Kivalina v. Exxon Mobil Corp.*, No. 09-17490, 2010 WL 3299982, at *61–66 (9th Cir. June 30, 2010).

federal common law regarding interstate air pollution, the Clean Air Act displaced that common law. *AEP*, 564 U.S. at 421, 424; *see also Rhode Island v. Shell Oil Prods. Co.,* 35 F.4th 44, 55 (1st Cir. 2022) (the Clean Air Act "statutorily displaced any federal common law that previously existed") (cleaned up); *BP I*, 31 F.4th 204, 206 (same); *Bd. of Cnty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1260 (10th Cir. 2022) (same).

Thus, the appropriate analysis is whether the Climate Act could be preempted by the Clean Air Act, which it is not, *see* above pp. 24–36. Indeed, in *Ouellette*, the Supreme Court did not analyze whether the displaced federal common law of interstate pollution preempted a state common law claim; instead, it ruled only that the Clean Water Act preempted that state common law claim because the claim sought to control pollution emanating from another state. *See* 479 U.S. at 491 ("the question presented [is]: whether the [Clean Water] Act pre-empts Vermont common law to the extent that law may impose liability on a New York point source").

Plaintiffs and the United States argue that *City of New York* held that "only federal law can govern liability for out-of-state emissions." CC Br. 13; *see also* WV Br. 23–24; US St. 11–12. But *City of New York* did not involve preemption of a state statute by federal common law; instead, the Second Circuit held that a common law claim for climate damages could be brought only under federal common law. *See* 993 F.3d at 95 ("the City's claims must be brought under federal common law").[14] To the

---

[14] West Virginia also appears to rely on *Illinois v. City of Milwaukee*, 731 F.2d 403 (7th Cir. 1984), WV Br. 24, but that case involved two States seeking plenary regulatory authority over a single source of pollution. *Id.* at 414.

extent that the federal cases cited by plaintiffs and the United States address preemption by federal common law, they address only preemption of state common law. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (federal common law displaced state common law based on the "uniquely federal interest" in procurement of equipment by the United States); *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) (declining to imply a federal common law right to contribution under antitrust laws); *Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 387 (7th Cir. 2007) (state law breach of contract claim was preempted by federal common law of air carrier liability); *see also Franchise Tax Bd.*, 587 U.S. at 246–47 (States have sovereign immunity from private suits brought in courts of other States); *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 103–104 (1938) (federal common law regarding apportionment of interstate waters provided federal jurisdiction); *Clean Air Mkts. Grp.*, 338 F.3d at 87–89 (New York statute preempted by the Clean Air Act).

Even if federal common law could preempt a state statute, it would not preempt the Climate Act because the Act does not control interstate greenhouse gas emissions. As the Supreme Court explained in *AEP*, federal common law governed nuisance actions "brought by one State to abate pollution emanating from another State." 564 U.S. at 421. Those nuisance actions sought to enjoin further pollution by out-of-state polluters, *see, e.g.*, *Illinois v. City of Milwaukee,* 406 U.S. 91, 93, 104–107 (1972); *New Jersey v. City of New York*, 283 U.S. 473, 477 (1931); *Tenn. Copper Co.,* 206 U.S. at 237–38, which the Climate Act does not do. Indeed, *City of New York*

38

recognized that federal common law would preempt a state common law claim only if "the City's lawsuit would regulate cross-border emissions."[15] 993 F.3d at 93. The court found that the City's lawsuit would have that effect and, as New York has shown, the Climate Act will not.

The Chamber and the United States suggest that the Act is precluded by the Constitution simply because it implicates a "uniquely federal interest." CC Br. 10–11; US St. 2–3, 11; *see also* WV Br. 24–31. But they rely on cases involving federal common law, including *City of New York*, and the other federal common law cases discussed above, pp. 36–39, and federal common law does not preempt the Climate Act. Moreover, as discussed below, pp. 40–42, even if the Climate Act regulated cross-border pollution—which it does not—there is no ban on extraterritorial regulation that arises from the structure of the Constitution; instead, States are subject only to the restrictions on such regulation that may arise from specific constitutional provisions like the dormant Commerce Clause and the Fourteenth Amendment Due Process Clause.[16]

---

[15] Insofar as plaintiffs and the United States rely on *City of New York* to expand the federal common law of interstate pollution to the recovery of damages for climate harms, WV Br. 24–27; CC Br. 22–23; US St. 11–12, the Second Circuit ruled only that the City's public nuisance claim was covered by the federal common law regarding regulation of interstate pollution.

[16] The Chamber relies on three state court decisions to argue that "only federal law can govern liability for out-of-state emissions." CC Br. 13. But decisions from lower state courts are insufficient authority for the Chamber's argument and, in any event, those cases relied largely upon *City of New York*'s ruling regarding preemption of state common law. *See City of Charleston v. Brabham Oil Co.*, No. 2020-CP-10-03975, 2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025); *Mayor & City Council of Balt. v.*

III.    **THE CLIMATE ACT IS NOT PREEMPTED BY THE CONSTITUTION.**

The Chamber argues that the Climate Act is unconstitutional because the Constitution's structure of equally sovereign States prohibits a State from "exercis[ing] authority over conduct that takes place entirely elsewhere," CC Br. 15–16 (citation omitted), and West Virginia makes a similar argument, WV Br. 31–32. However, the "structure of the Constitution" does not prohibit the Climate Act, *see* CC Br. 16, nor is there a per se constitutional prohibition on "extraterritorial regulation," *see* WV Br. 31.

Plaintiffs similarly argue that the Climate Act violates the Fourteenth Amendment's Due Process Clause because the Act regulates conduct beyond New York's borders. CC Br. 16–17; WV Br. 33–35. Yet the West Virginia States do not have a cause of action and in any event, the Climate Act complies with the Due Process Clause because it seeks compensation for harm occurring within New York and requires that responsible parties have minimum contacts with New York.

A.    **The Structure of the Constitution Does Not Ban Extraterritorial Regulation.**

Plaintiffs and the United States argue that the Climate Act violates the Constitution's establishment of equal sovereignty between States because the Act regulates conduct that occurs outside of the State of New York. CC Br. 15–16; WV Br. 31; US St. 3–4. West Virginia further asserts that there is a "rule against extraterritorial regulation" that rests in part on the "original and historical

---

*BP P.L.C.*, No. 24-C-18-004219, 2024 WL 3678699 (Md. Cir. Ct. July 10, 2024) ("*BP II*"); *Platkin v. Exxon Mobil Corp.*, No. MER-L-001797-22, 2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025). As explained above, *City of New York* is not controlling here.

understandings of the Constitution's structure," WV Br. 31 (citing *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023) (citation omitted)), and the United States makes a similar argument, US St. 4. However, those parties do not cite any cases ruling that the equal sovereignty of States or the Constitution's structure creates a per se ban on extraterritorial regulation. Instead, they rely on cases that: (1) assert the general principle of equal sovereignty among the States, *e.g.*, *Hoyt v. Sprague*, 103 U.S. 613, 630–31 (1880); WV Br. 31, 32, 34, or (2) address specific clauses of the Constitution, including the dormant Commerce Clause, *e.g., Pork Producers*, 598 U.S. at 376; the Full Faith and Credit Clause,[17] *e.g., Bonaparte v. Appeal Tax Ct.,* 104 U.S. 592, 594 (1881); and the Due Process Clause, *e.g., N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161–62 (1914), *see* CC Br. 2, 11, 15–16; WV Br. 1–2, 19, 31–34; US St. 2–5.

For example, West Virginia asserts that in *Pork Producers* the Supreme Court reaffirmed "that the Constitution's structure limits 'the reach of one State's power.'" WV Br. 31 (quoting *Pork Producers*, 598 U.S. at 376); *see also* US St. 4. But in *Pork Producers*, the Court ruled that a state law does not violate the dormant Commerce Clause simply because it has "the practical effect of controlling commerce outside the State." 598 U.S. at 371 (cleaned up); *see also id.* at 374 (citation omitted) (noting "many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior," without raising constitutional concerns) (citation omitted). In fact, the Court rejected "an almost *per se* rule against state laws with

---

[17] U.S. Const., art IV, § 1.

extraterritorial effects." *Id.* at 394 (Roberts, J., concurring in part) (internal quotations omitted). *Pork Producers* thus held that a California law barring sales of pork from animals confined in a way inconsistent with California standards did not violate the dormant Commerce Clause,[18] even though California imports almost all of the pork it consumes. *Id.* at 364, 368, 370–371.

West Virginia also relies on Justice Kavanaugh's concurrence in *Pork Producers* to assert that the Full Faith and Credit Clause prevents "one State from forbidding what another State expressly authorizes." WV Br. 34. But Justice Kavanaugh "express[ed] no view on whether such an argument ultimately would succeed," *Pork Producers*, 598 U.S. at 410 (concurring in part), and did not set forth a per se rule against extraterritorial regulation. Furthermore, the Climate Act does not forbid any States from promoting fossil fuel production in their economies.

Moreover, as explained in *Pork Producers*, 598 U.S. at 376, the Supreme Court has looked to the "original and historical understandings of the Constitution's structure," to aid in its interpretation of *specific* constitutional provisions such as the dormant Commerce Clause. The Court has not held that the Constitution's structure or the equal sovereignty of States creates a general ban on extraterritorial regulation. Thus, to the extent that plaintiffs and the United States assert a constitutional prohibition on extraterritoriality based on the Constitution's structure, equal state

---

[18] The United States argues, US St. 4, that the Climate Act regulates "commerce that takes place wholly outside of the State's borders," *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982), but the Act does not apply to wholly out-of-state transactions because the consumption of fossil fuels produced elsewhere has caused greenhouse gas emissions in New York attributable to the production of those fuels.

sovereignty, the dormant Commerce Clause, or the Full Faith and Credit Clause, those claims fail.

### B.    The Climate Act Does Not Violate the Due Process Clause.

Plaintiffs next assert that the Climate Act violates the Fourteenth Amendment's Due Process Clause. CC Br. 16–17; WV Br. 33–35. The West Virginia States lack a cause of action to bring a due process claim on behalf of fossil fuel companies. And even if all the plaintiffs had a cause of action, the Climate Act does not violate the Due Process Clause.

A plaintiff must identify a cause of action allowing it to "judicially enforce the statutory rights or obligations" at issue. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979). The Supreme Court has found that States are not "persons" in the context of the Due Process Clause of the Fifth Amendment and therefore have no standing to bring such claims. *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966); *Conn. Dep't of Soc. Servs. v. Leavitt*, 428 F.3d 138, 147 (2d Cir. 2005). Courts have likewise held that the Fourteenth Amendment's Due Process Clause shields "persons" rather than States from state conduct. *See Nebraska v. Cent. Interstate Low-Level Radioactive Waste Comm'n*, 974 F. Supp. 762, 768 (D. Neb. 1997) ("By its very terms the Due Process Clause protects persons against the power of the states; it does not entitle the states themselves to its protections."); *Pennsylvania v. Porter*, 659 F.2d 306, 314 (3d Cir. 1981) (the Fourteenth Amendment does not protect Pennsylvania). The West Virginia States cite no support for the claim that they are protected by an "extraterritoriality doctrine emanat[ing] … [from] the principles underlying the Due Process Clause," WV Br. 33. Furthermore, to the extent the West Virginia States seek

to vindicate the due process rights of fossil fuel companies in their *parens patriae* capacity, that claim also fails. *See Connecticut ex rel. Blumenthal v. United States*, 369 F. Supp. 2d 237, 247 (D. Conn. 2005) ("The right to due process is an individual right that cannot be adequately represented by means of parens patriae authority.").

Even if all of the plaintiffs could make a claim under the Due Process Clause, the Act limits liability to parties whose contacts with New York satisfy the Clause. ECL § 76-0101(21). To establish that the Climate Act facially violates the Due Process Clause as it applies to personal jurisdiction—as they need to do in this facial challenge—plaintiffs must show, and have not, that New York will be unable to exercise personal jurisdiction over *any* fossil fuel producer. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (in a facial challenge a "challenger must establish that no set of circumstances exists under which the Act would be valid"). And to the extent plaintiffs speculate that DEC may issue cost demands to fossil fuel producers who do not satisfy the minimum contacts requirement of due process, that claim is premature and will involve fact-intensive determinations regarding the recipients of future demands.

West Virginia argues that the Act's sufficient contacts provision is insufficient because a corporation may still "be punished for activities wholly outside of the State." WV Br. 35. But as explained above, pp. 41–42, there is no per se constitutional ban on laws with extraterritorial impacts.

Moreover, the yet to be determined companies who receive cost demands *have* caused injury in New York. Courts have long recognized that States may apply their

laws to out-of-state actors whose actions have in-state consequences. *See, e.g., Young v. Masci*, 289 U.S. 253, 258–59 (1933) ("a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it"); *Calder v. Jones*, 465 U.S. 783, 789 (1984) ("Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California.") (citations omitted); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 286 (E.D.N.Y. 2004) (relief City sought for harm imposed on itself and on those within its borders would not violate the Due Process Clause); *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 354 (E.D.N.Y. 2007) (same).

Here, the State of New York has determined that climate change resulting from the fossil fuels produced by fossil fuel companies, "is an immediate, grave threat to the state's communities, environment, and economy," 2025 N.Y. Sess. Laws ch. 100, § 1(1), and has obligated fossil fuel companies to pay a share of the State's costs that New York will incur to adapt to climate change. Accordingly, New York's "statute is not a mere intermeddling in affairs beyond her boundaries which are no concern of hers." *Watson v. Emps. Liab. Assurance Corp., Ltd.*, 348 U.S. 66, 72 (1954).

Plaintiffs and the United States argue that "it is impossible to determine whether any particular emission actually caused harm in New York." WV Br. 35; *see* CC Br. 17–18; US St. 4. But New York's climate expert has explained that local harms can be attributed to specific sets of emissions, including emissions attributable to a specific company. NY 56.1 ¶¶ 10–13. Moreover, due process is a fact-specific inquiry that does not always require "proof that the plaintiff's claim came about because of

the defendant's in-state conduct"; instead, "some relationships will support jurisdiction without a causal showing." *Ford Motor Co. v. Mont. 8th Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (finding jurisdiction in a State where vehicle caused injury even though defendant sold vehicle in a different State).

West Virginia counters that "[a]n in-state effect is not enough to regulate out of state conduct." WV Br. 34. Relying on *Strassheim v. Daily*, 221 U.S. 280, 285 (1911), it argues, "States can only regulate out-of-state conduct when the act was 'intended to produce and produc[ed] detrimental effects within it.'" *Id.* However, the Court ruled in *Strassheim* that a jury could indict the defendant under state law for obtaining money from the State by false pretenses, even if his actions occurred outside the State. *Id.* at 284–85. Intent was required as an element of the crime, not because the case concerned extraterritorial regulation. *See id.* at 285 (citations omitted) (if a defendant intends harm and causes it, a State is justified in "punishing the cause of the harm"). Here, the Climate Act does not punish conduct, rather, it requires companies to compensate New York State for the costs of adapting to climate change.

Indeed, the Act is modeled after the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, which makes responsible parties strictly liable for the government's costs to remediate hazardous contamination. Courts have found that this compensation is not a form of punishment. *See, e.g., United States v. Monsanto Co.*, 858 F.2d 160, 174–75 (4th Cir. 1988) ("The restitution of cleanup costs was not intended to operate, nor does it operate in fact, as a criminal penalty or a punitive deterrent."). Like CERCLA, the

purpose of the Act is to recover costs from fossil fuel companies, not to punish them. And like CERCLA, no intent requirement is needed because the Act is a strict liability statute, 2025 N.Y. Sess. Laws ch. 100 § 1(5). *See*, *e.g.*, *Mobay Corp. v. Allied-Signal, Inc.*, 761 F. Supp. 345, 350 n. 4 (D.N.J. 1991) ("CERCLA is a strict liability statute. Plaintiffs do not need to establish intent on the part of any involved owner or operator in order to establish liability."); *145 Marcus Blvd., Inc. v. F&H Mfg. Corp.*, No. 04-CV-1882, 2006 WL 8441012, at *2 (E.D.N.Y. Aug. 7, 2006) (CERCLA "imposes strict liability without regard to causation").

The Chamber argues that the Due Process Clause "forbids a State from legislating beyond its own jurisdiction unless specifically authorized by Congress." CC Br. 16. But the Due Process Clause allows a State to establish specific jurisdiction over an out-of-state corporate defendant if it can "show that [its] claim arises out of or relates to defendant's contacts with the forum state." *Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998) (cleaned up).[19] The Chamber cites *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12-13 (2025), CC Br. 16, but that case recognized the existence of

---

[19] In contrast, a court may only exercise general jurisdiction over "foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cleaned up). West Virginia alleges that "New York does not produce any traditional fuels" so the Act will exclusively target out-of-state businesses. *See* WV Br. 35. If West Virginia's allegation is true, New York will need to establish specific jurisdiction for the responsible parties and therefore, show that their contacts with New York relate to the claims under the Act.

specific personal jurisdiction over a nonresident defendant if there are minimum contacts between the defendant and the forum state.

The United States argues that "the regulated conduct bears no discernible connection to New York," US St. 4, and West Virginia asserts that there is limited production of fossil fuels in New York, WV Br. 32. However, neither contends—nor could they—that fossil fuels produced by companies that will receive cost demands are not distributed and used in New York.[20]

Next West Virginia argues that the Act's retroactive application does not "give notice to regulated parties of how to conduct their affairs." WV Br. 33. But courts have repeatedly rejected similar arguments that retroactive application of CERCLA violates due process. *United States v. Alcan Aluminum Corp.*, 49 F. Supp. 2d 96, 101 (N.D.N.Y. 1999); *United States v. Kramer*, 757 F. Supp. 397, 428–29 (D.N.J. 1991). "Due Process is satisfied simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Kramer,* 757 F. Supp. at 429 (cleaned up). Here, the New York Legislature provided a rational legislative purpose: the covered period of 2000-2024 was selected because there was "a marked increase in the rate of emissions after the year 2000" and "[b]y 2000 the science of climate change was well established, and no reasonable corporate actor could have

---

[20] West Virginia relies on *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, WV Br. 35, but that court found "no connection" between Florida and insurance transactions in Germany, 267 F.3d 1228, 1238 (11th Cir. 2001). In contrast, greenhouse gases emitted from the use of fossil fuels extracted and refined by the responsible parties have caused harm in New York. *See* pp. 3–4, 8 above. So even if the Act regulated conduct—which it does not—that conduct has a sufficient nexus to New York to satisfy due process.

failed to anticipate regulatory action to address its impacts." 2025 N.Y. Sess. Laws ch. 100 § 1(7).[21]

Finally, the United States argues that other States may enact laws similar to the Climate Act, which would lead to the destruction of the national energy market and the bankruptcy of the country's largest energy producers, US St. 5, but relies on multiple levels of implausible speculation that should not be credited, *Wash. State Grange*, 552 U.S. at 449–50 ("speculat[ion] about 'hypothetical' or 'imaginary' cases" insufficient for facial challenge). Moreover, concerns about the policy implications of state climate superfund laws are "a matter for Congress, not the courts, to resolve." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981).

## IV.    THE FOREIGN AFFAIRS DOCTRINE DOES NOT PREEMPT THE CLIMATE ACT.

Plaintiffs and the United States erroneously contend that the Act is preempted by the foreign affairs doctrine.[22] *See* WV Br. 36–39; CC Br. 17–19; US St. 6–10. As with preemption by a federal statute, the foreign affairs power only preempts state law where (1) there is "a clear conflict" (conflict preemption), *Am. Ins. Ass'n v.*

---

[21] West Viriginia cites *Peralta-Taveras v. Att'y Gen.*, 488 F.3d 580, 584 n.2 (2d Cir. 2007), but that case rejected an improper retroactivity argument because the defendant had fair notice.

[22] The United States filed a declaration from Deputy Secretary of State Christopher Landau, Landau Decl., ECF 222-1. The Chamber relies on a nearly identical declaration the United States filed in a lawsuit challenging a similar Vermont law. CC Br. 18 (citing U.S. Mot. Summ. J., Attach. 3, Landau Decl. ¶¶ 15–20, United States v. Vermont, No. 2:25-cv-00463 (D. Vt. Sept. 15, 2025), ECF 50-3). As explained in the State's accompanying motion, paragraphs 15 to 20 of the Landau Declaration should be stricken as inadmissible.

*Garamendi*, 539 U.S. 396, 421 (2003), or (2) a state law "intrudes on the field of foreign affairs without addressing a traditional state responsibility" (field preemption), *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012) (en banc); *Garamendi*, 539 U.S. at 419 n.11. Courts have refused to invalidate state laws unless they have "direct impacts on foreign relations." *BP I*, 31 F.4th at 214. Plaintiffs and the United States fail to demonstrate that the Climate Act conflicts with any foreign policy or that the Climate Act is beyond New York's traditional state responsibility and intrudes on foreign affairs.

## A.    The Climate Act Does Not Conflict With Foreign Policy.

To preempt state law, a foreign policy "must stem either from an act of Congress or from the Constitution itself" and therefore have the effect of "domestic law." *Medellín v. Texas*, 552 U.S. 491, 523–24 (2008) (citation omitted). Thus, an executive action can preempt only if it was taken pursuant to Article II of the Constitution, such as a statute or ratified treaty, or, in a "narrow set of circumstances," when there is a "systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned." *Id.* at 531 (citation omitted).

Moreover, foreign policy preempts only a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or "stands in the way" of the foreign policy, *Garamendi*, 539 U.S. at 398, 421, 427 (California law imposing disclosure obligation on insurers conflicted with "consistent Presidential foreign policy" to resolve Holocaust-era insurance claims through international commission); *accord In*

50

*re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 118–19 (2d Cir. 2010) (affirming

dismissal of Holocaust-era claims under state laws against Italian insurers).

Neither plaintiffs nor the United States identify any statute, international

agreement, or executive practice long pursued to Congress' knowledge with which the

Climate Act conflicts. And, alleged conflict with generalized executive concerns is

insufficient to preempt the Act.[23]

*Statutes.* As explained above, pp. 24–36, the Clean Air Act does not preempt

the Climate Act.[24] West Virginia and the United States mention the Global Climate

Protection Act of 1987, Pub. L. No. 100-204, §§ 1101–1106, 101 Stat. 1331, *reprinted*

as note to 15 U.S.C. § 2901,[25] WV Br. 38; US St. 7, but that statute declares only that

---

[23] The reliance of plaintiffs and the United States on *City of New York* in support of their foreign affairs arguments, *see* CC Br. 18; WV Br. 37; US St. 7, is misplaced. The court's discussion of "the need for judicial caution in the face of delicate foreign policy considerations" relied solely on federal common law cases, 993 F.3d at 103, and, as demonstrated by New York, the Climate Act will not trigger serious foreign policy consequences or improperly result in the bypassing of diplomatic channels such as the Framework Convention and Paris Agreement, *see* NY 56.1 ¶¶ 15–22.

[24] The reliance of plaintiffs and the United States on *City of New York's* concerns about the impact of a public nuisance claim on foreign nations, *see* CC Br. 18; WV Br. 37, 39; US St. 7, is also misplaced. As discussed above, p. 32, the Second Circuit determined that that claim would regulate cross-border emissions, which the Climate Act will not do.

[25] West Virginia also mentions the Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891; note at 28 U.S.C. § 1602, WV Br. 38, which immunizes "a foreign state" from state and federal court jurisdiction, 28 U.S.C. § 1604. Even if an entity that receives a cost demand under the Climate Act were "an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(b), the "commercial activity" exception to immunity would apply, 28 U.S.C. §§ 1605, 1607. That the Foreign Sovereign Immunities Act creates general immunity with specific exceptions demonstrates that Congress knows how to specify when foreign relations

the United States "*should* 'work toward multilateral agreements' on greenhouse emissions with a 'coordinated national policy,' including in the international arena.'" 15 U.S.C. § 2901 note (emphasis added). Congressional aspiration does not preempt state law. *Cf. City of Joliet v. New W., L.P.*, 562 F.3d 830, 837 (7th Cir. 2009) ("a conflict between a local law and legislative aspirations does not displace another jurisdiction's law").

*International agreements and executive practice long pursued to Congress' knowledge.* Plaintiffs and the United States contend that the Climate Act conflicts with the Framework Convention; the United States' position on agreements under that convention; and the United States' purportedly long-standing position on liability for climate harm. CC Br. 18–19; WV Br. 36–39; US St. 7–10. The Climate Act is consistent with international agreements and executive practice long pursued to Congress' knowledge.

First, the Climate Act does not conflict with the Framework Convention and executive decisions to not join the Kyoto Protocol and to leave the Paris Agreement. *See* US St. 8–9; *see also* CC Br. 18; WV Br. 37. The Framework Convention—and the agreements under it—are aimed at the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." Framework Convention, art. 2; NY 56.1 ¶ 15. In contrast, the Climate Act establishes compensation for harms from

---

considerations warrant shielding a particular party from liability, and plaintiffs and the United States identify no basis to believe that Congress intends such a shield for fossil fuel companies' liability for climate damages.

past greenhouse gas emissions. Moreover, the Framework Convention and Paris Agreement, which do not set limits on greenhouse gas emissions, and the Kyoto Protocol which does, *see* Kyoto Protocol, arts. 2-3, only bind countries and regional entities like the European Union. Framework Convention, art. 1; Paris Agreement, arts. 1, 20; Kyoto Protocol, arts. 4, 22; *see* NY 56.1 ¶¶ 20-22. The Climate Act obligates private companies, not governments, to pay compensation. And, neither the Executive's decision not to join the Kyoto Protocol, nor its decision to withdraw from the Paris Agreement are clear federal law, Article II executive action, or long pursued executive position on fossil fuel companies' liability for climate damages. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 67 (2002) (a federal agency decision not to regulate propeller guards did not preclude States from imposing regulations). Insofar as West Virginia further argues that declining to join the Kyoto Protocol is evidence of a broader United States practice of rejecting emissions reduction requirements that harm the economy, WV Br. 37, they cite no other example and, as explained above, pp. 7–8, 15, the Climate Act will not reduce emissions or harm the economy.

Second, plaintiffs and the United States suggest the Act conflicts with the United States' longstanding opposition to "the establishment of liability and compensation schemes at the international level." CC Br. 18 (cleaned up); WV Br. 37 (cleaned up); *see also* Landau Decl. ¶ 16, but the United States has only opposed any requirement that *it*—not private entities—compensate foreign governments for the impacts of historical emissions from domestic sources. *See* Paris Agreement, art. 8; NY 56.1 ¶ 21. The Climate Act does not address that intergovernmental liability.

Moreover, the United States has long recognized a "polluter pays" principle, *id.* ¶ 14, with which the Climate Act is consistent. To the extent that West Virginia argues more broadly that the Climate Act impermissibly "bypasses … diplomatic channels," WV Br. 37 (cleaned up); *accord* US St. 8, not everything that is the subject of international negotiations is preempted, *see, e.g.*, *Medellín*, 552 U.S. at 529–530 (Congress's authorization to represent the U.S. before international bodies did not establish the President's "unilateral authority to create domestic law" sufficient to preempt a state law) and, in any event, West Virginia and the United States fail to demonstrate that the Executive Branch is using any diplomatic channels to shield fossil fuel producers from liability for climate damages.[26]

*Generalized concerns and speculation.* Plaintiffs and the United States speculate that the Climate Act will interfere with various executive interests. Those interests are not based on admissible evidence and in any event are not Article II actions or long-standing practices that are sufficient to preempt state law.

The United States speculates that cost demands under the Act will amount to "crushing penalties" that reduce energy affordability and availability, US St. 8, thereby exacerbating the "national energy emergency" that the President declared in Executive Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 29, 2025); *accord* CC Br. 18. West Virginia also notes the executive order exempting fossil fuel production from tariffs. WV Br. 38 (referencing Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,045–

---

[26] The United States declined to participate in the recent COP30 in Brazil, s*ee* NY 56.1 ¶ 17, and plaintiffs and the United States fails to identify any specific diplomacy efforts with which the Climate Act interferes.

47 (Apr. 7, 2025)). These executive orders are admissible "only for the fact that they were issued, and not for the truth of any facts asserted in them."[27] *Ajami v. Solano*, No. 3:19-cv-00161, 2020 WL 996813, at *20 n.30 (M.D. Tenn. Feb. 28, 2020), *aff'd on other grounds sub nom.*, *Salame v. Tescari*, 29 F.4th 763 (6th Cir. 2022); *see also Upstate Shredding, LLC v. Ne. Ferrous, Inc.*, No. 3:12-CV-1015, 2016 WL 865299, at *13 (N.D.N.Y. Mar. 2, 2016) (the statements in a public record "are admissible if they fall within an exception to the hearsay rule") (citing FRE 805). Further, plaintiffs and the United States' concerns regarding the economic effects of the Climate Act are speculative and, as discussed above, pp. 13–17, disproven by New York.

In any event, "Executive Branch communications that express federal policy but lack the force of law cannot render unconstitutional … otherwise valid" legislation. *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 229–330 (1994) (federal accounting methodology did not preempt State's accounting methodology, as applied to foreign businesses). Thus, "generalized remarks" about energy availability are not a basis for conflict preemption. *See Lighthouse Res. Inc. v.*

---

[27] The Executive's opinion that the Climate Act impedes various priorities—as expressed in both the separate action the United States filed challenging the Climate Act, *see* CC Br. 18; WV Br. 38, and the executive order characterizing laws like the Climate Act as trade barriers, *see* WV Br. 37–38 (quoting Exec. Order 14,260, of Apr. 8, 2025, § 1, 90 Fed. Reg. 15,513 (Apr. 14, 2025))—is not *evidence* of foreign affairs preemption. The Executive's views "'concerning the meaning of an international treaty' are 'not conclusive,' and a Court must evaluate whether they are 'faithful to the [treaty's] text, purpose, and overall structure.'" *Est. of Tov v. United Nations Relief & Works Agency*, No. 24 Civ. 4765, 2025 WL 2793701, at *3 (S.D.N.Y. Sept. 30, 2025) (finding UNRWA immune despite Executive's position "UNRWA is not an organ of the U.N. and thus not immune from suit") (quoting *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168-69 (1999)).

*Inslee*, 429 F. Supp. 3d 736, 740–41 (W.D. Wash. 2019) ("remarks favoring the development of the coal industry and the export of coal are not in clear conflict with the State's decision" to deny a permit); *cf. Barclays*, 512 U.S. at 328 n.28 (the executive's "preference" for a certain policy approach, without more, does not invalidate a state law). Additionally, treating mere market effects as a "clear conflict" would allow the executive branch to preempt any state laws that may influence energy production, from workplace safety to consumer protection law. Such expansive authority is counter to the Constitution's delegation of domestic lawmaking authority to Congress. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

Plaintiffs and the United States fail to demonstrate that the Act is conflict-preempted under the foreign affairs doctrine.[28]

## B.    The Foreign Affairs Power Does Not Field Preempt the Climate Act.

In the absence of a conflict, the foreign policy power preempts state law only if it intrudes on foreign policy without addressing a traditional state interest. And the

---

[28] The United States also speculates that the Climate Act could result in retaliation by foreign countries. US St. 9–10; Landau Decl. ¶ 18. The United States cites *Japan Line, Ltd. v. L. A. Cnty.*, 441 U.S. 434, 450 (1979), US St. 10, where the Supreme Court held unconstitutional a state property tax on ships "used constantly and *exclusively* for the transportation of cargo for hire *in foreign commerce*," *id.* at 446 n.9 (emphasis added). The Climate Act does not regulate wholly extraterritorial activity, and speculation about possible retaliation, US St. 9–10, does not warrant preemption. *See, e.g., Hartford Enters., Inc. v. Coty*, 529 F. Supp. 2d 95, 103 (D. Me. 2008) (rejecting challenge to state law based on "speculation about what could happen if every state enacted such a law and foreign countries retaliated").

Supreme Court has consistently held that state laws with only "incidental effects" on foreign affairs are not preempted. Plaintiffs and the United States fail to demonstrate that the Climate Act is field preempted.

West Virginia and the United States mistakenly contend that the Climate Act does not address a traditional state responsibility. *See* WV Br. 39; US St. 10-11. However, as discussed above, pp. 25–26, the Climate Act addresses a traditional state responsibility by redressing *in-state* injuries, unlike situations where courts have described a State's interest in redressing injuries wholly outside the United States as "weak." *Contra Garamendi*, 539 U.S. at 425; *Generali*, 592 F.3d at 119. And, as also discussed above, pp. 3–4, 27–32, the Climate Act does not attempt to abate or decrease interstate pollution or global emissions.

The Climate Act is not field-preempted because plaintiffs and the United States fail to demonstrate that it will have a direct effect on international affairs, as demonstrated by two cases on probate statutes. In *Clark v. Allen*, the Supreme Court rejected a preemption challenge to a California law forbidding testamentary transfers to non-resident aliens whose home countries did not have reciprocal rights. 331 U.S. 503, 516–18 (1947). The Court recognized that California's law likely would "have some incidental or indirect effect in foreign countries," but noted that that was true of "many state laws" that arose in traditional areas of state competence. *Id.* at 517.

Two decades later, in *Zschernig v. Miller*, the Supreme Court invalidated a reciprocity provision in Oregon's probate law that directed probate courts to analyze whether the home country would confiscate any proceeds. 389 U.S. 429, 430–31

(1968). The Court concluded that these provisions invited "minute inquiries concerning the actual administration of foreign law [and] the credibility of foreign diplomatic statements," so constituted impermissible "state involvement in foreign affairs." *Id.* at 435–36.

Like *Clark*—but unlike *Zschernig*[29]—the Climate Act does not instruct DEC to inquire into the affairs of foreign nations or reflect "foreign policy attitudes" or "criticism[s]" of foreign governments, *id.* at 437, 440, particularly because it applies objective criteria equally to domestic and foreign companies. Nor does it "adversely affect the power of the central government to deal with [foreign relations]." *Id.* at 441. Indeed, the Climate Act is even farther removed from foreign relations than the statute upheld in *Clark*. California's reciprocity provision applied only to foreign nationals while the Climate Act only applies to entities with "sufficient contacts with the state to satisfy the due process clause." ECL § 76-0101(21).

Other state laws field-preempted by foreign policy have, as in *Zschernig*, taken positions on actions by foreign nations or invited state courts to do so. *See, e.g.*, *Kyocera Doc. Sols. Am., Inc. v. Div. of Admin.*, 708 F. Supp. 3d 531 (D. N.J. 2023) (state law imposing restrictions on Russian entities); *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731 (N.D. Ill. 2007) (state statute prohibiting investment in Sudan). For example, *Movsesian*, upon which the plaintiffs and the

---

[29] Not only is *Zchernig* factually distinguishable, it "has been applied sparingly, because the Supreme Court has held that a statute does not violate the constitution where it merely has 'some incidental or indirect effect in foreign countries.'" *Deutsch v. Turner Corp.*, 324 F.3d 692, 710 (9th Cir. 2003) (quoting *Clark*, 331 U.S. at 517).

United States rely, CC Br. 17; WV Br. 36, 39; US St. 6, 9, 10, 11, struck down a California statute because it referred to the Armenian "genocide" and compelled a "highly politicized inquiry into the conduct of a foreign nation." 670 F.3d at 1076.

But courts have upheld state laws imposing obligations on foreign companies operating in those States. *See, e.g.*, *BP I*, 31 F.4th at 213–15 (declining to apply foreign affairs doctrine in suit against energy companies involving "intersection between Maryland law and private, international companies"); *cf. Barclays*, 512 U.S. at 329–30 (upholding state tax methodology challenged by foreign companies because Congress was aware of the issue and declined to preempt that methodology). Courts have also upheld state laws addressing traditional state concerns such as pollution and land use that may impact foreign trade. *See, e.g.*, *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 445 (D. Me. 2017) (rejecting challenge to ordinance with practical effect of preventing import of Canadian oil that did not target any foreign country or conflict with foreign policy). In short, there is no field preemption because plaintiffs and the United States fail to demonstrate that the Climate Act will directly affect foreign relations without addressing a traditional state responsibility.

## V. THE ELEVENTH AMENDMENT BARS WEST VIRGINIA'S CLAIMS AGAINST ACTING TAX COMMISSIONER HILLER.

The Eleventh Amendment bars West Virginia's claims against the Acting Commissioner of the New York State Department of Tax and Finance, Amanda Hiller. That amendment bars federal suits against a State, including state officers, subject to a narrow exception recognized in *Ex parte Young*, 209 U.S. 123, 155–56

(1908), for suits against state officers "(a) 'alleg[ing] an ongoing violation of federal law' and (b) 'seek[ing] relief properly characterized as prospective.'" *In re Deposit Ins. Agency v. Superintendent of Banks of the State of N.Y.*, 482 F.3d 612, 618 (2d. Cir. 2007) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). This exception applies to state officers "clothed with some duty in regard to the *enforcement* of the laws of the state, and who threaten and are about to commence [enforcement] proceedings." *Ex parte Young*, 209 U.S. at 155–156 (emphasis added).

The *Ex parte Young* exception does not apply to Hiller because, while she initially had authority to enforce the Climate Act, the Act was amended to delegate exclusive enforcement authority to DEC and the Attorney General. *See* 2025 N.Y. Sess. Laws ch. 100 § 3; ECL § 76-0103(8). While both Hiller and the state Comptroller have "custody" of the climate change adaptation fund, payments from the fund may be made only as appropriated by the Legislature. N.Y. State Fin. Law § 97-m(1), (2). And DEC, not the Tax Commissioner, must identify responsible parties, issue cost demands, *see* ECL § 76-0103(1), (2)(a)–(c), (3)(e), (4), and provide guidance to the legislature on criteria for projects, *id.* § 76-0103(6)(f). Thus, Hiller is immune from suit under the Eleventh Amendment.

## <u>CONCLUSION</u>

For the reasons stated above, New York respectfully requests that the Court deny plaintiffs' motions for partial summary judgment and grant New York's cross-motion for partial summary judgment.

Dated:     December 19, 2025
           Albany, New York

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*

By: ***/s/Ayah F. Badran***
    Ayah F. Badran (Bar No. 706184)
    Assistant Attorney General
    Office of the New York State Attorney General
    Environmental Protection Bureau
    The Capitol
    Albany, NY 12224
    (518) 776-2394
    ayah.badran@ag.ny.gov

    Monica Wagner (Bar No. 706690)
    Deputy Bureau Chief

    Sabita Krishnan (Bar No. 706712)
    Laura Mirman-Heslin (Bar No. 704855)
    Joya Sonnenfeldt (Bar No. 706511)
    Assistant Attorneys General
    Office of the New York State Attorney General
    Environmental Protection Bureau
    28 Liberty Street
    New York, NY 10005
    (212) 416-8184