## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

STATE OF WEST VIRIGINA, et al.,

       *Plaintiffs,*

  v.

LETITIA JAMES, in her official capacity
as the Attorney General of New York, et al.,

       *Defendants.*

No.  25-cv-00168-BKS-DJS

## DECLARATION OF DON FULLERTON, Ph.D.

Pursuant to 28 U.S.C. § 1746, Don Fullerton declares under penalty of perjury that the following is true and correct:

1.  I submit this declaration in support of defendants' (together "New York") opposition to the motions for partial summary judgment submitted by the plaintiffs in this consolidated action ("West Virginia" and the "Chamber of Commerce") and in support of the New York's cross-motion for partial summary judgment.

## EDUCATIONAL BACKGROUND AND EXPERIENCE

2.  I received a Bachelor of Arts degree in Economics from Cornell University and a Master of Arts degree and a Doctor of Philosophy degree in Economics from the University of California, Berkeley. I am Gutgsell Professor of Finance (Emeritus) at the University of Illinois in Urbana-Champaign, and an Affiliate of the Environmental Markets Lab at the Bren School of the Environment, University of California, Santa Barbara. Before joining the University of Illinois, I

was Professor of Economics at the University of Virginia from 1988 to 1994 and Addison Baker Duncan Centennial Professor of Economics, Department of Economics, University of Texas at Austin from 1994-2008. From 2017-2019, I was Editor of the *Journal of the Association of Environmental and Resource Economists* (*JARE*).

3.      From 1985 to 1987, I served in the U.S. Treasury Department as Deputy Assistant Secretary for Tax Analysis under President Reagan. From 2011 to 2014, I was a Lead Author of Chapter 3, entitled "Social, Economic, and Ethical Concepts and Methods," of the U.N. Intergovernmental Panel on Climate Change (IPCC), Fifth Assessment Report (Working Group III). From 2014 to 2017, I served on a U.S. EPA Science Advisory Board Committee on economy-wide models and co-authored the report published in 2017 under President Trump. In 2025, I co-chaired the committee writing a book for the National Academy of Sciences entitled "Municipal Solid Waste Recycling in the United States: Analysis of Current and Alternative Approaches".[1]

4.      I have spent over 45 years researching the distributional effects, price effects, and efficiency effects of environmental and tax policies, focusing on the likely distribution of the burdens of price effects, as well as effects on the environment, on the cost-effectiveness of implemented as well as proposed government policies, and on overall social welfare. I have authored over a hundred publications on these topics.

---

[1] See https://www.epa.gov/system/files/documents/2023-02/EPA-SAB-17-012_1.pdf and https://www.nationalacademies.org/our-work/costs-and-approaches-for-municipal-solid-waste-recycling-programs.

My work has been published in leading peer-reviewed scientific journals, including the three highest ranked economics journals (*American Economic Review*, *Journal of Political Economy*, and *Quarterly Journal of Economics*) and top field journals like the *Journal of Public Economics* and the *Journal of the Association of Environmental and Resource Economists*.

5.     My current research focuses on the economic effects of climate policies, including energy efficiency mandates, renewable portfolio standards, cap-and-trade permits for greenhouse gas emissions, and a carbon tax.

6.     My credentials, research and publications are further summarized in my curriculum vitae, which is included as Exhibit A to this declaration.

## SCOPE OF WORK AND SUMMARY OF CONCLUSIONS

7.     I have been retained by the Office of the New York State Attorney General, which represents New York in this action, to opine on the economic effects of the New York Climate Change Superfund Act (the "Act"), and to address statements made by West Virginia and the Chamber of Commerce in their complaints and motions for summary judgment.  I have reviewed the Act, the West Virginia and Chamber of Commerce complaints, their memoranda of law in support of their motions for summary judgment, and the declaration of Dr. Benjamin Zycher in support of West Virginia's motion for summary judgment, and I have consulted the resources cited in this declaration and listed at the end of my declaration.

8.     The opinions set forth in this declaration are based on my education, training, professional experience, review of the Act and other documents relevant to this case, and my understanding and application of fundamental economic principles.

3

My opinions below are based on information and materials commonly accepted by economists in forming such opinions and are offered to a reasonable degree of professional certainty.

9.     I understand that the Act provides for the New York State Department of Environmental Conservation to develop and impose assessments on entities that have sufficient contacts with the State of New York, that engaged in extracting fossil fuel or refining crude oil during any part of the years 2000 through 2024, and that meet certain criteria, including that the total quantity of emissions attributable to each company's extraction and/or refining during the covered period exceed one billion metric tons. Each entity's assessment is a portion of the total assessment of $75 billion, in proportion to that entity's share of the total covered greenhouse gas emissions attributable to the fossil fuels extracted or crude oil refined by all such entities between 2000 and 2024. Each entity's assessment may be paid via annual payments over 25 years.

10.     West Virginia asserts that the Act will raise the cost of fossil fuels for individuals and for plaintiff states, reduce employment in the fossil fuel industry within plaintiff states and reduce the revenue to plaintiff states from severance tax and other taxes derived from the production of fossil fuels. I disagree with these assertions. Based upon my review and analysis, I have developed the following key conclusions, which are summarized here but more fully discussed in the following sections:

a.  Economists employ models of profit-maximizing firms that can be used
    reliably to predict the effects of policy changes, such as the policies that
    will be imposed by the Act. These models have been verified using data
    on actual outcomes from enacted policy changes, and subsequent
    publications have been peer-reviewed. These economic models show that
    a firm will continue to produce and sell additional goods and services if
    it can earn a profit on the next sale, that is, if that next product is sold
    at a price higher than the cost of producing it, a cost known as the
    marginal cost of production. As firms continue to produce and sell more
    goods and services, supply increases and the market price is driven
    down toward the marginal cost of production. In these standard
    economic models, market price depends on marginal cost and does not
    depend on any fixed cost that does not vary with the quantity of output
    produced and sold.

b.  The Act's anticipated assessment on a fossil fuel company is based on its
    share of applicable emissions from fossil fuels extracted or crude oil
    refined from 2000 to 2024. This monetary assessment does not vary with
    or depend upon any current or future decision the company makes about
    the output to produce, so it will have no effect on the marginal cost of
    production and no direct effect on market price. Instead, each
    assessment is a fixed cost. This fixed cost will be absorbed by the firm

and its shareholders and cannot be passed on to customers through an increase in price.

c. Economists also evaluate indirect effects of policy changes that are not included in the economic models. In paragraphs 20-26 below, I review indirect effects and conclude that they are unlikely to apply here.

d. Because the models predict that fossil fuel companies and their shareholders will fully absorb these assessments, it is my opinion that the Act will have no effect on market prices and provide no reason for any fossil fuel company to change its future innovation, investment technology, production of energy, or market supply and sales of energy products. These models predict no effect on behavior, either of the fossil fuel company paying the assessment or any other fossil fuel company in another state or country. For this reason, the Act is not an "economic regulation", as defined and understood by economists, because it does not intervene in the private actions of firms and individuals to change their behavior.

e. Because the Act will have no effect on prices, it imposes no extra burden on individuals and no effect on their demand for fossil fuel products or their use of fossil fuel products.

f. Because the Act will have no effect on either the supply by firms of fossil fuel products nor demand by consumers for those products, the Act will have no effect on the availability of fossil fuels in the United States, no

effect on the future value of oil and gas resources, and no effect on severance tax revenue to plaintiff states.

## STANDARD ECONOMIC MODELS OF PROFIT-MAXIMIZING FIRMS PREDICT THAT THE ACT WILL NOT AFFECT ENERGY PRICES

11.    West Virginia asserts that the Act will raise the cost of fossil fuels for individuals. In most cases, however, individuals do not buy coal or any energy product directly from companies that are engaged in extracting fossil fuel or refining crude oil. Presumably, West Virginia assumes that an assessed company engaged in extracting coal between 2000 and 2024 will recover some or all of its assessment by raising the price of its coal and passing this extra cost to electric generating plants, and that these plants will raise the price of electricity sold to their consumers. Or that an assessed entity engaged in refining crude oil between 2000 and 2024 will recover some or all of its assessment by raising the price of motor fuels or other fossil fuel products sold to distributors, and that retailers will raise the price of those products to consumers. As explained below, West Virginia's argument is contrary to the predictions of standard economic models as validated by data based on actual economic experience.

12.    Using standard economic models, economists can reliably predict how any change in a government tax or regulatory policy will affect market price and the quantity that will be sold. These models assume that a firm sets its optimal price to

maximize its profits and that consumers choose how many of these products to buy based on the price.[2]

13.    In economic models of profit-maximizing firms, each firm can add to its profit by selling additional output of its goods (such as fuel) at any market price higher than "marginal cost", defined as "the increase in total cost that arises from an extra unit of production" (Mankiw, 2018, p.256). If the market price is above marginal cost, those firms will continue to sell more of the product. Those additional sales help drive down the market price until the price is based on marginal cost.[3]

14.    Fixed costs are "costs that do not vary with the quantity of output produced" (Mankiw, 2018, p.255). Economic models of profit-maximizing firms show that because a fixed cost does not affect marginal cost, it has no role in determination of price.[4] A firm may *want* to raise its price to help cover a fixed cost, but if it tries to raise its price then its customers would switch to other sellers. Any other seller – regardless of their fixed costs – has an incentive to sell more output by undercutting

---

[2] Economists have developed other models that assume firms do not perfectly maximize profits because of poor information, the use of simple rules of thumb, or other manager objectives such as revenue, market share, or social and environmental goals (*e.g.*, Kitzmueller and Shimshack, 2012). Some empirical models have been designed to test whether these secondary goals exist, or whether firms maximize profits (*e.g.*, Chambers and Rehbeck 2025), but these models are not designed to predict the effect of policy changes on output price.

[3] For example, the marginal cost of a barrel of oil includes the cost of drilling, extraction, labor, storage, transportation, and any tax on purchase of additional inputs or sale of additional output. The marginal cost of a gallon of gasoline includes the cost of the oil, the refining equipment, labor, transportation, marketing, pumping equipment, and any tax on new inputs or on output.

[4] A possible exception where a large fixed cost may affect company operations is discussed below.

the price of a firm that tries to raise its price (as long as the other seller's price at least covers marginal cost). The firm facing the new assessment has already maximized profits by setting its optimal price in a way that depends on its marginal cost, so raising that price to cover a fixed cost reduces that firm's sales and profits.

15.    The assumption that each firm sets its optimal price to maximize its profits has been validated. Firms may not perfectly follow the mathematical models, but the models make clear predictions about the effects of tax or regulatory policies on market prices and quantities. These predictions have been verified using data on the outcomes that result from those policies.[5] In other words, economic models are excellent predictors of how prices and quantities react to changes in government policies or other market circumstances.

16.    Firm behavior also supports the profit-maximization assumption. Large firms, including fossil fuel companies, each have a staff of analysts who study the market carefully, conduct research on how to set their pricing strategies, and employ accounting methods to ensure that their efforts do closely maximize their profits and returns to shareholders. A firm that does otherwise will lose market share

---

[5] No study can confirm an assumption like profit maximization in all cases. However, models that assume profit maximization can use many years of historical data to calculate predictions of how prices would react to the policy changes that occurred over the same time period. They can then compare those predictions to the actual impacts of the policies. Many peer-reviewed studies that assume profit-maximization have produced calculations predicting price changes that closely track actual price changes over the same time period. For examples, see Borenstein *et al.* (1997), Fowlie *et al.* (2016), and Berry *et al.* (2019).

to competing firms that do maximize profits, including competing firms from across the U.S. and around the world.

17.    Any fossil fuel company (or a firm that buys fossil fuels to produce energy products) must decide how to set the price of its product in the face of a variety of production costs. Because an assessment imposed by the Act does not change the marginal cost of production, and the market price is based on that marginal cost of production, a fossil fuel company is unlikely to be able to change its own price of coal sold to electricity generating plants or the price of refined petroleum sold to manufacturers or service stations. The companies that purchase that coal or refined petroleum from the fossil fuel companies then face no change in their marginal cost of producing electricity, natural gas, or motor fuel. Market price is based on that marginal cost of production, so these companies would also not be able to change their price of energy products sold to consumers.

18.    Some economic models assume markets with perfect competition, in which a large number of firms all sell the same product to a large number of buyers.[6] In this case, competition drives the market price down until the price is equal to marginal cost. Given the large worldwide number of oil producers and gasoline refiners, with transportation of fuel from sellers around the globe, oil and gasoline markets are sufficiently competitive that prices are very close to the marginal cost of production (Taylor and Muehlegger, 2025).

---

[6] Under perfect competition, buyers and sellers also have full information about prices and products, and firms can exit or enter the market without barriers.

19.    Other markets may not be perfectly competitive if they do not have a large number of firms that can sell the same product in the same market. Coal has high weight per dollar value, for example, so transportation costs are relatively high and may reduce the number of sellers within a particular geographic area. Economists have also built mathematical models to explain how a firm sets a price to maximize profits under other market structures (as reviewed by Tirole, 1988, a leading textbook in the field of industrial organization). Examples of market structure include monopoly (only one seller), duopoly (two sellers), oligopoly (several sellers), or monopolistic competition (where firms each sell a somewhat different version of the same product). For these other market structures, models of profit-maximizing firms show that the number and behavior of the firms in the market and of consumers lead each firm to a formula for setting its own optimal price or quantity of output. Without perfect competition, the firm may be able to set a price above marginal cost, but its marginal cost still plays a key role in the formula used by the firm to set that price. Even in these models of other market structures, the firm's choice of price does not depend on any fixed cost.

## THE ACT WILL HAVE ONLY NEGLIGIBLE INDIRECT EFFECTS ON PRICE AND BEHAVIOR

20.    The prior section explains that standard economic models make definitive predictions that the Act will have zero effect on fossil fuel prices or behavior. In this section, I discuss other indirect impacts of the Act not considered by those models, but then I explain why those indirect impacts will be negligible or, in

the case of concerns about future liability, will have no definitive impact on predictions.

21.    If a fixed cost is so large that a company goes out of business, then temporary disruptions may affect market price until other firms expand their investments and production – driving market price back down toward the marginal cost of production. That is, any increase in market price would be temporary. For large oil companies, however, any assessment under the Act will be a relatively small fraction of profits and will not disrupt its operations.[7] In a model with "monopolistic competition" among firms with somewhat different products, a fixed cost that reduces the number of firms could affect market price, but this case does not apply to a standardized product like coal, natural gas, oil, or gasoline.

22.    The Act is highly unlikely to affect energy prices indirectly through a change in consumer demand. Because the energy prices paid by consumers are not expected to change, consumers bear no burden and will experience no change to their income.  Because neither prices nor consumer incomes are expected to change, the Act is highly unlikely to alter consumer energy demand.

23.    The Act is also unlikely to affect prices indirectly through changes in global energy market structure. Total assessments may be paid over 25 years, so they will be a small fraction of U.S. companies' annual revenue from fossil fuel production

---

[7] The fossil fuel companies that will receive an assessment and the size of any assessment have not yet been determined. See Howard and Xu (2022, p.13) for a study of an earlier proposal in New York State. They use earlier data to find that those earlier proposed assessments will be a small fraction of the annual profits of the largest fossil fuel companies.

and an even smaller fraction of worldwide fossil fuel revenue. Even companies that receive an assessment through implementation of the Act are not expected to change their output, prices, or behavior. Given these expectations, the Act will not affect extraction and refining of crude oil within the U.S. or around the world and will not have any noticeable effect on global energy markets.

24.    The Act has no definitive indirect effect on prices through changes in the expectations of fossil fuel companies about future liability (as explained by Howard and Xu, 2022, pp.17-19). West Virginia has advanced a hypothesis about future laws New York could enact that could affect future liabilities, but no such hypothesis has been validated by evidence. Economists have different theories about how firms and individuals form expectations. Economic models have been used to predict the effects of a policy change under alternative theories about the form of expectations (*e.g.*, Fowlie *et al.*, 2016). But no empirical model has provided definitive evidence that one theory is generally better than other theories about expectations. In other words, economists have no generally accepted theory about how firms and individuals form expectations. And even if New York or some other state were to enact similar legislation, any effect of that legislation on price cannot be attributed to any direct effect of this Act. I conclude that expectations about future liability have no definitive impact on predictions about the economic effects of the Act.

25.    Indeed, other jurisdictions within the U.S. and around the world are actively trying to reduce emissions using cap-and-trade permit systems, carbon taxes, and other restrictions, so fossil fuel companies likely already expect further

13

regulations. As Howard and Xu (2022, p.19) discuss: "Regardless of New York's decision, other entities are likely to ramp up climate regulations and lawsuits." In other words, expectations about future liability may have nothing to do with the New York Climate Change Superfund Act.

26.    Having concluded that any indirect effects of the Act will be negligible or will have no definitive impacts on predictions of economic models, it is my expert opinion offered to a reasonable degree of professional certainty that the Act will not affect prices or behavior.

## THE ACT IS NOT ECONOMIC REGULATION BECAUSE IT WILL NOT CHANGE THE CONDUCT OF FOSSIL FUEL COMPANIES

27.    Economists define a regulation as follows: "Economic regulation involves the government intervening, in a variety of ways, in the private actions of firms and individuals" (Kolstad, 2000, p.135). In other words, economic regulation involves the government attempting to change the conduct of firms or individuals. The Clean Power Plan (CPP) proposed in 2015 is an example of economic regulation of greenhouse gas emissions.[8] If it had been implemented, the CPP would have required each U.S. state to reduce fossil fuel use and emissions by a specific amount. Each state could decide for itself how to achieve this required reduction, such as by a cap-and-trade permit system or by a tax on the carbon content of fossil fuels. Either way, under the CPP, a company that wanted to use more fossil fuel would have to pay a permit price or a tax per unit of each additional purchase of a barrel of oil, a ton of

---

[8] https://archive.epa.gov/epa/cleanpowerplan/fact-sheet-overview-clean-power-plan.html

coal, or a cubic foot of natural gas. Many studies use economic models of profit-maximizing firms discussed above to predict how much the CPP would raise the prices of energy goods and all final consumer goods. Some models then calculated resulting overall burdens on families at different levels of income.[9]

28.    The CPP is an example of an economic regulation because it would intervene in the private actions or conduct of companies and individuals. Indeed, the increases in prices of fossil fuels and of energy products were intentional, to alter companies' decisions about emissions and individuals' decisions about use of energy products (*e.g.*, decisions whether to implement better fuel efficiency or renewable energy).

29.    In contrast, the Act is not economic regulation. It will impose assessments on fossil fuel companies that will be based on applicable emissions attributable to the amount of fossil fuels extracted or crude oil refined by each company from 2000 to 2024. This anticipated assessment is a fixed cost to each assessed fossil fuel company because it is based on past conduct and does not vary with any current or future quantity of output produced or sold. It will not affect the marginal cost of extracting any additional fossil fuel or refining any additional crude oil. Thus, the Act will have no effect on the market price of fossil fuels, the marginal cost of producing electricity or gasoline, or the market prices of those energy products.

30.    Because the Act imposes an assessment that is determined by production activity and greenhouse gas emissions prior to 2025, a company cannot

---

[9] For two examples, see Goulder and Hafstead (2017) or Cronin *et al*. (2019).

change the amount of its assessment by changing its current or future fossil fuel price or production. This one-time retroactive assessment is a fixed cost that cannot be passed on to consumers by higher prices; if the company tried to do so, consumers would shift purchases to other companies, even other companies subject to a similar assessment that do not raise their price above marginal cost. Instead, each fossil fuel company that pays the assessment will absorb the cost and thereby earn a reduced net profit.

31.     While the assessments will reduce net profit from past behavior, they will not affect the profit an assessed company can earn today or in the future (because that profit is defined as the unchanged market price minus the unchanged marginal cost of production). As a result, the Act will not change the incentives for assessed companies to produce and sell their coal or refined oil products. And since electricity generators and other companies that buy fossil fuel products will not face any change in the cost of fossil fuel, they will have unchanged costs of producing their electricity or other final energy goods. As a consequence, the assessments will not change production or sale of energy products nor any consumer's use of energy. Unlike the CPP, the Act will not lead to a reduction in current or future greenhouse gas emissions; it would serve only to collect an assessment from fossil fuel companies that depends on past conduct.

**THE ACT ALSO WILL NOT AFFECT FOSSIL FUEL COMPANIES'
INCENTIVE TO INVEST, THE FUTURE AVAILABILITY OF FOSSIL
FUELS OR OTHER ENERGY PRODUCTS, OR INCENTIVES OF FOREIGN
FOSSIL FUEL COMPANIES**

32.    The Act will have no effect on a fossil fuel company's incentive to invest in new innovation or physical infrastructure. Firms that want to maximize profits cannot change past behavior and so must look to the future. For this reason, incentives for current and future innovation efforts and physical investments do not depend on fixed costs based on past behavior.

33.    In other words, investment depends on a company's estimation of potential future net profits, which are determined by its estimated future costs of production and the future price at which its output can be sold. The Act will leave unchanged the current and future marginal cost of new production as well as the current and future price it can receive, so the Act will not change any company's estimate of potential net profit from future production. Thus, the Act will not change any company's incentive to invest in new innovation, physical infrastructure, or any other form of investment, including investments in pollution control devices.

34.    Even if a company that pays an assessment imposed by the Act has low cash on hand, a proposed investment that is expected to earn future profits can be financed by borrowing or other outside sources of funds. And even if assessments leave a fossil fuel company with too little cash and no outside source of finance to make promising investments in future production, the Act still has no effect on marginal cost of production, market price, or total investment in fossil fuel

production, because the same investment and any other investments in future production that are sufficiently promising will be undertaken by a competitor.

35.     Moreover, assessments under the Act will only apply to large fossil fuel companies, those to which are attributed more than one billion metric tons of covered greenhouse gas emissions. Any assessment by the State of New York will likely be a small fraction of the worldwide profits of those large fossil fuel companies and should not impact the company's ability to invest.

36.     The Act will not affect the future availability of fossil fuels or of consumer energy products in the United States. Because the Act will not change fossil fuel prices or production in the U.S. or abroad, it will not affect the supply of new energy. Also, the Act will affect neither the price of consumer energy products nor consumer income, so it will not affect demand for energy products. Thus, the Act will have no effect on energy availability in the United States.

37.     The Act also will not affect any state's revenue from severance taxes. A severance tax is based on the value of extraction of a fossil fuel such as coal, crude oil, or natural gas. That value is the quantity of the extracted fossil fuel multiplied by the price received for it. The Act will not affect the marginal cost of that fossil fuel production, so it will not affect the market price. In addition, the Act will not affect the behavior of those firms, so it will not affect the quantity of extraction. With no effect on price or quantity, the value of extraction is left unchanged, and severance tax revenue is left unchanged.

38.    Because the Act will affect neither extraction activities nor production of fossil fuels anywhere in the United States, it also will not affect the revenue that fossil fuel companies obtain from selling those extracted fossil fuels. The Act affects neither market prices nor behavior of producers, so it will not affect employment in the fossil fuel sector of any state.

39.    For the same reasons that the Act does not impose any economic regulation on any fossil fuel companies within the United States, it also does not impose economic regulation on fossil fuel companies in other countries. As discussed above, the Act is unlikely to change the price of energy in any country, and it does not impose any mandate or restriction on behavior. It does not interfere with the conduct of any company or individual. It is not economic regulation, because it does not "involve the government intervening, …, in the private actions of firms and individuals."

**ZYCHER'S OPINION IS
BASED ON SEVERAL ERRONEOUS ASSUMPTIONS**

40.    I have reviewed the declaration of Zycher submitted by West Virginia in support of its motion for partial summary judgment. Zycher opines that the Act will lead to a reduction in future fossil fuel investment, which will reduce production of fossil fuels, and as a result, lead to an approximately six percent increase in the price of fossil fuels for consumers. Declaration of Benjamin Zycher in Support of Plaintiffs' Motion for Summary Judgment ("Zycher Decl.") ¶¶ 5, 12.

41.    In sum, Zycher's opinion is flawed for several reasons. First, he assumes without evidence that investors will believe that the State of New York will extend

the Act to apply to future fossil fuel company activities and therefore investors will view the Act as a tax on future behavior. But the Act is not a tax on future behavior. It is an assessment on fossil fuel companies based on past conduct, so it is a fixed cost that would not affect the market price of fossil fuels. Even if the Act were to be extended and could be treated as a tax on future behavior, Zycher's analysis makes two key additional erroneous assumptions: (1) he treats the Act as a tax directly on the investment in fossil fuel supply within the United States, even though the Act does not impose assessments based on fossil fuel companies' investment; and (2) he fails to recognize that fossil fuel companies that do not receive an assessment under the Act, or new entrants to the fossil fuel market, will make any promising investment that assessed companies do not make. Those other companies would thus expand their future investment and fossil fuel supply to offset any decrease in production by assessed companies.

42.    Zycher's analysis starts with the assumption that investors will believe that the State of New York will extend the Act to apply in the future and then, based on that assumption, treat the Act as a tax on current and future investment. His assumption is based on a theory of political economy that the Act's "spending programs [will] create constituencies interested in a continuation and increase in such spending." (Zycher Decl. ¶¶ 24-26.) But he does not provide any evidence to support the application of that theory to the climate adaptation projects that will be funded by the Act or to support his assertion that based on that theory, investors must believe that the State of New York will extend the Act to apply in the future.

43.    In contrast, and as explained earlier, the 2015 Clean Power Plan, if implemented, would have been a tax on future fossil fuel production. It would have raised the marginal cost of production, which means it would raise the market price of fossil fuels. The Act is not a tax on future fossil fuel supply. It is an assessment based on past fossil fuel extraction and refinement. It would impose a fixed cost that would not affect the market price of fossil fuels.

44.    Based on his incorrect assumption that the Act is a tax on future behavior, Zycher then proceeds to calculate the impact of the supposed tax, making several flawed and unsupported additional assumptions. First, he assumes that the Act's $75 billion total assessment will be spent over 20 years, or $3.75 billion a year, that the State of New York will continue to spend $3.75 billion a year for every subsequent year after those 20 years, and that the supposed tax will be used to pay for that spending. (Zycher Decl. ¶ 34.) Zycher provides no basis for his assumption that the State of New York will spend the $75 billion over 20 years, that it will spend $3.75 billion a year for every year in perpetuity, or that the spending can only be paid for in the future through the supposed tax.

45.    Second, Zycher then incorrectly treats that $3.75 billion annual spending as a tax on fossil fuel investment by U.S. companies. (Zycher Decl. ¶ 35.) But the Act imposes an assessment that is based on the greenhouse gas emissions attributable to the fossil fuels produced worldwide by the assessed companies, not an assessment that is based directly on those companies' investment. Even if the Act were to be extended into the future and could be treated as a future tax, Zycher

21

provides no basis to treat it as a tax on investment. Rather, the appropriate assessment base under the Act – and thus if it were extended – is the fossil fuel extraction and refining that generated those greenhouse gas emissions.[10]

46.    Third, in order to calculate the supposed tax rate, Zycher takes his assumed $3.75 billion annual spending and divides it by $206 billion, citing an International Energy Agency (IEA) finding about 2024 U.S. investment in fossil fuel supply, to conclude that the Act will impose a 1.8 percent tax on investment. (Zycher Decl. ¶¶ 34-35.) Even if the Act were to be extended into the future, and even if it could be treated as a tax on future investment rather than on fossil fuel production, Zycher provides no basis for considering only U.S. investment in fossil fuel supply when the Act applies to fossil fuels produced worldwide. Indeed, the source Zycher cites indicates that worldwide investment in fossil fuel supply in 2025 will likely exceed $1 trillion.[11]

47.    Fourth, Zycher assumes a 10 percent long-run rate of return to investment in fossil fuels and finds that the Act represents a decline in profitability of 1.8 percentage points of that 10 percent return, which is an 18 percent reduction in the rate of return (Zycher Decl. ¶¶ 37-39.) He then assumes a value of .33 for the elasticity of investment with respect to the rate of return (so investment falls by .33

_____

[10] As with the CPP discussed above, any hypothetical tax on future fossil fuel production would have some effect on all future fossil fuel activities, including employment, output, and investment. Zycher's error is assuming his entire hypothetical tax would directly apply only to investment.
[11] International Energy Agency(2025). Executive summary – World Energy Investment 2025. IEA Publications. https://www.iea.org/reports/world-energy-investment-2025/executive-summary.

percent for each one percent fall in the net rate of return). He thus finds that the 18 percent reduction in the rate of return will lead to a 6 percent reduction in capital investment in fossil fuel production. (Zycher Decl. ¶40.) In doing so, Zycher implicitly assumes that the tax on investment applies to all existing companies and all potential entrants to the industry. Instead, it would only apply to fossil fuel companies that receive assessments under the Act. If those assessed companies reduced their investment in future fossil fuel supply, then other existing firms or new firms would make those same investments instead and expand their future fossil fuel supply. Those other firms would be unaffected by the Act, so total investment would be unaffected (see my paragraph 34 above).

48.     Fifth, because investment will allegedly be reduced by 6 percent, Zycher assumes that output would also fall by 6 percent, because "reduction in capital investment results directly in a decline in production capacity" (Zycher Decl. ¶ 40.) The implication of Zycher's assumption is that production bears a fixed relationship to the capital infrastructure. But standard economic models instead assume that companies have flexibility to substitute among inputs to production such as capital, labor, and other inputs. Even assuming reduced investment in capital infrastructure such as drilling or mining equipment, fossil fuel companies have some flexibility to use more workers to run the same equipment for more hours with better maintenance and more efficiency in production. Thus, a reduction in investment will not equate to the same percent reduction in production.

23

49.     Finally, Zycher assumes a demand elasticity between 0.5 and 1.0 to infer that the 6 percent reduction in output would raise prices by 6 to 12 percent. [12] He also assumes that the price increase would affect all producers, including those not assessed, because a single market cannot have more than one price. (Zycher Decl. ¶ 41.) Zycher is correct that a single market cannot have more than one price, but he incorrectly assumes that the single market price would be based solely on the assessed companies. If only a subset of companies face an assessment on fossil fuel extraction or refining, even if it were on future extraction or refining every year forever, then other companies remain unassessed and can proceed to produce and sell fossil fuels at their unchanged marginal cost. That lower unchanged marginal cost of production would determine market price, which would also therefore be unchanged.

50.     Zycher's conclusion that a law passed by a single state within the United States could be the cause of a 6 to 12 percent increase in the worldwide market price of fossil fuels is implausible on its face. Hypothetically, an extended annual assessment would be $3 billion per year ($75 billion divided by the 25 years over which the assessed companies could pay it). The International Energy Agency reports that worldwide annual revenues of the oil and gas industry have averaged close to

---

[12] A demand elasticity of 1.0 means that a one percent decline in quantity is associated with a one percent rise in price (so the 6 percent decline in output leads to a 6 percent rise in price). A demand elasticity of 0.5 means that a half percent decline in quantity is associated with a one percent rise in price (so the 6 percent decline in output leads to a 12 percent rise in price).

$3.5 trillion (in U.S. dollars).[13] The IEA does not report the annual value of all fossil fuels worldwide, but their numbers can be used to calculate that the value of worldwide coal production is approximately $1 trillion USD.[14] The sum of these values for annual oil and gas production ($3.5 trillion) plus coal production ($1 trillion) is $4.5 trillion. Thus, even if the $3 billion annual assessment were extended, it would not have any noticeable effect on this $4.5 trillion market.

51.    But as discussed above, the Act does not impose a tax on future behavior. The only assessment that is appropriate to analyze is the assessment actually enacted by the State of New York, namely, a one-time assessment that is based on emissions attributable to past fossil fuel extraction and crude oil refining. That assessment represents a fixed cost on fossil fuel companies and is not a tax on any current investment or future production of any fossil fuel company.

## CONCLUSIONS

52.    Economic models of profit-maximizing firms interacting with consumer demand are used by economists to provide useful insights and valid predictions of how firms and markets determine prices and how government policies can affect

---

[13] International Energy Agency (2023). The Oil and Gas Industry in Net Zero Transitions. IEA Publications. https://www.iea.org/reports/the-oil-and-gas-industry-in-net-zero-transitions. Page 13 says "Since 2018, the annual revenues generated by the oil and gas industry have averaged close to USD 3.5 trillion."

[14] International Energy Agency (2024). Coal 2024: Analysis and Forecast to 2027. IEA Publications. https://www.iea.org/reports/coal-2024. Page 7 reports that estimated global coal production in 2024 is 8.77 billion tonnes. Coal does not have a single worldwide price, but page 10 reports that "the price of imported thermal coal in Europe was around USD 120 per tonne". This price multiplied by 8.77 billion tonnes is barely over $1 trillion in USD.

those prices. These models clearly predict that mechanisms like a carbon tax on each future barrel of oil or ton of coal would raise the prices of those fossil fuels, discourage the burning of fossil fuels, and help reduce emissions. In contrast, the Act does not impose a tax on any current or future barrel of oil or ton of coal. It imposes an assessment based on applicable emissions from fossil fuel extracted or crude oil refined from 2000 to 2024.

53.    Using the tools typically relied upon by economists to evaluate the effect of government policies or regulations on market prices, it is my opinion that the assessment imposed by the Act will not lead to any change in a company's production or sale of any current or future barrel of oil, cubic foot of natural gas, or ton of coal; it will not change any fossil fuel company's behavior. With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (i.e., electricity or motor fuels). Thus, the Act is not an economic regulation that intervenes in the actions or conduct of any company or individual.

54.    The Act imposes an assessment that must be absorbed by the fossil fuel company out of its own profits, with no change in the price paid by consumers. Thus, it does not result in any burden on consumers or any change in consumer behavior. The Act also will not change the conduct of any fossil fuel company – foreign or domestic – because it will not change existing incentives for finding new energy, investing in future energy production, importing energy, or exporting energy. Thus, the Act will have no effect on the availability of energy.

Dated: December 5, 2025

_Don Fullerton_
_____
Don Fullerton, Ph.D.

**References** (Publications attached in Exhibit B)

Berry, Steven, Martin Gaynor, and Fiona Scott Morton (2019). Do Increasing Markups Matter? Lessons from Empirical Industrial Organization. *Journal of Economic Perspectives* 33(3): 44–68. https://doi.org/10.1257/jep.33.3.44

Borenstein, Severin, A. Colin Cameron, and Richard Gilbert (1997). Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes? *The Quarterly Journal of Economics*, 112(1), 305–339. https://doi.org/10.1162/003355397555118

Christopher P. Chambers, and John Rehbeck (2025). Testing profit maximization in the U.S. cement industry. *Journal of Economic Behavior and Organization* 231: 106773. https://doi.org/10.1016/j.jebo.2024.106773

Cronin, Julie Ann, Don Fullerton, and Steven Sexton (2019). Vertical and Horizontal Redistributions from a Carbon Tax and Rebate. *Journal of the Association of Environmental and Resource Economists* 6(S1): S169-S208. http://dx.doi.org/10.1086/701191

Fowlie, Meredith, Mar Reguant, and Stephen P. Ryan (2016). Market-Based Emissions Regulation and Industry Dynamics. *Journal of Political Economy*, 124(1): 249–302. http://dx.doi.org/10.1086/684484

Goulder, Lawrence H., and Marc A.C. Hafstead (2017). *Confronting the Climate Challenge: US Policy Options*, New York: Columbia University Press.

Howard, Peter H., and Minhong Xu (2022). Enacting the "Polluter Pays" Principle: New York's Climate Change Superfund Act and Its Impact on Gasoline Prices. Institute for Policy Integrity, New York University School of Law. https://policyintegrity.org/publications/detail/enacting-the-polluter-pays-principle

Kitzmueller, Markus, and Jay Shimshack (2012). Economic perspectives on corporate social responsibility. *Journal of Economic Literature* 50(1):51–84. http://dx.doi.org/10.1257/jel.50.1.51

Kolstad, Charles D. (2000). *Environmental Economics*. Oxford UK: Oxford University Press.

Mankiw, N. Gregory (2018). *Principles of Economics*. 8th edition. Independence, KY: Cengage.

Taylor, Reid B., and Erich Muehlegger (2025). The Effects of Competition in the Retail Gasoline Industry. Cambridge, MA: NBER Working Paper No. 33569.

Tirole, Jean (1988). *The Theory of Industrial Organization*. Cambridge, MA: MIT Press.