## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

STATE OF WEST VIRIGINA, et al.,

*Plaintiffs*,

v.

LETITIA JAMES, in her official capacity
as the Attorney General of New York, et al.,

*Defendants*.

No.  25-cv-00168-BKS-DJS

## DECLARATION OF JUSTIN S. MANKIN, Ph.D.

Pursuant to 28 U.S.C. § 1746, Justin S. Mankin, Ph.D., declares under penalty of perjury that the following is true and correct:

1.      I submit this Declaration in support of defendants' (together "New York") opposition to plaintiffs' ("West Virginia" and the "Chamber") motion for partial summary judgment and in support of New York's cross-motion for partial summary judgment.

### EDUCATIONAL BACKGROUND AND EXPERIENCE

2.      I received my Bachelor of Arts degree in Political Science from Columbia University, a Master of Science degree in Global Politics and Development Economics from the London School of Economics, a Master of Public Administration degree in Environmental Science and Policy from Columbia University, and a Doctorate of Philosophy in Environment and Resources focused on Earth System Science from

1

Stanford University. I did my postdoctoral training at Lamont-Doherty Earth Observatory of Columbia University and the National Aeronautics and Space Administration Goddard Institute for Space Studies.

3.      I am an Associate Professor in the Department of Geography, the program in Ecology, Evolution, Environment & Society, and the Department of Earth Sciences at Dartmouth College, located in Hanover, New Hampshire. I am also an Adjunct Associate Research Scientist in the Division of Ocean & Climate Physics at the Lamont-Doherty Earth Observatory of Columbia University. At Dartmouth, I direct the Climate Modeling & Impacts Group, where I lead a research team that works to understand the impacts of human-caused global warming on our water, food, infrastructure, and economic and physical security.

4.      My areas of expertise include climate variability and dynamics; climate attribution, prediction, and projection; drought and ecohydrology; earth system modeling; and the socioeconomic and ecosystem impacts of climate change. Much of my scientific research centers on using observations and models to quantify the impacts and costs of global warming to date and to estimate how those impacts and costs may evolve into the future. I have over 15 years of research experience in these areas and have authored over 65 peer-reviewed publications on these topics. My climate research has been published in leading peer-reviewed scientific journals, like *Science*, *Nature,* and the *Proceedings of the National Academy of Sciences.*

5.      I also serve in numerous leadership and community roles that reflect both my scientific expertise and my commitment to advancing climate research. I was

2

co-lead of the National Oceanic and Atmospheric Administration's (NOAA) *Drought Task Force IV* (2020–2024), coordinating drought science across federal, academic, and state partners. I was selected and served as a graphics lead author to the *U.S. Global Change Research Program's Sixth National Climate Assessment (NCA6,* now disbanded*)* and I am currently a member of the *National Academies of Sciences, Engineering, and Medicine* consensus study on the future of drought in the United States. I contribute to advancing national research priorities as part of the *U.S. Climate Variability and Predictability Program Working Group on Accelerating Research on the Scientific Foundations of Regional Climate Risk Information,* serve with the *University Corporation for Atmospheric Research,* and currently co-lead the drought section of *Water Cycles Priorities* for the next *National Aeronautics and Space Administration (NASA) Decadal Survey.* Beyond these activities, I help strengthen the scientific community through editorial leadership, serving as an editor for the American Geophysical Union's *Earth's Future* and the American Meteorological Society's *Journal of Climate.* I also serve on the *American Meteorological Society Committee on Climate Variability and Change* and remain active in professional and academic societies, including American Geophysical Union, American Meteorological Society, the American Association of Geographers, and American Association for the Advancement of Science. Across these roles, I work to guide the direction of climate research, foster collaboration, and support the next generation of scientists.

6.     My credentials, research, and publications are summarized in my curriculum vitae, which is included as Exhibit A to this Declaration.

7.     I have been retained by the Office of the New York State Attorney General, which represents defendants in this action to explain the different types of emissions that climate scientists consider in connection with attributing greenhouse gas emissions to companies that extract or refine and then sell fossil fuels. I also explain the methodological approaches scientists take in making attributions of particular climate-change harms from the greenhouse gas emissions traceable to particular fossil fuel extractors or refiners.

8.     I have reviewed New York's Climate Change Superfund Act (the "Act"), the West Virginia's and the Chamber's complaints, the West Virginia's and the Chamber's memoranda of law in support of their motions, the Declaration of Dr. Benjamin Zycher in support of West Virginia plaintiffs' motion for summary judgment, and have consulted the resources cited in this Declaration, identified in footnotes throughout. Resources cited that are not publicly available online are included in Exhibit B. I understand that the plaintiffs assert that it is impossible to determine whether particular emissions cause in-state harm, and that the Act seeks recovery from companies for greenhouse gas emissions without any certainty that those emissions caused in-state harm.

9.     My Declaration does not seek to provide any opinion of the various legal requirements under the Act, such as the conditions upon which the State of New York

may regulate or impose consequences on fossil fuel companies that caused in-state harm.

10.     Instead, my Declaration outlines that peer-reviewed consensus-based science *can*, with high degrees of confidence, trace state-level harms back to particular emissions, such as those originating with the production and sale of fossil fuels made by individual companies. Such methods collectively fall under a scientific discipline called *climate attribution science*. The science that causally traces particular emissions (like those from a company) to particular harms (like those endured by the State of New York) is called *end-to-end climate damage attribution*. Briefly, using publicly available, peer-reviewed greenhouse gas emissions inventories from individual companies (built on voluntary reporting data from companies given their production (Scope 1) and sale (Scope 3) of fossil fuels), peer-reviewed attribution science methods can estimate changes in the likelihood and magnitudes of impactful extreme weather and climate at the state-level. Moreover, peer-reviewed methods can document the economic losses from changes in those emissions-driven hazards, thus providing an estimate of state-level damages traceable to individual sets of emissions. While I have not been asked to review any specific proposed attribution methods that the New York State Department of Environmental Conservation may apply in the future in developing or adopting regulations to implement the Act, I first outline the greenhouse gas emissions accounting protocol associated with the production and sale of fossil fuels; I then discuss climate attribution science, emphasizing how, with

high degrees of confidence, science can assess the causal role of particular greenhouse gas emissions to state-level harms.

11.    My Declaration also addresses statements made in a Declaration by Benjamin Zycher, in which he contends that "the temperature impacts of [greenhouse gas] emissions from U.S. natural gas and petroleum systems is not detectable." Zycher Declaration ¶16. He erroneously concludes that "the assertion that fossil energy producers that emitted more than 1 billion metric tons[1] of GHG in their extraction and refining operations over 2000-2024 are responsible for the purported effects of anthropogenic climate change cannot be supported analytically." *Id.* ¶67. As I document beginning at ¶41 in my Declaration below, Zycher's analysis of the warming and damages attributable to covered emissions is not scientifically credible due to the numerous errors, arbitrary assumptions, and incorrect calculations he makes and how those inform his problematic and poorly documented experimental design with the U.S. Environmental Protection Agency (EPA) climate model. Collectively, these lead to Zycher's incorrect conclusions about (1) the magnitude of the emissions at issue, (2) the warming they cause, and (3) the damages that result. These errors suggest either a lack of familiarity with or understanding of the state-of-the-science or an effort to come to a predetermined conclusion. Either way, the science presented in the Zycher Declaration appears dictated by a desired conclusion, undermining its credibility.

---

[1] Note that a "metric tonne" and a "metric ton" are equivalent units of mass both representing 1,000 kilograms. The "tonne" is the international scientific standard spelling and the latter is a U.S. convention.

## DISCUSSION

### Greenhouse Gases Attributable to Companies
### that Produce and Sell Fossil Fuels

12.     The Climate Change Superfund Act defines "covered greenhouse gas emissions" with respect to any entity, as "the total quantity of greenhouse gas emissions, expressed in metric tons of carbon dioxide equivalent, as defined in section 75-0101 of this chapter attributable to the total amount of fossil fuels extracted by that entity during the covered period, as well as the total amount of crude oil refined by that entity during the covered period. For the purposes of this article, covered greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining worldwide by such entity and are not limited to such emissions within the state." N.Y. Env't Conserv. L. § 76-0101(8).

13.     The Act defines the "covered period" for covered greenhouse gas emissions as the period from January 1, 2000 to December 31, 2024. N.Y. Env't Conserv. L. § 76-0101(9).

14.     The Act also defines a "responsible party" as "any entity (or a successor in interest to such entity described herein), which, during any part of the covered period, was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the department to be responsible for more than one billion tons of covered greenhouse gas emissions. The term responsible party shall not include any person who lacks sufficient contacts with the state to satisfy the due process clause of the United States Constitution." N.Y. Env't Conserv. L. § 76-0101(21).

15.    Greenhouse gas emissions from organizations are typically delineated by their scope, or operational boundaries, following guidance from the Greenhouse Gas (GHG) Emissions Protocol.[2] The GHG Protocol emerged in the 1990s from a collaboration between the World Resources Institute and the World Business Council for Sustainable Development, which together sought to define standardized practices to identify and delineate the emissions that organizations directly control via their operations (defined as *Scope 1*) from those that they indirectly influence through energy choices in pursuit of their activities (defined as *Scope 2*) from those for which they are responsible across their full value chain (*Scope 3*).

16.    Defining organizational emissions in this standardized way achieves the GHG Protocol's key principles: (1) *relevance*, meaning a focus on inventorying the emissions that matter to all potential stakeholders both in and outside the organization; (2) *completeness*, meaning the inventory accounts for all emissions and formalizes a process to disclose and justify exclusions; (3) *consistency*, meaning that the inventories and their boundaries are consistent over time to allow for effective benchmarking and tracking; (4) *transparency*, meaning that the protocol is auditable, as methods, data sources, and assumptions are fully disclosed; and (5) *accuracy*, meaning that the reported inventories are true and integrous.[3]

---

[2] *The Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard. Revised Edition.* World Resources Institute and World Business Council for Sustainable Development, Mar. 2004. ISBN 1-56973-568-9. Perma | ghgprotocol.org. Accessed 15 Oct. 2025.

[3] See Greenhouse Gas Protocol, p. 7.

17.     The GHG Protocol has become the standard across corporate entities responsive to the Climate Disclosure Project,[4] a global nonprofit that provides a disclosure system for entities to voluntarily report their environmental impacts, such as emissions. For example, in 2023, some 97% of emissions-disclosing Standard and Poor's (S&P) 500 companies reported to the Climate Disclosure Project that they used the GHG Protocol.[5] The GHG Protocol also undergirds the EPA's Center for Climate Leadership, which provides guidance on how organizations can manage greenhouse gas emissions. The GHG Protocol 'Scopes' are the global standard for delineating and tracking organizational emissions, irrespective of size, operations, and sector, ensuring consistency and comparability across industries worldwide.

18.     It is worth considering how the GHG Protocol scopes are formally defined: *Scope 1* emissions are those direct emissions from sources fully controlled by an organization.[6] In contrast, *Scope 2* emissions are indirect emissions associated with the energy purchased by an organization. Lastly, *Scope 3* emissions are indirect emissions as part of the organization's entire value chain; they are the most complicated to inventory. An application of the GHG Protocol to a university might

---

[4] *Carbon Disclosure Project (CDP)*. Perma | CDP: Turning Transparency to Action. Accessed 15 Oct. 2025.

[5] *About Us*. Greenhouse Gas Protocol, Perma | About Us | GHG Protocol. Accessed 15 Oct. 2025.

[6] *Scope 1 and Scope 2 Inventory Guidance*. U.S. Environmental Protection Agency, last updated 23 Apr. 2025, Perma | Scope 1 and Scope 2 Inventory Guidance | US EPA. Accessed 15 Oct. 2025.

be something along the lines of campus-based boilers and fleet vehicles constituting Scope 1 emissions, its purchased electricity constituting Scope 2, and the supply chains, waste, and commuting to and from university constituting Scope 3.

19.     As applied to fossil fuel companies, Scope 1 emissions would include, for example, direct emissions from flaring or venting, fugitive methane from extraction, refining, and other operations, as well as the companies' own fuel inventory for vehicle fleets, equipment, and other infrastructure. A fossil fuel company's Scope 2 emissions are similar to other organizations, being those from energy supplied to the company for its operations (e.g., externally sourced electricity, steam, heating, cooling, and fuels). Scope 3 constitute the emissions across the rest of the fossil fuel company value chain. In particular, the most dominant sources of Scope 3 emissions are the emissions from the use of the fossil fuel companies' sold products (known as Scope 3 Category 11 in the GHG Protocol), namely their gasoline, diesel, natural gas, or coal that is combusted by downstream users.

20.     Scope 3 represents the dominant emissions category for organizations generally[7] and companies producing and selling fossil fuels are no different. The GHG Protocol's Corporate Value Chain Standards[8] were developed to help companies

---

[7] "Corporates' Supply Chain (Scope 3) Emissions Are on Average 11.4 Times Higher Than Operational Emissions." *Carbon Disclosure Project (CDP)*, 10 Feb. 2021, Perma | Corporates' supply chain scope 3 emissions are 26 times higher than their operational emissions - CDP

[8] See p. 4 in Bhatia, Pankaj, et al. *Corporate Value Chain (Scope 3) Accounting and Reporting Standard: Supplement to the GHG Protocol Corporate Accounting and*

standardize estimates of Scope 3 emissions owing to the complexity of tracking them. The standard articulates 15 different categories over which organizational Scope 3 emissions can occur both upstream (in the supply chain, Categories 1-8) and downstream (product use and end of life, Categories 9-15) from organizational activities.[9]

21.    The Carbon Majors Database, a publicly available and peer-reviewed database of the emissions inventories from 180 of the world's largest fossil fuel companies,[10] provides year-on-year estimates of the Scope 1 and 3 emissions and accords very well with both independent estimates and firm disclosures.

### Attributing Climate Change Damages to Fossil Fuel Companies

22.    As I understand, the West Virginia plaintiffs have contended that "it is impossible to determine whether any particular emissions actually caused harm in New York," West Virginia Br. 35. This statement is based on an inaccurate appraisal of the state of the science. *Peer-reviewed, consensus-based climate attributions can provide causal assessments of the warming, hazards, and local harms promulgated by any set of greenhouse gas emissions, including those scoped to a company.* As I discuss in detail below, peer-reviewed scientific research has leveraged consensus-

---

*Reporting Standard.* World Resources Institute and World Business Council for Sustainable Development, 2011, Perma | ghgprotocol.org

[9] See p. 34 in Bhatia, Pankaj, et al.

[10] About Carbon Majors." *Carbon Majors*, Perma | Carbon Majors Home. Accessed 19 Oct. 2025.

based methods (e.g., empirical and modeling approaches used in both the Intergovernmental Panel on Climate Change (IPCC) Assessment Reports[11] and the US Global Change Research Program National Climate Assessment[12])[13] to link company-level emissions to in-state harms by calculating (1) how the warming from those emissions alter cumulative greenhouse gas concentrations, (2) how those concentrations altered hazards (such as the likelihood or magnitude[14] of extreme

---

[11] IPCC, Physical Science Sixth Assessment Report (AR6), at 108-110 (https://perma.cc/4WPZ-HDCD), 204-206 (https://perma.cc/6CPU-QBK3), 1522-1527, 1541-1542, 1552-1553 (https://perma.cc/DJ33-2RUW). Note that this type of analysis is distinct from the long-established research attributing global warming to anthropogenic greenhouse gas emissions and broader body of research projecting climate impacts from rising temperatures and ocean acidification. *Id. See also* Bulletin of the American Meteorological Society, Explaining Extreme Events of 2021 and 2022 from a Climate Perspective (2022), https://www.ametsoc.org/ams/publications/bulletin-of-the-american-meteorological-society-bams/explaining-extreme-events-from-a-climate-perspective/explaining-extreme-events-of-2021-from-a-climate-perspective/

[12] Marvel, K. et al., 2023: Ch. 2. Climate trends. In: *Fifth National Climate Assessment*. Crimmins, A.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, B.C. Stewart, and T.K. Maycock, Eds. U.S. Global Change Research Program, Washington, DC, USA. Perma | toolkit.climate.gov.

[13] It is important to note that these syntheses of the state-of-the-science are massive undertakings by hundreds upon hundreds of scientists. The Working Group I contribution to the IPCC's 6th Assessment Report synthesized findings from more than 14,000 peer-reviewed studies. "In-depth Q&A: The IPCC's Sixth Assessment Report on Climate Science." *Carbon Brief*, 9 Aug. 2021, Perma | In-depth Q&A: The IPCC's sixth assessment report on climate science - Carbon Brief. Accessed 19 Oct. 2025. The 5th National Climate Assessment synthesized over 8,200 references. U.S. Environmental Protection Agency. *EPA Tools and Resources Webinar: 5th National Climate Assessment – Resources and Interactive Atlas*. U.S. EPA, 20 Nov. 2024. PDF file, Perma | www.epa.gov. Accessed 19 Oct. 2025.

[14] Quilcaille, Y. et al., Systematic attribution of heatwaves to the emissions of carbon majors, *Nature* 645, 392–398 (2025). Perma | Systematic attribution of heatwaves to

heat), and (3) how much impact those greenhouse gas-driven changes in those hazards generate economic burdens on subnational regions, like New York State.[15]

23.    I am not offering an opinion on how the New York State Department of Environmental Conservation will or should determine a responsible party's share of the costs imposed by the Act. Instead, I explain how end-to-end climate damage attributions have emerged scientifically and how they work to determine an entity's contribution to climate hazards and their documented harms.

24.    *Climate attribution is the science to assess causality in a complex Earth system.*[16] Myriad mechanisms can coalesce to account for any given weather or climate phenomena, whether a cloudless summer day, a devastating flood event, or a slowly unfolding warming trend in the ocean. Because of societal demands to inform climate risk mitigation, adaptation, and policy, attribution science is most often concerned with how human activities (in particular greenhouse gas emissions from

---

the emissions of carbon majors | Nature; Burke, M. et al., Quantifying climate change loss and damage consistent with a social cost of greenhouse gases, *NBER Working Paper*, 31658 (2023) DOI: 10.3386/w31658 Perma | Quantifying Climate Change Loss and Damage Consistent with a Social Cost of Greenhouse Gases | NBER; Callahan, C. & J.S. Mankin, Globally unequal effect of extreme heat on economic growth, *Science Advances* **8**, eadd3726 (2022) Perma | www.science.org; Callahan, C. & J. S. Mankin, National attribution of historical climate damages, *Climatic Change* 172 40 (2022). Perma | National attribution of historical climate damages | Climatic Change

[15] Callahan and Mankin, "Globally unequal effect of extreme heat on economic growth."

[16] *What Is Attribution?* National Oceanic and Atmospheric Administration Physical Sciences Laboratory, Perma | Interpreting Climate Conditions: What is Attribution: NOAA Physical Sciences Laboratory. Accessed 15 Oct. 2025.

fossil fuel use and patterns of development like agriculture, deforestation, and other land-use and land cover changes) contribute to both long- and short-term changes in weather and climate phenomena.

25.    Attribution science assesses causality by comparing the observed world to a counterfactual one absent some potential explanatory factor, much in the way a controlled medical drug trial compares individuals in a treatment group to those in a control group to assess drug efficacy. In climate science, we rely on observational data and physics-based models to compare the world as it has been (i.e., the treatment group) to a counterfactual one absent an explanatory factor (i.e., the control group). In the counterfactual world, we use physics-based models or statistical approaches to remove one (or more) potential explanatory factor(s) for the outcome, like observed greenhouse gas emissions. The counterfactual thus asks, how would the climate or this event have been different *but for* this factor? The difference between the world how it has been (the treatment) and the counterfactual world absent some explanatory factor (the control) is a measure of the causal contribution of that factor to the outcome.

26.    Attribution science can take many forms, a function of the question at hand and the portions of the Earth system the attribution is considering. But generally, all attribution requires the use of observational data alongside physical and statistical models to disentangle the contributions of various drivers of weather and climate phenomena, often focusing on separating factors that are "internal" to

the climate system (termed *internal variability*) from those "external" to it (termed *forcings*, as they *force* a change in planetary energy balance).

27.     A canonical example of "internal" variability is El Niño—when interannual ocean temperatures in the eastern tropical Pacific are anomalously warm. El Niño is a feature of the climate system, meaning it and its impacts on extreme weather globally would occur in absence of people and their combustion of fossil fuels. Another example of internal variability is a randomly occurring high pressure system that sits off the California coast, acting like a boulder in a stream, steering storms north to Washington state. We term these kinds of oscillations in the ocean and atmosphere internal variability because they are an innate characteristic that is a natural feature *internal* to the climate system.

28.     Characterizing internal variability is essential to the climate attribution enterprise. Consider the challenge of assessing a causal role for global warming on a heatwave. Addressing this question requires that we isolate the contributions from internal variability to the heatwave—we ask, 'could this observed heatwave have occurred simply from the randomness in weather?' Because of that task, climate scientists work to identify why internal variability emerges, and where possible, characterize recurrent patterns (or *modes*) of variability, and how they can act to shape the weather and climate people experience locally. Internal variability tells us that there are many weather patterns in any one place consistent with the same planetary temperature or greenhouse gas emissions at any one time. And, to the extent that scientists can identify a recurrent pattern of internal variability, it

provides a source of predictability as well. When we expect an El Niño, for example, we know it will influence set patterns of weather around the world, such as increasing risks of flood in California or bushfires in Australia. From a climate attribution standpoint, it is essential to identify the contributions of internal variability to weather and climate phenomena.

29.     "External" climate drivers are those that exist outside of the climate system. These can be naturally occurring ones like changes in the sun's energy or volcanic eruptions that block sunlight; both can alter climatic behavior by forcing changes in global-scale energy balance. But external drivers can also be human-caused or *anthropogenic*, such as that from land use and land cover changes or from greenhouse gases, like carbon dioxide, methane, and nitrous oxide emitted as by-products from human activities, such as the production and sale of fossil fuels.

30.     The energy from the Sun that enters Earth's atmosphere must be balanced by the energy that Earth sends back out to space (this is the first law of thermodynamics). As such, changes in the composition of Earth's atmosphere, like from greenhouse gases—even in small amounts—can disrupt Earth's energy balance, preventing Earth from shedding its heat back out to space. This is akin to the way a lid on a pot of water put onto the stove to boil traps more heat than one without. If Earth cannot shed its heat energy as efficiently, it must heat up, raising its temperature to reattain energy balance. This is because hotter objects emit much more energy than cooler ones. For example, if you double the temperature of an object,

it emits 16 times more energy. This heating is the global warming we are experiencing.

31.     The charge of attribution science is to separate the contributions of internal variability and external forcings of weather and climate phenomena, both to advance the science of Earth system prediction, but also to answer the question of how human activities, particularly the combustion of fossil fuels, have altered weather and climate. There is a long history of attribution science; in fact, the IPCC was awarded the Nobel Prize in 2007 in large part for definitively identifying the fingerprint of human activities on warming temperatures in the climate system—a physical attribution of human-caused changes in greenhouse gas concentrations to global temperature changes (see "physical attribution" link in **Figure 1**).



**Figure 1|** The attribution chain to assess causality. Climate attribution can take many forms, depending on the question at hand. It can consider any linkages in the chain of causality diagramed here, from how measures of carbon dioxide concentrations influence climate change writ large (a physical attribution), to how such concentrations shape weather or climate hazards, like a heatwave (an event

attribution), to how such hazards select for impacts like homes washed away or lives lost (a damage attribution). Should any of these attribution linkages include the upstream emissions rather than the concentrations, that is a source or emitter-based attribution. If the entire chain of causality is considered from emissions through damages, that is an end-to-end attribution.

32.     In the last several decades, attribution science has become much more expansive, considering not just planetary scale changes unfolding over many decades from measured changes in greenhouse gas concentrations, but small-scale changes happening over shorter time periods, to include rapid advances in the ability to assess how human activities have altered the likelihood and magnitude of individual extreme weather and climate events, called extreme event attribution (see "event attribution" link in **Figure 1**).

33.     Extreme event attribution research identifies how various physical drivers (such as greenhouse gas emissions) alter the likelihood or intensity of extreme weather or climate events, such as heatwaves, extreme rainfall, droughts, wildfires, and floods.[17] The field has rapidly expanded and streamlined its approaches since it was first attempted in 2004, when scientists showed how anthropogenic warming had doubled the likelihood of the 2003 European heatwave that killed 70,000 people.[18] Since that time, extreme event attribution has advanced to become a scientific standard, with scientists fingerprinting anthropogenic contributions to hot and cold

---

[17] *Extreme Event Attribution,* National Oceanic and Atmospheric Administration, Perma | Extreme event attribution: the climate versus weather blame game | NOAA Climate.gov. Accessed 18 Oct. 2025.

[18] Stott et al. "Human contribution to the European heatwave of 2003." *Nature* 432, 610–614 (2004). https://www.nature.com/articles/nature03089

temperature extremes, to heavy precipitation events, to droughts, to tropical cyclones. Per the NCA5,[19] "climate change made the record-breaking Pacific Northwest heatwave of June 2021 2° to 4°F hotter,[20] and in 2017, Hurricane Harvey's rainfall was estimated to be about 15%–20% heavier than it would have been without human-caused warming.[21]" Both the Sixth Assessment Report of the IPCC and the NCA5 note that attribution science has advanced to the point where we can confidently quantify the role of climate change in altering the likelihood or magnitude of extreme events in near-real time,[22] as is done by *World Weather Attribution*, an organization that since its formation in 2014, has used peer-reviewed science to

---

[19] See page 2-4 of Marvel, K. et al., 2023: Ch. 2. Climate trends. In: *Fifth National Climate Assessment*. Crimmins, A.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, B.C. Stewart, and T.K. Maycock, Eds. U.S. Global Change Research Program, Washington, DC, USA. Perma | toolkit.climate.gov

[20] Philip, S.Y. et al., 2021: Rapid attribution analysis of the extraordinary heat wave on the Pacific coast of the US and Canada in June 2021. *Earth System Dynamics*, 13 (4), 1689–1713. Perma | ESD - Rapid attribution analysis of the extraordinary heat wave on the Pacific coast of the US and Canada in June 2021

[21] Risser, M.D. and M.F. Wehner, 2017: Attributable human-induced changes in the likelihood and magnitude of the observed extreme precipitation during Hurricane Harvey. Geophysical Research Letters, 44 (24), 12457–12464. Perma | agupubs.onlinelibrary.wiley.com

[22] Seneviratne, Sonia I., et al. "Weather and Climate Extreme Events in a Changing Climate." *Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change*, edited by Valérie Masson-Delmotte et al., Cambridge University Press, 2021, pp. 1513–1766. Perma | Weather and Climate Extreme Events in a Changing Climate (Chapter 11) - Climate Change 2021 – The Physical Science Basis; and Marvel, Kate, et al. "Climate Trends." *Fifth National Climate Assessment*, edited by Allison R. Crimmins et al., U.S. Global Change Research Program, 2023. Perma | toolkit.climate.gov.

attribute the causal role of human-caused climate change on more than 100 extreme weather and climate events around world.[23]

34.    Beyond event attribution, the science has advanced to consider more linkages in the chain of causality that connects changes in emissions to changes in greenhouse gas concentrations; changes in such concentrations to changes in warming; changes in warming to changes in extremes and hazards; and changes in hazards to consequent damages (**Figure 1**)—how emissions through warming lead to, for example, homes washed away, agricultural yield losses, depressed economies, or heatstroke in people. As such, attribution science is now well-positioned to provide assessments of how particular sets of emissions, such as those emerging from the activities of a single nation or firm like a fossil fuel company, contribute to particular damages, such as the economic losses New York State suffers from extreme heat cumulatively over a time period, or from an individual heat wave.[24] These kinds of attributions are called *end-to-end climate damage attributions*, as they resolve the

---

[23] World Weather Attribution, available at Perma | World Weather Attribution – Exploring the contribution of climate change to extreme weather events. Accessed 18 Oct. 2025.

[24] Quilcaille, Y. et al., Systematic attribution of heatwaves to the emissions of carbon majors, *Nature* 645, 392–398 (2025). Perma | Systematic attribution of heatwaves to the emissions of carbon majors | Nature; Burke, M. et al., Quantifying climate change loss and damage consistent with a social cost of greenhouse gases, *NBER Working Paper*, 31658 (2023). DOI: 10.3386/w31658 Perma | Systematic attribution of heatwaves to the emissions of carbon majors | Nature; Callahan, C. & J.S. Mankin, Globally unequal effect of extreme heat on economic growth, *Science Advances* 8, eadd3726 (2022) Perma | www.science.org; Callahan, C. & J. S. Mankin, National attribution of historical climate damages, *Climatic Change* 172 40 (2022). Perma | National attribution of historical climate damages | Climatic Change

full chain of causality from specific emissions to specific damages (**Figure 1**): "*but for* the extreme heat impacts of these emissions, New York State's economy would look like this." Such end-to-end climate damage attribution analyses are grounded in observations of what has already occurred: What are the observed changes in weather and climate extremes? What is the observed relationship between such extremes and socioeconomic outcomes? These end-to-end attributions are retrospective, documentary assessments of the world as it has been, the losses that have already occurred, not predictions of a far off and contingent future.

35.    Causal inference approaches, which are statistical tools used to mimic a controlled experiment on observed data,[25] can then be used to determine the causal relationship between the intensity of that extreme and its harms, such as flood-[26] or

---

[25] Angrist and Pischke. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton University Press, 2009.

[26] Lynch et al. "Large floods drive changes in cause-specific mortality in the United States." *Nature Medicine*, vol. 31, no. 2, Feb. 2025, pp. 663-671, Perma | Large floods drive changes in cause-specific mortality in the United States | Nature Medicine; Carleton et al. "Valuing the Global Mortality Consequences of Climate Change Accounting for Adaptation Costs and Benefits." *The Quarterly Journal of Economics*, vol. 137, no. 4, 2022, pp. 2037–2105, Perma | academic.oup.com.

heatwave-driven[27] mortality[28], property[29] or crop[30] damages, or reductions in economic growth.[31] Such relationships are formalized as 'dose-response' models, and are often called 'marginal effects' or 'damage functions.' Such *damage functions* relate a unit change in the magnitude of a weather or climate hazard, like a 1°C change in a heatwave (the dose), to a unit change in some socioeconomic outcome of interest, like changes in annual-scale economic growth in New York State (the response). Combining the quantification of company-level emissions contributions to local climate hazards, like heatwaves, with the observed socioeconomic consequences of such hazards, like depressed economic growth, allows for an assessment of local scale (i.e., at the level of a U.S. state) climate damages traceable to a company's emissions.

36.    End-to-end attribution of climate damages at the level of a U.S. state begins with the greenhouse gas emissions to be considered. This can be a fossil fuel producer's or refiner's historical greenhouse gas emissions; it could also be a state's

---

[27] Carleton et al. "Valuing the Global Mortality Consequences of Climate Change Accounting for Adaptation Costs and Benefits."

[28] U.S. Environmental Protection Agency. "Climate Change Indicators: Heat-Related Deaths." *EPA*, 26 Feb. 2025, Perma | Climate Change Indicators: Heat-Related Deaths | US EPA

[29] Davenport et al. "Contribution of Historical Precipitation Change to U.S. Flood Damages." *Proceedings of the National Academy of Sciences of the United States of America*, vol. 118, no. 4, 26 Jan. 2021, e2017524118, Perma | www.pnas.org.

[30] Diffenbaugh et al. "Historical Warming Has Increased U.S. Crop Insurance Losses." *Environmental Research Letters*, vol. 16, no. 8, 2021, article 084025, https://perma.cc/UXA8-HNVT.

[31] Callahan and Mankin, "Globally unequal impact of extreme heat on economic growth."

emissions, or emissions from a sector of the economy, like the power or transport sectors.[32] This can be presented as a time series of annual emissions in metric tons of carbon or carbon dioxide equivalent (if considering methane and other greenhouse gas emissions), or it can be a percentage of some total set of emissions considered, whether it is all anthropogenic emissions over a given time period, or some other covered period, as considered by the New York Climate Change Superfund Act.

37.    A company's emissions can be determined based on data provided by the company through self-reporting, through publicly available datasets, or some combination therein. Currently, there are at least two publicly available datasets of emissions inventories associated with Scope 1 and Scope 3 emissions[33]. In all cases, however, the State is dependent on corporate disclosures from the companies themselves. Self-reported data come with sizable reporting gaps, are rarely audited, and provide companies with wide latitude over the boundaries of the emission Scopes they consider. As such, self-reported data from fossil fuel companies very likely understates the true emissions associated with company activities, particularly for

---

[32] Mankin et al. (2025), Climate damages to the U.S. economy from U.S. power sector emissions, Perma | Climate damages to the U.S. economy from U.S. power sector emissions; and Mankin et al. (2025), Climate damages to the U.S. economy from U.S. transportation emissions, Perma | Climate damages to the U.S. economy from U.S. transportation emissions.

[33] *Carbon Majors Database Downloads.* Carbon Majors, Perma | Carbon Majors Downloads. Accessed 15 Oct. 2025; Chen et al., "How Much Have the Oil Supermajors Contributed to Climate Change? The Carbon Footprint of the Oil Refining and Petroleum Products Sales Sectors," *Columbia Center on Sustainable Investment*, Mar. 2022, Perma | ccsi.columbia.edu.

Scope 3 and non-$CO_2$ gases. Moreover, because Scope 3 emissions are typically estimated from fossil fuel production volumes by removing non-energy uses of those fuels (e.g., petrochemicals), and then applying widely-accepted "emissions factors,"[34] which estimate the total emissions released when those fuels are combusted, such values are inherently conservative.[35] Scope 1 emissions from flaring, venting, fugitive methane emissions, and companies' own fuel use are similarly estimated using such emissions factors.[36] Because of the conservatism in both the reporting and in the estimates of emissions using emissions factors, I must emphasize that emissions inventories from fossil fuel companies represent minimum estimates of corporate emissions, rather than complete totals. As such, any attributions of climate damages to New York State associated with such emissions will tend to be conservative.

---

[34] Emissions factors translate activities—such as burning a gallon of gasoline—into emissions values, expressed as the mass of greenhouse gases (e.g., kilograms of $CO_2$, $CH_4$, or $N_2O$ released). When emissions factors are reported in $CO_2e$ (carbon dioxide equivalent) they already incorporate a global warming potential (GWP) to convert each gas into an equivalent amount of $CO_2$ based on its warming impact over a specified time horizon (typically 100 years).

[35] Note that this only captures Scope 3 Category 11 ("use of sold products") emissions and thus represents a lower-bound on total Scope 3 emissions.

[36] Note that this method applies a global emissions factor based on the state-of-the-science to all companies' production data. Standardized emissions factors are conservative by construction, erring on the side of understating emissions. Constructing global emissions factors requires smoothing high carbon intensity outlying fuels and regions, it means excluding methane or black carbon, fuel leaks, flaring inefficiencies, and/or incomplete combustion (which interestingly increases GHG forcing by increasing methane and black carbon contributions). So, while modeled estimates of Scope 3 emissions based on cautious IPCC emissions factors produce internally consistent estimates of GHG emissions, this is another reason these inventories should be considered conservative.

38.    Once a fossil fuel producer or refiner's total emissions have been determined, the next step is to determine how those emissions contributed to cumulative greenhouse gas concentrations, consequent global warming, and local hazards. That determination requires a means of estimating the counterfactual climate without the considered emissions (i.e., the control): "what might global temperatures have been absent a party's emissions?" Climate or Earth System Models[37] which simulate the global temperature response to greenhouse gas emissions and other climate forcings, provide a means of estimating these counterfactuals. Such models can be run (a) with all historical emissions and (b) with all historical emissions minus those of a particular emitter over a particular time period or a leave-one-emitter-out framework. The difference between these two scenarios—the world as it has been versus the world without one company's emissions—represents the contribution of that company's emissions to observed historical warming.

39.    Linking the temperature changes from a company's emissions to a local scale climate hazard can be done a number of ways. A spatially explicit Earth System Model explicitly simulates changes in extreme heat, drought, flood, and tropical cyclone changes within a region like New York State. It can also be done by chaining

---

[37] Climate or Earth System Models are computer programs that use physics, chemistry, and biology to simulate how components of our planet—oceans, atmosphere, land, and ice, interact to shape weather and climate over time and space. See, for example, McSweeney & Hausfather, "Q&A: How Do Climate Models Work?" *Carbon Brief*, 16 Jan. 2018, Perma | Q&A: How do climate models work? - Carbon Brief. Accessed 19 Oct. 2025.

a series of models together, whether based on well-vetted and understood statistical relationships between global temperature changes and local hazard changes,[38] or by using secondary physics-based models, such as a tropical cyclone model[39] run with different experimental treatments many times, such as one with observed temperatures, and one with the temperatures absent a single emitter. In general, however, current peer-reviewed practice is to use consensus-based tools like pattern scaling.[40] Pattern scaling takes the estimate of global warming attributable to an emitter and translates it into local-scale changes in climate hazards. The physical basis for the relationship between global temperatures and climate extremes has been known for decades (e.g., for extreme precipitation,[41] extreme heat,[42] sea level rise[43]). Coupled with longer observational records and advances in modeling,

---

[38] Quilcaille, Y. et al., "Systematic attribution of heatwaves to the emissions of carbon majors."

[39] Reed et al. "Attribution of 2020 Hurricane Season Extreme Rainfall to Human-Induced Climate Change." *Nature Communications*, vol. 13, no. 1, Dec. 2022, Article 1905, Perma | Attribution of 2020 hurricane season extreme rainfall to human-induced climate change | Nature Communications.

[40] IPCC, 2021, AR6 WG1, Chapter 4, Section 4.2.4.2 ("Pattern Scaling"), p. 4-35. Perma | www.ipcc.ch

[41] Trenberth et al., "The Changing Character of Precipitation." *Bulletin of the American Meteorological Society*, vol. 84, no. 9, Sept. 2003, pp. 1205-1217, Perma | journals.ametsoc.org.

[42] Stott et al. "Human contribution to the European heatwave of 2003."

[43] Schneider, S. H., and R. S. Chen. "Carbon Dioxide Warming and Coastline Flooding: Physical Factors and Climatic Impact." *Annual Review of Energy and the Environment*, vol. 5, 1980, pp. 107-140, https://doi.org/10.1146/annurev.eg.05.110180.000543.

scientists can quantify with increasing precision how global warming alters the likelihood or intensity of these extreme events. Combining the steps above provides an answer to the question: "How has the warming resulting from the emissions of a particular party affected the local risk of climate hazards?"

40.     Climate attribution science allows the State of New York to assess the in-state climate harms it has endured over a covered period traceable to the emissions from individual fossil fuel companies. Peer-reviewed, consensus-based end-to-end climate damage attributions can provide estimates of how sets of emissions have contributed to cumulative emissions, warming, and by extension, local extreme weather and climate hazards. Climate damage attributions can then link changes in such hazards to their documented economic harms.

## RESPONSE TO ZYCHER DECLARATION

41.     In this section of my Declaration, I address what Zycher presents as "Central Implications of the U.S. Environmental Protection Agency Climate Model" in his Declaration, and his conclusions that "the temperature impact of GHG emissions from U.S. natural gas and petroleum systems is not detectable," Zycher Declaration ¶60, *see* also ¶16. I also address Zycher's conclusion that "the EPA climate model demonstrates that the assertion that fossil energy producers that emitted more than 1 billion metric tons of GHG in their extraction and refining operations over [the covered period] 2000-2024 are responsible for the purported effects of anthropogenic climate change cannot be supported analytically." Zycher Declaration ¶67.

42.    For the reasons detailed in this section, Zycher's conclusions are incorrect because they rely on a flawed and error-ridden analysis. His errors fall into three main categories. First, he misrepresents the sources and scopes of emissions that could potentially be covered by the Act. Second, he applies these mischaracterized emissions in a modeling exercise that answers a different question than the one he poses and that appears structured to minimize the temperature response, all while simultaneously misdescribing the model he uses as oversensitive to emissions. The latter claim is particularly problematic, as he says that his temperature estimates from emissions are higher ('bias[ed] upward', see Zycher Declaration ¶60 n. 27) than would otherwise be the case in the real world, which is not true. Third, he mischaracterizes the state of scientific understanding of human-caused climate change, demonstrating fundamental misunderstandings of climate attribution and of the extensive evidence for anthropogenic warming and its impacts. Taken together, these features of the Zycher Declaration produce a misleading account of the magnitude of the emissions at issue, the warming they cause, and the damages that follow. In my professional opinion, the physical climate science presented in the Zycher Declaration is not scientifically credible.

43.    On the first issue in Zycher's analysis, he uses an incorrect and highly selective framing of the sources and scopes of emissions potentially considered by the Act, thereby inappropriately minimizing their magnitude (**Figure 2**). The Act provides that the term *fossil fuel*, as used in the Act, "shall have the same definition as in section 1-103 of the energy law." ECL § 76-0101(12). Note that § 1-103(7) of the

NY State Energy Law defines *fossil fuels* as "[…] coal, petroleum products and fuel gases" the latter of which "include[s] but shall not be limited to methane, natural gas, liquefied natural gas, and manufactured fuel gases." NY Energy Law § 1-103(8).[44] As I note in ¶12 of my Declaration above, the Act defines *covered emissions* to include all emissions associated with the extraction of fossil fuels (including crude oil) over the covered period. While the GHG emissions values Zycher cites at ¶59 of his Declaration are reputable data from the Environmental Protection Agency (EPA) Greenhouse Gas Reporting Program (GHGRP),[45] his analysis of them with regards to the Act are flawed because he inappropriately limits the emissions he considers, presumably to minimize their impact.

44.    Zycher limits the fossil-fuel emissions he considers in two inappropriate ways. First, he restricts his analysis to emissions from U.S. "natural gas and petroleum systems" only, Zycher Declaration ¶59, a narrow subset of the fossil fuels covered by the Act that excludes, for example, coal from the U.S. energy sector. Second, he further restricts the emissions data he considers by limiting them to Scope 1 emissions only (i.e., those from facility operations alone), thus representing a narrow subset of fossil fuel emissions, rather than the total emissions attributable to the "total amount of fossil fuels extracted […] as well as the total amount of crude oil refined" as the Act requires. This narrowing appears to stem from Zycher's own

---

[44] See the New York State Energy Law here, https://perma.cc/7TVQ-W9P7

[45] GHGRP Petroleum and Natural Gas Systems, EPA: https://perma.cc/U9J3-PM6W.

interpretation of the statute: he asserts that covered emissions arise only from "extraction and refining *operations*" (emphasis added). *Id.* ¶56. But the Act defines covered emissions as including emissions attributable to "the total amount of fossil fuels extracted by that entity during the covered period, as well as the total amount of crude oil refined by that entity during the covered period." The New York State Department of Environmental Conservation has not yet issued the regulations to implement the Act, which will specify how responsible parties and applicable shares of covered greenhouse gas emissions will be identified. ECL § 76-0103(4). As such, Zycher has no basis to assume that only Scope 1 emissions from a subset of fossil fuel emissions (that arbitrarily excludes coal, for example) would be encompassed by the Act. In fact, we can use the same EPA database Zycher cites to compare the emissions he considers to the magnitude of emissions that might fall under consideration of the Act (**Figure 2**). The figure illustrates how Zycher's analytical choices appear to intentionally minimize emissions (and thus the warming he associates with them in his modeling analysis, the problems with which are discussed below in ¶46).[46]

---

[46] Note too that Zycher makes a technical error in his presentation of total global GHG emissions, writing that "[f]or the period 2000 through 2024, total global GHG emissions were 1,141,361.7 *billion* metric tons, or 45,654.5 *billion* metric tons on average annually." Zycher Declaration ¶58 (emphasis added). The units Zycher presents are incorrect; the European Union EDGAR data he cites are actually presented in megatonnes (or millions of metric tonnes) of CO2 equivalent (abbreviated Mt CO2eq). He thus states that global GHG emissions are over *1,000 times larger than they actually are*, one of several errors in his analysis suggesting a lack of familiarity with the material at hand. See total emissions data from the EPA Greenhouse Gas Inventory Explorer, here: https://perma.cc/GTV8-4USX.



**Figure 2 |** Comparison of the subset of emissions considered in the Zycher Declaration (natural gas and petroleum systems Scope 1 emissions), dotted line, and the total emissions from the U.S. energy sector, which includes other fossil fuels, like coal, as well as their combustion, solid line, illustrating the selective emissions presented in the Zycher Declaration. The U.S. energy sector emissions are closer to the full mass of covered emissions that could potentially be considered by the Act. All emissions data are from the same EPA data source used by Zycher.[47]

45.     Zycher's choice to limit the emissions he analyzes positions him to claim

that "annual GHG emissions from U.S. natural gas and petroleum systems were

about 0.7 percent of average annual global GHG emissions." *Id.* ¶59. To be clear, this

is a calculation he makes based on a speculative interpretation of the Act (in advance

of the promulgation of any regulations to implement the Act) that minimizes

emissions by presenting a limited set of sources and scopes as compared to that

---

[47] The EPA data presented in Figure 2 can be accessed here: https://perma.cc/R4W3-W2QY.

written in, and potentially covered by, the Act. In contrast to the modest 0.7% of global emissions Zycher's selective emissions represent, the actual percentage of global emissions that the U.S. energy sector represents is about 12.3% of global emissions over the 2000-2022 period, an order of magnitude larger than Zycher reports (**Figure 2**).[48]

46.    Second, these mischaracterizations of the data then influence his modeling choices with what he calls the "EPA Climate Model," which is a reduced complexity climate model called the "Model for the Assessment of Greenhouse Gas Induced Climate Change" (MAGICC7). While MAGICC7 is an entirely appropriate tool to assess the warming from sets of GHG emissions, Zycher makes two problematic and unsupported analytical choices, outlined below. He writes, "[l]et us apply the EPA climate model to estimate the temperature impact of the GHG emissions from the U.S. natural gas and petroleum systems. *If all such emissions were reduced to zero by 2050*, the global temperature impact by 2100, ceteris paribus, would be about 0.009 degrees C, that is, about nine one-thousandths of a degree C." *Id.* ¶60.

47.    The first problematic analytical choice is Zycher's reliance on an arbitrarily chosen and unsupported emissions inventory that is an order of magnitude smaller than that potentially covered by the Act (see discussion above and

---

[48] I perform this calculation by comparing the global totals reported in the EU EDGAR database cited by Zycher in ¶58 n.25 of his Declaration (https://perma.cc/LU3G-SJ75) to the U.S. Scope 1 and Scope 3 emissions from the EPA (https://perma.cc/GTV8-4USX).

**Figure 2**). The second is that his calculation does not estimate the "temperature impact of the GHG emissions from the U.S. natural gas and petroleum systems," as he claims. Instead, it computes the marginal mid-century warming avoided if this narrowly defined set of emissions were reduced to zero, relative to another arbitrarily chosen scenario where global emissions grow considerably (called RCP6), with all temperature changes evaluated over a very short time horizon. This is a fundamentally different calculation than estimating the historical and future warming attributable to the emissions potentially covered by the Act. In particular, his calculation, by construction both (1) uses an emissions inventory that is arbitrarily small and (2) evaluates only the future warming avoided over a very short time horizon relative to much larger and contingent global emissions, rather than the warming already realized. Together, these choices cause his analysis to understate and mischaracterize the contribution of the U.S. energy sector to warming now and into the future. The appropriate use of MAGICC7 would instead estimate the historical warming from the full set of covered emissions—not the marginal future warming avoided by eliminating an arbitrarily limited subset.

48.     Concerningly, Zycher's analysis reflects deeper misunderstandings about climate attribution, climate models, and how scientists evaluate causation. For example, at ¶60, Zycher's analysis reveals a basic conceptual error: he treats *detection* as if it were the standard for determining *causation*. When he argues that the warming avoided by eliminating U.S. natural gas and petroleum system emissions is "not detectable" because it is smaller than the year-to-year variation in global

temperature, *id.* ¶60, he incorrectly assumes that an effect must be individually detectable in observational data in order to be causally real. That is not how attribution works in climate science, nor in any scientific field that assesses causation in complex systems. Many scientific fields—epidemiology, toxicology, air-quality regulation, and insurance—regularly attribute harms that are smaller than the observational variability. This is because attribution is based on modeling known physical mechanisms. Every additional ton of $CO_2$ contributes to warming regardless of whether that marginal contribution is individually detectable in the global temperature record. Each ton of $CO_2$ physically adds radiative forcing and contributes to warming, even if the increment considered is, by Zycher's construction, too small to detect in the noisy global temperature record. Attribution science relies on this centuries-old, well-established physical mechanism[49] and on the observed near-linear relationship between cumulative $CO_2$ emissions and global temperature—the transient climate response to cumulative emissions (TCRE). Multiple lines of evidence from observations, reduced-complexity models (e.g., MAGICC), Earth System Models of Intermediate Complexity, and full-complexity Earth System Models indicate a best-estimate TCRE of 0.45°C per 1000 Gt $CO_2$ (likely range: 0.27–0.63°C).[50]

---

[49] Eunice Foote is credited with making the physical link between carbon dioxide and temperature in 1856. See here: https://perma.cc/3YAU-Y9AK.

[50] IPCC AR6 WGI Chapter 5, 5.5.1.4. See pp. 742-749 and the sources in Table 5.7 on p.748. https://perma.cc/K6H4-L37Z

49.    In ¶60, Zycher claims he is likely overstating the warming avoided by eliminating the limited natural gas and petroleum system emissions he evaluates, pointing to the fact that he set the equilibrium climate sensitivity (ECS) in MAGICC7 to 4.5°C, which he describes as the top of the IPCC's "likely" range. *Id.* ¶60 n.27. He casts this choice as "biasing upward" his avoided-warming values. But this reflects a basic misunderstanding of what ECS measures. ECS refers to the long-term warming expected from a doubling of $CO_2$. It reflects the climate system's full "equilibrium" response, meaning after many hundreds to thousands of years, as slow processes (such as permafrost thaw and its associated carbon release) gradually amplify warming.[51] Over the short horizons Zycher analyzes—extending only to 2050—these slow feedbacks have not had sufficient time to emerge and alter temperatures. As such, models with high and low ECS produce nearly indistinguishable warming trajectories over short time periods because long-timescale feedbacks and tipping points are irrelevant on the timescales he analyzes.[52] His suggestion that a higher

---

[51] See, for example, Table 1 from Ruggenstein et al., "Equilibrium Climate Sensitivity Estimated by Equilibrating Climate Models" *Geophysical Research Letters,* vol. 47, no. 4 (2020) e2019GL083898, https://perma.cc/9HTC-7ZUX

[52] See, for example, the comparison of the transient climate response (TCR), which the is warming realized at a doubling of CO2 as compared to ECS in Figure 2 of Nijsse et al., "Emergent constraints on transient climate response (TCR) and equilibrium climate sensitivity (ECS) from historical warming in CMIP5 and CMIP6 models", vol. 11, no. 3, 737–750 (2020), https://perma.cc/82AZ-D7DK. In that figure one can see that TCR is far lower than ECS. One can also see that high-ECS and low-ECS models are equally likely to have the same or similar TCRs, indicating a shared warming response over short intervals. This is because they measure different things—TCR the warming on short time scales, ECS, the warming after millennia.

ECS makes his estimates conservative is therefore incorrect. It also explains why he obtains similar avoided-warming values from the non-peer-reviewed Lindzen et al. manuscript,[53] *id.* ¶60 n.28, even though those authors use an implausibly low ECS of 0.75°C—*six times lower* than Zycher's 4.5°C. While there are many separate issues with the Lindzen et al. manuscript that make clear Zycher is not relying on well-vetted peer reviewed climate science,[54] what is most relevant here is that neither Zycher nor Lindzen et al. are evaluating the multi-century temperature response where ECS differences matter.

50.    Zycher also incorrectly claims that "[t]he assertion of substantial damage from anthropogenic climate change is not supported by the evidence," primarily relying on his own non–peer-reviewed opinion piece as support. *Id.* ¶62

---

[53] There are a concerning number of issues with the Lindzen et al. manuscript, and it is striking that Zycher relies on this non–peer-reviewed work, despite its myriad analytical flaws, to support his claims. The paper assumes a feedback-free climate system, misapplies fundamental physical principles, adopts an unrealistically low value of climate sensitivity, and employs modeling choices that violate basic carbon-cycle physics. These choices are, by construction, implemented in a way that guarantees U.S. emissions reductions appear to have a negligible effect on global temperatures, discordant with the science of the IPCC and the National Climate Assessment and most climate scientists. The Lindzen et al. work can be downloaded here: https://www.researchgate.net/publication/381319117_Net_Zero_Averted_Temperature_Increase

[54] Zycher's cites Lindzen et al. as an independent confirmation of his estimates of avoided warming (¶60 n.28). Yet a close reading of pages 6–7 of the Lindzen et al. manuscript shows that they, in turn, rely on Zycher's 2023 Congressional testimony to validate *their* calculations. This creates a circular, self-referential loop: each source points to the other as evidence of accuracy, but neither provides an independent assessment of the calculations or their real-world validity.

n.30. His personal view stands in stark contrast to the global scientific consensus reflected in the latest IPCC Assessment, whose Summary for Policymakers—approved line-by-line by thousands of scientists and all 195 participating national governments[55]—states with high confidence that human-caused climate change has already produced "widespread adverse impacts and related losses and damages to nature and people."[56] The existence of substantial damages from anthropogenic climate change is also a consensus position within the economics literature. For example, Richard Tol's meta-analysis of more than 200 social cost of carbon (SCC) [57] studies shows that the SCC is robustly positive, reflects significant economic harm, and has increased over time as scientific understanding of the climate-economy system has advanced and observed climate damages have accumulated. [58]

---

[55] See details of how the IPCC writes and approves the Summary for Policymakers here: https://perma.cc/M6TL-TXZB and here https://perma.cc/6WAY-UT2T.

[56] The "Observed Changes and Impacts" in the IPCC AR6 Summary for Policymakers states: "Widespread and rapid changes in the atmosphere, ocean, cryosphere and biosphere have occurred. Human-caused climate change is already affecting many weather and climate extremes in every region across the globe. This has led to *widespread adverse impacts and related losses and damages to nature and people* (high confidence). Vulnerable communities who have historically contributed the least to current climate change are disproportionately affected (high confidence). {2.1, Table 2.1, Figure 2.2, Figure 2.3} (Figure SPM.1)", at p.5 bullet A.2. As such, the consensus that anthropogenic climate change is damaging is considerable. See here: https://perma.cc/42PR-CWKN.

[57] The Social Cost of Carbon is the net present value of monetary damages from emitting one additional ton of $CO_2$.

[58] Tol, Richard S. J. "Social Cost of Carbon Estimates Have Increased over Time." *Nature Climate Change*, vol. 13, 2023, pp. 532-536. Springer Nature, https://perma.cc/3N28-282M.

51. Finally, Zycher cites a July 2025 Department of Energy (DOE) report titled "A Critical Review of Impacts of Greenhouse Gas Emissions on U.S. Climate" as purported evidence that anthropogenic emissions cause no damages. This report is not a scientific assessment and does not meet accepted standards of scientific integrity. It has been widely dismissed by the scientific community, including in formal statements by the American Meteorological Society[59] and by 85 climate scientists who have assiduously documented the report's many inaccuracies and misleading claims.[60]

52. Collectively, the statements in Zycher's Declaration are demonstrably false and materially misrepresent the magnitude of the emissions at issue, the warming they cause, and the damages that result. Whether these errors stem from a lack of relevant domain expertise, mischaracterization, or some combination therein, it is my professional opinion that the physical climate science in his Declaration is not scientifically credible.

Dated:      December 18, 2025
            New Orleans, Louisiana

_____
            Justin S. Mankin, Ph.D.

---

[59] American Meteorological Society (AMS), The Practice and Assessment of Science: Five Foundational Flaws in the Department of Energy's 2025 Climate Report, at https://www.ametsoc.org/ams/about-ams/ams-statements/statements-of-the-ams-in-force/the-practice-and-assessment-of-science-five-foundational-flaws-in-the-department-of-energys-2025-climate-report/

[60] See the response to the DOE report here: https://perma.cc/6TN8-7HLH