## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF WEST VIRGINIA, et al., | |
| *Plaintiffs*, | |
| v. | |
| LETITIA JAMES, in her official capacity as the Attorney General of New York, et al., | No. 1:25-cv-00168-BKS-DJS |
| *Defendants*. | |

## <u>DECLARATION OF HAROLD HONGJU KOH</u>

Pursuant to 28 U.S.C. § 1746, Harold Hongju Koh declares under penalty of perjury that the following is true and correct:

1.    I submit this declaration in support of the defendants' (together, "New York") opposition to the motions for partial summary judgment submitted by the plaintiffs in this consolidated action ("West Virginia" and the "Chamber") and in support of New York's cross-motion for partial summary judgment.

### <u>EDUCATIONAL BACKGROUND AND EXPERIENCE</u>

2.    I am Sterling Professor of International Law (2013-present) and former Dean (2004-09) of Yale Law School in New Haven, Connecticut, where I have taught since July 1, 1985. My credentials are described more fully in paragraphs 3-9 below and in my curriculum vitae, which is included as Exhibit A to this declaration.

3.    During the past 45 years, I have developed expertise as a government official, professor, scholar, and lawyer in the areas of public and private international law and the law of United States foreign policy. I am an expert in the fields of foreign

relations and national security law, constitutional law, civil procedure, public and private international law, international environmental law, and international human rights law. In both my private and governmental capacities, I have testified before Congress on numerous occasions on a broad range of issues, including United States national security policy, human rights policy, foreign policy, the lawfulness of proposed foreign policy actions, and refugee law and policy.

4.    *Government Service.* I served in the United States Department of State as Legal Adviser from 2009-13 and from January to October 2021 as Senior Advisor in the Office of the Legal Adviser, the senior political appointee in that office. From 1998-2001, I served as Assistant Secretary of State for Democracy, Human Rights, and Labor in the Clinton administration. I served from 1983-85 as an Attorney-Adviser at the Office of Legal Counsel at the United States Department of Justice in the Reagan administration, from 1981-82 as a law clerk to Justice Harry A. Blackmun of the United States Supreme Court, and from 1980-81 as a law clerk to Judge Malcolm Richard Wilkey of the United States Court of Appeals for the D.C. Circuit.

5.    *Teaching.* I began teaching as Associate Professor at the Yale Law School in New Haven, Connecticut in 1985 and have held multiple titles since then, including, since 2013, Sterling Professor of International Law, the highest professorial rank recognized by Yale University. I teach courses, give lectures, and supervise students conducting research on international environmental law and the law of climate change, foreign affairs and national security law, international law, transnational law, international human rights law, and civil procedure. I have also

been an invited lecturer, taught courses and seminars, and conducted workshops on international law and related subjects, including international climate change law, at universities around the country and the world and have served as a visiting professor or lecturer at numerous institutions, including Oxford University, Cambridge University, Stanford University, Columbia University, New York University, Georgetown University, George Washington Law School, the University of Hawaii, Fordham Law School, the Hague Academy of International Law, and the University of Toronto Faculty of Law. I have also served regularly as a faculty member on international and foreign affairs law at the Federal Judicial Center, the NYU-Columbia Law Judges Colloquium, and the Aspen Institute Judicial Seminar.

6.    *Editorial Boards*. I served for more than two decades on the Board of Editors of the American Journal of International Law (where I currently sit on the Honorary Board of Editors) and the West Academic/Foundation Press Casebook Series, as well on the Editorial Boards of Human Rights Quarterly and the Editorial Advisory Board of Human Rights Watch World Report (Yale University Press).

7.    *Publications*. I am the author/coauthor of more than 275 articles and book chapters on constitutional law, civil procedure, international law, human rights, and other legal topics. I am the author, editor, or co-editor of ten books on national security and foreign affairs law, international law, and international human rights, including most recently *The National Security Constitution in the 21st Century* (2024). While writing this latest book, I conducted research into the background of the various laws and treaties discussed in this declaration.

8. *Professional Activities.* I have served as counsel, co-counsel, or legal adviser for parties or amici in many cases involving environmental law, human rights and international law, before federal district and circuit courts, and the United States Supreme Court. For example, I argued before the United States Supreme Court on behalf of Haitian and Cuban refugees, *see Sale v. Haitian Ctrs. Council*, 509 U.S. 155 (1993); *Cuban American Bar Ass'n v. Christopher*, 43 F.3d 1412 (11th Cir. 1995); and have served as counsel for former American diplomats or national security officials with respect to several amicus curiae briefs filed before the Supreme Court and the lower courts regarding the national and international law of climate change. I have also regularly appeared before international courts and tribunals as an international lawyer on behalf of the United States, other governments, and organizations and am currently Counsel in the following pending international cases: *for Canada, Sweden, United Kingdom, and Ukraine* in *Aerial Incident of 8 January 2020* (Can., Swed., Ukr. & U.K. v. Iran), I.C.J. (2025) and *Appeal relating to the Jurisdiction of the ICAO Council under Article 84 of the Convention on International Civil Aviation (Islamic Republic of Iran v. Canada, Sweden, Ukraine and United Kingdom)*, I.C.J. (2025); for *International Trade Unions Confederation on the Right to Strike Under ILO Convention No. 87*, Request for Advisory Opinion, 2023 I.C.J. (Nov. 10, 2023); and for *Ukraine in Dispute Concerning Coastal State Rights in the Black Sea, Sea of Azov, and Kerch Strait* (Ukr. v. Russ.), No. 2017-06, Merits Hearing (P.C.A. Sept. 2024) and *Allegations of Genocide Under the Convention on the Prevention and Punishment of the Crime of Genocide* (Ukr. v. Russ.).

9.    *Professional Recognition.* I have received eighteen honorary degrees, several law school medals, and dozens of awards and recognitions from various bar and nongovernmental organizations, including the 2024 Robert A. Katzmann Award for Academic Excellence from the Burton Awards; the 2023 Raphael Lemkin Rule of Law Guardian Award from Duke Law School; the 2003 Wolfgang Friedmann Award from Columbia Law School; and the 2004 Louis B. Sohn Award from the American Bar Association Section on International Law for lifetime achievements in law. I am Counselor (and was previously Co-Chair) of the American Law Institute's *Restatement (Fourth) of the Foreign Relations Law of the United States*, a Fellow of the American Academy of Arts and Sciences and the American Philosophical Society, a Member of the Council of the American Law Institute (since 2007), and Honorary Counsellor of the American Society of International Law.

## SCOPE OF WORK AND SUMMARY OF CONCLUSIONS

10.    I have been retained by the Office of the New York State Attorney General, which represents New York in this action, to opine on international law, multilateral agreements, and United States climate policy relevant to the imposition of liability on fossil fuel corporations through New York's Climate Change Superfund Act (the "Climate Act").

11.    I have reviewed the Climate Act, plaintiffs' complaints and motions for partial summary judgment ("CC Br." and "WV Br.") and the United States' statement of interest ("US St.") and supporting declaration of Deputy Secretary of State Christopher Landau ("Landau Decl."). Plaintiffs and the United States assert that

5

the Climate Act conflicts with United States foreign policy and intrudes into foreign affairs without addressing a traditional state responsibility. WV Br. 36-39; CC Br. 17-19. The United States makes similar arguments in its statement of interest. US St. 6-10.

12.    I have evaluated these assertions and disagree. Based on my expertise and experience in this area, I conclude that plaintiffs and the United States have incorrectly represented the international law and agreements that form the basis of their legal allegations. Below is the basis for these conclusions:

- International environmental law has long recognized a "polluter pays" principle.

- No international agreement addresses the liability of corporations or other private entities for costs for harms and adaptation needs caused by climate change, much less embodies or requires a policy of corporate immunity for climate change costs under duly enacted state laws.

   o The UN Framework Convention on Climate Change, which is a treaty ratified by the Senate under Article II of the Constitution, neither dictates how individual nations will implement it, nor broadly immunizes any private actor within a member country for its actions that may promote the proliferation of greenhouse gases.

   o The 2015 Paris Agreement mainly binds member countries to meet certain requirements regarding maintaining information,

transparency, and reporting of nationally determined contributions (NDCs) to be aggregated to meet global emissions goals. Nothing in the Paris Agreement immunizes private corporations from complying with state laws recognizing their liability for the costs of climate adaptation measures necessitated by their actions. Although President Trump has declared his intention to withdraw from this agreement, that withdrawal has not yet been finalized. Whether or not that withdrawal becomes final, the Climate Act will remain consistent with the United States' existing domestic and international legal obligations.

## DISCUSSION

### *I. The Polluter Pays Principle*

13. International environmental law and agreements have long recognized a "polluter pays" principle. That principle originated in the 1941 *Trail Smelter Case,* in which a binational arbitration panel addressed the costs caused by pollution from a mining and smelting company in Trail, British Columbia that crossed the border into the United States and caused injury to residents of United States border towns. *See Trail Smelter* (U.S. v. Can.), 3 R.I.A.A. 1905 (Trail Smelter Arb. Trib. 1938); *Trail Smelter* (U.S. v. Can.), 3 R.I.A.A. 1938 (Trail Smelter Arb. Trib. 1941). The arbitral award established the principle that the "polluter pays" for the damage it causes, including compensating for harm to injured individuals and property in another nation-state. Under this principle, the polluting entity should not benefit financially

from injury that it causes to others without their consent; instead, it is required to internalize (i.e. pay for) the costs of the negative externalities (i.e. the economic harms) that its profit-making activities impose on neighboring people and entities. *See generally* Alan Boyle, *Polluter Pays*, OXFORD PUB. INT'L L. (Mar. 2009). The Climate Act is consistent with this principle.

14.    In the 1970s, the "polluter pays" principle became the subject of a series of discussions and recommendations by the Paris-based Organization for Economic Co-operation and Development (OECD), of which the United States was a founding member. The OECD is currently a group of 38 member countries, consisting mostly of European member nations, but also including the United States and Canada. The OECD works to promote economic growth, prosperity, and sustainable development by coordinating national policies and best practices on a range of public policy issues, including climate change. It was founded in 1961 as a successor to the Organization for European Economic Co-operation, which was created to administer the Marshall Plan after World War II. The OECD concluded that the "polluter pays" principle is a fair and sensible economic policy by which governments may allocate the costs of environmental damage caused to their citizens by private activity. *See* OECD, *Recommendation of the Council on Guiding Principles Concerning International Economic Aspects of Environmental Policies*, OECD/LEGAL/0102; OECD, *Recommendation of the Council on the Implementation of the Polluter-Pays Principle*, OECD/LEGAL/0132; OECD, *Recommendation of the Council Concerning the Application of the Polluter-Pays Principle to Accidental Pollution*,

OECD/LEGAL/0251. The OECD position on the subject thus sought to encourage private entities to pay for ("internalize") the economic costs of pollution control, cleanup, and protection measures, so as to ensure that governments did not distort international trade and investment by subsidizing these environmental costs.

15.     In 1992, the United Nations Conference on Environment and Development—also known as the first "Earth Summit"—was held in Rio de Janeiro, Brazil.  More than 175 countries—by consensus and including the United States—adopted the *Rio Declaration on Environment and Development,* U.N. Doc. A/CONF.151/26/Rev.1 (Vol. I), annex I (Aug. 12, 1992), which established 27 principles to guide nations towards sustainable development.  Article 16 of the Rio Declaration provides that:

> National authorities should endeavour to promote the internalization of environmental costs and the use of economic instruments, taking into account the approach that *the polluter should, in principle, bear the cost of pollution,* with due regard to the public interest and without distorting international trade and investment.

*Id.* at Art. 16 (emphasis added).

16.     Since then, the "polluter pays" principle has become a well-accepted global tool to internalize the external costs of pollution by making polluters responsible for remediation and prevention of the pollution they cause. The principle has been incorporated into a broad range of international environmental treaties including: the Convention for the Protection of the Marine Environment of the North-East Atlantic, Sep. 22, 1992, art. 2, ¶ 2(b), 2354 U.N.T.S. 67; the Convention on the Protection and Use of Transboundary Watercourses and International Lakes, Mar. 17, 1992, art. 2, ¶ 5(b), 1936 U.N.T.S. 269;  the  Convention for the Protection of the

Marine Environment and the Coastal Region of the Mediterranean, Feb. 16, 1976, 1102 U.N.T.S. 27; the Amendments to the Convention for the Protection of the Mediterranean Sea Against Pollution, U.N. Doc. UNEP(OCA)/MED IG.6/7(1995); the 1996 Protocol to the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter, Nov. 17, 1996, art. 3, ¶ 2, S. TREATY DOC No. 110-5; and the Energy Charter Treaty of 1991, art. 19, ¶ 1, Dec. 17, 1991, 2080 U.N.T.S. 95.

17.     The preambles of both the 1992 Convention on the Transboundary Effects of Industrial Accidents of the United Nations Commission for Europe, Mar. 17, 1992, 2105 U.N.T.S. 457, and the Protocol on Civil Liability and Compensation for Damage Caused by the Transboundary Effects of Industrial Accidents on Transboundary Waters to the 1992 Convention on the Protection and Use of Transboundary Watercourses and International Lakes and to the 1992 Convention on the Transboundary Effects of Industrial Accidents, May 21, 2003, U.N. Doc. ECE/MP.WAT/11-ECE/CP.TEIA/9, describe the polluter pays principle as a "general principle of international environmental law." The "polluter pays" principle also appears in numerous post-Rio Declaration treaties and protocols addressing pollution of international watercourses, marine pollution, transboundary industrial accidents, and energy. *See, e.g.,* the Convention on Cooperation for the Protection and Sustainable Use of the Danube River, art. 2, ¶ 4, 1997 O.J. (L. 342) 19; and the Energy Charter Treaty, Dec. 17, 1991, 2080 U.N.T.S. 95. More recent treaties to which the United States is either a party or a signatory incorporating the "polluter pays" principle include the Agreement Under the United Nations Convention on the Law

of the Sea on the Conservation and Sustainable Use of Marine Biological Diversity of Areas Beyond National Jurisdiction, art. 7, June 19, 2023, U.N. Doc. A/CONF.232/2023/4, and the Agreement on Cooperation on Marine Oil Pollution Preparedness and Response in the Arctic, May 15, 2023, Preamble, T.I.A.S. No. 16-325.

## II. The UN Framework Convention on Climate Change

18.    At the 1992 Rio Earth Summit, UN member nations also began signing the United Nations Framework Convention on Climate Change ("Framework Convention"), *opened for signature* June 4, 1992, S. TREATY DOC. No. 102-38, 1771 U.N.T.S. 107. That Framework Convention has now been ratified by 197 states and the European Union, all of whom have committed to act on climate change and to report regularly on their progress. The Framework Convention states as its goal the "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic [i.e. human-caused] interference with the climate system" within a timeframe that would allow people everywhere to adapt and economies to develop sustainably.  The Framework Convention does not set specific emission targets for particular member countries. Rather, as its title suggests, it provides a legal and institutional framework within which future climate change research, negotiations, policies, and agreements may be discussed among member nations. The Framework Convention parties gather every fall at an annual Conference of Parties (COP) held at various locations around the world. Those parties also established the Secretariat, a standing international administrative entity for

climate discussions and negotiations, which operates year-round and prepares for the annual COPs, the thirtieth of which was held in November 2025 in Belem, Brazil. The Framework Convention and the international organization it has spawned have served as the foundation for every subsequent international climate negotiation, including the Kyoto Protocol of 1997 and the Paris Agreement of 2015.

19.     Member nations, including the United States, who join the Framework Convention acknowledge the existence of the threat of climate change and agree to undertake efforts to combat it. The Framework Convention does not, however, say anything about imposing intergovernmental or corporate liability for past emissions. In Article 3, the Framework Convention directs member states to "protect the climate system for the benefit of present and future generations of humankind, on the basis of equity and in accordance with their common but differentiated responsibilities and respective capabilities. Accordingly, the developed country Parties should take the lead in combating climate change and the adverse effects thereof."

20.     On October 7, 1992, under the presidency of George H.W. Bush, the United States Senate gave its unanimous (95-0; 5 senators not present) advice and consent to ratification of the Framework Convention. Soon thereafter, the United States became the first industrialized nation, and fourth nation overall, to ratify the treaty. As a ratified Article II treaty, the Framework Convention imposes binding horizontal commitments between member parties under international law, as well as binding vertical commitments on the United States as a whole and, under the United States Constitution's Supremacy Clause, its states and localities as United States

12

domestic law. Upon signing the instrument of ratification, President Bush summarized the commitments being assumed as follows:

> As proposed by the United States, the convention is comprehensive in scope and action-oriented. All parties must inventory all sources and sinks of greenhouse gases and establish national climate change programs. Industrialized countries must go further, outlining in detail the programs and measures they will undertake to limit greenhouse emissions and adapt to climate change and quantifying expected results. Parties will meet on a regular basis to review and update those plans in the light of evolving scientific and economic information …. The United States was one of the first nations to lay out its action plan [in 1992] … Through such measures as the newly enacted national energy legislation, the Clean Air Act Amendments of 1990, the Intermodal Surface Transportation Efficiency Act of 1992, and other programs and policies of this administration, I am confident the United States will continue to lead the world in taking economically sensible actions to reduce the threat of climate change.

President George H.W. Bush, Statement on Signing the Instrument of Ratification for the United Nations Framework Convention on Climate Change, 1992 PUB. PAPERS 1818 (Oct. 13, 1992).

### III. The Kyoto Protocol of 1997

21.     The Kyoto Protocol of 1997, negotiated under the auspices of the Framework Convention, established a legally binding "targets-and-timetable" approach to reducing global greenhouse gas emissions. Kyoto Protocol, art. 3, Dec. 11, 1997, 2303 U.N.T.S. 162. The Protocol established legally binding quantitative emissions reduction targets for developed country parties, but did not subject developing nations to binding emissions targets. Although the Kyoto Protocol did not enter into force until 2005, the United States was concerned about what it perceived to be an asymmetry of obligations imposed on developed versus developing nations. Accordingly, the Clinton Administration did not sign the Kyoto Protocol, S. Res. 98,

105th Cong. (1997), and President Clinton never submitted it to the Senate for advice and consent.

22.     In March 2001, shortly after President George W. Bush took office, he wrote a letter to senators stating his opposition to the Kyoto Protocol, in large part because the Protocol did not legally require major developing economies like China and India to reduce their emissions within the same timeframe as developed countries like the United States. *See* Letter from President George W. Bush to Senators Jesse Helms, Larry E. Craig, Pat Roberts, & Chuck Hagel, 11 PUB. PAPERS 444 (Mar. 13, 2001). The administration of the second President Bush did not, however, withdraw from or otherwise disturb the continuing United States membership in the Framework Convention.

## IV. The Paris Agreement

23.     The twenty-first session of the Conference of the Parties to the Framework Convention (COP-21) took place in December 2015 in Paris, France. The resulting Paris Accords constitute multiple documents. These include a formal decision of the UN Framework 21st Conference of Parties (COP-21 Decision), which includes as an annex the Paris Agreement, a treaty which consists of 29 articles addressing such disparate issues as Mitigation, Adaptation, Ambition, Climate Finance, Technology Transfer, and Capacity-Building. *See* Rep. of the Conf. of the Parties on its Twenty-First Session, Jan. 29, 2016, U.N. Doc. FCCC/CP/2015/10/Add.1.

24.     In 2015, 191 parties signed the Paris Agreement. To enter into force, at least 55 Framework Convention members accounting for at least 55% of all global greenhouse gas emissions were required to accept. These thresholds were met on October 5, 2016, allowing the Paris Agreement to enter into force on November 4, 2016. *Paris Agreement - Status of Ratification*, United Nations Climate Change, https://unfcc.int/process/the-paris-agreement/status-of-ratification, [https://perma.cc/C8QN-AGU3].

25.     The Paris Agreement has now been approved by 195 countries representing over 94 percent of the world's greenhouse gas emissions. *Overview*, ClimateWatch, https://www.climatewatchdata.org/ndc-overview, [https://perma.cc/ANF8-98UJ]. As described in paragraph 21 above, the Kyoto Protocol had adopted a prescriptive, "top-down" architecture based on legally binding, internationally-negotiated emission targets and rules, with some emission targets applied only to developed countries. The Paris Agreement, by contrast, was designed to have a non-prescriptive, "bottom-up" architecture, including mostly "political" (i.e., moral)—as opposed to legally binding—obligations, with a greater symmetry of duties between developed and developing nations. A lay analogy would be to a university fundraising bar graph, whereby each of one hundred donors "pledges" a certain amount of money that each expects to donate each year. These "pledges" are not legally binding, but can be aggregated from the bottom up to determine whether the institution can reach its overall fundraising goal by a certain time.  In much the same way, the Paris Agreement requires each member state to maintain and pledge to meet a national

emission target, then aggregates the various national pledges from the bottom up to determine when an overall global emission target can be met.

26.    Under United States domestic law, the Paris Agreement is neither an Article II treaty nor a sole executive agreement. Rather, the Paris Agreement is what may be called an "executive agreement authorized by prior treaty," in this case, the UN Framework Convention. The Paris Agreement was negotiated under the 2011 Durban Platform to the Framework Convention. *See generally* Daniel Bodansky, *Paris Agreement*, Audiovisual Libr. of Int'l Aff., (Dec. 12, 2015) https://legal.un.org/avl/ha/pa/pa.html, [https://perma.cc/TPF2-27VE]. The Durban Platform provided that the forthcoming climate change instrument would be "under the [Framework] Convention," thus bringing the subsequent Paris Agreement within the scope of the Senate's original advice and consent, as preauthorized by an existing Article II treaty.

27.    Those few provisions of the Paris Agreement that are legally binding under international law are largely procedural in nature. In many instances, they are duplicative of existing United States obligations under the Framework Convention and, therefore, could be fully implemented under existing United States law. This feature allowed President Obama to enter the Paris Agreement without submitting it for Senate approval, because he had sufficient domestic authority to implement any legal obligations assumed under the agreement by carrying out preexisting domestic legal obligations. The United States' procedural obligations to assemble, maintain,

and publicly transmit information to the Secretariat do not conflict with any provision of the Climate Act.

28.    In particular, the Paris Agreement binds the United States under international law: (1) to communicate its first intended NDCs to nationwide emissions targets upon ratification (which the United States did in 2015, which then converted into the first formal United States NDC); (2) thereafter to prepare, communicate and maintain its NDCs every five years (which the United States did in 2024); (3) to pursue domestic mitigation measures to achieve its stated NDCs; and (4) to provide transparent information regarding its stated NDCs, anthropogenic emissions and removals, and national inventory and progress in achieving its NDCs, which the United States has provided at each subsequent COP meeting (excepting COP30 in Belem, Brazil, which the United States did not attend). *See* Paris Agreement, arts. 3, 4, 13, Dec. 12, 2015, 3156 U.N.T.S. 79. Each member country develops its NDC in its own way through a "bottom-up" process, which involves creating a national climate action plan after technical analysis, consultation with many stakeholders, and public domestic discussion regarding achievable and sustainable emission reduction goals, adaptation measures, and financial capacity. Such plans generally do not discuss the price or availability of fossil fuels.  Instead, their focus is predictive: what overall national emissions levels would likely be achieved by aggregating various domestic sectoral emission-reduction measures?

29.    Since taking office in January 2025, President Trump has indicated his intent to withdraw the United States from the Paris Agreement. *See* Exec. Order No.

14,162, 90 Fed. Reg. 8455, 8455 (Jan. 20, 2025). But under the Vienna Convention on the Law of Treaties, arts. 54-56, May 23, 1969, 1155 U.N.T.S. 331, a single state party cannot invalidate an entire multilateral agreement; it can only withdraw from the treaty in accordance with its terms. The specific terms of the Paris Agreement do not allow a party to withdraw from the agreement except by giving "written notification" with "[a]ny such withdrawal . . . tak[ing] effect upon expiry of one year from the date of the receipt . . . of the notification of withdrawal," Paris Agreement, art. 28, Dec. 12, 2015, 3156 U.N.T.S. 79. Thus, at the earliest, the United States could not withdraw from the Paris Agreement until January 20, 2026, one year after the second Trump Administration sent formal notification of its intent to withdraw to the United Nations Secretary General.

30.    Even then, there is constitutional doubt as to whether the President acting alone may unilaterally withdraw the United States from the Paris Agreement. As I have explained elsewhere, "[t]he Paris Agreement was not a sole executive agreement in the traditional sense, but rather, an *agreement approved by Congress through both ex ante treaty and general legislative preauthorization*" and hence, not an agreement from which the President may withdraw without comparable congressional input. *See generally* Harold Hongju Koh, *Presidential Power to Terminate International Agreements,* Yale L.J.F. 432, 472 (2018). In any event, until the United States formally withdraws from the Paris Agreement, it is obliged under international law not to violate its object and purpose, which is fully consistent with the Climate Act under challenge here.

18

31.    The Paris Agreement says nothing about intergovernmental liability for
past emissions. Article 8, which addresses "loss and damage," explicitly "does not
involve or provide a basis for any liability or compensation" by any government. Rep.
of the Conf. of the Parties on the Twenty-First Session, ¶ 51, U.N. Doc.
FCCC/CP/2015/10/Add.1 (2016). Former United States Special Envoy for Climate
Change Todd Stern stated, in words mischaracterized in the West Virginia brief on
page 37, that "[t]here's one thing that we don't accept and won't accept in this
agreement and that is the notion that there should be liability and compensation for
loss and damage," *COP21 Press Availability with Special Envoy Todd Stern*, U.S.
Dep't      of      State,      (Dec.      4,      2015),      https://2009-
2017.state.gov/s/climate/releases/2015/250305.htm,    [https://perma.cc/LS9M-9D7S].
But in so saying, Special Envoy Stern was simply reiterating the United States'
traditional opposition to any Paris Agreement provisions establishing the liability to
other countries of the United States *government or the governments of the several
states* for past greenhouse gas emissions. I have personally heard Mr. Stern and other
senior government officials involved in the Paris climate negotiations repeat this
point unambiguously.

32.    The Declaration of Deputy Secretary of State Christopher Landau
effectively confirms this point when he says at paragraph 16, "in international
climate-change negotiations, the United States has long opposed the establishment
of liability and compensation schemes *at the international level*." Landau Decl. ¶ 16
(emphasis added). In other words, in international climate-change negotiations, the

United States has not announced a policy opposing the establishment of compensation schemes for cost-recovery *at the domestic level*. Thus, properly read in context, Special Envoy Stern's discussion of the United States' traditional opposition to its *own* governmental liability in no sense signaled that past or present United States foreign policy opposes the imposition of any private *corporate* liability against fossil fuel companies to provide cost-recovery for adaptation measures or injuries that those producers may cause within the several States.

33.     In sum, neither of the two agreements at the heart of international climate diplomacy—the Framework Convention and the Paris Agreement—immunizes private corporations from complying with state laws, like the Climate Act, that may require some to pay compensation for the costs of climate adaptation measures necessitated by their actions. These agreements were expressly designed to apply only to countries and regional economic integration organizations like the European Union, not to corporate entities like fossil fuel companies.

34.     Finally, a judgment upholding the Climate Act would not affect ongoing intergovernmental climate negotiations or complicate ongoing diplomacy and foreign affairs respecting climate change. The multilateral discussions involving countries engaged in international climate negotiations over the last two decades are intergovernmental in nature. They do not and have not addressed questions of corporate legal liability nor the narrower issue of whether corporations should be immunized from responsibility for injury caused within states or localities by private business activity. Of note, Congress has enacted no statute altering the many prior

United States legal commitments on climate change. In particular, Congress has not modified any provision of the Global Climate Protection Act of 1987—referenced on page 38 of West Virginia's brief and page 7 of the United States' Statement of Interest—which provides that the United States should "work toward multilateral agreements" on the issue of greenhouse gas emissions, Landau Decl. ¶ 4. It is thus inaccurate to say, as Deputy Secretary of State Landau states in his declaration that New York's "Climate Superfund Act … interferes with the United States foreign policy on greenhouse gas regulation, including … the United States participation in the Framework Convention…." Landau Decl. ¶ 17. Because the Trump Administration is not currently participating in the ongoing intergovernmental climate negotiations under the Framework Convention and did not attend the most recent COP30 climate talks in Belem, Brazil, there is no ongoing "United States participation in the Framework Convention" for New York's actions to disrupt.

35.    In sum, the Framework Convention, the Paris Agreement, and whatever climate policy the Trump Administration may seek to put in place—if and when the United States has lawfully withdrawn from the Paris Agreement—do not conflict with any requirement of the Climate Act. That state law is directed not at foreign policy, but at seeking cost-recovery for private corporate behavior that causes injury within New York to its people and environment.

## CONCLUSION

36.    For the foregoing reasons, I conclude that the Climate Act is consistent with international environmental law and agreements, which have long recognized a

"polluter pays" principle. International climate negotiations and agreements have never established a policy of corporate immunity for climate costs. The United States remains a party to the Framework Convention, with which the Climate Act is entirely consistent. The Act is also entirely consistent with the United States' obligations under the Paris Agreement. Although President Trump has declared his intention to withdraw from the Paris Agreement, that withdrawal has not yet been finalized and may not prove legally effective. Any such withdrawal would not in any event preempt the Climate Act, absent some definitive congressional legislation affirmatively opposing that law, which has not been enacted.

37.    I reserve the right to modify, amend, or expand this declaration as new information comes to light.


Dated:        December 17, 2025
              New Haven, CT

                                        _____
                                              Harold Hongju Koh