**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION**

---

STATE OF WEST VIRGINIA, et al.,

        *Plaintiffs*,

        v.

LETITIA JAMES, et al.,

        *Defendants*.

Civil Action No. 1:25-cv-168 (BKS/DJS)

---

**BRIEF OF AMICI CURIAE WEST HARLEM ENVIRONMENTAL ACTION, INC.,
BLACK FARMERS UNITED-NEW YORK STATE, INC., CITIZENS CAMPAIGN FOR
THE ENVIRONMENT, AND CATSKILL MOUNTAINKEEPER
IN SUPPORT OF DEFENDANTS' MOTION, AND IN OPPOSITION TO
PLAINTIFFS' MOTIONS, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTERESTS OF AMICI CURIAE ....................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.     The Act is a valid exercise of sovereign state authority .................................. 2

     A.     The Act aims to alleviate the financial burden of climate
adaptation on New Yorkers ................................................................. 2

     B.     The Act falls squarely within New York's traditional powers
and the presumption against preemption therefore applies................... 4

     C.     The Supreme Court and courts of appeals have consistently
reaffirmed retroactive cost reallocation laws ...................................... 5

II.     Federal law does not preempt the Act and *City of New York* does
not control the preemption analysis .................................................................. 7

     A.     The Act poses no conflict with the historical federal
common law of interstate pollution ...................................................... 8

     B.     The Act is materially different from the tort action in *City of
New York* ............................................................................................ 11

CONCLUSION ................................................................................................................... 12

i

## TABLE OF AUTHORITIES

### Cases

*Am. Elec. Power Co., Inc. v. Connecticut*,
    564 U.S. 410 (2011) ........................................................................................ 8, 9

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*,
    903 F.3d 903 (9th Cir. 2018) ............................................................................. 7

*ASARCO LLC v. Goodwin*,
    756 F.3d 191 (2d Cir. 2014) ............................................................................... 6

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ........................................................................................ 8, 9

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021) ............................................................... 1, 7, 8, 11, 12

*Copart Indus., Inc. v. Consol. Edison Co. of New York*,
    362 N.E.2d 968 (N.Y. 1977) ............................................................................. 12

*Dep't of Revenue of Or. v. ACF Indus., Inc.*,
    510 U.S. 332 (1994) ........................................................................................... 4

*Georgia v. Tenn. Copper Co.*,
    206 U.S. 230 (1907) ........................................................................................... 9

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972) ........................................................................................ 9, 10

*In re Gaston & Snow*,
    243 F.3d 599 (2d Cir. 2001) ............................................................................... 8

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    725 F.3d 65 (2d Cir. 2013) ................................................................................. 5

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ..................................................................................... 11, 12

*LeClair v. Saunders*,
    627 F.2d 606 (2d Cir. 1980) ............................................................................... 4

*Marcus v. AT&T Corp.*,
    138 F.3d 46 (2d Cir. 1998) ................................................................................. 8

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................................... 7

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)..............................................................................4

*Milwaukee v. Illinois*,
    451 U.S. 304 (1981)..............................................................................8

*Missouri v. Illinois*,
    180 U.S. 208 (1901)..............................................................................9

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)..............................................................................4

*Nat'l Shooting Sports Found. v. James*,
    144 F.4th 98 (2d Cir. 2025)................................................................10

*New York v. Nat'l Serv. Indus., Inc.*,
    460 F.3d 201 (2d Cir. 2006)...............................................................10

*North Dakota v. Minnesota*,
    263 U.S. 365 (1923)..............................................................................9

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983)............................................................................10

*Rest. L. Ctr. v. City of New York*,
    90 F.4th 101 (2d Cir. 2024) ...............................................................10

*Sensational Smiles, LLC v. Mullen*,
    793 F.3d 281 (2d Cir. 2015)..................................................................6

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*,
    742 F.3d 37 (2d Cir. 2014)....................................................................9

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)............................................................................10

*Thornhill v. Alabama*,
    310 U.S. 88 (1940)................................................................................5

*United States v. Monsanto Co.*,
    858 F.2d 160 (4th Cir. 1988) ................................................................6

*United States v. Ne. Pharm. & Chem. Co.*,
    810 F.2d 726 (8th Cir. 1986) ................................................................6

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976).........................................................................5, 6, 7

iii

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
    164 F.3d 123 (2d Cir. 1999)..................................................................... 10

*Young v. Masci*,
    289 U.S. 253 (1933)............................................................................. 4

**Statutes**

2024 N.Y. Sess. Laws Ch. 679 (S. 2129-B) ......................................... 2, 3, 7

**Other Authorities**

N.Y. Const. art. I, § 19 .......................................................................... 5

N.Y. Const. art. XIV, § 4 ........................................................................ 5

N.Y. Const. art. XVII, § 3 ....................................................................... 5

Restatement (Second) of Torts § 821B (1979) ............................................ 12

## INTERESTS OF AMICI CURIAE[1]

Amici curiae West Harlem Environmental Action, Inc., Black Farmers United-New York State, Inc., Citizens Campaign for the Environment, and Catskill Mountainkeeper are four New York-based nonprofit organizations devoted to addressing various aspects of the climate crisis, including adaptation and resilience. Amici's members, supporters, and communities include farmers, conservationists, and people who live in low-income communities and communities of color who face severe risks from climate change. They represent the perspectives of New Yorkers residing across the State, from the Great Lakes to the Catskills to New York City and Long Island. Amici possess concrete experience and expertise on both the existing harms from climate change and the possibilities of adapting to address future harms. They stand to benefit from the Climate Change Superfund Act (the "Act") challenged in these cases. Amici submit this brief to provide insight into the critical climate needs that motivated the Act's passage and to offer relevant context for the parties' legal arguments. Amici respectfully urge the Court to grant Defendants' motion for summary judgment and deny Plaintiffs' motions for summary judgment.

## ARGUMENT

Amici's brief focuses on the following points. First, the Act is a valid exercise of New York's traditional sovereign authority: the State has the power and duty to protect its residents and natural resources from climate harm, and the Legislature's chosen mechanism comports with constitutional limitations on state action. Second, federal law does not preempt the Act. The Act does not conflict with the historical federal common law of interstate pollution, and for that reason and others the Act differs materially from the tort action at issue in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021). The Court should sustain the Act.

---

[1] No party's counsel authored this brief in whole or in part. No person contributed money that was intended to fund preparing or submitting this brief. *See* L.R. 7.2(d).

I.      **The Act is a valid exercise of sovereign state authority**

      A.      **The Act aims to alleviate the financial burden of climate adaptation on New Yorkers**

Contrary to Plaintiffs' narrative, New York did not pass the Act to "punish energy producers," Chamber Pls. Summ. J. Mem. 6, Dkt. No. 216-1 ("Chamber Mem."); "penalize" fossil fuel extraction, W. Va. Pls. Summ. J. Mem. 34, Dkt. No. 217-1 ("W. Va. Mem."); or "police out-of-state emissions," *id.* at 42. Instead, the New York Legislature passed the Act to fulfill a genuine financial need to address a real and urgent problem: adapting to climate change in New York.

The Legislature expressly found that climate change poses "an immediate, grave threat to the state's communities, environment, and economy." 2024 N.Y. Sess. Laws Ch. 679 (S. 2129-B), § 2(1) (McKinney). Its "irreversible" consequences include "rising sea levels, increasing temperatures, extreme weather events, flooding, [and] heat waves." *Id.* These findings are borne out by the painful and costly experiences of New Yorkers—including Amici's members and supporters—whose lives have been disrupted by extreme storms, flooding, wildfires, and climate-related health impacts. For example, torrential downpours have flooded roadways and stranded vehicles on Long Island, ravaged towns in the Catskills, increased flooding along the shores of the Great Lakes, and disrupted subway service in New York City. At Black Farmers United's members' farms throughout the state, excessive rain diminishes crop yield and degrades soil, reducing what members can sell; in the worst cases, severe soil degradation has made it impossible for members to grow enough to sustain their livelihoods, forcing them to forfeit their land altogether. In northern Manhattan, where West Harlem Environmental Action, Inc. is based, extreme heat can be life-threatening, particularly for people (including public housing residents) who are less able to afford air conditioning.

Hard data demonstrate the toll climate change exacts on New Yorkers. From 1980 to 2024, New York saw 95 separate weather or climate disaster events that caused losses exceeding $1 billion each. Nat'l Ctrs. for Env't Info, *Billion-Dollar Weather and Climate Disasters: New York Summary*, https://perma.cc/B2V2-A663 (last visited Dec. 19, 2025). 2024 brought ten such events. *Id.* Hurricane Sandy alone caused $88.5 billion in losses across the Northeast. *Id.* One model predicts that, because climate change continues to increase storm intensity, a single storm in the future could put 25 percent of New York City under water and cause twice as much property damage in the city as did Hurricane Sandy. *See* Hilary Howard et al., *The Disaster to Come: New York's Next Superstorm*, N.Y. Times (Nov. 25, 2025), https://perma.cc/34HB-2TXG.

Because of the threats posed by climate change, the Legislature concluded that maintaining New Yorkers' "quality of life into the future" would require "huge investments" in infrastructure and "new revenue sources to pay for those investments." S. 2129-B, § 2(1). That conclusion, too, is reinforced by the experiences and expertise of Amici, who have designed, advocated for, and implemented climate adaptation solutions and who know that current government funding levels are inadequate to support the adaptation efforts required to protect their communities. As the Legislature recognized, adaptation is costly. New York City currently has approximately $60 billion already earmarked for projects that address flood risk, address heat risk, or otherwise contribute to climate resiliency. *City of New York Executive Budget Fiscal Year 2026: New York City Climate Budgeting* 14, https://perma.cc/A5NW-V9V4. And 95 other municipalities reported $737 million in actual and anticipated climate resilience spending from 2017 to 2026. N.Y. State Comptroller, *New York's Local Governments Adapting to Climate Change: Challenges, Solutions and Costs* 1 (Apr. 2023), https://perma.cc/C2KE-JWCD.

Plaintiff Chamber of Commerce has recognized that climate resilience investments are prudent ones. In a recent report, it estimated that every dollar invested in climate resilience can avoid up to $33 in lost future economic activity from climate impacts. U.S. Chamber Com. et al., *Beyond the Payoff: How Investments in Resilience and Disaster Preparedness Protect Communities* 4, 24 (2025), https://perma.cc/NJM7-Z3FT. It also affirmed that building climate resilience is a "shared responsibility" among local, state, and federal governments, *id.* at 4, and recommended that local governments build resilience by creating a dedicated fund for mitigation, *id.* at 18. Meanwhile, the federal government has sought to claw back resilience funding from states and municipalities and make it harder for them to qualify for federal assistance when disaster strikes. *See* N.Y. State Comptroller, *Severe Weather Events & Resiliency in New York State* 18 (Oct. 2025), https://perma.cc/CKT6-GMXV.

### B. The Act falls squarely within New York's traditional powers and the presumption against preemption therefore applies

New York has broad police powers to "protect the health and safety of [its] citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *see also LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980) ("Economic regulation concerned with public health is squarely within the state's police power . . . ."). It also has the power to raise revenue. *See Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994) (affirming that "taxation authority" is "central to state sovereignty"). Moreover, it is well-established that a state may apply its law to out-of-state activities that cause in-state harm. *See, e.g., Young v. Masci*, 289 U.S. 253, 258-59 (1933) (explaining that "a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it"); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023) (rejecting *per se* limitation on state laws with extraterritorial effect where

"virtually all state laws create ripple effects beyond their borders"); Defs. Summ. J. Mem. &

Opp'n 40-42, 44-48, Dkt. No. 230-1 ("Defs. Mem.").

New York not only has broad authority to enact laws, but it also has a duty to protect its

residents and resources. *See Thornhill v. Alabama*, 310 U.S. 88, 105 (1940) (states' duty to

protect residents "cannot be doubted"); N.Y. Const. art. I, § 19 ("Each person shall have a right

to clean air and water, and a healthful environment."); *id.* art. XIV, § 4 (the "policy of the state

shall be to conserve and protect its natural resources"); *id.* art. XVII, § 3 (the state "shall"

provide for the "protection and promotion" of public health).

The Act's core purpose—raising revenue to protect the health, safety, and well-being of

New York's residents and natural resources from climate harm in the state—falls squarely within

the scope of traditional state authority. Accordingly, the "presumption that Congress did not

intend to preempt" the Act "is particularly strong." *In re Methyl Tertiary Butyl Ether (MTBE)*

*Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

### C.    The Supreme Court and courts of appeals have consistently reaffirmed retroactive cost reallocation laws

The Supreme Court has recognized that there is nothing impermissibly punitive about

laws that retroactively impose cost-sharing on entities that profited from actions that created

harm. *Contra* Chamber Mem. 1; W. Va. Mem. 33-34. When states legislate to "adjust[] the

burdens and benefits of economic life," even by imposing retroactive liability, their actions are

presumed constitutional. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

In upholding the Black Lung Benefits Act, which required coal operators to pay

retroactive health benefits to miners, the Supreme Court endorsed the legislative decision to

require contributions from coal companies that had known "for at least 20 years" about the

health dangers their operations posed. *Id.* at 17. The Court explained it was not upholding "the

retrospective imposition of liability" based "on any theory of deterrence." *Id.* While the government would continue to bear "a substantial portion of the burden," it could also impose liability on coal companies to "spread the costs of the employees' disabilities to those who have profited from the fruits of their labor." *Id.* at 18. There was nothing improper about "legislation readjusting rights and burdens" to reflect increased costs borne by society; such retrospective cost-sharing "is not unlawful solely because it upsets otherwise settled expectations." *Id.* at 16.

Similarly, courts have uniformly upheld the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, commonly known as Superfund)—which imposes strict and retroactive statutory liability on companies to clean up hazardous waste sites—reasoning that it is appropriate to place financial responsibility on companies that profited from activities that generated pollution. *See, e.g.*, *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 734 (8th Cir. 1986), *cert. denied*, 484 U.S. 848 (1987) (finding Congress rationally imposed liability on "parties who created and profited from the sites and upon the chemical industry as a whole"). In doing so, courts have rejected arguments that CERCLA's liability scheme "exact[s] punishment": CERCLA "was not intended to operate, nor does it operate in fact, as a criminal penalty or a punitive deterrent." *United States v. Monsanto Co.*, 858 F.2d 160, 174-75 (4th Cir. 1988); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 200 (2d Cir. 2014) (concluding retroactive liability "does not convert CERCLA into a bill of attainder or an ex post facto law").[2]

The Act fits neatly within these precedents. The State has a "legitimate interest in combating the adverse effects of climate change on [its] residents." *Am. Fuel & Petrochemical*

---

[2] While the Black Lung Benefits Act and CERCLA are both federal statutes, the cases upholding them are instructive because courts evaluate state and federal legislation governing economic matters pursuant to the same deferential standard of review. *Compare Ne. Pharm. & Chem. Co.,* 810 F.2d at 733-34 (applying rational basis review to CERCLA), *with, e.g.*, *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (applying rational basis review to state statute).

*Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018); *see also Massachusetts v. EPA*, 549 U.S. 497, 518-23 (2007) (recognizing state's interest in protecting its territory from climate impacts). Faced with the financial burden of climate adaptation, the Legislature elected to shift a portion of those costs from the State's taxpayers to fossil fuel companies that profited from and contributed to the problem within the State. S. 2129-B, § 2(6)(c). The total cost recovery amount of $75 billion represents a fraction of the several hundred billion dollars in adaptation costs New York will incur through 2050, and it is less than the profits of the three largest domestic oil and gas producers in 2023 alone. *Id.* § 2(6)(b)-(c). The Act is neither punitive nor impermissible; it is a reasonable exercise of the State's traditional powers to raise revenue, protect its residents and resources, and "adjust[] the benefits and burdens of economic life." *Usery*, 428 U.S. at 15.

## II.   Federal law does not preempt the Act and *City of New York* does not control the preemption analysis

Plaintiffs rely principally on the Second Circuit's decision in *City of New York* to argue that the Act is preempted by federal common law, W. Va. Mem. 23-29, or precluded by the U.S. Constitution, Chamber Mem. 10-14. But as detailed below, and for the reasons set forth by Defendants, *City of New York*'s holding does not control and its reasoning should not be extended to this case. First, unlike the tort claims in *City of New York*, the Act does not conflict with the historical federal common law applicable to some interstate pollution disputes. Second, *City of New York* did not hold that *all* liability related to greenhouse gas emissions was preempted, *contra* Chamber Mem. 12-14; W. Va. Mem. 26-27, but only that *tort* liability was preempted because it operated as an ongoing de facto emissions regulation.[3]

---

[3] Amici agree with Defendants that the Clean Air Act does not preempt the Act, Defs. Mem. 24-36, and do not address Plaintiffs' statutory preemption claims in this brief.

**A.     The Act poses no conflict with the historical federal common law of interstate pollution**

Courts narrowly define the scope of federal common law and its consequent preemption of state law. "The Supreme Court has cautioned against the broad use of federal common law," *Marcus v. AT&T Corp.*, 138 F.3d 46, 53 (2d Cir. 1998), and "[t]he ability of the federal courts to create federal common law and displace state-created rules is severely limited," *In re Gaston & Snow*, 243 F.3d 599, 606 (2d Cir. 2001). This is because "[t]he enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *Milwaukee v. Illinois*, 451 U.S. 304, 312-13 (1981) (*Milwaukee II*). Federal common law thus applies only in highly "limited situations." *Marcus*, 138 F.3d at 53. And without a "significant conflict" between federal common law and "the [operation] of state law," federal common law cannot displace state law. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 507-08 (1988) (alteration in original).

While a limited body of federal common law historically governed disputes to abate interstate pollution, *see Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"), the Act does not fall within this sphere because it does not regulate pollution at all. *See, e.g.*, Defs. Mem. 25-26, 29-31. State common law nuisance, at issue in *City of New York*, created an ongoing duty not to pollute—just as federal common law nuisance does—and in the Second Circuit's view thus operated in an area "previously governed by federal common law." *City of New York*, 993 F.3d at 99. The Act, by contrast, imposes no ongoing duty whatsoever, let alone one to abate pollution. *See also infra* at Argument II.B (explaining why nuisance imposes ongoing duties but the Act does not). The Act presents no "significant conflict" with federal common law for the same reason: it imposes no conflicting duty of care. *Cf. Boyle*, 487 U.S. at

509, 512 (finding "significant conflict" when "state-imposed duty of care" was "precisely contrary" to duty imposed by federal policy); *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 742 F.3d 37, 42 (2d Cir. 2014) (finding "significant and direct conflict" between state fiduciary law and federal statutory obligation).

This conclusion is reinforced by the historical context of this limited body of federal common law. Contrary to Plaintiffs' characterizations, this federal common law did not govern *all* interstate pollution, W. Va. Mem. 24-25, or "disputes concerning transboundary . . . emissions," Chamber Mem. 11. Instead, it applied in a narrow context: when a state brought a nuisance action "to abate pollution emanating from another State." *AEP*, 564 U.S. at 421; *see, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91, 93 (1972) (*Milwaukee I*) (nuisance action to abate sewage discharge into Lake Michigan); *North Dakota v. Minnesota*, 263 U.S. 365, 371, 374 (1923) (suit to enjoin alteration of river flow as public nuisance); *Missouri v. Illinois*, 180 U.S. 208, 241-43 (1901) (nuisance action to abate sewage discharge into interstate waters). This body of law arose because of a specific need for an alternative to armed conflicts between states seeking to abate pollution from a specific source in another state. Before entering the union, out-of-state pollution harming a state would have given that state a "casus belli" (i.e., a legal justification) to send armed forces into the upstream state and stop the discharge. *See Milwaukee I*, 406 U.S. at 107. But "[w]hen the states by their union made the forcible abatement of outside nuisances impossible," they did not "thereby agree to submit to whatever might be done." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237-38 (1907). To provide an "alternative to force," *id.*, the Court recognized a federal common law nuisance action as a "more peaceful means" to serve the same end, *Milwaukee I*, 406 U.S. at 107 (citation omitted). The Supreme Court has observed in dicta that these interstate disputes warranted federal common law because a

9

"uniform rule of decision" was needed to adjudicate states' "alleged federal rights" in the quality of interstate waters. *Id.* at 105 n.6, 107 n.9. But the Court has never applied this federal common law outside the context of nuisance suits by one state to abate pollution originating in another. *Contra* W. Va. Mem. 24-25. The Act is far removed from that context.

Plaintiffs nonetheless speculate that the Act must yield to federal common law because it could lead to "a patchwork of conflicting state rules" over the same pollution sources. Chamber Mem. 1, 23; *see also* W. Va. Mem. 25-26. Such speculation should not be credited in the context of a facial preemption challenge. *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 117 (2d Cir. 2024) (declining to find facial preemption based on a speculative application of the challenged law); *Nat'l Shooting Sports Found. v. James*, 144 F.4th 98, 112 (2d Cir. 2025) (cautioning against "speculating about hypothetical or imaginary cases in which a law might be" preempted). But even accepting Plaintiffs' premise, "a mere federal interest in uniformity is insufficient to justify displacing state law in favor of a federal common law rule." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 208 (2d Cir. 2006) (cleaned up); *see also Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 129 (2d Cir. 1999) ("vague assertions about the need for uniformity" are insufficient to displace state law). Instead, any concerns about allowing other states to enact similar legislation are "a matter for Congress, not the courts, to resolve." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981); *see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 223 (1983) ("The courts should not assume the role which our system assigns to Congress.").

Because the Act poses no conflict with the historical federal common law applicable to some interstate pollution disputes, it is not preempted by that federal common law and *City of New York* does not control.

**B.     The Act is materially different from the tort action in *City of New York***

The panel in *City of New York* did not hold that *all* financial liability for past fossil fuel production amounts to a de facto regulation of emissions. *Contra* Chamber Mem. 12, W. Va. Mem. 28. Rather, as described below, it identified concerns with the effects of specific state law tort claims and focused on how those claims would operate. But the Act differs materially from the tort claims at issue in *City of New York*, and the court's animating concerns in that case are not present here.

In *City of New York*, the court observed that the only way for the defendants to avoid future tort liability for their fossil fuel production "would be to cease global production altogether." 993 F.3d at 93. But here, liability under the Act is entirely retroactive: there is no future liability to avoid. As the Chamber Plaintiffs concede, whatever fossil fuel producers choose to do going forward will have no effect on their liability under the Act, which will derive entirely from their historical production of fossil fuels from 2000 to 2024.[4] Unlike the tort action in *City of New York*, therefore, the Act cannot be considered a de facto emissions regulation.

The court in *City of New York* also observed that retroactive *tort* damages can influence behavior going forward. *Id.* at 92-93. That is because a finding of tort liability recognizes that the tortfeasor violated an ongoing legal duty. Once found liable for a nuisance, a tortfeasor can only "avoid the threat of ongoing liability" by "chang[ing] its methods of doing business and controlling pollution" or in some cases "ceas[ing] operations" altogether. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1987). And New York City conceded that the damages it sought could drive "production-side changes." *City of New York*, 993 F.3d at 93. By contrast, a one-time

---

[4] Compl. ¶ 161, *Chamber of Com. v. James*, No. 1:25-cv-1307-BKS-DJS (N.D.N.Y. Feb. 28, 2025), Dkt. No. 1 ("Nothing energy producers can do today can affect their liability under the Act.").

statutory assessment based on past activity does not impose an ongoing duty and does not subject responsible parties to liability for future fossil fuel production.

Notably, the *City of New York* plaintiffs sought both damages and an injunction to abate the nuisance and trespass in the event defendants failed to pay any court-awarded damages. 993 F.3d at 88. The court relied on this fact in finding that the City's claims sought to "regulate emissions." *Id.* at 92-93 & n.5. By contrast, the Act seeks to recover only a one-time payment.

Finally, unlike the tort claims in *City of New York*, the Act does not require courts to apply any "vague" or "indeterminate standards" to adjudge liability. *See id.* at 97 (quoting *Ouellette*, 479 U.S. at 496). The *City of New York* court was concerned that courts were ill-suited to enforce a state nuisance remedy related to greenhouse gas emissions. *Id*. at 97-98. But unlike tort law, the New York Act does not require courts to balance the reasonableness of emissions, the impact of those emissions on other parties, or to craft a remedy, much less to engage in this type of analysis on an ongoing basis. *See Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 362 N.E.2d 968, 971 (N.Y. 1977) (court assessing private nuisance claim must determine whether conduct was intentional and unreasonable, negligent or reckless, or abnormally dangerous); Restatement (Second) of Torts § 821B (1979) (public nuisance requires an "unreasonable" interference with public rights). Thus, *City of New York*'s holding does not control the preemption analysis in this case.

## CONCLUSION

For the reasons set forth above and by Defendants, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motions for summary judgment.

Dated: December 22, 2025                    Respectfully submitted,

                                            /s/ Michelle Wu
                                            Michelle Wu (NDNY Bar No. 706205)
                                            Mitchell S. Bernard (NDNY Bar No. 104409)
                                            Natural Resources Defense Council, Inc.
                                            40 West 20th Street, 11th Floor
                                            New York, NY 10011
                                            (646) 889-1489
                                            michellewu@nrdc.org
                                            mbernard@nrdc.org

                                            /s/ Dror Ladin
                                            Dror Ladin (NDNY Bar No. 705171)
                                            Earthjustice
                                            48 Wall Street, 15th Floor
                                            New York, NY 10005
                                            (917) 410-8701
                                            dladin@earthjustice.org

                                            *Counsel for West Harlem Environmental Action,
                                            Inc., Black Farmers United-New York State, Inc.,
                                            Citizens Campaign for the Environment, and
                                            Catskill Mountainkeeper*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing using the Court's CM/ECF system on December 22, 2025, which will serve all counsel of record in this matter.

/s/ Michelle Wu