# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

STATE OF WEST VIRGINIA, et al.,

*Plaintiffs*,

v.                                                 Civil Action No. 1:25-cv-00168-BKS-DJS

LETITIA JAMES, et al.,

*Defendants*.

**PLAINTIFFS CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AMERICAN PETROLEUM INSTITUTE, NATIONAL MINING ASSOCIATION, AND THE BUSINESS COUNCIL OF NEW YORK STATE, INC.'S COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II AND OPPOSITION TO <u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## Table of Contents

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 2

    A.  The Act imposes liability for greenhouse gas emissions. ............................... 2

    B.  The Act targets activity and energy producers located almost entirely outside New York. ........................................................................................................ 3

    C.  The Act imposes ongoing and immediate compliance harms on Plaintiffs' members. ......................................................................................................... 4

Argument ........................................................................................................................ 5

   I.  Plaintiffs have associational standing to challenge New York's Act. ............................... 6

    A.  The Act injures Plaintiffs' members. ....................................................... 6

    B.  Statements showing the Act targets Plaintiffs' members are not hearsay. ................. 10

  II.  The Act is precluded by the U.S. Constitution. ............................................... 12

    A.  Under the U.S. Constitution, federal law governs liability for global greenhouse gas emissions, which precludes New York's Act. ........................................... 12

    B.  There is no genuine factual dispute about whether the Act is an impermissible regulation imposing liability for global greenhouse gas emissions. ......................... 26

  III.  The Clean Air Act preempts the Act because it imposes liability for greenhouse gas emissions originating in other States. .................................................... 34

Conclusion .................................................................................................................. 40

## Table of Authorities

**Page(s)**

**Cases**

*Am. Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011) .................................................................13, 15, 17, 21, 38

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ................................................................. 9-10

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964) .................................................................................23

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) .............................................................................28, 30

*Bridgeway Corp. v. Citibank,*
    201 F.3d 134 (2d Cir. 2000) ....................................................................12

*Bucks Cnty. v. BP P.L.C.,*
    2025 WL 1484203 (Pa. Com. Pl. May 16, 2025) ............................. 14-15

*Calder v. Jones,*
    465 U.S. 783 (1984) .................................................................................20

*CFCU Cmty. Credit Union v. Hayward,*
    552 F.3d 253 (2d Cir. 2009) ....................................................................11

*City of Annapolis v. BP PLC,*
    2025 WL 588595 (Md. Cir. Ct. Jan. 23, 2025) .......................................15

*City of Charleston v. Brabham Oil Co.,*
    No. 2020-CP-10-03975 (S.C. Ct. Com. Pl. Aug. 6, 2025) .....................15

*City of Milwaukee v. Illinois,*
    451 U.S. 304 (1981) .................................................................................17

*City of New York v. Chevron Corp.,*
    993 F.3d 81 (2d Cir. 2021) ...............................1-2, 13-18, 21-22, 24-25, 27-40

*Cnty. Comm'rs v. Suncor Energy USA, Inc.,*
    2025 WL 1363355 (Colo. 2025) ..............................................................15

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman,*
    906 F.3d 41 (2d Cir. 2018) ......................................................................40

*CompassCare v. Hochul,*
    125 F.4th 49 (2d Cir. 2025) .....................................................................24

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    141 F.4th 976 (9th Cir. 2025) ..................................................................21

*D.C. v. Exxon Mobil Corp.*,
    89 F.4th 144 (D.C. Cir. 2023) ..................................................................36

*Doe v. Zucker*,
    520 F. Supp. 3d 217 (N.D.N.Y. 2021) ......................................................11

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) ..................................................................................19

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008) ..................................................................................37

*Franchise Tax Bd. v. Hyatt*,
    587 U.S. 230 (2019) ..................................................................................13

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025) ................................................................................18, 20

*Goe v. Zucker*,
    43 F.4th 19 (2d Cir. 2022) ........................................................................11

*Haight v. NYU Langone Med. Ctr., Inc.*,
    2016 WL 29628 (S.D.N.Y. Jan. 4, 2016) ................................................26

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989) ..................................................................................27

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013) ........................................................................9

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*,
    304 U.S. 92 (1938) ..............................................................................13, 17

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ....................................................................................23

*Honolulu v. Sunoco LP*,
    537 P.3d 1173 (Haw. 2023) ......................................................................15

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ....................................................................................6

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972) ..............................................................................13, 17

*Ind. Harbor Belt R. Co. v. Am. Cyanamid Co.*,
    916 F.2d 1174 (7th Cir. 1990) ........................................................................32

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)........................................................................ 1, 34-39

*Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*,
    644 F.3d 934 (9th Cir. 2011) ........................................................................40

*Kumar v. Republic of Sudan*,
    880 F.3d 144 (4th Cir. 2018) ........................................................................25

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012)........................................................................28

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................................7

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023)........................................................................18, 20

*Mayor & City Council of Balt. v. BP P.L.C.*,
    2024 WL 3678699 (Md. Cir. Ct. July 10, 2024)........................................15

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*,
    725 F.3d 65 (2nd Cir. 2013)........................................................................40

*N.Y. Life Ins. Co. v. Head*,
    234 U.S. 149 (1914)........................................................................18-19

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013)........................................................................7

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)........................................................................18

*NRDC v. FDA*,
    710 F.3d 71 (2d Cir. 2013)........................................................................6

*NRDC v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018)........................................................................31

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*,
    489 U.S. 493 (1989)........................................................................40

*Picard v. Magliano*,
    42 F.4th 89 (2d Cir. 2022) ........................................................................9

*Platkin v. Exxon Mobil Corp.*,
  2025 WL 604846 (N.J. Super. Ct. Law Div. Feb. 5, 2025) .................................................15

*Real Est. Bd. of N.Y. v. City of New York*,
  786 F. Supp. 3d 788 (S.D.N.Y. 2025) ....................................................................................11

*Reyes v. City of New York*,
  141 F.4th 55 (2d Cir. 2025) ....................................................................................................11

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ................................................................................................................16

*Roman Catholic Archdiocese of N.Y. v. Sebelius*,
  907 F. Supp. 2d 310 (E.D.N.Y. 2012) ....................................................................................10

*San Diego Bldg. Trades Council v. Garmon*,
  359 U.S. 236 (1959) ................................................................................................................28

*Schachtler Stone Prods., LLC v. Town of Marshall*,
  2024 WL 4025862 (N.D.N.Y. Sept. 3, 2024) ............................................................................6

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ..................................................................................................................24

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
  632 F.3d 938 (5th Cir. 2011) ..................................................................................................25

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ..........................................................................................................2, 6-10

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ............................................................................................................13, 17

*Tweed-New Haven Airport Auth. v. Tong*,
  930 F.3d 65 (2d Cir. 2019) ...................................................................................................7, 10

*United States v. Articles of Banned Hazardous Substances*,
  34 F.3d 91 (2d Cir. 1994) ........................................................................................................26

*United States v. Comstock*,
  560 U.S. 126 (2010) ................................................................................................................22

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ................................................................................................................26

*United States v. State of New York*,
  No. 1:25-cv-03656-PKC (S.D.N.Y.) ......................................................................................15

*Vt. Right to Life Comm., Inc. v. Sorrell*,
221 F.3d 376 (2d Cir. 2000) ........................................................................9

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ..........................................................................18, 20

*Young v. Masci*,
289 U.S. 253 (1933) ............................................................................ 20-21

*Zschernig v. Miller*,
389 U.S. 429 (1968) ..................................................................................23

**Statutes, Regulations, and Related Materials**

N.Y. Env't Conservation Law § 76-0101 ................................1, 3, 7, 23, 29

N.Y. Env't Conservation Law § 76-0103 ..................................................3, 9

Fed. R. Evid. 201 ........................................................................................31

Fed. R. Evid. 801 ........................................................................................11

Fed. R. Evid. 803 ........................................................................................12

Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle
Standards, 90 Fed. Reg. 36,288, 36,302 (Aug. 1, 2025) ........................37

Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle
Standards: Response to Comments (Feb. 2026), https://perma.cc/K6N5-GP8X ..................38

Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle
Greenhouse Gas Emission Standards Under the Clean Air Act, Final Rule
(Feb. 12, 2026) (pre-publication version, available at https://perma.cc/Y7FQ-T2Z5) ..........................................................................................................38

S.2129-B, 2023-2024 Sess. (N.Y. Dec. 26, 2024) ...............................29, 30

S.824, 2025-2026 Sess. (N.Y. Feb. 28, 2025) ...........................................30

S.9417, 2021-2022 Sess. (N.Y. May 25, 2022) .........................................30

**Other Authorities**

Am. Compl., *City of New York v. Chevron*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018)
(No. 18-cv-182-JFK), 2018 WL 8064051 ...........................29, 30, 32, 35

Appellant's Br., *City of New York*, 993 F.3d 81 (2d Cir. Nov. 8, 2018) (No. 18-2188), 2018 WL 5905772 ...............................................24, 28, 36

Br. for United States as Amicus Curiae in Support of Pet. for Reh'g, *City of Oakland v. BP p.l.c.*, 969 F.3d 895 (9th Cir. Aug. 3, 2020) (No. 18-16663)............................................................15

Br. for the United States as Amicus Curiae Supporting Petitioners, *Suncor Energy (U.S.A.) Inc. v. Cnty. Comm'rs of Boulder Cnty.*, No. 25-170 (Sept. 11, 2025)............................................................15

Br. for the United States as Amicus Curiae Supporting Resp., *C.H. Robinson Worldwide, Inc. v. Miller*, 142 S. Ct. 2866 (2022) (No. 25-1425), 2022 WL 1670803...................................29

*Climate Superfund Map*, Pillsbury (Feb. 1, 2026), https://perma.cc/Q6HV-SKMV...................31

N.Y. State Assemb., June 7, 2024 Chamber Debate, 2023-24 Legislative Session, (June 7, 2024), https://perma.cc/B4BA-8KMU ...................................21

Reply, *United States v. State of New York*, No. 1:25-cv-03656-PKC (S.D.N.Y. Nov. 19, 2025), ECF 99 ...................................26

Vol. I: Summary for Policymakers: 2025 New York State Energy Plan, N.Y. State Energy Planning Board 43-44 (Dec. 2025), https://perma.cc/R2TA7RL6.............................4

## Introduction

New York's Act is unconstitutional on its face. The Act attempts to impose $75 billion in penalties on a select group of energy producers for "*worldwide*" greenhouse gas emissions. N.Y. Env't Conservation Law § 76-0101(8) ("Act") (emphasis added).[1] The Second Circuit has held that the Constitution forbids such laws. In *City of New York v. Chevron Corp.*, the Second Circuit held that a State cannot impose liability for out-of-state greenhouse gas emissions. 993 F.3d 81, 90-93 (2d Cir. 2021). That conclusion is binding on this Court, supported by a long history of "cases . . . apply[ing] federal law to disputes involving interstate . . . air pollution," *id.* at 91, and confirmed by multiple constitutional provisions and doctrines that limit state authority—including equal sovereignty, due process, and federal primacy in foreign affairs. Defendants' arguments amount to no more than a repackaging of positions the Second Circuit addressed and rejected.

The only room for action by the States related to greenhouse gas emissions is the "slim reservoir" of power granted in the Clean Air Act to govern *in-state* emissions—*i.e.*, those originating within the State's borders. *Id.* at 100; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487-88 (1987). New York's Act does not fit within that slim reservoir because it indisputably imposes liability for *out-of-state* (indeed, global) greenhouse gas emissions.

Defendants attempt to save the Act by characterizing it as a mere compensatory scheme that does not "regulate" greenhouse gas emissions. That distinction is both irrelevant and wrong. Whether the Act "regulates" emissions has no bearing on whether the Constitution permits New York to impose liability for global greenhouse gas emissions. Even if it *were* relevant, the Second Circuit has already concluded that seeking substantial compensation for global greenhouse gas

---

[1] Unless otherwise noted, statutory citations are to Article 76 of New York's Environmental Conservation Law.

emissions amounts to regulating emissions. A contrary conclusion would "ignore[] economic reality." *City of New York*, 993 F.3d at 92. That is because it is well established, as a matter of law, that both "an award of damages" and "the obligation to pay compensation" "can be, indeed [are] designed to be, a potent method of governing conduct and controlling policy." *Id.* (cleaned up).

Defendants also argue that Plaintiffs[2] lack Article III standing because they have not shown that the Act will injure one of their members. That is absurd. By its own terms, the Act targets a narrow group of large energy producers, and Plaintiffs' members are some of the largest energy producers in the world. The Act's legislative history calls out Plaintiffs' members *by name*—in a memorandum appending an "Approximate List of Covered Companies" to other statements by the Act's sponsors. In other words, the New York legislature explicitly identified Plaintiffs' members as the intended targets of the Act. There is simply no doubt that there is "a substantial risk" that Plaintiffs' members will be penalized under the Act, which is sufficient to establish standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA*") (citation omitted). Moreover, Plaintiffs' members have submitted declarations detailing the harms they are incurring or will soon incur by virtue of having been targeted by the Act.

The Court should grant Plaintiffs' motion for partial summary judgment, deny Defendants' cross-motion, declare that New York's Act is precluded by the U.S. Constitution and preempted by the CAA, and enjoin enforcement of the Act in any capacity against Plaintiffs' members.

## Background

### A.    The Act imposes liability for greenhouse gas emissions.

New York's Act imposes $75 billion in penalties on a set of energy producers for

---

[2] "Plaintiffs" refers to the Chamber of Commerce of the United States, American Petroleum Institute, National Mining Association, and the Business Counsel of New York State, Inc., and "West Virginia Plaintiffs" refers to the coalition of plaintiffs led by West Virginia in this matter.

greenhouse gases emitted over a 25-year "[c]overed period." § 76-0101(6), (9). The Act requires the New York Department of Environmental Conservation ("DEC") to issue cost recovery demands to "responsible parties," who are held strictly liable for their purported share of that $75 billion amount. § 76-0103(3)(e)(i). The statute leaves DEC no discretion as to whether to issue such demands. *See id.* The Act then funnels these punitive payments into a state fund to use for its preferred "climate change adaptive infrastructure projects." § 76-0103(1), (2)(d)-(f).

Critically, the Act's scheme does not limit liability to greenhouse gas emissions occurring within New York. Instead, it defines "covered greenhouse gas emissions" to include "emissions attributable to all fossil fuel extraction and refining worldwide," and expressly states that such emissions are "not limited to emissions within the state." § 76-0101(8).

**B.    The Act targets activity and energy producers located almost entirely outside New York.**

The Act is designed to target fossil fuel producers and refiners whose relevant activities occur overwhelmingly outside New York. The Act imposes penalties upon "responsible part[ies]," which it defines as "any entity . . . which, during any part of the covered period, was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by [DEC] to be responsible for more than one billion tons of covered greenhouse gas emissions." § 76-0101(21). Defendants concede that New York has little in-state fossil fuel extraction, no coal production, and no crude oil refining in the State. *See* ECF 230-11 ¶¶ 33-34. And because New York produces—and produced during the covered period—such a small amount of fossil fuels, the fact that the Act applies only to entities that produce over "one billion tons of covered greenhouse gas emissions" means that the Act must apply to conduct outside of New York. § 76-0101(21). In other words, no company could meet the one-billion-ton threshold based solely on conduct in, and emissions from within, New York. The Act's aim is thus *necessarily* extraterritorial.

Ironically, while imposing fines upon out-of-state companies for greenhouse gas emissions related to extraction and refining of fossil fuels, New York has committed to continuing to use those same fuels. New York's Final 2025 State Energy Plan, released in December, acknowledges that the State will continue to rely upon fossil fuels for the foreseeable future to meet energy demand and ensure grid reliability. *See, e.g.*, Vol. I: Summary for Policymakers: 2025 New York State Energy Plan, N.Y. State Energy Planning Board 43-44 (Dec. 2025), https://perma.cc/R2TA7RL6 ("[T]hrough the 2040 planning period, New York will continue supporting the safe and reliable provision of natural gas and petroleum fuels to [all major] sectors. In part this will require continued investment in the natural gas system, including guaranteeing adequate supply infrastructure. . . . Combustion generating units will also remain essential parts of electric grid reliability and energy affordability . . . ."); *see also* ECF 216-28 (Draft New York State Energy Plan, 2025). The Act therefore reflects a deliberate policy choice to penalize out-of-state fossil fuel producers for global emissions, while New York continues to rely upon and benefit from these same companies' fuel products and invest in the ongoing combustion of greenhouse-gas-emitting fossil fuels.

### C. The Act imposes ongoing and immediate compliance harms on Plaintiffs' members.

New York's Act inflicts immediate and concrete harm on energy producers. The Act's legislative history and related materials make clear that the Act is intended to target a narrow class of major energy producers, including Plaintiffs' members. *See* ECF 216-2 ¶¶ 26-32. Defendants do not dispute that these legislative materials exist or that they were authored by the Act's sponsors. *See* ECF 230-11 ¶ 26; *see also* ECF 216-2 ¶¶ 26-32. Thus, Plaintiffs' members fall squarely within the class of entities the Act was designed to reach, and will reach if not invalidated.

4

Plaintiffs' members are either already incurring or will soon incur substantial legal, technical, and strategic compliance costs as a result of the Act. *See* ECF 216-2 ¶¶ 4-5, 9-10, 15-16, 19-20. These costs include retaining experts, preserving and analyzing decades of global production and refining data, modeling potential attribution and allocation scenarios, and preparing to participate in administrative proceedings mandated by the Act.[3] Absent relief from this Court, these costs will continue to mount as the State proceeds toward issuing cost recovery demands.

## Argument

In their motion for partial summary judgment, ECF 216, Plaintiffs explain why they are entitled to summary judgment on Counts I (constitutional preclusion) and II (Clean Air Act preemption). Defendants' consolidated brief does not change anything.

To start, Plaintiffs have standing. The Act is clearly intended to apply to Plaintiffs' members—the New York Legislature expressly said so. Defendants' feigned uncertainty rings hollow. Defendants cannot avoid the obvious conclusion that Plaintiffs' members are at substantial risk of enforcement under the law by erroneously characterizing standard legislative history as hearsay.

On the merits, Second Circuit and Supreme Court precedent make clear that a State may not impose retroactive, extraterritorial liability for global greenhouse gas emissions. The Constitution precludes, and the Clean Air Act ("CAA") preempts, New York's Act. Because there is no genuine dispute of material fact and the Act is unconstitutional, Plaintiffs are entitled to summary judgment on both counts. Defendants claim entitlement to judgment as a matter of law on the same counts on which Plaintiffs moved, but they are wrong. The Act is facially unconstitutional.

---

[3] *See* Durbin Decl. ¶¶ 18-22, ECF 216-4; Meyer Decl. ¶¶ 17-19, ECF 216-7; Sweeney Decl. ¶¶ 14-18, ECF 216-13; Pokalsky Decl. ¶¶ 15-22, ECF 216-10; Torrence Decl. ¶¶ 10-22, ECF 216-14; Swarup Decl. ¶¶ 15-26, ECF 216-12; Cochrane Decl. ¶¶ 13-21, ECF 216-3; Martini Decl. ¶¶ 13-21, ECF 216-6; Jarboe Decl. ¶¶ 14-25, ECF 216-5; Parrish Decl. ¶¶ 13-23, ECF 216-9; Slone Decl. ¶¶ 15-22, ECF 216-11.

Defendants have offered no evidence creating a dispute of *material* fact about whether the Act regulates emissions. Nor could they. Plaintiffs' claims are purely legal. Defendants attempt to manufacture a fact dispute over whether the Act regulates emissions; but that is in direct conflict with *City of New York*, which rejected, as a matter of law, a nearly identical assertion.[4]

## I.    Plaintiffs have associational standing to challenge New York's Act.

Plaintiffs have associational standing to bring this challenge because: (1) at least one of Plaintiffs' members has individual standing to sue in its own right; (2) challenging the Act is germane to Plaintiffs' respective purposes; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); ECF 216-1 at 8-9. Defendants do not dispute the second or third elements. They argue only that Plaintiffs' members lack standing to sue because they have not shown injury in fact. *See* ECF 230-1 at 12. That is demonstrably wrong; the Act specifically targets Plaintiffs' members.

### A.    The Act injures Plaintiffs' members.

To establish an injury in fact for standing, Plaintiffs need show only that the Act causes for at least one of their members a "threatened injury [that] is 'certainly impending,' or [that] there is a 'substantial risk' that the harm will occur." *SBA*, 573 U.S. at 158 (citation omitted). "Even a small financial loss is an injury for purposes of Article III standing." *NRDC v. FDA*, 710 F.3d 71, 85 (2d Cir. 2013). So too are costs due to "interference with [a plaintiff's] business and attorneys' fees . . . incurred . . . to address the unlawful and unconstitutional actions by Defendants." *Schachtler Stone Prods., LLC v. Town of Marshall*, 2024 WL 4025862, at *4 (N.D.N.Y. Sept. 3, 2024). And where "the plaintiff is . . . an object of the [government] action . . . at issue

---

[4] Defendants do not dispute that, if the court grants summary judgment in Plaintiffs' favor, Plaintiffs and their members are entitled to a permanent injunction. ECF 216-1 at 23-25.

. . ., there is ordinarily little question that the action . . . has caused [the plaintiff] injury." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019) (quoting *Lujan v. Defs. of Wild-life*, 504 U.S. 555, 561-62 (1992)).

There is no question that the Act injures at least one of Plaintiffs' members.[5] The Act's purpose is to force Plaintiffs' members—oil, gas, and coal companies—to pay New York for alleged climate change harms. The Act does so by defining responsible parties to include companies with large volumes of extraction and refining around the world (subject to a nexus requirement with New York). *See* § 76-0101(21). Defendants do not dispute that Plaintiffs' members include some of the largest companies engaged in fossil fuel extraction and refining in the United States and worldwide. Nor can they dispute that the Act affords DEC no discretion over whether to issue cost recovery demands to defined responsible parties. § 76-0103(3)(e)(i). Instead, Defendants quibble with the quantum of evidence Plaintiffs have produced showing that their members will receive such demands. But Article III has never required a plaintiff to admit liability or suffer actual enforcement in order to have standing to challenge a law. Article III merely requires that there be a credible threat of enforcement under the law. *See, e.g.*, *SBA*, 573 U.S. at 163 ("Nothing . . . requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law."). And that is an important distinction, lest the price of exercising one's constitutional rights to challenge a law be conditioned upon one's willingness to concede liability. Plaintiffs have submitted more than enough evidence of a credible threat of enforcement.[6]

---

[5] To the extent Defendants argue Plaintiffs' claims are constitutionally unripe, ECF 230-1 at 12, that argument also fails because Plaintiffs' members have shown injury in fact. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013).

[6] *See* Durbin Decl. ¶¶ 16-17; Meyer Decl. ¶¶ 15-16; Sweeney Decl. ¶¶ 12-13; Pokalsky Decl. ¶¶ 13-14; Torrence Decl. ¶¶ 8-9; Swarup Decl. ¶¶ 11-14; Cochrane Decl. ¶ 12; Martini Decl. ¶¶ 11-12; Jarboe Decl. ¶¶ 12-13; Parrish Decl. ¶¶ 11-12; Slone Decl. ¶¶ 13-14.

Indeed, the Act's legislative history forecloses any doubt that there is more than a substantial risk at least one of Plaintiffs' named members—Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, BP America, Inc., Peabody Energy, Core Natural Resources, and Alliance Resource Partners—will receive cost recovery demands. *See SBA*, 573 U.S. at 158.

*First*, the Act's sponsors circulated a memorandum *listing those seven member companies*, among others, as being covered by the Act and estimating their cost recovery demands. ECF 216-37; ECF 216-2 ¶¶ 26-29; ECF 216-15 ¶ 24. This memorandum, titled "Approximate List of Covered Companies under the Climate Change Superfund Act," listed 38 companies that, according to the Act's sponsors, are purportedly "in the cohort of entities that have released more than 1 billion tons of CO2 in the prescribed period and have sufficient nexus with New York State such that the state could successfully enforce" a cost recovery demand issued under the law. ECF 216-2 ¶ 27. And for each producer company listed, the memorandum includes the purported total tons of greenhouse gas emissions attributable to each producer and the anticipated penalties against each producer. *Id.* ¶ 28. Defendants "admit[] to the existence" of this memorandum, ECF 230-11 ¶ 26, and "admit that the Act's sponsors created" it, Defs.' Answer ¶ 75, *Chamber of Commerce v. James*, No. 1:25-cv-01397-BKS-DJS (N.D.N.Y.), ECF 80.

*Second*, one of the Act's sponsors stated during the legislative floor debate on the Act that "Exxon Mobil, Shell, BP, [and] Chevron" would "have to participate" in paying penalties under the Act. ECF 216-2 ¶ 30 (record citation omitted). Defendants "admit[] that the quoted statements appear" in the legislative "transcript." ECF 230-11 ¶ 30.

*Third*, the official New York State Assembly memorandum in support of the Act specifically mentions purported "capital investments in low-carbon sources" of "Chevron" and "ExxonMobil" in discussing their "immense profits" as "a market failure that needs to be addressed

8

through policy change." ECF 216-2 ¶ 31 (record citation omitted). Defendants "admit[] to the existence of" this "memorandum." ECF 230-11 ¶ 31.

*Fourth*, New York's Governor, legislators, and other supporting groups issued a press release about the Act, stating "[n]ow Big Oil will pay for much of the damages that they helped cause." ECF 230-11 ¶ 32 (stating that "fossil fuel companies" needed to "pay" (record citation omitted)). Plaintiffs' named members are seven of the world's largest oil, gas, and coal producers. Defendants admit this press release was issued and includes these quotations. ECF 230-11 ¶ 32.

It is more than reasonable for Plaintiffs' named members to fear that the Act does precisely what the legislators who passed it intended, creating "a substantial risk that the harm will occur." *SBA*, 573 U.S. at 158. Indeed, the standard for credible threat of enforcement is a "forgiving" one, such that "if a plaintiff's interpretation of a statute is reasonable enough[,] and under that interpretation, the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute." *Antonyuk v. James*, 120 F.4th 941, 1008 (2d Cir. 2024) (citation omitted); *Picard v. Magliano*, 42 F.4th 89, 98-99 (2d Cir. 2022) (considering for purposes of standing whether "conduct is 'arguably proscribed' by the challenged statute, not whether" it is "*in fact* proscribed") (citation omitted); *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013) (standing in the preenforcement context is a "low threshold" and is "quite forgiving," requiring a plaintiff to show only that enforcement of a statute against it "is not imaginary or wholly speculative" (citations omitted)). Here, the Act is designed to target Plaintiffs' members. The fact that DEC has not yet issued payment demands is of no moment, especially given that the agency has no discretion to decline to issue the demands required by the Act. § 76-0103(3)(e)(i). *See*, *e.g.*, *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (concluding plaintiff had standing because plaintiff's interpretation of statute was "reasonable enough that it

may legitimately fear that it will face enforcement," even where State claimed "no intention of suing [plaintiff] for its activities"). Thus, Plaintiffs' members have a strong basis to "legitimately fear that [they] will face enforcement" of the Act. *Antonyuk*, 120 F.4th at 1008 (citation omitted).

The substantial risk of the Act's enforcement also injures Plaintiffs' members by imposing ongoing and future compliance costs, financial uncertainty, and reputational harm. *See* ECF 216-2 ¶¶ 5, 10, 15, 20. Such ongoing burdens likewise establish injury in fact. *See SBA*, 573 U.S. at 158-59. Defendants present no evidence disputing the ongoing compliance injuries described in Plaintiffs' members' declarations. Nor, for that matter, do Defendants disclaim an intent to enforce the Act against Plaintiffs' members.

Instead, Defendants argue that compliance costs cannot support standing and are speculative because DEC has not yet issued formal cost-recovery demands. *See* ECF 230-1 at 22. That argument misunderstands both the statute and Article III. Standing does not require Plaintiffs to await the consummation of threatened injury. *See, e.g.*, *Tweed-New Haven Airport Auth.*, 930 F.3d at 70 (court found "little difficulty concluding that [plaintiff] suffered an injury-in-fact" because challenged state statute "directly target[ed]" plaintiff and plaintiff faced threat of enforcement); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 907 F. Supp. 2d 310, 328-29 (E.D.N.Y. 2012) (collecting cases explaining that present harms from future burdens satisfy Article III injury in fact). Where a statute by its terms targets a plaintiff and imposes present burdens, injury is established. *See SBA*, 573 U.S. at 158; *Tweed-New Haven Airport Auth.*, 930 F.3d at 70-71.

**B.    Statements showing the Act targets Plaintiffs' members are not hearsay.**

Attempting to avoid the Act's obvious intent to target Plaintiffs' members, Defendants mischaracterize the above legislative statements as inadmissible hearsay. *See* ECF 230-1 at 21. As an initial matter, those statements—all from government officials and legislators—are part of the Act's legislative history, and this Court can properly take judicial notice of those documents in

interpreting the Act. Indeed, courts routinely consider legislative history, hearing testimony, official reports, and government websites at both the motion-to-dismiss and summary-judgment stages. *See, e.g.*, *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022); *Real Est. Bd. of N.Y. v. City of New York*, 786 F. Supp. 3d 788, 802 (S.D.N.Y. 2025); *Doe v. Zucker*, 520 F. Supp. 3d 217, 229 (N.D.N.Y. 2021). These materials are properly before the Court as part of the legislative record.

More fundamentally, the legislative history documents and statements are not hearsay because they are not being offered in evidence for the truth of the matter asserted. Fed. R. Evid. 801(c)(2). These documents demonstrate legislative intent to target Plaintiffs' members, such that Plaintiffs' members have more than enough reason to credibly fear that the Act will be applied to them. *See, e.g.*, *CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 263 (2d Cir. 2009) (looking to statements of law's sponsors to determine legislative intent); *Reyes v. City of New York*, 141 F.4th 55, 69 (2d Cir. 2025) (similar). That is, these documents support the conclusion that Plaintiffs' named members meet the low threshold of showing that they face a substantial risk of receiving cost recovery demands, regardless of whether the quoted statements are true. Plaintiffs do not cite the "Approximate List of Covered Companies" memorandum to prove the precise list of covered companies, amount of emissions attributable to specific companies, or dollar amount of potential cost recovery demands. Rather, the memorandum shows that the Act's sponsors specifically designed the Act to target Plaintiffs' members. The same is true of the floor debate statement that "Exxon Mobil, Shell, BP, [and] Chevron" would "have to participate," ECF 216-2 ¶ 30 (record citation omitted). This statement is not offered to prove that those companies in fact have to participate; it is submitted to show that the Plaintiffs' members have been named by government officials as intended targets of the Act and thus have a reasonable fear of enforcement under it. The official Assembly memorandum's mention of "Chevron['s]" and "ExxonMobil['s] "capital

investments" and "profits" likewise demonstrates that these specific entities were contemplated and discussed during the legislative process—and thus further supports the credible threat of enforcement. ECF 230-11 ¶ 31 (record citation omitted).

Moreover, even if the statements above could somehow be considered hearsay, each fall within well-recognized hearsay exceptions, including the public-records exception under Federal Rule of Evidence 803(8). Official legislative memoranda, testimony, and agency materials are presumptively admissible in civil cases absent indicia of untrustworthiness, which New York does not allege. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000); *see also* Fed. R. Evid. 803(8)(B). Indeed, as noted above, Defendants do not contest the existence of these statements or who made them. *See supra* pp.8-9. Moreover, the statements from the Act's sponsors constitute "[a] statement of" their "then-existing state of mind" that they intended the Act to apply Plaintiffs' members. Fed. R. Evid. 803(3).

## II.     The Act is precluded by the U.S. Constitution.

Plaintiffs are entitled to summary judgment on Count I of their Complaint pursuant to binding Second Circuit precedent. Under the Constitution's basic structure and specific guarantees, only federal law may govern liability for interstate and international greenhouse gas emissions. New York cannot project its power beyond its borders to punish decades of lawful, out-of-state and foreign conduct or to rewrite national and global energy policy. *City of New York* forecloses New York's attempt to impose massive retroactive liability stemming from greenhouse gas emissions originating from out of state and, indeed, from around the world.

### A.     Under the U.S. Constitution, federal law governs liability for global greenhouse gas emissions, which precludes New York's Act.

The Constitution precludes the Act. Interstate and international greenhouse gas emissions implicate uniquely federal interests and must be governed by federal law. That principle is

confirmed by core structural limits of the Constitution on the sovereignty of other States, due process limits on extraterritorial legislation, and the federal Government's exclusive control of foreign affairs. Put simply, a State cannot project its power beyond its borders to dictate national and global outcomes, and New York's effort to do so is unconstitutional.

### 1. New York's Act invades a field that the Constitution reserves to federal law.

The Supreme Court has long held that some disputes necessarily concern "uniquely federal interests." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981) (citation omitted). In those areas, "our federal system does not permit the controversy to be resolved under state law." *Id.*; *see also Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 246 (2019) ("[T]he Constitution implicitly forbids" applying state law when the "interstate nature of the controversy makes it inappropriate for state law to control." (cleaned up)). This includes interstate and international pollution disputes. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 103 (1972) ("*Milwaukee I*") (federal law governs disputes involving "air and water in their ambient or interstate aspects"); *see also Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) (similar for interstate water disputes). In such areas, the "basic scheme of the Constitution" "demands" a federal rule of decision. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*").

Relying upon these principles, the Second Circuit has already rejected attempts to use *state law* to impose liability on fossil fuel producers for global greenhouse gas emissions. In *City of New York*, the Second Circuit recognized that "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air . . . pollution" because these disputes raise "an overriding need for a uniform rule of decision" and "basic interests of federalism," 993 F.3d at 91-92 (cleaned up). The Second Circuit held that the City's attempt to use New York state tort law to impose liability on energy companies for "the effects of emissions made around the

13

globe over the past several hundred years" is "simply *beyond the limits of state law*." *Id.* at 92 (emphasis added). Federal law precluded the claims because they would have imposed liability for emissions from every State and every foreign country and "implicate[d] the conflicting rights of states and our relations with foreign nations." *Id.* (citation omitted).

*City of New York*'s holding addresses preclusion of state law by federal law under the basic scheme of the Constitution. *Id.* at 90. The Second Circuit explained that in certain "few and restricted" enclaves—marked by both federal interests and a conflict between such interests and the operation of state law—federal law precludes state action. *See id.* at 89-90 (citation omitted). Compensation for harms allegedly caused by global greenhouse gas emissions is one such area. *See id.* at 91-92. In reaching that conclusion, the Second Circuit identified and explained the uniquely federal interests involved in addressing "global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *Id.* at 92-93. It also recognized that States have competing regulatory rights and interests over interstate emissions. *Id.* In short, the prohibition on state-law liability for out-of-state emissions is rooted "in the basic scheme of the Constitution" and in "basic interests of federalism." *Id.* at 90, 92 (citations omitted).

*City of New York* controls the outcome here. And to decide this case (and grant judgment in Plaintiffs' favor), the Court need go no further than that point. But "[a] growing chorus of state . . . courts across the United States" support the same result. *Bucks Cnty. v. BP P.L.C.*, 2025 WL 1484203, at *6 (Pa. Com. Pl. May 16, 2025). Courts in Maryland, New Jersey, South Carolina, and Pennsylvania have all held that state-law claims seeking to impose liability for the impacts of

14

global greenhouse gas emissions trespass into a field that only federal law can govern.[7] Those courts have relied upon the same premise that underlies *AEP* and *City of New York*: Under "the basic scheme of the Constitution," disputes about the global climate impacts of interstate and international emissions cannot be governed by fifty different state regimes. *City of New York*, 993 F.3d at 90 (quoting *AEP*, 564 U.S. at 421).

The federal Government also agrees that governance of interstate emissions is reserved to federal law. The United States has described climate-change claims based on transboundary emissions as "inherently and necessarily federal in nature." Br. for United States as Amicus Curiae in Support of Pet. for Reh'g at 8, *City of Oakland v. BP p.l.c.*, 969 F.3d 895 (9th Cir. Aug. 3, 2020) (No. 18-16663); *see also* Br. for the United States as Amicus Curiae Supporting Petitioners at 12-16, *Suncor Energy (U.S.A.) Inc. v. Cnty. Comm'rs of Boulder Cnty.*, No. 25-170 (Sept. 11, 2025). Most relevant, the United States has brought its own suit against New York's Act, *United States v. State of New York*, No. 1:25-cv-03656-PKC (S.D.N.Y.), and filed a statement of interest in this case, ECF 222, based on these same grounds.

In sum, though New York "is not expressly seeking to impose a standard of care or emission restrictions on [responsible parties], the goal of its [Act] is perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *City of New York*, 993 F.3d

---

[7] *See, e.g., City of Charleston v. Brabham Oil Co.*, No. 2020-CP-10-03975, at 4-5 (S.C. Ct. Com. Pl. Aug. 6, 2025); *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846, at *5 (N.J. Super. Ct. Law Div. Feb. 5, 2025); *Mayor & City Council of Balt. v. BP P.L.C.*, 2024 WL 3678699, at *6 (Md. Cir. Ct. July 10, 2024); *Bucks Cnty.*, 2025 WL 1484203, at *6; *City of Annapolis v. BP PLC*, 2025 WL 588595 (Md. Cir. Ct. Jan. 23, 2025); *Anne Arundel Cnty., Md.* v. *BP PLC*, 2025 WL 588595 (Md. Cir. Ct. Jan. 23, 2025); *but see Cnty. Comm'rs v. Suncor Energy USA, Inc.*, 2025 WL 1363355, ¶ 57 (Colo. 2025), *petition for cert. filed*, No. 25-170 (U.S. Aug. 8, 2025); *Honolulu v. Sunoco LP*, 537 P.3d 1173, 1199-200 (Haw. 2023), *cert. denied*, 145 S. Ct. 1111 (2025).

at 93. The Constitution does not allow a single State to impose such a global mandate.

Defendants strain to distinguish *City of New York*'s holding and its clear application to this case. These attempts fail.

*First*, Defendants misunderstand *City of New York*'s holding concerning the long-running application of federal law to interstate pollution disputes and its controlling application to New York's Act here. Defendants characterize Plaintiffs' argument as saying simply that federal common law preempts New York's Act. ECF 230-1 at 36-39. But that is incorrect. *City of New York* recognized that federal common law in this area of interstate greenhouse gas emissions existed because structural constitutional principles preclude the application of state law. 993 F.3d at 98. The Second Circuit reasoned that "where a federal statute displaces federal common law, it does so not 'in a field in which the States have traditionally occupied,' but one in which the states have traditionally *not* occupied." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). It held that it would be "too strange to seriously contemplate" that state law would be "presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one." *Id*. at 98-99. The same structural constitutional principles that barred the City's state-law claims in *City of New York* also bar New York's Act here—regardless of whether Congress has enacted a statute that displaces federal common law in relation to interstate greenhouse gas emissions.

*Second*, Defendants suggest that *City of New York* and the "mostly unbroken string of cases . . . appl[ying] federal law to disputes involving interstate air or water pollution," 993 F.3d at 91, are inapplicable because "they address only preemption of state common law" as opposed to state statutes, ECF 230-1 at 37-38. That argument also fails. *City of New York* refers to "state law" without qualification, and its holding that federal law alone governs attempts to impose

liability on global greenhouse gas emissions applies equally to state statutes as it does to state common-law claims. 993 F.3d at 92-93 ("Such a sprawling case is simply beyond the limits of *state law*. . . . To permit this suit to proceed under *state law* would further risk upsetting the careful balance that has been struck[.]") (emphasis added).

Decades of Supreme Court precedent confirm the Second Circuit's decision. In determining whether a state law is precluded, the operative question is not what the source or form of the state law is; but whether "our federal system . . . permit[s] the controversy to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641. And as explained above, *see supra* pp.13-16; *see also* ECF 216-1 at 10-14, our federal system does not permit disputes over interstate and international pollution to be resolved under state law, whether statutory *or* common law. *See AEP*, 564 U.S. at 421; *see also, e.g.*, *Milwaukee I*, 406 U.S. at 105 (1972) ("The question of apportionment of interstate waters is a question of 'federal common law' upon which state *statutes* or decisions are not conclusive." (emphasis added; citation omitted)); *Hinderlider*, 304 U.S. at 110 ("For whether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' upon which neither the *statutes* nor the decisions of either State can be conclusive." (emphasis added)). Thus, the Constitution precludes *all* state law on this question, requiring that federal law resolve the dispute. *See City of New York*, 993 F.3d at 89-90 ("[F]ederal common law functions much like legal duct tape—it is a 'necessary expedient' that permits federal courts to address issues of national concern until Congress provides a more permanent solution." (quoting *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981)).

Defendants cite no authority suggesting that *City of New York* would have reached a different outcome if the case had concerned a state statutory scheme assigning liability for global greenhouse gas emissions instead of claims for common-law damages. Nor could any such

authority be persuasive: The request for "damages for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet . . . is simply beyond the limits of state law." *City of New York*, 993 F.3d at 92.

> ## 2. Equal sovereignty, due process, and the foreign affairs doctrine all confirm that New York has crossed the Constitution's structural line.

Specific constraints in the Constitution further confirm the Second Circuit's decision that New York is precluded from imposing liability for interstate and global greenhouse gas emissions.

**Equal Sovereignty and Due Process.** The Constitution limits States' ability to legislate outside of their borders. One limit is the "obviously . . . necessary result of the Constitution" that a State's sovereignty is limited by the sovereignty of other States. *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980) ("The sovereignty of each State . . . implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment."). Equal sovereignty guards each State's right to control affairs within its borders and to be free from domination by another State. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring) ("We have long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests.").

A second structural limit is the Due Process Clause, and the principles of interstate federalism it embodies. Due process limits a State's power to legislate beyond its territory. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023). Indeed, the Supreme Court's due process jurisprudence has "continued to recognize that constitutional restrictions on state court jurisdiction . . . reflect 'territorial limitations' on state power." *Mallory*, 600 U.S. at 156 (2023) (Alito, J., concurring) (citation omitted).

Here, the Act treats New York as sovereign over conduct—the extraction and refining of fossil fuels and global emissions of greenhouse gases from the use of those fossil fuels—that occurred almost entirely beyond its borders.[8] By asserting the power to impose $75 billion in penalties based upon that out-of-state, and indeed global, activity, *see* § 76-0101(8), New York seeks to override the energy choices of its sister States and the federal Government, and to punish lawful conduct that those governments have chosen to permit and, often, to encourage. Longstanding Supreme Court precedent forbids this sort of extraterritorial projection of power: "[W]ithout throwing down the constitutional barriers," a State may not govern conduct wholly beyond its own borders. *N.Y. Life Ins. Co.*, 234 U.S. at 161; *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982).

Defendants argue that the Act does not violate due process because it "limits liability to parties whose contacts with New York satisfy [the Due Process Clause]," ECF 230-1 at 44, but Defendants miss the point of Plaintiffs' discussion of due process. The limits imposed by due process, like the principle of equal sovereignty and the allocation of the foreign affairs powers, support the overall constitutional preclusion argument that Plaintiffs advance in Claim I.[9] Those principles reveal how the Constitution constrains the States merely by virtue of its structure. This Court need not find that New York's Act violates each of those limits to apply *City of New York* and conclude that the Constitution precludes the Act.

---

[8] Defendants do not dispute that New York's Act applies almost exclusively to extraterritorial conduct. *See* ECF 230-11 ¶¶ 33-34 (Defendants do not dispute that "[t]he majority of fossil fuel extraction and refining activities in the United States and worldwide occurred beyond New York's borders for the 25-year period covered by the Act" or that "New York produces only a 'small amount of natural gas and crude oil'" and "has no coal mines or oil refineries").

[9] Plaintiffs raised distinct Due Process claims in Count III of their Complaint and reserve the right to pursue those claims in the event this case proceeds beyond Plaintiffs' motion for partial summary judgment under Counts I and II. *See* Complaint, *Chamber of Commerce v. James*, No. 1:25-cv-01397-BKS-DJS (N.D.N.Y.), ECF 1 ¶¶ 156-82.

Turning to Defendants' discussion of due process on the merits, it is important to distinguish between (1) due process limits on the *judicial* power in the form of limitations on personal jurisdiction over non-citizens and (2) due process limits on *legislative* power over extraterritorial conduct. A State cannot escape the Constitution's territorial limits on its power to regulate conduct by pointing to some forum contacts that would—according to Defendants—support New York courts' exercise of personal jurisdiction. *Fuld* makes clear that "[s]tate sovereign authority is bounded by the States' respective borders," and that due process protects "interstate federalism," as well as individual rights. 606 U.S. at 14 (quoting *World-Wide Volkswagen*, 444 U.S. at 293; *see also Mallory*, 600 U.S. at 156 (Alito, J., concurring). Here, the Act applies to wholly out-of-state activities—*e.g.*, to fossil fuels extracted in Texas, refined in Louisiana, and used in Asia, well beyond the territorial jurisdiction of New York.

Defendants assert that "[c]ourts have long recognized that States may apply their laws to out-of-state actors whose actions have in-state consequences." ECF 230-1 at 44-45; *id.* at 42 n.18. But the cases Defendants rely on to support this argument are readily distinguishable. Take *Calder v. Jones*, 465 U.S. 783 (1984), for example. ECF 230-1 at 44. *Calder* involved an allegedly libelous article that was written in Florida about a plaintiff in California and published in California, causing the plaintiff's injury in California. *See* 465 U.S. at 788-90. The question there was whether California could assert personal jurisdiction over the defendants, not whether California's law, rather than Florida's, could be applied to the allegedly libelous conduct at issue. *See id.* at 789. And while *Young v. Masci*, 289 U.S. 253 (1933), at least addressed a question of legislative jurisdiction under the due process clause, the Court was clear that it "ha[d] no occasion to decide where the line is to be drawn generally between conduct which may validly subject an absent party to the laws of a state and that which may not," *id.* at 260.  Instead, it held only that when "Young gave

20

permission to drive his car to New York, he subjected himself to the legal consequences imposed by that state" for harms caused by the driver of that car, even though Young was "a citizen and resident of another state." *Id.* at 258-60. The Court thus allowed the application of state law to an injury *caused by conduct occurring entirely within that State* but authorized outside it.

That narrow decision hardly supports the Act. The Supreme Court has already recognized that greenhouse gases, once emitted, "become well mixed in the atmosphere," *AEP*, 564 U.S. at 422 (citation omitted), and "cannot be traced to their source." *City of New York*, 993 F.3d at 92 (record citation omitted). As the Supreme Court explained, greenhouse gas "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422; *see also Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1009 (9th Cir. 2025) ("[T]here is limited scientific capability in assessing, detecting, or measuring the relationship between a certain greenhouse gas emission source and localized climate impacts in a given region." (cleaned up)). And, on its face, the Act states that it will impose liability based upon global activities that allegedly contributed indirectly to in-state harm by way of emissions caused by independent acts of countless third parties all around the world. *See* § 76-0101(8). The Act also sets a dollar amount for New York's supposed injuries without engaging in any computation to support it. *See* N.Y. State Assemb., June 7, 2024 Chamber Debate, 2023-24 Legislative Session, at 350-51 (June 7, 2024), https://perma.cc/B4BA-8KMU (New York's selection of $75 billion was "just like Goldilocks," with "really no . . . scientific reason or economic reason [for] pick[ing] those numbers") (cited at 216-15 ¶ 25). New York's Act is thus no mere cost recovery mechanism for in-state injuries resulting from purely in-state conduct, but a projection of power worldwide that implicates the "conflicting rights of states and our relations with foreign nations." *City of New York*, 993 F.3d at 92 (cleaned up).

Attempting to avoid that obvious conclusion, New York relies upon a declaration from Dr. Justin S. Mankin to argue that "local harms can be attributed to specific sets of emissions, including emissions attributable to a specific company." ECF 230-1 at 45-46. But Dr. Mankin's declaration is irrelevant to the disposition of this motion, as is further explained in Plaintiffs' motion to strike.[10] Additionally, the Second Circuit has already rejected this same concept. *See, e.g.*, *City of New York*, 993 F.3d at 92 ("Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere." (record citation omitted)). *See supra* p.21. And it has also made clear that, regardless, compensation for such alleged harms attributed to worldwide conduct is simply beyond the reach of state law. *See City of New York*, 993 F.3d at 92.

Moreover, even if Dr. Mankin's attribution theory were correct (it is not), it still would not support this Act. By his own description, Dr. Mankin's multi-step "chain of causation" requires that he "connect[] changes in emissions to changes in greenhouse gas concentrations; changes in such concentrations to changes in warming; changes in warming to changes in extremes and hazards; and changes in hazards to consequent damages." Mankin Decl. ¶ 34, ECF 230-5; *see also id.* ¶ 31. New York plainly did not engage in any such calculation in adopting this Act or setting the cost demand it seeks. Nor does Dr. Mankin purport to engage in such calculation. *Id.* ¶ 23.[11]

---

[10] As the motion to strike explains, Plaintiffs reserve the right to challenge Dr. Mankin's methodology and conclusions if this case proceeds beyond cross-motions for summary judgment.

[11] Defendants and amici also draw comparisons to the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). ECF 230-1 at 46-47; ECF 233-2 at 6. For starters, assuming that Congress has authority to enact legislation like CERCLA, that does not mean that New York may impose liability based on global greenhouse gas emissions. *Cf. United States v. Comstock*, 560 U.S. 126, 144 (2010) ("The powers delegated to the United States by the Constitution include those specifically enumerated powers listed in Article I along with the implementation authority granted by the Necessary and Proper Clause. Virtually by definition, these powers are not powers that the Constitution reserved to the States [under the Tenth Amendment]." (cleaned up)). Moreover, New York's Act is entirely distinct from CERCLA. CERCLA requires all parties (from a variety of industries) who owned or operated a contaminated site or

**Foreign Affairs.** The foreign affairs doctrine likewise underscores the Constitution's structural limits on States' authority in this area. "The supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution." *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). Thus, the foreign affairs doctrine reserves to the federal Government alone the conduct of foreign relations and the setting of foreign policy. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964); *see also Zschernig v. Miller*, 389 U.S. 429, 442-43 (1968) (Stewart, J., concurring) ("Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." (citation omitted)). And here, the United States has explained why the Act interferes with the federal government's conduct of foreign affairs. *See* ECF 222 at 6 (explaining that the Act "clashes with 'our nation's foreign policy goals'" and "intrudes on the field of foreign affairs without addressing a traditional state responsibility" (citations omitted)).

Defendants insist the Act does not collide with any specific U.S. foreign policy and does not intrude into an area of uniquely federal interest. ECF 230-1 at 49-50. This is a reprise of an argument the City made in *City of New York*: "[n]o federal policy or statute regulates the relief sought in this suit—compensation for local harms that result from fossil-fuel production—or purports to prevent state-law tort suits seeking such relief. . . . Absent an identifiable federal policy, there is no uniquely federal interest that can conflict with this suit for damages from the production

---

transported or disposed of particular hazardous substances to clean up (or pay for) the particular contamination at a particular site within the United States that has some nexus to their conduct or ownership. By contrast, New York's Act is neither site-specific nor tied to specific entities and conduct associated with a specific polluted site and its contamination. Rather, New York's Act imposes strict liability upon a handful of energy producers for global greenhouse gas emissions from the worldwide use of fossil fuels by countless individuals and entities (including the State itself), and would use the penalties imposed on those energy producers to fund future projects across the State. § 76-0101(3).

and sale of an inherently harmful product." Appellant's Br. at 32-33, *City of New York*, 993 F.3d 81 (2d Cir. Nov. 8, 2018) (No. 18-2188), 2018 WL 5905772 ("Appellant's Br., *City of New York*").

The Second Circuit disagreed, holding that States' attempts to impose liability for global greenhouse gas emissions interfere with foreign affairs. Global greenhouse gas emissions, it held, "implicate[] the conflicting rights of states and our relations with foreign nations." *City of New York*, 993 F.3d at 92 (cleaned up). And such emissions intersect with the United States' decisions about whether and how to join treaties, how to balance energy security with climate goals, and whether to join or resist international "liability and compensation schemes." *Id.* at 103 n.11.

That precedent plainly controls here. New York is seeking compensation based upon the same theory of liability for global greenhouse gas emissions.[12] New York's Act cuts across the very same foreign-relations policies on greenhouse gas emissions that the Second Circuit relied on in *City of New York*. And as the declaration from Deputy Secretary of State Christopher Landau[13] explains, New York's Act "directly conflicts with . . . U.S. foreign policy in multiple respects," including that it "would increase costs for energy producers with ties to New York, which could in turn increase energy costs for U.S. consumers, thereby undermining crucial U.S. policy and national security interests in increasing affordable domestic energy." ECF 222-1 ¶ 15. The Act

---

[12] Defendants fail in seeking to distinguish *City of New York*'s discussion of the impact of imposing liability for global greenhouse gas emissions upon foreign affairs. It does not matter that the Second Circuit cited "federal common law cases" or discussed "public nuisance claim[s]." ECF 230-1 at 51 n.234-24. What matters is the Court's reasoning, which is necessary to and thus part of its holding. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996) (explaining the Court must "adhere . . . to the well-established rationale upon which the Court based the results of its earlier decisions"); *see also CompassCare v. Hochul*, 125 F.4th 49, 59 (2d Cir. 2025) (holding that the "portion[ ] of the opinion necessary to [the] result" in a previous panel decision constitutes Second Circuit "precedent" (quoting *Seminole Tribe of Fla.*, 517 U.S. at 67)).

[13] As "the principal deputy, adviser, and alter ego to the Secretary of State, the President's chief foreign affairs advisor," Deputy Secretary Landau "assist[s] the Secretary in the formulation and conduct of U.S. foreign policy and in giving direction to all elements of the Department of State." ECF 222-1 ¶ 1.

would also impose "the establishment of liability and compensation schemes" for energy produc-
ers, which "the United States has long opposed," thereby "foment[ing] new frictions in interna-
tional climate negotiations by targeting fossil fuel companies for actions they took overseas." *Id.*
¶ 16.[14] This Court should afford significant weight to Deputy Secretary Landau's statements re-
garding the New York Act's impact on U.S. foreign policy.[15]

      Defendants rely upon a declaration from Professor Harold Koh of Yale Law School to try
to dispute the foreign affairs implications of the Act. But the Court should disregard that declara-
tion, as it is inadmissible legal (not factual) opinion. Indeed, the declaration provides no relevant
*evidence*, as it is largely a legal brief in the guise of an "expert declaration." Professor Koh simply
"opine[s] on international law, multilateral agreements, and United States climate policy," and
"conclude[s] that the [Act] is consistent with international environmental law and agreements."
Koh Decl. ¶¶ 10, 36, ECF 230-8. But the Second Circuit already explained why state-law liability
like that imposed in the Act implicates foreign affairs. *See City of New York*, 993 F.2d at 92.
Moreover, Professor Koh discusses the federal Government's "ongoing intergovernmental climate
negotiations" without having any personal knowledge concerning the United States' current for-
eign policy positions, negotiations, or decision-making process. Koh Decl. ¶ 34. Even if Professor

---

[14] Defendants argue that "the United States has only opposed any requirement that *it*—not
private entities—compensate foreign governments for the impacts of historical emissions from
domestic sources." ECF 230-1 at 53. But the Second Circuit still credited that fact to support its
conclusion that permitting the City to impose liability for global greenhouse gas emissions "would
obviously sow confusion and needlessly complicate the nation's foreign policy, while clearly in-
fringing on the prerogatives of the political branches." *City of New York*, 993 F.3d at 103 & n.11.

[15] *See, e.g.*, *Kumar v. Republic of Sudan*, 880 F.3d 144, 157 (4th Cir. 2018) ("In foreign
affairs matters . . . , we afford the view of the Department of State 'substantial deference.'" (cita-
tions omitted)); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 951 n.14 (5th Cir.
2011) ("Courts have found Statements of Interest to be useful where cases involve questions of
foreign relations. . . . While a Statement of Interest does not bind us, we must 'give serious weight
to the Executive Branch's view of the case's impact on foreign policy.'" (citation omitted))).

Koh's interpretation of international agreements were correct, it does not change the fact that the Act intrudes into an area of international importance where only the federal Government may govern. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319-20 (1936). Professor Koh asserts no direct personal knowledge of the present administration's efforts in that regard, and his view of what prior administrations did is of no bearing on Plaintiffs' claims. In short, this Court should disregard Professor Koh's declaration "because it contains impermissible legal conclusions and factual assertions not based on personal knowledge." *Haight v. NYU Langone Med. Ctr., Inc.*, 2016 WL 29628, at *5 (S.D.N.Y. Jan. 4, 2016); *United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994); *see also* Reply at 31, *United States v. State of New York*, No. 1:25-cv-03656-PKC (S.D.N.Y. Nov. 19, 2025), ECF 99.

*    *    *

The Constitution does not allow a single State to project its power beyond its borders to control national and global conduct. A long line of precedent, including *City of New York*, establishes that federal law must govern any liability relating to out-of-state greenhouse gas emissions. And multiple constitutional provisions and doctrines confirm that New York's Act goes too far. In sum, the Constitution allocates disputes over global greenhouse gas emissions to federal law.

**B.    There is no genuine factual dispute about whether the Act is an impermissible regulation imposing liability for global greenhouse gas emissions.**

Perhaps aware that *City of New York* dooms the Act, Defendants attempt to manufacture a factual dispute about the function of the Act to evade summary judgment. Defendants try to characterize the Act as a compensation scheme unrelated to greenhouse gas emissions, contending that it does nothing to regulate, abate, or control emissions. Moreover, they assert that the Act does not otherwise impact energy producers' behavior because it is a one-time, retroactive fee that one economist thinks might not affect pricing or production of fossil fuels. Therefore, according to

26

Defendants, the Act does not "regulate[ ] out-of-state and global greenhouse gas emissions" and cannot be precluded by the Constitution or preempted by the CAA. ECF 230-1 at 23.

The Court should reject this red herring. Constitutional preclusion is *not* dependent upon whether a particular law "regulates" emissions. Rather, imposing liability for global greenhouse gas emissions is "simply beyond the limits of state law." *City of New York*, 993 F.3d at 92. That is because the doctrine of constitutional preclusion turns on the federal interests at play and "basic interests of federalism." *Id.* at 91-92. Here, the "'overriding ... need for a uniform rule of decision' on matters influencing national energy and environmental policy," is plainly implicated, as exhibited by the United States' assertion that the Act interferes with its sovereign interests. *Id.*

Even accepting *arguendo* New York's assertions that this Act is a one-time, retroactive penalty that will be absorbed as a loss by America's largest energy producers, a penalty of $75 billion imposed upon such producers will invariably impact national energy and environmental policy. If replicated—as it already has been by Vermont—the scope of influence exerted by States over national energy policy will only grow and further implicate the basic interests of federalism that have brought 22 States into this Court to challenge a sister State's law. *See id.* at 92 (amicus briefs filed by "the federal government, the District of Columbia, and 23 states . . . aptly illustrates that this is an interstate matter raising significant federalism concerns"); *cf. Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (considering, under a extraterritoriality analysis, "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.").

Moreover, even if the characterization of this law as a "regulation" were relevant to the constitutional preclusion question (it is not), the Second Circuit has already held that liability under state law for global greenhouse gas emissions *is*, by definition, a form of regulation that intrudes

upon an area of exclusive federal authority. *City of New York*, 993 F.3d at 92. Defendants cannot

escape that *legal conclusion* with their economist's (incorrect) opinion.

**1.** Defendants argue that the Act "does not regulate cross-border pollution." ECF 230-1 at

25. Instead, according to Defendants, the "Act requires fossil fuel companies to compensate the

State of New York for harm from past greenhouse gas emissions, not to limit or otherwise control

ongoing emissions" like "nuisance actions" brought by states to "abate pollution emanating from"

other states. *Id.* (citation omitted).

Yet again, Defendants recycle a position that the Second Circuit rejected. In *City of New*

*York*, the City argued that "because it [sought] damages—not abatement or the imposition of pol-

lution standards—its claims d[id] not threaten to regulate emissions at all[.]" 993 F.3d at 92. It

further noted that its "complaint expressly disclaims any attempt to impose liability based on De-

fendants' emissions of greenhouse gases," that "[n]owhere does the complaint seek the imposition

of emissions standards," and that "the City seeks only compensation for the harms it has been

forced to bear by Defendants' products." Appellant's Br. at 9, *City of New York*.

The Second Circuit rejected that argument. It held that the City's assertion "ignores eco-

nomic reality," that "'regulation can be effectively exerted through an award of damages,' and

[that] 'the obligation to pay compensation can be, indeed is designed to be, a potent method of

governing conduct and controlling policy.'" *City of New York*, 993 F.3d at 92 (quoting *Kurns v.*

*R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012)).[16] Accordingly, the Second Circuit held, as

---

[16] The Second Circuit's holding applied decades of Supreme Court precedent holding that claims for compensatory damages constitute regulation. *See, e.g.*, *Kurns*, 565 U.S. at 637; *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246-47 (1959) ("Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief."); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 n.17

a matter of law, that "a substantial damages award like the one requested by the City would effectively regulate the Producers' behavior far beyond New York's borders." *Id.*

The same is true of New York's Act. Just like the "substantial damages award" that the City sought for past conduct in *City of New York*, New York's Act seeks to impose substantial, backwards-looking penalties on energy producers for global greenhouse gas emissions under a strict liability theory. The City "requested compensatory damages for the past and future costs of climate-proofing its infrastructure and property." *Id.* at 88. Specifically, it sought "a money judgment"—that is, "[c]ompensatory damages"—"for the costs already incurred by the City," as well as "the costs of actions" it was "currently taking" and "needs to take" in the future "to protect City infrastructure and property, and to protect the public health, safety, and property of its residents from the effects of climate change." Am. Compl. ¶ 13 & pp.73-74, *City of New York v. Chevron*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018) (No. 18-cv-182-JFK), 2018 WL 8064051 ("Am. Compl., *City of New York*"). New York's Act almost identically seeks to "compensate[ ] the State of New York for the impacts that climate change poses to health, safety, and well-being." ECF 230-1 at 26; *see also* § 76-0101(3) (defining "adaptive infrastructure project[s]" to include "projects designed to avoid, moderate, repair, or adapt to negative impacts caused by climate change, and to . . . prepar[e] for future climate change-driven disruptions"); *see* S.2129-B § 6(c), 2023-2024 Sess. (N.Y. 2024) (Act's $75 billion assessment "represents" the "cost to New York State for repairing from and preparing for climate change-driven extreme events over the next 25 years").

_____

(1996) ("State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute."). Relatedly, the United States has consistently taken the position that common-law tort suits constitute government regulation. *See, e.g.*, Br. for the United States as Amicus Curiae Supporting Resp. at 8-9, *C.H. Robinson Worldwide, Inc. v. Miller*, 142 S. Ct. 2866 (2022) (No. 25-1425), 2022 WL 1670803 ("This Court has repeatedly recognized in its preemption jurisprudence that a State's common law of torts is a manifestation of a State's 'regulatory' authority." (citation omitted)).

In short, both the City's damages claim in *City of New York* and the Act's cost recovery demands seek the same prohibited remedy: compensation for the alleged effects of climate change attributed to global greenhouse gas emissions. As the Second Circuit explained, this "obligation to pay compensation" is a form of "potent" regulation "governing conduct and controlling policy." *City of New York*, 993 F.3d at 92 (citation omitted).[17] That is because the "legislatively authorized fines" of the Act, like tort "damages" in *City of New York*, are forms of "economic sanctions" that can change businesses' "lawful conduct in other States." *Gore*, 517 U.S. at 572.

And under *City of New York*, a retroactive penalty is just as much a regulation of greenhouse gas emissions as an award of compensatory damages. Indeed, if New York's Act is upheld, it can easily be amended or reenacted multiple times over.[18] That means that energy producers are on notice that their ongoing production and refining can expose them to the same liability, a risk that will prospectively influence behavior. It is this *risk of, or potential for,* the *existing law* to be extended or reenacted, in New York and other jurisdictions, that businesses must take into account, just as a previous award of damages puts them on notice of the risk they could be sued again.[19]

---

[17] It also did not matter to the Second Circuit that the City expressly disclaimed that it was "seek[ing] to impose liability on Defendants for their direct emissions of greenhouse gases" or "to restrain Defendants from engaging in their business operations." Am. Compl. ¶ 14, *City of New York*. It was the City's attempt to collect compensatory damages to pay for the costs of climate change that the Second Circuit held to be unlawful regulation. *City of New York*, 993 F.3d at 92; *see also id.* at 96 ("[T]he City's claims, if successful, would operate as a de facto regulation on greenhouse gas emissions.").

[18] This is not mere speculation or a hypothetical risk. Indeed, a 2022 New York bill proposed imposing a $30 billion total cost, S.9417 § 3, 2021-2022 Sess. (N.Y. May 25, 2022), which was increased a year later to $75 billion in the operative Act. Then, within three months of the law's enactment, New York amended the law to extend its covered period from 2000-18 to 2000-24. *Compare* S.2129-B § 3, 2023-2024 Sess. (N.Y. Dec. 26, 2024) *with* S.824 § 3, 2025-2026 Sess. (N.Y. Feb. 28, 2025).

[19] Energy producers must take account of New York's Act in the context of their nationwide obligations and risks, including retroactive liability laws enacted in other States. Vermont

**2.** Defendants make several counterarguments. Each fails.

*First*, Defendants argue that Plaintiffs may not rely on the plain reasoning of *City of New York* because, they argue, the "findings" in that case "are not subject to judicial notice because they are not 'generally known' or 'accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" ECF 230-1 at 30-31 (quoting Fed. R. Evid. 201). But Defendants confuse adjudicative facts with legislative facts. *See* Fed. R. Evid. 201(a) advisory committee's note to 1972 amendment ("Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."). This Court need not take judicial notice of any adjudicative facts in *City of New York*; rather, it need only apply the Second Circuit's legal reasoning and holding concerning government attempts to impose liability under state law for global greenhouse gas emissions. Part of that holding is the conclusion that such attempts to impose liability are, as a matter of law, regulation of greenhouse gas emissions. *City of New York*, 993 F.3d at 92-93.

*Second*, Defendants argue that even if the Act regulated emissions by causing energy producers to make changes to pollution control and production, "production decreases or other impacts do not constitute regulations on greenhouse gas emissions." ECF 230-1 at 30. But, as explained above, the Second Circuit held exactly the opposite in *City of New York*. 993 F.3d at 92-93. Even if the Act's penalties "regulate cross-border emissions in an indirect and roundabout manner" by decreasing production (and thereby decreasing greenhouse gas emissions) or resulting in new means of pollution control, the Act "regulate[s] them nonetheless." *Id.* at 93; *see also NRDC*

---

has enacted a similar law and nearly a dozen states are considering similar legislation. *See* Amanda G. Halter, et al., *Climate Superfund Map*, Pillsbury (Feb. 1, 2026), https://perma.cc/Q6HV-SKMV.

*v. NHTSA*, 894 F.3d 95, 104-05 (2d Cir. 2018) ("The notion that financial incentives deter environmental misconduct is hardly novel . . . [as] common sense and basic economics tell us that increased cost of . . . conduct will make that conduct less common." (cleaned up)); *cf. Ind. Harbor Belt R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1177 (7th Cir. 1990) (Posner, J.) (discussing how strict liability regimes incentivize parties to alter business practices, including by "relocating, changing, or reducing (perhaps to the vanishing point) the activity giving rise" to liability).

*Third*, Defendants argue that the Act does not regulate greenhouse gas emissions because it does not impact energy producers' behavior. ECF 230-1 at 32 (arguing that the Act does not "regulate cross-border emissions" because "it has no impact on future fossil fuel production"). This is a thinly-veiled attempt to reframe a question of settled law into a "factual" dispute to escape summary judgment. In support of this argument, Defendants rely upon an opinion by Dr. Don Fullerton, who claims in his declaration that the Act's retroactive, one-time penalty is a "fixed cost that will not lead companies to decrease production or alter any incentives to invest or innovate, including by implementing additional pollution controls." ECF 230-1 at 26.

But whether academics categorize the Act's penalties as fixed costs instead of variable costs is legally irrelevant. It is irrelevant because (once again) the Second Circuit already rejected the argument. In *City of New York*, even when the factual allegations in New York City's complaint were assumed to be true and all inferences were made in the City's favor, the Second Circuit nonetheless held as a matter of law that an "obligation to pay compensation," such as a "damages award," is a means of regulation. 993 F.3d at 92-93 (citation omitted).[20] That was a categorical

---

[20] Amici note that the City also sought injunctive relief, ECF 233-2 at 12, but they leave out a critical detail: The City sought an injunction only "if the Defendants fail to pay the court-determined damages for the past and permanent injuries inflicted." Am. Compl. ¶ 13, *City of New York*; *City of New York*, 993 F.3d at 92 n.5. The Second Circuit relegated that issue to a footnote

holding that requiring private companies to pay for climate change resulting from global green-house gas emissions—regardless of the form of the payment—impermissibly regulates emissions. This Court should disregard Dr. Fullerton's contrary declaration.[21]

Even if the Court were to consider Dr. Fullerton's opinion, it could not support summary judgment for Defendants. The West Virginia Plaintiffs have submitted a declaration by Dr. Benjamin Zycher that rebuts Dr. Fullerton's assertions. Dr. Zycher's declaration explains how the Act is likely to impact energy producers' behavior, affecting both price and production of fuel. *See* Zycher Decl. ¶¶ 5, 29-30, ECF 217-26. Likewise, Plaintiffs have submitted unrebutted evidence that the Act would result in "notable consequences for ExxonMobil, its projects, and its planning" because the "significant cost recovery demands would have to be paid, and the funds to make that payment would have to come from somewhere, forcing energy producers . . . to make strategic business decisions about capital investments, production volumes, planning, prices, contracts, and personnel." Swarup Decl. ¶ 25; *see also* Meyer Decl. ¶ 18; Durbin Decl. ¶ 21; Sweeney Decl. ¶ 16; Pokalsky Decl. ¶ 18. Those "business decisions," Swarup Decl. ¶ 25, will directly impact extraction and refining activities, and consequently, any greenhouse gas emissions attributable to the use of fossil fuel produced from those activities.

Thus, if the Court both disagrees that the likely effects on energy producers' behavior are irrelevant to the constitutional preclusion issue under *City of New York* and is inclined to consider Dr. Fullerton's declaration, then the competing Dr. Zycher declaration and evidence submitted by Plaintiffs would create a factual dispute that would prevent this Court from granting Defendants'

---

and based its key holding—that the City's attempt to impose liability for global greenhouse gas emissions constituted an unlawful regulation—on the City's claim for *damages*. *See City of New York*, 993 F.3d at 92-93.

[21] Plaintiffs are also filing a motion to strike Dr. Fullerton's declaration (as well as the declarations of Dr. Mankin and Professor Koh, *see supra* p.22; *infra* pp.25-26).

cross-motion for summary judgment. Again, there is no factual dispute preventing the entry of summary judgment *for Plaintiffs* here, given *City of New York*.

### III.    The Clean Air Act preempts the Act because it imposes liability for greenhouse gas emissions originating in other States.

In addition to being constitutionally precluded, New York's Act is statutorily preempted by the CAA because it seeks to impose liability for domestic greenhouse gas emissions originating in other States. *See* ECF 216-1 at 19-23. New York's authority to impose liability for *any* greenhouse gas emissions is limited to the "slim reservoir" of emissions originating within New York's borders. *City of New York*, 993 F.3d at 100; *Ouellette*, 479 U.S. at 494. Because the law, on its face, imposes liability for *global* greenhouse gas emissions, it exceeds the bounds of state authority under the CAA and is preempted.

**1.** Defendants argue that the Act is entitled to a presumption against preemption under traditional statutory preemption analysis because the Act regulates within the State's "traditional" authority to "protect the health and safety of [its] citizens." ECF 230-1 at 25-26 (citation omitted). Defendants are wrong.

*First*, there is no presumption against preemption because the Act falls outside New York's "traditional powers" regarding its citizens "health, safety, and well-being." ECF 230-1 at 26. Instead, liability for global greenhouse gas emissions is an area "in which the states have traditionally *not* occupied." *City of New York*, 993 F.3d at 98. Indeed, courts have long held that federal law must apply to "disputes involving interstate air . . . pollution." *Id.* at 91; *see supra* pp.13-16. That is just as true for New York's Act.

Defendants assert again that the Act "does not regulate cross-border pollution" and is distinct from claims to abate pollution from another State, ECF 230-1 at 25-26, but these arguments are just a repackaging of the same arguments the Second Circuit rejected in *City of New York*. 993

F.3d at 91 (rejecting argument that "because it seeks damages rather than abatement," the City's "claims will not result in the regulation of global emissions"); *see supra* pp.28-30. And there the Second Circuit held that the City's claims involved an area of traditional *federal* authority where the City, just like New York's Act here, sought compensation "to protect the health, safety, and property of its residents from the impacts of climate change." Am. Compl. ¶ 13, *City of New York*.

*Second*, because *Ouellette* and *City of New York* speak directly to the preemption question at issue here, this Court can (and should) simply apply those precedents. Under these cases, States' authority under the CAA "is narrowly circumscribed, and has been interpreted to permit only state lawsuits brought under 'the law of the pollution's *source* state.'" *City of New York*, 993 F.3d at 100 (cleaned up; quoting *Ouellette*, 479 U.S. at 497). Thus, under the CAA, New York may not impose liability under its state law from greenhouse gas emissions that originate from other States.

Because the Act, on its face, applies to greenhouse gases emitted from all States in the Union (and from every country around the world), it falls outside the "slim reservoir" of state authority under the CAA. *Id.* at 100. Indeed, the Act expressly imposes liability for "emissions attributable to all fossil fuel extraction and refining worldwide" and does not "limit[ ]" its reach to "emissions within [New York]." § 76-0101(8). "The [CAA] therefore does not authorize" New York's Act, "meaning that" New York's attempt to impose liability for "domestic emissions [is] barred." *City of New York*, 993 F.3d at 100; ECF 216-1 at 19-23.

Defendants argue that *City of New York* "did not analyze preemption by the [CAA]," ECF 230-1 at 31, but instead "reasoned that" because the CAA displaced federal common law, the City's "state common law claim could be revived only by one of the [CAA's] savings clauses and found that it was not." ECF 230-1 at 31-32. But Defendants read *City of New York*'s reasoning and its application of *Ouellette* too narrowly.

After holding that only federal law can create liability for global greenhouse gas emissions and that the CAA has displaced federal common law with respect to domestic emissions, the Second Circuit considered whether the CAA authorized the City's state-law claims. *City of New York*, 993 F.3d at 90-100. The City argued that it could still bring its state-law claims because the CAA's displacement of federal common law meant that its state claims "snap[ped] back into action unless specifically preempted by statute." *Id.* at 98; *see* Appellant's Br. at 16-17, *City of New York*. Applying the Supreme Court's reasoning from *Ouellette*, the Second Circuit concluded that the City's *state-law claims* could survive only if they were authorized by the CAA. Because the CAA did not authorize those claims concerning out-of-state greenhouse gas emissions, the City's state-law claims "concerning domestic emissions [we]re barred." *City of New York*, 993 F.3d at 100. That same reasoning, which was essential to the Second Circuit's holding, applies equally here because New York attempts to impose its law based on emissions originating in other States.[22]

Defendants otherwise argue that *City of New York*'s interpretation of *Ouellette* should not apply, repeating their arguments that the Act does not abate or control pollution. ECF 230-1 at 27-36. But for the reasons explained above, *City of New York*'s reasoning applies equally to the Act. *See supra* pp.28-30. Thus, this Court need not conduct a traditional preemption analysis—it can (and should) simply hold that the Act is preempted under *City of New York* and *Ouellette*.

---

[22] It is telling that after making its half-hearted attempt to distinguish *City of New York*, Defendants fall back to reserving "the right to argue that *City of New York* was wrongly decided." ECF 230-1 at 32 n.11. Some of the cases Defendants cite to support this fallback argument involve a separate issue not relevant here—removal to federal court based upon the complete preemption doctrine. That issue involves a separate, "heightened standard unique to the removability inquiry." *City of New York*, 993 F.3d at 94; *see also D.C. v. Exxon Mobil Corp.*, 89 F.4th 144, 153 n.5 (D.C. Cir. 2023) (acknowledging the "Second Circuit expressly did not decide" the complete preemption removal question) (citing *City of New York*, 993 F.3d at 93)).

**2.** If this Court nevertheless were inclined to conduct a traditional preemption analysis, it would be obliged to reach the same conclusion. To begin, the Act is field preempted because the CAA occupies the field of interstate air pollution. Although Congress has authorized States to regulate emissions originating from within their borders, federal law has never permitted States to use their laws to address emissions from outside their borders. This is consistent with the Supreme Court's holding in *Ouellette*, where the Court rejected the contention that a savings clause of the Clean Water Act ("CWA") "preserve[d] the right to bring suit under the law of any affected State." 479 U.S. at 493. Rather, the Court concluded that the CWA "precludes a court from applying the law of an affected State against an out-of-state source." *Id.* at 494. The CAA's nearly-identical savings clauses likewise leave no room for a State to apply its law to an out-of-state source of greenhouse gas emissions. Phrased in terms of field preemption: Federal law occupies the field of interstate pollution, even if the CAA's savings clauses mean that Congress has carved out limited exceptions for local pollution control. *See City of New York*, 993 F.3d at 99-100.

Defendants argue that the CAA does not "occupy the entire field of pollution remedies," citing a case holding that the CWA does not bar punitive damages imposed under federal maritime law. ECF 230-1 at 29 (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)). But that case did not address the preemption question here: whether a State could seek relief, under its own law, for injuries caused by pollution from another State. The Supreme Court answered that question in the negative in *Ouellette*. Moreover, the Second Circuit considered *Exxon Shipping* in *City of New York* and found the City's "reliance on" that case to be "misplaced." 993 F.3d at 96-97.[23]

---

[23] In arguing that the CAA does not preempt New York's Act, amici state that "EPA has proposed to find that the [CAA] does not allow it to regulate greenhouse gas emissions at all." ECF 232-2 at 5. That characterization is inaccurate. *See* Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 Fed. Reg. 36,288, 36,302 (Aug. 1, 2025)

**3.** The Act is also conflict preempted. In *Ouellette*, the Court held that allowing one State to apply its law to pollution originating in another State would "disrupt [the] balance of interests" Congress struck with the CWA and "undermine the important goals of efficiency and predictability" in that Act's permitting scheme. 479 U.S. at 495-96; *see City of New York*, 993 F.3d at 100. The same is true under the similar text and structure of the CAA, which authorized EPA to determine "whether and how" pollutants, including greenhouse gas emissions, should be regulated, *AEP*, 564 U.S. at 426. Although States have certain defined roles under the CAA, ECF 216-1 at 19-20, they may not impose their own liability regimes on out-of-state air pollution.

A contrary rule would conflict with the CAA, as both *Ouellette* and *City of New York* make clear. Energy producers would be forced to adjust their financial and strategic business decisions according to differing, often inconsistent state laws imposing inherently duplicative liability rules, even if they are fully compliant with the laws of the States in which they are operating and the CAA. *See Ouellette*, 479 U.S. at 494 (holding that "Vermont nuisance law 'stands as an obstacle'

---

(explaining that, for purposes of CAA § 202(a), even if greenhouse gas emissions are "air pollutant[s]" Act-wide, EPA may invoke section 202(a) only if the statutory standard for regulating motor-vehicle emissions is satisfied). EPA has since finalized the rule and concluded that CAA § 202(a)(1) does not authorize EPA to prescribe greenhouse gas emission standards for new motor vehicles. But EPA expressly rejected amici's broader suggestion that the CAA does not reach, and does not preempt state regulation of, greenhouse gases. On the contrary, EPA emphasized that the Act "continues to preempt state common-law claims and statutes that seek to regulate out-of-state emissions, independently of CAA section 209(a)'s express preemption provision for mobile-source emissions." Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act, Final Rule 206 (Feb. 12, 2026) (pre-publication version, available at https://perma.cc/Y7FQ-T2Z5) (citing *City of New York*, 993 F.3d at 98-100; *Ouellette*, 479 U.S. at 492). EPA went on to explain that "[w]e retain our authority to prescribe emission standards for any air pollutant that, in the Administrator's judgment, causes or contributes to air pollution that may reasonably be anticipated to endanger public health or welfare." *Id.* In fact, again citing *City of New York* and *Ouellette*, EPA noted that the CAA "does not empower states to apply their own law to control emissions occurring outside their own jurisdiction." Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards: Response to Comments 297 (Feb. 2026), https://perma.cc/K6N5-GP8X.

to the full implementation of the CWA" because it "upset[ ] the balance of public and private interests so carefully addressed by the Act"); *City of New York*, 993 F.3d at 100 ("[I]mpos[ing] New York nuisance standards on emissions emanating simultaneously from all 50 states and the nations of the world . . . would 'undermine this carefully drawn statute through a general savings clause,' and would 'seriously interfere with the achievement of the full purposes and objectives of Congress.'" (cleaned up) (quoting *Ouellette*, 479 U.S. at 493-94)).

Defendants' objections here boil down to repeating their argument that the Act is not an emissions standard or other regulation. *See* ECF 230-1 at 34-35. But the Act directly imposes a regime of substantial (indeed, massive) governmental penalties for global greenhouse gas emissions. That penalty regime alone would "effectively override" the laws and "policy choices" made by other States and the federal Government and would "interfere[ ] with the methods by which the" CAA is designed to govern the issue of interstate pollution, regardless of whether the Act formally "regulate[s]" greenhouse gas emissions. *Ouellette*, 429 U.S. at 494-95.

Moreover, as explained above, the Second Circuit has already held that the imposition of liability for greenhouse gas emissions on energy producers is, as a matter of law, a regulation of emissions. *See supra* pp.26-33. The Second Circuit's analysis of the CAA considered "both state legislation and common law claims" for compensation "under state tort law" to be the same for purposes of its ruling that state law could not govern out-of-state emissions. *City of New York*, 993 F.3d at 100; *see also Ouellette*, 479 U.S. at 491 (addressing "whether the CWA pre-empts Vermont common law to the extent that law may impose liability on a New York point source"). Thus, the Act's penalty scheme imposing liability for emissions originating in other States conflicts with federal authority over those same emissions under the CAA.

Defendants' reliance upon cases holding that "incidental effects" of regulation cannot

amount to conflict preemption is likewise misplaced. ECF 230-1 at 33.[24] The Second Circuit already held that attempting to impose liability and collect compensation for out-of-state greenhouse gas emissions constitutes regulation of emissions not authorized under the CAA. *See supra* pp.26-33. In doing so, it rejected the City's argument that, because the City was "not seeking to *directly* penalize emitters," it was not seeking to "regulat[e] . . . global emissions." *City of New York*, 993 F.3d at 91 (emphasis added). Rather, the Second Circuit held that "though the City's lawsuit would regulate cross-border emissions in an *indirect and roundabout* manner, it would regulate them nonetheless." *Id.* at 93 (emphasis added). "[T]he City's focus on [an] 'earlier moment' in the global warming lifecycle"—the production and sale of fossil fuels—did not change the "substance" of its attempt to seek damages from emissions. *Id.* at 97. The same is true of New York's Act, which seeks the same result the City pursued in *City of New York*. *See supra* pp.28-30.

## Conclusion

Plaintiffs request that the Court enter judgment in Plaintiffs' favor, declare the Act unconstitutional, and enjoin Defendants from enforcing the Act against Plaintiffs' members.

---

[24] The cases Defendants rely on are distinguishable in that they involve (i) express preemption provisions that are not at issue here, *see Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 940 (9th Cir. 2011); (ii) other statutes not at issue here, *see Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 55-57 (2d Cir. 2018) (Federal Power Act); *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 516 (1989) (Natural Gas Act and Natural Gas Policy Act of 1978); or (iii) issues that do not counter *City of New York*'s reasoning. Defendants also cite *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 725 F.3d 65, 101 (2nd Cir. 2013), but the Second Circuit rejected the analogy to that case, concluding that the City's claims were not "modest litigation akin to a product liability suit" like *MTBE* but, instead, were "a clash over regulating worldwide greenhouse gas emissions and slowing global climate change," *City of New York*, 993 F.3d at 91.

Dated: February 13, 2026

Respectfully submitted,

/s/ Steven P. Lehotsky

Jennifer B. Dickey*
Kevin R. Palmer*
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

Steven P. Lehotsky*
Scott A. Keller*
Michael B. Schon*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
    Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: steve@lkcfirm.com
Email: scott@lkcfirm.com
Email: mike@lkcfirm.com

*Counsel for Plaintiff the Chamber of Commerce of the United States of America*

Ryan Meyers*
American Petroleum Institute
200 Massachusetts Avenue, NW,
    Suite 1200
Washington, DC 20001
Telephone: (202) 682-8000

Andrew B. Davis*
LEHOTSKY KELLER COHN LLP
750 Rialto Blvd.
    Suite 1-250
Austin, TX 78735
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: andrew@lkcfirm.com

*Counsel for Plaintiff American Petroleum Institute*

Tawny Bridgeford*
National Mining Association
101 Constitution Avenue, NW
Washington, DC 20001
Telephone: (202) 463-2629

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: jared@lkcfirm.com

*Counsel for Plaintiff National Mining Association*

Heather Briccetti Mulligan*
The Business Council of New York State, Inc.
111 Washington Avenue,
    Suite 400
Albany, NY
Telephone: (518) 465-7511

Meredith R. Pottorff*
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: meredith@lkcfirm.com

*Counsel for Plaintiff The Business Council of New York State, Inc.*

*admitted pro hac vice

Yvonne E. Hennessey
Richard S. Hartunian
Barclay Damon LLP
80 State Street

41

Albany, NY 12207
Telephone: (518) 429-4293
Email: YHennessey@barclaydamon.com
Email: RHartunian@barclaydamon.com

*Counsel for Plaintiffs the Chamber of Commerce of the United States of America, American Petroleum Institute, National Mining Association, and The Business Council of New York State, Inc.*

**Certificate of Service**

I, Steven P. Lehotsky, certify that on February 13, 2026, the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky