IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

|  |  |
|---|---|
| **STATE OF WEST VIRGINIA**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**LETITIA JAMES**, in her official capacity as the Attorney General of New York, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:25-cv-00168-BKS-DJS |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
AND RESPONSE IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

   I.      Plaintiffs Have Standing To Sue. ....................................................... 3

      A.   The States Are Vindicating Their Proprietary Interests. ...................... 3

      B.   The States Can Sue *Parens Patriae*. ................................................ 7

      C.   The Private Parties Also Have Standing. ........................................ 12

  II.     Federal Common Law And The Constitution Preempt The Act........................ 15

      A.   Federal Common Law Preempts The Act. ........................................ 15

      B.   The Act Is An Unconstitutional Extraterritorial Regulation. ............... 20

      C.   The Act Violates The Foreign Affairs Doctrine. ............................... 26

 III.     The Clean Air Act Preempts The Superfund Act. ................................. 34

CONCLUSION ................................................................................................. 40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*People of State of N.Y. ex rel. Abrams v. Seneci,*
    817 F.2d 1015 (2d Cir. 1987) ...................................................................7

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982)..................................................................7, 8, 9, 10

*Am. Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011).....................................................................*passim*

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003)..............................................................27, 31, 32

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964)...........................................................................27

*Barmore v. Aidala,*
    419 F. Supp. 2d 193 (N.D.N.Y. 2005) ...........................................11

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996)....................................................................25, 26

*Bonaparte v. Tax Court,*
    104 U.S. 592 (1881)...........................................................................25

*Boomer v. Atl. Cement Co.,*
    257 N.E.2d 870 (N.Y. 1970)..............................................................7

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988)...........................................................................17

*Brown v. Fletcher's Estate,*
    210 U.S. 82 (1908)............................................................................21

*Cerame v. Slack,*
    123 F.4th 72 (2d Cir. 2024) .............................................................13

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.,*
    333 U.S. 103 (1948)...........................................................................30

*Cipollone v. Liggett Grp., Inc.,*
    505 U.S. 504 (1992)...........................................................................34

*City of Milwaukee v. Illinois and Michigan,*
    451 U.S. 304 (1981).................................................................................37

*City of New York v. Chevron Corp.,*
    993 F.3d 81 (2d Cir. 2021) ..................................................*passim*

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)...................................................................................5

*Clark v. Allen,*
    331 U.S. 503 (1947)..................................................................................33

*Clinton v. City of New York,*
    524 U.S. 417 (1998)...................................................................................5

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000)............................................................................29, 32

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019)...................................................................................5

*Dep't of Revenue of Ky. v. Davis,*
    553 U.S. 328 (2008).................................................................................26

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982)............................................................................24, 25

*Exxon Shipping Company v. Baker,*
    554 U.S. 471 (2008).................................................................................39

*First Nat'l City Bank v. Banco Nacional de Cuba,*
    406 U.S. 759 (1972).................................................................................30

*Franchise Tax Bd. of Cal. v. Hyatt,*
    587 U.S. 230 (2019).............................................................................9, 17

*Gingery v. City of Glendale,*
    831 F.3d 1222 (9th Cir. 2016) ..............................................................34

*Guy v. Baltimore,*
    100 U.S. 434 (1879).................................................................................26

*Healy v. Beer Inst., Inc.,*
    491 U.S. 324 (1989).....................................................................10, 21, 22

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.,*
    304 U.S. 92 (1938)..............................................................................17, 18

*Hines v. Davidowitz,*
    312 U.S. 52 (1941)..................................................................................31

*Hoyt v. Sprague,*
    103 U.S. 613 (1880)...........................................................................10, 23

*Illinois v. City of Milwaukee,*
    406 U.S. 91 (1972)............................................................................16, 17

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987).........................................................................*passim*

*Japan Line, Ltd. v. Los Angeles County,*
    441 U.S. 434 (1979).................................................................................27

*Kansas v. Garcia,*
    589 U.S. 191 (2020).................................................................................34

*Kurns v. R.R. Friction Prods. Corp.,*
    565 U.S. 625 (2012).......................................................................19, 35, 36

*Litwin v. Blackstone Grp., L.P.,*
    634 F.3d 706 (2d Cir. 2011) ....................................................................35

*Maryland v. Louisiana,*
    451 U.S. 725 (1981)........................................................................4, 8, 9, 12

*Massachusetts v. EPA,*
    549 U.S. 497 (2007).............................................................................26, 33

*Medellín v. Texas,*
    552 U.S. 491 (2008).............................................................................30, 31

*Michelin Tire Corp. v. Wages,*
    423 U.S. 276 (1976).................................................................................26

*Milk Control Bd. v. Eisenberg Farm Prods.,*
    306 U.S. 346 (1939).................................................................................23

*Movsesian v. Victoria Vershicherung AG,*
    670 F.3d 1067 (9th Cir. 2012) .................................................................33

*Nat'l Foreign Trade Council v. Natsios,*
    181 F.3d 38 (1st Cir. 1999) ...............................................................25, 33

*Nat'l Pork Prods. Council v. Ross,*
    598 U.S. 356 (2023)........................................................................*passim*

*Nat'l Res. Def. Council v. NHTSA*,
   894 F.3d 95 (2d Cir. 2018) ..............................................................7

*New York v. DHS*,
   969 F.3d 42 (2d Cir. 2020) ..............................................................5

*New York v. Niagara-Wheatfield Cent. Sch. Dist.*,
   119 F.4th 270 (2d Cir. 2024) ..........................................................8

*Oneok, Inc. v. Learjet, Inc.*,
   575 U.S. 373 (2015) ........................................................................34

*Osborn v. Ozlin*,
   310 U.S. 53 (1940) ..........................................................................23

*Pac. Coast Dairy v. Dep't of Agric. of Cal.*,
   318 U.S. 285 (1943) ........................................................................26

*Purdue Pharma L.P. v. Kentucky*,
   704 F.3d 208 (2d Cir. 2013) ..........................................................12

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) ........................................................................38

*Rizzo–Puccio v. Coll. Auxiliary Servs., Inc.*,
   216 F.3d 1073 (2d Cir. 2000) ........................................................11

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
   547 U.S. 47 (2006) ..........................................................................15

*S. Pac. Co. v. Arizona*,
   325 U.S. 761 (1945) ........................................................................25

*S.D. Myers, Inc. v. City & Cnty. of San Francisco*,
   253 F.3d 461 (9th Cir. 2001) ........................................................23

*Sable Comm'cns of Cal., Inc. v. FCC*,
   492 U.S. 115 (1989) ........................................................................23

*San Diego Bldg. Trades Council v. Garmon*,
   359 U.S. 236 (1959) ..........................................................................6

*Shafer v. Farmers' Grain Co. of Embden*,
   268 U.S. 189 (1925) ........................................................................22

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) ........................................................................21

*Strassheim v. Daily*,
    221 U.S. 280 (1911)................................................................10, 21, 23, 25

*Tanvir v. Tanzin*,
    894 F.3d 449 (2d Cir. 2018) ...................................................................13

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)...........................................................................16, 17

*Treiber & Straub, Inc. v. UPS, Inc.*,
    474 F.3d 379 (7th Cir. 2007) ..................................................................17

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936)...............................................................................30

*United States v. Pink*,
    315 U.S. 203 (1942)...............................................................................32

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)...............................................................................30

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)............................................................................27, 30

*Zschernig v. Miller*,
    389 U.S. 429 (1968).........................................................................27, 33

**Statutes and Constitutional Provisions**

42 U.S.C. § 7401 ....................................................................................39

42 U.S.C. § 7416 ....................................................................................37

42 U.S.C. § 7604 ....................................................................................37

N.Y. Env't Conserv. Law § 76-0101 ................................................*passim*

N.Y. Env't Conserv. Law § 76-0103 ...........................................18, 19

U.S. Const. art. VI, cl. 2 ........................................................................34

W. Va. Code § 11-13EE-1.......................................................................10

**Rules and Regulations**

Exec. Order No. 14260, 90 Fed. Reg. 15513 (Apr. 8, 2025).......................................................28

FED. R. EVID. 801 ...............................................................................................................13

FED. R. EVID. 803 ...............................................................................................................13

**Other Authorities**

*About EIA*, EIA, https://www.eia.gov/about/ (last visited Feb. 11, 2026).............................13

*Alpha Metallurgical Resources*, CARBON MAJORS,
   https://tinyurl.com/bdee9ukb (last visited Feb. 11, 2026) .................................................12

Amanda G. Halter et al., *Climate Superfund Map*, PILLSBURY,
   https://tinyurl.com/abe6jncp (last visited Feb. 11, 2026).....................................................40

Donald H. Regan, *Siamese Essays: (I)* CTS Corp. v. Dynamics Corp. of
   America *and Dormant Commerce Clause Doctrine; (II) Extraterritorial
   State Legislation*, 85 MICH. L. REV. 1865 (1987) ...............................................................21

Katherine Florey, *State Courts, State Territory, State Power: Reflections
   on the Extraterritoriality Principle in Choice of Law & Legislation*, 84
   NOTRE DAME L. REV. 1057 (2009) ......................................................................................22

NAT. RES. GOVERNANCE INST., THE NATIONAL OIL COMPANY DATABASE
   (April 2019), https://tinyurl.com/53wj4hmy ......................................................................32

Steven Garber & James K. Hammitt, *Risk Premiums of Environmental
   Liability: Does Superfund Increase the Cost of Capital?*, 36 J. ENV'T
   ECON. & MGMT. 267 (1998) ..................................................................................................4

## INTRODUCTION

New York assumes a lot.  It assumes, for instance, that it doesn't regulate out-of-state conduct even when it imposes billions of dollars in penalties on conduct happening only outside New York.  It imagines its Climate Change Superfund Act is merely a "revenue-raising" measure that will not affect fossil-fuel prices because energy producers will simply absorb the billions in losses.  And it supposes that its law is not an emissions-regulation law because it would only affect emissions in an indirect way.  Based on these assumptions, New York insists its law falls in line with federal control over interstate air emissions.

But New York's assumptions run headlong into both binding precedent and economic reality.

Binding precedent says New York can't do what the Act tries to do.  *City of New York v. Chevron Corporation*, 993 F.3d 81 (2d Cir. 2021), is the starting and end point.  This case and that one are indistinguishable.  Both involve strict liability schemes.  New York City argued—as New York State does now—that it wasn't regulating emissions, just seeking compensation for alleged climate harms.  But the Second Circuit saw through the city's ploy, explaining that imposing liability for global greenhouse-gas emissions is "a potent method of governing conduct and controlling policy"—in other words, regulation. *Id.* at 92 (cleaned up).  Just like in that case, the federal common law of interstate pollution and the Constitution's limits do not allow New York to unilaterally regulate interstate greenhouse-gas emissions.  Neither does the Clean Air Act.  So the Act can't stand as a straightforward matter of law.

Because it can't run from *City of New York*, New York State attempts to manufacture a factual dispute about standing. But that diversion fails, too. New York ignores economic realities and relies on opinions that companies won't care about billion-dollar losses from the Act. So New York says the States' economies and pocketbooks will be unaffected. That's not true. But New York's expert's opinion doesn't deprive the States of standing, anyway. And neither he nor New York says anything about the States' sovereign standing.

What's more, New York does not—and cannot—dispute that Alpha Metallurgical Resources was identified by name in legislative materials as a target of the Act. And New York can't deny that the Carbon Majors database lists Alpha as responsible for billions of tons of emissions during the covered period. Defendants suggest that Alpha might not satisfy the Act's "sufficient contacts" requirement. But Alpha only needs to prove a credible threat New York will try to enforce the Act, not that New York will succeed in holding them liable. And the facts show a credible threat.

Because the Act is unlawful in all its applications, this Court should grant the Plaintiffs summary judgment and a permanent injunction preventing Defendants from enforcing it. Because the Plaintiffs are entitled to summary judgment, the Court should deny Defendants' motion for summary judgment.

## ARGUMENT

The Court should permanently enjoin Defendants from enforcing the Act. Plaintiffs have standing to sue. The States are protecting their proprietary, *parens patriae*, and sovereign interests, which the Act threatens. Likewise, the private parties are reasonably

likely to have the Act enforced against them or their members. The Act imposes a credible enforcement threat.

On the merits, Supreme Court and Second Circuit precedent confirm that the Constitution restrains States' powers to reach across State and international lines and regulate out-of-state greenhouse-gas emissions. The Clean Air Act also preempts the Act. Put simply, New York's Act intrudes upon the federal government's authority and tramples on co-equal States' sovereignty. It cannot survive.

## I.    Plaintiffs Have Standing To Sue.

New York's standing arguments fail at every turn. Both the States and private Plaintiffs have established concrete, imminent injuries sufficient to confer Article III standing. New York's attempts to manufacture factual disputes cannot overcome the unrebutted evidence Plaintiffs have submitted. As large consumers of traditional fuels and the electricity they generate, the States will suffer an injury based on the increased costs to consumers. Likewise, the States' citizens purchase energy, so the States can sue as *parens patriae*. And the regulation of conduct within the States directly harms their sovereign interests as well. Finally, the private parties have suffered an imminent injury because they have a legitimate fear that New York will enforce its statute against them.

### A.    The States Are Vindicating Their Proprietary Interests.

The States have shown standing as large purchasers of energy whose costs will increase as a direct result of the Climate Act. Two dozen declarations show that States purchase and consume significant amounts of traditional fuels and energy. *See* States' Decls., ECF 217-2 to 217-25. New York doesn't dispute this. So when energy prices rise,

the States pay more, thus establishing a "substantial and real" proprietary injury the Supreme Court has repeatedly recognized as sufficient for standing. *E.g.*, *Maryland v. Louisiana*, 451 U.S. 725, 737 (1981). And make no mistake: prices will rise as the massive fines will reduce available capital or even force shutdown decisions, which will in turn reduce supply (even aside from the lower profitability in the near term).

New York likens the Act to CERCLA. Resp. Br. 46, 48. That comparison supports Plaintiffs' standing. Empirical studies prove CERCLA increased "costs of capital" for "large[] chemical companies." Steven Garber & James K. Hammitt, *Risk Premiums of Environmental Liability: Does Superfund Increase the Cost of Capital?*, 36 J. Env't Econ. & Mgmt. 267, 268 (1998). And "[i]ncreases in costs of capital may affect the investment behavior of firms." *Id.* at 287. "[I]nvestors holding [firms'] securities" experienced "additional risk bearing," too. *Id.* In the end, CERCLA's estimated $1 billion in "cleanup cost[s]" to chemical companies produced hundreds of millions of dollars in additional costs. *Id.* at 288. Those increased costs matter because "[s]ubstantial increases in costs of capital … would be expected to affect investment decisions." *Id.* at 289. The Act's penalties dwarf the studied CERCLA penalties by a magnitude of seventy-five. So the risk here is "substantial and real." *Maryland*, 451 U.S. at 737.

What's more, energy producers have explained that, as a factual matter, they are already pricing in the Act's costs or will be forced to do so in the near future. *See, e.g.*, Jarboe Decl. ¶¶ 14-25, ECF 216-5 (discussing Peabody Energy Corporation's anticipated costs, reporting obligations, and reputational harm); Martini Decl. ¶¶ 13-21, ECF 216-6 (discussing Chevron Corporation's ongoing costs, reporting obligations, and reputational

harm).  Those costs will in turn decrease investment and increase prices, which will cost the States financially.  *See* Zycher Decl. ¶¶ 28-44, ECF 217-26 (explaining that increased costs will decrease investment and increase prices).  The States thus have standing based on the Act's "predictable effect … on the decisions of third parties" like the producers and energy investors.  *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).  And again, it's irrelevant whether New York's expert disagrees here: "the consequences of those third party decisions may suffice to establish standing, even when the decisions are illogical or unnecessary."  *New York v. DHS*, 969 F.3d 42, 59 (2d Cir. 2020).

New York's sole response is to claim that the Act will not increase prices because the producers of oil, natural gas, and coal will treat the billions of dollars in penalties under the Act as purely fixed costs that will not affect the marginal cost of future production.  New York's argument fails for multiple reasons.

To start, Plaintiffs need only show a "substantial risk" that "harm will occur."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).  For the Plaintiff States, "a sufficient likelihood of economic injury" suffices.  *Clinton v. City of New York*, 524 U.S. 417, 432 (1998).  Thus, the Court needn't determine that there *will* be a definite price increase; the Plaintiffs' declarations are enough to establish a likely proprietary injury at this stage.  New York's economist's illusory rebuttal of the States' economist (and no one else) doesn't stand in the way of summary judgment.

And fundamentally, New York's economist is wrong.  As explained above, future risk isn't the only consequence of the Act that's affecting prices.  But anyway, a rational firm would account for future liability and would take action to recuperate losses and alleviate

risk. New York dismisses these concerns as "speculation." Resp. Br. 15. But New York has already expanded the Act's covered period once, from 2000-2018 to 2000-2024. Producers know New York considers their activities worthy of punishment. So they (and investors) will price in the substantial risk that New York will extend the Act again.

As a matter of law, the Second Circuit already explained that a "substantial damages award" like the penalties here can "effectively regulate" producer "behavior far beyond New York's borders." *City of New York*, 993 F.3d at 92. By claiming these penalties don't regulate, New York "ignores economic reality." *Id.* "The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959). The Act's $75 billion in damages is an undoubtedly "potent" sum. So although New York's law "would regulate cross-border emissions in an indirect and roundabout manner, it would regulate them nonetheless." *City of New York*, 993 F.3d at 93. Because the Act regulates in a *legal* sense, whether New York's expert believes the Act is "economic regulation" is irrelevant.

New York fails to escape the Second Circuit's determinative precedent. Instead, New York argues primarily that *City of New York* doesn't apply because the Act supposedly "has no impact on future fossil fuel production." Resp. Br. 32. But that argument simply repeats New York's economist's beliefs. In doing so, it runs headlong into the Second Circuit's holding that "a significant damages award would no doubt 'compel'" producers "to develop new 'means of pollution control." *City of New York*, 993 F.3d at 93 (cleaned up) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495, 498 n.19 (1987)). New York law agrees, calling "damages" a "reasonable effective spur" to encourage a party to change its

behavior.  *Boomer v. Atl. Cement Co.*, 257 N.E.2d 870, 873 (N.Y. 1970).  Yet New York's argument here casts aside "common sense and basic economics," which "tell us that the increased cost of … conduct will make that conduct less common" and affect parties' "business decisions and compliance approaches" going forward.  *Nat'l Res. Def. Council v. NHTSA*, 894 F.3d 95, 105 (2d Cir. 2018) (cleaned up).  And while New York might "reserve[] the right to argue that *City of New York* was wrongly decided," Resp. Br. 32 n.11, that argument won't work in this court.  Binding Second Circuit precedent dictates that the States have standing, regardless of what New York's expert might think.

Finally, New York's objections about the admissibility of the State's expert's declaration don't erase standing.  For one thing, those objections are meritless.  *See* W. Va.'s Resp. to N.Y.'s Mot. to Strike, ECF 246.  But even if they somehow weren't, and the declaration was excluded, nothing would change.  The States' and companies' declarations alone—which New York doesn't challenge—establish standing.  The producers' declarations demonstrate an anticipated increase in their costs.  The States' declarations, in turn, show an increase in the States' costs as consumers.  This proprietary interest is sufficient to establish standing.

## B.  The States Can Sue *Parens Patriae*.

The States also have standing as *parens patriae*.  A State has "*parens patriae* standing" to sue for "an injury to [its] general economy."  *People of State of N.Y. ex rel. Abrams v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987).  "[A] state has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

A State also has a *parens patriae* interest in not being "discriminatorily denied its rightful status within the federal system." *Id.* Establishing *parens patriae* standing requires showing: (1) injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) inability for individual plaintiffs to obtain complete relief. *Id.* at 607-08. The States satisfy each element.

First, the Act will harm virtually every citizen in the Plaintiff States by raising energy costs. Defendants cannot seriously dispute that energy price increases affect a "substantial segment" of a state's population—energy is not a luxury good purchased by a select few but a necessity consumed by virtually everyone. It is difficult to imagine a policy with a more "'universal sting'" than one that increases the price of fuel. *New York v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 282 (2d Cir. 2024) (quoting *Alfred L. Snapp & Son*, 458 U.S. at 609). If natural gas price increases alone confer *parens patriae* standing, *Maryland*, 451 U.S. at 739, then increases in coal, oil, electricity, *and* natural gas prices surely give the Plaintiff States standing here.

Defendants' opposition relies on the same flawed argument they make against States' proprietary standing: the Act will not raise prices or reduce output. Resp. Br. 16-18. But as discussed above, the Act will alter prices and production of traditional fuels. So this argument fails for the same reasons.

The Act's harm extends beyond price increases. The Act directly targets the fossil fuel industries that employ millions of Plaintiff State citizens and anchor their economies. West Virginia's energy sector employs over 12% of the State's workforce and generates hundreds of millions in compensation annually. Adkins Decl. ¶¶ 7-8, ECF 217-2. But as Dr.

Zycher's declaration demonstrates, the Act will meaningfully decrease the incentives for firms to invest in extracting more traditional fuels. Even conservative estimates put the reduced capital investment around 6% annually. Zycher Decl. ¶ 40, ECF 217-26. Given the millions of traditional-fuel sector jobs in the Plaintiff States, even a small decrease in investment will have significant effects. When New York attempts to impose $75 billion in penalties on the energy industry, it threatens the livelihoods of millions of citizens across the Plaintiff States—plainly a "substantial segment" of their populations.

Second, the States have quasi-sovereign interests in protecting their citizens from economic injury and in defending their rightful status in the federal system. The first is straightforward: protecting state residents from "substantial economic injury" is a classic quasi-sovereign interest. *Maryland*, 451 U.S. at 739. The Act threatens that interest by targeting for punishment an industry that is integral to the Plaintiff States' economies and by imposing costs that will be passed on to their citizens.

New York's Act also harms the States' "interest in securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp & Son*, 458 U.S. at 607-08. The Constitution guarantees equal sovereignty among States. *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 245 (2019). When one State attempts to project its regulatory authority into sister States to punish conduct that those States have authorized and even encouraged, it denies those States their constitutional status as coequal sovereigns. *Alfred L. Snapp & Son*, 458 U.S. at 607-08. That is exactly what New York is doing here. The Plaintiff States have affirmatively promoted fossil fuel production within their borders through tax incentives, regulatory support, and express statutory policies.

*See*, *e.g.*, W. VA. CODE § 11-13EE-1 (policy to "encourage capital investment in the coal industry"). New York's attempt to retroactively penalize that same conduct—conduct that occurred entirely within the Plaintiff States' borders and under their regulatory authority—is a striking example of one State seeking to infringe on the sovereign prerogatives of another.

Defendants argue that the States haven't shown harm to a "substantial segment" of the population. Resp. Br. 16-17. That argument misses the mark. The States have shown such harm—energy price increases affect virtually everyone. But even without a diffuse pocketbook injury, the States still have *parens patriae* standing as sovereigns.

Each State has "sovereign power over individuals and entities within" its borders. *Alfred L. Snapp & Son*, 458 U.S. at 601. That sovereign power includes "the power to create and enforce a legal code." *Id.* And each State is entitled to "recognition from other sovereigns." *Id.* Put another way, the States have "autonomy … within their respective spheres." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989). New York's Act tramples on the States' sovereign powers by imposing liability on actions that were taken wholly outside "the limits of [New York's] own territory." *Hoyt v. Sprague*, 103 U.S. 613, 630 (1880), and that were not "*intended* to produce … detrimental effects within [New York]." *Strassheim v. Daily*, 221 U.S. 280, 285 (1911) (emphasis added); *see also Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 375–76 (2023). So the States have a sovereign interest in defending against New York's extraterritorial overreach.

New York doesn't refute the States' sovereign standing. Rather, it says the States "do not discuss that injury as distinct from the injury they assert to their quasi-sovereign

interests." Resp. Br. 13 n.4. It's true that the States didn't organize their brief to include a separate heading for sovereign standing. That structural choice doesn't erase the legal argument. The States asserted a sovereign injury. *See* W. Va. Mem. of Law in Supp. of Mot. Summ. J. 11 (W. Va. Br.) ("[T]he States have standing because the Act directly infringes their sovereignty by regulating conduct that occurred within their own borders."), ECF 217-1; W. Va. Br. 19-20 (discussing how New York's extraterritorial regulation "usurp[s] the federal system," "denies its coequal State[s] their 'rightful status' in our federal system[,] and repudiates 'the terms under which [States] participate[]' in that system" (cleaned up)).

New York acknowledges the States' argument and agrees that "securing observance of the terms under which [a State] participates in the federal system" is one of "[t]he two main categories of quasi-sovereign interests." Resp. Br. 16 (citation omitted). But New York doesn't address—let alone refute—the States' argument that the Act's extraterritorial regulation confers standing by overriding each State's laws and interests. So Defendants have conceded the argument. *See Rizzo–Puccio v. Coll. Auxiliary Servs., Inc.*, 216 F.3d 1073 (2d Cir. 2000) (claims not addressed in opposition to motion for summary judgment were deemed abandoned). And, in the Northern District of New York, failure to oppose an argument "is deemed consent to granting that portion of the motion." *Barmore v. Aidala*, 419 F. Supp. 2d 193, 201-02 (N.D.N.Y. 2005) (citations omitted). New York's concession should end the standing inquiry.

Third, individual consumers cannot obtain complete relief through private litigation. The increased costs any individual citizen will pay because of higher energy prices will be

11

"relatively small," *Maryland*, 451 U.S. at 739, making individual lawsuits impractical. And no individual consumer could vindicate the States' sovereign interest in resisting New York's extraterritorial overreach—that interest belongs to the States alone. The States are thus the proper parties to challenge the Act on behalf of their citizens and in defense of their sovereignty.

Defendants also err in suggesting the States cannot establish *parens patriae* standing to assert producers' interests. Resp. Br. 17. The States do not assert the "interests of particular private parties." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 215 (2d Cir. 2013) (citation omitted). They assert the interests of their citizens in affordable energy and gainful employment, alongside their own sovereign interest in the economic vitality of industries within their borders. That companies are the immediate targets of the Act does not transform the States' claims into improper assertions of corporate interests.

### C.    The Private Parties Also Have Standing.

Alpha Metallurgical Resources, Inc. faces a credible threat of enforcement. Alpha produced massive quantities of coal during the covered period and was identified by name in legislative materials as a target of the Act. Wold Decl., Ex. D, ECF 217-33. The Carbon Majors database, which New York legislators relied upon in crafting the Act, estimates Alpha is responsible for approximately 4.94 billion tons of emissions over the covered period—well above the one-billion-ton threshold. *See Alpha Metallurgical Resources*, CARBON MAJORS, https://tinyurl.com/bdee9ukb (last visited Feb. 11, 2026). Alpha has more than a "credible threat" of enforcement; it has near-certainty of receiving a cost recovery demand measured in the hundreds of millions of dollars.

Defendants argue that this evidence is inadmissible hearsay.  But Defendants are wrong.  Start with the legislative materials identifying Alpha as a target.  That's a classic opposing party statement offered to show New York's intent to enforce the Act against Alpha—not hearsay.  FED. R. EVID. 801(d)(2); *see also Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) ("In an official capacity suit, the real party in interest ... is the governmental entity and not the named official." (cleaned up)).  Even if it were hearsay, it's an excepted public record.  FED. R. EVID. 803(8).  The Carbon Majors database isn't hearsay, either.  The database is not offered for the truth of Alpha's emissions but to show the basis on which New York will identify responsible parties.  So it doesn't even meet the hearsay definition.  FED. R. EVID. 801(c).  The same is true for the U.S. Energy Information Administration website and an annual report.  They aren't used to prove that Alpha is one of the largest producers of coal, but to show why Alpha believes it faces a credible threat that New York will attempt to impose liability.   And EIA's data is a public record excepted from the rule against hearsay.  FED. R. EVID. 803(8).  Indeed, EIA's raison d'être is public records: it "collects, analyzes, and disseminates independent and impartial energy information to promote sound policymaking, efficient markets, and public understanding of energy and its interaction with the economy and the environment."  *About EIA*, EIA, https://www.eia.gov/about/ (last visited Feb. 11, 2026).  New York hasn't offered anything indicating "a lack of trustworthiness" to defeat the exception.  FED. R. EVID. 803(8)(B).

Defendants also argue that Alpha needs to do DEC's job for it and provide evidence that it has sufficient contacts with the State of New York.  Resp. Br. 20.  But Alpha does not need to prove that it will ultimately be found liable under the Act. *See Cerame v. Slack*,

123 F.4th 72, 81 (2d Cir. 2024) (stating that "pre-enforcement challenges to regulations providing for civil liability can thus be cognizable under Article III because plaintiffs need not first expose themselves to liability before bringing suit to challenge … the constitutionality of such regulations" (cleaned up)).  Rather, Alpha needs only show a credible threat that New York will attempt to impose liability.  That threat exists.  New York's inclusion of Alpha in its legislative materials shows its intent to target the company.  Whether Alpha would ultimately prevail on a jurisdictional defense is irrelevant to standing—Alpha will incur substantial costs defending against New York's enforcement efforts regardless of the ultimate outcome.  That's enough to show a credible threat.

The associations have standing, too.  The West Virginia Coal Association represents members who collectively produced billions of tons of coal during the covered period.  Bostic Decl. ¶ 5, ECF 217-28.  The Gas and Oil Association of West Virginia represents over 400 member companies engaged in fossil fuel production.  Burd Decl. ¶¶ 8, 10, ECF 217-27.  The associations' members face the same certain enforcement threat as Alpha.  The associations have standing despite declaring their members "potentially" liable.  New York says the associations can't show an injury because the members are only "potentially" subject to a cost recovery demand.  Resp. Br. 19.  But "potentially" refers to New York's ultimate determination, not to whether members meet the statutory criteria.  On that point, the members meet the emissions threshold.  *See* W. Va. Br. 22.  That's enough to show standing.

Moreover, all association members have standing to challenge the Act even if they are not themselves "responsible parties" because the Act will affect market-wide pricing and production.  As Dr. Zycher explains, when some producers face substantial penalties,

14

market prices adjust across the board—"there cannot persist more than one price for a given good in a given market."   Zycher Decl. ¶ 41, ECF 217-26.   Thus, even smaller producers who fall below the Act's billion-ton threshold will face market changes.   And contrary to New York's claims, GO-WV's declaration explains the industry impact of New York's law.   Burd Decl., ¶¶ 14-15.   This market-wide harm gives all the associations' members standing to challenge the Act.

Finally, it's worth repeating that, because Plaintiffs bring the same claims, the Court only needs to find that one plaintiff has standing for each form of relief sought. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

## II.    Federal Common Law And The Constitution Preempt The Act.

Federal law blocks the Act four times over.   First, federal common law preempts the Act regardless of any federal statute.   Second, the Constitution doesn't permit the Act's direct extraterritorial regulation.   Third, the Constitution bars the Act's effort to exercise power over foreign affairs.   And finally, the Clean Air Act preempts the Act.   So for one or all of these reasons, the Court should grant summary judgment to Plaintiffs and enjoin enforcement of the Act.

### A.    Federal Common Law Preempts The Act.

Out of the gate, New York concedes that there's "specialized federal common law" for "interstate pollution."   Resp. Br. 36-37 (quoting *Am. Elec. Power Co. v. Connecticut* (*AEP*), 564 U.S. 410, 421 (2011)).   New York just says that the "Clean Air Act displaced that common law."   Resp. Br. 37.   That's true to an extent.   But displaced federal common law retains its preemptive effect. *City of New York*, 993 F.3d at 98.   So even without the Clean

Air Act, the federal common law independently preempts New York's Act. That federal statutory law *also* preempts the Act merely reinforces the Act's unlawful nature.

Federal common law indeed preempts the Act. Federal common law preempts "where there is an overriding federal interest in the need for a uniform rule of decision." *Illinois v. City of Milwaukee* (*Milwaukee I*), 406 U.S. 91, 105 n.6 (1972). The Act squarely tackles questions of interstate air pollution, a "federal interest[]" that is "incompatible with the application of state law." *City of New York*, 993 F.3d at 91. And an "unbroken string of cases" demonstrates as much. *Id.* (collecting cases). Allowing state laws to prevail over federal laws in this arena would undermine "basic interests of federalism" and give States carte blanche to project their laws beyond their borders. *Milwaukee I*, 406 U.S. at 105 n.6. This disruption in turn would create "a chaotic regulatory structure" with "impossible to predict" standards, ultimately leading to "confrontation[s] between sovereign states." *Ouellette*, 479 U.S. at 496-97 (citation omitted). To avoid this outcome, "a federal rule of decision is necessary." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (cleaned up). Allowing the "controversy to be resolved under state law" invites a patchwork system strewn together by 50 States run amok. *Id.* "[O]ur federal system does not permit" that alternative. *Id.*

The Second Circuit has already answered this question, holding that federal common law applies "to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91. New York's response gives this dead-on-point precedent little attention, though, claiming only that "*City of New York* did not involve preemption of a state *statute* by federal common law," only a state "common law claim." Resp. Br. 37 (emphasis added). Based on

that observation, New York attempts to evade *City of New York*'s binding effect by claiming that federal common law can supposedly preempt only "state common law" but not "a state statute." *Id.* at 38. But New York provides no support for this novel theory. And for good reason: The Supreme Court disagrees with New York's theory. Where a matter involves "a question of federal common law," it displaces either "state statutes or [state] decisions." *Milwaukee I*, 406 U.S. at 105 (cleaned up); *see also Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) (recognizing same and collecting cases).

Though New York correctly surmises that Plaintiffs' cases involved preemption of state common law, *see* Resp. Br. 38, none of those decisions limited their analysis to common law or otherwise suggested their reasoning doesn't apply to effectively identical statutes. For instance, in *Boyle v. United Technologies Corporation*, the Court made clear that, where preemption conditions are met, federal common law displaces "the operation of" and "application of state law," with no further qualification as to the source of that state law. 487 U.S. 500, 507 (1988) (cleaned up). "[W]here the federal interest requires a uniform rule," the Court continued, federal common law can even replace "the entire body of state law applicable to the area" of conflict. *Id.* at 508. Similarly, *Texas Industries* held that, where federal common law applies, it is "inappropriate for state law to control," again without New York's added qualification. 451 U.S. at 641. The other cases say much the same. *See Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 386 (7th Cir. 2007) (reasoning that "federal common law" preempts the same "swath of cases" as a federal statute and so "overrides any state law" related to the federal interest); *Franchise Tax Bd. of Cal.*, 587 U.S. at 246 ("[N]o State can apply its own law to interstate disputes over borders.");

*Hinderlider*, 304 U.S. at 110 ("[N]either the statutes nor the decisions of [the] State[s] can be conclusive" on "questions of federal common law" (cleaned up)).

As long as there's a "demonstrated need for a federal rule of decision," the source of the law is irrelevant. *AEP*, 564 U.S. at 422. After all, the need for uniformity on federal issues is just as great regardless of whether the preempted state law is common law or statute. And need exists here: just as with interstate water pollution, the regulation of interstate air pollution is "incompatible with the application of state law." *City of New York*, 993 F.3d at 91; *cf. Ouellette*, 479 U.S. at 488 (noting that Supreme Court had "affirmed the view that the regulation of interstate water pollution is a matter of federal, not state, law" and "overrul[ed] [a] contrary suggestion" in a previous case). So federal common law preempts state statutes like the Act just as it preempts state common law.

New York next argues that federal common law can't preempt the Act because the Act allegedly "does not control interstate greenhouse gas emissions." Resp. Br. 38. But it does. The Act explicitly calculates producers' penalties by including emissions "attributable to all fossil fuel extraction and refining worldwide." N.Y. ENV'T CONSERV. LAW § 76-0101(8). In case that wasn't clear enough, the Act emphasizes that this attribution is "not limited to such emissions within the state." *Id.* The Act's language is transparent. Interstate emissions are not "only a link in the causal chain of the [State's] damages." *City of New York*, 993 F.3d at 91 (cleaned up). They're the sole basis for the law's strict liability scheme. *See* N.Y. ENV'T CONSERV. LAW § 76-0103(3)(a), (c) ("A responsible party shall be strictly liable" if its "covered greenhouse gas emissions … exceed[] one billion metric tons."). Again, New York doesn't have any producers within its borders that could be

18

responsible parties. So the Act regulates interstate emissions exclusively. And it imposes penalties far beyond New York's borders and from "just about every jurisdiction on the planet." *City of New York*, 993 F.3d at 92.

Similarly, New York can't insulate the Act from federal common law's grasp by flatly claiming that it "does not control interstate greenhouse gas emissions" because it merely seeks compensation for past emissions. Resp. Br. 38. Again, *City of New York* forecloses this argument. For one thing, there's no functional difference between a tort suit seeking compensatory damages and a statute seeking "[t]o secure compensatory payments" for global emissions. N.Y. ENV'T CONSERV. LAW § 76-0103(2)(a). Both are "substantial damages awards" that "would effectively regulate" behavior. *City of New York*, 993 F.3d at 92. New York's argument otherwise asks this Court to disregard the Act's effects. This Court should decline to do so. The City of New York aimed to "impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id.* at 93. New York's Act imposes "a standard of strict liability," N.Y. ENV'T CONSERV. LAW § 76-0103(2)(a), for the damages caused by "[c]overed greenhouse gas emissions … attributable to all fossil fuel extraction and refining worldwide," N.Y. ENV'T CONSERV. LAW § 76-0101(8). So there's no daylight between the tort suit in *City of New York* and the Act's strict liability scheme. And just like the suit in *City of New York*, the Act involves a "significant damages award" that will "no doubt compel the Producers to develop new means of pollution control." 993 F.3d at 92 (cleaned up). This statute is plainly "regulation … exerted through an award of damages." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (citation omitted). No matter how New York

19

wants to slice it, the Act "regulate[s] cross-border emissions," even if it does so "in an indirect and roundabout manner." *City of New York*, 993 F.3d at 93.

Finally, federal common law would preempt even if the Clean Air Act somehow went away. Congress's decision to partially displace federal common law doesn't mean that New York's Act "suddenly become[s] presumptively competent to address" interstate air pollution. *City of New York*, 993 F.3d at 98. With or without the Clean Air Act, interstate pollution remains an "issue[] that demand[s] a unified federal standard." *Id.* All that the Clean Air Act changes (besides it being a frontline preemption source) is that Congress could have chosen to carve out room for the States "to operate in" this "area of national concern." *Id.* at 99. If it had done so, state action would then be "permissible only to the extent authorize[d] by federal statute." *Id.* (cleaned up). But Congress did not authorize New York's Act. So it is preempted.

## B.    The Act Is An Unconstitutional Extraterritorial Regulation.

In its response, New York either misreads the States' concerns about the Act's unconstitutional extraterritoriality or attempts to build a strawman. The States don't claim that the Constitution imposes a "per se ban on extraterritorial regulation." Resp. Br. 41.

Rather, the Act is unconstitutionally extraterritorial because it purports to directly regulate entirely out-of-state conduct that is lawful where it occurs, with the aim of effecting "purposeful discrimination against out-of-state economic interests." *Nat'l Pork Prods.*, 598 U.S. at 371. Penalizing companies for fossil-fuel extraction in West Virginia is no different than penalizing fossil-fuel companies operating in West Virginia for violating New York's labor laws. It's no different than penalizing a company operating in West Virginia for failing

20

to obtain a permit from New York. The Act prevents "each State [from] mak[ing] its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). Yet "[t]he several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others." *Brown v. Fletcher's Estate*, 210 U.S. 82, 89 (1908) (internal citation omitted). Thus, the extraterritoriality doctrine holds "at a minimum" that a State may not apply its law "to commerce that takes place wholly outside of the State's borders." *Healy*, 491 U.S. at 336 (citation omitted). It makes no difference "whether or not the commerce has effects within the State," *id.* (citation omitted), unless the out-of-state actor "*intended* to produce … detrimental effects within [New York]." *Strassheim*, 221 U.S. at 285 (emphasis added); *see also Nat'l Pork Prods.*, 598 U.S. at 375–76. No evidence whatsoever proves any such intent.

This analysis is informed by multiple constitutional principles, which together "demonstrate why the Act is an especially egregious violation of the extraterritoriality doctrine." W. Va. Br. 33; *see Pork Producers*, 598 U.S. at 376 ("To resolve disputes about the reach of one State's power, this Court has long consulted … the Constitution's structure … as well as a number of … express provisions, including the Due Process Clause and the Full Faith and Credit Clause." (cleaned up)); *contra* Resp. Br. 43 (incorrectly claiming that the States are trying to "bring a due process claim on behalf of" producers). "[T]he extraterritoriality principle does not flow from the dormant commerce clause"—it derives "from the structure of the Constitution as a whole." Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II)*

*Extraterritorial State Legislation*, 85 MICH. L. REV. 1865, 1885, 1887-88 (1987); *see also* Katherine Florey, *State Courts, State Territory, State Power: Reflections on the Extraterritoriality Principle in Choice of Law & Legislation*, 84 NOTRE DAME L. REV. 1057, 1060 (2009) (explaining that the extraterritoriality principle is "better understood as a prohibition rooted in general structural principles of horizontal federalism").

And the Act is unlawful extraterritorial regulation in its purest form. Remember: the Act does not target any potential producers in New York. New York doesn't claim otherwise. Yet the Act will use the funds it extracts to "address the statewide impacts of climate change" and "fund future adaptation projects" in the State. Resp. Br. 3. Thus, "[b]y its plain terms, the [Act] applies solely to interstate" producers and thus "discriminate[s] against interstate commerce" by imposing costs on exclusively out-of-state businesses to fund projects in New York. *Healy*, 491 U.S. at 340-41. In this way, the Act's "necessary operation directly interferes with [and] burdens [fossil-fuel production] commerce" by raising the price of energy everywhere in the country; this is "a prohibited regulation and invalid." *Shafer v. Farmers' Grain Co. of Embden*, 268 U.S. 189, 199 (1925). This result follows "regardless of the purpose with which it was enacted." *Id.*

New York tries to shield the Act behind *Pork Producers*, but that case comes down against it, too. In *Pork Producers*, the Court "reject[ed]" an "almost per se" bar on laws with any extraterritorial effects under the dormant Commerce Clause doctrine. 598 U.S. at 375. But in doing so, the Court cautioned that it was not "trivializ[ing] the role territory and sovereign boundaries play in our federal system." *Id.* In fact, the Court "recognized the usual 'legislative power of a State to act upon persons and property within the limits of

its own territory.'" *Id.* (quoting *Hoyt*, 103 U.S. at 630). This feature, it continued, "allows 'different communities' to live 'with different local standards.'" *Id.* (quoting *Sable Comm'cns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). So nobody "should think one State may prosecute the citizen of another State for acts committed 'outside [the first State's] jurisdiction" that are not "intended to produce [or that do not] produce detrimental effects within it." *Id.* at 375-76 (cleaned up) (quoting *Strassheim v. Daily*, 221 U.S. 280, 285 (1911)).

Put differently, *Pork Producers* merely acknowledged that one state can regulate goods hailing from other states; in doing so, the regulating State addresses harms that arise because of the products' presence or use within its borders. That approach is the essence of a "local" interest. *Cf. Milk Control Bd. v. Eisenberg Farm Prods.*, 306 U.S. 346, 351 (1939) ("One of the commonest forms of state action is the exercise of [] police power directed to the control of local conditions and exerted in the interest of the welfare of the state's citizens."). It was the *sale* of the pork that gave rise to liability and responsibility, so the relevant conduct in *Pork Producers* occurred in the regulating State. In contrast, a direct regulation—a regulation that applies to the entity outside of the State without an intermediary—cannot be avoided in any way other than ceasing the out-of-state activity. *See S.D. Myers, Inc. v. City & Cnty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) ("Direct regulation occurs when a state law directly affects transactions … entirely outside of the state's borders." (citation omitted)). That's exactly what the Act does here; the relevant conduct occurs the moment the resource is taken from the ground, and that conduct begins and ends out of state. That conduct is "none of [New York's] concern." *Osborn v. Ozlin*, 310 U.S. 53, 62 (1940).

23

The Act's unabashed targeting of out-of-state activity makes it the kind of law the Court warned about in *Pork Producers*. By targeting only producers in other States (and other countries), the Act has a "*specific* impermissible extraterritorial effect." *Pork Producers*, 598 U.S. at 374 (cleaned up). It "deliberately prevent[s] [out-of-state producers] from undertaking competitive pricing" by assessing massive penalties that those fossil-fuel producers (as opposed to alternative energy producers) must take into account. *Id.* (cleaned up). And New York's law "deprive[s] [producers] and consumers in other States of … competitive advantages" by penalizing fossil-fuel producers and the States who promote and encourage fossil-fuel production. *Id.* (cleaned up). The law "deliberately rob[s] out-of-state" producers "of the opportunity" to compete in a fair market in not only New York, but the entire country. *Id.* at 372. And it "purposely discriminate[s] against out-of-state economic interests" by imposing these burdens *only* on "out-of-state" producers—because New York has none. *Id.* at 371. Finally, the Act does all this using a strict-liability scheme that makes no effort to determine whether the producers' penalized behaviors were intended to produce or actually produced any harm whatsoever in New York. *See id.* at 375-76. And while the Act might not "forbid any States from promoting fossil fuel production in their economies," Resp. Br. 42., it undoubtedly punishes them for doing so. The Act thus "has a sweeping extraterritorial effect" amounting to "a direct restraint on interstate commerce." *Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982).

New York can't get around this discrimination by claiming the producers have some alleged impact on their State or by saying that the law would apply to in-state producers, too (if they existed). On the first claim, the Act still cannot apply to actions "that take[]

place wholly outside of [New York's] borders, whether or not the commerce has effects within the State," *Edgar*, 457 U.S. at 642-43, unless the out-of-state actions is "intended to produce … detrimental effects within [New York]." *Strassheim*, 221 U.S. at 285; *see also Nat'l Pork Prods.*, 598 U.S. at 375–76.  And anyway, because of the Act's strict-liability structure, New York has never tried to prove any harmful effect—much less intent to create that harmful effect.  As to the second claim, it matters little what hypothetical effects the Act could have in a different world; what matters is that the Act's exclusive "practical effect … is to control [conduct] beyond the boundaries of the state." *S. Pac. Co. v. Arizona*, 325 U.S. 761, 775 (1945).  And the Act would still be unconstitutional when applied to conduct occurring exclusively in other States.  New York can't declare its laws nationally supreme.  The Act doesn't supersede other States' legislative choices.  Accepting New York's arguments would open the floodgates to States passing any number of laws that extract monetary payments from other States' industries based on a tenuous claim of harm and the empty promise that "if it was happening here, we'd go after them too."

Equally concerning, the Act's "intention and effect … is to change conduct beyond [New York's] border" to bring that conduct in line with New York's preferences.  *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 69 (1st Cir. 1999).  Yet "it is clear that no single State could … impose its own policy choice on neighboring States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996).  In this way, "one State's power to impose burdens on the interstate market" is "constrained by the need to respect the interests of the other States." *Id.*  One such constraint is that "[n]o State can legislate except with reference to its own jurisdiction" because "[e]ach State is independent of all the others." *Bonaparte v.*

*Tax Court*, 104 U.S. 592, 594 (1881). Thus, New York "may not impose economic sanctions on violators of its laws with the intent of changing the [violators'] lawful conduct in other States." *BMW*, 517 U.S. at 572. The Act does just that and thereby unlawfully undercuts the "harmony among the States." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285 (1976).

Ultimately, state laws are unconstitutionally extraterritorial when they aim to "build up … domestic commerce" by imposing "burdens upon the industry and business of other States." *Guy v. Baltimore*, 100 U.S. 434, 443 (1879). The Act does just that. It is a "regulatory measure[] designed to benefit in-state economic interests by burdening" producers in other States. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (citation omitted). New York is "policing its own concerns." *Pac. Coast Dairy v. Dep't of Agric. of Cal.*, 318 U.S. 285, 295 (1943). But the "sovereign prerogative[]" to remedy out-of-state problems (to the extent they really even exist) rests with the oil, gas, or coal-producing State or is "lodged in the Federal Government." *Massachusetts v. EPA,* 549 U.S. 497, 519 (2007); Florey, *supra*, at 1093 ("[The extraterritoriality doctrine] is perhaps best understood as a means of establishing order—and confining each state to its proper sphere of authority—in a federalist system."). The Act offends that sovereign prerogative.

## C.    The Act Violates The Foreign Affairs Doctrine.

New York seems to agree that, under the foreign affairs doctrine, the Act would be preempted if it either has "a clear conflict" with the foreign affairs power or it otherwise "intrudes on the field of foreign affairs without addressing a traditional state responsibility." Resp. Br. 49-50 (citation omitted). That's a good start. But New York then goes on to wrongly claim that the Act satisfies all these requirements. It does not.

26

The "field of foreign affairs" certainly belongs "to the President and the Congress." *Zschernig v. Miller*, 389 U.S. 429, 432 (1968). Indeed, the Constitution "expressly identifies certain foreign affairs powers and vests them in particular branches." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015) (Thomas, J., concurring). And "it vests the residual foreign affairs powers of the Federal Government … in the President by way of Article II's Vesting Clause." *Id.* at 33 (Thomas, J., concurring).

Because the Constitution vests express and residual foreign-affairs powers in the federal government, there's "no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003). State subordination to the foreign-affairs field's "uniquely federal interests" ensures "uniformity in this country's dealings with foreign nations." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426, 427 n.25 (1964). So, in this unique field, the Constitution preempts state laws "that would plainly prevent this Nation from speaking with one voice." *Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 451 (1979).

**1.** The Act is in "clear conflict" with the federal government's foreign policy. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 421 (2003). Greenhouse gas emissions "present[] a uniquely international problem of national concern." *City of New York*, 993 F.3d at 85. Yet the Act reaches emissions "worldwide" and without "limit[] to such emissions within the state." N.Y. ENV'T CONSERV. LAW § 76-0101(8). The law's plain text contemplates demanding payments from foreign entities, including companies owned by foreign nations.

Imposing sanctions on foreign-state-owned energy producers "implicat[es]" the United States' "relations with foreign nations." *City of New York*, 993 F.3d at 92 (cleaned up).

The Act's "worldwide" sanctions conflict with "the United States' longstanding position in international climate-change negotiations ... to oppose the establishment of liability and compensation schemes at the international level." *City of New York*, 993 F.3d at 103 n.11 (cleaned up). President Trump called laws like New York's "significant barriers to ... international trade." Exec. Order No. 14260, 90 Fed. Reg. 15513 (Apr. 8, 2025). If that's not clear enough, the United States has also sued New York to enjoin it from enforcing the Act. *See* Compl., *United States v. New York*, No. 1:25-cv-03656 (S.D.N.Y. May 1, 2025), ECF No. 1; *see also* Compl., *United States v. Vermont*, No. 2:25-cv-00463 (D. Vt. May 1, 2025), ECF No. 1 (federal government challenge to similar Vermont law).

In challenging the Act, the federal government emphasized that New York's law "intrudes on, and interferes with, the federal government's exclusive role in foreign affairs." Compl. ¶ 7, *United States v. New York*. For instance, the United States has long "engaged in international efforts regarding climate change and greenhouse gas emissions, balancing foreign policy considerations and domestic energy needs." *Id.* ¶ 44. So the Act undermines the federal government's "capacity to speak with one voice when conducting commercial relations with foreign governments on issues such as regulation of greenhouse gas emissions, trade policy, exports and imports of fossil fuels, and national security." *Id.* ¶ 94.

Deputy Secretary of State Christopher Landau recently reiterated these concerns in this case, too. *See* Landau Decl., ECF 222-1. Secretary Landau explained that the Act "directly conflicts with ... U.S. foreign policy in multiple respects." *Id.* ¶ 15. First, the Act

"would increase costs for energy producers" targeted by the Act "which could in turn increase costs for U.S. consumers, thereby undermining crucial U.S. policy and national security interests in increasing affordable domestic energy." *Id.*  Second, the Act "undermines important ongoing diplomacy to advance U.S. interests." *Id.* ¶ 16.  Third, the Act "interferes with the United States' foreign policy on greenhouse gas regulations, including but not limited to" federal involvement in the Framework Convention and its withdrawal from the Paris Agreement. *Id.* ¶ 17.  Fourth, the Act "threatens to harm foreign relations between the United States and foreign countries where such producers are based or have substantial operations." *Id.* ¶ 18.  And fifth, the Act "hampers what President Trump has lauded as the ability of the United States to grow its economy and maintain jobs for its citizens while playing a leadership role in global efforts to protect the environment." *Id.* ¶ 19 (cleaned up).  Finally, Secretary Landau cautioned that "[t]hese foreign policy harms would multiply if other states started enacting similar laws … because it would become even more difficult—if not impossible—to maintain a coherent national position on the regulation of global greenhouse gas emissions." *Id.* ¶ 20.

So for these reasons, the Act stands as an "obstacle to the accomplishment of [the federal government's] full objectives." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (cleaned up).  New York doesn't contest that the Act would conflict with these as-stated positions either.  Rather, New York just argues that none of this actually represents foreign policy.  In New York's vision, foreign policy must come from or be implicitly approved by Congress.  That's wrong.

For one thing, New York's narrow conception of who can make foreign policy ignores that the President and those he directs in the executive branch exercise the "vast share of responsibility for the conduct of our foreign relations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring). The President is "the Nation's organ in foreign affairs." *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948). Indeed, he is the "sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). And contrary to New York's belief that *all* foreign policy must involve Congress in some way, *see* Resp. Br. 50, the President "does not require as a basis for [his] exercises an act of Congress," *Curtiss-Wright*, 299 U.S. at 320. Recall that the Constitution places some express and all residual foreign-affairs powers in the executive. *Zivotofsky*, 576 U.S. at 32-33 (Thomas, J., concurring). Put simply, the President has "the lead role … in foreign policy." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972) (plurality op.).

With so much foreign-affairs power vested in the President, New York is wrong to think he *can't* make foreign policy without Congress. New York bases this belief on a misunderstanding of *Medellín v. Texas*, 552 U.S. 491 (2008). *See* Resp. Br. 50. But *Medellín* does not say the President can't make foreign policy. That case didn't actually look at when the President can create *foreign* policy at all; it dealt with whether he has "authority to create *domestic* law pursuant to a non-self-executing treaty." 552 U.S. at 528 (emphasis added). In *Medellín*, President Bush sought to "vindicate United States interests in ensuring the reciprocal observance of the Vienna Convention." *Id.* at 524. The

Court explained that "a non-self-executing treaty can become domestic law only in the same way as any other law." *Id.* at 526. As a result, "[t]he responsibility for transforming an international obligation arising from a non-self-executing treaty into domestic law falls to Congress." *Id.* at 525-26.

In objecting to the Act, the federal government is not making domestic law. Instead, it is detailing the federal government's position on *foreign* policy. And "[o]ur system of government is such that the interest" of States and citizens alike, "imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941). So inasmuch as the Act "stands in the way" of foreign policy, it is preempted. *Garamendi*, 539 U.S. at 399. As the Second Circuit explained, permitting foreign-reaching-penalties like those in the Act would "obviously sow confusion and needlessly complicate the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *City of New York*, 993 F.3d at 103.

New York argues the Act isn't preempted because it has only "incidental effects" on foreign powers. Resp. Br. 57. New York says it imposes "obligations on foreign companies" only. Resp. Br. 59. Because those obligations conflict with the United States' foreign policy and regulate international emissions, they're more than "incidental effects." Regardless, it's simply not true that only foreign *companies* are within the Act's worldwide sweep. "Responsible part[ies]" include "entit[ies]." N.Y. ENV'T CONSERV. LAW § 76-0101(21). An "entity" can be a "company," but the Act also specifically includes governmental bodies like "municipalit[ies], political subdivision[s], or other legal organization[s]." *Id.* § 76-0101(11). And the company-government distinction doesn't exist for many targeted entities. New

York's Act targets Saudi Aramco (Saudi Arabia), Pemex (Mexico), Petrobras (Brazil), Equinor (Norway), and Ecopetrol (Colombia). Krueger & Dinowitz Memo., ECF 217-33; *see also* NAT. RES. GOVERNANCE INST., THE NATIONAL OIL COMPANY DATABASE 24-25 (April 2019), https://tinyurl.com/53wj4hmy (listing state-owned oil companies). Each of those entities is at least majority state-owned. NAT. RES. GOVERNANCE INST., *supra*, at 7. So when New York attempts to sanction Saudi Aramco, for example, it's really sanctioning the Kingdom of Saudi Arabia. That's more than an "incidental effect" on foreign affairs. *See Crosby*, 530 U.S. at 373-74 (finding State law undermined "natural effect" of and was preempted by federal statute directing "President to proceed diplomatically in developing a comprehensive, multilateral strategy toward Burma").

If the Act didn't reach foreign actors or affect foreign policy, the foreign affairs doctrine would not preempt it (though it would still be illegal for other reasons). But "[p]ower over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942). So regardless of whether the Act might be legal if it lacked international reach, as it stands, the Act "impair[s] the effective exercise of the Nation's foreign policy." *Garamendi*, 539 U.S. at 419 (citation omitted). It "must give way." *Id.* (citation omitted).

**2.** The direct conflict with foreign policy dooms the Act. Yet even if there wasn't a direct conflict, the Act undoubtedly intrudes on foreign policy without addressing a traditional state interest. It deals with global emissions, which, as the Second Circuit already explained, present a "uniquely international problem of national concern" that "is simply beyond the limits of state law." *City of New York*, 993 F.3d at 85, 92. The Supreme

32

Court agrees: "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector" is a "question[] of national or international policy." *AEP*, 564 U.S. at 427. So the "sovereign prerogative" of how to effect cross-border "reductions in greenhouse gas emissions" is "lodged in the Federal Government." *Massachusetts*, 549 U.S. at 519. New York has "no serious claim to be addressing a traditional state responsibility." *Movsesian v. Victoria Vershicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc).

And far from having some "incidental or indirect effect in foreign countries," *Clark v. Allen*, 331 U.S. 503, 517 (1947), the Act directly levies penalties against foreign producers for their emissions. So just like it will domestically, the Act's "practical effect" is an attempt to curb emissions in foreign nations and thus impermissibly "regulate conduct beyond its borders and beyond the borders of this country." *Natsios*, 181 F.3d at 69. Such "state activity" in international affairs is "forbidden." *Zschernig*, 389 U.S. at 436.

New York tries to salvage the Act by saying that it doesn't "inquire into the affairs of foreign nations or reflect foreign policy attitudes or criticisms of foreign governments … because it applies objective criteria equally to domestic and foreign companies." Resp. Br. 58 (cleaned up). Likewise, New York points to the Act's unadorned requirement that producers have "sufficient contacts with [New York] to satisfy the due process clause." Resp. Br. 58 (citation omitted). But these arguments fail to mention that these "objective criteria" and "sufficient contacts" aren't God-given standards. They are subjective based on New York's determinations and reflect its views on greenhouse gas emissions and who's "responsible" for them. Thus, the Act "not only expresses a distinct political point of view on a specific matter of foreign policy, but also subject[s] foreign [producers] to [penalties]

in [New York]." *Gingery v. City of Glendale*, 831 F.3d 1222, 1229 (9th Cir. 2016) (cleaned up). The Constitution does not allow New York to "bypass the various diplomatic channels the United States uses to address" international emissions and take it upon itself to "hold [producers] accountable for purely foreign activity." *City of New York*, 993 F.3d at 103.

### III.    The Clean Air Act Preempts The Superfund Act.

Article VI of the Constitution provides that laws of the United States "shall be the supreme Law of the Land; … any Thing in the Constitution or Law of any State to the Contrary." U.S. CONST. art. VI, cl. 2. "[E]ven where … a statute does not refer expressly to pre-emption, Congress may implicitly pre-empt a state law." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015). In such situations, "[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (cleaned up). To be sure, Congress "rare[ly]," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020), regulates "comprehensive[ly]" enough to "infer[] that [it] left no room for supplementary state regulation." *Ouellette*, 479 U.S. at 491 (cleaned up). But the Clean Air Act's regulation of interstate air pollution is one of those rare circumstances.

### A.    The Second Circuit Confirmed The Clean Air Act Preempts Laws Like The Act.

Second Circuit precedent confirms the Clean Air Act preempts New York's law. As that Court explained, the Clean Air Act's comprehensive coverage of interstate air pollution leaves room only for regulation under "the law of the pollution's source state." *City of New York*, 993 F.3d at 100 (cleaned up). This "slim reservoir" left to the States does not allow New York to impose its "standards on emissions emanating simultaneously from all 50 states and nations of the world." *Id.* Indeed, "[t]o permit such a [result] would 'undermine

th[e] carefully drawn [Clean Air Act] through a general savings clause.'" *Id.* (quoting *Ouellette*, 479 U.S. at 494). In turn, this "generic savings clause" would "serious[ly] interfere[] with the achievement of the full purposes and objectives of Congress." *Id.* (cleaned up). This Court, as the Second Circuit before it, "cannot allow" this outcome that "Congress never intended." *Id.* (cleaned up).

New York again tries to wriggle its law out of *City of New York*'s grasp. This time, the State claims once more that the Act does not "regulate[] out-of-state and global greenhouse gas emissions" but rather "seeks only compensation for harm to New York State from past emissions." Resp. Br. 23-24. The Supreme Court and Second Circuit already rejected this exact distinction, though: "regulation can be effectively exerted through an award of damages." *City of New York*, 993 F.3d at 92 (cleaned up) (quoting *Kurns*, 565 U.S. at 637). In fact, penalties like the Act's "obligation to pay compensation can be, indeed [are] designed to be, a potent method of governing conduct and controlling policy." *Id.* (cleaned up) (quoting *Kurns*, 565 U.S. at 637). So as a matter of law, such penalties are simply an "indirect and roundabout" means of regulation. *Id.* at 93. The Clean Air Act does not allow this.

New York asks the Court to disregard *City of New York*, describing its holdings as "findings in [an]other case[] that are not subject to judicial notice." Resp. Br. 30. Not so. The Second Circuit's findings in that case were entirely legal. Indeed, the case was decided on a motion to dismiss. *City of New York*, 993 F.3d at 88. In that posture, the court accepted "*all* factual allegations as true and dr[e]w[] all reasonable inferences in favor of the [City]." *Id.* at 89 (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir.

2011)).  So when the court rejected the City's arguments and found that the nuisance claims were indeed regulation, it did so as a matter of law, not a fact-specific determination.  Note how the Second Circuit cited the Supreme Court for the proposition that regulation by way of damages has been "long recognized."  *City of New York*, 993 F.3d at 92 (quoting *Kurns*, 565 U.S. at 637).  This recognition, the Second Circuit said, is a universal "economic reality," not a case-by-case factual question.  *City of New York*, 993 F.3d at 92.

No practical distinction between tort liability and the Act's penalties would make the analysis any different.  Both are "obligation[s] to pay compensation."  *City of New York*, 993 F.3d at 92 (cleaned up).  Both "effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released."  *Id.* at 93.  And both require producers to "develop new means of pollution control" to avoid "ongoing liability."  *Id.* (cleaned up).  Indeed, the Act's coverage years were already expanded once (from 2000-2018 to 2000-2024).  Thus, the "economic reality" identified by the Second Circuit applies to the Act, and the Clean Air Act preempts it.  *Id.* at 92.

The Second Circuit's legal conclusions render New York's expert declaration legally irrelevant as well.  That expert opined on the Act based—purportedly—on "information and materials commonly accepted by *economists*."  Fullerton Decl. ¶ 8, ECF 230-2 (emphasis added).  But the view of economists isn't the legal standard for preemption, and an expert's opinion cannot override the Second Circuit's *legal* conclusions and precedent.  That court held that as a matter of law "regulation can be effectively exerted through an award of damages."  *City of New York*, 993 F.3d at 92 (cleaned up).  That holding controls, regardless of what New York's expert might think.

New York also tries to distance itself from binding precedent by claiming that *City of New York* did not involve a "traditional statutory preemption analysis." Resp. Br. 31. That's true, but New York fails to mention why: the Second Circuit didn't need to do a statutory analysis because state law was already preempted by "federal common law," which "governed [interstate pollution] in the first place." *City of New York*, 993 F.3d at 98. The same is true here, so the question is whether the Clean Air Act, which displaces federal common law, authorizes the Act. The source of the state law is irrelevant.

The Clean Air Act does not authorize New York's Act. The States' rights savings clause permits only in-state regulation of in-state sources. *See* 42 U.S.C. § 7416. Similarly, the citizen-suit savings clause permits suits only under a source state's laws. *See id.* § 7604(e). So New York is free to regulate "pursuant to the law of the *source* state." *Ouellette*, 479 U.S. at 497. It can "adopt more stringent limitations" and "establish such limitations through state" law. *City of Milwaukee v. Illinois and Michigan* (*Milwaukee II*), 451 U.S. 304, 328 (1981). But it may only apply those limitations "to in-state discharges." *Id.* Yet the Act covers "worldwide" emissions and is "not limited to emissions within the state." N.Y. Env't Conserv. Law § 76-0101(8). "Nothing in the [Clean Air Act] gives [New York] this power to regulate" beyond its borders. *Ouellette*, 479 U.S. at 497.

New York tries to overcome all of this logic by flipping the burden. New York believes the presumption against preemption rescues the Act. In a familiar refrain, New York claims the presumption applies because the Act "does not regulate cross-border pollution" but is instead within the State's "broad police powers to protect the health and safety of their citizens." Resp. Br. 25-26 (cleaned up). That argument remains foreclosed

by *City of New York* for two reasons.  First, the Second Circuit held that monetary damages "can be, indeed [are] designed to be," regulatory.  *See* 993 F.3d at 92 (citation omitted).  And second, New York's claim of traditional police power ignores *what* the State is allegedly protecting its citizens from: interstate air pollution.  But interstate air pollution is not a "field in which states have traditionally occupied."  *Id.* at 98 (cleaned up).  "For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution."  *Id.* at 91 (collecting cases).  New York can't sidestep binding precedent by framing the Act as a health and safety regulation.  The Second Circuit already rejected that very argument.  *See id.* at 91.  At bottom, the Clean Air Act "touch[es] a field in which the federal interest is so dominant that" no presumption against preemption can attach to the Act, or any other "state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

### B.    The Act Is Field Preempted And Conflict Preempted.

New York's arguments on the specific type of preemption here largely repeat their previous claims, namely that, despite *City of New York*, the Act does not regulate emissions of air pollutants.  But on field preemption, New York supposes that "[t]he Clean Air Act does not occupy the field of controlling ongoing emissions of air pollutants."  Resp. Br. 28.  This belief is incompatible with *City of New York*'s holding that "[t]he Clean Air Act is a comprehensive statutory scheme."  993 F.3d at 99.  The argument also disregards EPA's role as the "primary regulator of greenhouse gas emissions."  *AEP*, 564 U.S. at 428. All told, the Second Circuit already found that the Clean Air Act leaves States only a "much more limited role in regulating pollution sources beyond their borders."  *City of New York*,

993 F.3d at 88.  That role "permit[s] each [s]tate to take the first cut at determining how best to achieve EPA emissions standards *within its domain*."  *Id.* (citation omitted).  It does not allow States to regulate emissions in other States—let alone abroad.

*Exxon Shipping Company v. Baker*, 554 U.S. 471 (2008), doesn't change this analysis.  *Contra* Resp. Br. 29.  In finding that the Clean Water Act did not "occupy the entire field of pollution remedies," the Court distinguished it from federal maritime law.  *Exxon Shipping*, 554 U.S. at 489.  It did not look at *state* law of a non-source state at all or suggest some newfound state power over interstate pollution.  All *Exxon Shipping* stands for is the proposition that the Clean Water Act does not fully displace federal maritime common law.  This finding is irrelevant to whether New York's Act is preempted.

Even if the Clean Air Act didn't occupy the field, the Act would still conflict.  It undermines EPA's exclusive, nationwide regulatory authority.  *See AEP*, 564 U.S. at 428.  Congress made an "informed assessment of competing interests" with the Clean Air Act.  *Id.* at 427.  It chose to allocate authority in the Clean Air Act by making States responsible for "how best to achieve EPA emissions standards within its domain."  *Id.* at 428.  In that way, it gave States a "narrowly circumscribed" role over emissions regulation exclusively exercised "under the law of the pollution's source state."  *City of New York*, 993 F.3d at 100 (cleaned up); *see also* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution control *at its source* is the primary responsibility of States and local governments." (emphasis added)).  Meanwhile, the Clean Air Act makes EPA the one who decides "whether and how" to regulate in the first place on a national scale.  *AEP*, 564 U.S. at 426.  New York's Act bypasses EPA's expert determinations and usurps the agency in the realm of interstate pollution regulation.

39

The Act also creates parallel liability for the same emissions. The result is "separate discharge standards on a single point source." *Ouellette*, 479 U.S. at 493. This in turn creates "serious interference with the achievement of the full purposes and objectives of Congress." *Id.* (cleaned up). Congress did not "intend[] to undermine th[e] carefully drawn [Clean Air Act]" in this way, so New York is "preclude[d] … from applying [its] law … against an out-of-state source." *Id.* at 494.

The state-versus-state regime envisioned by New York would lead to a "chaotic confrontation between sovereign states." *Ouellette*, 479 U.S. at 496 (citation omitted). It would become "virtually impossible to predict the standard for a lawful discharge" because multiple States could impose multiple standards on the same emissions. *Id.* at 497 (citation omitted). This chaos isn't mere speculation: Vermont already enacted a similar law, and several other States are considering doing the same. *See* Amanda G. Halter et al., *Climate Superfund Map*, PILLSBURY, https://tinyurl.com/abe6jncp (last visited Feb. 11, 2026); Zycher Decl. ¶ 32, ECF 217-26. Even if it were speculative though, the Supreme Court considers the threat of such an "irrational system of regulation" enough to preempt state law. *Ouellette*, 479 U.S. at 496.

So either way, under field preemption or conflict preemption (and really both), the Clean Air Act preempts New York's Act.

## CONCLUSION

The Court should grant Plaintiffs summary judgment on Counts I and II and deny Defendants' motion for summary judgment.

Respectfully submitted,

Dated: February 13, 2026

JOHN B. MCCUSKEY
  ATTORNEY GENERAL OF WEST VIRGINIA

/s/ Caleb B. David
Michael R. Williams
  Solicitor General
Caleb B. David
  Deputy Solicitor General
Caleb A. Seckman
  Assistant Solicitor General

Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
caleb.b.david@wvago.gov

Counsel for State of West Virginia


STEVE MARSHALL
  ATTORNEY GENERAL OF ALABAMA

/s/ Robert M. Overing
Robert M. Overing*
  Deputy Solicitor General

Office of the Attorney General
of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Robert.Overing@AlabamaAG.gov

Counsel for State of Alabama


TIM GRIFFIN
  ATTORNEY GENERAL OF ARKANSAS

/s/ Autumn Hamit Patterson
Autumn Hamit Patterson*
  Solicitor General

Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-3661
Autumn.Patterson@Arkansasag.Gov

Counsel for the State of Arkansas

CHRISTOPHER M. CARR
  ATTORNEY GENERAL OF GEORGIA

Stephen J. Petrany
  *Solicitor General*

*/s/ Elijah O'Kelley*
Elijah O'Kelley*
  *Assistant Solicitor General*

Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
  ATTORNEY GENERAL OF IDAHO

*/s/ Michael A. Zarian*
Michael A. Zarian #12418ID*
  *Solicitor General*

Office of the Idaho Attorney General
700 W. Jefferson St., Suite 210,
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

*Counsel for the State of Idaho*

BRENNA BIRD
  ATTORNEY GENERAL OF IOWA

*/s/ Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

KRIS W. KOBACH
  ATTORNEY GENERAL OF KANSAS

*/s/ Anthony J. Powell*
Anthony J. Powell*
  *Solicitor General*

Office of the Kansas Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel.: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

RUSSELL COLEMAN
  ATTORNEY GENERAL OF KENTUCKY

/s/ *Victor B. Maddox*
Victor B. Maddox (KBA No. 43095)*
Jason P. Woodall (KBA No. 95013)*

Kentucky Office of the Attorney General
310 Whittington Parkway, Suite 101
Louisville, KY 40222
(502) 696-5300
Victor.Maddox@ky.gov
Jason.Woodall@ky.gov

*Counsel for Commonwealth of Kentucky*


LYNN FITCH
  ATTORNEY GENERAL OF MISSISSIPPI

/s/ *Justin L. Matheny*
Justin L. Matheny*
  *Deputy Solicitor General*

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

/s/ *J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
  *Solicitor General*

Office of the Louisiana Attorney General
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6705
AguinagaB@ag.louisiana.gov

*Counsel for State of Louisiana*


CATHERINE HANAWAY
  ATTORNEY GENERAL OF MISSOURI

/s/ *Louis J. Capozzi*
Louis J. Capozzi *
  *Solicitor General*

Office of The Missouri Attorney General
Solicitor General
Office of Missouri Attorney General
815 Olive Street
St Louis, MO 63101
717-802-2077
Email: louis.capozzi@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ Christian B. Corrigan
Christian B. Corrigan*
  Solicitor General

Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov

Counsel for State of Montana


DREW H. WRIGLEY
  ATTORNEY GENERAL OF NORTH DAKOTA

/s/ Philip Axt
Philip Axt*
  Solicitor General

600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

Counsel for the State of North Dakota


MICHAEL T. HILGERS
  ATTORNEY GENERAL OF NEBRASKA

/s/ Zachary A. Viglianco
Zachary A. Viglianco*
  Principal Deputy Solicitor General

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
zachary.viglianco@nebraska.gov

Counsel for State of Nebraska


DAVE YOST
  ATTORNEY GENERAL OF OHIO

/s/ Mathura Sridharan
Mathura Sridharan *
  Solicitor General

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
Email: mathura.sridharan@ohioago.gov

Counsel for the State of Ohio

GENTNER DRUMMOND
  ATTORNEY GENERAL OF OKLAHOMA

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
  *Solicitor General*

Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*


MARTY J. JACKLEY
  ATTORNEY GENERAL OF SOUTH DAKOTA

*/s/ Emily Greco*
Emily Greco*
  *Assistant Attorney General*

South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
605-773-3215
emily.greco@state.sd.us

*Counsel for State of South Dakota*


ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr.*
  *Solicitor General*

Office of the Attorney General of
South Carolina
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-3680
esmith@scag.gov

*Counsel for State of South Carolina*


JONATHAN SKRMETTI
  ATTORNEY GENERAL AND REPORTER OF
TENNESSEE

*/s/ J. Matthew Rice*
J. Matthew Rice*
  *Solicitor General*

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
615-532-6026
Email: matt.rice@ag.tn.gov

*Counsel for State of Tennessee*

KEN PAXTON
  ATTORNEY GENERAL OF TEXAS

Brent Webster
*First Assistant Attorney General*

Ralph Molina
*Deputy First Assistant Attorney General*

Austin Kinghorn
*Deputy Attorney General for Legal Strategy*

/s/ Ryan G. Kercher
Ryan G. Kercher*
  *Chief, Special Litigation Division*
Texas Bar No. 24060998

Zachary Berg*
  *Special Counsel*
Tex. State Bar No. 24107706

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Kercher@oag.texas.gov
Zachary.Berg@oag.texas.gov
Kathleen.Hunker@oag.texas.gov

*Counsel for State of Texas*

DEREK E. BROWN
  ATTORNEY GENERAL OF UTAH

/s/ Gary T. Wight
Gary T. Wight (Utah Bar No. 10994)*
  *Assistant Attorney General*

1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah*

46

KEITH G. KAUTZ
  ATTORNEY GENERAL OF WYOMING

/s/ Ryan Schelhaas
Ryan Schelhaas*
  *Chief Deputy Attorney General*

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

WEST VIRGINIA COAL ASSOCIATION AND
AMERICA'S COAL ASSOCIATIONS
By Counsel

/s/ Christopher M. Hunter
Robert G. McLusky, WVBN 2489*
Christopher M. Hunter, WVBN 9768*

Jackson Kelly, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
(304) 340-1381
rmclusky@jacksonkelly.com
chunter@jacksonkelly.com

*Counsel for West Virginia Coal Association
and America's Coal Associations*

GAS AND OIL ASSOCIATION OF WEST VIRGINIA,
INC.
By Counsel

/s/ Ivan L. London
Ivan L. London*
William E. Trachman*
Alexander Khoury

Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
916-284-3255
ilondon@mslegal.org
wtrachman@mslegal.org
akhoury@mslegal.org

*Counsel for Gas and Oil Association of West
Virginia, Inc.*

ALPHA METALLURGICAL RESOURCES, INC.
By Counsel

/s/ Michael W. Kirk
Michael W. Kirk*
Adam P. Laxalt*
Brian W. Barnes*
Megan M. Wold*

Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
mkirk@cooperkirk.com
alaxalt@cooperkirk.com
bbarnes@cooperkirk.com
mwold@cooperkirk.com

*Counsel for Plaintiff
Alpha Metallurgical Resources, Inc.*

*pro hac vice