# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

STATE OF WEST VIRGINIA, et al.,

*Plaintiffs,*

v.

LETITIA JAMES, in her official capacity
as the Attorney General of New York, et al.,

*Defendants.*

No. 1:25-cv-00168-BKS-DJS

# REPLY MEMORANDUM IN SUPPORT
# OF NEW YORK'S CROSS-MOTION FOR SUMMARY JUDGMENT
# AND SUPPLEMENTAL MEMORANDUM
# IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT
# AND IN SUPPORT OF
# NEW YORK'S CROSS-MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General of the State of New York
The Capitol
Albany, New York 12224-0341
Attorney for State Defendants

MONICA WAGNER
Deputy Bureau Chief

AYAH F. BADRAN
SABITA KRISHNAN
LAURA MIRMAN-HESLIN
Assistant Attorneys General

*Of Counsel*
March 27, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

ADDITIONAL BACKGROUND ........................................................................... 2

    EPA's Rescission of the Motor Vehicle Endangerment Finding ......................... 2

    The United States' Withdrawal from the Framework Convention ...................... 4

ARGUMENT ........................................................................................................ 5

  I.    PLAINTIFFS LACK STANDING. ................................................................ 5

      A.    The States Fail to Demonstrate Injury. ............................................... 5

      B.    The Associations and Alpha Fail to Demonstrate Injury. ...................... 7

  II.    THE CLEAN AIR ACT AND FEDERAL COMMON LAW DO NOT
      PREEMPT THE CLIMATE ACT. ............................................................. 9

      A.    The Clean Air Act Does Not Preempt the Climate Act. ......................... 9

          1.    The Climate Act Is an Exercise of Traditional State
              Responsibility ................................................................. 10

          2.    The Climate Act Is Not Field-Preempted. ...................... 12

          3.    The Climate Act Is Not Conflict-Preempted. .................... 14

          4.    The Climate Act Is Not Preempted Under *City of New York*. .......... 17

          5.    EPA's Rescission of the Motor Vehicle Endangerment Finding Is
              Inconsistent with Plaintiffs' and the United States' Clean Air Act
              Preemption Arguments. ................................................... 18

      B.    Federal Common Law Does Not Preempt the Act. ............................. 22

  III.  THE CLIMATE ACT IS NOT PREEMPTED BY THE CONSTITUTION.  24

      A.    The Structure of the Constitution Does Not Preclude the Climate
          Act .............................................................................. 24

      B.    The Climate Act Does Not Violate Due Process. ................................ 26

      C.    The Climate Act Does Not Violate the Dormant Commerce Clause. ... 29

IV.   THE FOREIGN AFFAIRS DOCTRINE DOES NOT PREEMPT THE CLIMATE ACT. ............................................................................................ 31

    A.    *City of New York* is Not Controlling ........................................................ 31

    B.    The Climate Act Does Not Conflict With Foreign Policy. .................... 33

    C.    The Foreign Affairs Power Does Not Field-Preempt the Climate Act.  35

CONCLUSION .................................................................................................... 36

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
   458 U.S.592 (1982) ................................................................................ 7

*Am. Elec. Power Co. v. Connecticut,*
   564 U.S. 410 (2011) ................................................................ 13, 20, 22-23

*Askew v. Am. Waterways Operators, Inc.,*
   411 U.S. 325 (1973) .............................................................................. 35

*Barclays Bank PLC v. Franchise Tax Bd. Of Cal.,*
   512 U.S. 298 (1994) .............................................................................. 34

*BMW of N. Am., Inc. v. Gore,*
   517 U.S. 559 (1996) ......................................................................... 10, 29

*Boomer v. Atl. Cement Co.,*
   257 N.E.2d 870 (N.Y. 1970).............................................................. 6, 10

*Boyle v. United Technologies. Corp.,*
   487 U.S. 500 (1988) .............................................................................. 24

*Bridgeway Corp. v. Citibank,*
   201 F.3d 134 (2d Cir. 2000)................................................................... 7

*Calder v. Jones,*
   465 U.S. 783 (1984) .............................................................................. 26

*CFCU Cmty. Credit Union v. Hayward,*
   552 F.3d 253 (2d Cir. 2009)................................................................... 8

*City of New York v. Chevron Corp.,*
   993 F.3d 81 (2d Cir. 2021).............................................................passim

*Clean Air Mkts. Grp. v. Pataki,*
   338 F.3d 82 (2d Cir. 2003)................................................................... 13

*Coal. for Competitive Elec. v. Zibelman,*
   906 F.3d 41 (2d Cir. 2018)................................................................... 13

*Domino Media, Inc. v. Kranis,*
    9 F. Supp. 2d 374 (S.D.N.Y. 1998) ........................................................................ 7

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982) ............................................................................................. 24

*Exxon Shipping Co. v. Baker,*
    554 U.S. 471 (2008) ......................................................................................... 13-14

*Fuld v. Palestine Liberation Org.,*
    606 U.S. 1 (2025) ........................................................................................... 24, 26

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000) ............................................................................................. 13

*Goe v. Zucker,*
    43 F.4th 19 (2d Cir. 2022), *cert denied* 143 S.Ct. 1020 (2023) ............................. 8

*Healy v. Beer Inst.*
    491 U.S. 324 (1989) ............................................................................................. 25

*Illinois v. City of Milwaukee,*
    406 U.S. 91 (1972) ............................................................................................... 23

*In re Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy USA, Inc.,*
    No. 24SA206, 2025 WL 1363355 (Colo. 2025) ...................................................... 17

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,*
    447 F. Supp. 2d 289 (S.D.N.Y. 2006) .................................................................. 28

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ......................................................................................passim

*Kurns v. R.R. Friction Prods. Corp.,*
    565 U.S. 625 (2012) ............................................................................................. 10

*Mallory v. Norfolk S. Ry. Co.,*
    600 U.S. 122 (2023) ............................................................................................. 24

*Marsh v. Rosenbloom,*
    499 F.3d 165 (2d Cir 2007) ................................................................................. 24

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .......................................................................................... 2, 4

iv

*Medtronic, Inc. v Lohr,*
    518 U.S. 470 (1996) ................................................................. 17

*Movsesian v. Victoria Versicherung AG,*
    670 F.3d 1067 (9th Cir. 2012) ................................................. 35

*N.Y. Life Ins. Co. v. Head,*
    234 U.S. 149 (1914) ................................................................. 24

*N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.,*
    850 F.3d 79 (2d Cir. 2017)....................................................... 30

*Nat'l Foreign Trade Council v. Natsios,*
    181 F.3d 38 (1st Cir. 1999)...................................................... 34

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ..........................................................passim

*NRDC v. NHTSA,*
    894 F.3d 95, 105 (2d Cir. 2018)............................................ 6, 10

*O'Melveny & Myers v. FDIC,*
    512 U.S. 79 (1994) ................................................................... 24

*Reyes v. City of New York,*
    141 F.4th 55 (2d Cir. 2025) ...................................................... 8

*San Diego Bldg. Trades Council v. Garmon,*
    359 U.S. 236 (1959) ............................................................ 6, 10

*Steel Ins. Of N.Y. v. City of N.Y.,*
    716 F.3d 31 (2d Cir. 2013)....................................................... 21

*Strassheim v. Daily,*
    221 U.S. 280 (1911) ................................................................. 30

*Suncor Energy, Inc. v. Comm'rs of Boulder Cnty.,*
    No. 25-170, 2025 WL 490537 (S. Ct. Feb. 23, 2026)............................ 17

*United States v. Best,*
    219 F.3d 192 (2d Cir. 2000)....................................................... 9

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) ................................................................. 24

*Young v. Masci,*
    289 U.S. 253 (1933) ................................................................................ 26-27

**Federal Statutes**

42 U.S.C. § 7411 (b) (1) .............................................................................. 2

42 U.S.C. § 7521.......................................................................................... 3-4

42 U.S.C. § 7521 (a) .................................................................................... 2

42 U.S.C. § 7543 (a) .................................................................................... 19

42 U.S.C. § 7543 (e) (1) .............................................................................. 19

**State Statutes**

2025 N.Y. Sess. Laws ch. 100 § 1 (1)........................................................ 28

2025 N.Y. Sess. Laws ch. 100 § 1 (5) (c)................................................... 29

N.Y. Env't Conserv. Law § 76-103 (3) (b)................................................. 36

**Federal Regulations**

Endangerment and Cause or Contribute Findings for Greenhouse Gases
    Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15,
    2009)........................................................................................................ 2

Oil and Natural Gas Sector: Emission Standards for New, Reconstructed and
    Modified Sources, 81 Fed. Reg. 35,824 (June 3, 2016)............................ 3

Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle
    Greenhouse Gas Emission Standards Under the Clean Air Act, 91 Fed.
    Reg. 7686 (Feb. 18, 2026) ....................................................................... 3-4, 21

Standards of Performance for Greenhouse Gas Emissions from New,
    Modified, and Reconstructed Stationary Sources: Electric Utility
    Generating Units, 80 Fed. Reg. 64,510 (Oct. 23, 2015) ......................... 3

**Rules**

Fed. R. Evid. 801 (d) (2)............................................................................. 7

Fed. R. Evid. 803 (18) ................................................................................................ 6

Fed. R. Evid. 803 (3) .................................................................................................. 8

Fed. R. Evid. 803 (8) .................................................................................................. 7

**Miscellaneous Authorities**

*C.H. Robinson Worldwide, Inc. v. Miller,* Brief for United States as Amicus
    Curiae, 142 S. Ct. 2866 (2022) (No. 20-1425) 2022 WL 1670803 ........................ 11

Depositary Notification of United States of America's Withdrawal from the
    United Nations Framework Convention on Climate Change, Jan. 27,
    2025, Reference No. C.N.71.2025.TREATIES-XXVII.7.d,
    https://treaties.un.org/doc/Publication/CN/2026/CN.102.2026-Eng.pdf................ 5

Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of
    America and Dormant Commerce Clause Doctrine; (II) Extraterritorial
    State Legislation,* 85 Mich. L. Rev. 1865 (1987)................................................... 25

*EPA (2024) Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-
    2022.* U.S. Environmental Protection Agency, EPA 430-R-24-004.
    https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-
    emissions-and-sinks-1990-2022. .......................................................................... 19

Katherine Florey, *State Courts, State Territory, State Power: Reflections on
    the Extraterritoriality Principle in Choice of Law & Legislation,* 84 (3)
    Notre Dame L. Rev. 1057 (2009)........................................................................... 25

Memorandum Withdrawing the United States from International
    Organizations, Conventions, and Treaties that Are Contrary to the
    Interests of the United States, 2026 Daily Comp. Pres. Docs. No. 000010
    §§ 1, 2 (b) (xxii) ...................................................................................................... 5

Steven Garber & James K. Hammitt, *Risk Premiums of Environmental
    Liability: Does Superfund Increase the Cost of Capital?*, 36 (3) J. Env't
    Econ. & Mgmt. 267 (Nov. 1998) .............................................................................. 6

United States' Amicus Brief, *City of New York v. BP PLC*, (No. 18-cv-182),
    2019 WL 1112108 (Mar. 7, 2019)........................................................................... 32

**PRELIMINARY STATEMENT**

New York has shown that West Virginia and the Chamber have not demonstrated injuries sufficient for standing and that New York's Climate Change Superfund Act ("the Climate Act") is not preempted by the Clean Air Act or precluded by a free-standing constitutional ban and does not violate the Due Process Clause or conflict with United States foreign policy. In response, the States in *West Virginia* do not submit undisputed, admissible evidence that the Climate Act will raise energy prices and lower fossil fuel production. *West Virginia* plaintiff Alpha and members of the associations in both cases also do not submit admissible evidence that they are likely to receive cost demands. On the merits, plaintiffs in both cases fail to demonstrate that the Act, which seeks compensation for harm from past emissions, is preempted by the Clean Air Act, which regulates ongoing emissions. Nor have they identified any constitutional provision or foreign policy with which the Act conflicts.[1]

Two recent actions further undermine the arguments made by plaintiffs and the United States (together, "the parties). On February 18, 2026, EPA rescinded its finding that greenhouse gas emissions from motor vehicles endanger human health and welfare, claiming that the Clean Air Act does not authorize EPA to regulate those emissions. EPA's disavowal of that authority—which New York and others have challenged in the U.S. Court of Appeals for the D.C. Circuit—cannot be squared with the parties' argument here that the Clean Air Act comprehensively regulates

---

[1] Tax Commissioner Hiller should be dismissed as a defendant because the Eleventh Amendment bars West Virginia's claims against her, *see* New York's Mem. in Opp'n to Pls.' Mots. ("NY Br."), 59–60, ECF 230-1, and West Virginia provides no opposition, *see* West Virginia's Reply Supp. Mot. Summ. J. ("WV Rep."), ECF 249.

greenhouse gas emissions. The rescission further supports ruling for New York, however, New York has already provided ample reason for the Court to do so and thus the Court need not address the impact of the rescission, which is contested in other litigation, on the parties' arguments here.

Second, the United States' withdrawal from the United Nations Framework Convention on Climate Change ("Framework Convention") will be effective in one year. As a result, there can be no conflict, as the parties argue, between the Climate Act and United States foreign policy as based on the Framework Convention.

## ADDITIONAL BACKGROUND

### EPA's Rescission of the Motor Vehicle Endangerment Finding

EPA must regulate certain air pollutants, including greenhouse gases, when it finds that the pollutant "may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §§ 7411(b)(1) (stationary sources), 7521(a) (mobile sources). In response to a 1999 petition, EPA maintained that it could not regulate emissions from motor vehicles because the Clean Air Act addressed only "*local* air pollutants," not pollutants that cause climate change. *See Massachusetts v. EPA*, 549 U.S. 497, 512 (2007) (emphasis in original). In *Massachusetts*, the Supreme Court held that "[b]ecause greenhouse gases fit well within the Clean Air Act's capacious definition of 'air pollutant,' … EPA has the statutory authority to regulate the emission of such gases from new motor vehicles." *Id.* at 532. Following *Massachusetts v. EPA*, EPA issued a finding that greenhouse gas emissions from motor vehicles contribute to air pollution that endangers public health and welfare. Endangerment and Cause or

2

Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009). EPA later determined that greenhouse gas emissions from certain stationary sources also endanger public health and welfare. *See, e.g.,* Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64,510 (Oct. 23, 2015); Oil and Natural Gas Sector: Emission Standards for New, Reconstructed and Modified Sources, 81 Fed. Reg. 35,824 (June 3, 2016).

EPA proposed rescission of the 2009 motor-vehicle endangerment finding on August 1, 2025. *See* NY Br. 5, n.1.[2] On February 18, 2026, EPA finalized its rescission of that endangerment finding and repealed all greenhouse gas emissions standards for new motor vehicles and engines, effective April 20, 2026. Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act, 91 Fed. Reg. 7686 (Feb. 18, 2026). In support of the rescission, EPA claimed that section 202(a) of the Clean Air Act, 42 U.S.C. § 7521, which authorizes it "to regulate the emission of any air pollutant" from motor vehicles once it has made an endangerment finding, does not cover greenhouse gas emissions. *See id.* at 7710 ("section 202(a) [42 U.S.C. §7521] does not authorize the EPA to prescribe standards for [greenhouse gas] emissions based on global

---

[2] New York refers to (1) Chamber's Reply Supp. Mot. Summ. J. (Counts I, II) & Opp'n to New York's Summ. J. Cross-mot., ECF 216-1, as "CC Rep."; (2) United States' Statement of Interest, ECF 222, as "US St."; (3) New York's Mem. Supp. Mot. to Strike Decls., ECF 229-1, as "NY Mot."; and (4) New York's Rule 56.1 Statement, ECF 230-10, as "NY 56.1."

climate change concerns."); *see also id.* at 7706 ("we lack statutory authority under [Clean Air Act] section 202(a)(1) to regulate [greenhouse gas] emissions").

EPA also stated that, when it issued the motor vehicle endangerment finding in 2009, it "assumed" that "*Massachusetts* compelled [it] to read the [Clean Air Act] as authorizing the regulation of [greenhouse gas emissions] under CAA section 202(a)(1)." *Id.* at 7711. But, based on *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400-01 (2024), which "overruled *Chevron* deference to agency statutory interpretation," EPA maintained that "the best reading of CAA section 202(a)(1), as informed by *Loper Bright* and principles of statutory interpretation, does not authorize the EPA to assert jurisdiction over GHG emissions based on global climate change concerns in a standalone endangerment finding." 91 Fed. Reg. at 7702, 7711. EPA also discussed preemption, contending that the Clean Air Act "continues to preempt" state laws that "seek to regulate out-of-state emissions." *Id.* at 7739.

States, including New York, and environmental organizations have sought judicial review of the rescission. *Massachusetts v. EPA*, No. 26-1061 (D.C. Cir. Mar. 19, 2026); *Am. Pub. Health Ass'n v. EPA,* No. 26-1037 (D.C. Cir. Feb. 18, 2026).

### The United States' Withdrawal from the Framework Convention

As New York has explained, in 1992 the United States signed the Framework Convention, agreeing to "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system." NY Br. 5. On January 6 of this year, President Trump announced that "it is contrary to the interests of the United States to remain a member of,

4

participate in, or otherwise provide support to" over sixty intergovernmental organizations, conventions, and treaties, including the Framework Convention. Memorandum Withdrawing the United States from International Organizations, Conventions, and Treaties that Are Contrary to the Interests of the United States, 2026 Daily Comp. Pres. Docs. No. 000010 §§ 1, 2(b)(xxii).[3] On February 27 of this year, the Secretary-General of the United Nations issued a determination that the United States had "effected" its withdrawal from the Framework Convention on that date and that its withdrawal would take effect on February 27, 2027.[4]

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING.

#### A.    The *West Virginia* States Fail to Demonstrate Injury.

New York has shown that the States in *West Virginia* have not demonstrated injury to their proprietary or *parens patriae* interests based on admissible, undisputed evidence that the Climate Act will raise energy prices or lower production. NY Br. 13–17. The States have not overcome this deficiency. To the extent the States now claim the Act injures their sovereign interests, they fail to show how the Act imperils their power to create or enforce any specific law or regulation.

First, the States claim that the Act will increase energy costs and lower tax revenue. WV Rep. 11, 14–15, 17–18. The States have relied on inadmissible publications as well as testimony from Dr. Benjamin Zycher that is contradicted by

---

[3]https://www.govinfo.gov/content/pkg/DCPD-202600010/pdf/DCPD-202600010.pdf.

[4] https://treaties.un.org/doc/Publication/CN/2026/CN.102.2026-Eng.pdf.

New York's expert, Dr. Don Fullerton, who explains that cost demands will not have those effects. NY Br. 13–17. The States now argue the Court can instead find that the Climate Act will increase prices based on declarations submitted by the Chamber and *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021) and other cases. WV Rep. 3–12. [5] The States are wrong on the facts and the law.

None of the declarations states that a fossil fuel company will raise prices; instead they claim that companies will incur costs preparing to respond to cost demands that they speculate they will receive. *See* WV Rep. 4–5 (citing Decl. of Scott Jarboe; Decl. of John Martini). Nor does *City of New York* cure the States' failure to set forth facts to establish injury because standing was not an issue there or in any other case West Virginia cites. *See* WV Rep. 6–7 (citing *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236 (1959); *NRDC v. NHTSA*, 894 F.3d 95, 105 (2d Cir. 2018); *Boomer v. Atl. Cement Co.*, 257 N.E.2d 870, 873 (N.Y. 1970)).

*Sovereign Interests.* The States argue that New York conceded injury to their sovereign interests, WV Rep. 11, but instead, New York explained that the States had not raised sovereign interests that were distinct from quasi-sovereign interests. *See* NY Br. 13 n.4. To the extent the States now assert a separate injury to their sovereign interests, WV Rep. 10–11, they have not shown particularized and imminent injury

---

[5] The States also cite a study of the Comprehensive Environmental Response, Compensation and Liability Act, which imposes liability for the costs of government cleanups of contaminated sites. *See* WV Rep. 4 (citing Steven Garber & James K. Hammitt, *Risk Premiums of Environmental Liability: Does Superfund Increase the Cost of Capital?*, 36 (3) J. Env't Econ. & Mgmt. 267, 268 (Nov. 1998)). That article, like the other articles the States relied upon in their opening brief, does not meet the requirements of the hearsay exception for periodicals in FRE 803(18). *See* NY Br. 14.

to their "power to create and enforce a legal code" or its "demand for recognition from other sovereigns." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.592, 601 (1982). The States claim no injury to the integrity of their borders, nor do they offer any evidence to show the Climate Act imperils any specific state law or regulation.

### B.      The Associations and Alpha Fail to Demonstrate Injury.

*West Virginia Associations*. As New York has explained, the *West Virginia* associations fail to identify any member who will be harmed by the Climate Act. NY Br. 18–19. West Virginia now argues instead that members will be harmed by increased prices and lower production. WV Rep. 14–15. West Virginia cannot raise a new basis for standing in its reply, *see e.g.*, *Domino Media, Inc. v. Kranis,* 9 F. Supp. 2d 374, 387 (S.D.N.Y. 1998), a*ff'd,* 173 F.3d 843 (2d Cir. 1999), and, in any case, it relies solely on Zycher's testimony, which is inadmissible and contradicted. *See* NY Br. 14–16. And, if prices increased, that could *benefit* fossil fuel companies.

*Alpha*. Alpha primarily relies on an inadmissible legislative memorandum ("October 2023 Memo") to argue that it is likely to receive a cost demand. NY Br. 20. Alpha argues that the memo is admissible as an opposing party statement under FRE 801(d)(2) or a public record under FRE 803(8), WV Rep. 13, but legislators are not parties here and West Virginia does not argue that the memo meets the requirements for public records.[6] Even if admissible, legislators' opinions cannot establish a substantial risk that DEC will find Alpha meets the requirements for a

---

[6] The Chamber's reliance on FRE 803(8), CC Rep. 12, fails for the same reason notwithstanding its citation to *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) (State Department reports constituted factual findings from a legally authorized investigation).

cost demand. Alpha does not have to do DEC's job, *see* WV Rep. 13, but Alpha must do more to establish standing, particularly since it challenged the Climate Act before DEC had even issued regulations determining responsible parties.

*Chamber Associations.* The *Chamber* associations also argue that their members are likely to receive a cost demand but fail to establish the admissibility of the October 2023 Memo or legislators' statements in floor debates, a legislative memorandum, and a press release. NY Br. 21. The Chamber argues that courts regularly consider legislative materials but courts do so to interpret and apply statutes, *see* CC. Rep. 11 (citing *Reyes v. City of New York*, 141 F.4th 55, 69 (2d Cir. 2025) (considering legislative history to construe a statutory right); *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022), *cert denied* 143 S.Ct. 1020 (2023) (considering legislative history in connection with rational basis review); *CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 263 (2d Cir. 2009) (considering whether legislature intended statute to apply retroactively), not to determine standing.

The Chamber also asserts that those materials are admissible because it offered them to show that the sponsors targeted association members, and not for the truth of the matters asserted in the materials. CC Rep. 11–12. But the Chamber relies on the fact that those materials name association members as future recipients of cost demands as evidence of the truth of that fact. *See id.* The Chamber also invokes FRE 803(3), but that hearsay exception provides that "a statement may be introduced to prove that the declarant thereafter acted in accordance with" their

8

state of mind, *see United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000), *cert denied* 532 U.S. 1007 (2001) (citation modified), not to show the likelihood of a future event.

In any case, the legislative materials do not establish a substantial risk that DEC will determine that any specific entity meets the statutory requirements for a cost demand. New York does not suggest that association members must concede liability or await a cost demand, as the Chamber suggests, CC Rep. 7, 10, but the Chamber brought this suit before DEC issued regulations and the Chamber needs more than inadmissible statements by legislators to show that it has standing based on a substantial risk that association members will receive a cost demand.

## II.    THE CLEAN AIR ACT AND FEDERAL COMMON LAW DO NOT PREEMPT THE CLIMATE ACT

### A.    The Clean Air Act Does Not Preempt the Climate Act.

The Clean Air Act does not preempt the Climate Act because the Climate Act does not regulate emissions, but instead compensates New York State for some of its costs to address climate change harms. Thus, there is no field or conflict preemption nor should the Court forego a preemption analysis based on *City of New York*.

Moreover, plaintiffs' contention that the Climate Act is preempted because the Clean Air Act comprehensively regulates greenhouse gas emissions is in tension with EPA's recent assertion that the Clean Air Act gives it no authority to control emissions from vehicles, the largest U.S. source of such emissions. Neither contention is correct, but both cannot be true at once. While the scope of EPA's authority under the Clean Air Act is not before this Court, EPA's disavowal of a core premise of plaintiffs' arguments further supports ruling for New York on the pending motions.

9

### 1.    The Climate Act Is an Exercise of Traditional State Responsibility.

The Climate Act is an exercise of traditional state responsibility because it seeks compensation for in-state harms, and is thus entitled to a presumption against preemption. NY Br. 25–27. But if the presumption does not apply, the Court should still undertake a traditional preemption analysis. *Id*. 27, n.10. Citing *City of New York*, plaintiffs contend that the Climate Act is outside traditional state responsibilities because it regulates ongoing interstate pollution. CC Rep. 34–35, WV Rep. 38. However, New York's economist Fullerton has testified that the Act's cost demands are a fixed cost that will not change future conduct. *See* NY Br. 7–8, 25–27.

Plaintiffs respond first that *City of New York* held, as a matter of law, that obligations to pay compensation always regulate conduct. WV Rep. 35–36; CC Rep. 28–30, 32–33. The Second Circuit did *not* state that that is a "universal 'economic reality,' not a case-by-case factual question." *See* WV Rep. 36 (citing 993 F.3d at 92). Instead, it stated that the City's argument that its claims did not regulate emissions "ignore[d] economic reality." 993 F.3d at 92–93. That observation is not a holding nor do the cases cited in *City of New York* or by plaintiffs, CC Rep. 28–29; WV Rep. 7, 36, hold that compensatory damages always regulate conduct.[7] The Circuit also noted

---

[7] *See Kurns v. R.R. Friction Prods. Corp.,* 565 U.S. 625, 637 (2012) ("regulation *can be* … effectively exerted through an award of damages") (emphasis added); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996), 572 n.178 (1996) ("*BMW*") (*punitive* damages); *San Diego Bldg. Trades Council*, 359 U.S.at 246–47 (1959) (damages for tortious conduct); *NRDC*, 894 F.3d at 104–05 (ongoing penalties for statutory violations); *Boomer,* 257 N.E.2d at 873 (noting that it "seem[ed] reasonable" that damages that "would compensate" for "the total economic loss to … property *present and future*[,]" would "spur [tortfeasor] to research for improved techniques to

10

that the City "conveniently avoids the fact that [it] also seeks injunctive relief." 993 F.3d at 92, n.5. Moreover, *City of New York* was decided on a motion to dismiss, *id.* at 89, while plaintiffs here must establish the Climate Act's supposed regulatory effects based on admissible and undisputed evidence, which they have not done.

Unlike the common law claims in *City of New York*, the Climate Act does not impose any form of forward-looking emissions reductions. Nor has New York ignored economic reality. Just the opposite, New York relies on Fullerton's testimony that the economic reality is that cost demands will not change future conduct. NY Br. 25–26. The Chamber is wrong that fossil fuel representatives' statements that cost demands would require "decisions about capital investments" and "production volumes" and testimony by West Virginia's expert, Dr. Benjamin Zycher, refutes Fullerton's testimony. CC Rep. 33–34. Vague statements about "business decisions" with no suggestion as to the outcome of those decisions do not contradict Fullerton's testimony. Indeed, declarants do not say that the Climate Act will force companies to reduce production, restrict investments, or increase prices. *See* Cochrane Decl., ECF 216-3; Martini Decl., ECF 216-66; Swarup Decl., ECF 216-12; Torrence Decl., ECF 216-14. Zycher's testimony speculates about economic impacts of the Climate Act

---

minimize nuisance.") (emphasis added). The Chamber also relies on the United States' arguments in *C.H. Robinson Worldwide, Inc. v. Miller,* Brief for United States as Amicus Curiae, 142 S. Ct. 2866 (2022) (No. 20-1425) 2022 WL 1670803, CC Rep. 28–29, n.16, but the United States argued that "[s]tate common-law duties and standards of care are a form of state regulation … designed to govern conduct," *id.* at 8–9, not that compensatory damages in all cases regulate conduct.

based on unfounded assumptions about how he believes investors will perceive the Act, and is also inadmissible, *see* NY Mot. 10–16.

Plaintiffs also take *City of New York* out of context when they point to the phrase that "liability for global greenhouse gas emissions is an area 'in which the states have traditionally not occupied." CC Rep. 34 (quoting 993 F.3d at 98); WV Rep. 38 (same). That referred to the displacement of federal common law by a federal statute, *see* 993 F.3d at 98, and explained earlier that any federal common law claim that the City might have brought was displaced by the Clean Air Act because "the City's claims, if successful, would operate as a *de facto* regulation on greenhouse gas emissions," *id.* at 96, which the Climate Act does not do.

## 2. The Climate Act Is Not Field-Preempted.

As New York has shown, the Clean Air Act does not field-preempt the Climate Act because the Clean Air Act does not occupy the field of controlling emissions of air pollutants and even if it did, the Climate Act seeks only compensation for climate harms. NY Br. 27–32. West Virginia and the Chamber respond that the Clean Air Act preempts the field of regulating air pollution and that the Climate Act regulates air pollution. WV Rep. 38–39; CC Rep. 37. They are wrong. The Climate Act does not regulate air pollution, as discussed above, pp. 10–12, but in any event, the Clean Air Act does not field-preempt state regulation of air pollution.

West Virginia and the Chamber continue to argue that the Climate Act is field-preempted because the "Clean Air Act is a comprehensive statutory scheme," WV Rep. 38; CC Rep. 37, but they rely on *City of New York* and *International Paper Company v. Ouellette,* 479 U.S. 481 (1987). Neither case holds that the Clean Air Act

12

field-preempts state regulation of emissions. And neither plaintiff successfully distinguishes *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 489 (2008).

*City of New York* did not address whether the Clean Air Act occupies the field for purposes of preemption. To the contrary, it distinguished between a "traditional statutory preemption analysis" and the analysis it conducted—whether a state public nuisance claim preempted by federal common law "snap[ped] back into action" when federal common law was displaced by the Clean Air Act. 993 F.3d at 98.

Regarding *Ouellette*, courts have treated it as a conflict preemption case, not a field preemption case. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873–74 (2000) (citing *Ouellette,* 479 U.S. at 493–494, as a "frustration-of-purpose" conflict preemption case); *Coal. for Competitive Elec. v. Zibelman,* 906 F.3d 41, 55 (2d Cir. 2018) (relying on *Ouellette,* 479 U.S. at 494, only for conflict preemption, not field preemption); *Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 87 (2d Cir. 2003) (same). And, regardless, *Ouellette* concerned the Clean Water Act, not the Clean Air Act. Even if *Ouellette* found field preemption, the Clean Water Act and the Clean Air Act are "different regulatory regimes," as explained in *American Electric Power Company v. Connecticut*, because the Clean Water Act *prohibits* discharges unless a permit has been issued while the Clean Air Act *allows* emissions until a permit has been issued. *See* 564 U.S. 410, 426 (2011) (citation modified) ("*AEP*"). While *AEP* found that distinction irrelevant to whether the Clean Air Act displaced federal common law for the same reasons that the Clean Water Act did in *Ouellette*, *see id.*, it applies to differentiate the fields covered by both statutes. Thus, neither *Ouellette* nor *City of*

13

*New York* supports plaintiffs' contention that the Clean Air Act field-preempts the Climate Act, and they cite no other support for that contention.

Finally, plaintiffs fail to distinguish *Exxon Shipping,* in which Exxon admitted that the Clean Water Act "does not displace compensatory remedies for consequences of water pollution," 554 U.S. at 489, and the Supreme Court ruled that the Clean Water Act also does not preempt punitive damages because there is "no clear indication of congressional intent to occupy the entire field of pollution remedies," *id.* (citation modified); *see* NY Br. 29. As New York explained, citing *Exxon Shipping*, even if the Clean Air Act occupied the field of controlling emissions, it does not address "economic loss" or "occupy the entire field of pollution remedies," *Id.* 29 (citing 554 U.S. at 489 (citation omitted)). West Virginia argues that that decision ruled that "the Clean Water Act does not fully displace federal maritime common law." WV Rep. 39; *see also* CC Rep. 37. But the Supreme Court also addressed whether the Clean Water Act preempted "any tort action predicated on an oil spill," and found it "too hard to conclude" that the Act would preempt "compensatory damages for thwarting economic activity or, for that matter, compensatory damages for physical, personal injury from oil spills or other water pollution." 554 U.S. at 488–489 (citation modified). For the same reason, the Clean Air Act does not field-preempt the compensatory damages sought by the Climate Act.

### 3.    The Climate Act Is Not Conflict-Preempted.

The Climate Act does not conflict with the Clean Air Act because the Clean Air Act controls ongoing emissions while the Climate Act seeks compensation for harms

14

from past emissions. NY Br. 33–36. Plaintiffs' argument that the Climate Act is conflict-preempted because it undermines EPA's authority by allowing multiple States to impose standards and liability for the same emissions is incorrect. *See* WV Rep. 39–40; CC Rep. 38–40. The Climate Act does not impose greenhouse gas emission standards. *See* pp. 10–12 above. Tellingly West Virginia and the Chamber fail to identify *any* source of greenhouse gas emissions that is subject to emissions standards under the Clean Air Act and would be subject to conflicting emissions standards under the Climate Act. Instead, they speculate about the Climate Act's incidental effects, see WV Rep. 40, CC Rep. 39–40, which is insufficient to demonstrate a conflict.

Even if the Climate Act imposed emission standards—which it does not—fossil fuel producers liable under the Climate Act would not be subject to conflicting emission standards under the Clean Air Act. Those producers may be subject to emission standards under the Clean Air Act but only for emissions during fossil fuel production (scope 1 emissions), not downstream emissions (scope 3 emissions). Any applicable emission standards for downstream sources like cars, trucks, and power plants are imposed on those sources, not on fossil fuel producers. But those scope 3 emissions are the lion's share of the historic emissions for which the Climate Act imposes liability on fossil fuel producers. *See* NY Br. 8, 45; Mankin Decl. ¶¶ 18, 19, ECF 230-5 (scope 3 emissions "represent[] the dominant emissions category" for most users). Thus, the Climate Act imposes liability on fossil fuel producers primarily for historic scope 3 emissions, and any emission standards applicable to those scope 3

emissions apply to the sources of those emissions, and not to the fossil fuel producers. Therefore, even if the Climate Act imposed emission standards, fossil fuel producers would not be subject to conflicting standards.

*Ouellette* and *City of New York* do not support plaintiffs' arguments. In *Ouellette*, a Vermont public nuisance claim against a New York company was conflict-preempted because it was based on the same discharges covered by the company's Clean Water Act permit. 479 U.S. at 494–95. But that decision "preclude[d] only those suits that may require standards of effluent control that are incompatible" with standards under the Clean Water Act. 479 U.S. at 497. In contrast, neither plaintiff argues that the Climate Act imposes emissions standards on fossil fuel producers that conflict with the standards in their Clean Air Act permits. Nor could they as the Climate Act sets no emission standards. *City of New York* was similarly based on the court's conclusion that state common law claims regulated interstate greenhouse emissions, which the Climate Act does not do. *See* pp. 10–12 above. And in any case, *City of New York* was not a conflict preemption case. *See* pp. 17–18 below.

All that remains are speculative conflicts based on unfounded assumptions about incidental economic effects of the Act. *See, e.g.,* WV Rep. 40 (adoption of similar laws by other states "would lead to a 'chaotic confrontation between sovereign states'") (citation omitted); CC Rep. 38 ("[e]nergy producers would be forced to adjust their financial and strategic business decisions"). Those theoretical effects are not based on or contrary to admissible evidence and even if they had factual support, they are still insufficient to establish conflict preemption. *See* NY Br. 36.

16

### 4.     The Climate Act Is Not Precluded Under *City of New York.*

Plaintiffs ask this Court to hold based on *City of New York* that the Climate Act is precluded because the Clean Air Act "does not authorize" it. WV Rep. 37; CC Rep. 35–36. Their argument puts the cart before the horse. *City of New York* ruled that a state common law claim preempted by federal common law could proceed only if it was preserved by a Clean Air Act savings clause. 993 F.3d at 99–100; *see also* NY Br. 31–32, 37. Plaintiffs have not shown that the Clean Air Act field-preempts or conflict-preempts the Climate Act, a prerequisite for the Second Circuit's rationale.[8]

The Chamber argues that this Court can skip a traditional preemption analysis because *City of New York* ruled that "only federal law can create liability for global greenhouse gas emissions." CC Rep. 36. But the Second Circuit's decision addressed a judicially-created state common law claim. It did not say that courts are free to ignore the Supreme Court's observation that the preemption of a state statute is "a serious intrusion into state sovereignty[,]" *Medtronic, Inc. v Lohr*, 518 U.S. 470, 489 (1996), and forego preemption analysis where a state statue is at issue.

Moreover, the Second Circuit ruled that that common law claim would "regulate cross-border emissions," 993 F.3d at 93, which the Climate Act will not do (*see* pp. 10–12 above). Nor is the Climate Act "almost identical" to the nuisance claims raised and relief sought in *City of New York.* CC Rep. 29; *see also* WV Rep. 36. The

---

[8] The Supreme Court granted certiorari in *Suncor Energy, Inc. v. Comm'rs of Boulder Cnty.*, No. 25-170, 2025 WL 490537 (mem) (S. Ct. Feb. 23, 2026), which New York cited, *In re Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy USA, Inc.*, No. 24SA206, 2025 WL 1363355 (Colo. 2025), in its opening brief, NY Br. 32 n.11.

Climate Act does not impose "vague and indeterminate standards attached to nuisance law," 993 F.3d at 97 (citation modified), or "an elastic standard ... especially ill-suited to address the technically complex area of environmental law," *id.* at 98 (citation modified). Nor does the Climate Act establish a legal and ongoing duty of care that will obligate polluters to change their conduct by "develop[ing] new means of pollution control" or "cease[ing] global production altogether," *Id. a*t 93 (citation modified); *see also Ouellette*, 479 U.S. at 495, 498. And the Chamber's speculation that the Climate Act may be amended or reenacted, CC Rep. 30, is insufficient to establish preemption. *See* NY Br. 36.

5. **EPA's Rescission of the Motor Vehicle Endangerment Finding Is Inconsistent with the Parties' Clean Air Act Preemption Arguments.**

The Court should rule for New York on Clean Air Act preemption for the additional reason that EPA, in its recent rescission of the motor vehicle endangerment finding, claims that the Clean Air Act gives it no authority to control greenhouse gas emissions from vehicles, the single largest U.S. source of such emissions. While the scope of EPA's authority under the Clean Air Act is not before this Court, EPA's contention cannot be reconciled with plaintiffs' and the United States' contention that the Climate Act is preempted by the Clean Air Act because the Clean Air Act comprehensively regulates greenhouse gas emissions. Neither contention is correct but both cannot be true at once. And plaintiffs cannot continue to rely on EPA's comprehensive authority to argue that the Clean Air Act preempts the Climate Act under either a traditional preemption analysis or *City of New York.*

18

The parties' arguments that the Clean Air Act field-preempts and conflict-preempts the Climate Act are fundamentally inconsistent with EPA's claim that it lacks authority under the Clean Air Act to regulate greenhouse gas emissions from motor vehicles—particularly because motor vehicles are the largest U.S. source of greenhouse gas emissions.[9] Even if the Clean Air Act occupied the same field as the Climate Act (it does not, pp. 12–14 above) or  regulated greenhouse gas emissions (it does not, pp. 10–12 above), EPA's disavowal of any Congressional intent to create pervasive federal regulation of greenhouse gas emissions would undo any preemption claim.

Indeed, the termination of EPA's regulation of greenhouse gas emissions from motor vehicles is especially damaging to the parties' preemption arguments because, while the Climate Act does not regulate any greenhouse gas emissions, *see* pp. 10–12 above; NY Br. 7–8, 25–27, past greenhouse gas emissions from motor vehicles are a significant portion of the emissions for which the Climate Act seeks compensation, *see* p. 15 above. Thus, the emissions for which the Climate Act seeks recompense for New Yorkers cover emissions that EPA claims it no longer has authority to regulate and will stop regulating in less than a month.[10]

---

[9] See *EPA (2024) Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2022.* U.S. Environmental Protection Agency, EPA 430-R-24-004. https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2022, p. ES-26, Figure ES-16: 2022 Key Categories (Approach 1 including LULUCF).

[10] As New York has explained, the Clean Air Act grants EPA authority to preempt state regulations concerning emissions standards for motor vehicles, 42 U.S.C.

19

Plaintiffs' reliance on *City of New York* is further undermined by EPA's disavowal of regulatory authority. *City of New York* flowed in part from *Massachusetts*, which EPA now repudiates in its rescission decision, *see* p. 4 above. And *City of New York* also relied upon *AEP* to hold that "[t]he Clean Air Act is a comprehensive statutory scheme that anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions,'" *id.* at 99, a conclusion that is impossible to reconcile with EPA's recent about-face. Put another way, the basis of the Second Circuit's conclusion that permitting claims based on greenhouse gas emissions "would 'undermine this carefully drawn statute'" and "'serious[ly] interfere[] with the achievement of the full purposes and objectives of Congress,'" *id.* at 100 (quoting *Ouellette*, 479 U.S. at 493, 494), would no longer make sense if EPA were correct that it is not authorized to regulate greenhouse gas emissions. While the scope of EPA's authority under the Clean Air Act is not before this Court, the parties can no longer rely on the Second Circuit's rationale when EPA's rescission contravenes that rationale and when, in less than a month, EPA will no longer regulate greenhouse gas emissions from motor vehicles.

The Chamber argues that the Court should rule that the rescission is irrelevant to its Clean Air Act preemption arguments, CC Rep. 37–38, n.23, because, when EPA rescinded the motor vehicle endangerment finding, it stated that the

---

§§ 7543(a), 7543(e)(1). NY Br. 24–25, n.8. The parties have not claimed that that express preemption applies to the Climate Act, nor could they because the Climate Act does not set emission standards. *See id.* 23–24.
.

20

Clean Air Act "continues to preempt state … statutes that seek to regulate out-of-state emissions," based on *City of New York* and *Ouellette,* 91 Fed. Reg. at 7739. That argument is flawed. EPA begs the question when it relies on *City of New York* because EPA's own rescission cuts the legs out from under *City of New York.*

EPA also relies on the Supreme Court's decision in *Ouellette.* Again, New York has shown that the Clean Air Act does not preempt the Climate Act based on the reasoning in *Ouellette* even under EPA's prior interpretation of its Clean Air Act authority. *See* pp. 13, 16 above. EPA's rescission further undercuts any relevance of *Ouellette* here because that decision rested on the premise that "Congress intended the [1972 amendments to the Clean Water Act] to establish an all-encompassing program of water pollution regulation," 479 U.S. at 492 (citation modified). If EPA were correct about its authority under the Clean Air Act, the Clean Air Act would no longer establish an all-encompassing program of greenhouse gas regulation, to the extent that it ever did.

In any event, EPA's legal conclusions about preemption are not entitled to deference from this Court. While courts give "some weight to an agency's explanation of how state or local laws may affect the federal regulatory scheme," they "do not defer to an agency's legal conclusion regarding preemption." *Steel Ins. Of N.Y. v. City of N.Y.*, 716 F.3d 31, 40 (2d Cir. 2013) (citation modified).

The United States has argued that "even if Congress had *barred* EPA from regulating interstate emissions of carbon dioxide and other greenhouse gases under the Clean Air Act, the statute still does not "authorize" resort to *state law* to regulate

21

those emissions." US St. 13 (emphasis in original). Similarly, West Virginia and the Chamber argue that the Climate Act would be preempted even in the absence of the Clean Air Act. *See* WV Rep. 20 ("federal common law would preempt even if the Clean Air Act somehow went away"); CC Rep. 16 ("constitutional principles … bar New York's Act here – regardless of whether Congress has enacted a statute that displaces federal common law in relation to interstate greenhouse gas emissions"). If the parties are raising an alternative argument that, even if the Clean Air Act does not address greenhouse gas emissions, the Climate Act is precluded based on the need for a unified federal standard or federal common law, that argument appears to duplicate their arguments that the Climate Act is precluded by the Constitution, *see* WV Rep. 15–26; CC Rep. 12–22; US St. 2–5, to which New York responds in its opening brief, NY Br. 40–49, and below (pp. 24–31).

### B.    Federal Common Law Does Not Preempt the Act.

West Virginia and the Chamber have not made independent claims that the federal common law of interstate pollution preempts the Climate Act but have invoked that federal common law in support of their claims that the Climate Act is precluded by the Constitution, Chamber of Commerce Complaint, ECF 1 (*see* N.D.N.Y. No. 25-cv-1307); West Virginia Amended Complaint, ECF 125, which New York addresses below (pp. 24–31). Even if they had made independent claims, *AEP* ruled that that that common law was displaced by the Clean Air Act. 564 U.S. at 426–29. And in any event, the limited scope of that common law does not preempt the Climate Act, which does not seek to regulate greenhouse gas emission. NY Br. 36–39.

22

Although plaintiffs acknowledge that the federal common law they invoke has been displaced by the Clean Air Act, *see* WV Rep. 15; CC Rep. 36, they argue without support that it can still preempt a state statute. But once federal common law has been displaced, it cannot continue to have preemptive effect. Instead, the relevant analysis is whether the Clean Air Act preempts the Climate Act. *See* NY Br. 36; *AEP*, 564 U.S. at 429; *see also Ouellette*, 479 U.S. at 491–92. To the extent plaintiffs rely on *City of New York*, that case does not hold that displaced federal common law can preempt a state statute, *see* p. 17 above.

Even if the displaced federal common law had retained preemptive force, plaintiffs rely on cases that hold that federal common law preempts nuisance claims to abate interstate pollution and disputes regarding apportionment of interstate waters. *See* WV Rep. 15–20; CC Rep. 13–17. The Climate Act does not fall within the limited "specialized federal common law" for interstate pollution, *AEP*, 564 U.S. at 421 (citation modified) (collecting cases), which  emerged because of a need to avoid the existence of a "casus belli for a [downstream] State" to remove the source of the nuisance from the upstream State by force, by creating the "more peaceful means of a suit," *Illinois v. City of Milwaukee*, 406 U.S. 91, 107 (1972). This specialized federal common law does not preempt the Climate Act, which does not seek abatement or impose standards on emissions. And as discussed above, pp. 17–18, *City of New York,* on which plaintiffs rely, WV Rep. 19, CC Rep. 13, does not hold otherwise.

To the extent West Virginia and the Chamber ask this Court to broaden or create federal common law to displace the Climate Act, the Supreme Court has

23

consistently made clear that the "cases in which judicial creation of a special federal rule would be justified" are "few and restricted, limited to situations where there is a significant conflict between some federal policy or interest and the use of state law[,]" *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (citation modified); *see also Boyle v. United Technologies. Corp.*, 487 U.S. 500, 508 (1988). And plaintiffs have failed to identify a "significant conflict" here. See pp. 14–16. "'[A] mere federal interest in uniformity is insufficient to justify displacing state law in favor of a federal common law rule.'" *Marsh v. Rosenbloom*, 499 F.3d 165, 182 (2d Cir 2007) (citation omitted).

## III.    THE CLIMATE ACT IS NOT PREEMPTED BY THE CONSTITUTION.

As New York has demonstrated, the structure of the Constitution does not prohibit the Climate Act nor is the Act an unconstitutional extraterritorial regulation. NY Br. 40–43. The Act also complies with the Fourteenth Amendment Due Process Clause, *id.* 43–49. and the dormant Commerce clause.

### A.    The Structure of the Constitution Does Not Preclude the Climate Act.

Both in their opening briefs, *see* NY Br. 40–41, and their opposition briefs, plaintiffs fail to cite any authority for their claims that the equal sovereignty of States and the Constitution's structure ban extraterritorial regulation. The Chamber argues the Constitution's structure precludes the Climate Act regardless of whether it violates a constitutional provision, CC Rep. 18–19, but relies only on cases that concern the Full Faith and Credit Clause, (*N.Y. Life Ins. Co. v. Head*, 234 U.S. 149 (1914)), Due Process Clause (*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023); *Fuld v. Palestine Liberation*

24

*Org.*, 606 U.S. 1 (2025)), and dormant Commerce Clause (*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023); *Edgar v. MITE Corp.*, 457 U.S. 624 (1982)). CC Rep. 18-19. The Chamber asserts that these decisions support its "overall constitutional preclusion argument," *id.* 19, but relies on dicta insufficient to create a claim for structural Constitutional preclusion. Indeed, the Chamber's reliance on cases concerning specific clauses confirms that there is no valid independent claim for structural constitutional preclusion.

West Virginia concedes that there is no per se ban on extraterritorial regulation, WV Rep. 20, but asserts an "extraterritoriality doctrine" that "a State may not apply its law to commerce that takes place wholly outside of the State's borders," *id.* 21 (internal quotation omitted). West Virginia cites dormant Commerce Clause case law as the source of this purported doctrine, WV Rep. 21 (citing *Healy v. Beer Inst.* 491 U.S. 324, 336 (1989); *Pork Producers,* 598 U.S. at 375–76), but puzzlingly asserts the doctrine flows from the Constitution's structure, WV Rep. 21. West Virginia relies only on law review articles that do not support its argument. *Id.* 21-22. One article "[does] not offer a general theory of the extraterritoriality principle." Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation,* 85 Mich. L. Rev. 1865, 1885 (1987). The other admits that the extraterritoriality "principle may be rooted in the dormant Commerce Clause" and that "[t]he exact scope of this limit, however, remains notoriously unclear." Katherine Florey, *State Courts, State*

25

*Territory, State Power: Reflections on the Extraterritoriality Principle in Choice of Law & Legislation,* 84 (3) Notre Dame L. Rev. 1057, 1060 (2009).

### B.    The Climate Act Does Not Violate Due Process.

The States may not bring a due process claim on behalf of fossil fuel companies and, in any case, the Climate Act's minimum contacts requirement ensures compliance with the Fourteenth Amendment's Due Process Clause. See NY Br. 43–44. Furthermore, because the Climate Act compensates New York for in-state harms, it does not violate any principles of legislative jurisdiction.

The Chamber asserts that the Climate Act's sufficient contacts provision does not satisfy the "due process limits on *legislative* power over extraterritorial conduct." CC Rep. 20 (emphasis in original). However, *Fuld*, on which the Chamber relies, supports the validity of the Act because it states that "the requirement that a defendant have minimum contacts with the forum State... functionally ensure[s] that the States, through their courts, do not reach out beyond limits imposed on them by their status as coequal sovereigns in a federal system." 606 U.S. at 14.

The Chamber's attempt to distinguish *Calder v. Jones*, 465 U.S. 783 (1984), and *Young v. Masci*, 289 U.S. 253 (1933), fails. *See* NY Br. 44–45; CC Rep. 20–21. *Calder* and *Young* demonstrate, respectively, that personal jurisdiction and legislative jurisdiction are proper when an out-of-state actor causes harm in a State. In *Calder*, an article written in Florida caused harm in California. The Supreme Court ruled jurisdiction was "proper in California based on the 'effects' of the[] Florida conduct in California." 465 U.S. at 789 (citation modified). And in *Young*, a New Jersey resident allowed a third party to drive his car to New York, where it injured

26

Masci, who then sued Young under New York law in New Jersey. The Court found that "a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it." 289 U.S. at 258–59. Thus, the relevant conduct that gave rise to liability in both cases took place *outside* of the state where the harm occurred. These cases support liability under the Climate Act for production of fossil fuel outside of New York that causes harm in New York. *Young* is additionally relevant because it shows that a party can be held liable for harm even when the conduct of a third party is part of the causal chain. Thus New York can hold producers liable for emissions from fossil fuels that are burned by downstream users.

The Chamber asserts that New York cannot show that the responsible parties have caused harm to New York because greenhouse gases become mixed in the atmosphere and cannot be traced to their source. CC Rep. 21. But New York's climate expert has explained that local harms can be attributed to specific sets of emissions, including emissions attributable to a specific company. Mankin Decl. ¶¶ 10, 21– 39. The Chamber counters that neither Mankin nor New York have engaged in such a calculation, CC Rep. 22, but that is simply because the Chamber's lawsuit is premature, coming before the Climate Act's implementing regulations were drafted.[11]

The Chamber is incorrect that "the Second Circuit has already rejected" climate attribution science. CC Rep. 22. The passage of *City of New York,* 993 F.3d at

---

[11] The Chamber also argues that "Dr. Mankin's declaration is irrelevant to the disposition of this motion." CC Rep. 22, citing its motion to strike. New York addresses that argument in its opposition to the Chamber's motion, at 16–21, and incorporates by reference that argument here.

27

92, on which the Chamber relies refers to the fact that greenhouse gas emissions outside of New York contribute to climate change within New York—a fact that New York does not dispute. *City of New York* did not address the use of climate attribution science as a method of holding polluters accountable for climate change.

Moreover, courts have held in other environmental cases that it is possible to allocate liability without pinpointing the source of each and every harmful molecule. "[F]rom time to time courts have fashioned new approaches in order to permit plaintiffs to pursue a recovery when the facts and circumstances of their actions raised unforeseen barriers to relief." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 447 F. Supp. 2d 289, 301 (S.D.N.Y. 2006) (adopting a causation standard for the chemical MTBE in gasoline). Here, attribution science provides a way to allocate liability among the largest fossil fuel producers.

West Virginia is wrong that the Act is "no different than penalizing fossil-fuel companies operating in West Virginia for violating New York's labor laws" or "penalizing a company operating in West Virginia for failing to obtain a permit from New York." WV Rep. 20–21. Merely operating in another state does not cause harm or create sufficient minimum contacts for personal jurisdiction in New York State. But the production of fossil fuel in West Virginia does lead to climate change-driven harms to New York State that are "an immediate, grave threat to the state's communities, environment, and economy," 2025 N.Y. Sess. Laws ch. 100 § 1(1). Thus, unlike merely operating an intrastate business elsewhere, fossil fuel emissions that cause harm in New York State are the State's concern and the State has a strong

28

interest in obligating fossil fuel companies to pay a share of the costs the State will incur to adapt to climate change.

The Chamber is mistaken that New York set the $75 billion cost recovery amount "without engaging in any computation to support it." CC Rep. 21. The "total assessment of $75 billion dollars represents a small percentage of the extraordinary cost to New York State for repairing from and preparing for climate change-driven extreme events over the next 25 years." 2025 N.Y. Sess. Laws ch. 100 § 1(5)(c). That amount was "designed to have a meaningful impact on the burden borne by New York State taxpayers for climate adaptation while being sufficiently limited so as to not impose a punitive negative impact on [the fossil fuel] industry." *Id.*

Finally, West Virginia argues that the Climate Act imposes economic sanctions to change producers' lawful conduct in other States, WV Rep. 25–26, but relies on *BMW*, where a large punitive damages award intended to induce BMW to change a nationwide policy violated due process because the award was grossly excessive in relation to the legitimate state interests. 517 U.S. 572–73. The Climate Act is compensatory, not punitive. It requires companies to compensate New York State for the costs of adapting to climate change. The Act does not impose costs for the purpose of changing lawful conduct and the costs the Act imposes are only for past emissions.

## C.     The Climate Act Does Not Violate the Dormant Commerce Clause.

Despite asserting that its extraterritoriality argument is not derived from the dormant Commerce Clause, West Virginia argues that the Climate Act "discriminate[s] against interstate commerce" in violation of the standard in *Pork*

29

*Producers*. WV Rep. 22–24. That is wrong. In *Pork Producers*, the Supreme Court ruled that a state law does not violate the dormant Commerce Clause simply because it has "the practical effect of controlling commerce outside the State." 598 U.S. at 371 (citation modified). Rather, a state law violates the Clause only if it "seeks to advantage in-state firms or disadvantage out-of-state rivals." *Id*. at 370. And all fossil fuel producers, wherever located, are equally subject to the Act's requirements.

Nor does the Climate Act discriminate in effect. As in *Pork Producers*, the Act does not violate the dormant Commerce Clause because it primarily impacts out-of-state producers that sell products in-state. *See* 598 U.S. at 376, 376 n.1. A statute is not "discriminatory because it will apply most often to out-of-state entities in a market that has more out-of-state than in-state participants." *N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 91 (2d Cir. 2017) (citation modified).

West Virginia is wrong that the Act cannot apply to actions that took place wholly outside New York State's borders unless the out-of-state actions are intended to produce detrimental effects within the State. WV Rep. 24–25. It relies only on a case concerning criminal law—when "one State may *prosecute* the citizen of another State for acts committed outside the first State's jurisdiction." *Pork Producers*, 598 U.S. at 376 (discussing *Strassheim v. Daily*, 221 U.S. 280, 285 (1911) (citation modified)). That intent standard is inapplicable to the Act because it is a civil law that imposes strict liability, similar to the Comprehensive Environmental Response, Compensation, and Liability Act. NY Br. 46–47.

30

West Virginia is similarly incorrect that, even if the Act applies to in-state producers, it is discriminatory because it has the "practical effect" of controlling out-of-state conduct. WV Rep. 24–25. A state law does not run afoul of the dormant Commerce Clause simply because it has "the practical effect of controlling commerce outside the State." *Pork Producers*, 598 U.S. at 371 (citation modified); *see id.* at 374 (noting "many (maybe most) state laws have the practical effect of controlling extraterritorial behavior," without raising constitutional concerns) (citation modified). For example, *Pork Producers* upheld a California law that primarily impacted entities located out-of-state that sold products in-state. *Id.* at 364, 370–371.

As in *Pork Producers*, where "California imports almost all of the pork it consumes," *id* at 367, New York does not contest that most of the fossil fuels consumed in New York State are produced out-of-state. This alone is insufficient for a dormant Commerce Clause violation. Moreover, the Climate Act does not apply to wholly out-of-state transactions because the downstream use of fossil fuels produced elsewhere has caused greenhouse gas emissions in New York that are attributable to those fuels.

## IV.    THE FOREIGN AFFAIRS DOCTRINE DOES NOT PREEMPT THE CLIMATE ACT.

### A.    *City of New York* is Not Controlling.

The Chamber's and West Virginia's reliance on *City of New York* to argue that the Climate Act is precluded by the Constitution because it interferes with foreign affairs is misplaced. CC Rep. 23–25; WV Rep. 27–28. *City of New York*'s discussion of "the need for judicial caution in the face of delicate foreign policy considerations" relied solely on federal common law cases, 993 F.3d at 103, and, as demonstrated by

31

New York, the Climate Act will not trigger serious foreign policy consequences or result in the bypassing of diplomatic channels, *see* NY 56.1 ¶¶ 15–22.

Moreover, *City of New York* has been undermined by recent legal developments because it relied on both the United States' status as a party to the Framework Convention and the Paris Agreement and EPA's ability to comprehensively regulate greenhouse gases under the Clean Air Act. 993 F.3d at 103 (discussing those international agreements and the Clean Air Act's "comprehensive scheme designed to address greenhouse gas emissions," which "contemplates the need for foreign nations to promulgate reciprocal legislation"). Based on these facts, the Second Circuit concluded: "As a result, condoning an extraterritorial nuisance action here would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." *Id*.

The United States has since withdrawn from the Framework Convention and the Paris Agreement and EPA now claims that it cannot regulate greenhouse gases from motor vehicles under the Clean Air Act. *See* pp. 2–5 above. The Climate Act cannot bypass diplomatic channels to which the United States is no longer a party. And there can be no expectation that foreign nations will promulgate reciprocal legislation when EPA claims that domestic law does not do so. Indeed, any opposition the United States had to "the establishment of liability and compensation schemes at the international level," *City of New York*, 993 F.3d at 103, n.11, is no longer a concern because that issue was only raised through the Framework Convention. *See* United

32

States' Amicus Brief, *City of New York v. BP PLC*, (No. 18-cv-182), 2019 WL 1112108, at \*16 (Mar. 7, 2019) (citation omitted). Accordingly, the foreign policy concerns that formed the basis for the Second Circuit's ruling are no longer extant and the conclusions based on those concerns fall with them.[12]

### B.   The Climate Act Does Not Conflict with Foreign Policy.

Under foreign policy conflict preemption, a state law must give way only when there is a clear conflict with an express federal foreign policy that stems from an act of Congress or the Constitution itself. Neither plaintiffs nor the United States identify any statute, international agreement, or executive practice long pursued to Congress' knowledge that conflicts with the Climate Act. NY Br. 51–56.

West Virginia is wrong to rely on *City of New York* and the Landau Declaration, to demonstrate a conflict. WV Rep. 28–29. As explained above (pp. 32–33), the foreign policy concerns animating *City of New York* are gone. The Climate Act does not conflict with the concerns raised by Landau (whose declaration New York has moved to strike), which in any event do not have preemptive effect. NY Br. 52–56. Nor is West Virginia correct that "New York doesn't contest that the Act would conflict with" six foreign policy concerns raised in the Landau Declaration. *See* WV Rep. 29.

First, Fullerton, New York's economic expert, has shown that the Act will not increase energy costs. NY 56.1 ¶¶ 1–9. Second, the Act does not undermine diplomacy because the Executive Branch is not using any diplomatic channels to shield fossil

---

[12] The Chamber also argues that "the Court should disregard [Koh's] declaration, as it is inadmissible legal (not factual) opinion." CC Rep. 25. New York addresses that argument in its opposition to the Chamber's motion to strike, at 22–25, and incorporates by reference that argument here.

33

fuel producers from liability for climate damages. NY Br. 54. Third, the Act does not interfere with federal involvement in the Framework Convention or the Paris Agreement because the United States has withdrawn from both. Fourth, speculation about possible harm to foreign relations does not warrant preemption of the Act, *id.* 56 n.28, particularly where it has not been shown that any foreign-state-owned companies have sufficient contacts with New York to be held liable under the Act. Fifth, the Act does not hamper the ability of the United States to grow its economy and maintain jobs because the Act will not increase prices. NY 56.1 ¶¶ 1–9. Sixth, because the Act does not regulate emissions, it is no obstacle to a coherent national policy on the regulation of greenhouse gas emissions. NY Br. 29–32.

New York does not argue that none of Landau's concerns are foreign policy but that they are insufficient to preempt state law because they do not have the effect of domestic law. An alleged conflict with generalized concerns stated in executive orders lacks preemptive effect. "Executive Branch communications that express federal policy but lack the force of law cannot render unconstitutional" state legislation. *Barclays Bank PLC v. Franchise Tax Bd. Of Cal.*, 512 U.S. 298, 330 (1994). And such generalized concerns are all that plaintiffs have. They do not cite a single conflicting foreign policy that has the effect of domestic law—*i.e.*, any statute, international agreement, or executive practice long pursued to Congress' knowledge.

Similarly, the fact that the United States has sued New York to enjoin it from enforcing the Act, WV Rep. 28, is not evidence of preemption because the Executive's view of foreign policy is not dispositive. *Nat'l Foreign Trade Council v. Natsios*, 181

34

F.3d 38, 54 n.9 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ("Executive Branch views are not dispositive.").

### C.    The Foreign Affairs Power Does Not Field-Preempt the Climate Act.

A state law may be field-preempted only if it intrudes on foreign affairs without addressing a traditional state responsibility. West Virginia is incorrect that the Climate Act is not an exercise of traditional state responsibility. *See* NY Br. 25–32. West Virginia relies upon, *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012), which is easily distinguishable. There, the challenged statute provided redress for victims of a foreign genocide. Thus, it concerned injuries to a limited group of people wholly outside the United States, which is not a traditional state responsibility. *See* WV Rep. at 33. The Climate Act compensates New York State for costs it must incur to mitigate harms to its residents and territory, which is squarely within the State's traditional responsibilities. *See Askew v. Am. Waterways Operators, Inc.*, 411 U.S. 325, 336 (1973).

West Virginia also argues that the Act will have a direct effect on foreign countries by curbing emissions and expressing a political point of view on a matter of foreign policy. WV Rep. 32–34. But the Act does not regulate emissions or lower fossil fuel production, and liability will be determined in accordance with DEC's regulations based on objective criteria like facts and science rather than any foreign policy view.

West Virginia alleges that the criteria the Act applies to domestic and foreign companies is "subjective based on New York's determinations," WV Rep. 33, but the costs assessed to each responsible party will be determined in a consistent manner

for both domestic and foreign companies as prescribed by the regulations that DEC will adopt. *See* ECL § 76-103(3)(b). DEC will not have to engage in a subjective determination regarding the amount of fossil fuels a company has produced.

## CONCLUSION

For the reasons stated in New York's opening brief and above, New York respectfully requests that the Court deny plaintiffs' motions for partial summary judgment and grant New York's cross-motion for partial summary judgment.

Dated:      March 27, 2026
            Albany, New York

                          LETITIA JAMES
                          Attorney General of the State of New York
                          *Attorney for Defendants*

                  By: */s/ Ayah F. Badran*
                          Ayah F. Badran (Bar No. 706184)
                          Assistant Attorney General
                          Office of the New York State Attorney General
                          Environmental Protection Bureau
                          The Capitol
                          Albany, NY 12224
                          (518) 776-2394
                          Ayah.badran@ag.ny.gov

                          Monica Wagner (Bar No. 706690)
                          Deputy Bureau Chief

                          Sabita Krishnan (Bar No. 706712)
                          Laura Mirman-Heslin (Bar No. 704855)
                          Assistant Attorneys General
                          Office of the New York State Attorney General
                          Environmental Protection Bureau
                          28 Liberty Street
                          New York, NY 10005
                          (212) 416-8184