# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK
### ALBANY DIVISION

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> **LETITIA JAMES**, in her official capacity as the Attorney General of New York, *et al.*, <br><br> *Defendants.* | Civil Action No. 1:25-cv-00168-BKS-DJS |

**PLAINTIFFS' SUR-SURREPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND SURREPLY IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................ 2

    I.    EPA Did Not Strip The Clean Air Act Of Its Preemptive Effect By
         Rescinding Its Endangerment Finding ............................................................ 3

        A.    EPA's rationale confirms the Clean Air Act's continuing preemptive
              effect ..................................................................................................... 3

        B.    EPA's actions aside, the Clean Air Act comprehensively regulates
              interstate air pollution ......................................................................... 6

        C.    Federal common law further preempts .................................................. 8

    II.    The Federal Government Retains Exclusive Authority Over Foreign
         Emissions Policy Despite Withdrawing From One Climate Treaty.......................... 9

    III.  *City Of New York* Still Controls Here.......................................................... 12

CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Elec. Power, Inc. v. Connecticut,*
564 U.S. 410 (2011)...................................................................................6, 8, 13

*Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff,*
755 F. Supp. 2d 556 (D.N.J. 2010)...................................................................8

*Berlin v. United States,*
535 F. Supp. 298 (E.D.N.Y. 1982) ...................................................................5

*Boyle v. United Techs. Corp.,*
487 U.S. 500 (1988)...........................................................................................9

*City of New York v. Chevron Corp.,*
993 F.3d 81 (2d Cir. 2021) ...................................................................*passim*

*Container Corp. of Am. v. Franchise Tax Bd.,*
463 U.S. 159 (1983).........................................................................................10

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000)..............................................................................10, 11, 12

*Dames & Moore v. Regan,*
453 U.S. 654 (1981).........................................................................................10

*Hines v. Davidowitz,*
312 U.S. 52 (1941)...........................................................................................15

*Illinois v. City of Milwaukee,*
406 U.S. 91 (1972)...........................................................................................8

*Jesner v. Arab Bank, PLC,*
584 U.S. 241 (2018).........................................................................................10

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024).........................................................................................13

*Massachusetts v. EPA,*
549 U.S. 497 (2007).....................................................................................5, 11

*McCulloch v. Sociedad Nacional de Marineros de Honduras,*
372 U.S. 10 (1963)...........................................................................................11

*Nat'l Res. Def. Council v. Regan*,
    67 F.4th 397 (D.C. Cir. 2023) ........................................................................................6

*Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*,
    105 F.4th 46 (2d Cir. 2024) ...........................................................................................2

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) .......................................................................................................9

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) .....................................................................................................10

*United States v. Pink*,
    315 U.S. 203 (1942) ..................................................................................................9, 10

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .......................................................................................................6

*Zschernig v. Miller*,
    389 U.S. 429 (1968) ..................................................................................................9, 11

## Statutes and Treaties

42 U.S.C. § 7401(a)(3) ..........................................................................................................7

42 U.S.C. § 7408 ....................................................................................................................6

42 U.S.C. § 7409 ....................................................................................................................6

42 U.S.C. § 7410 ....................................................................................................................6

42 U.S.C. § 7410(a)(2)(D)(i) ..................................................................................................8

42 U.S.C. § 7415 ..................................................................................................................15

42 U.S.C. § 7416 ....................................................................................................................7

42 U.S.C. § 7426 ....................................................................................................................7

42 U.S.C. § 7521(a)(1) ...........................................................................................................5

42 U.S.C. § 7604(e) ................................................................................................................7

42 U.S.C. § 7671(9) ................................................................................................................7

42 U.S.C. § 7671c ...................................................................................................................7

42 U.S.C. § 7671d ...................................................................................................................7

Kigali Amendment to the Montreal Protocol on Substances that Deplete the
    Ozone Layer, art. 2J, Oct. 15, 2016, S. Treaty Doc. No. 117-1,
    C.N.872.2016.TREATIES-XXVII.2.f, https://tinyurl.com/uvwr29tf ................................7

United Nations Framework Convention on Climate Change, May 9, 1992, S.
    Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 ........................................................................3

**Other Authorities**

*International Actions – The Montreal Protocol on Substances that Deplete
    the Ozone Layer*, EPA, https://tinyurl.com/4tm3fyvn (last updated Mar.
    23, 2026) ..............................................................................................................................7

*Rescission of the Greenhouse Gas Endangerment Finding and Motor
    Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*,
    91 Fed. Reg. 7686 (Feb. 18, 2026) .................................................................................3, 4, 5

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED
    STATES § 339, Reporters' Note 1 (1987)...........................................................................12

Sarah McGovern, *The Future of Climate Superfund Laws*, 55 ENVTL. L.
    REP. (ELI) 10493 (2025) ....................................................................................................12

**INTRODUCTION**

The States here have already explained at length how federal law preempts New York's Climate Change Superfund Act in multiple ways. Yet now New York thinks a couple late-breaking developments have freed it from two of those constraints. For one, New York assumes it can now regulate interstate emissions because EPA recently rescinded certain emissions regulations for motor vehicles. In New York's view, this administrative action somehow limits the Clean Air Act's scope. For another, New York says the federal government has tacitly turned over even *international* emissions regulation to the States because it withdrew from one particular treaty, the United Nations Framework Convention on Climate Change. This single diplomatic action—itself an exercise of the very foreign affairs power that preempts New York's law—has purportedly wiped the slate clean.

To describe these arguments in plain terms is nearly enough to refute them. New York is wrong on both counts.

*First*, EPA can't modify the Clean Air Act's text, through rulemaking or otherwise. The law's scope exists independently of what the agency says. In any event, EPA didn't disclaim general emissions-regulation authority in its recent action. The agency just determined that one specific CAA provision didn't give it the authority it previously invoked when it made the so-called "endangerment finding" about mobile carbon emissions. And the Clean Air Act still occupies the field, so there's no room for New York to step in. Not that it even matters if the CAA *did* fall away; federal common law would still provide a preemptive backstop that would foreclose the sort of sweeping law that New York has adopted.

1

*Second*, the Constitution's grant of foreign affairs power to the federal government wasn't diminished when the United States withdrew from the Framework Convention. The power remains with the federal government regardless of how it's exercised. The decision not to be part of a specific treaty doesn't permit States to conduct their own foreign policy, especially where the Executive Branch's interest in foreign relations—and its deliberate choice to abstain from certain action in the international space—will be directly harmed by a state-level effort to march ahead anyway.

*Third*, New York still fails to distinguish the Second Circuit's decision in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), even with these recent developments now in hand. The Second Circuit didn't hang its hat there on either the endangerment finding or the Framework Convention. It applied the Clean Air Act and the Constitution. Those federal laws were enough there, and they're enough here. And New York is asking this Court to play a dangerous game in inviting it to ignore the decision now. "[A] District Court must follow controlling precedent—even precedent the District Court believes may eventually be overturned—rather than preemptively declaring that [the Second Circuit's] caselaw has been abrogated." *Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 50 (2d Cir. 2024).

The Court should grant Plaintiffs summary judgment on Counts I and II and deny Defendants' motion for summary judgment.

## ARGUMENT

Recent developments haven't changed this case. When EPA rescinded a previous endangerment finding, it determined that the finding was improperly made under the Clean

Air Act. EPA wasn't somehow trying to alter the Clean Air Act's text or limit its reach. It's an agency—it can't. Likewise, when the United States withdrew from the Framework Convention, *see* United Nations Framework Convention on Climate Change, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107, that diplomatic decision didn't give the States free rein to carry out their own foreign affairs. That power remains firmly with the federal government, even when it's not being exercised in specific ways. One president can't abdicate the foreign affairs power.

So *City of New York* remains dispositive. That case's Clean Air Act preemption and foreign-affairs-doctrine analyses didn't revolve around either agency determinations or specific federal actions. The Second Circuit instead deployed legal principles based on the Clean Air Act's text and the Constitution. Neither of those foundations has been upended, so the outcome here should be the same as in *City of New York*. The Act is preempted.

**I.    EPA Did Not Strip The Clean Air Act Of Its Preemptive Effect By Rescinding Its Endangerment Finding.**

New York misunderstands the effect of EPA's recent rescission of the greenhouse gas endangerment finding. *See Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7686 (Feb. 18, 2026). For at least three reasons, federal law continues to preempt state regulation of interstate emissions.

**A. EPA's rationale confirms the Clean Air Act's continuing preemptive effect.**

The Clean Air Act's text informs the preemption analysis. EPA's rescission rule doesn't change that analysis or undermine the Clean Air Act's "comprehensive statutory scheme." *City of New York*, 993 F.3d at 99. New York's contrary arguments are wrong.

3

New York first stumbles by claiming that EPA said it had "no authority to control greenhouse gas emissions from vehicles." N.Y. Reply 18. Not so. EPA explained that the rescission was necessary because the Clean Air Act "does not authorize [the agency] to prescribe [greenhouse gas] emission standards" when those standards are "based on global climate change concerns." 91 Fed. Reg. at 7695. Far from disclaiming authority to regulate interstate pollution wholesale, EPA determined that the *basis* for the previous endangerment finding was improper. In doing so, EPA hewed to Clean Air Act Section 202(a)(1)'s text: "[a]ir pollution," the agency explained, "mean[s] pollution that harms public health or welfare through local or regional exposure." *Id.* at 7722. This meaning excludes "gases that are not harmful in that sense but may contribute to global phenomena on a far more attenuated chain of causation." *Id.* In other words, EPA cannot regulate emissions "that may endanger public health or welfare only on a global scale and through an attenuated and indirect causal chain." *Id.* at 7714. But the agency is still the exclusive regulator for interstate emissions that cause "smog and health and welfare impacts related to inhalation and physical contact." *Id.*

Based on EPA's understanding of when it can regulate, the rescission was warranted. In making the endangerment finding, the agency previously failed its statutory duties by "sever[ing] … the consideration of contribution and fail[ing] to engage with the standards that must issue when making such a finding." 91 Fed. Reg. at 7695. The Clean Air Act permits EPA to regulate only if the agency first determines that emissions "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public

4

health and welfare." 42 U.S.C. § 7521(a)(1). Such a finding is therefore "a prerequisite to prescribing emission standards." 91 Fed. Reg. at 7704.

Although greenhouse gases might be an "air pollutant" under the Clean Air Act, *Massachusetts v. EPA*, 549 U.S. 497, 528-29 (2007) (quoting 42 U.S.C. § 7602(g)), Congress said that status alone was insufficient to warrant active regulation. EPA would still need to determine that greenhouse gases pose the kind of danger that Section 202 envisions. In line with that congressional direction, the rescission doesn't say EPA *can't* regulate interstate greenhouse gas emissions under any conditions. It just explains that the agency never provided a proper basis for doing so.

In any event, EPA didn't purport to amend the statute's scope when it rescinded the endangerment finding. It knew it couldn't. *See Berlin v. United States*, 535 F. Supp. 298, 300 (E.D.N.Y. 1982) ("[An] administrative agency cannot alter [C]ongress' intent in enacting the underlying statute. Nor can the agency substitute its judgment for that of [C]ongress."). Instead, the agency stressed that "section 202" is "a critical part of the [Clean Air Act's] comprehensive national framework for regulating air pollution." 91 Fed. Reg. at 7696. Further, EPA emphasized that "section 209(a)," which bars States from setting or enforcing vehicle emissions standards, "continues to apply by its own force to preempt State laws, regulations, and causes of action." *Id.* at 7738. And "independently of CAA section 209(a)'s express preemption provision," the Clean Air Act "continues to preempt state common-law claims and statutes that seek to regulate out-of-state emissions." *Id.* at 7739.

5

Ultimately, EPA retains "the power to decide" the endangerment question as to greenhouse gas emissions. *Nat'l Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023). In the future, the agency may determine that such emissions do satisfy the Clean Air Act's endangerment requirement. After all, EPA is the one that decides "whether and how to regulate" interstate emissions. *Am. Elec. Power, Inc. v. Connecticut* (*AEP*), 564 U.S. 410, 426 (2011). So even though the agency has "decline[d] to regulate carbon-dioxide emissions" from motor vehicles, the States still "have no warrant … to upset the Agency's expert determination." *Id.* at 462-27. Especially not by way of a sweeping law that purports to regulate emissions of all sorts.

## B. EPA's actions aside, the Clean Air Act comprehensively regulates interstate air pollution.

The endangerment finding was never the reason the Clean Air Act preempts New York's law—after all, the States have cited the statutes, not the regulations. To be sure, the finding was a practical example of EPA exercising (albeit improperly) its exclusive authority over interstate air pollution. But "the relevant question for purposes of displacement is whether the field has been occupied, not whether it has been occupied in a particular manner." *AEP*, 564 U.S. at 426 (cleaned up). The answer to that question is clear enough: the Clean Air Act comprehensively regulates interstate emissions.

For instance, EPA determines National Ambient Air Quality Standards. 42 U.S.C. §§ 7408-7410. Those standards set "the maximum airborne concentration of a pollutant that the public health can tolerate." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001). States then decide "how best to achieve EPA emissions standards within [the State's] domain." *AEP*, 564 U.S. at 428. EPA thus has national standard-setting authority, while

"air pollution control at its source" is left to "the primary responsibility of States and local governments."  42 U.S.C. § 7401(a)(3).

The Clean Air Act also directly regulates greenhouse gas emissions through the execution of the Montreal Protocol on Substances that Deplete the Ozone Layer.  *See* 42 U.S.C. §§ 7671(9), 7671c, 7671d.  The Montreal Protocol "gradually eliminat[es] the production and consumption of ozone depleting substances to limit their damage to the earth's ozone layer."  *International Actions – The Montreal Protocol on Substances that Deplete the Ozone Layer*, EPA, https://tinyurl.com/4tm3fyvn (last updated Mar. 23, 2026).  And the Kigali Amendment to that protocol specifically addresses and requires reduction of certain greenhouse gas emissions, including hydrofluorocarbons.  Kigali Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, art. 2J, Oct. 15, 2016, S. Treaty Doc. No. 117-1, C.N.872.2016.TREATIES-XXVII.2.f, https://tinyurl.com/uvwr29tf.  This, too, demonstrates that the Clean Air Act expansively regulates the kinds of interstate, extraterritorial emissions that New York seeks to regulate.

The Clean Air Act teems with other indications of the law's comprehensive regulation of interstate emissions.  For instance, both the States' rights savings clause, 42 U.S.C. § 7416, and the citizen-suit savings clause, *id.* § 7604(e), reference only a *source* state's laws and regulations.  When a State suspects a source or group of sources in another State is in violation of their air quality implementation plan, the law instructs the concerned State to petition EPA, which then has investigative and enforcement authority over any violations.  *Id.* § 7426.  Similarly, State plans must have "adequate provisions" that

7

"prohibit[]" their sources "from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to" EPA's nationally set standards. 42 U.S.C. § 7410(a)(2)(D)(i). So interstate disputes are supposed to be decided by the national overseer, not by a race-to-the-bottom approach of ad hoc, regulatory statutes at the state level.

At bottom, "[t]he Clean Air Act is no less an exercise of [Congress's] considered judgment concerning the regulation of air pollution because it permits emissions *until* EPA acts." *AEP*, 564 U.S. at 426 (cleaned up). "The critical point is that Congress delegated to EPA the decision whether and how to regulate." *Id.* That "delegation is what displaces" other laws. *Id.* New York cannot attempt to gap-fill simply because EPA isn't actively exercising its exclusive authority in the State's preferred manner.

## C. Federal common law further preempts.

Even before the Clean Air Act came to be, a body of "specialized federal common law" governed interstate pollution. *AEP*, 564 U.S. at 421 (cleaned up). This federal common law spawned from the "overriding federal interest in the need for a uniform rule of decision." *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6 (1972). And "federal common law has the same preemptive force as the Constitution or laws of Congress." *Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 599 (D.N.J. 2010). So altogether, "state statutes or decisions" do not control on matters of interstate pollution. *Milwaukee*, 406 U.S. at 105.

The Clean Air Act displaced this federal common law but did not rob the federal common law of its preemptive force. *City of New York*, 993 F.3d at 95. Yet if New York

8

were right that EPA's endangerment rescission somehow transformed the statute itself, then federal common law would kick in. That common law would preempt "the operation" and "application of" New York's law. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (cleaned up). Thus, even if the rescission had trimmed the Clean Air Act's sails (it didn't), it would still be "inappropriate for state law to control" in this uniquely federal field. *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). And for that reason, New York's endangerment arguments merely return it to square one.

## II.    The Federal Government Retains Exclusive Authority Over Foreign Emissions Policy Despite Withdrawing From One Climate Treaty.

The United States' withdrawal from the Framework Convention also didn't signal the federal government's relinquishment of its foreign affairs power. The "foreign policy concerns," N.Y. Reply 33, preempting New York's law do not necessarily turn on whether the federal government was part of any specific treaty or convention. Rather, the concerns stem from the Act's "direct impact upon foreign relations" that "may well adversely affect the power of the central government to deal with" international problems. *Zschernig v. Miller*, 389 U.S. 429, 441 (1968). Indeed, "even in absence of a treaty" or other formal law, "a State's policy" would still be preempted if it directly "disturb[ed] foreign relations." *Id.* The Act does just that.

The Act directly targets foreign entities, including foreign governments themselves. This direct targeting would be a "source[] of friction" between the federal government and the foreign nations New York penalizes, thus creating an "impediment to … friendly relations" between the countries involved. *United States v. Pink*, 315 U.S. 203, 225 (1942). Such an impediment squarely implicates the President's authority as the "sole organ of the

9

federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).  Indeed, the President frequently addresses financial sources of friction, like the Act's fines.  *See Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981) (noting a "longstanding practice" of the President discharging "the claims of [U.S.] nationals against foreign countries" by "executive agreement without the advice and consent of the Senate").  And a state law cannot "interfer[e] with the conduct of our foreign relations by the Executive."  *Pink*, 315 U.S. at 240 (Frankfurter, J., concurring).

These concerns are not hypothetical here: the Executive Branch warns that the Act will indeed create such friction, explaining that it "threatens to harm foreign relations between the United States and foreign countries where such producers are based or have substantial operations."  Landau Decl. ¶ 18, ECF 222-1.  And "[a]lthough [courts] do not unquestionably defer to the legal judgments expressed in Executive Branch statements," neither do courts "question[] their competence to show the practical difficulty" of achieving international goals.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 385-86 (2000).  After all, the Executive Branch is better positioned to "determin[e] precisely when foreign nations will be offended by particular acts."  *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983).  And the "nuances" of "the foreign policy of the United States … are much more the province of the Executive Branch and Congress than of th[e] [courts]."  *Id.* at 196.  Thus, "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns."  *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 265 (2018).

The Court should heed the Executive Branch's warning.  Congress tasked "the State Department … to formulate United States foreign policy with reference to environmental matters relating to climate."  *Massachusetts*, 549 U.S. at 534.  And according to the Executive Branch, New York's law "undermines the President's capacity … for effective diplomacy" by placing unjustified fines on foreign governments and their citizens.  *Crosby*, 530 U.S. at 381.  This impact is more than "some incidental or indirect effect in foreign countries," *Zschernig*, 389 U.S. at 434—it will constitute a direct and deliberate effort to interfere in international relations by imposing extraterritorial regulation.  *Cf. McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963) (explaining how a presumption against extraterritoriality applies, as the Court is reluctant to "sanction the exercise of local sovereignty under such conditions in this delicate field of international relations" (cleaned up)).

It would be especially odd to infer some renunciation of the foreign affairs power here given the disconnect between the cited treaty and the relevant state law.  The Framework Convention never addressed a compensation scheme like the one New York's law imposes.  So the United States' withdrawal doesn't signal acceptance of a strict-liability payment structure for greenhouse gas emissions.  But even if New York's law did broadly align with the United States's objectives, the foreign affairs power would still preempt New York's intrusion into the field.  *See Crosby*, 530 U.S. at 373-74 (finding federal statute preempted State law that undermined directive to "President to proceed diplomatically in developing a comprehensive, multilateral strategy toward Burma," despite State law's alignment with nation's foreign policy).

11

To be sure, the Framework Convention constitutes an exercise of the political branches' foreign affairs power.  And the United States' withdrawal shows that the Executive Branch has authority to pull back from a treaty "that no longer serves the national interest."  RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 339, Reporters' Note 1 (1987).  But neither the United States' entry into nor withdrawal from the Framework Convention invites New York to try its hand at international air pollution regulation. That the United States made a conscious choice to exercise its power over foreign affairs in this way does not give New York "implicit permission" to step in and fill what it sees as a gap in international regulations.  *Crosby*, 530 U.S. at 387-88.  The foreign affairs doctrine still preempts the Act.

### III.    *City Of New York* Still Controls Here.

Finally, neither the rescission nor the withdrawal put New York's law beyond *City of New York*'s precedential reach.  That decision didn't turn on EPA's endangerment finding for its Clean Air Act analysis.  And it didn't rely on the Framework Convention in holding that the foreign affairs doctrine bars international regulation of greenhouse gas emissions.  "Unfortunately for Climate Superfund laws, the analogy to *City of New York* is hard to escape," even in light of new developments.  Sarah McGovern, *The Future of Climate Superfund Laws*, 55 ENVTL. L. REP. (ELI) 10493, 10496 (2025).  Its reasoning still controls.

*First*, the Second Circuit looked only at the Clean Air Act's text when it concluded that the law "[speaks] directly to" the issue of "regulation [of] greenhouse gas emissions." *City of New York*, 993 F.3d at 96 (cleaned up).  Indeed, "domestic transboundary emissions

12

of greenhouse gases" fall into EPA's domain based on that text alone. *Id.* at 95. Congress's choice thus rendered it "beyond cavil that the Clean Air Act displaced federal common law" and thereby "occupied the field" of interstate greenhouse gas emissions regulation. *Id.* The Court's only citation to the endangerment finding (through *AEP*) was for the proposition that "[g]reenhouse gases once emitted 'become well mixed in the atmosphere.'" *Id.* at 92 (quoting AEP, 564 U.S. at 422 (quoting Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,514 (Dec. 15, 2009))). That *factual* statement didn't undergird the Second Circuit's *legal* conclusion that the Clean Air Act operated in a field "in which the states have traditionally *not* occupied." *Id.* at 98 (cleaned up).

In the end, the Clean Air Act's "well-defined and robust statutory and regulatory scheme" dictated *City of New York*'s outcome. 993 F.3d at 97. That scheme "entrust[s] [the] complex balancing of interests that climate change demands" to EPA, but its bounds don't ebb and flow with EPA's decisions. *Id.* at 98 (cleaned up); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (explaining that in statutory interpretation, courts must be the ones to "fix[] the boundaries of [the] delegated authority" (cleaned up)). And adding new constraints and new remedies to Congress's Clean Air Act regime—punishing conduct often expressly permitted and endorsed under the CAA framework—wouldn't be "filling a gap"; it would be "providing a different regulatory scheme than the one chosen by Congress altogether. *City of New York*, 993 F.3d at 96 (cleaned up) (quoting *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 866 (9th Cir. 2012) (Pro, J., concurring)). Here, like in

13

*City of New York*, "it is enough … that the issues raised in this dispute concerning emissions are squarely addressed by the Clean Air Act." *Id.* at 98.

*Second*, the Framework Convention didn't play a pivotal role in *City of New York*'s foreign affairs analysis. The court instead focused on the "global" nature of "climate change and greenhouse gas emissions." *City of New York*, 993 F.3d at 88. It referred to the Framework Convention only as part of a description of ways in which the "United States has worked cooperatively with foreign governments … to coordinate a global response" to these issues. *Id.* In that way, the Framework Convention stands as just one of many "diplomatic channels" used by the federal government. *Id.* Other "multi-lateral agreements" followed. *Id.*

Climate change's international reach led the Second Circuit to "proceed cautiously … so as to avoid unintentionally stepping on the toes of the political branches." *City of New York*, 993 F.3d at 102. The court explained that the local government's attempt to "hold the Producers accountable for purely foreign activity (especially the Foreign Producers)" was impermissible because it would "affect the price and production of fossil fuels abroad." *Id.* at 103. Allowing these penalties "would also bypass the various diplomatic channels that the United States uses to address this issue." *Id.* The court then pointed to the Framework Convention as an example, but it never signaled that the examples were exhaustive or that the Framework Convention—rather than the federal government's foreign affairs power generally—stood as the legal basis for preemption. *See id.*

Rather than violate any one treaty or convention, the court feared that local regulation of international actors "would obviously sow confusion and needlessly complicate

14

the nation's foreign policy." *City of New York*, 993 F.3d at 103.  The regulation also "clearly infring[ed] on the prerogatives of the political branches." *Id.*  Those prerogatives include "the United States' longstanding position in international climate-change negotiations" that it "oppose[s] the establishment of liability and compensation schemes at the international level." *Id.* at 103 n.11 (cleaned up).  And allowing extraterritoriality "would be all the more out of place given that Congress created a comprehensive scheme to address greenhouse gas emissions—the Clean Air Act—which it declined to extend beyond our borders." *Id.* at 103; *see also, e.g.*, 42 U.S.C. § 7415 (considering international emissions effects, but only in the context of regulating *domestic* sources, not foreign ones).

So the foreign affairs doctrine doesn't preempt the Superfund Act because of the Framework Convention, or any other single treaty.  It preempts the Act because New York's law's extraterritorial effect "would not only risk jeopardizing our nation's foreign policy goals" writ large "but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." *City of New York*, 993 F.3d at 103.  "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941).

## CONCLUSION

The Court should grant Plaintiffs summary judgment on Counts I and II and deny Defendants' motion for summary judgment.

Respectfully submitted,

Dated: April 10, 2026

JOHN B. MCCUSKEY
 ATTORNEY GENERAL OF WEST VIRGINIA

/s/ *Caleb B. David*
Michael R. Williams
 *Solicitor General*
Caleb B. David
 *Deputy Solicitor General*
Caleb A. Seckman
 *Assistant Solicitor General*

Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
caleb.b.david@wvago.gov

*Counsel for State of West Virginia*

STEVE MARSHALL
 ATTORNEY GENERAL OF ALABAMA

/s/ *Robert M. Overing*
Robert M. Overing*
 *Deputy Solicitor General*

Office of the Attorney General
of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Robert.Overing@AlabamaAG.gov

*Counsel for State of Alabama*

TIM GRIFFIN
 ATTORNEY GENERAL OF ARKANSAS

/s/ *Autumn Hamit Patterson*
Autumn Hamit Patterson*
 *Solicitor General*

Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
(501) 682-3661
Autumn.Patterson@Arkansasag.Gov

*Counsel for the State of Arkansas*

16

CHRISTOPHER M. CARR
  ATTORNEY GENERAL OF GEORGIA

John Henry Thompson
  *Solicitor General*

*/s/ Elijah O'Kelley*
Elijah O'Kelley*
  *Assistant Solicitor General*

Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
  ATTORNEY GENERAL OF IDAHO

*/s/ Michael A. Zarian*
Michael A. Zarian #12418ID*
  *Solicitor General*

Office of the Idaho Attorney General
700 W. Jefferson St., Suite 210,
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

*Counsel for the State of Idaho*

BRENNA BIRD
  ATTORNEY GENERAL OF IOWA

*/s/ Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

KRIS W. KOBACH
  ATTORNEY GENERAL OF KANSAS

*/s/ Anthony J. Powell*
Anthony J. Powell*
  *Solicitor General*

Office of the Kansas Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel.: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

17

RUSSELL COLEMAN
  ATTORNEY GENERAL OF KENTUCKY

/s/ *Victor B. Maddox*
Victor B. Maddox (KBA No. 43095)*
Jason P. Woodall (KBA No. 95013)*

Kentucky Office of the Attorney General
310 Whittington Parkway, Suite 101
Louisville, KY  40222
(502) 696-5300
Victor.Maddox@ky.gov
Jason.Woodall@ky.gov

*Counsel for Commonwealth of Kentucky*

LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

/s/ *J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
  *Solicitor General*

Office of the Louisiana Attorney General
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6705
AguinagaB@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
  ATTORNEY GENERAL OF MISSISSIPPI

/s/ *Justin L. Matheny*
Justin L. Matheny*
  *Deputy Solicitor General*

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

CATHERINE HANAWAY
  ATTORNEY GENERAL OF MISSOURI

/s/ *Louis J. Capozzi*
Louis J. Capozzi *
  *Solicitor General*

Office of The Missouri Attorney General
Solicitor General
Office of Missouri Attorney General
815 Olive Street
St Louis, MO 63101
717-802-2077
Email: louis.capozzi@ago.mo.gov

*Counsel for State of Missouri*

18

AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ *Christian B. Corrigan*
Christian B. Corrigan*
  *Solicitor General*

Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov

*Counsel for State of Montana*


DREW H. WRIGLEY
  ATTORNEY GENERAL OF NORTH DAKOTA

/s/ *Philip Axt*
Philip Axt*
  *Solicitor General*

600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

*Counsel for the State of North Dakota*


MICHAEL T. HILGERS
  ATTORNEY GENERAL OF NEBRASKA

/s/ *Zachary A. Viglianco*
Zachary A. Viglianco*
  *Principal Deputy Solicitor General*

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
zachary.viglianco@nebraska.gov

*Counsel for State of Nebraska*


DAVE YOST
  ATTORNEY GENERAL OF OHIO

/s/ *Mathura Sridharan*
Mathura Sridharan *
  *Solicitor General*

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
Email: mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

19

GENTNER DRUMMOND
  ATTORNEY GENERAL OF OKLAHOMA

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II*
  Solicitor General

Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

Counsel for State of Oklahoma


MARTY J. JACKLEY
  ATTORNEY GENERAL OF SOUTH DAKOTA

/s/ Emily Greco
Emily Greco*
  Assistant Attorney General

South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
605-773-3215
emily.greco@state.sd.us

Counsel for State of South Dakota

ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

/s/ J. Emory Smith, Jr.
J. Emory Smith, Jr.*
  Solicitor General

Office of the Attorney General of
South Carolina
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-3680
esmith@scag.gov

Counsel for State of South Carolina


JONATHAN SKRMETTI
  ATTORNEY GENERAL AND REPORTER OF
TENNESSEE

/s/ J. Matthew Rice
J. Matthew Rice*
  Solicitor General

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
615-532-6026
Email: matt.rice@ag.tn.gov

Counsel for State of Tennessee

20

KEN PAXTON
  ATTORNEY GENERAL OF TEXAS

Brent Webster
*First Assistant Attorney General*

Ralph Molina
*Deputy First Assistant Attorney General*

Austin Kinghorn
*Deputy Attorney General for Legal
Strategy*

*/s/ Ryan G. Kercher*
Ryan G. Kercher*
  *Chief, Special Litigation Division*
Texas Bar No. 24060998

Zachary Berg*
  *Special Counsel*
Tex. State Bar No. 24107706

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Kercher@oag.texas.gov
Zachary.Berg@oag.texas.gov
Kathleen.Hunker@oag.texas.gov

*Counsel for State of Texas*

DEREK E. BROWN
  ATTORNEY GENERAL OF UTAH

*/s/ Gary T. Wight*
Gary T. Wight (Utah Bar No. 10994)*
  *Assistant Attorney General*

1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah*

21

KEITH G. KAUTZ
  ATTORNEY GENERAL OF WYOMING

/s/ Ryan Schelhaas
Ryan Schelhaas*
  Chief Deputy Attorney General

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

Counsel for State of Wyoming

WEST VIRGINIA COAL ASSOCIATION AND
AMERICA'S COAL ASSOCIATIONS
By Counsel

/s/ Christopher M. Hunter
Robert G. McLusky, WVBN 2489*
Christopher M. Hunter, WVBN 9768*

Jackson Kelly, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
(304) 340-1381
rmclusky@jacksonkelly.com
chunter@jacksonkelly.com

Counsel for West Virginia Coal
Association and America's Coal
Associations

GAS AND OIL ASSOCIATION OF WEST
VIRGINIA, INC.
By Counsel

/s/ *Ivan L. London*
Ivan L. London*
William E. Trachman*
Alexander Khoury

Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
916-284-3255
ilondon@mslegal.org
wtrachman@mslegal.org
akhoury@mslegal.org

*Counsel for Gas and Oil Association of
West Virginia, Inc.*


*pro hac vice

ALPHA METALLURGICAL RESOURCES, INC.
By Counsel

/s/ *Michael W. Kirk*
Michael W. Kirk*
Adam P. Laxalt*
Brian W. Barnes*
Megan M. Wold*

Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
mkirk@cooperkirk.com
alaxalt@cooperkirk.com
bbarnes@cooperkirk.com
mwold@cooperkirk.com

*Counsel for Plaintiff
Alpha Metallurgical Resources, Inc.*